EXHIBIT 8

# SUPERIOR COURT OF NEW JERSEY

STATE OF NEW JERSEY,                   :

    Plaintiff-Respondent,             :

                                      :

                                      :

JAMIE FARTHING,                        :

    Defendant-Appellant.              :

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION

DOCKET NO.: A-003481-07T4

<u>CRIMINAL ACTION</u>

ON APPEAL FROM FINAL ORDER
DENYING PETITION FOR POST-
CONVICTION RELIEF, SUPERIOR
COURT OF NEW JERSEY, LAW
DIVISION, BERGEN COUNTY


SAT BELOW

The Honorable Donald R. Venezia, J.S.C.

---

## BRIEF AND APPENDIX FOR
## DEFENDANT-APPELLANT
## APPENDIX (Da 1 to Da 115)

---

Jamie Farthing
#18567/SBI#985369-B
New Jersey State Prison
P.O. Box 861 – 1EE
Trenton, NJ 08625-0861

**<u>Presently Confined</u>**

# TABLE OF CONTENTS

**PAGE NO(S)**

PROCEDURAL HISTORY............................................................................1

STATEMENT OF FACTS........................................................................5

STATEMENT OF FACTS ON APPEAL OF DENIAL OF SECOND

POST-CONVICTION RELIEF.................................................................17

**LEGAL ARGUMENTS**

POINT I

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND BECAUSE SHE WAS PREJUDICED THERREBY, THE COURT SHOULD GRANT HER PETITION FRO POST-CONVICTION RELIEF. AND BECAUSE THE PETITIONER PRESENTED ENOUGH PROOF FOR A PRIMA FACIE CASE SHOWING THAT SHE WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL, THE COURT SHOULD GRANT HER AN EVIDENTIARY HEARING ON THIS ISSUE IT IS A VIOLATION OF APPEALLNT'S SIXTH AMENDMENT RIGHT TO EVFFECTIVE ASSISTANCE OF COUNSEL.......................................................................................19

    a. Ineffective assistance of counsel because counsel did not object to the jury not properly instructed that an accomplice may intend to commit a lower-degree offense than the main actor(s), and because there was no evidence that the offense, nor for a homicide to result, her conviction of first-degree felony murder must be amended to any lesser-included offense.

    b. Ineffective assistance of counsel for failure to object to the disparity between the sentences imposed on a 17-year old co-defendant as compared to age of the defendant who had just turned 18-years of age, renders defendant's sentence manifestly unjust and unduly punitive, thus requiring reversal and a remand resentencing.

POINT II

FAILURE OF POST-CONVICTION RELIEF COUNSEL TO ADVANCE ALL OF THE ISSUES RAISED BY DEFENDANT. R. 3:22-6(d).......................................28

    a. Counsel failed to raise and argue the defendant's diminished capacity defense in Conjunction with voluntary intoxication defense for presentation to the jury.

**TABLE OF CONTENTS(cont'd)**

**PAGE NO(S)**

POINT III

TRIAL COURT ABUSED IT'S DISCRETION DURING THE FIRST POST-CONVICTION RELIEF HEARING; DEFENDANT'S CLAIMS SHOULD NOT BE BARRED ON PROCEDURAL GROUNDS.................................................40

POINT IV

THE CULMULATIVE ERRORS OF COUNSEL CAUSED PREJUDICE TO THE DEFENDANT DENYING HER THE EFFECTIVE ASSISTANCE OF COUNSEL, AND A MENINGFUL AND VIABLE DEFENSE DURING HER FIRST POST-CONVICTION RELIEF HEARING................................................................43

CONCLUSION..................................................................................44

**INDEX TO APPENDIX**

INDICTMENT.................................................................................Da 1 to 7

VERDICT SHEET.........................................................................Da 8 to 15

JUDGMENT OF CONVICTION/ORDER FOR COMMITMENT..............Da 16 to 17

AMENDED JUDGMENT OF CONVICTION/ ORDER FOR COMMITMENT.......................................................Da 18 to 20

NOTICE OF APPEAL.....................................................................Da 21

APPELLATE DIVISION'S OPINION.............................................Da 22 to 54

JUDGE VENEZIA'S LETTER TO DEFENDANT.....................................Da 55

APPELLATE DIVISION'S ORDER.........................................................Da 56

SUPREME COURT'S ORDER DENYING PETITION FOR CERTIFICATION...........................................................Da 57

PETITION FOR POST-CONVICTION RELIEF.................................Da 58 to 64

AMENDED PETITION FOR POST-CONVICTION RELIEF...................Da 65 to 71

## TABLE OF CONTENTS(cont'd)
## INDEX TO APPENDIX(cont'd)

**PAGE NO(S)**

SUPPLEMENTAL PETITION FOR POST-CONVICTION
RELIEF..............................................................................Da 72 to 74

ORDER DENYING PETITION OF POST-CONVICTION
RELIEF..............................................................................Da 75 to 76

NOTICE OF APPEAL...................................................…..……......Da 77

BRIEF IN SUPPORT OF POST-CONVICTION RELIEF……….….........Da 78 to 115

**APPENDIX VOLUME I**...................................................Da 116 to Da 220

APPEAL BRIEF DENYING PETITION FOR
POST-CONVICTION RELIEF.............................................Da 116 to 154

SECOND PETITION FOR POST-CONVICTION RELIEF…….…..........Da 155 to 158

MOTION FOR NEW TRIAL...............................................…...…......Da 159

ORDER DENYING MOTION FOR NEW TRIAL…………………..…........Da 160

NOTICE OF APPEAL.....................................................Da 161 to Da 162

ORDER DENYING MOTION.............................................…....Da 163

BRIEF IN SUPPORT OF POST-CONVICTION RELIEF……….……Da 164 to Da 210

ORDER DENYING SECOND POST-CONVICTION
RELIEF................................................................…..…...Da 210 to Da 216

NOTICE OF APPEAL.....................................................Da 217 to Da 218

ORDER DENYING ASSIGNMENT OF COUNSEL
FOR SECOND POST-CONVICTION RELIEF...........................….....Da 219

CLASSIFICATION DOCUMENT SUPPORTING
TRANSPORT....................................................…..…...…....Da 220

-iii-

## TABLE OF CASES CITED(cont'd)
### TABLE OF CASES CITED

State v. Anderson, 117 N.J. Super. 507, 519 (App. Div. 1971), 60 N.J. 437 (1972) ......20

State v. Bellucci, 81 N.J. 531 (1980) ...............................................20

State v. Bielkiewicz, 267 N.J. Super.520, 528, 534 (App. Div. 1993)..................21, 23

State v. Blake, 234 N.J. Super. 166 (1993)...............................................21, 23

State v. Bridges, 254 N.J. Super. 541, 566 (App. Div. 1992), N.J. 447 (1993).............21

State v. Buonadonna, 122 N.J. 22, 39 (1991)...................................20

State v. Carter, 85 N.J. 300, 314 (1981).......................................34

State v. Christener, 71 N.J. 55, (1976).....................................23

State v. Clark, 347 N.J. Super. 507............................................33

State v. Coruzzi, 189 N.J. Super. 273, 319 (App. Div.) certif.. den.,
94 N.J. 531 (1983)........................................................28

State v. Deliberto, 149 N.J. 90, 101 (1997).................................38

Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, (1985)...........................29

State v. Farthing, 165 N.J. 530 (2000)........................................3

State v. Farthing, 331 N.J. Super. 58 (App. Div. 2000)..........................2

State v. Fritz, 105 N.J. 42 (1987)................................19, 20, 31

State v. Giorgianni, 189 N.J. Super. 220, 230 (App. Div.) certif.. den.,.
156 N.J. (1983)..........................................................29

State v. Gregg, 278 N.J. Super. 182 (1994).....................................33

State v. Harris, 181 N.J. 391 (2004).........................................21

State v. Hicks, 54 N.J. 390, 391 (1969)......................................24

**TABLE OF CONTENTS (cont'd)**
**TABLE OF CASES CITED (cont'd)**

PAGE NO(S)

State v. Hreniuk, Appellate Docket No. A-5667-04T4, April 18, 2007.......................38

State v. Johnson, 309 N.J. Super. 257, 268 (App. Div. certif.. den., 156 N.J. 387 (1998)......................................................................38

State v. Jardan, 147 N.J. 409, 422-23 (1996)................................................23

State v. Lee, 235 N.J. Super. 410 (App Div 1999)..............................................24

State v. Malloy, 324 N.J. Super. 525, 533 (App Div 1999)..............................23

State v. Morant, 241 N.J. Super. 121, 142 (App. Div. 1999)................................24

State v. Moore, 273 N.J. Super. 118, 12 (App. Div. 1994), certif.. den., 137 N.J. 311 (1994)........................................................................23, 40

State v. Norman, 151 N.J. 5, 37 (1997)....................................................22

State v. Pineda, 151 N.J. 621, 625 (1990)....................................................24

State v. Poteet, 61 N.J. 493 (1972)...........................................................26

Powell v. Alabama, 287 U.S. 45, 71, 53, S. Ct. 55, 65, 77 L.Ed. 158, 172 (1932)........................................................................29

State v. Preciose, 129 N.J. 451 (1992)........................................18, 34, 40, 41, 42

State v. Roach, 146 N.J. 208, 232 (1996)....................................................25

Rodriguez v. Rosenbalt, 58 N.J. 281, 295 (1974)............................................30

State v. Rue, 175 N.J. 1, 811 A.2d 425 (2000)..........................................30, 32

State v. Russo, 330 N.J. Super. 119, 140 (App. Div. 2000)................................35

State v. Sprano, 249 N.J. Super. 419........................................................39

State v. Sugar, 84 N.J. 1, 17 (1980).........................................................29

-v-

**TABLE OF CONTENTS (cont'd)**
**TABLE OF CASES CITED (cont'd)**

State v. Towey, 114 N.J. 69, 78-79 (1989)...................................................24

State v. Vick, 117 N.J. 288-289 (1980)......................................................23

State v. Webster, 185 N.J. 399, 866 A. 2d 663 (2006)......................................29, 34

State v. Weeks, 107 N.J. 396, 404-410 (1997).............................................21

Strickland v. Washington, 466 U.S. 688, 104 S. Ct. 2052,
80 L.Ed. 2d 674 (1984)...............................................18, 19, 20, 35, 39, 41, 42

Viviano v. CBS, 1-1 N.J. 538 (1986)........................................................44

**TABLE OF STATUTES CITED**

N.J.S.A. 2C:4-2..............................................................................38

N.J.S.A. 2C:11-3a (1)........................................................................1

N.J.S.A. 2C:11-3a (3)........................................................................1

N.J.S.A. 2C:13-1b (1)........................................................................1

N.J.S.A. 2C:15-1.............................................................................1

N.J.S.A. 2C:39-4a............................................................................1

N.J.S.A. 2C:39-5b............................................................................1

**TABLE OF RULES CITED**

R. 2:10-2....................................................................................23

R. 3:13-3(c).................................................................................33

R. 3:13-3(g).............................................................................28, 33

R. 3:22-1....................................................................................31

## TABLE OF CONTENTS (cont'd)
### TABLE OF RULES (cont'd)

R. 3:22-2(a)..................................................................................29

R. 3:22-4...............................................................................40, 41, 42

R. 3:22-4(b).............................................................................40

R. 3:22-4 (c).............................................................................40

R. 3:22-6(d)..........................................................................28, 30

## TABLE OF TRANCRIPTS CITED

"4T" refers to the transcript of the judge's decision on pretrial motions on July 17,1996

"5T" refers to the trial transcript of November 6, 1996.

"6T" refers to the transcript of November 7, 1996.

"7T" refers to the trial transcript of November 8, 1996.

"8T" refers to the trial transcript of November 12, 1996.

"9T" refers to the trial transcript of November 13, 1996. (volume one).

"9T" refers to the trial transcript of November 13,1996. (volume two).

"11T" refers to the trial transcript of November14, 1996. (volume one).

"11T" refers to the trial transcript of November 14, 1996. (volume two).

"13T" refers to the trial transcript of November 18, 1996.

"14T" refers to the trial transcript of November 19, 1996.

"15T" refers to the trial transcript of November 20, 1996.

"16T" refers to the trial transcript of November 21, 1996.

"17T" refers to the trial transcript of November 25, 1996.

"18T" refers to the trial transcript of November 26, 1996.

"19T" refers to the trial transcript of February, 1997.

"20T refers to the resentencing conference transcript of November 3, 2000.

"21T" refers to the resentencing transcript of February 2, 2001.

"22T" refers to the PCR hearing of June, 2005.

## PROCEDURAL HISTORY

Bergen County Indictment Number 95-07-0089 charged defendant Jamie Farthing with two counts of first degree kidnapping, contrary to N.J.S.A. 2C:13-1b(1) (counts 1 and 10); two counts of first degree robbery, contrary to N.J.S.A. 2C:15-1 (counts 2 and 11); two counts of second degree possession of weapons for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (counts 3 and 12); two counts of third degree unlawful possession of handguns without permits, contrary to N.J.S.A. 2C:39-5b (counts 4 and 13); purposeful of knowing murder of James Polites, contrary to N.J.S.A. 2C:11-3a(1) and/or (2) (count 7); felony murder (during commission of kidnapping) of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 8); felony murder (during commission of armed robbery of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 9). Three co-defendants, Ivie Demolina, Thomas Christopher James, and Efrain Papaleo, were also named in the indictment. (Da 1 to 7).

A Miranda hearing and a motion to suppress evidence seized at the time of defendant's arrest were held before the Honorable Sybil R. Moses, J.S.C., on May 29, 20, and June 11, 1996. On July 17, 1996, Judge Moses ruled that both defendant's oral and written statements and all the physical evidence seized would be admissible at trial. (4T 39-25 to 40-4; 4T 44-19 to 47-18).

Following a jury trial held before the Honorable Timothy J. Sullivan, J.S.C., from November 6 through 26, 1996, defendant was found guilty of all counts of the indictment. (18T 49-23 to 54-6; Da 8 to 15).

1

On February 14, 1997, Judge Sullivan merged the convictions for felony murder (counts 8 and 9) into the conviction for knowing and/or purposeful murder (count 7) and sentenced defendant to life imprisonment with a 30-year period of parole ineligibility on the merged conviction. Judge Sullivan also merged one of the convictions for possession of a weapon for an unlawful purpose (count 3) into one of the robbery convictions (count 2) and imposed a sentence of 20 years with a ten-year period of parole ineligibility to be served consecutively to the sentence imposed on the murder conviction. A 30-year sentence for kidnapping charge (count 1) was ordered to be served consecutively to the murder sentence. Judge Sullivan then imposed another 30-year term of imprisonment on the second kidnapping charge (count 10) to run consecutively to all previously imposed sentences. The sentences on the remaining counts (4, 11, 12, 13) were either merged or ordered to be served concurrently with the previously imposed sentences, for an aggregate sentence of life plus 60 years' imprisonment with a 40-year prior of parole ineligibility. (19T 32-17 to 35-11; Da 16-17).

A Notice of Appeal was filed on April 30, 1997. (Da 21).

On May 18, 2000, the Appellate Division, in a published opinion, State v. Farthing, 331 N.J. Super. 58 (App. Div. 2000), reversed defendant's conviction for purposeful or knowing murder but affirmed her remaining convictions, including that for felony murder. (Da 22 to 54). The Appellate Division concluded that the State had the option of retrying defendant for purposeful or knowing murder, but if the State elected to do so, the trial court would have to recast the aggregate sentence imposed. 331 N.J. Super. at 86.

2

Defendant filed a petition for certification that was denied by the Supreme Court on September 20, 2000. State v. Farthing, 165 N.J. 530 (2000).

At a resentencing conference on November 3, 2000, the State elected not to retry defendant for purposeful or knowing murder. (20T 13-11 to 16).

On February 2, 2001, Judge Sullivan dismissed the count for purposeful or knowing murder and resentenced defendant to an aggregate sentence of life imprisonment with 40 years of parole ineligibility. (21T 3-21 to 4-6; 21T 18-22 to 20-4).

By letter dated August 16, 2001, the Honorable Donald R. Venezia, J.S.C., informed defendant that he had received her petition for post-conviction relief (PCR), but that he was unable to address the petition because her matter still was on appeal. Judge Venezia asked that defendant contact his chambers once the appeal was resolved so that he could consider the petition. (Da 55).

Defendant had appealed from the resentencing, and by order dated May 9, 2002, the Appellate Division affirmed the sentence. (Da 56).

Defendant filed a petition for certification regarding the affirmance of her sentence, and by order filed September 25, 2002, the Supreme Court denied certification. (Da 56).

Defendant's PCR petition, which originally had been filed with the Bergen County Superior Court in August 2001, was marked "Received" by the Bergen County Superior Court on November 13, 2002. (Da 58 to 64).

On February 14, 2005, defendant filed an amended PCR petition and also filed a supplemental PCR petition. (Da 65 to 74).

On June 22, 2005, Judge Venezia ruled that defendant's PCR petitions were not time-barred. (22T 8-14 to 20). However, defendant's claims were rejected, and Judge Venezia found that she was not entitled to an evidentiary hearing. (22T 42-12 to 16).

On August 30, 2005, defendant filed a Notice of Appeal. (Da 77).

On January 3, 2008, defendant filed a pro-se Motion for New Trial. (Da 159).

On January 10, 2008, Judge Venezia, J.S.C. denied the defendant's pro-se Motion for New Trial. (Da 160).

On February 19, 2008, defendant filed a pro-se Notice of Appeal. (Da 161 to 162).

Defendant filed a second Petition for Post-Conviction Relief, Pro-se. (Da 155 to Da 158).

On February 20, 2008, Judge Venezia, J.S.C. denied the defendant's second petition for PCR based on the decision in oral opinion on February 20, 2008, on papers, without the presence of the defendant. (Da 211 to 216).

On March 19, 2008, defendant filed a Notice of Appeal. (Da 217-218).

On May 1, 2008, an order granting defendant to proceed as indigent and denying assignment of counsel. (Da 219).

4

## STATEMENT OF FACTS

A.  The Trial Testimony

On August 8, 1994, James Polites was found dead in his apartment in Edgewater, New Jersey. (7T 58-1 to 61-9). Investigator Carlos Rodriguez of the Bergen County Prosecutor's Office was assigned to investigate and process the scene. (7T 87-11 to 88-14). He noticed that the apartment was in "total disarray". (7T 90-7 to 13; 7T 95-1 to 2). When he saw the body he noticed that the wrists and ankles had been bound with neckties and could tell from the way in which one of the neckties had been ripped that at one point the victim's wrists had been "hog-tied" to his ankles. There was also a pillowcase over the victim's head and electrical cord around his neck, the other end of which had been tied to the doorknob of the bedroom door causing his upper torso to be suspended approximately six inches off the floor. (7T 107-18 to 109-8). There was a 25-pound weight found a few feet from the body which Rodriguez determined belonged to the set of weights discovered in a second bedroom. (7T 115-14 to 116-4).

Donald Sposa, the manager of the Fort Lee Saloon, owned by the victim, and a friend of Polites, indicated that the last time he had spoken with this friend was on the night of Thursday, August 4, 1994. (8T 106-3 to 5). When Polites arrived at the Fort Lee Saloon at approximately 10:30 p.m., Polites told Sposa that he had received a "strange" telephone call from a woman he had been involved with a year before. When the woman, whom Sposa recalled had a name that sounded like "Mia, Thea, Fia," called that evening, she told Polites that she and another woman wanted to meet him at his apartment later that night, presumably for a "ménage a trios." Polites

received another phone call from the same woman at approximately 12:30 a.m. Sposa answered the phone and then gave it to Polites, who talked for five minutes before he hung up. Polites then left with "a couple of paper bags," Sposa assumed to contain Budweiser beer. (8T 103-10 to 106-2).

The medical examiner who performed the autopsy observed a single ligature mark around Polite's neck and determined that his death was by asphyxia due to a single fracture of the thyroid cartilage. (11T 181-12 to 23; 11T 184-19 to 185-12). He further determined that this injury would have required considerable force applied for a minimum of 30 seconds and a maximum of three minutes that it could not have been caused by the electrical cord found around the victim's neck. (11T 182-2 to 13; 11T 188-1 to 189-20). It was more likely that the victim was strangled with neckties found loosely tied around his neck. (11T 182-14 to 22).

The State presented evidence of another robbery which was later linked to the Polites incident. On August 3, 1994, Robert Hippman received a telephone call at work from a woman he knew as Erica. She said that she was in the New York area with a friend from Florida and that they needed a place to stay. Hippman told her that he had a date that night so he would probably not be available, but he gave her his home phone number and told her to call him later that night. (8T 137-3 to 20).

On the night of August 4, 1994, Erica called Hippman at his apartment and he told her to come over with her friend. (9T 34-7 to 35-20). Erica arrived at approximately 2:00 a.m. with a woman introduced as Alexis. Unexpectedly, a man was also with them. (8T 138-3 to 139-12). Hippman served each of the women a glass of wine and then took Erica onto the balcony to talk. When they came back into

6

the living room and sat on the couch, he did not see Alexis or the man. As he was talking to Erica, Alexis came into the living room pointing a gun and said, "this is a stick up". (8T 142-18 to 143-7).

Hippman was told to lie face down on the carpet, when he resisted, the man also pointed a gun at him, and he complied. (8T 145-19 to 146-16). The man used gray duct tape to bind Hippman's hands behind his back and to bind his ankles. He also taped Hippman's mouth (8T 146-18 to 147-3). Unable to move, Hippman lay face down on the carpet for approximately and hour an a half while the three ransacked his apartment. (8T 149-18 to 25). When they were done, they taped Hippman to a chair and left. (8T 149-18 to 152-10).

Hippman freed himself within minutes after they left. His telephone had been disconnected, so he went down to the lobby of his apartment building and had the doorman call the police. Among the items taken from Hippman's apartment was his automatic teller machine card. Hippman recognized the man who was recorded by the bank cameras attempting to use the card at 4:00 a.m. the morning after the robbery as the man who had been in his apartment that night. He was identified as Thomas Christopher James. (8T 159-24 to 161-22).

In September 1994, Hippman identified Erica, and a month or two later identified Alexis and the man in his apartment from photographic arrays. (8T 164-14 to 166-12). Hippman made an in-court identification of the defendant as the woman he knew as Alexis. (8T 175-18 to 176-4).

Lieutenant John Hynes of the Hackensack Police Department investigated the Hippman robbery. (9T 97-12 to 99-3). Hynes interviewed Hippman, but then went on

vacation for two weeks. When Hynes returned to work on September 2, 1994, he read an article in The Bergen Record regarding the Polites murder. He noticed the similarities between the Polites and Hippman's incidents and contacted the Bergen County Prosecutor's Office. Hynes then began working with the investigator Terrance Alver on the two cases. (9T 105-24 to 108-3).

Hynes gave the members of the Bergen County Prosecutor's office the phone bill supplied to him by Hippman. (9T 178-17 to 179-2; 9T 182-24 to 183-5). Investigator Frank Kelaher traced collect phone calls "Erica" had placed to Hippman to an apartment located at 456 Grant Avenue in Brooklyn and two pay telephone booths in the Vicinity of that apartment. (9T 179-3 to 180-5; 9T 183-6 to 15). Further investigation revealed that the phone number for the Grant Avenue residence was issued to a Maria Rios, and Rios's daughter, Evia Demolina, also lived at that address "at one time or another." (9T 180-13 to 24).

Kelaher obtained Demolina's photograph and worked in conjunction with the New York City Police Department to locate her. (9T 180-25 to 181-20). The investigation led New York City Police officers to the Cross Bay Motel in Queens on September 13, 1994 at approximately 1:30 a.m. (19T 189-25 to 190-10). Both Thomas Christopher James and Ivy Demolina were apprehended as they were in the process of leaving the motel. They were both placed under arrest. The police seized the luggage and transported the pair to Demolina's mother's apartment where Ivy's half-brother Benigno Rosario, was also arrested. (9T 193-2 to 197-11; 9T 224-9 to 17).

8

After the three suspects arrived at the police precinct, Bergen County Prosecutor's Office was notified of the arrests. Evidence linking the three suspects to the Hippman and Polites robberies was discovered when the luggage was inventoried. Among the items seized were wigs, several pairs of gloves, one of which had duct tape around the finger, a finger hut catalog that had been mailed to Jamie Farthing, and six or seven rolls of undeveloped film. (8T 57-2 to 8; 8T 170-8 to 174-22; 9T 198-11 to 18; 9T 202-4 to 213-24; 11T 207-4 to 13). The developed photographs showed James, Demolina, Rosario, a man named Efrain Papaleo, who was later arrested in connection with the investigation, and a woman who the police later identified as Jamie Farthing, (11T 28-12 to 39-23).

Kelaher also executed several search warrants at Demolina's mother's apartment. Among the items seized where a jets jacket which belonged to Hippman found in Rosario's bedroom. On the dining room table, he found an invoice for Chelsea Mini Storage rented to Thomas Christopher James. (11T 13-11 to 141-1; 11T 46-7 to 24; 11T 89-2 to 6). Hanging on a chair on the living-groom area was a pocket book which contained a wallet with identification belonging to Magda Rahey. Also found in Rahey's pocket book were night club cards belonging to Polites, a credit card belonging to Polites, his vehicle registration, and a temporary insurance card issued to Thomas Christopher James. (11T 17-7 to 23-4). Kelaher also recovered jewelry linking the suspects to the crimes at the King's Jewelry Store in Brooklyn. In addition, Investigator Kelaher executed a search warrant at Chelsea mini storage and seized items identified as having been stolen from Hippman and Polites. (8T 54-7 to 18; 8T 167-20 to 25; 9T 235-12 to 241-1.

On September 13, 1994, after being contacted by Detective Duggan of the New York City Police Department about the arrest of Demolina, James, and Rosario, Investigator Terrance Alver of the Bergen County Prosecutor's Office went to the Midtown South Precinct in Manhattan where he interviewed Demolina and James. (11T 201-15 to 203-23). As a result of that conversation, he and detective Hynes flew to Conyers, Georgia, to arrest Jamie Farthing two days later. (11T 209-5 to 210-24). Alver testified that before going to Georgia, he had arrest warrants for murder and robbery for Jamie Farthing. (11T 210-3 to 17).

Working in conjunction with U.S. Marshals in Georgia, Alver and Hynes set up surveillance of Farthing's mother's house in Union City, Georgia. (11T 211-3 to 212-14). After several hours of observing the comings and goings of defendant and her family, defendant was arrested as she, her mother, Lupe Anderson, and her Stepfather, Luke Anderson, attempted to leave the house in a pick-up truck. Alver advised defendant that she was under arrest for robbery and murder and obtained her consent to search of her house. Alver also obtained Lupe Anderson's consent to search the house. (11T 217-15 to 221-5). During the search of the house, Alver recovered property linking defendant to the crimes. (13T 7-6 to 11-7).

After defendant was advised that she was under arrest, she was questioned by Alver and Detectives Hynes. A statement was taken that was neither tape-recorded nor taken down by stenographer. (13T 12-7 to 18-10).

According to Alver, Jamie told him that she had first met Demolina with Chris James in late June or July of 1994 in Conyers, Georgia. Jamie had known James because he went to high school with one of her brothers. Jamie had indicated that she

had recently been thrown out of the house by her father and that she would occasionally visit Demolina and James where they were staying. At Demolina's invitation, Jamie hitchhiked to New York with her and James late July, and the three of them stayed at Demolina's mothers in Brooklyn. Demolina's younger brother, who Jamie knew as Ben or Junior, was also staying at the apartment. While at the apartment, Demolina told Jamie that she knew of "coke heads that have money and deserve to get ripped off". Demolina and James had a telephone book with the names and numbers of the people they planned to "set up". (13T 18-11 to 22-7).

Two of those people were Robert Hippman and James Polites. According to Alver, Jamie said that Demolina called Hippman's residence from a phone booth near Demolina's mother's house, and Demolina told Jamie that they would get into the apartment under the pretence of having sex with him and they would rob him. According to Alver, Jamie admitted her involvement in the robbery and admitted that she held a gun on Hippman but claimed that it was James who removed the gun from the bag and handed it to Demolina, who handed it to Jamie. (13T 22-15 to 28-14).

The next day, they planned the Polites robbery. Jamie allegedly told Alver she had no idea Polites would be killed until she was in his apartment and overheard Demolina tell James that they had to kill him because he could identify her. (13T 30-1 to 9).

After the trio arrived at the apartment, Polites was ordered inside and told to lie on his stomach in the living room. The apartment was ransacked, money and valuables were taken, and Polites was strangled to death by James. (13T 32-13 to 36-8).

Alver also indicated that Jamie admitted that she went to a jewelry store in Brooklyn and that she, James and Demolina traded in stolen property for several pieces of jewelry. Eventually, Jamie flew back to Georgia. One evening, her boyfriend, Eddie Kummer, received a telephone call from Demolina telling him that she and James had been arrested and that Jamie should keep a low profile. (13T 37-6 to 13). At the conclusion of this oral interview, Jamie was to give a tape-recorded statement. Since Alver could not locate a tape recorder, he went to the store to buy one. When he returned 45 minutes later, Jamie said she wanted to talk to someone before making any further statements, and the interview was terminated.(13T 37-23 to 40-1).

Alver and Hynes flew back to New Jersey with Jamie on September 17, 1994. Jamie was brought to a satellite office of the Bergen County Prosecutor's Office at about 2:00 p.m. (13T 48-1 to 23). Another statement was much like the first but differed in a few respects. (13T 111-1 to 167-13).

At trial Jamie's boyfriend, Eddie Kummer, testified that he had also been friends with James and Demolina, who was dating James, in the spring of 1994. Early that same summer, Jamie's father kicked her and her brother out of the family home and Jamie had nowhere to go. Jamie often stayed at James' grandmother's house during which time she and Kummer socialized with Demolina and James frequently. When James and Demolina left to go to New York, Jamie went with them because "she really didn't have a place to stay and she was going to go up there because they had a place to stay up there and she wanted to see New York". (11T 96 -18 to 99-25; 11T

99-23 to 100-17; 11T 119-12 to 122-19). Kummer did not go with them because he had a job. (11T 98-8 to 11).

A month later, flew Jamie flew back to Georgia and Kummer picked her up at the airport. She stayed at her mother's house for a week then returned to New York. Some time later, Jamie called Kummer from New York and asked him to come up. He flew up to New York and stayed at a hotel with Jamie, James, and Demolina, for about four or five days. Kummer noticed that James had a lot of money and paid for everything they did. He also had two guns. He observed new clothes, camcorders, and jewelry. (11T 108-10 to 110-10).

Kummer kept asking Jamie where all the money was coming from, and Jamie admitted that she, Demolina and James had robbed people and that James had killed a man. (11T 110-11 to 111-14). When Kummer asked Jamie why she went along with it, Jamie said she no idea it would go that far and had no idea James would kill someone. (11T 111-23 to 113-1). Kummer asked Jamie to leave New York with him, But she said that she could not leave but would not say why. Kummer got the impression that James was keeping her there, but James denied this. Three weeks later, Jamie returned to Georgia. Kummer did not see Jamie before Demolina called to tell him that she had been arrested. (11T 113-2 to 115-23).

One of the defenses raised at the trial was diminished capacity. Dr. Jonathon Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents, Jamie was suffering from post-traumatic stress disorder, which kept her from being able to form either purposeful or knowing states of mind. (14T 132-1 to 135-12). Kleinman explained that when he first interviewed Jamie, he found that she

13

was generally in good contact with reality, but that she had a difficult time expressing things having to do with the events surrounding Polites death. (14T 105-11 to 23). When he asked her for personal background information, Jamie's responses indicated to him that she had been physically or sexually abused, but she was incapable of telling him what had happened. (14T 105-24 to 106-11). Having a strong suspicion that there had been abuse, Klienman recommended that a forensic social worker be employed to get background information. His suspicions were confirmed by the report and he re-interviewed Jamie and found that as a child she had been physically abused by her father and sexually abused by two teenage cousins when she was five or six years old. (14T 118-22 to 120-6).

Jamie's father testified on her behalf and confirmed that he had been extremely unstable. He admitted that he drank to excess and had violent fights with the children's mother in front of the children. After he separated from the mother, the children were moved from one parent's home to other as the parents fought over the children.

Klienman also learned that Jamie had been molested by her father on one occasion when she was between the ages of 12 and 14. He concluded that her basic childhood needs to be nurtured and cared for were never met. (14T 122-3 to 11). Jamie's father remarried, and her stepmother was bitter, abusive, and rejecting. (14T 121-12 to 17). Jamie and both of her brothers eventually turned to substance abuse as a form of self-medication. (14T 121-2 to 6). Finally, Jamie reported that when she was older, she was sexually assaulted by a man with a knife one night when her car broke down. She had flashbacks after this incident and intensified her use of drugs

14

and alcohol. (14T 122-15 to 24). Given this background, when Jamie met Demolina at the age of 18, developmentally she was closer to being 12-14 years old in terms of maturity. Jamie was very needy and se ceded control over her life to Demolina. (14T 129-9 to 131-25).

Dr. Arnoldo Apolito, a forensic psychiatrist, also found post-traumatic stress disorder and add, that in his opinion, Jamie was also in a dissociative state at the time of the crimes. (14T 14-8 to 17-4) Dr. Klienman, however, felt that Jamie's symptoms did not reach the degree of disturbance or frequency required for a diagnosis of dissociative disorder, but did find that she had experienced episodes of depersonalization, a feeling that you are watching events over which you have no control, rather than experiencing them yourself. (14T 115-3 to 15; 14T 132-22 to 133-14; 15T 182-24 to 185-6).

Dr. Steven Simring, a psychiatrist called by the state on rebuttal, testified that while he was sure Jamie had experienced severe problems at home, he found no evidence of post-traumatic stress disorder. (16T 169-9 to 170-6). Dr. Simring further opined that the relationship between post-traumatic stress disorder and committing robberies was an "irrelevant concept." (16T 158-1 to 7). Dr. Simring agreed that Jamie showed "considerable immaturity as she discussed her past life", And diagnosed her with a personality disorder "not otherwise specified." Simring also diagnosed a drug and alcohol dependence. (16T 144-25; 14T 162-2 to 8; 14T 200-8 to 202-13; 15T 113-17 to 116-6). Dr. Simring opined that "she may have been high on drugs or alcohol" during the commission of the crimes and "that may have affected

her judgment," but in his opinion it did not affect her awareness of what she was doing. (16T 151-22 to 152-15).

## B.  The PCR Hearing

In her PCR petition and at the PCR hearing, defendant claimed that she was denied effective assistance of trial counsel. Among the grounds asserted for ineffective of counsel were the following: (a) counsel failed to consult adequately with her and failed to conduct an adequate investigation; (b) counsel failed to move that her antidepressant medication that had been terminated be readministered; (c) counsel failed to move for a mistrial regarding the jury's apparent rejection of her diminished capacity defense; (d) counsel failed to secure a legitimate plea offer and engage in effective plea bargaining. (Da 67 to 68; 22T 9-13 to 20-11).

## STATEMENT OF FACTS ON APPEAL OF DENIAL OF SECOND POST-
## CONVICTION RELIEF

Defendant was sentenced to a total custodial term of life imprisonment with 40-years parole ineligibility. (21T 31-46; 21T 18-22 to 20-4).

On Post Conviction Relief (PCR), Jamie Farthing contended that her trial counsel provided ineffective of counsel. Since this matter represents the defendant's second petition for PCR, and attorney was not assigned to represent her. The defendant is attacking the quality or legal skills of the trial and appellate attorneys.

Defendant's trial counsel did not testify at her first or second PCR hearing. The appellant was attacking the quality of legal skills of her trial counsel and the ineffective assistance of counsel rendered by her appellate and PCR attorney. Judge Venezia denied the appellant's second petition on papers, without her presence. The trial court abused its discretion by denying the appellant the opportunity to represent herself pro-se at the second PCR hearing. The State contended the appellant failed to establish a prima facie case and that she was procedurally barred from raising some of her issues, however the claims and issues raised by the appellant serve to support ineffective assistance.

On February 19, 2008, defendant-appellant was writted from New Jersey State Prison to the Bergen County jail and because of her high security classification was brought back the same day being that her hearing was on February 20, 2008. The defendant-appellant in the above matter is under the jurisdiction of the Department of Corrections and can not make any requests for a writ or the conditions of one. Writs are issued by the Judge. The defendant-appellant in this matter was not afforded her opportunity to defend her position, since the judge proceeded without her and decided the matter on papers.

On February 20, 2008, the defendant-appellant was denied her opportunity to appear in court for her second PCR hearing, thus she was unable to appear and place her contentions on record. The defendant-appellant is incarcerated and due to the operations within the institution did not receive the prosecutor's brief until February 12, 2008. The defendant-appellant had to prepare a rebuttal pro-se and fax it to the judge and opposing party, to date she has not received a response to that brief. Those issues were not addressed in Judge Venezia's oral opinion. The defendant-appellant suffered prejudice by not being present to defend herself pro-se.

The Judge denied the defendant's petition for PCR due to the fact defendant was unable to satisfy both prongs of the Strickland test. (T14 12 to 19). See Strickland v. Washington 466 U.S. 688, 104 S. Ct. 2052 (1984).

The court refused to conduct a full hearing under the procedure established by State v. Preciose, 129 N.J. 451 (1992), "Since it held that the defendant failed to establish a prima facie claim of ineffective assistance of counsel.

Ms. Farthing has suffered prejudice and had she been afforded reasonable representation at the appellate level, her issues would have been presented. Judge Venezia denied appointment of counsel to argue and brief points that clearly differ from previous argument.  The Appellant has established a prima facie case under the Sixth Amendment to warrant an evidentiary hearing regarding any of the issues outlined in her brief. Appellant now presents these issues to this Court.

## LEGAL ARGUMENT

## POINT I

**PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND BECAUSE SHE WAS PREJUDICED THEREBY, THE COURT SHOULD GRANT HER PETITION FOR POST-CONVICTION RELIEF. AND BECAUSE THE PETITIONER PRESENTED ENOUGH PROOF FOR A PRIMA FACIE CASE SHOWING THAT SHE WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL, THE COURT SHOULD GRANT HER AN EVIDENTIARY HEARING ON THIS ISSUE IT IS A VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

The petitioner argues that the actions of her defense counsel before and during trial, her post conviction and appellate counsels constituted ineffective assistance of counsel contrary to sixth Amendment of the United States constitution. Strickland v. Washington, 466 U.S. 668. 104 S. Ct. 2052 (1984); State v. Fritz, 105 N.J. 42 (1987). The Sixth Amendment right to an attorney as guaranteed by the United States Constitution ensures that a defendant will receive "effective assistance" of counsel. Strickland v. Washington, supra, 466 U.S. at 686, 80 L. Ed. at 692. In essence, the benchmark for judging a claim of ineffectiveness is" whether counsel's conduct so undermined the proper functioning of the adversarial process that cannot be relied on as having a just result." Id. at 687, 80 L. Ed. 2d at 692-693.

To succeed on a claim of ineffective of counsel an aggrieved defendant must satisfy a two-prong test set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). The first prong requires the defendant to show the counsel's representation fell "below an objective standard of reasonableness" considered in light of all the circumstances of the case. Id. at 690. The defendant must overcome a

strong presumption that counsel's actions fell within sound trial strategy. Id. at 689. "In assessing the adequacy of counsel's performance, strategic choices made after through investigation of law and facts relevant to plausible options are virtually unchallengeable". Id. at 690. "To second guess whether a course chosen by defendant's counsel was the best strategy, or even a good one, is not the role of a reviewing court, so long as the defendant was afforded meaningful representation". State v. Buonadonna, 122 N.J. 22, 39 (1991).

Our own Supreme Court in State v. Fritz, 105 N.J. 42 (1987) has held that this right to assistance of counsel is also guaranteed by the New Jersey Constitution. Counsel must be effective in both the preparation and trial of a fair trial and a new trial will be awarded when mistakes and miscalculations are so incompetent as to thwart this fundamental protection Id. at 48. A defendant is entitled to a standard of adequacy of legal services equal to the exercise of normal customary skill and knowledge. State v. Anderson, 117 N.J. Super. 507, 519 (App. Div. 1971), modified, 60 N.J. 437 (1972).

In the instant matter, the petitioner received ineffective assistance of counsel on all levels of her case. State v. Bellucci, 81 N.J. 531 (1980). A defendant must receive the guarantees of a fair trial, counsel failed to raise the issues highlighted below. If one refers to the attached Appendix to review the briefs prepared by post conviction and appellate attorneys it is clear that the quality of legal defense for this petitioner is questionable.

The defendant must satisfy the second prong of Strickland by demonstrating there is a "reasonable probability that, but for counsel's unprofessional errors, the result of

20

the proceeding would have been different". <u>Harris</u>, 181 N.J. 391 (2004). A reasonable

probability is one sufficient to undermine confidence in the outcome. <u>Strickland</u>, 466

U.S. at 694. The error must be serious enough to undermine the court's confidence in

the jury's verdict. <u>See</u> <u>Harris</u>, 181 N.J. at 431. These are issues which counsel failed

to raise in petitioner's previous post conviction relief matters.

    a.  **Ineffective assistance of counsel because counsel did not object to the jury not properly instructed that an accomplice may intend to commit a lower-degree offence than the main actor(s), and because there was no evidence that the offence, nor for a homicide to result, her conviction of first degree felony murder must be amended to any lesser-included offense.**

The liability of each participant in a criminal venture "is dependant on his own

state of mind, not on anyone else's. <u>State v. Bridges</u>, 254 N.J. Super. 541, 566 (App. Div.

1992). rev'd in part on other grounds, 133 N.J. 447 (1993). To be an accomplice, "the

defendant must actually foresee and intend the result of his or her acts." <u>Bridges</u>, 133 N.J.

477, 456 (1993). Our courts have made clear in cases such as <u>State v. Weeks</u>, 107 N.J.

396, 404-410 (1987), and <u>State v. Bielkiewicz</u>, 267 N.J. Super. 520, 528-534 (App. Div.

1993), that judges are imperative that juries be advised that while the principle in a crime

may have intended to commit a more serious offence , but, the defendant, rather, might

only have intended to commit a lesser-included offense. Thus, even if a defendant aids in

the commission of a felony, she is not guilty of a felony unless she shared the purpose to

use a weapon during the crime or commit the crime at all. <u>Weeks</u>.

Specifically, in <u>State v. Bielkiewicz</u>, 267 N.J. Super. 520, this court reversed a

murder conviction for failure to charge that an accomplice could be convicted of a lesser

offense that the principle." The court, did not inform the jury that it could find one

defendant guilty of murder as a principal and the other defendant guilty of aggravated

21

manslaughter, manslaughter, or assault as an accomplice." Id. at 531; See State v. Norman, 151 N.J. 5, 37 (1997), (approving decision in Bielkiewicz).

In the instant matter, the trial judge, did vaguely inform the juror's generally of the theory of accomplice liability. He failed, however, to specifically inform them that unless the defendant had shared Ms. Demolina's and Mr. James' intent to commit robbery, she could be found guilty of only the second degree offence or any lesser-included, if not assault as an accomplice. The defendant in this matter, never personally possessed or used a weapon during the incident, and gave no indication that she intended or approved of Ms. Demolina's and Mr. James's use of a weapon. In fact, the jury implied an acquittal of the defendant's count of a weapon for unlawful purpose, thus clearly indicating it's belief that she was not an accomplice to Ms. Demolina's and Mr. James' act of murder and/or robbery. Under these circumstances, the court's failure to provide this charge was error clearly capable of producing an unjust result.

It is undisputed that Ms. Demolina and Mr. James had used a weapon found in the room. However, with the defendant not present in the room at the time of the instant offense, nor having had any access to the weapon used... since she was never present in the room at any time, all testimony was also entirely consistent as top the fact that Ms. Demolina and Mr. James were the only persons to use a weapon and commit a robbery. Thus, a properly-charged jury could certainly have concluded that the state had proven a reasonable doubt that the defendant had shared in the plan to commit robbery, if not murder, but had failed to meet it's burden of proving that she had intended that a weapon be used, a robbery be committed, and/or a murder occur. That finding would have resulted in a conviction for second degree rather than first degree. Because the charge

was not given, the first-degree must be amended to a second-degree conviction, if not a lesser-included offense. The defendant contends that the court's charge did charge the jurors as to the state of mind, but focused on the greater offenses. It is respectfully submitted that the "overcharge" had impliedly invited the jury to reach a verdict on felony murder which should not have been submitted at all. Overcharging the jury as to the greater offenses than the proofs support is only reversible if the defendant was prejudiced thereby. State v. Moore, 330 N.J. Super. 535, 542 (App. Div.), cert. den. 165 N.J. 531 (2000). It should be regarded as error for a trial judge to deliver a jury instruction on a criminal charge for which there is no, or insufficient evidence to support the instruction. It must be assumed that that the jury inferred by the giving of such an instruction that the elements of the charge were present in the case. Jurors are not skilled in legal techniques, they welcome an opportunity to compose differences, and agree upon a compromise verdict. State v. Christener, 71 N.J. 55, (1976); Rule 2:10-2. If the court is willing to exercise its original jurisdiction to apply these remedies, it is respectfully requested to vacate the defendant's first-degree felony murder sentence, and remand the matter for retrial of that charge.

Defense counsel did not object to the judge's proposed jury instruction. Nonetheless, as noted in State v. Malloy, 324 N.J. Super. 525, 533 (App. Div. 1999), quoting, State v. Vick, 117 N.J. 288, 289 (1980), "charging errors are usually regarded as poor conditions for rehabilitation by harmless error treatment". Indeed, as noted in State v. Jardan, 147 N.J. 409, 422-23 (1996), and again quoted in Malloy, 324, N.J. Super at 533, "[n]o surer showing of clear capacity to bring about an unjust result can be made than a basis error in instructing the jury." Because the erroneous charge in the instant

matter had the clear capacity to bring about unjust result, reversal is warranted, despite the lack of objection below.

**b. Ineffective assistance of counsel for failure to object to the disparity between the sentences imposed on a 17-year old co-defendant as compared to age of the defendant who had just turned 18-years of age, renders defendant's sentence manifestly unjust and unduly punitive, thus requiring reversal and a remand resentencing.**

Mr. Rosario, a co-defendant, by all accounts (included his own), and one of the masterminds and main actors in this criminal venture, pled guilty pursuant to the prosecutor's recommendation, but ultimately received a 15-year term. The defendant, by contrast, was sentenced to a life term with a 40-year parole eligibility, despite the fact that her role was relatively minor compared to that of her co-defendant's. This is a prime example of intolerable sentencing disparity.

Ten years before the Criminal Code was enacted, the Supreme Court declared that "grievous inequities in sentences destroy a prisoner's sense of having been justly dealt with, as well as the public's confidence in the even-handed justice of our system. "State v. Hicks, 54 N.J. 390,391 (1969). Accordingly, the court ordered that the greater sentence imposed on one of two co-defendants be reduced. With the advent of the code's, the Supreme Court has repeatedly emphasized that "[t]he essence of the code's sentencing provisions lies in the pursuit of uniformity and the avoidance sentencing disparity. State v. Towey, 114 N.J. 69, 78-79 (1989); State v. Pineda, 119 N.J. 621, 625 (1990) ("The polestar of the code's sentencing provisions is uniformity in sentencing .") State v. Morant, 241 N.J. Super. 121, 142 (App. Div. 1990) in light of sentencing laws' goals of uniformity and lack of disparity, trial courts must be concerned with proportionality" of co-defendants' sentence); State v. Lee, 235 N.J. Super. 410 (App. Div. 1989) (remanding

24

for reconsideration of sentence where the defendant convicted of the same offences as the co-defendant, and with a similar prior record, received longer sentence).

In State v. Roach, 146 N.J. 208, 232 (1996), our Supreme Court held that [d]isparity may invalidate an otherwise sound and lawful sentence…because "there is an obvious sense of unfairness in having disparate punishments for equally culpable for perpetrators." (citations omitted) The court announced specific rules for the sentencing of co-defendants.

[T]he sentence court must exercise a broader discretion to obviate excessive disparity. The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria. The court should then inquire into the basis of the sentence imposed on the other defendant. It should further consider the length, terms, and conditions of the sentence imposed on the co-defendant. If the co-defendant insufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order to avoid excessive disparity. Sentence based on such added considerations will accommodate the basic discretion of a sentencing court to impose a just sentence of the individual defendant in accordance with the sentencing guidelines while fulfilling the court's responsibility to achieve uniform sentencing when that is possible. Id. at 233-34.

The court failed to follow these principals in the instant matter. Mr. Rosario, clearly one of the most culpable of the defendants, received a substantially lower sentence than the other defendants in this matter, including Ms. Farthing. It was Mr. James who knocked the victim to the ground, resulting in the victim's death.

Neither the co-defendant's nor Ms. Farthing had any prior indictable convictions. The only apparent mitigator working in Mr. Rosario's favor was the fact that he had cooperated with the state. The disparity is particularly glaring with regard to defendant, who at the time of her sentencing was first-time offender.

As of January 2008, appellant became aware that her co-defendant's received lesser terms that herself. Efrain Papaleo may become eligible for parole within another year or two. He is still in a New Jersey State Prison, not one of her attorneys has provided any information regarding the true sentences her co-defendant's received. To date she still requests that information. Benigno Rosario received a lesser sentence because of failure of the Bergen County Prosecutor's Office to communicate with New York. He was offered 15 years for aggravated manslaughter. The plea offer called for defendant Rosario to plead guilty and to receive a 15 year sentence, to run concurrent to his new York sentence. The appellant is not mistaken that there is a disparity. Efrain Papaleo is eligible for parole in a year or two so that means he also received a plea for aggravated manslaughter for 15 years. It is clear that the appellant received a more severe sentence because she did not plead guilty to 30 years with 30 years parole ineligibility and chose to defend herself in a trial. See, State v. Poteet, 61 N.J. 493 (1972).

Instead of arguing disparate sentence alone, trial counsel should have argued plain error with the overcharge of the jury. The appellate and PCR counsel should have argued it as ineffective counsel. Even if for the sake of arguendo, the issue of Rosario could not have been raise, counsel could have supplied the judgment of conviction of co-defendant Papaleo and argued that. The sentence is and remand disparate and at some point counsel should have raised, argued and briefed this issue.

For all of the forgoing reasons, the court is respectfully requested to vacate the sentence imposed of defendant and remand the matter for the court below to reconsider the term imposed in light of relevant disparity principals, and re-sentence the defendant, Ms. Farthing, to a term not exceeding the presumptive for any lesser-included offense.

## LEGAL ARGUMENT

## POINT II

**FAILURE OF POST CONVICTION RELIEF COUNSEL TO ADVANCE ALL OF THE ISSUES RAISED BY DEFENDANT. R. 3:22-6(d).**

Defendant contends that the failure of her PCR counsel to brief and argue all claims regarding prosecutorial failure to comply with discovery obligations based on R. 3:13-3(g) and thus warrants a new trial.

Defendant asserts she has presented a prima facie case of ineffective assistance of counsel that warrants an evidentiary hearing. Defendant has satisfied her burden to demonstrate the failure of counsel that could have changed the outcome of her trial. She was denied the effective assistance of counsel on both the trial and appellate level for the reasons cited below. It is further asserted that the defendant was prejudiced by the ineffective assistance of counsel she received. Because there can be no valid strategic reason for these failures; it is asserted that the court should grant the defendant's petition for post conviction relief.

The right to counsel is guaranteed both by the State and Federal Constitution, U.S. Const. Amends. VI, XIV; N.J. Const., (1947), Art. I, Par. 10. This critically important right insures more than the mere presence of a lawyer. Rather, the accused is entitled to an advocate who is free of any conflict of interest, and will effectively represent his/her position, State v. Belluci, 81 N.J. 531, 538 (1980). The essence of the right is not merely the assistance of an attorney. But the effective assistance of counsel. State v. Coruzzi, 189 N.J. Super. 273, 319 (App. Div.), certif. den. N.J. 531 (1983). In assessing whether the defendant has been afforded his rights under the state and federal constitution's our court's have frequently noted that counsel must be both available and effective. State v.

Giorgianni, 189 N.J. Super. 220, 230 (App. Div.), certif. den. at 94 N.J. 569 (1983). This concept of effective assistance of counsel encompasses both the preparation and trial of the case. State v. Sugar, 84 N.J. 1, 17 (1980), quoting, Powell v. Alabama, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L. Ed. 2d 158, 172 (1932). In Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 836 (1985), the Supreme Court held that due process also guarantees a criminal defendant effective assistance of counsel on a first appeal as of right to prosecute his appeal. "[a] defendant is entitled to have assigned to his counsel one who has sufficient ability to ensure capable representation on appeal , and who will in good faith and full vigor undertake that responsibility."

An evidentiary hearing would allow the judge to determine whether PCR counsel violated Rule 3:22-6(d) by failure to advance all the issues raised by defendant. Defendant contends that the failure of PCR counsel to brief and argue all of the claims advanced in her pro-se submission of supplemental letter-brief warrants a new trial. Consequently, it is clear that the right to effective assistance of appellate counsel and/or post-conviction counsel are both within the purview of R. 3:22-2(a) and thus cognizable for PCR.

In State v. Webster, 187 N.J. 254 (2006), the Supreme Court held that PCR counsel must advance the arguments that can be made in support of petition and include defendant's remaining claims, either by listing them or incorporating them by reference so that the judge may consider them. Since the public defender's brief did not refer to or incorporate all of the claims raised by defendant the matter should be reversed and remanded to the trial court.

Rule 3:22-6(d) provided that "counsels should advance any grounds insisted upon by defendant, not withstanding that counsel deems them without merit. State v. Rue, 175 N.J. 1 (2002), interpreted Rule 3:22-6(d) as requiring that PCR counsel must communicate with client, investigate the claims urged by the client and determine whether there are additional claims that should be brought forward. Thereafter, counsel should advance all of the legitimate arguments that the record will support. If after investigation counsel can formulate no fair legal argument in support of a particular claim raised by the defendant, no argument need be made on that point.

The Constitution guarantee of effective assistance recognizes the "average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty." Rodriguez v. Rosenbalt, 58 N.J. 281, 295 (1974).

In the instant matter, the defendant's original discovery was not disclosed by her attorney. The trial attorney despite many requests for the discovery never responded to its whereabouts. He did respond saying that he was not in possession of trial transcripts which is not what the defendant requested. The defendant still remains concerned about the unanswered question of where is the discovery and was the discovery ever used in the original trial? Since the defendant is not a qualified professional in legal practice she did not know that these documents would support the contentions that she needed her attorneys to assert. Despite the defendant's requests and insistence that the discovery was not disclosed, it was not until after a motion to compel was submitted and right before her PCR hearing after her briefs had been prepared and submitted, that the prosecutor disclosed the discovery to her then attorney, Linda E. Peterson, Esq. (PCR Hearing T4 6

to 10). An evidentiary hearing is required to establish what discovery was produced by the State through the order to compel. To date the defendant does not have possession of this discovery to use in her appeal process.

The defendant has made several requests to her previous PCR attorney to submit this discovery to the court and provide her and her counsel with copies. The attorney realized the importance of this discovery, albeit too late. However, it was never recommended to the defendant that she should request for motion for a new trial. Her PCR attorney asserted that his representation was limited to the appeal for Certification on PCR denial and had nothing to do with discovery since he returned all of the documents he used to the Public Defender's Office.

In October 2004, my post-conviction counsel, Linda E. Peterson, Esq. did not have possession of my trial folder or the entire discovery pertaining to my case. This information was necessary for her to become familiar with all issues in order to be able to review and analyze any defects so she could prepare a brief defending my stance. This attorney despite submitting a motion to compel which His Honor Donald R.Venezia J.S.C. granted on March 2, 2005, did not matter to the prosecutor, who did not comply until last minute before defendant's PCR Hearing, after all the briefs were submitted. To date, the defendant still does not have a copy of said discovery in her possession.

Post-conviction counsel did not meet the level of preparation due to the defendant in this case. There was a failure to investigate and review all documents, mainly discovery. It is impossible to say that the most effective arguments and all issues could be raised without the review of the attorney. Pursuant to R. 3:22-1, post-conviction rules constitute "New Jersey's Analogue to federal writ of habeas corpus".

31

Post-Conviction Relief involves issues that are not part of the written transcript. Defendant must raise all issues in PCR review in order to prevent ramifications of later federal habeas corpus review. The defendant does not want to default claims on State level which would procedurally bar her from raising them on Federal level. In such cases of ineffective assistance of counsel of the direct appeal lawyer the proper forum is Post-Conviction Relief for resolution.

In State v. Rue, 175 N.J. 1, 811 A.2d 425 (2002), this Court interpreted the rule to require that counsel communicate with the client, investigate the claims and, based on that communication and investigation, fashion the most effective arguments possible.

Despite not having all necessary and pertinent information she needed in order to prepare the defendant's brief, she did so without having it, as did the attorneys before her.

Ineffective assistance of counsel is prevalent in this instant matter from it's onset, originating from trial counsel through to appellate counsel. Her attorneys continuously asserted to the defendant that this discovery was not available and that it was lost. In response to this, the defendant began to request on her own for this discovery information.

This petition for post-conviction relief is based on ineffective assistance and trial counsel's failure to raise the absence of discovery during the trial process, despite the repeated requests of the defendant for it and appellate counsel's failure to provide same, thus depriving the defendant of vigorous representation.

This continued and willful violation by the trial counsel and subsequent counsels of their discovery obligations requires reversal of conviction because the defendant has been deprived of a fair trial and post-conviction proceedings.

Discovery according to R. 3:13-3(c), the prosecutor shall permit defendant to inspect and copy or photograph the following relevant material if not given as part of the discovery package. R. 3:13-3(g) continuing duty to disclose was violated. The consequences of the trial attorney's failure to comply with discovery obligations and the standards to be applied in consideration the effect of violations are the same both for the initial obligation and the obligation of continuing discovery.

A willful violation by the prosecutor/trial attorney of their discovery obligations may, however, require reversal of the conviction if defendant deprived of a fair trial. State v. Blake, 234 N.J. Super. 166 (1989), State v. Clark, 347 N.J. Super. at 507, State v. Gregg, 278, N.J. Super. 182 (1994).

In the instant case, defendant's post-indictment right to discovery is automatic, but not scrupulously honored. This violation to date has prevented the defendant to present a complete defense in PCR proceedings. This discovery is relevant to the defendant in the preparation of her PCR defense.

In the defendant's post-conviction Relief counsel's brief for appeal of the denial of PCR to the appellate Division, her attorney relied on PCR counsel's brief and files in order to prepare his appeal. The PCR brief was prepared without discovery, incomplete paperwork and lack of investigation. Appellate counsel failed to communicate and investigate defendant's claims as well as incorporate her issues into his argument.

In State v. Webster, 185 N.J. 393, 866 A. 2d 663 (2006), held PCR counsel must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by reference, so that the judge may consider them.

33

In the instant case, this was impossible because the defendant was denied her discovery and was unable to raise issues regarding her appeals.

The prosecution, trial and appellate counsels were in violation. In addition a defendant should not be deprived of his ability to raise a "question of constitutional dimension" due to the inattention of his appellate counsel, who should have raised the matter on direct appeal. Preciose. 129 N.J. at 477.

It is apparent that the defendant has consistently attempted to secure all necessary documents in order to be able to raise issues on appeal for a judge to decide. Defendant's counsels have vitiated her rights to appeal and must be rectified in the interest of justice.

Defendant asserts that she repeatedly addressed this issue with PCR attorney who took no curative action, thus resulting in subsequent petition for post conviction relief for determination of issues raised by the defendant.

In State v. Carter, 85 N.J. 300, 314 (1981), holding that the evidence must be material and not merely cumulative, must be discovered after the trial and not reasonably discoverable prior thereto and must be of nature as to probably have affected the jury's verdict. In the instant matter, the discovery would have been properly submitted and interpreted during the defendant's trial it would have allowed the jury to decide on it's relevance during their deliberations. The defendant has suffered years of incarceration because of the possibility of how great this discovery could have impacted on their verdict.

State v. Russo, 330 N.J. Super. 119, 140 (App. Div. 2000), holding if a prima facie case is made, a hearing must be held; the court, even if it conducted the trial, may not assume that the result would not have been different. With respect to defendant's

claim of denial of effective assistance, the judge erred in finding that defendant had failed to establish that the outcome of her case would have been different. These claims present a prima facie case of ineffective under Strickland v. Washington, 466 U.S. 668,678-9, 104 S. Ct. 2052, 2064-65 (1984).

In conclusion, defendant asserts that the outcome would have been different had the trial, Appellate and PCR counsel briefed and argued the absence of pertinent discovery. The matter therefore, should be reversed and remanded to the trial judge for determination of the issues raised by the defendant.

### a. Counsel failed to raise and argue the defendant's diminished capacity defense in conjunction with voluntary intoxication defense for presentation to the jury.

Defendant requests an evidentiary hearing to determine whether trial counsel's failure to raise the defendant's diagnosis for presentation to the jury during the presentation of diminished capacity to the jury was trial strategy or ineffective assistance of counsel so serious as to deprive her of a constitutionally guaranteed fair trial Strickland v. Washington, 466 U.S. 668, 687,104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). During the trial, diminished capacity was raised, but counsel failed to raise the issue of what the defendant's diagnoses was for the jury. If these diagnosis would have been raised and further discussed the jury would have been able to deliberate and weigh their value as to the defendant's guilt. If the court's have recognized that this defendant lacked the mens rea to support knowing and purposeful murder of Mr. Polites during direct appeal, why wouldn't the mindset of this defendant be further analyzed for culpability? This defendant has the following diagnoses from expert witnesses, her attorney failed to raise them properly.

Dr. Jonathon Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents, the defendant was suffering from post-traumatic stress disorder, which kept her from being able to form either purposeful or knowing states of mind. (14T 132-1 to 135-12). Kleinman explained that when he first interviewed the defendant, he found that she was generally in good contact with reality, but that she had a difficult time expressing things to do with the events surrounding Polite's death. (14T 105-11 to 23). When asked for her personal background information, the defendant's responses indicated that she had been physically or sexually abused, but that she was incapable of telling what had happened. (14T 105-24 to 106-11). These events took place when she was five or six years old. (14T 129-9 to 131-25)

Finally, the defendant reported that when she was older, she was sexually assaulted by a man with a knife one night when her car broke down. She had flashbacks after this incident and intensified her use of drugs and alcohol. (14T 122-15 to 24). Given this background, when the defendant met at the age of 18, developmentally she was closer to being 12-14 years old in terms of maturity. The defendant was needy and she ceded control over her life to Demolina. (14T 129-9 to 131-25).

Dr. Arnold Apolito, a forensic psychiatrist, also found post-traumatic stress disorder and added that, in his opinion, the defendant was also in a dissociative state at the time of the crimes. (14T 14-8 to 17-4). Dr. Kleinman, however, felt that the defendant's symptoms did not reach the degree of disturbance or frequency required for a diagnoses of dissociative disorder, but did find that she had experienced episodes of depersonalization, a feeling that you are watching events over which you have no

control, rather than experiencing them yourself. (14T 115-3 to 15; 14T 132-22 to 133-14; 15T 182-24 to 185-6).

Dr. Steven Simring, a psychiatrist called by the State on rebuttal, testified that while he was sure the defendant had experienced severe problems at home, he found no evidence of traumatic stress disorder. (16T 169-9 to 170-6). Dr. Simring further opined that the relationship between post traumatic stress disorder and committing robberies was an "irrelevant concept." (16T 158-1 to 7). Dr. Simring agreed that the defendant showed "considerable immaturity as she discussed her past life." Dr Simring also diagnosed a drug and alcohol dependence. (16T 144-1 to25; 14T 162-2 to 8; 14T 200-8 to 202-13; 15T 113-17 to 116-6). Dr. Simring opined that "she may have been high on drugs or alcohol: during the commission of the crimes and "that may have affected her judgment, but in his opinion it did not affect her awareness of what she was doing. (16T 151-22 to 152-15). Counsel failed to move for mistrial regarding the jury's apparent rejection of her diminished capacity defense.

Despite the above, the defense counsel failed to argue voluntary intoxication as a defense to the felony murder charge, it is clear that the State's expert gave a report relating to the defendant's intoxication and drug use during the commission of these crimes. Clearly, raising these issues as part of the defense of diminished capacity as requested by the defendant would have bolstered this defense. There is no conclusion from the court that the failure to raise the diminished capacity defense in conjunction with the intoxication defense was a trial strategy because counsel failed to raise it.

The court recognized that this defendant lacked the mens rea to support knowing and purposeful murder of Mr. Polites during direct appeal, had the trial attorney

submitted her drug and alcohol dependence for charging;  the jury would have been able to deliberate and weigh its value as to the defendant's guilt. The trial counsel failed to move for a mistrial regarding the jury's apparent rejection of her diminished capacity defense. Defense counsel failed to argue voluntary intoxication and drug use as defense to the felony murder charge and its predicate felonies. It is clear that the State's expert gave a report relating to the defendant's intoxication and drug use during the commission of these crimes.

N.J.S.A. 2C:4-2, imposes no burden of proof upon a defendant and recognizes that evidence of diminished capacity serves to negate the men area element of the offense charges. State v. Delibero, 149 N.J. 90, 101 (1997). See State v. Johnson, 309 N.J. Super. 237, 268 (App. Div.), certif. den., 156 N.J. 387 (1998). Thus, unlike a voluntary intoxication defense that may negate purposeful or knowing conduct, but not recklessness diminished capacity negates any mental state and results in a defendant being set free. See. State v. Hreniuk, Appellate Docket No.: A-5667-04T5667-04T4; State v. Humanik,  199 N.J. Super. 283, 299 n.6 (App. Div.), certif.. denied. 101 N.J. 266 (1985), rev'd o.g. sub. nom. Humanik v. Beylu, 871 F.2d 432 (3rd Cir.), cert. denied, 493 U.S. 812, S Ct. 57, 107 L. Ed. 2d 25 (1989).

Defendant had medical records that diagnosed her previous to fatal killing. She contends that these records were available to her trial counsel, and that she discussed her mental condition with counsel and was examined by experts in the field. Trial counsel failed to raise the defense of diminished capacity to the best of his ability because the record is void of any argument raised by him or post-conviction or appellate counsel.

Therefore, it is respectfully submitted that the defendant has made a prima facie showing of ineffective assistance of counsel with respect to her diminished capacity and voluntary intoxication and drug dependence defense.

It is for the forgoing reasons that the defendant requests an evidentiary hearing. Such a hearing will permit the development of a record from which the trial court can more meaningfully determine whether ineffective assistance of counsel, as claimed by the defendant, was trial strategy that comports with reasonable professional standards, See Sprano, Supra, 249 N.J. Super. at 419, or ineffective assistance of counsel under the Strickland test.

## LEGAL ARGUMENT

### POINT III

**TRIAL COURT ABUSED ITS DISCRETION DURING THE FIRST POST CONVICTION HEARING; DEFENDANT'S CLAIMS SHOULD NOT BE BARRED ON PROCEDURAL GROUNDS.**

The fundamental injustice exception in R. 3:22-4(b), and the exception in R. 3:22-4(c) for violations of the Constitution of the United States or New Jersey, should be applied to excuse the bar of waiver in R. 3:22-4. While the claims raised by defendant should have been raised by timely objection at trial, or on direct appeal, or during previous PCR proceedings, the reason they were not is now obvious; i.e., defendant was denied effective assistance of counsel at every stage of the proceedings.

Serial claims of ineffectiveness would overcome the bar of waiver. As indicated by our Supreme Court, "defendants should not have to pay the exacting price for state procedural forfeitures that result from the ignorance or inadvertence of their counsel – regardless of whether counsel's error violates constitutional standards." State v. Preciose, 129 N.J. 451, 477 (1992). See also, Murray v. Carrier, 106 S. Ct. 2639, 2645 (1986) (noting that where procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state); and, State v. Moore, 273 NJ Super. 118, 12 (App. Div. 1994), certif. den., 137 NJ 311 (1994) (exceptions of waiver are particularly appropriate when defendant claims appellate counsel ineffective). Waivers which are the product of counsel's neglect must be imputed to the State. Murray, 106 S. Ct. at 2645.

Enforcing the bar of waiver in this case would also result in fundamental injustice. The Court, clearly deprived defendant of her due process right to fair trial under both the U.S. Const. Amend. XIV and N.J. Const. Art. I, Sect. 10.

On Post-Conviction, Jamie Farthing contended that: her trial counsel provided ineffective assistance of counsel. (Opinion denying PCR filed, February 14, 2005 and a opinion denying second PCR filed January 3, 2008, which appears in the appendix).

Since this matter represents the defendant's pro-se attempt for Post-Conviction Relief the defendant is attaching the quality of the legal skills of the trial, appellate, and PCR attorneys regarding the following issues, ineffective assistance of counsel, trial, appellate. Defendant's trial attorney never raised the disparity of sentence issue. In this instance there was a failure of the trial, appellate, and PCR counsel's to raise the issue of the trial court's abuse of discretion during sentencing.

Post-Conviction Relief is New Jersey's analogue to the federal writ of habeas corpus. See. State v. Preciose, 129 N.J. 451, 459 (1992). The petitioner has the burden of establishing a right to relief by showing a preponderance of credible evidence. A petition for PCR must allege more than a "bare allegation" to be considered by the court. State v. Goodwin, 173 N.J. 583, 596 (2002). It is clear by the record that her PCR attorney failed to provide her with effective assistance. It is the petitioner's constitutional right to effective assistance of counsel. To succeed on a claim of ineffective assistance of counsel the defendant must satisfy a two-prong test set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984); State v. Fritz, 105 N.J. 42, 58 (1987).

In regards to Procedural Bars, R. 3:22-4, this bar may be overcome by satisfying one of the three following exceptions:

41

(1) the ground for relief not previously asserted could not have been reasonably raised in a prior proceeding; (2) the enforcement of the bar would result in fundamental injustice; or (3) denial of relief would be contrary to the Constitution of the United States of the state of New Jersey. See. R. 3:22-4; Preciose, 129 N.J. at 584. the New Jersey Supreme Court  "has repeatedly emphasized that procedural rules' are not an end unto themselves, but a means to serving the ends of justice" and thus "declined to read the exceptions to Rule 3:22-4 narrowly." Preciose, 129 N.J. at 474-76 (quoting Viviano v. CBS, 1-1 N.J. 538 (1986)).

The New Jersey Supreme Court recognizes the general policy "against entertaining ineffective assistance of counsel claims on direct appeal." Id. at 466. It is clear that no Appellate or PCR Court has ever adjudicated the merits of the constitutional violations presented in the appellant's second petition for PCR.

The Judge denied defendant's petition for post-conviction relief due to the fact that the defendant was unable to satisfy both prongs of the Strickland test. See. Strickland v. Washington, 66 U.S. 688, 104 S. Ct. 2052 (1984). The lower court refused to conduct a full hearing under the procedure established by State v. Preciose, 129 N.J. 451 (1992), "Since it held that the defendant failed to establish a prima facie claim of ineffective assistance of counsel.

Therefore, defendant respectfully submits she be granted an evidentiary hearing, or in the alternative, that the sentence should therefore, be vacated, and the defendant should be allowed to proceed for a new trial.

42

## LEGAL ARGUMENT

### POINT IV

**THE CULMULATIVE ERRORS OF COUNSEL CAUSED PREJUDICE TO THE DEFENDANT DENYING HER THE EFFECTIVE ASSISTANCE OF COUNSEL, AND A MEANINGFUL AND VIABLE DEFENSE DURING HER FIRST POST-CONVICTION RELIEF HEARING.**

The points raised in this brief, taken together, intersect, compound aggravate and exacerbate the errors made.

It is well settled in the law that even though individual points may not be sufficient grounds for reversal in themselves, the combination of errors when taken together in the context of a single judicial proceeding may be such force and prejudice that it would be plain error on its face not to overturn the conviction. State v. Janewicz, ___ N.J. ___, ___ (2008) (slip opinion at 42);  State v. Koskovich, 168 N.J. 448, 540 (2001); State v. Orecchio, 16 N.J. 125, 129 (1954).

## **CONCLUSION**

For the foregoing reasons, It is urged that the defendant's petition for post-conviction relief should be granted, an evidentiary hearing is warranted because the judge did not comment in any way on the defendant's remaining claims, it is clear that he did not consider them. The matter should be reversed and remanded to the trial judge for determination of the issues raised by the defendant pro se. This defendant's incarceration violates her State and Federal Constitutional rights to fair trial and jury, due process of law and must be remanded for further proceedings and modification.

Respectfully submitted,

JAMIE FARTHING

DATED: July 25, 2008

44

Jamie Farthing
#18567/SBI#985369-B
New Jersey State Prison
PO Box 861 – 1EE
Trenton, NJ 08625

STATE OF NEW JERSEY    :    SUPERIOR COURT OF NEW JERSEY
    Plaintiff-Respondent,    :    APPELLATE DIVISION
        :
        :    DOCKET NO.: A-003481-07T4
    v.    :
        :
        :
JAMIE FARTHING,    :    CRIMINAL ACTION
    Defendant-Appellant.    :

PROOF OF SERVICE

    Jamie Farthing, of full age, duly affirms in lieu of formal swearing that:

1. I am the Defendant-Appellant in the above-entitled criminal action.

2. On the 4th day of June 2008, I did serve two (2) copy of the annexed Brief and Appendix and all supporting papers(transcripts) upon the Office of the Attorney General – Hughes Justice Complex, P.O. Box 080, Trenton, New Jersey, 08625-0080; copies of the same papers upon the following, five (5) copies of same to John Chacko – Clerk, Appellate Division's Clerk's Office, Hughes Justice Complex, 25 Market Street, P.O. Box 006, Trenton, New Jersey, 08625-0006 by mailing same United States Mail, postage prepaid.

    3. I duly affirm in lieu of formal swearing that the above statements are true and correct.

Respectfully submitted;

DATED: July 25, 2008

JAMIE FARTHING

45

P.O.  2165-94
nd
7/19/95
SUPERIOR COURT OF NEW JERSEY
BERGEN COUNTY - LAW DIVISION
JULY          TERM A.D. 1995
FIRST         STATED SESSION

RECEIVED
SEP 1 3 1995
OFFICE OF THE PUBLIC DEFENDER

THE STATE OF NEW JERSEY    :

        -vs-               :

IVIE DEMOLINA              :

THOMAS CHRISTOPHER JAMES :

JAMIE FARTHING             :

EFRAIN PAPALEO a/k/a       :
Tato
                           :

        DEFENDANT

Indictment No.

S·0889·95
95·070889·I

The Grand Jurors of the State of New Jersey, for the

County of Bergen, upon their oaths present as a

### FIRST COUNT
(First Degree)

that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and

EFRAIN PAPALEO a/k/a Tato, on or about August 4, 1994, in the

City of Hackensack, in the County of Bergen aforesaid, and within

the jurisdiction of this Court, did unlawfully confine Robert

Hippman for a substantial period with purpose to facilitate the

commission of a crime or flight thereafter and did fail to

release the said Robert Hippman unharmed, and/or in a safe place

prior to apprehension; contrary to the provisions of

NJS 2C:13-1b(1), and against the peace of this State, the

Government and dignity of the same.

Pg 1

## SECOND COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 4, 1994, in the City of Hackensack, in the County of Bergen aforesaid, and within the jurisdiction of this Court, in the course of committing a theft, did use force upon Robert Hippman while armed with a deadly weapon; contrary to the provisions of NJS 2C:15-1, and against the peace of this State, the Government and dignity of the same.

## THIRD COUNT
### (Second Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 4, 1994, in the City of Hackensack, in the County of Bergen aforesaid, and within the jurisdiction of this Court, knowingly and unlawfully did possess certain weapons, to wit: a H&R .32 caliber revolver and a Rossi .38 caliber revolver, with the purpose to use it unlawfully against the person or property of another; contrary to the provisions of NJS 2C:39-4a, and against the peace of this State, the Government and dignity of the same.

## FOURTH COUNT
### (Third Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES,

Pa 2

JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 4, 1994, in the City of Hackensack, in the County of Bergen aforesaid, and within the jurisdiction of this Court, knowingly and unlawfully did possess certain weapons, to wit: a H&R .32 caliber revolver and a Rossi .38 caliber revolver without having obtained a permit to carry same as provided in NJS 2C:58-4; contrary to the provisions of NJS 2C:39-5b, and against the peace of this State, the Government and dignity of the same.

### FIFTH COUNT
(First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did purposely and/or knowingly cause the death of James Polites as an accomplice by procuring the death of James Polites by payment or promise of payment of anything of pecuniary value, contrary to NJS 2C:11-3a(1) and/or (2) and NJS 2C:2-6, and against the peace of this State, the Government and dignity of the same.

### SIXTH COUNT
(First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that THOMAS CHRISTOPHER JAMES, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did by his own conduct, purposely and/or knowingly cause the death of

Pg 3

James Polites; contrary to the provisions of NJS 2C:11-3a (1) and/or (2), and against the peace of this State, the Government and dignity of the same.

### SEVENTH COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did purposely and/or knowingly cause the death or serious bodily injury resulting in the death of James Polites; contrary to the provisions of NJS 2C:11-3a (1) and/or (2), and against the peace of this State, the Government and dignity of the same.

### EIGHTH COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did engage in the commission of the crime of Kidnapping during which he/she or another caused the death of James Polites; contrary to the provisions of NJS 2C:11-3a(3), and against the peace of this State, the Government and dignity of the same.

Dc 4

### NINTH COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did engage in the commission of the crime of Armed Robbery during which he/she or another caused the death of James Polites; contrary to the provisions of NJS 2C:11-3a(3), and against the peace of this State, the Government and dignity of the same.

### TENTH COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, did unlawfully confine James Polites for a substantial period with purpose to facilitate the commission of a crime or flight thereafter and/or inflict bodily injury on James Polites and did fail to release the said James Polites unharmed and/or in a safe place prior to apprehension; contrary to the provisions of NJS 2C:13-1b(1) and/or (2), and against the peace of this State, the Government and dignity of the same.

### ELEVENTH COUNT
### (First Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid,

D4 5

do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, in the course of committing a theft, did use force upon James Polites and/or commit the crime of Murder upon James Polites while armed with a deadly weapon; contrary to the provisions of NJS 2C:15-1, and against the peace of this State, the Government and dignity of the same.

### TWELFTH COUNT
### (Second Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August 5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, knowingly and unlawfully did possess certain weapons, to wit: a H&R .32 caliber revolver and a Rossi .38 caliber revolver, with the purpose to use it unlawfully against the person or property of another; contrary to the provisions of NJS 2C:39-4a, and against the peace of this State, the Government and dignity of the same.

### THIRTEENTH COUNT
### (Third Degree)

AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that IVIE DEMOLINA, THOMAS CHRISTOPHER JAMES, JAMIE FARTHING and EFRAIN PAPALEO a/k/a Tato, on or about August

5, 1994, in the Borough of Edgewater, in the County of Bergen aforesaid, and within the jurisdiction of this Court, knowingly and unlawfully did possess a certain weapon, to wit: a H&R .32 caliber revolver and a Rossi .38 caliber revolver without having obtained a permit to carry same as provided in NJS 2C:58-4; contrary to the provisions of NJS 2C:39-5b, and against the peace of this State, the Government and dignity of the same.

CHARLES R. BUCKLEY
DEPUTY ATTORNEY GENERAL-IN CHARGE
ACTING BERGEN COUNTY PROSECUTOR

Patricia Baglivi
By:        Special Deputy Attorney General
           Acting Assistant Prosecutor

A True Bill

Samuel E. Brace, Foreperson

**VERDICT SHEET**
**STATE OF NEW JERSEY V. JAMIE FARTHING**
**IND. NO. S-0889-95**

**CHARGE 1** (KIDNAPPING OF ROBERT HIPPMAN)

1. HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING**, ON AUGUST 4, 1994 DID KIDNAP ROBERT HIPPMAN?

NOT GUILTY _____

GUILTY _____✗_____

IF YOU FIND THE DEFENDANT, **JAMIE FARTHING**, GUILTY OF KIDNAPPING, YOU MUST ANSWER QUESTION #1A AND #1B.

1A. DID **JAMIE FARTHING** RELEASE THE VICTIM, ROBERT HIPPMAN, UNHARMED PRIOR TO HER APPREHENSION?



NO ___✗___

YES_____

1B. DID **JAMIE FARTHING** RELEASE THE VICTIM, ROBERT HIPPMAN, IN A SAFE PLACE PRIOR TO HER APPREHENSION?



NO ___✗___

YES_____

IF YOU FIND THE DEFENDANT, **JAMIE FARTHING**, NOT GUILTY OF KIDNAPPING, PROCEED TO QUESTION #1C.

1C. HOW DO YOU FIND THE DEFENDANT, **JAMIE FARTHING**, ON THE CHARGE OF CRIMINAL RESTRAINT OF ROBERT HIPPMAN ON AUGUST 4, 1994?

NOT GUILTY_____

GUILTY_____



## CHARGE 2

2.  HOW DO YOU FIND AS TO THE CHARGE THAT **JAMIE FARTHING**, ON AUGUST 4, 1994 WHILE IN THE COURSE OF COMMITTING A THEFT, DID USE FORCE UPON ROBERT HIPPMAN?

NOT GUILTY_____

GUILTY____✕____

IF YOU FIND THE DEFENDANT GUILTY OF ROBBERY, THEN ANSWER THE FOLLOWING QUESTION.

DURING THE COURSE OF THE ROBBERY, WAS SHE ARMED WITH A DEADLY WEAPON?

YES____✕____

NO_____

Deg

## CHARGE 3

3.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST 4, 1994, DID KNOWINGLY AND UNLAWFULLY POSSESS CERTAIN WEAPONS, TO WIT: A H&R .32 CALIBER REVOLVER AND A ROSSI .38 CALIBER REVOLVER, WITH THE PURPOSE TO USE IT UNLAWFULLY AGAINST THE PERSON OR PROPERTY OF ANOTHER?

NOT GUILTY_____

GUILTY_____✕_____

## CHARGE 4

4.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST 4, 1994, DID KNOWINGLY AND UNLAWFULLY POSSESS CERTAIN WEAPONS, TO WIT: A H&R .32 CALIBER REVOLVER AND A ROSSI .38 CALIBER REVOLVER WITHOUT HAVING OBTAINED A PERMIT TO CARRY SAME?

NOT GUILTY_____

GUILTY_____✕_____

Da 10

**CHARGE 5** (PURPOSEFUL OR KNOWING MURDER)

5.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING**, DID COMMIT

MURDER, I.E., THAT SHE  DID PURPOSELY OR KNOWINGLY CAUSE THE DEATH OR

SERIOUS BODILY INJURY RESULTING IN THE DEATH OF JAMES POLITES ON

AUGUST 5, 1994?

                                  NOT GUILTY _____

                                  GUILTY ____✕____

(IF YOU FIND THE DEFENDANT GUILTY OF MURDER, THEN PROCEED TO CHARGE

#6.  HOWEVER, IF YOU FIND THE DEFENDANT NOT GUILTY OF MURDER, THEN

CONSIDER THE FOLLOWING QUESTION #5A AS TO AGGRAVATED

MANSLAUGHTER.)

5A.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING**, DID

RECKLESSLY CAUSE THE DEATH OF JAMES POLITES ON AUGUST 5, 1994 UNDER

CIRCUMSTANCES MANIFESTING EXTREME INDIFFERENCE TO HUMAN LIFE?

                                  NOT GUILTY_____

                                  GUILTY_____

(IF YOU FIND THE DEFENDANT NOT GUILTY OF AGGRAVATED MANSLAUGHTER,

THEN CONSIDER THE FOLLOWING QUESTION #5B AS TO RECKLESS

MANSLAUGHTER.)

5B.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,**  DID

RECKLESSLY CAUSE THE DEATH OF JAMES POLITES ON AUGUST 5, 1994?

                                  NOT GUILTY_____

                                  GUILTY_____



DG 11

**CHARGE 6** (FELONY MURDER- KIDNAPPING)

6. HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** WHILE IN THE COURSE OF COMMITTING THE CRIME OF KIDNAPPING, SHE OR ANOTHER PERSON DID CAUSE THE DEATH OF JAMES POLITES ON AUGUST 5, 1994?

NOT GUILTY_____

GUILTY____X____

*? no lesser ones*

**CHARGE 7** (FELONY MURDER- ROBBERY)

7. HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** WHILE IN THE COURSE OF COMMITTING THE CRIME OF ROBBERY, SHE OR ANOTHER PERSON DID CAUSE THE DEATH OF JAMES POLITES ON AUGUST 5, 1994?

NOT GUILTY_____

GUILTY____X____

*? No lesser ones*

*D9 12*

**CHARGE 8** (KIDNAPPING OF JAMES POLITES)

8.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST

5, 1994 DID KIDNAP JAMES POLITES?

NOT GUILTY_____

GUILTY _____

IF YOU FIND THE DEFENDANT GUILTY OF KIDNAPPING, YOU MUST

ANSWER QUESTION #8A AND #8B.

8A.  DID THE DEFENDANT, **JAMIE FARTHING,** RELEASE THE VICTIM, JAMES

POLITES, UNHARMED PRIOR TO HER APPREHENSION?



_____NO

_____YES

8B. DID **JAMIE FARTHING** RELEASE THE VICTIM, JAMES POLITES, IN A SAFE

PLACE PRIOR TO HER APPREHENSION?



_____NO

_____YES

IF YOU FIND THE DEFENDANT NOT GUILTY OF KIDNAPPING, PROCEED TO

QUESTION 8C.

8C.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON

AUGUST 5, 1994 DID  CRIMINALLY  RESTRAIN JAMES POLITES?

NOT GUILTY_____

GUILTY_____

Pg 13

## CHARGE 9

9.  HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST 5, 1994, WHILE  IN THE COURSE OF COMMITTING A THEFT, DID USE FORCE UPON JAMES POLITES?

NOT GUILTY_____

GUILTY____ ✕ __

IF YOU FIND THE DEFENDANT GUILTY OF ROBBERY, THEN ANSWER THE FOLLOWING QUESTION..

DURING THE COURSE OF THE ROBBERY, WAS SHE ARMED WITH A DEADLY WEAPON?

YES__ ✕ __

NO_____

PA 14

## CHARGE 10

10. HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST 5, 1994, DID KNOWINGLY AND UNLAWFULLY POSSESS CERTAIN WEAPONS, TO WIT: A H&R .32 CALIBER REVOLVER AND A ROSSI .38 CALIBER REVOLVER, WITH THE PURPOSE TO USE IT UNLAWFULLY AGAINST THE PERSON OR PROPERTY OF ANOTHER?

NOT GUILTY_____

GUILTY_____

## CHARGE 11

11. HOW DO YOU FIND AS TO THE CHARGE THAT, **JAMIE FARTHING,** ON AUGUST 5, 1994, DID KNOWINGLY AND UNLAWFULLY POSSESS A CERTAIN WEAPON, TO WIT: A H&R .32 CALIBER REVOLVER AND A ROSSI .38 CALIBER REVOLVER WITHOUT HAVING A PERMIT TO CARRY SAME?

NOT GUILTY_____

GUILTY_____



D9 15

| State of New Jersey | New Jersey Superior Court Law Division - Criminal |
|---|---|

**DEFENDANT:**
(Specify Complete Name)

JAMIE FARTHING

☒ JUDGMENT OF CONVICTION
☐ CHANGE OF JUDGMENT
☐ ORDER FOR COMMITMENT
☐ INDICTMENT / ACCUSATION DISMISSED
☐ JUDGMENT OF ACQUITTAL

| DATE OF BIRTH | SBI NUMBER |
|---|---|
| 05/03/76 | 985369B |

| DATE OF ARREST | DATE INDICTMENT/ ACCUSATION FILED |
|---|---|
| 09/18/94 | 07/19/95 |

| DATE OF ORIGINAL PLEA | ORIGINAL PLEA |
|---|---|
| 09/18/95 | ☒ NOT-GUILTY   ☐ GUILTY |

**ADJUDICATION BY**
☐ GUILTY PLEA   DATE:
☒ JURY TRIAL   DATE: 11/26/96
☐ NON-JURY TRIAL   DATE:
☐ Dismissed/Acquitted   DATE:

**ORIGINAL CHARGES**

IND./ACC.NO. 95-07-00889-I   COUNT CT.1   DESCRIPTION KIDNAPPING- 2C:13-1b(1). CT:2: ROBBERY- 2C:15-1. CT.3: POSS.WEAPON (FIREARM) FOR UNLAWFUL PURPOSE-2C:39-4a. CT.4:UNLAWFUL POSS.WEAPON(REVOLVER) W/O A PERMIT-2C:39-5b/2C:58-4. CT.7: MURDER - MURDER- 2C:11-3a(1)/and/or (2). CT.8: FELONY MURDER- 2C:11-3A(3).CT.9: FELONY ARMED ROBBERY- 2C:15-1. CT.10: KIDNAPPING- 2C:13-1B(1) and/or (2). CT.11 ARMED ROBBERY- 2C:15-1. CT.12: POSS.WEAPON- 2C:39-4a. CT.13:POSS.WEAPON W/O A PERMIT - 2C:39-5b/2C:58-4.

**FINAL CHARGES**

COUNT CT.1: DESCRIPTION KIDNAPPING- 2C:13-1b(1). CT.2: ROBBERY- 2C:15-1. CT.3: POSS. WEAPON (FIREARM) FOR UNLAWFUL PURPOSE- 2C:39-4a. CT: 4: UNLAWFUL POSS. WEAPON (REVOLVER) W/O A PERMIT- 2C:39-5b/2C:58-4. CT.7: MURDER - 2C:11-3a(1) and/or(2). CT. 8: FELONY MURDER- 2C:11-3A(3). CT.9: FELONY MURDER- 2C:11-3A(3). CT.10: KIDNAPPING- 2C:13-1b(1) and/or(2). CT. 11: ARMED ROBBERY- 2C:15-1. CT. 12: POSS. WEAPON- 2C:39-4a. CT.13: POSS. WEAPON W/O A PERMIT- 2C:39-5b/ 2C:58-4.

It is, therefore, on FEB.14,1997 ORDERED and ADJUDGED that the defendant is sentenced as follows:
CT. 1:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR 30 YEARS.
CT.2&3(merged): THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR
         20 YEARS, 10 YEARS WITHOUT PAROLE ELIGIBILITY.   GRAVE'S ACT OFFENSE
CT. 4:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR 5 YEARS.
CT. 7:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR LIFE -
         30 YEARS WITHOUT PAROLE ELIGIBILITY.
CTS.8&9: Merge with CT. 7. (Concurrent to Cts. 11,12,13.)
CT.11:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR 20 YEARS,
         10 YEARS WITHOUT PAROLE ELIGIBILITY.       GRAVE'S ACT OFFENSE
CT.12:   Merged with CT. 11.
CT.13:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR 5 YEARS.
CT.10:   THE DEFENDANT IS REMANDED TO NEW JERSEY STATE PRISON FOR 30 YEARS,
         CONSECUTIVE TO OTHER COUNTS.

☒ It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.

| | TOTAL NUMBER OF DAYS | DATE (From/To) |
|---|---|---|
| ☒ Defendant is to receive credit for time spent in custody. (R. 3:21-8). | 881 | 09/18/94-02/14/97 |
| ☐ Defendant is to receive gap time credit for time spent in custody. (N.J.S.A. 2C:44-5b(2)). | TOTAL NUMBER OF DAYS | DATE (From/To) |

| Total Custodial Term | Institution | Total Probation Term |
|---|---|---|
| LIFE | CDC | |

PLUS 60 YEARS WITH 40 YEAR PERIOD OF PAROLE INELIGIBILITY.

Administrative Office of the Courts
State Bureau of Identification
COPIES TO: CHIEF PROBATION OFFICER     STATE POLICE     AOC CRIMINAL PRACTICE DIVISION     DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

CPO108 (8/96)



D916

State of New Jersey v. ___ JAMIE FA___HING ___  S.B.I. # 9__ 369B   IND / ACC # 95-07-889-I

Total FINE  $_____

Total RESTITUTION  $_____

If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A. 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

Cts.1,2&3,11&12,10: 100 each

☒ Assessment imposed on

count(s) ___4,13___

___50.00___

Ct.9: 2,000.00 each.

Total VCCB Assessment  $ ___2,500.00___

☐ Installment payments are due at the rate of

$_____ per_____

beginning_____ (DATE)

If any of the offenses occurred on or after July 9, 1987, and is for a violation of Chapter 35 or 36 of Title 2C.

1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for each count. (Write in # times for each.)

___ 1st Degree  @ $3000   ___ 4th Degree  @ $750
___ 2nd Degree  @ $2000   ___ Disorderly Persons or Petty
___ 3rd Degree  @ $1000   ___ Disorderly Persons  @ $500

Total D.E.D.R. Penalty  $_____

☐ Court further ORDERS that collection of the D.E.D.R. penalty is suspended upon defendant's entry into a residential drug program for the term of the program.

2) A forensic laboratory fee of $50 per offense is ORDERED. _____ Offenses @ $50.

Total Lab Fee  $_____

3) Name of Drugs involved_____

4) A mandatory driver's license suspension of_____ months is ORDERED.

The suspension shall begin today. _____ and end_____

Driver's License Number_____

(IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.)

Defendant's Address_____

Eye Color_____ Sex_____ Date of Birth_____

☐ The defendant is the holder of an out-of-state driver's license from the following

jurisdiction_____ Driver's License Number_____

☐ Defendant's non-resident driving privileges are hereby revoked for_____ Months.

If the offense occurred on or after February 1, 1993 and the sentence is to probation or to a State Correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169)

If the offense occurred on or after August 2, 1993, a $75 Safe Neighborhood Services Fund assessment is ordered for each conviction. (P.L. 1993, c. 220)   75.00 x 8 = $600.00

If the offense occurred on or after January 5, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered. (P.L. 1993, c. 275) Amount per month_____

| NAME (Court Clerk or Person preparing this form) | TELEPHONE NUMBER | NAME (Attorney for Defendant at Sentencing) |
|---|---|---|
| IRENE NIGRO | 646-2147 | JOHN WEICHSEL, ESQ. |

**STATEMENT OF REASONS**

The court finds the following aggravating factors: (1) with regard to the murder charge, the nature and circumstances of the cruel manner in which the victim was killed; (2) the harm inflicted on the victim in Hackensack placing a gun to his head; (3) that this defendant is a risk to repeat her criminal behavior.  She is presently charged with a second murder in the State of New York.  There is a need to deter her and others.  Anything but incarceration sends the wrong message.  This defendant shows no remorse for her criminal behavior.  Mitigating factors (11) and (12) are applicable.  The court concludes that the aggravating factors substantially outweigh the mitigating factors.

| JUDGE (Name) | JUDGE (Signature) | DATE |
|---|---|---|
| TIMOTHY  J. SULLIVAN, JSC | Timothy J Sullivan | 2/27/97 |

Administrative Office of the Courts
State Bureau of Identification
COPIES TO:  CHIEF PROBATION OFFICER   STATE POLICE

DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

CPO166 (8/94)



D917

AMENDED ON 9/22/97 FOR REASON OF CLARIFICATION.

*J. Kullutin*

SEP 29 1997
SEP 27 1997

DOCKET #2165-94

### State of New Jersey

v.

JAMIE FARTHING

**New Jersey Superior Court**
**Law Division - Criminal**

DEFENDANT:
(Specify Complete Name)

| | |
|---|---|
| [X] | JUDGMENT OF CONVICTION |
| [ ] | CHANGE OF JUDGMENT |
| [ ] | ORDER FOR COMMITMENT |
| [ ] | INDICTMENT / ACCUSATION DISMISSED |
| [ ] | JUDGMENT OF ACQUITTAL |

| DATE OF BIRTH | SBI NUMBER |
|---|---|
| 5/3/76 | 985369B |

| DATE OF ARREST | DATE INDICTMENT/ ACCUSATION FILED |
|---|---|
| 9/18/94 | 7/19/95 |

| DATE OF ORIGINAL PLEA | |
|---|---|
| 9/18/95 | [X] NOT GUILTY   [ ] GUILTY |

**ADJUDICATION BY**

| [ ] GUILTY PLEA | DATE: | [ ] NON-JURY TRIAL | DATE: |
|---|---|---|---|
| [X] JURY TRIAL | DATE: 11/26/96 | [ ] Dismissed/Acquitted | DATE: |

**ORIGINAL CHARGES**

| IND / ACC NO | COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|---|

95-07-00889-I  CT.1: KIDNAPPING-2C:13-1b(1); CT.2: ROBBERY-2C:15-1;
CT.3: POSS. WEAPON (FIREARM) FOR UNLAWFUL PURPOSE-2C:39-4a; CT.4: UNLAWFUL POSS. WEAPON
(REVOLVER) W/O A PERMIT-2C:39-5b/2C:58-4; CT.7: MURDER-2C:11-3a(1)and/or (2);
CT.8: FELONY MURDER-2C:11-3A(3); CT.9: FELONY MURDER-2C:11-3A(3); CT.10: KIDNAPPING-
2C:13-1B(1) and/or (2); CT.11: ARMED ROBBERY-2C:15-1; CT.12: POSS. WEAPON-2C:39-4a;
CT.13: POSS. WEAPON W/O A PERMIT-2C:39-5b/2C:58-4.

**FINAL CHARGES**

| COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|

CT.1: KIDNAPPING-2C:13-1b(1); CT.2: ROBBERY-2C:15-1; CT.3: POSS. WEAPON (FIREARM) FOR
UNLAWFUL PURPOSE-2C:39-4a; CT.4: UNLAWFUL POSS. WEAPON (REVOLVER) W/O A PERMIT-
2C:39-5b/2C:58-4; CT.7: MURDER-2C:11-3a(1) and/or (2); CT. 8: FELONY MURDER-2C:11-3A(3);
CT.9: FELONY MURDER-2C:11-3A(3); CT.10: KIDNAPPING-2C:13-1b(1) and/or (2);
CT.11: ARMED ROBBERY-2C:15-1; CT.12: POSS. WEAPON-2C:39-4a; CT. 13: POSS. WEAPON W/O
A PERMIT-2C:39-5b/2C:58-4.

It is, therefore, on __FEB. 14, 1997__  ORDERED and ADJUDGED that the defendant is sentenced as follows:

SEE ATTACHED FOR SENTENCE.

[ ] You are hereby sentenced to community supervision for life.

[ ] The court finds that your conduct was characterized by a pattern of repetitive and compulsive behavior.

| [X] | It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority. | | |
|---|---|---|---|

| [X] Defendant is to receive credit for time spent in custody (R. 3:21-8). | TOTAL NUMBER OF DAYS 881 | DATE (From/To) 9/18/94-2/14/97 |
|---|---|---|
| [ ] Defendant is to receive gap time credit for time spent in custody (N.J.S.A. 2C:44-5b(2)). | TOTAL NUMBER OF DAYS | DATE (From/To) |

| Total Custodial Term  LIFE | Institution  CDC | Total Probation Term _____ |
|---|---|---|

PLUS 60 YEARS WITH 40 YEAR PERIOD OF PAROLE INELIGIBILITY.

D918

State of New Jersey v. __JAMIE FARTHING__   S.B.I. # __985369B__   IND / ACC # __95-07-889-I__

Total FINE          $ _____

Total RESTITUTION   $ _____

If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A. 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

CTS. 1,2&3, 11&12, 10:  100 EACH

☒ Assessment imposed on

count(s) _____4.13_____

is $ __50__ each.

CT. 7: 2,000

Total VCCB Assessment  $ __2,500__

☐ Installment payments are due at the rate of

$ _____ per _____

beginning _____
              (DATE)

If any of the offenses occurred on or after July 9, 1987, and is for a violation of Chapter 35 or 36 of Title 2C.

1)  A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for each count. (Write in # times for each.)

____ 1st Degree  @ $3000     ____ 4th Degree @ $750
____ 2nd Degree  @ $2000     ____ Disorderly Persons or Petty
____ 3rd Degree  @ $1000          Disorderly Persons @ $500

                    Total D.E.D.R. Penalty  $ _____

☐ Court further ORDERS that collection of the D.E.D.R. penalty be suspended upon defendant's entry into a residential drug program for the term of the program.

2)  A forensic laboratory fee of $50 per offense is ORDERED.  _____ Offenses @ $50.

                    Total Lab Fee  $ _____

3)  Name of Drugs involved _____

4)  A mandatory driver's license suspension of _____ months is ORDERED.

The suspension shall begin today. _____ and end _____

Driver's License Number _____

IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING:

Defendant's Address _____

Eye Color _____ Sex _____ Date of Birth _____

☐ The defendant is the holder of an out-of-state driver's license from the following jurisdiction _____. Driver's License Number _____

☐ Defendant's non-resident driving privileges are hereby revoked for _____ Months.

If the offense occurred on or after February 1, 1993 but was before March 13, 1995 and the sentence is to probation or to a state correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169). If the offense occurred on or after March 13, 1995 and the sentence is to probation, or the sentence otherwise requires payments of financial obligations to the probation division, a transaction fee of up to $2.00 is ordered for each occasion when a payment is made. (P.L. 1995, c. 9).

If the offense occurred on or after August 2, 1993, a $75 Safe Neighborhood Services Fund assessment is ordered for each conviction. P.L. 1993, c. 220      75 x 8 = $600

If the offense occurred on or after January 5, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered. (P.L. 1993, c. 275) Amount per month _____ .

If the crime occurred on or after January 1, 1997, a $30 Law Enforcement Officers Training and Equipment Fund penalty is ordered.

| NAME (Court Clerk or Person preparing this form) | TELEPHONE NUMBER | NAME (Attorney for Defendant at Sentencing) |
|---|---|---|
| IRENE NIGRO | 646-2147 | JOHN WEICHSEL, ESQ. |

STATEMENT OF REASONS

The court finds the following aggravating factors: (1) with regard to the murder charge, the nature and circumstances of the cruel manner in which the victim was illed; (2) the harm inflicted on the victim in Hackensack placing a gun to his head; (3) that this defendant is a risk to repeat her criminal behavior. She is presently charged with a second murder in the State of New York. There is a need to deter her and others. Anything but incarceration sends the wrong message. This defendant shows no remorse for her criminal behavior. Mitigating factors (11) and (12) are applicable. The court concludes that the aggravating factors substantially outweigh the mitigating factors.

| JUDGE (Name) | JUDGE (Signature) | DATE |
|---|---|---|
| TIMOTHY J. SULLIVAN, JSC | _Timothy J. Sullivan_ | 9/22/97 |

Administrative Office of the Courts
State Bureau of Identification                                    CP0106 (rev. 1/97)
COPIES TO:  CHIEF PROBATION OFFICER   STATE PC        ION   DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

DT 19

SENTENCE RE: JAMIE FARTHING INDICTMENT NO. 95-07-00889-I DOCKET NO. 2165-94

THE DEFENDANT IS REMANDED TO THE CUSTODY OF THE COMMISSIONER OF CORRECTIONS OF THE STATE OF NEW JERSEY AS FOLLOWS:

CT. 1 - 30 YRS.;
CTS. 2 & 3 (MERGE) 20 YRS, 10 YR. PERIOD WITHOUT PAROLE (GRAVES ACT OFFENSE);
CT. 4 - 5 YRS;
CT. 7 - LIFE IMPRISONMENT, 30 YRS WITHOUT PAROLE;
CTS. 8 & 9 - MERGE WITH CT. 7;
CT. 11 - 20 YRS, 10 YRS WITHOUT PAROLE (GRAVES ACT OFFENSE)
CT. 12 - MERGE WITH CT. 11;
CT. 13 - 5 YRS;
CT. 10 - 30 YRS;

CTS. 1, 2, 4 TO RUN CONCURRENT TO EACH OTHER;
CTS. 7, 11, 13 TO RUN CONCURRENT TO EACH OTHER:
CTS. 1, 2, 4 TO RUN CONSECUTIVE TO CTS. 7, 11, 13;
CT. 10 TO RUN CONSECUTIVE TO CT. 7.

TOTAL CUSTODIAL TERM: LIFE PLUS 60 YEARS WITH 40 YEARS WITHOUT PAROLE.

_Timothy J. Sullivan_ 9/22/97

TIMOTHY J. SULLIVAN, J.S.C.

SUSAN L. REISNER
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street
Box 46003, 9th Floor
Newark, New Jersey 07101
201-877-1200

APR 30 1997

A4776-96 T4

Emile R. Cox, Esq.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
IND. NO(S). 95-07-00889

STATE OF NEW JERSEY,               :          CRIMINAL ACTION

    Plaintiff-Respondent,      :          NOTICE OF APPEAL

    v.                         :

JAMIE FARTHING,                    :

    Defendant-Appellant.       :

PLEASE TAKE NOTICE that the defendant, Confined at Edna
Mahan Correctional Facility for Women appeals to this Court from
the final judgment of conviction of murder, kidnapping, robbery,
possession of a weapon for an unalwful purpose, possession of a
weapon without a permit entered on February 27, 1997 in the
Superior Court, Law Division, Bergen County, in which a sentence
of life imprisonment plus 60 years, with a 40 year parole
ineligibility term, $2,500 VCCB penalty, $600 SNSF penalty was
imposed by the Honorable Timothy J. Sullivan.

SUSAN L. REISNER
Public Defender
Attorney for Defendant-Appellant

BY: _____
DEBORAH C. COLLINS
Assistant Deputy Public Defender
Intake Unit

The undersigned certifies that the requirements of R. 2:5-3(a)
have been complied with by ordering the transcript(s) on April
23, 1997 as indicated on the accompanying transcript request
form(s) and that a copy of this Notice has been mailed to the
tribunal designated above.

_____

Da 21

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
A-4776-96T4

FILING DATE
APPELLATE DIVISION

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMIE FARTHING,

      Defendant-Appellant.

APPROVED FOR PUBLICATION

MAY 1 8 2000

APPELLATE DIVISION

MAY 18 2000

Clerk

Submitted April 19, 2000 - Decided MAY 1 8 2000

Before Judges Baime, Brochin and Eichen.

On appeal from Superior Court of New
Jersey, Law Division, Bergen County.

Ivelisse Torres, Public Defender, attorney
for appellant (Ruth Bove Carlucci, Assistant
Deputy Public Defender, of counsel and on
the brief).

John J. Farmer, Jr., Attorney General, attorney
for respondent (Nancy A. Hulett, Deputy Attorney
General, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Following a protracted jury trial, defendant was found
guilty of two counts of first degree kidnaping (N.J.S.A. 2C:13-
1b(1) and (2)), two counts of first degree robbery (N.J.S.A.
2C:15-1), two counts of possession of a firearm for an unlawful
purpose (N.J.S.A. 2C:39-4a), two counts of possession of a
handgun without a permit (N.J.S.A. 2C:39-5b), purposeful or



Da 22

knowing murder (<u>N.J.S.A.</u> 2C:11-3a(1) and (2)), and two counts of felony murder (<u>N.J.S.A.</u> 2C:11-3a(3)). After merging the convictions for felony murder and possession of a firearm for an unlawful purpose, the trial court sentenced defendant to an aggregate term of life imprisonment plus sixty years with a forty year parole disqualifier on the surviving counts. Defendant appeals. We reverse defendant's conviction for purposeful or knowing murder because: (1) the prosecutor elicited testimony from two investigators that defendant's non-testifying co-defendants had implicated her in the robberies and murder, (2) the trial court erroneously allowed the State to cross-examine the defense's expert witnesses using inadmissible hearsay, and (3) hearsay evidence was improperly admitted under the co-conspirator exception. These errors did not affect the remaining convictions, which we affirm.

I.

Defendant, who was eighteen years old, resided in Conyers, Georgia with her father, step-mother and brother. In June 1994, defendant's father ordered her to leave the family home for disciplinary reasons. Penniless and unemployed, defendant found shelter with her boyfriend, Edward Kummer, and others. Through Kummer, defendant met Ivie Demolina and Thomas Christopher James.

Demolina had worked for an escort service in New York City. During the summer, she hatched a plan to rob several of her former clients. Over Kummer's objections, Demolina and James

-2-

D9 23

enlisted defendant in the scheme.  The plan was for the two women to gain entry to the victims' residences by promising sexual services.  The victims were to be restrained and their belongings taken.

In July 1994, defendant, James and Demolina left Georgia for New York City.  At some point during the journey, Demolina placed a collect telephone call to her half-sister, Magda Rahey, who resided in Brooklyn.  Demolina told Rahey she was in the company of James and defendant.  During the conversation, Rahey heard two voices in the background.  One was a male; the other was a female having a "thick [southern] accent."  Demolina told Rahey that the three intended to "finish something off" and to "take care of something."  When pressed for details, Demolina responded that she, James and defendant planned to go to New Jersey to "kill" a man.  Demolina added that she might visit Rahey while in the area.

Demolina, James and defendant arrived in Brooklyn some time in August.  They took up residence with Demolina's mother, Maria Rios, and her half-brother, Ben Rosario.  Demolina and defendant purchased wigs which they were to wear in the planned robberies. The stage was thus set for execution of their plan.

On August 3, 1994, Demolina telephoned Robert Hippman. Calling herself "Erica," Demolina told Hippman that she and her friend "Alexis," who was also an escort, were in the area. Demolina offered to provide sexual services to Hippman in

-3-

Pa 24

exchange for money.  Hippman had met Demolina on a prior occasion
when he had telephoned the L'Affaire Escort Service on December
24, 1992.  Demolina had identified herself as "Erica" and the two
had engaged in sexual relations.  Hippman thus invited the two
women to his highrise apartment in Hackensack.

At the appointed hour, Efrain Papaleo, a friend of Rosario,
drove Rosario, defendant, Demolina and James to Hippman's
apartment.  During the ride, it was agreed that Demolina would
identify herself as "Erica" and defendant would identify herself
as "Alexis."  Once having gained entry into Hippman's apartment,
James was to brandish a firearm and restrain the victim.  Papaleo
and Rosario were to remain in the automobile.

At approximately 1:30 a.m., defendant and her companions
arrived at Hippman's building where they were greeted by William
Mooney, the doorman.  Identifying herself as "Erica," Demolina
explained that they were there to visit Hippman.  Using the
building's intercom, Hippman confirmed that "Erica" and "Alexis"
were his guests.

Hippman was not happy to see that "Erica" and "Alexis" were
accompanied by James.  He nevertheless allowed the three to enter
the apartment based upon Demolina's statement that James merely
wished to use the telephone.  Hippman testified that "Alexis,"
whom he identified in court as the defendant, suddenly pointed a
dark gray or black gun at him and announced, "this is a stickup."
Hippman was ordered to lie face down.  When he refused, James

-4-

Pg 25

pulled out a second gun.  James then taped Hippman's hands and legs so he could not move.

As Hippman lay immobilized on his stomach, defendant, Demolina and James ransacked the apartment.  After placing numerous items in a sports bag, James held a pair of scissors to Hippman's back while the two women secured him with additional duct tape.

The trio left Hippman's apartment at approximately 4:00 a.m. James carried the sports bag containing the stolen items. Papaleo then drove defendant and her companions to Brooklyn.  En route, they stopped at the Valley Bank in Bergenfield where James used Hippman's ATM card to withdraw money from the cash machine.

Hippman was eventually able to free himself and summon the police.  The police subsequently retrieved a surveillance tape of the Valley Bank's ATM machine.  The tape showed James using Hippman's ATM card.  Hippman later identified James from the tape as the man who had assisted defendant and Demolina in the robbery.

The next victim was James Polites.  Polites lived alone in an apartment in Edgewater.  Among other business ventures, Polites was a partner with John Acunto and Francis Sposa in a bar located in Fort Lee.  The practice was for Sposa to distribute cash profits in a white envelope.  Polites would obtain the envelope at his leisure and give Acunto his share.  In the beginning of August, Sposa gave Polites an envelope containing

-5-

pg 26

$5,000.  Polites telephoned Acunto and told him that he would give him his share when the two next met.

Demolina was acquainted with Polites.  She had met Polites and his friend, Leonard Marshall, at a nightclub in 1992. Demolina had introduced herself as "Evia."  Polites and Demolina engaged in a sporadic romantic relationship that ended in 1994.

On August 4, 1994, Demolina telephoned Polites at his Fort Lee bar and told him that she and "Alexis" were in the area and wanted to engage in a menage a trois.  Demolina instructed Polites to make sure he was alone and to have a bottle of Pino Grigio Santa Marguerita wine at hand.  After concluding his telephone conversation with Demolina, Polites described what had occurred to Vincent Luppino, a friend who was also a patron of the bar.  He also told Sposa.  Later that night, Sposa answered the telephone at the bar, and a woman asked for Polites. Demolina and defendant made final arrangements with Polites to meet him at his apartment.  Demolina told Polites that she and her friend charged $300 an hour for sexual activities.  This call was placed from a pay telephone near Rios's apartment in Brooklyn.  Polites left the bar and was never again seen alive.

Polites' death was not discovered until August 8, 1994.  As we mentioned, Polites was to meet Acunto and deliver his share of the profits from the bar.  Acunto attempted to reach Polites by telephone, but was unsuccessful.  After getting numerous busy signals, Acunto tried contacting Polites by paging him.

-6-

Pg 27

Ultimately, Acunto received a telephone call from James who had stolen Polites' pager. Acunto asked whether he was speaking to Polites. When James said no, Acunto hung up.

His suspicions aroused, Acunto proceeded to the Fort Lee bar but was told that Polites had not appeared. Acunto then drove to Polites' apartment where he gained entry by using a key Polites had given him. Acunto immediately noticed that the apartment had been ransacked. Fearing the worst, Acunto proceeded to the second floor where he observed Polites' ankles bound together protruding from the bedroom doorway. Entering the bedroom, Acunto saw that Polites was hanging from the doorway with his upper torso suspended and his head approximately six inches from the floor. Polites' body was positioned face down with his back arched. His hands were tied together behind his back. His head was covered by a pillow case. A cord was wrapped around his neck and tied to the door knob.

The police responded immediately. They found the apartment in a state of disarray. Polites' ashen gray body was discovered in the position we have described. The officers noticed that two neckties had been used to bind Polites' ankles. The victim's wrists were tied behind his back with a telephone cord. A third necktie had been used to "hog tie" Polites' hands and ankles. The victim's thighs were also tied with a necktie. A pillow case had been placed over Polites' head and was secured with a necktie. Blood stains appeared on the pillow case and carpet.

$pq28$

An electrical cord was tied around Polites' neck and tied to the bedroom doorknob.

An autopsy disclosed a laceration on the back of Polites' head, consistent with having been made by a small blunt object. The medical examiner, Dr. Sunandan Singh, concluded that the blow was not sufficient to render the victim unconscious.  There was a single ligature mark on Polites' neck which was also imprinted on the outer surface of his esophagus.  In Singh's opinion, the cause of death was asphyxia due to a single fracture of the left superior horn of the hyoid cartilage.  Since Polites was a young person whose cartilage was strong and elastic, Singh theorized that a great deal of force had been applied.  Singh concluded that the killer had straddled the victim's body from behind and pulled the tie surrounding Polites' neck with great pressure. There was no sign that Polites had struggled.  Death occurred within three minutes.

The State presented overwhelming evidence connecting defendant to the crimes.  On August 5, 1994, the day Polites' body was discovered, Demolina, James and defendant went to a pawn shop in Brooklyn where they attempted to sell a Super Bowl ring they had taken from the victim's apartment.  Thomas Delgado, the proprietor of the store, was acquainted with Demolina, and was able to provide the police with a detailed description of James and defendant.  Delgado refused to accept the Super Bowl ring, but sold various items of jewelry to the three individuals.

-8-

Pg 29

Defendant purchased what Delgado described as a motion ring.

Several days after the killing, Demolina placed a collect telephone call to Magda Rahey.  In guarded language, Demolina confided that she had "finished" her dealings in New Jersey and was leaving for an unspecified destination with defendant and James.  Initially, Demolina noted that "she had to rough [the victim] up" and "beat" him.  When pressed by Rahey, Demolina told her that she had "finished him off."

Beginning on August 6, 1994, defendant and her companions checked into a series of expensive Manhattan hotels, paying their bills and other charges with cash.  The trio brazenly registered under the name "Farthing," using "Conyers, Georgia" as their home address.  On one occasion, the room was registered in defendant's name and the address was that of her father.  While staying at one hotel, defendant and Demolina had a photograph taken of them wearing the wigs they had used in the Hippman robbery.

Subsequently, defendant parted company with Demolina and James and flew to Georgia for a one week visit.  Kummer met defendant at the airport and noticed that her luggage was very heavy and that she was wearing the motion ring she had purchased from Delgado's pawn shop.  Kummer drove defendant to her mother's house in Union City, Georgia.  While helping defendant unpack, Kummer found a plethora of items defendant claimed she had purchased in New York.  At the end of the week, defendant returned to New York using the return of a round trip ticket.

-9-

Da 30

Upon her return, defendant and her companions checked into the Mayflower Hotel on Central Park West in Manhattan. Kummer ultimately flew to New York and joined them. During Kummer's stay, defendant, Demolina and James lived lavishly. James paid "for almost everything" with a "stack of money" consisting of thousands of dollars. Kummer asked defendant about the source of the money, which was spent on clothes, jewelry, camcorders and crystal. Defendant explained that they had robbed a man by entering his house while pretending to be prostitutes. Defendant told Kummer that James had killed the man. Appalled by defendant's story, Kummer asked how she could have participated in such a scheme. Defendant replied that it was "an easy way to get things," although she claimed that she did not know in advance that James intended to kill the victim.

Before leaving New York, Kummer urged defendant to return with him to Georgia, offering to pay for her flight. Defendant declined Kummer's invitation, emphasizing that she could leave whenever she wished. Kummer returned to Georgia without defendant.

On August 28, 1994, defendant, James and Demolina checked out of the Mayflower Hotel. They arrived at the Brooklyn apartment of defendant's half-sister, Magda Rahey, with four pieces of luggage. Rahey was about to move to another apartment and had stored her household items in a warehouse. James, with Rahey's help, rented a larger storage bin at the same facility.

-10-

*Pg 31*

This proved to be a brief interlude.  Defendant, Demolina and
James checked into the Iroquois Hotel in Manhattan, where they
continued to spend money lavishly.  Ultimately, they "ran out of
money," and defendant returned to Georgia where she resided with
her mother.

Detective Robert Hynes, who was investigating the Hippman
robbery, happened upon a newspaper article describing the Polites
homicide investigation.  Hynes joined Bergen County Investigators
Terrance Alver and Frank Kelaher, who were investigating the
Polites killing.  Kelaher traced the telephone numbers Hippman
had provided regarding the calls that had been made to him by
"Erica."  The telephone numbers were traced to a pay telephone
booth near Maria Rios's Brooklyn apartment.  A third telephone
call had been made to Hippman from Rios's residence.  The
investigators learned that Demolina occasionally resided at her
mother's apartment.  They obtained her photograph from the New
York City police.  Hippman subsequently identified Demolina as
one of the perpetrators of the robbery.  Marshall also identified
Demolina as Polites' former girlfriend.

With the aid of the New York City police, Demolina and James
were apprehended as they were checking out of the Cross Bay Motel
in Queens.  A search of their luggage revealed a .34 caliber H &
R revolver and a .38 caliber Rossi revolver.  The police
additionally recovered many of the items that had been stolen
from Hippman's apartment.  An undeveloped film depicted

-11-

Dc 32

defendant, Demolina, James, Papaleo and Rosario.  Papaleo and
Rosario were subsequently arrested and additional articles
belonging to Hippman were seized.

Demolina and James gave statements to the police implicating
defendant.  Based upon those statements, Detective Hynes and
Investigator Alver flew to Georgia to arrest defendant.  However,
Demolina telephoned Kummer and warned him that the police were
attempting to locate defendant.  Kummer relayed this message to
defendant who was apprehended as she was about to flee.  A search
of defendant's bedroom disclosed various articles that had been
stolen from Hippman and Polites.

After waiving her constitutional rights, defendant gave an
oral statement admitting that she had participated in the two
robberies.  However, she minimized her involvement.  She claimed
that she was unaware of Demolina's plan to rob former clients
until she arrived in Brooklyn.  While staying at Rios's
apartment, Demolina told defendant she knew "coke heads" with
money who deserved to get "ripped off."  Defendant admitted to
the police that she agreed to the plan.  Demolina told defendant
they would gain entry to the apartment of her former clients by
promising to engage in sexual relations.  Pursuant to that
scheme, defendant was present when Demolina telephoned Hippman
from a pay booth near Rios's apartment.

Defendant described how she, Demolina and James robbed
Hippman while Papaleo waited in his car.  According to defendant,

-12-

Da 33

Demolina gave her a gun which she pointed at Hippman.  After taping the victim to a chair, the trio returned to Brooklyn in Papaleo's automobile.  They then took a taxi to Manhattan where they stayed in various luxury hotels.

Defendant also admitted that she participated in the Polites' robbery.  However, she again minimized her involvement.  Specifically, she claimed that she did not know Polites was going to be killed until she overheard Demolina tell James in Polites' apartment that he had to be eliminated because he could identify her.  She claimed that this conversation between Demolina and James took place in Polites' bedroom and that she was downstairs when she overheard it.  Defendant told the police that Papaleo drove Demolina, James and her to Polites' apartment.  After gaining entry, Demolina asked Polites to pay the cab driver.  Polites went downstairs.  Several minutes later, he returned with his hands in the air.  Defendant saw James walking behind Polites brandishing a gun.  Defendant explained that she and Demolina went upstairs and started rummaging through Polites' belongings.  James called to them to find something he could use to tie Polites' hands and feet.  Demolina found some neckties and a pillow case.

While searching Polites' bedroom, defendant found the victim's Super Bowl ring and substantial amounts of cash.  At some point, Demolina went downstairs and helped James carry Polites upstairs to the bedroom.  Defendant observed that

-13-

Da 34

Polites' hands, legs and ankles were bound with neckties and telephone cord.  According to defendant's oral statement, she went downstairs where she continued her search for valuables. When she later returned to the second floor bedroom, she saw Polites hanging by the neck face down from the door knob.  A bloody pillow case covered the victim's head.  James was standing over the body.  Demolina stood by the nearby staircase. Defendant recounted that, after staring at the body, she and her companions left the apartment with Polites' belongings.

The police asked defendant to give a recorded statement. Defendant replied that she first wanted to talk to her mother. Questioning then stopped.  Detective Hynes and Investigator Alver returned to New Jersey with defendant, who was then transported to the Bergen County Prosecutor's Office.

Immediately before she was to be transferred to the jail annex, defendant told Lieutenant Roger Kane that she had lied in her earlier statement and now wanted to tell the truth.  After again waiving her constitutional rights, defendant gave a transcribed statement.  Defendant admitted that Demolina's plan to rob former escort clients was first discussed in Georgia.  She admitted for the first time that Rosario accompanied them to Hippman's apartment and remained in the car with Papaleo while she, Demolina and James robbed the victim.  Although she claimed the gun was unloaded, defendant demonstrated how she pointed it at Hippman.

Pg 35

As to the Polites homicide, defendant noted that Rosario accompanied them on the ride to the victim's apartment.  She further claimed that Rosario and Papaleo entered the apartment after James surprised Polites with the gun.  Defendant repeated her earlier assertion that while in the apartment she overheard a conversation between Demolina and James in which they decided to kill Polites in order to avoid being identified.  She again claimed that the conversation took place in Polites' bedroom and that she was not present.

Defendant elected not to testify.  Through the testimony of Jonathan Kleinman, a psychologist, and Arnaldo Apolito, a psychiatrist, defendant raised the defense of diminished capacity.  We will describe certain aspects of their testimony in greater detail later in this opinion.  Suffice it to say at this point, both witnesses asserted that defendant suffered from "post-traumatic stress disorder" as a result of a difficult childhood.  They claimed that defendant was in a "disassociative state" when the crimes were committed, and that she was unable to act with purpose or knowledge because her perception of reality was impaired.

The prosecution's expert, Dr. Steven Simring, found no evidence that defendant suffered from post-traumatic stress disorder.  He concluded that defendant was fully aware of the nature of the crimes committed and that she purposely and knowingly participated.

-15-

Da 36

It is against this factual backdrop that we address defendant's arguments.  Defendant claims (1) testimony relating to Demolina's and James' statements to the police in which they implicated her in the commission of the crimes was erroneously admitted, (2) the prosecutor improperly elicited details about the co-defendants' statements from the expert witnesses, (3) the trial court committed error by admitting evidence pertaining to a threat she made to another inmate following her incarceration, (4) hearsay evidence was improperly admitted under the co-conspirator exception, (5) the trial court committed plain error in its instructions and in its response to a question propounded by the jury during its deliberations, and (6) the aggregate sentence imposed is manifestly excessive.  Only the first four of defendant's arguments require extended discussion.

## II.

During Kelaher's direct examination, the prosecutor inquired whether the New York City police had apprised him of the arrest of Demolina, James and Rosario.  Kelaher replied that he had been so informed on September 13, 1994.  In response to further questions, Kelaher noted that he was also told where defendant could be located.  In her direct examination of Investigator Alver, the prosecutor elicited testimony that the witness went to the Midtown South Precinct in New York City where he spoke with Demolina and James.  The prosecutor then inquired whether Alver "went anywhere" as a result of the time he spent in New York City

-16-

Da 37

with Demolina and James.  Alver replied that he flew to Conyers,
Georgia.  The prosecutor asked why the witness had decided to go
to Conyers.  Alver explained that his purpose was "[t]o locate
and arrest" defendant for whom he had obtained arrest warrants
for murder and robbery.  Alver subsequently described his
interview with defendant, noting that he began his interrogation
by explaining that "both [Demolina and James] had given sworn
statements implicating her" in the robbery and murder.  Defendant
contends that this evidence violated both the hearsay rule and
her right of confrontation.  We agree.

In _State v. Bankston_, 63 _N.J._ 263 (1973), our Supreme Court
acknowledged the well-settled rule that the right of
confrontation is not violated when a police officer explains the
reasons he apprehended a suspect or went to the scene of a crime
by stating that he did so "upon information received."  _Id._ at
268.  This type of general testimony was said to be admissible to
show that the officer was not acting arbitrarily.  _Ibid._
However, when an officer becomes more specific by repeating what
some other person told him concerning a crime by the accused,
both the hearsay rule and the right of confrontation are
violated.  _Ibid._  The Court expanded the applicability of the
rule by determining that a specific hearsay statement is not
required in order to create an impermissible inference of guilt.
_Id._ at 271.  The Court reasoned, "[w]hen the logical implication
to be drawn from the testimony leads the jury to believe that a

-17-

Dg 38

non-testifying witness has given police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Ibid.

The principle distilled from Bankston and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights. See, e.g., State v. Roach, 146 N.J. 208, 224-25, cert. denied, 519 U.S. 1021, 117 S. Ct. 540, 136 L.Ed.2d 424 (1996); State v. Irving, 114 N.J. 427, 446-47 (1989); State v. Guzman, 313 N.J. Super. 363, 381 (App. Div.), certif. denied, 156 N.J. 424 (1998); State v. Torres, 313 N.J. Super. 129, 157 (App. Div.), certif. denied, 156 N.J. 425 (1998); State v. Alston, 312 N.J. Super. 102, 112-14 (App. Div. 1998); State v. Laboy, 270 N.J. Super. 296, 302-05 (App. Div. 1994); State v. Baker, 228 N.J. Super. 135, 139-40 (App. Div. 1988).

Where, as here, the defendant does not claim that the police acted arbitrarily in arresting or interrogating her, we perceive no justification for deviating from this well-recognized principle. We thus reject the State's argument that Alver's testimony was not admitted as substantive evidence, but instead pertained solely to the reason why defendant was arrested. The line of demarcation the State attempts to draw is much too tenuous. In any event, no limiting instruction was requested or given. See State v. Maristany, 133 N.J. 299, 309 (1993); State v. Laboy, 270 N.J. Super. at 306. The error so committed

-18-

deprived defendant of her Sixth Amendment right of confrontation.

## III.

For the sake of convenience and clarity, we consider together defendant's second and third arguments. We hold that the prosecutor improperly elicited hearsay testimony from the expert witnesses concerning the inculpatory statements of the co-defendants and the defendant's post-incarceration threat to another inmate. We summarize the salient feature of this evidence.

As we noted earlier, defendant's claim of diminished capacity was presented through the testimony of Dr. Kleinman and Dr. Apolito. Both witnesses asserted that defendant was unable to harbor the requisite mens rea because she was suffering from post-traumatic stress disorder. However, the witnesses differed in the manner in which they arrived at their conclusions. Dr. Kleinman testified that the facts surrounding the crimes were not significant in arriving at his diagnosis. Instead, his conclusions were based on clinical tests and facts relating to defendant's childhood. In contrast, Dr. Apolito heavily relied upon the operative facts pertaining to the crimes in arriving at his conclusions. To a large extent, he assumed as true most of the facts contained in defendant's confession. He also relied upon portions of James' statement. This distinction between the methods by which the experts arrived at their diagnosis is important in assessing the propriety of the prosecutor's cross-

-19-

₍a 40

examination of the witnesses.  We begin our analysis by reciting the applicable legal principle.  We then take a closer look at the prosecutor's cross-examination of Kleinman and Apolito.

It has long been the law in New Jersey that "hearsay statements upon which an expert relies are admissible, not for [the purpose of] establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached."  State v. Humanik, 199 N.J. Super. 283, 305 (App. Div.), certif. denied, 101 N.J. 266 (1985), cert. denied sub nom. Beyer v. Humanik, 493 U.S. 812, 110 S. Ct. 57, 107 L.Ed.2d 25 (1989); see also State v. Lucas, 30 N.J. 37, 79 (1959); Blanks v. Murphy, 268 N.J. Super. 152, 162-64 (App. Div. 1993); Dietzeman v. Peterson, 196 N.J. Super. 96, 97-101 (Law Div. 1984).  One of the main sources of proof of insanity or diminished capacity is the conduct of the defendant both at the time of the examination and earlier.  In this connection, verbal conduct is as important as non-verbal conduct in the eyes of the psychiatrist or psychologist.  State v. Lucas, 30 N.J. at 79.  The psychiatrist or psychologist may consider the defendant's statement in a variety of ways.  He may be "not so interested in the truth of what is said as he is in the fact it was said."  Ibid.  The classic illustration is the man who claims he is Napoleon.  The psychiatrist or psychologist considers such a statement as important not because of its truth or falsity, but because it is evidence of irrationality.  Conversely, some statements of a patient may be considered

-20-

important because they disclose a factual history that is relevant to the doctor's diagnosis.  Stated somewhat differently, the doctor assumes the truth of such statements and considers the facts in terms of their impact upon the patient's mental health or mental disease.

These common sense notions suggest an analytical framework for resolution of evidentiary questions pertaining to psychiatric evidence.  The first step is to determine whether the psychiatrist or psychologist actually relied upon the hearsay statement as a necessary element in the formulation of his opinion.  In that event, the testimony should be circumscribed by a limiting instruction to the effect that the jury should not consider the hearsay statement as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the doctor on the question of insanity or diminished capacity.  <u>Ibid.</u> If it further appears that the expert's opinion "hinges upon the truth of the matter asserted, rather than the fact that it was said, then the jury should be instructed that the probative value of the [doctor's] opinion will depend upon whether there is, from all the evidence in the case, independent proof of the statement made by the accused."  <u>Id.</u> at 79-80.  Thus, the second step in resolving questions relating to psychiatric testimony is to determine whether the psychiatrist or psychologist considered the hearsay statement as true in arriving at his diagnosis, and to

-21-

Pg 42

instruct the jury accordingly.

Applying these principles, we first conclude that Dr. Kleinman did not rely on defendant's recitation of the facts surrounding the crimes in arriving at his conclusions.  However, he did rely on defendant's description of her unhappy childhood and other hearsay statements pertaining to her upbringing in determining that she suffered from post-traumatic stress disorder.  In Dr. Kleinman's testimony, few references were made to defendant's statements pertaining to the crimes.  The judge should have instructed the jury that it could not consider these references as proof of the truth of the assertions made.  As to the hearsay statements concerning defendant's upbringing, upon which Dr. Kleinman relied, the judge should have told the jury that the psychologist's opinion depended upon whether there was independent proof of the assertions made.  Ibid.; see also State v. Maik, 60 N.J. 203, 208 (1972), rev'd on other grounds, 68 N.J. 236 (1975); State v. Burris, 298 N.J. Super. 505, 512-13 (App. Div.), certif. denied, 152 N.J. 187 (1997).

More importantly for the purpose of this appeal, the judge should have precluded the prosecutor from cross-examining Dr. Kleinman on the subject of the statements made by Demolina and James - specifically the "numerous discrepancies" between their version of the facts and the roles of the participants and defendant's account.  It is true, as the State asserts, that Dr. Kleinman's credibility was a proper subject for cross-

-22-

Da 43

examination.  However, it is improper for a prosecutor to attack the credibility of a defendant's expert by cross-examining him about the details of inadmissible hearsay on which he did not rely in forming his opinion.  State v. Pennington, 119 N.J. 547, 577-83 (1990); State v. Rose, 112 N.J. 454, 500 (1988); State v. Spencer, 319 N.J. Super. 284, 299-303 (App. Div. 1999).  Expert testimony is not a vehicle for the "wholesale [introduction] of otherwise inadmissible evidence."  State v. Raso, 321 N.J. Super. 5, 16 (App. Div.), certif. denied, 161 N.J. 332 (1999).  An expert witness "should not be permitted to serve as a conduit for alerting the jury to evidence it would not otherwise be allowed to hear."  State v. Burris, 298 N.J. Super. at 512.

Dr. Apolito's testimony stands on a somewhat different footing.  Dr. Apolito began his testimony with a lengthy monologue concerning the facts surrounding the crimes.  In the course of this highly selective recitation, the witness repeatedly emphasized defendant's "minimal involvement" in the robberies.  As to the Polites homicide, Dr. Apolito characterized defendant's participation as "nil."  The doctor's description of the facts was based on defendant's confessions.  Moreover, Dr. Apolito stressed that as "a man of this world . . . with a great deal of experience," he knew that most people "tend to color the truth," but he nevertheless believed that defendant's recitation of the facts in her confessions was "given to the best of her knowledge" and was "mostly" true.  When asked on cross-

-23-

D. 44

examination whether he had compared defendant's confessions with the statements of her co-defendants, Dr. Apolito responded that he had done so and volunteered that "[a]s a matter of fact [he had] found quite a bit of confirmation."  The witness specifically referred to portions of James' statements which he had underlined.  Dr. Apolito stated unequivocally that he "relied on" these passages in arriving at a conclusion with respect to defendant's state of mind.

The prosecutor then elicited testimony concerning portions of James' statement that were inconsistent with defendant's confessions.  For example, it will be recalled that defendant claimed to be downstairs when she overheard a conversation between Demolina and James in the upstairs bedroom in which it was agreed that Polites would be killed.  James related this conversation in his statement but claimed that defendant was present in the bedroom when it was decided that Polites would be killed.  Apolito was confronted with other parts of James' statement which seemed to indicate that defendant was present in or near the bedroom when Polites was killed.  Despite James' statement, Dr. Apolito insisted that defendant was only "minimally involved" in the robbery and murder of Polites.

The prosecutor also confronted Dr. Apolito with Demolina's statement.  Demolina claimed that the decision to kill Polites was made in Georgia before she, defendant and James hitchhiked to New York City.  She further asserted that the subject was again

-24-

6945

discussed on Polites' porch where she and her confederates were waiting to gain entry to the victim's apartment.  Despite these passages, Dr. Apolito continued to insist that defendant's participation in the robbery and killing was minimal.

We do not suggest that all of the prosecutor's cross-examination of Dr. Apolito was proper.  Dr. Apolito never stated or implied that he relied on Demolina's statement in arriving at his conclusion.  We find error in the prosecutor's extensive cross-examination of the witness on the subject of Demolina's statement.  However, Dr. Apolito testified unequivocally that he relied upon portions of James' statement in arriving at his conclusion that defendant was only minimally involved in the crimes.  The witness stated that parts of James' statement "confirmed" his understanding of defendant's role.  We reject defendant's argument that the prosecutor was only entitled to cross-examine Dr. Apolito on the passages the witness found were "confirmatory" of defendant's confessions.  We find that such a fine parsing of words and phrases would be unduly sterile and unrealistic.

We think that disposition of the issue is controlled by the spirit, if not the wording, of N.J.R.E. 106.  That rule states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at the time of any other part or any other writing or recorded statement which in fairness ought to be considered

-25-

Pa 46

contemporaneously." Although the rule is new, the underlying
principle of testimonial completeness has long guided our courts.
Biunno, Current N.J. Rules of Evidence, Comment on N.J.R.E. 106
(1999-2000); cf. State v. Sette, 259 N.J. Super. 156, 185-89
(App. Div.), certif. denied, 130 N.J. 597 (1992); State v. Lozada
257 N.J. Super. 260, 271 (App. Div.), certif. denied, 130 N.J.
595 (1992); State v. Colon, 246 N.J. Super. 608, 613 (App. Div.
1991); State v. Gomez, 246 N.J. Super. 209, 216-17 (App. Div.
1991). It has been said that this and the related "opening the
door" doctrine are essentially "rule[s] of expanded relevancy and
authorize[] admitting evidence which would have been irrelevant
or inadmissible in order to respond to admissible evidence that
generates an issue . . . ." State v. James, 144 N.J. 538, 554
(1996); see also State v. Marshall, 148 N.J. 89, 168-69, cert.
denied, 522 U.S. 850, 118 S. Ct. 140, 139 L.Ed.2d 88 (1997).

"Th[ese] doctrine[s] operate[] to prevent a defendant from
successfully excluding from the prosecutor's case-in-chief
inadmissible evidence and then selectively introducing pieces of
this evidence for the defendant's own advantage . . . ." State
v. James, 144 N.J. at 554.

Dr. Apolito's extensive references to the facts set forth in
defendant's confession did not "open the door" to admission of
Demolina's contradictory statement. But the doctor's unequivocal
testimony that he relied on portions of James' statement, which
he characterized as confirming defendant's account of the crimes,

-26-

Dq 47

did open the door to introduction of other parts of that statement.  Should there be a retrial, the court and counsel should be guided accordingly.

We next turn to admission of testimony relating to a threat defendant made against another inmate while awaiting trial.  The prosecutor cross-examined Dr. Kleinman and Dr. Apolito on the subject despite the fact that neither witness considered the threat in arriving at his conclusion concerning diminished capacity.  The prosecutor also erred when he raised the subject in the course of his direct examination of Dr. Simring, who similarly testified that he did not consider the threat in arriving at his determination respecting defendant's mental state.

### IV.

We also find error in the admission of Magda Rahey's testimony concerning her telephone conversation with Demolina before and after Polites' murder.  This testimony was admitted under the co-conspirator exception to the hearsay rule.  Under that exception, "a statement made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong [is admissible if] the statement was made in furtherance of the [unlawful] plan."  N.J.R.E. 803(b)(5).  Thus, "where two or more persons are alleged to have conspired to commit a crime or a civil wrong, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence

-27-

DG 48

against any other member of the conspiracy." <u>State v. Phelps</u>, 96 <u>N.J.</u> 500, 508 (1984).  This rule is applicable where it is charged that a crime was committed in pursuance of a conspiracy, whether or not the indictment contains a conspiracy count.  <u>State v. Clausell</u>, 121 <u>N.J.</u> 298, 336 (1990); <u>State v. Louf</u>, 64 <u>N.J.</u> 172, 177 (1973).  The hearsay exception does not abridge a defendant's right to confront the witnesses against him because the circumstances afford a sufficient guarantee of testimonial trustworthiness.  <u>State v. Harris</u>, 298 <u>N.J. Super.</u> 478, 487 (App. Div.), <u>certif. denied</u>, 151 <u>N.J.</u> 74 (1997); <u>State v. Varona</u>, 242 <u>N.J. Super.</u> 474, 483 (App. Div.), <u>certif. denied</u>, 122 <u>N.J.</u> 386 (1990).

N.J.R.E. 803(b)(5) is coextensive with the federal co-conspirator hearsay exception.  <u>State v. Taccetta</u>, 301 <u>N.J. Super.</u> 227, 251 (App. Div.), <u>certif. denied</u>, 152 <u>N.J.</u> 187-88 (1997).  Federal authorities hold that there is no requirement under the rule that the person to whom the statement is made be a co-conspirator.  <u>United States v. Beech-Nut Nutrition Corp.</u>, 871 <u>F.</u>2d 1181, 1199 (2d Cir.), <u>cert. denied sub nom.</u> <u>Lavery v. United States</u>, 493 <u>U.S.</u> 933, 110 <u>S. Ct.</u> 324, 107 <u>L.Ed.</u>2d 314 (1989).

However, to be admissible under <u>N.J.R.E.</u> 803(b)(5), the prosecution must establish that a co-conspirator's statement meets the following three-part test:  "First, the statement must have been made in furtherance of the conspiracy.  Second, the statement must have been made during the course of the

-28-

Pg 49

conspiracy.   Lastly, . . . there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it."   State v. Phelps, 96 N.J. at 510 (citations omitted).

The first two parts of the test reflect notions that an agent's statements are vicariously attributable to a principal. Ibid.   The rationale is that participation in a conspiracy confers upon co-conspirators the authority to act on another's behalf to achieve the goals of the common scheme.   Conspirators should be responsible for statements uttered by co-conspirators to further the common plan.   Ibid.

The last requirement, that the existence of a conspiracy and defendant's participation be demonstrated by evidence other than the hearsay statement sought to be admitted against the co-conspirator, reduces the danger that a defendant might be convicted solely on the basis of evidence that he or she had no opportunity to impeach or refute.   State v. Hunt, 115 N.J. 330, 367, reconsideration denied, 117 N.J. 152 (1989); State v. Phelps, 96 N.J. at 510-11.   The independent evidence must be substantial enough to engender a strong belief in the conspiracy's existence and defendant's participation. Specifically, the prosecution has the burden of satisfying the third part of the test by a fair preponderance of the evidence. State v. Clausell, 121 N.J. at 337; State v. Phelps, 96 N.J. at 510.   However, the trial court, in determining whether the co-

-29-

Da 58

conspirator hearsay exception applies, may consider the co-conspirator's hearsay declaration in conjunction with independent evidence if it is satisfied that such declaration is reliable and that there is other evidence substantial enough to engender a belief in the conspiracy's existence and the defendant's participation in it.  State v. Phelps, 96 N.J. at 511, 518-19.

We are satisfied that the foundational basis was not met in this case.  The record does not support the thesis that Demolina's statements were made "in furtherance" of the conspiracy.  The State presented no evidence that Demolina's telephone calls "promoted, or [were] intended to promote, the goals of the conspiracy.  United States v. Beech-Nut Nutrition Corp., 871 F.2d at 1199; see also United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982), cert. denied sub nom. Wright v. United States, 459 U.S. 1117, 103 S. Ct. 753, 74 L.Ed.2d 971 (1983).  These conversations can fairly be characterized as "idle chatter," United States v. Beech-Nut Nutrition Corp., 871 F.2d at 1199; see also United States v. Lieberman, 637 F.2d 95, 103 (2d Cir. 1980), not statements and declarations designed to advance or achieve conspiratorial objectives.  At no time did Demolina seek Rahey's help in carrying out the scheme to rob and kill her former escort service patrons.  Indeed, it would appear that Rahey attempted to persuade Demolina not to implement her plan. While it is true that Rahey subsequently assisted in secreting some of the stolen articles, those acts occurred after her

-30-

Pg 51

conversations with Demolina and after the conspiratorial objectives had been accomplished.

We need not determine whether the second and third prongs of the test for admission of co-conspirator statements were met. All foundational requisites must be satisfied in order to allow the admission of such evidence. The State's failure to establish that the statements were made to promote or further the unlawful plan precluded admission of testimony relating to the telephone conversations.

As an afterthought, the State argues that Demolina's statements to Rahey were admissible as adoptive admissions. The prosecutor points to the fact that Rahey heard "background" voices, one having a distinct southern accent. It is thus argued that defendant was present during Demolina's telephone conversation with Rahey and "adopted by word or conduct" the incriminating statements made. N.J.R.E. 803(b)(2). However, the State failed to produce any evidence that defendant was present for the entire conversation or at least for the inculpatory portions, or that she overheard Demolina's statement that the trio intended to rob and kill her former customers.

V.

We are satisfied that the errors we have described were capable of producing an unjust result with respect to the convictions for purposeful or knowing murder. But we are equally convinced that these errors did not taint the remaining

-31-

Pg 52

convictions.   The evidence overwhelmingly established that defendant purposely participated in the kidnaping and robbery of Hippman and Polites.   As to Polites, the jury, which was properly instructed, clearly concluded that the victim's death was not "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the [defendant's culpability] or on the gravity of [her] offense." N.J.S.A. 2C:2-3b and -3c; see also State v. Martin, 119 N.J. 2, 32 (1990).   The State's proofs established defendant's complicity in the felony-murder beyond any possible doubt.   The erroneously admitted evidence focused primarily on the issue whether defendant intended to kill Polites.   Our reversal of defendant's conviction for purposeful or knowing murder thus fully vindicates defendant's rights.

We thus conclude that defendant was fairly convicted of two counts of first degree kidnaping, two counts of first degree robbery, two counts of possession of a firearm for an unlawful purpose, two counts of possession of a handgun without a permit, and two counts of felony murder.   We reject defendant's remaining arguments as they pertain to those counts.   R. 2:11-3(e)(2).   We unmerge defendant's conviction for felony murder committed during a robbery.   The State may choose to retry defendant for purposeful or knowing murder or stand pat with the convictions we have affirmed.   If the State chooses not to retry defendant for purposeful or knowing murder, it will be necessary for the trial

Pg 53

court to recast the aggregate sentence imposed.  We thus need not address defendant's claim that the sentence is excessive.

The judgment is affirmed in part and remanded in part.  The matter is remanded to the Law Division for further proceedings consistent with this opinion.

-33-

I hereby certify that the foregoing is a true copy of the original on file in my office.

Clerk

### SUPERIOR COURT OF NEW JERSEY

DONALD R. VENEZIA
JUDGE



BERGEN COUNTY JUSTICE CENTER
HACKENSACK, N. J. 07601
(201) 646-3340

August 16, 2001

Jamie Farthing
Edna Mahan Correctional Facility for Women
P.O. Box 4004
Clinton, New Jersey 08809-4004

Dear Ms. Farthing,

    I am in receipt of your petition for post-conviction relief dated July 25, 2001.  As you have taken an appeal in this matter, I am unable to address your petition at this time.  Please advise my chambers when a disposition is reached in your appeal, and at such time I will consider said petition.

Very truly yours,

Hon. Donald R. Venezia, J.S.C.

A-4950-00T4

STATE OF NEW JERSEY

**FILED**
APPELLATE DIVISION

MAY 0 9 2002

*Jon F Lynn*
CLERK

v.

JAMIE FARTHING

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO:      A-4950-00T4
BEFORE PART:    F
JUDGES:         CONLEY
                LISA

**RECEIVED**
APPELLATE DIVISION

MAY 0 9 2002

ORAL ARGUMENT DATE: MAY 8, 2002

DECIDED DATE:       MAY 8, 2002

**R COURT**
NEW JERSEY

**O R D E R**

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT ON A
SENTENCING CALENDAR PURSUANT TO R.2:9-11, IT IS HEREBY ORDERED AS
FOLLOWS:

Having considered the record and argument of counsel, and it
appearing that the issues on appeal relate solely to the sentence
imposed, we are satisfied that the sentence is not manifestly
excessive or unduly punitive and does not constitute an abuse of
discretion. State v. O'Donnell, 117 N.J. 210 (1989); State v.
Ghertler, 114 N.J. 383 (1989); State v. Roth, 95 N.J. 334 (1984).

The judgment of the trial court is affirmed.

BER 95-07-0889-I

**RECEIVED**
BERGEN COUNTY

MAY 14 2002

TOR'S OF
MAY  SECT
14

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

*Jon F Lynn*
CLERK OF THE APPELLATE DIVISION

FOR THE COURT:

*Erminie J. Conley*
Erminie L. Conley, P.J.A.D.

Pg 56

SUPREME COURT OF NEW JERSEY
C-126 September Term 2002
53,337

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

             ON PETITION FOR CERTIFICATION

JAMIE FARTHING,

    Defendant-Petitioner.

**FILED**

SEP 2 5 2002

CLERK

To the Appellate Division, Superior Court:

    A petition for certification of the judgment in A-4950-00 having been submitted to this Court, and the Court having considered the same;

    It is ORDERED that the petition for certification is denied.

    WITNESS, the Honorable Deborah T. Poritz, Chief Justice, at Trenton, this 23rd day of September, 2002.

The foregoing is a true copy
of the original on file in my office.

CLERK OF THE SUPREME COURT
OF NEW JERSEY

CLERK OF THE SUPREME COURT

# FORM 1

## Rule 3:22 Post Conviction Relief

RECEIVED
CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601

2001 NOV 13 A 8: 57

CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601

2001 AUG -9 A 10 13

SUPERIOR COURT BERGEN COUNTY

FILED

AUG 2001

DEPUTY CLERK



**STATE OF NEW JERSEY:**

The petitioner being duly sworn according to law, upon the oath depose and say:

1. I desire to petition for post conviction relief under Rule 3:22 et. seq.

2. I was convicted of the offense(s) of (1) Purposeful or Knowing murder, (2) Felony murder (3) 1st degree Kidnapping (2) 1st degree Robbery (2) Possession fire arm (2) possession handgun, _____ by the Bergen County _____ Court. I was sentenced by Judge Timothy J Sullivan _____ on the date of Febuary 14th 1997 _____ and I am presently confined at EMCF.

RECEIVED
CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601
NOV 13

3. I am unable to obtain funds from anyone, including my family and friends and represent I am a poor person and that the following statements are true to the best of my information and belief:

   a. Money (here state whether you have money in any account, bank, institutional account or any other place. State if you owe any money to anyone and amount.)

   None

   b. Automobile (state whether you own a car, if so give the year, make and how much you owe on it. Give location of automobile.)

   None

   c. Real Estate (here specify if you own any real estate, it's value, location and mortages or liens thereon.)

   None

DA 58

Page 2 of Form :
Rule 3:22 Post Conviction Relief

    d.    Insurance (specify whether you have any insurance which has a cash value. Give amount of cash value and company name.)

*None*

    e.    Other Property (specify any other property, excluding clothing and personal effects you own and it's value.)

*None*

    f.    Marital Status (specify here whether you are married, the income of your spouse, name and ages of your children.)

*None*

    g.    Prior Employment (state here the employment you last held before conviction and salary earned.)

*None*

    h.    Social Security Number _____

    i.    Previous Representation (the name of private, or court appointed counsel who represented you in the case convicted of and any subsequent appeal counsel.)

*John L. Weichsel, Ruth Bove Carlucci*

4.    If you desire to have counsel appointed to represent you in this post-conviction proceeding check either. Yes  [ √ ]  No  [   ]

5.    The petitioner has read the foregoing affidavit and knows the contents thereof to be true to the best of his knowledge, information and belief. Petitioner is aware of the penalty for false swearing made herein.

_____
Signature

Sworn and subscribed to before me this ___25th___ day of ___July___ 19*01*.

_____
Notary Public - State of New Jersey

ALFRED N. KANDELL Jr.
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 1, 2004

*DG 59*

RECEIVED
CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601

8:  ( HERE STATE WITH SPECIFICITY THE FACTS UPON WHICH THE CLAIM FOR RELIEF IS BASED, THE LEGAL GROUNDS OF COMPLAINT ASSERTED; AND THE PARTICULAR RELIEF SOUGHT.  USA EXTRA PAPER IF REQUIRED. ARGUMENT, CITATIONS, AND DISCUSSION OF AUTHORITIES SHALL BE OMITTED FROM THE PETITION, BUT MAY BE SUBMITTED IN A SEPARATE MEMORANDUM OF LAW.)

1 :  <u>INEFFECTIVE ASSISTANCE OF COUNSEL (PRE TRIAL/ TRIAL)</u>

(DETAILED ANSWER)
A :  ON PRE TRIAL LEVEL I WAS NOT SUFFICIENTLY ADVISED OF MY RIGHTS TO TESTIFY ON MY OWN BEHALF.

B :  ON TRIAL LEVEL I WAS NOT SUFFICIENTLY ADVISED OF MY RIGHTS TO TESTIFY ON MY OWN BEHALF.

2 :  <u>VIOLATION OF MIRANDA RIGHTS</u>

(DETAILED ANSWER)
A :  IN GEORGIA I REQUESTED A LAWYER ON SEVERAL OCCASIONS AND REPEATEDLY TOLD THE INVESTIGATORS I DO NOT WANT TO SPEAK TO THEM.

B :  IN NEW JERSEY I REQUESTED A LAWYER ON SEVERAL OCCASIONS AND REPEATEDLY TOLD THEM I DID NOT WANT TO SPEAK TO THEM.

C :  MY MIRANDA RIGHTS WERE FURTHER VIOLATION BY THE NEW YORK INVESTIGATORS WHOM SNEAKED IN DURING THE NEW JERSEY QUESTIONING AND PROCEEDED TO QUESTION ME WITH OUT GIVING ME MY MIRANDA RIGHTS AT ALL.

3 :  <u>STATEMENT WAS NOT VOLUNTARY</u>

A :  IN GEORGIA I WAS HEAVILY UNDER THE INFLUENCE OF NARCOTICS AND ALCOHOL.  I WAS SO TERRIFIED I WAS IN SHOCK.

B :  BY THE TIME I WAS QUESTIONED IN NEW JERSEY I WAS SLEEP DEPRIVED AND UNDER EXTREME DURESS.

C :  INVESTIGATORS INTIMIDATED ME BY RAISING HIS HAND AT ME CALLING ME A MURDERER AND A WHORE WHEN I WOULD NOT SPEAK TO THEM.

D :  I WAS ALWAYS QUESTIONED BY TWO MEN A WOMAN WAS NEVER PRESENT DURING THE QUESTION.  A WOMAN INVESTIGATOR WAS ONLY PRESENT FOR A FEW MINUTES TO SEE IF I NEEDED ANY FOOD, WATER, OR USE THE BATHROOM.

E :  AFTER EIGHT HOURS OF ALMOST CONSTANT BADGERING AN INVESTIGATOR CAME IN AND SAT AT THE HEAD OF THE TABLE DIAGONALLY

D : 66

( CONT. OF (E))
FROM ME AND PLACED HIS HAND ON MY KNEE.   I WAS SO PETRIFIED
BY THE ORDEAL FROM THE OTHER INVESTIGATORS AND THE CONTACT WAS
SO UNEXPECTED I FROZE AND THEN HE TOLD ME THAT SINCE I DID NOT
WANT TO TALK TO THEM I WAS GOING TO JAIL.   THE THOUGHT OF GOING
TO JAIL AND HE HAD PHYSICALLY TOUCHED ME I FELT I HAD NO OTHER
CHOICE BUT TO SPEAK GOD KNOWS WHAT ELSE WOULD HAPPEN TO ME CAUSE
NONE OF THE OTHER INVESTIGATORS HAD TOUCHED ME.

F : WHEN THE INVESTIGATORS FINISHED TAKEN MY STATEMENT AND TOLD
ME IF I THOUGHT OF ANYTHING OR WANTED TO GET OUT OF JAIL TO
CONTACT THEM.

D9 61

**FORM 2**
(Rule 3:22 Post Conviction Relief)

STATE OF NEW JERSEY

RECEIVED
CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601

2002 NOV 13  A 8: 57

v.

*Jamie Farthing*

*Bergen*

RECEIVED
CRIMINAL DIVISION
ROOM 134-10 MAIN ST.
HACKENSACK, NJ 07601

COUNTY COURT

PETITION FOR POST CONVICTION
RELIEF

1.  Petitioner was charge with offense(s) of (1) *purposeful, Knowing murder,* (2) *Felony murder* (2) *1st degree Kidnapping,* (2) *1st degree robbery* (2) *possession of fire arm unlawful* (2) *possession handgun.*
    on indictment(s) *"same as above"*

    dated *9/18/94*
    in the County of *Bergen*

2.  Petitioner was convicted of the crime of (1) *purposeful, Knowing murder* (2) *Felony murder* (2) *1st degree Kidnapping,* (2) *first degree robbery* (2) *possession of firearm unlawful* (2) *possession of handgun.*
    AND ON THE DATE OF *Feb. 14, 1997* was SENTENCED by Judge *Timothy J. Sullivan* to a term of *Life w/60 w/a 40 year parole stipulation.*

3.  (here indicate any appeals taken from the conviction to the Appellate Courts or Supreme Court or Both. Attach copies of any opinion of those courts. If there no appeal, state so.
    *"enclosed"*

4.  (here indicate any prior post - conviction proceedings, other than appeal, relating to the conviction. Give dates of each, the appeal taken and the claims raised in them. State whether there was any appeal taken from any prior post - convictions. Attach copies of any trial or Appellate Court decisions.
    *"enclosed"*

*pg 62*

Page 2 of Form 2
Rule 3:22 Post Conviction Relief

5.      (here indicate if petitioner was represented by counsel in any of the above proceeding. give counsels name and state whether he was private or court appointed counsel.)

John L. Weichsel, Ruth B. Carlucci

6.      If petitioner desires to have counsel represent him on this post - conviction relief check either
Yes  [✓]    No   [ ]

7.      Petitioner is presently confined at   EMCF

8.      (here state with specificity the facts upon which the claim for relief is based, legal arguments and all claims. Use extra paper if needed. Arguments, citations shall be ommitted from this petition but you can submit them in a separate memorandum and attach hereto.)

(( enclosed on separate paper.... ))

STATE OF NEW JERSEY          :
                                              : ss:
COUNTY OF Bergen           :

The petitioner being duly sworn according to law, upon his oath depose and say:

1.      I am the petitioner in this action.

2.      I have read the foregoing and know the contents thereof and the same are true to the best of my information and belief, except as to matters relating to other persons and as to those matters I believe them to be true.

3.      In making this affidavit I am aware that false swearing could subject me to punishment for the same.

_____
                                          Signature

Sworn and subscribed to before
me this  25th  day of  July  19 01.

_____
Notary Public - State of New Jersey

ALFRED N KANDELL JR,
NOTARY PUBLIC NEW JERSEY
My Commi...

D9 67

NAME (please print) _Jamie Farthing_

(1)purposeful or knowing murder, (4) Felony murder (2) 1st degree, kidnapping (2) 1st degree robbery

CHARGES _(2) possession of firearm unlawful_   INDICTMENT/COMPLAINT _(2) possession of handgun_

HAVE YOU ever before been known by, arrested under or used any other name ?

SPECIFY _NO_

ADDRESS _____ APT/FLOOR _____ PHONE _____

_____ JAIL _EMCF_   BAIL(amount posted) $ _____

HEIGHT _5'4_   WEIGHT _140_   RACE _Hispanic_   SEX _Female_

DATE OF BIRTH _5-3-76_ PLACE OF BIRTH _St. Petersburg FL_ SOCIAL SECURITY NUMBER _____

ARE YOU PRESENTLY ON PROBATION ? _NO_   OR PAROLE ? _NO_   (Specify)

MARRIED ? _NO_   SPOUSE'S NAME _____ NO.OF CHILDREN _____

ARRESTING AGENCY _____ WHERE ARRESTED _____ DATE(S) OF ARREST _None_

NAMES OF PERSONS ARRESTED WITH YOU _Chris James,_

DO YOU HAVE ANY PENDING CHARGES IN ANY JURISDICTION ? (Specify) _____

PRESENT JOB OR LAST EMPLOYER (Name and Address) _None_

GROSS WEEKLY EARNINGS $ _None_ DO YOU RECEIVE CHILD SUPPORT ? _None_ OR ALIMONY ? _no_

IS THE CHILD SUPPORT BY COURT ORDER ? _____ AMOUNT OF SUPPORT OR ALIMONY $ _____

IS SPOUSE AND/OR CHILDREN EMPLOYED ? _____ WHERE ? _____

SALARY $ _None_ per _____

OTHER INCOME (Welfare, Soc. Sec., VA, Unemploy.Ins., Disability, Work.Comp., Stocks, Bonds, etc.)

Specify types and value _None_

DO YOU OWN PERSONAL PROPERTY ? (Auto, jewelry, furs, motorcycles, trucks, etc) Specify types and value

_None_

DO YOU OWN A HOUSE OR LAND ? _NO_   DO YOU RENT ? _NO_

D9 69

Office of the Public Defender
Post Conviction Relief Unit
60 State Street
Hackensack, NJ 07601
Attorney for Defendant-Petitioner, Jamie Farthing

RECEIVED

FEB 1 4 2005

DONALD R. VENEZIA, J.S.C.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - BERGEN COUNTY
INDICTMENT NO. 95-07-0889

STATE OF NEW JERSEY,
    Plaintiff-Respondent,

-vs.-

JAMIE FARTHING,
    Defendant-Petitioner.

Criminal Action
AMENDED VERIFIED PETITION
FOR POST CONVICTION RELIEF
PURSUANT TO RULE 3:22-1, et seq.

JAMIE FARTHING, presently confined in Edna Mahan Correctional Facility, Clinton, New Jersey, petitions the Superior Court of New Jersey, Law Division, Bergen County, for post conviction relief from the judgment of that court entered February 14, 1997, in the above-captioned matter and states:

1) Defendant-Petitioner was charged in Bergen County Indictment No. 95-07-0889 with the following offenses related to the events which transpired on or about August 4, 1994, in the city of Hackensack, county of Bergen, state of New Jersey and August 5, 1994, in the Borough of Edgewater, county of Bergen, state of New Jersey (PCRa1): Count 1: Kidnaping, in violation of N.J.S.A. 2C:13-1b(1), a crime of the first degree; Count 2: Robbery, in violation of N.J.S.A. 2C:15-1, a crime of the first degree; Count 3: Possession of a Weapon for an Unlawful Purpose, in violation of N.J.S.A. 2C:39-4a, a crime of the second degree; Count 4: Unlawful Possession of a Weapon, N.J.S.A. 2C:39-5b, a crime of the third degree; Count 5: as to codefendant, Ivie Demolina only; Count 6: as to codefendant, Thomas Christopher James only; Count 7: Murder,

Pg 65

in violation of <u>N.J.S.A.</u> 2C:11-3a (1) and/or (2), a crime of the first degree; Count 8: Felony

Murder, in violation of <u>N.J.S.A.</u> 2C:11-3a(3), a crime of the first degree; Count 9: Felony

Murder, in violation of <u>N.J.S.A.</u> 2C:11-3a(3), a crime of the first degree; Count 10: Kidnaping, in

violation of <u>N.J.S.A.</u> 2C:13-1b(1) and/or (2), a crime of the first degree; Count 11: Robbery, in

violation of <u>N.J.S.A.</u> 2C:15-1, a crime of the first degree; Count 12: Possession of a Weapon for

an Unlawful Purpose, <u>N.J.S.A.</u> 2C: 39-4a, a crime of the second degree; Count 13: Unlawful

Possession of a Weapon, <u>N.J.S.A</u> 2C:39-5b, a crime of the third degree.

   2) Trial of Indictment No. 95-07-0889 was conducted before the Honorable Timothy J.

Sullivan, J.S.C. and a jury.  On November 26, 1996, petitioner was convicted of two counts of

first degree kidnaping, two counts of first degree robbery, two counts of possession of a firearm

for an unlawful purpose, two counts of possession of a handgun without a permit, purposeful

knowing murder, and two counts of felony murder.  On February 14, 1997, petitioner was

sentenced by Judge Sullivan as follows: Count 1: Department of Corrections for 30 years; Count

2 and 3 (merged): Department of Corrections for 20 years with a 10 year period of parole

ineligibility; Count 4: Department of Corrections for 5 years; Count 7: Department of

Corrections for Life with a 30 year period of parole ineligibility; Counts 8 and 9(merge with

Count 7) concurrent to Counts 11, 12, and 13); Count 10: Department of Corrections for 30 years

consecutive to other counts. Count 11: Department of Corrections for 20 years with a 10 year

period of parole ineligibility; Count 12: Merged with Count 11; and Count 13: Department of

Corrections for 5 years. (PCRa2)

   3) In an opinion filed May 18, 2000, the Appellate Division reversed petitioner's

conviction for purposeful or knowing murder, but affirmed as to the remaining convictions.

(PCRa3)

ba 6b

4) The New Jersey Supreme Court denied certification on September 23, 2002, filed on September 25, 2002. (PCRa4)

5) Petitioner was represented in connection to these charges by John Weichsel, Esq., pool counsel of the Office of the Public Defender, Bergen Region, Hackensack, NJ 07601. On direct appeal in the Appellate Division, petitioner was represented by Ruth Bove Carlucci, Esq., Assistant Deputy Public Defender, Appellate Section, Office of the Public Defender, 31 Clinton Street, Newark, NJ. Petitioner was represented by Ms. Carlucci for the petition for certification as well. For purposes of this petition for post conviction relief, petitioner is represented by Linda E. Peterson, Esq., Assistant Deputy Public Defender, Post Conviction Relief Unit, Office of the Public Defender, 60 State Street, Hackensack, NJ 07601.

6) Petitioner is currently confined at Edna Mahan Correctional Facility, Clinton, New Jersey.

7) The pro se petition was filed with the Superior Court of New Jersey on or about August 9, 2001. (PCRa5)

8) Ms. Farthing seeks relief from the judgment of conviction entered on February 14, 1997, on the ground that she was denied the effective assistance of trial counsel in that:

a) counsel failed to provide petitioner with copies of all discovery in connection to the charges against her;

b) counsel failed to conduct an effective pretrial investigation;

(1) failed to interview stepmother, Kathy Farthing and follow up on investigative leads provided by her;

(2) failed to provide defense experts with copies of petitioner's school records;

(3) failed to advise experts to conduct testing relative to adult attention deficit

123 C7

disorder or post traumatic stress disorder;

        (4) failed to subpoena Edward Kummer's time cards from his place of employment regarding time periods relevant to his testimony;

        (c) counsel failed to secure a legitimate plea offer and engage in effective plea bargaining;

        (d) counsel failed to seek a court order to stop the harassment of petitioner's family by detectives from the prosecutor's office;

        (e) counsel failed to seek a court order readministering petitioner's medication at Bergen County Jail which was stopped immediately before her Miranda hearing;

        (f) counsel failed to move *in limine* regarding any deals made between the prosecutor's office and state witness, Edward Kummer, in exchange for his testimony;

        (g) counsel failed to move *in limine* regarding 404(b) material as to the admissibility of petitioner's arrests in Georgia and New York;

        (h) counsel failed to move to suppress the search of petitioner's truck, the electronic bugging of petitioner's home; and the state interference with petitioner's mail;

        (i) counsel failed to prepare petitioner for Miranda hearing;

        (j) counsel failed to assert affirmative defense to felony murder;

        (k) counsel failed to prepare expert regarding the applicability of post traumatic stress disorder of the petitioner to the time of the offenses charged;

        (l) counsel failed to effectively cross-examine state witnesses;

        (m) counsel failed to move for a mistrial regarding the jury's rejection of the petitioner's psychiatric defense during the trial;

        (n) counsel failed to move for a mistrial regarding prosecutorial misconduct;

*ba 68*

(o) counsel failed to thoroughly utilize petitioner's mental health and kidnaping by her birth mother to full advantage in the defense of petitioner;

(9) Ms. Farthing seeks relief from the judgment of conviction entered on February 14, 1997, on the ground that the trial court erred in that:

(a) the court was biased against the petitioner during the Miranda hearing;

(b) the court was biased against the petitioner during the trial of the within matter;

(c) the court permitted the codefendants' statements to be introduced against the petitioner during the course of the trial;

(d) the court permitted the prosecutor to engage in misconduct during the course of the trial;

(e) the court allowed enlarged photographs of the victim to be shown to the jury, thereby enflaming the jury;

(f) the court imposed an illegal sentence on the petitioner by sentencing her above 30 years, in violation of Apprendi;

(g) the court admitted the petitioner's statement which was not voluntarily made or electronically recorded;

(10) Ms. Farthing seeks relief from the judgment of conviction entered on February 14, 1997, on the ground that the jury's verdict was against the weight of the evidence in that:

(a) there was no ballistic evidence offered to suggest that the weapon seized was operable;

(b) there was no positive identification of petitioner obtained from a reliable source placing petitioner at the scene of the crimes;

(c) there were no fingerprints or footprints recovered from the scene of the

crimes matching the petitioner;

(d) petitioner's presence at the scene of the crimes was established by inadmissible statements of codefendants;

(e) construction of the evidence admitted at trial merely suggested that petitioner may have been in a separate room of the victim's home when he was killed;

(11) Ms. Farthing seeks relief from the judgment of conviction entered on February 14, 1997, on the ground that her right to trial by an impartial jury was violated in that:

(a) the jury indicated during *voir dire* by the court that it had rejected the petitioner's psychiatric defense prior to deliberations; and

(b) the jury was subjected to a variety of distractions during the trial which ultimately interfered with their ability to deliberate.

(12) For the reasons set forth in paragraph 8 through 11, as well as in the brief in support of this petition, Ms. Farthing alleges that her convictions and sentence in this matter resulted from a substantial denial of rights under the Constitution of the United States and the Constitution and laws of New Jersey. Ms. Farthing seeks to have the judgment of conviction and the sentence on Bergen County Indictment No. 95-07-0889 set aside and the case set down for an evidentiary hearing. Petitioner further seeks leave to amend this petition, as well as leave to file a supplemental petition and memorandum if it should become necessary to do so.

Respectfully submitted,
Yvonne Smith Segars, Esq.
Public Defender
Attorney for Petitioner, Jamie Farthing

By: _Linda E. Peterson_ _____
Linda E. Peterson, Esq.

Dated: December 22, 2004

0970

**VERIFICATION**

I, Jamie Farthing, have read the contents of the foregoing petition for post conviction relief and verify that the statements of fact, upon my personal knowledge, are true and correct.

Date: 2·04·05

Signed By: _____
Jamie Farthing

6971

Office of the Public Defender
Post Conviction Relief Unit
60 State Street
Hackensack, NJ 07601
(201)996-8030
Attorney for Defendant-Petitioner

RECEIVED

FEB 1 4 2005

DONALD R. VENEZIA, J.S.C.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - BERGEN COUNTY
INDICTMENT NO. 95-07-0889

STATE OF NEW JERSEY,
          Plaintiff-Respondent,

-vs.-

JAMIE FARTHING,
          Defendant-Petitioner.

Criminal Action
SUPPLEMENTAL VERIFIED PETITION
FOR POST CONVICTION RELIEF
PURSUANT TO RULE 3:22-1, et seq.

JAMIE FARTHING, presently confined in Edna Mahan Correctional Facility, Clinton,

New Jersey, petitions the Superior Court of New Jersey, Law Division, Bergen County, for post

conviction relief from the judgment of that court entered February 14, 1997, in the above-captioned

matter and states:

Petitioner wishes to supplement the amended verified petition for post conviction

relief, pursuant to R. 3:22-1, et seq.

1) Petitioner seeks relief from the judgment entered on February 14, 1997, on the

ground that she did not receive a fair trial or sentence in that:

a) The judge used N.J.S.A. 2C:13-1(b) stating a consecutive sentencing when a child

under the age of 12 years is involved in the case, eliciting an illegal sentence (R. 3:22-12) T) 2/14/97,

p. 21, ll.1-16. The first element in felony murder non-slayer participant (N.J.S.A. 2C:3A(3)) requires

*le 72*

the State to prove beyond a reasonable doubt the defendant was engaged in the commission of or attempt to commit the crime, to which the defendant was not, nor do any codefendant statements support. You cannot find a defendant guilty of felony murder unless you first find her guilty by trial beyond a reasonable doubt of having committed or attempted to commit the crime charged in the count;

(b) Petitioner's rights were violated as a result of double counting the two counts of felony murder (armed robbery and kidnaping) for only one victim. See (T) 2/14/97, p.20, ll.16-17;

(c) The judge engaged in judicial misconduct by providing an answer to a jury question that had been crossed out before being submitted to the court along with other questions that were not crossed out. The court should have provided answers only to the questions not crossed out. By answering a question the jury previously withdrew, the judge acted as a party against the defendant. This was a violation of the defendant's Fifth Amendment rights.

(d) The judge didn't give equal emphasis to the lesser included charges. (T) p.34, ll.20-22.

(e) Petitioner urges that the jury should have been instructed as to causation with respect to the relevant offenses. For example, had the doorman not let the codefendants and defendant inside the relevant building, the offenses would not have occurred. If the defendant's father had not kicked her out of her home, she would not have gone to live with the codefendants, and she would have never been charged with felony murder.

Respectfully submitted,

Jamie Farthing, Petitioner

Dated: 2.4.5

D973

## VERIFICATION

I, Jamie Farthing, have read the contents of the foregoing supplemental petition for post conviction relief and verify that the statements of fact, upon my personal knowledge, are true and correct.

Date: 2·04·05

Signed by: _____

JAMIE FARTHING, Petitioner

Dg 74

JOHN L. MOLINELLI
BERGEN COUNTY PROSECUTOR
BERGEN COUNTY JUSTICE CENTER
HACKENSACK, NEW JERSEY  07601
(201) 646-2300

**FILED**

AUG 0 8 2005

DONALD R. VENEZIA,
J.S.C.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - BERGEN COUNTY
INDICTMENT NO. 95-07-0889-I

--------------------------------

STATE OF NEW JERSEY,          :
    Plaintiff-Respondent,          Criminal Action

          -vs-          :          CORRECTED ORDER DENYING
                     :          DEFENDANT'S PETITION FOR
                     POST-CONVICTION RELIEF

JAMIE FARTHING,          :

    Defendant-Petitioner.     :

--------------------------------

This matter having been brought before the Court by defendant-petitioner Jamie Farthing by way of pro se petition for post-conviction relief, and by Linda Peterson, A.D.P.D., appearing on defendant's behalf and filing a verified amended petition for post-conviction relief, a verified supplemental petition for post-conviction relief, and brief in support thereof, and the State, by Assistant Prosecutor Patricia Baglivi and Assistant Prosecutor Annmarie Cozzi on behalf of Bergen County Prosecutor John L. Molinelli, having filed a brief opposing such relief and the Court having reviewed the written submissions of the parties and the trial record and having heard oral argument on June 22, 2005,

IT IS ON this 8th day of August, 2005

D975

ORDERED that the petition for post-conviction relief is denied for the reasons set forth on the record on June 22, 2005.

HONORABLE DONALD R. VENEZIA, J.S.C.

Da76

YVONNE SMITH SEGARS
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
P.O. Box 46003
Newark, New Jersey 07101
(973) 877-1200

*Filed August 30, 2005*

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
IND. NO(S). 95-07-0889

STATE OF NEW JERSEY,      :

    Plaintiff-Respondent,    :

    v.        :

JAMIE FARTHING,      :

    Defendant-Appellant.    :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

<u>CRIMINAL ACTION</u>

NOTICE OF APPEAL

    PLEASE TAKE NOTICE that the defendant, Jamie Farthing, confined at Edna Mahan Correctional Facility, For Women, P.O. Box E, Clinton, New Jersey 08809 appeals to this Court from the final Order denying defendant's petition for post-conviction relief entered on June 23, 2005 in the Superior Court, Law Division, Bergen County, by the Honorable Donald R. Venezia.

                YVONNE SMITH SEGARS
                Public Defender
                Attorney for Defendant-Appellant

                BY: _____
                   LOUIS G. GONNELLA
         Assistant Deputy Public Defender
                Intake Unit

The undersigned certifies that the requirements of <u>R</u>. 2:5-3(a) have been complied with by ordering the transcript(s) on August 25, 2005 as indicated on the accompanying transcript request form(s) and that a copy of this Notice has been mailed to the tribunal designated above.

Da 77

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - BERGEN COUNTY
INDICTMENT NO.: 95-07-0889

STATE OF NEW JERSEY,
      Plaintiff - Respondent,

-vs.-

JAMIE FARTHING,
      Defendant -Petitioner,

RECEIVED

JAN 1 4 2005

DONALD R. VENEZIA, J.S.C.

FILED

JAN 1 4 2005

DONALD R. VENEZIA,
J.S.C.

## BRIEF IN SUPPORT OF PETITION FOR POST CONVICTION RELIEF

YVONNE SMITH SEGARS, ESQ.
**Public Defender**
**Attorney for Defendant-Petitioner**

By: _Linda E. Peterson_
    Linda E. Peterson, Esq.
    Post Conviction Relief Unit
    60 State Street
    Hackensack, NJ 07601

Da 78-

## **PROCEDURAL HISTORY**

The amended verified petition provides the pertinent procedural history.

Da 79.

## STATEMENT OF FACTS

On August 8, 1994, James Polites was found dead in his apartment in Edgewater, New Jersey. (7T 58-1 to 61-9) Investigator Carlos Rodriguez of the Bergen County Prosecutor's Office was assigned to investigate and process the scene. (7T 87-11 to 88-14) He noticed that the apartment was in "total disarray." (7T 90-7 to 13; 7T 95-1 to 2) When he saw the body, he noticed that the wrists and ankles had been bound with neckties and could tell from the way in which one of the neckties had been ripped that at one point the victim's wrists had been "hog-tied" to his ankles. There was also a pillowcase over the victim's head and an electrical cord around his neck, the other end of which had been tied to the doorknob of the bedroom door causing his upper torso to be suspended approximately six inches off the floor. (7T 107-18 to 109-8) There was a 25-pound weight found a few feet from the body which Rodriguez determined belonged to a set of weights discovered in a second bedroom. (7T 115-14 to 116-4)

Donald Sposa, the manager of the Fort Lee Saloon, owned by the victim, and a friend of Polites, indicated that the last time he had spoken with his friend was on the night of Thursday, August 4, 1994. (8T 106-3 to 5) When Polites arrived at the Fort Lee Saloon at approximately 10:30 p.m., Polites told Sposa that he had just received a "strange" telephone call from a woman he had been "involved with" a year before. When the woman, whom Sposa recalled had a name that sounded like "Mia, Thea, Fia," called that evening, she told Polites that she and another woman wanted to meet him at his apartment later that night, presumably for a "menage a trois." Polites received another phone call from the same woman at approximately 12:30 a.m. Sposa

2

Da 90

answered the phone and then gave it to Polites, who talked for five minutes before he hung up. Polites then left with "a couple of paper bags," Sposa assumed to contain Budweiser beer. (8T 103-10 to 106-2)

The medical examiner who performed the autopsy observed a single ligature mark around Polites's neck and determined that his death was caused by asphyxia due to a single fracture of the thyroid cartilage. (12T 181-12 to 23; 12T 184-19 to 185-12) He further determined that this injury would have required considerable force applied for a minimum of 30 seconds and a maximum of three minutes, and that it could not have been caused by the electrical cord found around the victim's neck. (12T 182-2 to 13; 12T 188-1 to 189-20) It was more likely that the victim was strangled with the neckties found loosely tied around his neck. (12T 182-14 to 22)

The State presented evidence of another robbery which was later linked to the Polites incident. On August 3, 1994, Robert Hippman received a telephone call at work from a woman he knew as Erica. She said that she was in the New York area with a friend from Florida and that they needed a place to stay. Hippman told her that he had a date that night so he probably would not be available, but he gave her his home phone number and told her to call him later that night. (8T 137-3 to 20)

On the night of August 4, 1994, Erica called Hippman at his apartment, and he told her to come over with her friend. (9T 34-7 to 35-20) Erica arrived at approximately 2:00 a.m. with a woman introduced as Alexis. Unexpectedly, a man was also with them. (8T 138-3 to 139-12) Hippman served each of the women a glass of wine and then took Erica onto the balcony to talk. When they came back into the living room and sat on the couch, he did not see Alexis or the man. As he was talking to Erica, Alexis came into the living room pointing a gun and said, "this

3

Da 81

is a stickup." (8T 142-18 to 143-7)

Hippman was told to lie face down on the carpet, and when he resisted, the man also pointed a gun at him, and he complied. (8T 145-19 to 146-16) The man used gray duct tape to bind Hippman's hands behind his back and to bind his ankles. He also taped Hippman's mouth. (8T 146-18 to 147-3) Unable to move, Hippman laid face down on the carpet for approximately an hour and a half while the three ransacked his apartment. (8T 147-4 to 25) When they were done, they taped Hippman to a chair and left.

Hippman freed himself within minutes after they left. His telephones had been disconnected so he went down to the lobby of his apartment building and had the doorman call the police. Among the items taken from Hippman's apartment was his automatic teller machine card. Hippman recognized the man who was recorded by the bank cameras attempting to use the card at 4:30 a.m. the morning after the robbery as the man who had been in his apartment that night. He was later identified as Thomas Christopher James. (8T 159-24 to 161-22)

In September 1994, Hippman identified Erica, and a month or two later identified Alexis, and the man in his apartment from photographic arrays. (8T 164-14 to 166-12) Hippman made an in-court identification of petitioner as the woman he knew as Alexis. (8T 175-18 to 176-4)

Lieutenant John Hynes of the Hackensack Police Department investigated the Hippman robbery. (9T 97-10 to 99-3) Hynes interviewed Hippman but then went on vacation for two weeks. When Hynes returned to work on September 2, 1994, he read an article in The Bergen Record regarding the Polites murder. He noticed the similarities between the Polites and Hippman incidents, and contacted the Bergen County Prosecutor's Office. Hynes then began working with Investigator Terrance Alver on the two cases. (9T 105-24 to 108-3)

4

Da 82

Hynes gave the members of the Bergen County Prosecutor's Office the phone bill supplied to him by Hippman. (10T 178-17 to 179-2; 10T 182-24 to 183-5) Investigator Frank Kellaher traced collect phone calls "Erica" had placed to Hippman to an apartment located at 456 Grant Avenue in Brooklyn and two pay telephone booths in the vicinity of that apartment. (10T 179-3 to 180-5; 10T 183-6 to 15) Further investigation revealed that the phone number for the Grant Avenue residence was issued to a Maria Rios, and that Rios's daughter, Evia Demolena, also lived at that address "at one time or another." (10T 180-13 to 24)

Kelaher obtained Demolena's photograph and worked in conjunction with the New York City Police Department to locate her. (10T 180-25 to 181-20) The investigation led New York City police officers to the Cross Bay Motel in Queens on September 13, 1994 at approximately 1:30 a.m. (10T 189-25 to 190-10) Both Thomas Christopher James and Ivy Demolena were apprehended as they were in the process of leaving the motel. They were both placed under arrest. The police seized luggage and transported the pair to Demolena's mother's apartment where Ivy's half-brother, Benigno Rosario, was also arrested. (10T 193-2 to 197-11; 10T 224-9 to 17)

After returning to the precinct with the three suspects, Bergen County Prosecutor's Office was notified of the arrests. Evidence linking the three suspects to the Hippman and Polites robberies was discovered when the luggage was inventoried. Among the items seized were wigs, several pairs of gloves, one of which had duct tape around the finger, a Finger Hut catalog that had been mailed to Jamie Farthing, and six or seven rolls of undeveloped film. (8T 57-2 to 8; 8T 170-8 to 174-22; 10T 198-11 to 18; 10T 202-4 to 213-24; 12T 207-4 to 13) The developed photographs showed James, Demolena, Rosario, a man named Efrin Popalayo, who was later

Da 83

arrested in connection with the investigation, and a woman who the police later identified as Jamie Farthing.

Kelaher also executed several search warrants at Demolena's mother's apartment. Among the items seized were a Jets jacket which belonged to Hippman found in Rosario's bedroom. On the dining room table, he found an invoice for Chelsea Mini Storage rented to Thomas Christopher James. (11T 13-11 to 14-1; 11T 46-7 to 24; 11T 89-2 to 6) Hanging on a chair in the living room area was a pocketbook which contained a wallet with identification belonging to Magda Rahey. Also found in Rahey's pocketbook were night club cards belonging to Polites, a credit card belonging to Polites, his vehicle registration, and a temporary insurance card issued to Thomas Christopher James. (11T 17-7 to 23-4) Kelaher also recovered jewelry linking the suspects to the crimes at the King's Jewelry Store in Brooklyn. In addition, Investigator Kelaher executed a search warrant at Chelsea mini storage and seized items identified as having been stolen from Hippman and Polites. (8T 54-7 to 18; 8T 167-20 to 25; 10T 235-12 to 241-1)

On September 13, 1994, after being contacted by Detective Duggan, of the New York City Police Department, about the arrests of Demolena, James, and Rosario, Investigator Terrance Alver of the Bergen County Prosecutor's Office went to the Midtown South Precinct in Manhattan where he interviewed Demolena and James. (12T 201-15 to 203-23) As a result of that conversation, he and Detective Hynes flew to Conyers, Georgia to arrest Jamie Farthing two days later. (12T 209-5 to 210-24) Alver testified that before going to Georgia, he had arrest warrants for murder and robbery for Jamie Farthing. (12T 210-3 to 17)

Working in conjunction with U.S. marshals in Georgia, Alver and Hynes set up a surveillance of Farthing's mother's house in Union City, Georgia. (12T 211-3 to 212-14) After

Da 84

several hours of observing the comings and goings of petitioner and her family, petitioner was arrested as she, her mother, Lupe Anderson, and her stepfather, Luke Anderson, attempted to leave the house in a pick-up truck. Alver advised petitioner that she was under arrest for robbery and murder, and obtained her consent to the search of her house. Alver also obtained Lupe Anderson's consent to search the house. (12T 217-15 to 221-5) During the search of the house, Alver recovered property linking petitioner to the crimes. (13T 7-6 to 11-7)

After petitioner was advised that she was under arrest, she was questioned by Alver and Detective Hynes. A statement was taken that was neither tape-recorded nor taken down by a stenographer.

According to Alver, Jamie told him that she had first met Demolena with Chris James in late June or July of 1994 in Conyers, Georgia. Jamie had known James because he went to high school with one of her brothers. Jamie had indicated that she had recently been thrown out of the house by her father and that she would occasionally visit Demolena and James where they were staying. At Demolena's invitation, Jamie hitchhiked to New York with her and James in late July, and the three of them stayed at Demolena's mother's house in Brooklyn. Demolena's younger brother, who Jamie knew as Ben or Junior, was also staying at the apartment. While at the apartment, Demolena told Jamie that she knew of "coke heads that have money and deserve to get ripped off." Demolena and James had a telephone book with the names and numbers of the people they planned to "set up." (13T 18-11 to 22-7)

Two of those people were Robert Hippman and James Polites. According to Alver, Jamie said that Demolena called Hippman's residence from a phone booth near Demolena's mother's house, and Demolena told Jamie that they would get into the apartment under the

7

Da 85

pretense of having sex with Hippman and that they would rob him. According to Alver, Jamie admitted her involvement in the robbery and admitted that she held a gun on Hippman but claimed that it was James who removed the gun from the bag and handed it to Demolena, who handed it to Jamie.

The next day, they planned the Polites robbery. Jamie allegedly told Alver she had no idea that Polites would be killed until she was in his apartment and overheard Demolena tell James that they had to kill him because he could identify her. (13T 30-1 to 9)

After the trio arrived at the apartment, Polites was ordered inside and told to lie on his stomach in the living room. The apartment was ransacked, money and valuables were taken, and Polites was strangled to death by James. (13T 32-13 to 36-8)

Alver also indicated that Jamie admitted that she went to a jewelry store in Brooklyn, and that she, James and Demolena traded in stolen property for several pieces of jewelry. Eventually, Jamie flew back to Georgia. One evening, her boyfriend, Eddie Kummer, received a telephone call from Demolena telling him that she and James had been arrested and that Jamie should keep a low profile. (13T 37-6 to 13) At the conclusion of this oral interview, Jamie was to give a tape-recorded statement. Since Alver could not locate a tape recorder at the Marshal's Office, he went to the store to buy one. When he returned 45 minutes later, Jamie said she wanted to talk to someone before making any further statements, and the interview was terminated. (13T 37-23 to 40-1)

Alver and Hynes flew back to New Jersey with Jamie on September 17, 1994. Jamie was brought to a satellite office of the Bergen County Prosecutor's Office at about 2:00 p.m. (13T 48-1 to 23) Another statement was taken from Jamie. This one was in stenographic form.

Da 86

The statement was much like the first but differed in a few respects.  (13T 111-1 to 167-13)

At trial, Jamie's boyfriend, Eddie Kummer, testified that he had also been friends with James and first met Demolena, who was dating James, in the Spring of 1994.  Early that same summer, Jamie's father kicked her and her brother out of the family home and Jamie had nowhere to go.  Jamie often stayed at James' grandmothers house during which time she and Kummer socialized with Demolena and James frequently.  When James and Demolena left to go to New York, Jamie went with them because "she really didn't have a place to stay and she was going to go up there because they had a place to stay up there and she wanted to see New York."  (11T 96-18 to 99-25; 11T 99-23 to 100-17; 11T 119-12 to 122-19) Kummer did not go with them because he had a job.  (11T 98-8 to 11)

A month later, Jamie flew back to Georgia and Kummer picked her up at the airport.  She stayed at her mother's house for a week and then returned to New York.  Awhile later, Jamie called Kummer from New York and asked him to come up.  He flew up to New York and stayed at a hotel with Jamie, James, and Demolena, for about four or five days.  Kummer noticed that James had a lot of money and paid for everything they did.  He also had two guns.  He observed new clothes, camcorders, and jewelry.  (11T 108-10 to 110-10)

Kummer kept asking Jamie where all the money was coming from and Jamie admitted that she, Demolena, and James robbed people and that James had killed a man.  (11T 110-11 to 111-14) When Kummer asked Jamie why she went along with it, Jamie said she had no idea it would go that far and no idea James would kill someone.  (11T 111-23 to 113-1) Kummer asked Jamie to leave New York with him but she said that she could not leave but would not say why.  Kummer got the impression that James was keeping her there, but James denied this.  Three

9

Da 87

weeks later Jamie returned to Georgia.  Kummer did not see Jamie before Demolena called to tell him that she had been arrested.  (11T 113-2 to 115-23)

One of the defenses raised at trial was diminished capacity.  Dr. Jonathan Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents, Jamie was suffering from post-traumatic stress disorder, which kept her from being able to form either purposeful or knowing states of mind.  (14 T 132-1 to 135-12) Kleinman explained that when he first interviewed Jamie he found that she was generally in good contact with reality, but that she had a difficult time expressing things having to do with the events surrounding Polites's death.  (14T 105-11 to 23) When he asked her for personal background information, Jamie's responses indicated to him that she had been physically or sexually abused, but she was incapable of telling him what had happened.  (14T 105-24 to 106-11) Having a strong suspicion that there had been abuse, Kleinman recommended that a forensic social worker be employed to get background information.  His suspicions were confirmed by the report and he re-interviewed Jamie and found that as a child she had been physically abused by her father and sexually abused by two teenage cousins when she was five or six years old.  (14T 118-22 to 120-16)

Jamie's father testified on her behalf and confirmed that he had been extremely unstable. He admitted that he drank to excess and had violent fights with the children's mother in front of the children.  After he separated from the children's mother, the children were moved from one parent's home to the other as the parents fought over the children.

Kleinman also learned that Jamie had been molested by her father on one occasion when she was between the ages of 12 and 14.  He concluded that her basic childhood needs to be nurtured and cared for were never met.  (14T 122-3 to 11) Jamie's father remarried, and her

Da 88

stepmother was bitter, abusive and rejecting. (14T 121-12 to 17) Jamie and both of her brothers

eventually turned to substance abuse as a form of self-medication. (14T 121-2 to 6) Finally,

Jamie reported that when she was older she was sexually assaulted by a man with a knife one

night when her car broke down. She had flashbacks after this incident and intensified her use of

drugs and alcohol. (14T 122-15 to 24) Given this background, when Jamie met Demolena at the

age of 18, developmentally she was closer to being 12-14 years old in terms of maturity. Jamie

was very needy and she ceded control over her life to Demolena. (14T 129-9 to 131-25)

Dr. Arnaldo Apolito, a forensic psychiatrist, also found post traumatic stress disorder, and

added that in his opinion, Jamie was also in a dissociative state at the time of the crimes. (14T

14-8 to 17-4) Dr. Kleinman, however, felt that Jamie's symptoms did not reach the degree of

disturbance or frequency required for a diagnosis of dissociative disorder, but did find that she

had experienced episodes of depersonalization, a feeling that you are watching events over which

you have no control, rather than experiencing them yourself. (14T 115-3 to 15; 14T 132-22 to

133-14; 14T 182-24 to 185-6)

Dr. Steven Simring, a psychiatrist called by the State on rebuttal, testified that while he

was sure Jamie had experienced severe problems at home, he found no evidence of post-

traumatic stress disorder. (16T 169-9 to 170-6) Dr. Simring further opined that the relationship

between post-traumatic stress disorder and committing robberies was an "irrelevant concept."

(16T 158-1 to 7) Dr. Simring agreed that Jamie showed "considerable immaturity as she

discussed her past life," and diagnosed her with a personality disorder "not otherwise specified."

Simring also diagnosed a drug and alcohol dependence. (16T 144-1 to 25; 14T 162-2 to 8; 14T

200-8 to 202-13; 15T 113-17 to 116-6) Dr. Simring opined that "she may have been high on

11

Da 89

drugs or alcohol" during the commission of the crimes, and "that may have affected her judgment," but in his opinion it did not affect her awareness of what she was doing.  (16T 151-22 to 152-15)

Da 90

## LEGAL ARGUMENT

## POINT 1

## PETITIONER WAS DEPRIVED OF HER
## SIXTH AMENDMENT RIGHT TO EFFECTIVE
## ASSISTANCE OF TRIAL COUNSEL

The petitioner argues that the actions of her defense counsel before and during trial constituted ineffective assistance of counsel contrary to the Sixth Amendment of the United States Constitution and the New Jersey State Constitution. Strickland v. Washington, 466 U.S. 668, 80 L.Ed2d 674 (1984); State v. Fritz, 105 N.J. 42 (1987).

The Sixth Amendment right to an attorney as guaranteed by the United States Constitution ensures that a defendant will receive "effective assistance" of counsel. Strickland v. Washington, *supra.,* 466 U.S. at 686, 80 L.Ed2d at 692. In essence, the benchmark for judging a claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having a just result." *Id.* At 687, 80 L.Ed2d at 692-693. An aggrieved defendant must satisfy a two-pronged test: 1) counsel's performance was deficient, and 2) this deficient performance so prejudiced defendant that it caused an unjust result. *Id.*

The United States Supreme Court has developed a test for determining whether an attorney has provided effective assistance to his or her client in cases where that attorney has not acted in a way so egregious as to allow the court to make a *per se* finding that he or she has rendered ineffective assistance. Strickland v. Washington, 466 U.S. 668, 80 L.Ed2d 674 (1984) reh.den. 467 U.S. 1267, 82 L.Ed. 2d 864; United States v. Cronic, 466 U.S. 648, 80 L.Ed2d 657

13

Da 91

(1984); State v. Fritz, 105 N.J. 42 (1987).  The New Jersey Supreme Court, relying upon the

United States Supreme Court's formulation in Strickland, has articulated the standard as follows:

> We therefore hold that under Article I, paragraph 10 of the State
> Constitution a criminal defendant is entitled to the assistance of
> reasonably competent counsel, and that if counsel's performance has
> been so deficient as to create a reasonable probability that these
> deficiencies materially contributed to defendant's conviction, the
> constitutional right will have been violated.

> State v. Fritz, 105 N.J. 42, at 58 (1987)

New Jersey has uniformly held that the right to legal representation commands the right to

effective assistance of counsel.  Powell v. Alabama, 287 U.S. 45, 71-72, 77 L.Ed. 158, 172

(1932), quoting Holden v. Hardy, 169 U.S. 366, 389, 42 L.Ed. 780, 790 (1897); State v. Minao,

77 N.J. 576, 581 (1981); State v. Land, 73 N.J. 24 (1977); State v. Bellucci, 81 N.J. 531, 538

(1980).

The failure of counsel to require adversarial testing of a cause is described in Strickland v.

Washington, supra.:

> A convicted defendant making a claim of ineffective assistance must
> identify the acts or omissions of counsel that are alleged not to have
> been the result of reasonable professional judgment.  The court must
> then determine whether in light of all the circumstances, the identified
> acts or omissions were outside the wide range of professionally
> competent assistance.  In making the determination, the court should
> keep in mind that counsel's function, as elaborated in prevailing
> professional norms, is to make the adversarial testing process work in
> the particular case. [Id. At 690, 80 L.Ed2d at 695]

Even when no theory of defense is available, if the decision to stand trial has been made,

14

Da 92

counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt.
United States v. Cronic, 466 U.S. 648, 655, 80 L.Ed2d 657, 665 (1984).

It is beyond dispute that the Sixth Amendment not only provides defendants in criminal proceedings with the right to assistance of counsel, but also guarantees that such assistance be effective. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). United States v. Swinehart, 617 F.2d 336, 340 (3rd Cir. 1980), State v. Pace, 171 N.J. Super. 240, 251 (App. Div. 1979), certif. den. 84 N.J. 384 (1980). Our own Supreme Court in State v. Fritz, has held that this right to assistance of counsel is also guaranteed by the New Jersey Constitution.

Counsel must be effective in both the preparation and trial of a case. State v. Bellucci, 81 N.J. 531 (1980), State v. Sugar, 84 N.J. 1, 17 (1980), appeal after remand, 100 N.J. 214 (1985), appeal after remand, 108 N.J. 151 (1987). Mere presence of an attorney at trial does not satisfy the Constitution. Rather, the circumstances under which a lawyer provides counsel must not preclude the giving of effective aid in the preparation and trial of the case. State v. Fritz, 105 N.J. 42 (1987).

A defendant must receive the guarantees of a fair trial and a new trial will be awarded when mistakes and miscalculations are so incompetent as to thwart this fundamental protection. Id. at 48. A defendant is entitled to a standard of adequacy of legal services equal to the exercise of normal customary skill and knowledge. State v. Anderson, 117 N.J. Super. 507, 519 (App.Div. 1971), modified, 60 N.J. 437 (1972). As stated in Justice Black's dissent in Betts v. Brady, 316 U.S. 445, 476 (1942), "Whether a man is innocent cannot be determined from a trial in which, as here, denial of counsel has made it impossible to conclude, with any satisfaction the degree of certainty that the defendant's case was adequately presented."

15

Da 93

The right to effective assistance of counsel is axiomatic.  In discussing the importance of

a defendant's right to effective assistance, the United States Supreme Court stated:

> The substance of the Constitution's guarantee of effective assistance
> of counsel is illuminated by reference to its underlying purpose.
> "truth. . . , is best discovered by powerful statements on both sides
> of the questions.  This dictum describes the unique strength of our
> system of criminal justice.  The very premise of our adversary system
> of criminal justice is that partisan advocacy on both sides of a case will
> best promote the ultimate objective that the guilty be convicted and the
> innocent go free.  <u>Herring v. New York,</u> 422 U.S. 853, 862 (1975).

Clearly, this premise supports the Sixth Amendment by assuring fairness in the adversarial

process of a criminal case.  Unless the accused receives effective assistance of counsel, "a serious

risk of injustice infects the trial itself." <u>Cuyler v. Sullivan,</u> 446 U.S. 335 (1980).


## A.  Counsel Failed To Properly Investigate On Petitioner's Behalf.


Counsel failed to investigate on his client's behalf by neglecting to interview and

subpoena witnesses with relevant information.  Petitioner asserts that counsel failed to adequately

consult with her in preparation of her case, failed to provide her with copies of discovery she

requested, and failed to investigate witnesses to enable her to set forth a meaningful and

complete defense.  According to Ms. Farthing, her trial counsel did not spend enough time

conferencing with her regarding the pretrial and trial of the within matter.  She asserts that

defense counsel briefly spoke to her in advance of trial and did not follow up on leads to

witnesses provided to him by his client. Counsel neglected to utilize documented records and the

accounts of potential witnesses regarding Ms. Farthing's mental health problems and her

16



kidnaping by her birth mother. Because trial counsel neglected to conduct a thorough

investigation, an incomplete and ineffective defense was put forward on her behalf.

      Our case law suggests that the proper inquiry where a defendant alleges his counsel didn't

adequately investigate his case is, whether as a result of the consultation that took place between

petitioner and counsel, counsel was able to properly investigate the case and develop a

reasonable defense.  <u>State v. Savage,</u> 120 N.J. 594, at 617; 577 A.2d 455 (1990).  "When a

defendant has given counsel reason to believe that pursuing certain investigations would be

fruitless or even harmful, counsel's failure to pursue those investigations may not later be

challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant

may be critical to a proper assessment of counsel's other litigation decision," <u>Strickland v.</u>

<u>Washington</u> supra., 466 U.S. at 691, 104 S. Ct. at 2066, 80 L.Ed. 2d at 696.  Petitioner alleges

that she is entitled to an evidentiary hearing on this basis.

      Strategy decisions made after less than complete investigation are subject to close

scrutiny.  Counsel has a duty to make "reasonable investigations or to make a reasonable decision

that makes particular investigation unnecessary."  Id. at 691, 104 S. Ct. at 2066, 80 L.Ed.2d at

695.  "Deliberate trial tactics may constitute ineffective assistance of counsel if they fall 'outside

the wide range of professionally competent assistance' . . . if some other action would have better

protected a defendant and was reasonably foreseeable as such before trial."  <u>Martin v. Rose,</u> 744

F.2d 1245, 1249 (6th Cir.  1984), <u>quoting Strickland,</u> 466 U.S. at 690.  Petitioner maintains that

counsel's performance was deficient for failing to investigate on her behalf.  Importantly, counsel

failed to investigate the following defense leads requested by his client: (1) counsel failed to

interview Kathy Farthing, petitioner's stepmother regarding relevant information pertaining to

17

Da 95

her stepdaughter's defense; (2) counsel failed to provide defense experts with copies of the

petitioner's school records which would have given support to their conclusions and opinions

regarding her psychiatric state; (3) counsel failed to advise experts to conduct testing relative to

adult attention deficit disorder or adult post traumatic stress disorder which would have

substantiated the relevance of these disorders to the events in question; and (4) counsel failed to

subpoena Edward Kummer's time cards from his place of employment regarding relevant time

periods regarding his stay in New York with Jamie thus depriving the defense of the opportunity

to impeach his credibility during his trial testimony.  Petitioner submits that it was her counsel's

duty to pursue these investigative requests before dismissing them as unimportant.  It was his

duty to investigate on her behalf.  She contends that if he had done so, he would have discovered

helpful evidence to use on her behalf at trial.

     As a result of the foregoing, petitioner claims that she received the ineffective assistance

of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to

the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### B. Counsel failed to secure a legitimate plea offer and engage in effective plea bargaining on her behalf prior to the litigation of the matter.

     The petitioner argues that her attorney was ineffective in negotiating with the State

regarding a plea offer.  She submits that no real effort was put forward by counsel to use her

psychiatric history, as documented in school records and psychiatric reports, to obtain a suitable

plea offer for her.  Rather, he did not lobby on behalf of his client for an appropriate offer.

Further complicating the matter was the lack of communication between petitioner and counsel.

18

Da 96

Ms. Farthing suggests that her ability to consider any plea offer was impaired by the denial of her request for discovery. Due to the fact that she could not review and discuss the proofs against her with her counsel, she could not intelligently consider what would constitute an appropriate plea offer.

In State v. Tacetta, 351 N.J. Super. 196, 201 (App. Div. 2002), the court remanded the post conviction relief matter for an evidentiary hearing regarding the defendant's contention that he received ineffective assistance of counsel in respect to plea negotiations. In that case, defendant had previously been charged with and acquitted of murder in federal criminal proceedings. His concern was the exposure he faced on State racketeering and extortion charges if he were again to be acquitted of the murder, an eventuality that he apparently believed to be likely. It was his assertion that his attorney advised him that the remaining charges were all second-degree crimes on which the exposure would be five to ten years imprisonment, which he assumed meant a maximum total exposure of ten years. The court found that such an assumption was incorrect as a matter of law. The court reasoned as follows: first, it did not take into account that the racketeering charges would be elevated to first-degree crimes if the predicate extortion crimes were crimes of violence. Nor did it take into account the prospect of extended term sentencing or consecutive sentencing. Id. The defendant asserted in his petition for post conviction relief that had he been properly advised as to his sentencing exposure on the racketeering and extortion charges, he would have accepted the State's offer.

It is clear that plea bargaining is a critical stage of the criminal proceeding at which the right of representation attaches. State v. Powell, 294 N.J. Super. 557, 564 (App. Div. 1996). An attorney's substantial underestimation of sentencing exposure that prevents defendant from

Da 97

making a fair evaluation of a plea offer and induces him to reject a plea agreement he otherwise would likely have accepted constitutes remediable ineffective assistance. United States v. Gordon, 156 F.3d 376, 380-381 (2d Cir. 1998); Engelen v. United States, 68 F.3d 238, 241 (8th Cir. 1995); United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992); Turner v. Tennessee, 858 F.2d 1201, 1205 (6th Cir. 1988), vacated on other grounds, 492 U.S. 902, 109 S. Ct. 3208, 106 L.Ed.2d 559 (1989); Alvermaz v. Ratelle, 831 F.Supp. 790, 792 (S.D. Cal. 1993); State v. Donald, 10 P.3d 1193, 1200 (Ariz. Ct. App. 2000), cert. denied., 122 S.Ct. 63, 151 L.Ed.2d 30 (2001); People v. Curry, 687 N.E.2d 877, 887 (Ill. 1997); State v. Kraus, 397 N.W.2d 671, 672-673 (Iowa 1986).

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### C. Counsel failed to seek a court order to stop the harassment of Petitioner's family by detectives from the prosecutor's office.

Petitioner argues that detectives from the Bergen County Prosecutor's Office harassed members of her family, and her counsel did nothing to stop it. She claims that counsel had a duty to prevent the intimidation of her family, who were also her witnesses. She suggests further that the intimidation of her witnesses resulted in testimony that was tainted by fear of retaliation. If counsel had sought a court order to enjoin the harassing behavior, she argues that her witnesses would have been able to provide more effective testimony at trial.

As a result of the foregoing, petitioner claims that she received ineffective assistance of

counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### D. Counsel failed to seek a court order to direct the Bergen County Jail to begin readministering petitioner's medication that had been abruptly curtailed prior to the litigation of the within matter.

Petitioner submits that her psychotropic medication was suddenly stopped while she was housed at the Bergen County Jail, and her attorney did nothing to rectify the situation. Although she had advised him that the medication had been stopped and that the situation was negatively affecting her, he did not seek an order from the court directing that medication be continued. Ms. Farthing contends that the absence of medication made it difficult for her to function during the pretrial motions and trial of the within matter. In fact, the lack of medication made it nearly impossible for her to even consider testifying in her own behalf.

During the <u>Miranda</u> hearing, petitioner began to testify but was cautioned to stop by the court and her own attorney because she was not testifying well. She maintains that this was due, in part, to her unmedicated state. Because counsel failed in his duty as her advocate, to see to it that her medication was provided, she was deprived of effective representation and a fair trial.

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### E. Counsel failed to move *in limine* regarding any deals made between the prosecutor's office and state witness, Edward Kummer, in exchange

**for his testimony against the petitioner.**

Because counsel failed to move for the disclosure of any deals made between the State and Edward Kummer in exchange for his testimony, the petitioner was deprived of the use of impeachment material.  Petitioner argues that her ex-boyfriend, Edward Kummer very likely made a deal with the prosecutor's office to testify against her in exchange for immunity from prosecution.  She reasons that Mr. Kummer spent time with her, Demolena, and James in New York and received some of the stolen property and proceeds while he was there.  Since he indicated that he was suspicious of the large sums of cash and jewelry, it would have been clear to him that the property and money spent for his benefit was stolen or probably stolen.  She reasons further that he was likely informed of this reality by law enforcement when he was questioned by them and that a deal was made to insulate him from charges.

Ms. Farthing submits that the details of any arrangement between Mr. Kummer and law enforcement were discoverable and would have aided counsel in his cross examination of Mr. Kummer.  Counsel's failure to seek out this information deprived her of effective assistance of counsel.

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

**F.  Counsel failed to move to suppress the search of petitioner's truck, the electronic bugging of the petitioner's home, and the state's interference with the petitioner's mail.**

When an attorney has failed to conduct a thorough investigation of the law and the facts

Da 100

bearing on a particular case, or to take account of all plausible options in a given case, a defendant may satisfy the first prong of the Strickland-Cronic standard. Strickland, supra., at 690-91. This lack of investigation contributes to an attorney's failure to present a meaningful defense, State v. Savage, 120 N.J. 594, 623 (1990). Strategy decisions are subjected to closer scrutiny when made in connection with a less than complete investigation. Id. at 617-18.

In this matter, petitioner argues that defense counsel did not pursue suppression of evidence gathered as a result of the above-referenced searches or as a result of information gathered from the bugging. Petitioner further argues that the seizure of her mail and the use of it against her at her trial was violative of her constitutional rights.

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### G. Counsel failed to prepare petitioner for the Miranda hearing.

Counsel failed to afford meaningful representation at the Miranda hearing. Petitioner contends that her counsel failed to properly prepare her prior to the Miranda hearing. She maintains that his failure to insure that her medication was administered by the jail contributed to this problem. In addition, she and counsel did not discuss her proposed testimony prior to her taking the stand during the hearing before Judge Moses.

On May 30, 1996, Ms. Farthing began testifying during her Miranda hearing. ( See transcript dated 5/30/96, pp. 70-75) During her brief testimony the following exchange occurred:

23

Da 101

Question: Now, when you signed this - - this, talking about the consent to search that's marked in evidence here?

Answer: Yeah.  Yes.

Question: Did anything happen before you signed the consent to search, vis-a-vis the house?

Answer: Not that I know of.


Question: Now, had the house already been searched yet?

Answer: I don't know, I couldn't see the house from where I was arrested.

Question: Where were you arrested in relationship to the house?

Answer: The house was like right here (indicating with hands) and there is a road that goes like - - (indicating with hands) The driveway - -

The Court: I can't see.

The Witness: I'm sorry.

The Court: How far were you from the house?

The Witness: I don't know, maybe half a mile - - maybe not that much.

The Court: Next question.

(By Mr. Weichsel)

Question: You couldn't see the house from where you were arrested?

Answer: No.

Question: And how much time elapsed between the time you were stopped and the time you were given this consent to search form?

24

Da 102

Answer: Maybe ten, 20 minutes.

Question: And who gave you this form?

Answer: One of the officers.

Question: Do you remember which one?

Answer: No.

Question: Was it one of the New Jersey officers or Georgia officers?

Answer: I think it was a New Jersey officer, but I don't know.

Question: What did the officer say to you and what did you say to him?

Answer: He just asked me - - he said this was a thing to search the house and everything, and all I had to do is sign it to give him permission to search the house and everything, so I just said okay.

Question: What was your mood at that point?

Answer: Shock.

Question. Shocked?  What were you shocked about?

Answer: I was being arrested.  Cars coming out of everywhere for just me.

Question: Did the officer tell you that you had a right not to let him search the house?

Answer: Yes.

The Court: Prosecutor and Mr. Weichsel, would you step up here a minute.  Just have her go by the jury.

(Colloquy off the record)

(In open court)

25

Da 103

The Court: Step down next to your lawyer.

(Witness excused from stand)

The Court: Any objection?

Ms. Baglivi: No, Judge.

The Court: Mr. Weichsel indicated to me he really needed a little more time to prepare the witness and to speak to her. Is that correct?

Mr. Weichsel: That's correct, Judge.

The Court: Officers, can he speak with her down in the Circle if you take her down now? And make sure she has some lunch.

The Officer: Yes, Judge.

The Court: We'll reconvene at 1:30.

Mr. Weichsel: Thank you, Judge.

(After lunch recess)

The Court: Are you ready to continue?

Mr. Weichsel: Judge, I talked with my client and she has chosen not to testify.

The Court: Do you understand you have a right to testify?

The Defendant: Yes.

Mr. Weichsel: Stand up.

The Court: Do you understand that?

The Defendant: Yes.

The Court: And, in fact, you had started to testify. Do you now want to exercise your right not to testify?

26

Da 104

The Defendant: Yes, I do.

The Court: Have you discussed this with Mr. Weichsel?

The Defendant: Yes, I did.

The Court: Is anybody forcing you or pressuring you into this decision?

The Defendant: No, your Honor.

The Court: Very well.  I can't force her to testify.

(T: 5/30/96; pp.73-75 and p. 76(ll.1-15)

Based upon the foregoing, it is clear that the petitioner was not adequately prepared to testify.  The court interrupted the proceedings to advise defense counsel that his client was clearly unprepared.  As a result, her testimony was stopped and counsel was given some additional time to meet with his client.  However, Ms. Farthing was not prepared by counsel during the break.  Rather, she was dissuaded by defense counsel from continuing with her testimony.  Because she didn't know what else to do, she went along with his advice and gave up her right to testify in her own defense.  This same lack of preparedness also kept her from testifying in her own defense at trial.  While it may be argued that it was a strategy decision not to call the petitioner to the stand at the Miranda hearing, it is difficult to find a rational basis for any such a strategy since her testimony would have contributed to her defense.

Arguably, petitioner's statement was found to be competent evidence by the Court as a result of counsel's failure to assert a defense at the Miranda hearing.  Defense counsel's deficient performance at this hearing alone can be sufficient to support a claim of ineffective assistance of counsel.  Kimmelman v. Morrison, 477 U.S. 365, 383 (1986), where the Court stated that a single serious error can support an ineffectiveness claim.  Here, the abdication of responsibility

27

Da 105

regarding litigation of a Fifth Amendment claim is such an error. The petitioner claims that she was prejudiced by this error because the Court may have suppressed her statement if counsel had put forward a defense on her behalf.

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### H. Counsel failed to assert the affirmative defense to felony murder on the petitioner's behalf.

N.J.S.A. 2C:11-3a. (3) sets forth the following:

Murder. a. Except as provided in N.J.S.A. 2C:11-4 criminal homicide constitutes murder when:

(3) It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking or criminal escape, and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants; except that in any prosecution under this subsection, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

Petitioner submits that there is no evidence that she killed the victim, Jamie Polites.

28


Da 106

Although she was with Demolena and James when the victim was murdered, she did not participate in the crime. She was in a different room of the apartment when the killing took place, and she was not aware that it was going to occur ahead of time. As a result, she argues that the affirmative defense to felony murder would have applied to her at the time of trial and should have been raised on her behalf by her counsel.

As a result of the foregoing, petitioner claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### I. Counsel failed to request a proposed psychiatric expert to evaluate petitioner regarding post traumatic stress disorder during the time of the offenses charged, rather than a general diagnosis.

Counsel failed to adequately prepare a proposed expert, Ms. Feinberg, associated with this case by failing to request that the evaluation specifically address Ms. Farthing's state of mind at the time of the offenses charged. Specifically, potential defense witness, Billie Feinberg was barred from testifying as a witness for the defense because she was not prepared to testify regarding Ms. Farthing's state of mind at the time of the offenses charged. During her cross-examination by the prosecutor at the preliminary hearing, the following questioning occurred:

Question: Okay, Now, you made this diagnosis of post traumatic stress disorder however, did you not testify that you did not - you cannot say whether she suffered post - traumatic stress disorder at the time she committed all these crimes? Is that what you testified to

Da 107

with Mr. Weichsel?

Answer: I am saying that whether or not she did at the point of the crime is irrelevant to my report.

Question: My question to you is, did you make a diagnosis of whether or not she was suffering from post-traumatic stress disorder at the time of the crime?

Answer: Did I make that diagnosis in terms of whether she suffered it at the time of the crime?  No, I don't.

Question: Okay.  So you did not make any diagnosis as to her suffering from any mental disease or defect including post-traumatic stress disorder at the time of the crime?

Answer: I do not know.

(T: 11/19/96; p.79. ll.6-21)


After the conclusion of this hearing, the court ruled on the admissibility of Ms. Feinberg's testimony.  One of the key reasons in barring her as a defense witness, was the lack of any relationship between her opinion regarding Ms. Farthing's mental state and the crimes charged against her:

The Court: . . . I find that she is absolutely not qualified in giving a diagnosis of that nature for the purposes of this trial.  She said she also verified the fact that she did not - - she wasn't giving this - - this evaluation or this conclusion that she was coming to at the time of the crime itself which is really the issue in the case; what - - what was the state of mind in the diminished capacity issue that the defense has raised that the defendant was operating or behaving in a diminished capacity.  This witness does not in any way add one iota to that

Da 108

particular issue except that - - that the defendant has a background which was difficult.  She said
- - she testified that I don't know whether at the time of the events - -what - - what her condition
was at the time of the events. . .   (T: 11/19/96; p.83. ll.16-25; p.84. ll. 1-4)

Clearly, Ms. Farthing was prejudiced due to her attorney's failure to request an
evaluation of her covering the relevant time period.  As a result of the foregoing, petitioner
claims that she received ineffective assistance of counsel which prejudiced her rights guaranteed
by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Par. 10
of the New Jersey State Constitution.

### J.  Counsel failed to effectively cross-examine state witnesses.

Counsel for petitioner failed to provide effective assistance of counsel with respect to his
cross-examination of state witnesses.  Petitioner argues that a review of the trial transcripts and
counsel's cross-examination will substantiate this point.

As a result of the foregoing, petitioner claims that she received ineffective assistance of
counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the
United States Constitution and Article I, Par. 10 of the New Jersey State Constitution.

### K.  Counsel failed to move for a mistrial regarding the rejection of the petitioner's psychiatric defense during the trial and prosecutorial misconduct.

Petitioner argues that there were times during the trial that her counsel should have
moved for a mistrial but did not.  In particular, there was a point in the trial when a juror
complained to the court that other jurors were not taking the trial testimony seriously enough.
Juror #One indicated to the court in chambers, ". . .the whole thing is upsetting but when we're

31

Da 109

trying to make a decision and I don't find anything humorous about any of this. And I - - and just sometimes when - - there's just too much laughter regarding when we come back to the jury room. . ."(T: 11/20/96; p.38, ll.6-9). Further, he requested the court to caution the jury that they should take their oath seriously, ". . . perhaps a reminder that listening to psychologists and psychiatrists was part of the oath we took, that we would listen and listen to the facts and there's - - there's nothing humorous about any of it, the facts, and what they're talking about and their opinions and their expert opinions et cetera.." He suggested that jurors were making fun of the defense expert's demeanor as well.

As a result of the court's interview with Juror #One, a voir dire was conducted of the jurors to determine if the jury was disregarding its oath to listen to all the evidence and not prejudge the case. Initially, defense counsel indicated that he believed the case was in a "mistrial situation":

Mr. Weichsel: " . . . the impression I got was that she's concerned because other jurors are making fun of the defense mental health experts who have testified. They're joking about them and making fun of them and if that's the case then in a sense you know, jurors who have been told not to prejudge things have prejudged things and if that's the case then the jurors have violated their oath and we're in a mistrial situation."     (T:11/20/96; p.44. ll.11-18)

After the voir dire of the jury, defense counsel reversed his position and did not move for the mistrial. Petitioner claims that this was error, and she was prejudiced because of it. She suggests that the voir dire did corroborate the concerns expressed by Juror #One. Both Juror #12 and Juror #14 disclosed that there was a lack of respect for Dr. Apolito as a witness.

Juror #12 stated that, ". . . he once or twice made a snorting sound when he was on the

32

stand when he went to breathe in . . . And someone mimicked that sound, that's the only thing

like that I heard." (T: 11/20/96; p.80. ll.3-7) Juror #14 commented, ". . . I said it was hard to

understand and it was almost like you wanted to make him spit out the words." (T: 11/20/96;

p.86. ll.15-17)

 Ms. Farthing contends that the jury voir dire corroborated the disclosure made by Juror

#One. She further contends that her defense counsel should have moved for a mistrial due to the

fact that the jury was not taking her mental health witness seriously. Their behavior showed that

they had already discounted her defense.

 Additionally, Ms. Farthing argues that a mistrial motion was also warranted as a result

of the prosecutorial misconduct in this case. She urges that a review of the trial transcripts will

review prosecutorial improprieties throughout. For example, the prosecutor referred to open and

pending cases in other jurisdictions. (T:11/21/96; p.149. ll.7-21) Also, the prosecutor repeatedly

referred to Ms. Farthing as a liar throughout the trial.

 As a result of the foregoing, petitioner claims that she received ineffective assistance of

counsel which prejudiced her rights guaranteed by the Sixth and Fourteenth Amendments to the

United States Constitution and Article I, Par. 10 of the New Jersey Constitution.


Da 111

## POINT 2

## PETITIONER WAS DEPRIVED
## OF HER RIGHT TO A FAIR TRIAL DUE
## TO THE COURT'S BIAS AGAINST HER

Petitioner submits that the court exhibited bias against her in the following ways:

(A) the court demonstrated bias against her by interrupting and convincing her attorney to stop her testimony during the <u>Miranda</u> hearing; and after depriving her of her right to testify through intimidation, admitted her statement into evidence although it was not voluntarily made or electronically recorded;

(B) the court permitted the codefendants' statements to be introduced against her during the trial;

(C) the court permitted the prosecutor to engage in misconduct during the trial;

(D) the court permitted the prosecutor to show enlarged photographs of the victim's body to the jury, thereby prejudicing them against her;

(E) the court imposed an illegal sentence on the petitioner by sentencing her above thirty years, in violation of <u>Apprendi.</u>

As a result of the foregoing, petitioner claims that she was denied her right to a fair trial guaranteed by the United States Constitution and the New Jersey State Constitution.

## POINT 3

## THE JURY'S VERDICT WAS AGAINST
## THE WEIGHT OF THE EVIDENCE.

The petitioner submits that the jury's verdict was against the weight of the evidence in that:

(A) There was no ballistic evidence offered to suggest that the firearms seized were operable;

Da 112

(B) There was no positive identification of the petitioner obtained from a reliable source placing petitioner at the scene of the crimes;

(C) There were no fingerprints or footprints recovered from the scene of the crimes matching the petitioner;

(D) Petitioner's presence at the scene of the crimes was established by inadmissible statements of codefendants; and

(E) The fair construction of the evidence admitted at trial merely suggested that the petitioner was in a separate room of the victim's home when he was killed and had no idea that the killing would occur.

## POINT 4

## PETITIONER WAS DENIED THE RIGHT TO A FAIR JURY TRIAL.

As previously argued, petitioner's right to a fair jury trial was violated when her attorney failed to move for a mistrial on the grounds of jury failure to abide by its oath to fairly consider all of the evidence.  Clearly, the jury had predetermined the weight to be given the petitioner's psychiatric defense when it admitted to the court that some of its members had made fun of Dr. Apolito while he was testifying.

In addition, petitioner's right to a fair jury trial was also violated as a result of the many distractions to the jury during the trial of the case.  During the trial, there were many interruptions

35

Da 113

including various fire alarms, a juror had a seizure, and more than one of the jurors were agitated about how long the trial was taking.  All of these interruptions had the capacity to cause the jury to lose its focus on the issues and its ability to concentrate.

    As a result of the foregoing, petitioner claims that she was deprived of her right to a fair jury trial as guaranteed by the United States Constitution and the New Jersey State Constitution.

Da 114

## CONCLUSION

For the reasons expressed in Points 1-4 detailed herein, petitioner's petition for post conviction relief should be granted and an evidentiary hearing scheduled before the Court pursuant to <u>R.</u> 3:22-1, et seq.

Petitioner reserves the right to supplement this brief should its pending motion to compel discovery be granted by the Court.

Respectfully submitted,
Yvonne Smith Segars, Esq.
Public Defender
Attorney for Petitioner

By: Linda E. Peterson, Esq.
Assistant Deputy Public Defender I
Post Conviction Relief Unit

Dated: January 12, 2005

37

Da 115