EXHIBIT 9

# SUPERIOR COURT OF NEW JERSEY

STATE OF NEW JERSEY,                   :          SUPERIOR COURT OF NEW JERSEY
                                                  APPELLATE DIVISION
    Plaintiff-Respondent,          :
                                                  DOCKET NO.: A-003481-07T4
                                       :
                                                  <u>CRIMINAL ACTION</u>
                                       :
                                                  ON APPEAL FROM FINAL ORDER
JAMIE FARTHING,                        :          DENYING PETITION FOR POST-
                                                  CONVICTION RELIEF, SUPERIOR
    <u>Defendant-Appellant.</u>       :          COURT OF NEW JERSEY, LAW
                                                  DIVISION, BERGEN COUNTY


                                                  SAT BELOW

                                                  The Honorable Donald R. Venezia, J.S.C.

---

## APPENDIX OF DEFENDANT
## APPENDIX VOLUME I (Da 116 to Da 220)

---

Jamie Farthing
#18567/SBI#985369-B
New Jersey State Prison
P.O. Box 861 – 1EE
Trenton, NJ 08625-0861

<u>**Presently Confined**</u>

# TABLE OF CONTENTS

**PAGE NO(S)**

PROCEDURAL HISTORY.................................................................1

STATEMENT OF FACTS..............................................................5

STATEMENT OF FACTS ON APPEAL OF DENIAL OF SECOND

POST-CONVICTION RELIEF.......................................................17

**LEGAL ARGUMENTS**

POINT I

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND BECAUSE SHE WAS PREJUDICED THEREBY, THE COURT SHOULD GRANT HER PETITION FRO POST-CONVICTION RELIEF. AND BECAUSE THE PETITIONER PRESENTED ENOUGH PROOF FOR A PRIMA FACIE CASE SHOWING THAT SHE WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL, THE COURT SHOULD GRANT HER AN EVIDENTIARY HEARING ON THIS ISSUE IT IS A VIOLATION OF APPEALLNT'S SIXTH AMENDMENT RIGHT TO EVFFECTIVE ASSISTANCE OF COUNSEL.............................................................................19

    a.  Ineffective assistance of counsel because counsel did not object to the jury not properly instructed that an accomplice may intend to commit a lower-degree offense than the main actor(s), and because there was no evidence that the offense, nor for a homicide to result, her conviction of first-degree felony murder must be amended to any lesser-included offense.

    b.  Ineffective assistance of counsel for failure to object to the disparity between the sentences imposed on a 17-year old co-defendant as compared to age of the defendant who had just turned 18-years of age, renders defendant's sentence manifestly unjust and unduly punitive, thus requiring reversal and a remand resentencing.

POINT II

FAILURE OF POST-CONVICTION RELIEF COUNSEL TO ADVANCE ALL OF THE ISSUES RAISED BY DEFENDANT. R. 3:22-6(d).................................28

    a.  Counsel failed to raise and argue the defendant's diminished capacity defense in Conjunction with voluntary intoxication defense for presentation to the jury.

**TABLE OF CONTENTS(cont'd)**

**PAGE NO(S)**

POINT III

TRIAL COURT ABUSED IT'S DISCRETION DURING THE FIRST POST-
CONVICTION RELIEF HEARING; DEFENDANT'S CLAIMS SHOULD NOT
BE BARRED ON PROCEDURAL GROUNDS……………………………………..40

PQINT IV

THE CULMULATIVE ERRORS OF COUNSEL CAUSED PREJUDICE TO THE
DEFENDANT DENYING HER THE EFFECTIVE ASSISTANCE OF COUNSEL,
AND A MENINGFUL AND VIABLE DEFENSE DURING HER FIRST POST-
CONVICTION RELIEF HEARING……………………………………………...43

CONCLUSION……………………………………………………………...44

**INDEX TO APPENDIX**

INDICTMENT………………………………………………………......Da 1 to 7

VERDICT SHEET……………………………………………………….Da 8 to 15

JUDGMENT OF CONVICTION/ORDER FOR COMMITMENT…………..Da 16 to 17

AMENDED JUDGMENT OF CONVICTION/
ORDER FOR COMMITMENT……………………………………….........Da 18 to 20

NOTICE OF APPEAL………………………………………………...….Da 21

APPELLATE DIVISION'S OPINION………………………………..….Da 22 to 54

JUDGE VENEZIA'S LETTER TO DEFENDANT……………….……….Da 55

APPELLATE DIVISION'S ORDER……………………………..............Da 56

SUPREME COURT'S ORDER DENYING PETITION
FOR CERTIFICATION……………………………………………...............Da 57

PETITION FOR POST-CONVICTION RELIEF………………….……….Da 58 to 64

AMENDED PETITION FOR POST-CONVICTION RELIEF……………….Da 65 to 71

**TABLE OF CONTENTS(cont'd)**
**INDEX TO APPENDIX(cont'd)**

**PAGE NO(S)**

SUPPLEMENTAL PETITION FOR POST-CONVICTION
RELIEF……………………………………………………….......Da 72 to 74

ORDER DENYING PETITION OF POST-CONVICTION
RELIEF………………………………………………………......Da 75 to 76

NOTICE OF APPEAL…………………………………...………......Da 77

BRIEF IN SUPPORT OF POST-CONVICTION RELIEF……………..........Da 78 to 115

**APPENDIX VOLUME I**………………………………………Da 116 to Da 220

APPEAL BRIEF DENYING PETITION FOR
POST-CONVICTION RELIEF…………………………………..Da 116 to 154

SECOND PETITION FOR POST-CONVICTION RELIEF……………..........Da 155 to 158

MOTION FOR NEW TRIAL…………………………………...……....Da 159

ORDER DENYING MOTION FOR NEW TRIAL…………………...….…..Da 160

NOTICE OF APPEAL……………………………………………..Da 161 to Da 162

ORDER DENYING MOTION…………………………………….......Da 163

BRIEF IN SUPPORT OF POST-CONVICTION RELIEF…………….Da 164 to Da 210

ORDER DENYING SECOND POST-CONVICTION
RELIEF…………………………………………………….….……Da 210 to Da 216

NOTICE OF APPEAL…………………………………………..Da 217 to Da 218

ORDER DENYING ASSIGNMENT OF COUNSEL
FOR SECOND POST-CONVICTION RELIEF………………………….…..Da 219

CLASSIFICATION DOCUMENT SUPPORTING
TRANSPORT………………………………………………….……Da 220

-iii-

**TABLE OF CASES CITED(cont'd)**
**TABLE OF CASES CITED**

State v. Anderson, 117 N.J. Super. 507, 519 (App. Div. 1971), 60 N.J. 437 (1972) ......20

State v. Bellucci, 81 N.J. 531 (1980) ...........................................……....20

State v. Bielkiewicz, 267 N.J. Super.520, 528, 534 (App. Div. 1993)...................21, 23

State v. Blake, 234 N.J. Super. 166 (1993)..............................................21, 23

State v. Bridges, 254 N.J. Super. 541, 566 (App. Div. 1992), N.J. 447 (1993).............21

State v. Buonadonna, 122 N.J. 22, 39 (1991)............................................20

State v. Carter, 85 N.J. 300, 314 (1981).............................................34

State v. Christener, 71 N.J. 55, (1976)...........................................…..23

State v. Clark, 347 N.J. Super. 507............................................…......33

State v. Coruzzi, 189 N.J. Super. 273, 319 (App. Div.) certif.. den.,
94 N.J. 531 (1983)...........................................................…....28

State v. Deliberto, 149 N.J. 90, 101 (1997)..........................................…..38

Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, (1985)...............................29

State v. Farthing, 165 N.J. 530 (2000).............................................…....3

State v. Farthing, 331 N.J. Super. 58 (App. Div. 2000).............................…......2

State v. Fritz, 105 N.J. 42 (1987)...............................................…...19, 20, 31

State v. Giorgianni, 189 N.J. Super. 220, 230 (App. Div.) certif.. den.,
156 N.J. (1983).............................................................…....29

State v. Gregg, 278 N.J. Super. 182 (1994)...........................................…..33

State v. Harris, 181 N.J. 391 (2004)..............................................…...21

State v. Hicks, 54 N.J. 390, 391 (1969)...........................................…....24

-iv-

**TABLE OF CONTENTS (cont'd)**
**TABLE OF CASES CITED (cont'd)**

PAGE NO(S)

State v. Hreniuk, Appellate Docket No. A-5667-04T4, April 18, 2007…….…..……..38

State v. Johnson, 309 N.J. Super. 257, 268 (App. Div. certif.. den.,
156 N.J. 387 (1998)……………………………………………………..……..38

State v. Jardan, 147 N.J. 409, 422-23 (1996)…………………………………..……..23

State v. Lee, 235 N.J. Super. 410 (App Div 1999)…………………………..………..24

State v. Malloy, 324 N.J. Super. 525, 533 (App Div 1999)………………..……………23

State v. Morant, 241 N.J. Super. 121, 142 (App. Div. 1999)…………………….……..24

State v. Moore, 273 N.J. Super. 118, 12 (App. Div. 1994), certif.. den.,
137 N.J. 311 (1994)……………………………………………………………..23, 40

State v. Norman, 151 N.J. 5, 37 (1997)……………………………………………..22

State v. Pineda, 151 N.J. 621, 625 (1990)……………………………………………..24

State v. Poteet, 61 N.J. 493 (1972)……………………………………………………..26

Powell v. Alabama, 287 U.S. 45, 71, 53, S. Ct. 55, 65,
77 L.Ed. 158, 172 (1932)………………………………………………………..29

State v. Preciose, 129 N.J. 451 (1992)………………………………….……18, 34, 40, 41, 42

State v. Roach, 146 N.J. 208, 232 (1996)……………………………………………..25

Rodriguez v. Rosenbalt, 58 N.J. 281, 295 (1974)…………………………………….30

State v. Rue, 175 N.J. 1, 811 A.2d 425 (2000)………………………………………30, 32

State v. Russo, 330 N.J. Super. 119, 140 (App. Div. 2000)…………………………..35

State v. Sprano, 249 N.J. Super. 419……………………………………………………39

State v. Sugar, 84 N.J. 1, 17 (1980)…………………………………………………..29

-v-

**TABLE OF CONTENTS (cont'd)**
**TABLE OF CASES CITED (cont'd)**

State v. Towey, 114 N.J. 69, 78-79 (1989)……………………………………24

State v. Vick, 117 N.J. 288-289 (1980)……………………………………23

State v. Webster, 185 N.J. 399, 866 A. 2d 663 (2006)…………....……………29, 34

State v. Weeks, 107 N.J. 396, 404-410 (1997)……………………………21

Strickland v. Washington, 466 U.S. 688, 104 S. Ct. 2052,
80 L.Ed. 2d 674 (1984)……………………………....…………18, 19, 20, 35, 39, 41, 42

Viviano v. CBS, 1-1 N.J. 538 (1986)……………………………………44

**TABLE OF STATUTES CITED**

N.J.S.A. 2C:4-2……………………………………………………38

N.J.S.A. 2C:11-3a (1)……………………………………………………..1

N.J.S.A. 2C:11-3a (3)……………………………………………………..1

N.J.S.A. 2C:13-1b (1)……………………………………………………..1

N.J.S.A. 2C:15-1……………………………………………………1

N.J.S.A. 2C:39-4a……………………………………………………1

N.J.S.A. 2C:39-5b……………………………………………………1

**TABLE OF RULES CITED**

R. 2:10-2……………………………………………………23

R. 3:13-3(c)……………………………………………………33

R. 3:13-3(g)………………………………………....……………28, 33

R. 3:22-1……………………………………………………31

-vi-

## TABLE OF CONTENTS (cont'd)
### TABLE OF RULES (cont'd)

R. 3:22-2(a)...................................................................................29

R. 3:22-4.........................................................................40, 41, 42

R. 3:22-4(b)..................................................................................40

R. 3:22-4 (c)..................................................................................40

R. 3:22-6(d).............................................................................28, 30

## TABLE OF TRANCRIPTS CITED

"4T" refers to the transcript of the judge's decision on pretrial motions on July 17,1996

"5T" refers to the trial transcript of November 6, 1996.

"6T" refers to the transcript of November 7, 1996.

"7T" refers to the trial transcript of November 8, 1996.

"8T" refers to the trial transcript of November 12, 1996.

"9T" refers to the trial transcript of November 13, 1996. (volume one).

"9T" refers to the trial transcript of November 13,1996. (volume two).

"11T" refers to the trial transcript of November14, 1996. (volume one).

"11T" refers to the trial transcript of November 14, 1996. (volume two).

"13T" refers to the trial transcript of November 18, 1996.

"14T" refers to the trial transcript of November 19, 1996.

"15T" refers to the trial transcript of November 20, 1996.

"16T" refers to the trial transcript of November 21, 1996.

"17T" refers to the trial transcript of November 25, 1996.

"18T" refers to the trial transcript of November 26, 1996.

"19T" refers to the trial transcript of February, 1997.

"20T refers to the resentencing conference transcript of November 3, 2000.

"21T" refers to the resentencing transcript of February 2, 2001.

"22T" refers to the PCR hearing of June, 2005.

# Superior Court of New Jersey

## APPELLATE DIVISION

DOCKET NO.  A-104-05T4

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | : | CRIMINAL ACTION |
| Plaintiff-Respondent, | : | ON APPEAL FROM |
| .v. | : | FINAL ORDER DENYING PETITION FOR |
| JAMIE FARTHING, | : | POST-CONVICTION RELIEF, SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, |
| Defendant-Appellant. | : | BERGEN COUNTY |
|  | : | SAT BELOW |
|  | : | THE HONORABLE DONALD R. VENEZIA, J.S.C. |

---

BRIEF AND APPENDIX
FOR
DEFENDANT-APPELLANT

---

YVONNE SMITH SEGARS
PUBLIC DEFENDER
ATTORNEYS FOR DEFENDANT-APPELLANT
31 CLINTON STREET
PO BOX 46003
NEWARK, NEW JERSEY  07101

STEVEN M. GILSON
DESIGNATED COUNSEL
OF COUNSEL AND ON THE BRIEF

CONFINED

Da 116

## TABLE OF CONTENTS

                                                                        PAGE

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . .     1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . .     5

LEGAL ARGUMENT:

        THE DENIAL OF DEFENDANT'S PCR
        PETITION MUST BE REVERSED AND
        THIS MATTER MUST BE REMANDED
        FOR AN EVIDENTIARY HEARING,
        BECAUSE A PRIMA FACIE CASE WAS
        ESTABLISHED AS TO THE INEFFECTIVE-
        ASSISTANCE-OF-COUNSEL CLAIM . . . . . .      19

      A.  Counsel Failed To Consult
           Adequately With Defendant
           And Failed To Conduct An
           Adequate Investigation . . . . . .     23

      B.  Counsel Failed To Move That
           Defendant's Antidepressant
           Medication That Had Been
           Terminated Be Readministered . . .     25

      C.  Counsel Failed To Move For
           A Mistrial Regarding The
           Jury's Apparent Rejection Of
           Her Diminished Capacity Defense . .     27

      D.  Counsel Failed To Secure A
           Legitimate Plea Offer And
           Engage In Effective Plea
           Bargaining . . . . . . . . . . .     29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .     32

## APPENDIX

INDICTMENT . . . . . . . . . . . . . . . . . . .   Da 1 to 7

VERDICT SHEET . . . . . . . . . . . . . . . . . .   Da 8 to 15

JUDGMENT OF CONVICTION/ORDER FOR COMMITMENT . . . .   Da 16 to 17

-ii-

Da 1149

<u>TABLE OF CONTENTS</u>
(Continued)

<u>PAGE</u>

AMENDED JUDGMENT OF CONVICTION/
    ORDER FOR COMMITMENT . . . . . . . . . . . . . .   Da 18 to 20

STATEMENT OF REASONS FOR SENTENCE . . . . . . . .   Da 19

NOTICE OF APPEAL . . . . . . . . . . . . . . . .   Da 21

APPELLATE DIVISION OPINION  . . . . . . . . . . .   Da 22 to 54

JUDGE VENEZIA'S LETTER TO DEFENDANT . . . . . . .   Da 55

APPELLATE DIVISION ORDER  . . . . . . . . . . . .   Da 56

SUPREME COURT ORDER DENYING PETITION
    FOR CERTIFICATION . . . . . . . . . . . . . . .   Da 57

PETITION FOR POST-CONVICTION RELIEF . . . . . . .   Da 58 to 64

AMENDED PETITION FOR POST-CONVICTION RELIEF . . . .   Da 65 to 71

SUPPLEMENTAL PETITION FOR POST-CONVICTION RELIEEF .   Da 72 to 74

ORDER DENYING PETITION FOR POST-CONVICTION RELIEF .   Da 75 to 76

NOTICE OF APPEAL . . . . . . . . . . . . . . . .   Da 77

<u>CASES CITED</u>

<u>Kimmelman v. Morrison</u>, 477 <u>U.S.</u> 365, 106 <u>S.Ct.</u> 2574,
    91 <u>L.Ed.</u> 2d 305 (1986) . . . . . . . . . . . . .   19

<u>State v. Auld</u>, 2 <u>N.J.</u> 46 (1949) . . . . . . . . . . .   26

<u>State v. Farthing</u>, 165 <u>N.J.</u> 530 (2000) . . . . . . .   3

<u>State v. Farthing</u>, 331 <u>N.J. Super.</u> 58 (App. Div. 2000) .   3

<u>State v. Fritz</u>, 105 <u>N.J.</u> 42 (1987) . . . . . . . . .   22

<u>State v. Marshall</u>, 148 <u>N.J.</u> 89, <u>cert. denied</u>,
    522 <u>U.S.</u> 850, 118 <u>S.Ct.</u> 140, 139 <u>L.Ed.</u> 2d 88 (1997) .   20

-iii-

Da 119

TABLE OF CONTENTS
CASES CITED
(Continued)

PAGE

State v. Mitchell, 126 N.J. 565 (1992) . . . . . . . . .   19

State v. Otero, 238 N.J. Super. 649 (Law Div. 1989) . . .   27

State v. Powell, 294 N.J. Super. 57 (App. Div. 1996) . .   30

State v. Preciose, 129 N.J. 451 (1992) . . . . . . . .   19,20

State v. Pyatt, 316 N.J. Super. 46 (App. Div. 1998),
    certif. denied, 158 N.J. 72 (1999) . . . . . . . . .   20

State v. Russo, 333 N.J. Super. 119 (App. Div. 2000) . .   20

State v. Savage, 120 N.J. 594 (1990) . . . . . . . . .   24

State v. Spivey, 65 N.J. 21 (1974) . . . . . . . . . .   27

State v. Tacetta, 351 N.J. Super. 196 (App. Div.),
    certif. denied, 174 N.J. 554 (2002) . . . . . . . .   30

State v. Winter, 96 N.J. 648 (1984) . . . . . . . . .   29

Strickland v. Washington, 466 U.S. 688, 104 S.Ct.
    2052, 80 L.Ed. 2d 674 (1984) . . . . . . . . . . .   20

United States v. Cronic, 466 U.S. 648, 104 S.Ct.
    2039, 80 L.Ed. 2d 657 (1984) . . . . . . . . . . .   22


STATUTES CITED

N.J.S.A. 2C:4-4 . . . . . . . . . . . . . . . .   26

N.J.S.A. 2C:11-3a(1) . . . . . . . . . . . . . .   1

N.J.S.A. 2C:11-3a(2) . . . . . . . . . . . . . .   1

N.J.S.A. 2C:11-3a(3) . . . . . . . . . . . . . .   1

N.J.S.A. 2C:13-1b(1) . . . . . . . . . . . . . .   1

-iv-

Da 120

TABLE OF CONTENTS
STATUTES CITED
(Continued)

                                                    PAGE

N.J.S.A. 2C:15-1 . . . . . . . . . . . . . . . . .   1

N.J.S.A. 2C:39-4a . . . . . . . . . . . . . . . . .  1

N.J.S.A. 2C:39-5b . . . . . . . . . . . . . . . . .  1


                        RULE CITED

R. 3:22-4a  . . . . . . . . . . . . . . . . . . . . 19

-v-

DA 121

## TRANSCRIPTS CITED

"1T"  refers to the transcript of pretrial hearings held on May 29, 1996.

"2T"  refers to the transcript of pretrial hearings held on May 30, 1996.

"3T"  refers to the transcript of pretrial hearings held on June 11, 1996.

"4T"  refers to the transcript of the Judge's decisions on pretrial motions on July 17, 1996.

"5T"  refers to the trial transcript of November 6, 1996.

"6T"  refers to the trial transcript of November 7, 1996.

"7T"  refers to the trial transcript of November 8, 1996.

"8T"  refers to the trial transcript of November 12, 1996.

"9T"  refers to the trial transcript of November 13, 1996 (volume one).

"10T" refers to the trial transcript of November 13, 1996 (volume two).

"11T" refers to the trial transcript of November 14, 1996 (volume one).

"12T" refers to the trial transcript of November 14, 1996 (volume two).

"13T" refers to the trial transcript of November 18, 1996.

"14T" refers to the trial transcript of November 19, 1996.

"15T" refers to the trial transcript of November 20, 1996.

"16T" refers to the trial transcript of November 21, 1996.

"17T" refers to the trial transcript of November 25, 1996.

"18T" refers to the trial transcript of November 26, 1996.

"19T" refers to the sentencing transcript of February 14, 1997.

"20T" refers to the resentencing conference transcript of November 3, 2000.

"21T" refers to the resentencing transcript of February 2, 2001.

"22T" refers to the PCR hearing of June 22, 2005.

Da 122

## PROCEDURAL HISTORY

Bergen County Indictment Number 95-07-0889 charged defendant Jamie Farthing with two counts of first degree kidnapping, contrary to N.J.S.A. 2C:13-1b(1) (counts 1 and 10); two counts of first degree robbery, contrary to N.J.S.A. 2C:15-1 (counts 2 and 11); two counts of second degree possession of weapons for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (counts 3 and 12); two counts of third degree unlawful possession of handguns without permits, contrary to N.J.S.A. 2C:39-5b (counts 4 and 13); purposeful or knowing murder of James Polites, contrary to N.J.S.A. 2C:11-3a(1) and/or (2) (count 7); felony murder (during commission of kidnapping) of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 8); felony murder (during commission of armed robbery) of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 9).  Three co-defendants, Ivie Demolina, Thomas Christopher James, and Efrain Papaleo, were also named in the indictment.  (Da 1 to 7).

A Miranda hearing and a motion to suppress evidence seized at the time of defendant's arrest were held before the Honorable Sybil R. Moses, J.S.C., on May 29, 30, and June 11, 1996.  On July 17, 1996, Judge Moses ruled that both defendant's oral and written statements and all the physical evidence seized would be admissible at trial.  (4T 39-25 to 40-4; 4T 44-19 to 47-18).

Following a jury trial held before the Honorable Timothy J. Sullivan, J.S.C., from November 6 through 26, 1996, defendant was

-1-

Da 123

found guilty of all counts in the indictment. (18T 49-23 to 54-6; Da 8 to 15).

On February 14, 1997, Judge Sullivan merged the convictions for felony murder (counts 8 and 9) into the conviction for knowing and/or purposeful murder (count 7) and sentenced defendant to life imprisonment with a 30-year period of parole ineligibility on the merged conviction. Judge Sullivan also merged one of the convictions for possession of a weapon for an unlawful purpose (count 3) into one of the robbery convictions (count 2) and imposed a sentence of 20 years with a ten-year period of parole ineligibility to be served consecutively to the sentence imposed on the murder conviction. A 30-year sentence for kidnapping (count 1) was ordered to be served concurrently to the merged robbery conviction, but consecutively to the murder sentence. Judge Sullivan then imposed another 30-year term of imprisonment on the second kidnapping charge (count 10) to run consecutively to all previously imposed sentences. The sentences on the remaining counts (4, 11, 12, 13) were either merged or ordered to be served concurrently with the previously imposed sentences, for an aggregate sentence of life plus 60 years' imprisonment with a 40-year period of parole ineligibility. (19T 32-17 to 35-11; Da 16-17).

A Notice of Appeal was filed on April 30, 1997. (Da 21).

-2-

Da 124

On May 18, 2000, the Appellate Division, in a published opinion, State v. Farthing, 331 N.J. Super. 58 (App. Div. 2000), reversed defendant's conviction for purposeful or knowing murder but affirmed her remaining convictions, including that for felony murder. (Da 22 to 54).  The Appellate Division concluded that the State had the option of retrying defendant for purposeful or knowing murder, but if the State elected to do so, the trial court would have to recast the aggregate sentence imposed.  331 N.J. Super. at 86.

Defendant filed a petition for certification that was denied by the Supreme Court on September 20, 2000.  State v. Farthing, 165 N.J. 530 (2000).

At a resentencing conference on November 3, 2000, the State elected not to retry defendant for purposeful or knowing murder. (20T 13-11 to 16).

On February 2, 2001, Judge Sullivan dismissed the count for purposeful or knowing murder and resentenced defendant to an aggregate sentence of life imprisonment with 40 years of parole ineligibility.  (21T 3-21 to 4-6; 21T 18-22 to 20-4).

By letter dated August 16, 2001, the Honorable Donald R. Venezia, J.S.C., informed defendant that he had received her petition for post-conviction relief (PCR), but that he was unable to address the petition because her matter still was on appeal. Judge Venezia asked that defendant contact his chambers once the

-3-

DA 125

appeal was resolved so that he could consider the petition.  (Da 55).

Defendant had appealed from the resentencing, and by order dated May 9, 2002, the Appellate Division affirmed the sentence. (Da 56).

Defendant filed a petition for certification regarding the affirmance of her sentence, and by order filed September 25, 2002, the Supreme Court denied certification.  (Da 56).

Defendant's PCR petition, which originally had been filed with the Bergen County Superior Court in August 2001, was marked "Received" by the Bergen County Superior Court on November 13, 2002.  (Da 58 to 64).

On February 14, 2005, defendant filed an amended PCR petition and also filed a supplemental PCR petition.  (Da 65 to 74).

On June 22, 2005, Judge Venezia ruled that defendant's PCR petitions were not time-barred.  (22T 8-14 to 20).  However, defendant's claims were rejected, and Judge Venezia found that she was not entitled to an evidentiary hearing.  (22T 42-12 to 16).

On August 30, 2005, defendant filed a Notice of Appeal.  (Da 77).

-4-

Da 124

<u>STATEMENT OF FACTS</u>

A.    The Trial Testimony

On August 8, 1994, James Polites was found dead in his apartment in Edgewater, New Jersey.    (7T 58-1 to 61-9). Investigator Carlos Rodriguez of the Bergen County Prosecutor's Office was assigned to investigate and process the scene.   (7T 87-11 to 88-14).   He noticed that the apartment was in "total disarray."  (7T 90-7 to 13; 7T 95-1 to 2).  When he saw the body, he noticed that the wrists and ankles had been bound with neckties and could tell from the way in which one of the neckties had been ripped that at one point the victim's wrists had been "hog-tied" to his ankles.  There was also a pillowcase over the victim's head and an electrical cord around his neck, the other end of which had been tied to the doorknob of the bedroom door causing his upper torso to be suspended approximately six inches off the floor.  (7T 107-18 to 109-8).  There was a 25-pound weight found a few feet from the body which Rodriguez determined belonged to a set of weights discovered in a second bedroom.  (7T 115-14 to 116-4).

Donald Sposa, the manager of the Fort Lee Saloon, owned by the victim, and a friend of Polites, indicated that the last time he had spoken with his friend was on the night of Thursday, August 4, 1994.  (8T 106-3 to 5).  When Polites arrived at the Fort Lee Saloon at approximately 10:30 p.m., Polites told Sposa that he had just received a "strange" telephone call from a woman he had been

-5-

Da 127

"involved with" a year before.  When the woman, whom Sposa recalled had a name that sounded like "Mia, Thea, Fia," called that evening, she told Polites that she and another woman wanted to meet him at his apartment later that night, presumably for a "menage a trois." Polites received another phone call from the same woman at approximately 12:30 a.m.  Sposa answered the phone and then gave it to Polites, who talked for five minutes before he hung up.  Polites then left with "a couple of paper bags," Sposa assumed to contain Budweiser beer.  (8T 103-10 to 106-2).

The medical examiner who performed the autopsy observed a single ligature mark around Polite's neck and determined that his death was caused by asphyxia due to a single fracture of the thyroid cartilage.  (12T 181-12 to 23; 12T 184-19 to 185-12).  He further determined that this injury would have required considerable force applied for a minimum of 30 seconds and a maximum of three minutes, and that it could not have been caused by the electrical cord found around the victim's neck.  (12T 182-2 to 13; 12T 188-1 to 189-20).  It was more likely that the victim was strangled with the neckties found loosely tied around his neck. (12T 182-14 to 22).

The State presented evidence of another robbery which was later linked to the Polites incident.  On August 3, 1994, Robert Hippman received a telephone call at work from a woman he knew as Erica.  She said that she was in the New York area with a friend

-6-

Da 128

from Florida and that they needed a place to stay. Hippman told her that he had a date that night so he probably would not be available, but he gave her his home phone number and told her to call him later that night. (8T 137-3 to 20).

On the night of August 4, 1994, Erica called Hippman at his apartment and he told her to come over with her friend. (9T 34-7 to 35-20). Erica arrived at approximately 2:00 a.m. with a woman introduced as Alexis. Unexpectedly, a man was also with them. (8T 138-3 to 139-12). Hippman served each of the women a glass of wine and then took Erica onto the balcony to talk. When they came back into the living room and sat on the couch, he did not see Alexis or the man. As he was talking to Erica, Alexis came into the living room pointing a gun and said, "this is a stickup." (8T 142-18 to 143-7).

Hippman was told to lie face down on the carpet, and when he resisted, the man also pointed a gun at him, and he complied. (8T 145-19 to 146-16). The man used gray duct tape to bind Hippman's hands behind his back and to bind his ankles. He also taped Hippman's mouth. (8T 146-18 to 147-3). Unable to move, Hippman lay face down on the carpet for approximately an hour and a half while the three ransacked his apartment. (8T 147-4 to 25). When they were done, they taped Hippman to a chair and left. (8T 149-18 to 152-10).

-7-

Da 129

Hippman freed himself within minutes after they left. His telephones had been disconnected, so he went down to the lobby of his apartment building and had the doorman call the police. Among the items taken from Hippman's apartment was his automatic teller machine card. Hippman recognized the man who was recorded by the bank cameras attempting to use the card at 4:30 a.m. the morning after the robbery as the man who had been in his apartment that night. He was later identified as Thomas Christopher James. (8T 159-24 to 161-22).

In September 1994, Hippman identified Erica, and a month or two later identified Alexis and the man in his apartment from photographic arrays. (8T 164-14 to 166-12). Hippman made an in-court identification of defendant as the woman he knew as Alexis. (8T 175-18 to 176-4).

Lieutenant John Hynes of the Hackensack Police Department investigated the Hippman robbery. (9T 97-10 to 99-3). Hynes interviewed Hippman, but then went on vacation for two weeks. When Hynes returned to work on September 2, 1994, he read an article in The Bergen Record regarding the Polites murder. He noticed the similarities between the Polites and Hippman incidents and contacted the Bergen County Prosecutor's Office. Hynes then began working with Investigator Terrance Alver on the two cases. (9T 105-24 to 108-3).

-8-

DA 130

Hynes gave the members of the Bergen County Prosecutor's Office the phone bill supplied to him by Hippman. (10T 178-17 to 179-2; 10T 182-24 to 183-5). Investigator Frank Kelaher traced collect phone calls "Erica" had placed to Hippman to an apartment located at 456 Grant Avenue in Brooklyn and two pay telephone booths in the vicinity of that apartment. (10T 179-3 to 180-5; 10T 183-6 to 15). Further investigation revealed that the phone number for the Grant Avenue residence was issued to a Maria Rios, and that Rios's daughter, Evia Demolena, also lived at that address "at one time or another." (10T 180-13 to 24).

Kelaher obtained Demolena's photograph and worked in conjunction with the New York City Police Department to locate her. (10T 180-25 to 181-20). The investigation led New York City police officers to the Cross Bay Motel in Queens on September 13, 1994 at approximately 1:30 a.m. (10T 189-25 to 190-10). Both Thomas Christopher James and Ivy Demolena were apprehended as they were in the process of leaving the motel. They were both placed under arrest. The police seized luggage and transported the pair to Demolena's mother's apartment where Ivy's half-brother, Benigno Rosario, was also arrested. (10T 193-2 to 197-11; 10T 224-9 to 17).

After the three suspects arrived at the police precinct, Bergen County Prosecutor's Office was notified of the arrests. Evidence linking the three suspects to the Hippman and Polites

-9-

Da131

robberies was discovered when the luggage was inventoried.  Among the items seized were wigs, several pairs of gloves, one of which had duct tape around the finger, a Finger Hut catalog that had been mailed to Jamie Farthing, and six or seven rolls of undeveloped film.  (8T 57-2 to 8; 8T 170-8 to 174-22; 10T 198-11 to 18; 10T 202-4 to 213-24; 12T 207-4 to 13).  .  The developed photographs showed James, Demolena, Rosario, a man named Efrin Popalayo, who was later arrested in connection with the investigation, and a woman who the police later identified as Jamie Farthing.  (11T 28-12 to 39-23).

Kelaher also executed several search warrants at Demolena's mother's apartment.  Among the items seized were a Jets jacket which belonged to Hippman found in Rosario's bedroom.  On the dining room table, he found an invoice for Chelsea Mini Storage rented to Thomas Christopher James.  (11T 13-11 to 141-1; 11T 46-7 to 24; 11T 89-2 to 6).  Hanging on a chair in the living room area was a pocketbook which contained a wallet with identification belonging to Magda Rahey.  Also found in Rahey's pocketbook were night club cards belonging to Polites, a credit card belonging to Polites, his vehicle registration, and a temporary insurance card issued to Thomas Christopher James.  (11T 17-7 to 23-4).  Kelaher also recovered jewelry linking the suspects to the crimes at the King's Jewelry Store in Brooklyn.  In addition, Investigator Kelaher executed a search warrant at Chelsea mini storage and

-10-

Da132

seized items identified as having been stolen from Hippman and Polites.  (8T 54-7 to 18; 8T 167-20 to 25; 10T 235-12 to 241-1).

On September 13, 1994, after being contacted by Detective Duggan of the New York City Police Department about the arrests of Demolena, James and Rosario, Investigator Terrance Alver of the Bergen County Prosecutor's Office went to the Midtown South Precinct in Manhattan where he interviewed Demolena and James. (12T 201-15 to 203-23).  As a result of that conversation, he and Detective Hynes flew to Conyers, Georgia, to arrest Jamie Farthing two days later.  (12T 209-5 to 210-24).  Alver testified that before going to Georgia, he had arrest warrants for murder and robbery for Jamie Farthing.  (12T 210-3 to 17).

Working in conjunction with U.S. marshals in Georgia, Alver and Hynes set up a surveillance of Farthing's mother's house in Union City, Georgia.  (12T 211-3 to 212-14).  After several hours of observing the comings and goings of defendant and her family, defendant was arrested as she, her mother, Lupe Anderson, and her stepfather, Luke Anderson, attempted to leave the house in a pick-up truck.  Alver advised defendant that she was under arrest for robbery and murder and obtained her consent to the search of her house.  Alver also obtained Lupe Anderson's consent to search the house.  (12T 217-15 to 221-5).  During the search of the house, Alver recovered property linking defendant to the crimes.  (13T 7-6 to 11-7).

-11-

Da133

After defendant was advised that she was under arrest, she was questioned by Alver and Detective Hynes. A statement was taken that was neither tape-recorded nor taken down by a stenographer. (13T 12-7 to 18-10).

According to Alver, Jamie told him that she had first met Demolena with Chris James in late June or July of 1994 in Conyers, Georgia. Jamie had known James because he went to high school with one of her brothers. Jamie had indicated that she had recently been thrown out of the house by her father and that she would occasionally visit Demolena and James where they were staying. At Demolena's invitation, Jamie hitchhiked to New York with her and James in late July, and the three of them stayed at Demolena's mother's house in Brooklyn. Demolena's younger brother, who Jamie knew as Ben or Junior, was also staying at the apartment. While at the apartment, Demolena told Jamie that she knew of "coke heads that have money and deserve to get ripped off." Demolena and James had a telephone book with the names and numbers of the people they planned to "set up." (13T 18-11 to 22-7).

Two of those people were Robert Hippman and James Polites. According to Alver, Jamie said that Demolena called Hippman's residence from a phone booth near Demolena's mother's house, and Demolena told Jamie that they would get into the apartment under the pretense of having sex with Hippman and that they would rob him. According to Alver, Jamie admitted her involvement in the

-12-

Da134

robbery and admitted that she held a gun on Hippman but claimed that it was James who removed the gun from the bag and handed it to Demolena, who handed it to Jamie.  (13T 22-15 to 28-14).

The next day, they planned the Polites robbery.  Jamie allegedly told Alver she had no idea that Polites would be killed until she was in his apartment and overheard Demolena tell James that they had to kill him because he could identify her.  (13T 30-1 to 9).

After the trio arrived at the apartment, Polites was ordered inside and told to lie on his stomach in the living room.  The apartment was ransacked, money and valuables were taken, and Polites was strangled to death by James.  (13T 32-13 to 36-8).

Alver also indicated that Jamie admitted that she went to a jewelry store in Brooklyn and that she, James, and Demolena traded in stolen property for several pieces of jewelry.  Eventually, Jamie flew back to Georgia.  One evening, her boyfriend, Eddie Kummer, received a telephone call from Demolena telling him that she and James had been arrested and that Jamie should keep a low profile.  (13T 37-6 to 13).  At the conclusion of this oral interview, Jamie was to give a tape-recorded statement.  Since Alver could not locate a tape recorder, he went to the store to buy one.  When he returned 45 minutes later, Jamie said she wanted to talk to someone before making any further statements, and the interview was terminated.  (13T 37-23 to 40-1).

-13-

Alver and Hynes flew back to New Jersey with Jamie on September 17, 1994. Jamie was brought to a satellite office of the Bergen County Prosecutor's Office at about 2:00 p.m. (13T 48-1 to 23). Another statement was taken from Jamie. This one was in stenographic form. The statement was much like the first but differed in a few respects. (13T 111-1 to 167-13).

At trial, Jamie's boyfriend, Eddie Kummer, testified that he had also been friends with James and first met Demolena, who was dating James, in the Spring of 1994. Early that same summer, Jamie's father kicked her and her brother out of the family home and Jamie had nowhere to go. Jamie often stayed at James' grandmother's house during which time she and Kummer socialized with Demolena and James frequently. When James and Demolena left to go to New York, Jamie went with them because "she really didn't have a place to stay and she was going to go up there because they had a place to stay up there and she wanted to see New York." (11T 96-18 to 99-25; 11T 99-23 to 100-17; 11T 119-12 to 122-19). Kummer did not go with them because he had a job. (11T 98-8 to 11).

A month later, Jamie flew back to Georgia and Kummer picked her up at the airport. She stayed at her mother's house for a week and then returned to New York. Some time later, Jamie called Kummer from New York and asked him to come up. He flew up to New York and stayed at a hotel with Jamie, James, and Demolena, for about four or five days. Kummer noticed that James had a lot of

-14-

Da 136

money and paid for everything they did.  He also had two guns.  He observed new clothes, camcorders, and jewelry.  (11T 108-10 to 110-10).

Kummer kept asking Jamie where all the money was coming from, and Jamie admitted that she, Demolena and James had robbed people and that James had killed a man.  (11T 110-11 to 111-14).  When Kummer asked Jamie why she went along with it, Jamie said she had no idea it would go that far and no idea James would kill someone.  (11T 111-23 to 113-1).  Kummer asked Jamie to leave New York with him, but she said that she could not leave but would not say why.  Kummer got the impression that James was keeping her there, but James denied this.  Three weeks later, Jamie returned to Georgia.  Kummer did not see Jamie before Demolena called to tell him that she had been arrested.  (11T 113-2 to 115-23).

One of the defenses raised at trial was diminished capacity.  Dr. Jonathan Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents, Jamie was suffering from post-traumatic stress disorder, which kept her from being able to form either purposeful or knowing states of mind.  (14T 132-1 to 135-12).  Kleinman explained that when he first interviewed Jamie, he found that she was generally in good contact with reality, but that she had a difficult time expressing things having to do with the events surrounding Polites's death.  (14T 105-11 to 23).  When he asked her for personal background information, Jamie's responses

-15-

Da137

indicated to him that she had been physically or sexually abused, but she was incapable of telling him what had happened. (14T 105-24 to 106-11). Having a strong suspicion that there had been abuse, Kleinman recommended that a forensic social worker be employed to get background information. His suspicions were confirmed by the report and he re-interviewed Jamie and found that as a child she had been physically abused by her father and sexually abused by two teenage cousins when she was five or six years old. (14T 118-22 to 120-16).

Jamie's father testified on her behalf and confirmed that he had been extremely unstable. He admitted that he drank to excess and had violent fights with the children's mother in front of the children. After he separated from the children's mother, the children were moved from one parent's home to the other as the parents fought over the children.

He concluded that her basic childhood needs to be nurtured and cared for were never met. (14T 122-3 to 11). Jamie's father remarried, and her stepmother was bitter, abusive, and rejecting. (14T 121-12 to 17). Jamie and both of her brothers eventually turned to substance abuse as a form of self-medication. (14T 121-2 to 6). Finally, Jamie reported that when she was older, she was sexually assaulted by a man with a knife one night when her car

-16-

q5

Da138

broke down.  She had flashbacks after this incident and intensified her use of drugs and alcohol.  (14T 122-15 to 24).  Given this background, when Jamie met Demolena at the age of 18, developmentally she was closer to being 12-14 years old in terms of maturity.  Jamie was very needy and she ceded control over her life to Demolena.  (14T 129-9 to 131-25).

Dr. Arnaldo Apolito, a forensic psychiatrist, also found post-traumatic stress disorder and added that, in his opinion, Jamie was also in a dissociative state at the time of the crimes.  (14T 14-8 to 17-4).  Dr. Kleinman, however, felt that Jamie's symptoms did not reach the degree of disturbance or frequency required for a diagnosis of dissociative disorder, but did find that she had experienced episodes of depersonalization, a feeling that you are watching events over which you have no control, rather than experiencing them yourself.  (14T 115-3 to 15; 14T 132-22 to 133-14; 15T 182-24 to 185-6).

Dr. Steven Simring, a psychiatrist called by the State on rebuttal, testified that while he was sure Jamie had experienced severe problems at home, he found no evidence of post-traumatic stress disorder.  (16T 169-9 to 170-6).  Dr. Simring further opined that the relationship between post-traumatic stress disorder and committing robberies was an "irrelevant concept."  (16T 158-1 to 7).  Dr. Simring agreed that Jamie showed "considerable immaturity as she discussed her past life," and diagnosed her with a

-17-

Da139

personality disorder "not otherwise specified."  Simring also diagnosed a drug and alcohol dependence.  (16T 144-1 to 25; 14T 162-2 to 8; 14T 200-8 to 202-13; 15T 113-17 to 116-6).  Dr. Simring opined that "she may have been high on drugs or alcohol" during the commission of the crimes and "that may have affected her judgment," but in his opinion it did not affect her awareness of what she was doing.  (16T 151-22 to 152-15).

B.   The PCR Hearing

In her PCR petition and at the PCR hearing, defendant claimed that she was denied effective assistance of trial counsel.  Among the grounds asserted for ineffectiveness of counsel were the following:  (a) counsel failed to consult adequately with her and failed to conduct an adequate investigation; (b) counsel failed to move that her antidepressant medication that he been terminated be readministered; (c) counsel failed to move for a mistrial regarding the jury's apparent rejection of her diminished capacity defense; (d) counsel failed to secure a legitimate plea offer and engage in effective plea bargaining.  (Da 67 to 68; 22T 9-13 to 20-11).

-18-

Da140

## LEGAL ARGUMENT

THE DENIAL OF DEFENDANT'S PCR PETITION MUST BE REVERSED AND THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING, BECAUSE A PRIMA FACIE CASE WAS ESTABLISHED AS TO THE INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM.

Ineffective-assistance-of-counsel claims are particularly suited for PCR relief because they often cannot be raised in a prior proceeding. See R. 3:22-4a; State v. Mitchell, 126 N.J. 565 (1992). As the United States Supreme Court observed:

> Because collateral review will frequently be the only means which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation. A layman ordinarily will be unable to recognize counsel's errors as to evaluate counsel's professional performance; consequently, a criminal defendant will rarely know that he has not been represented competently until after trial or appeal, usually when he consults another lawyer about his case. Indeed, an accused will often not realize that he has a meritorious claim until he brings collateral review proceedings.
> [Kimmelman v. Morrison, 477 U.S. 365, 378, 106 S.Ct. 2574, 2584, 91 L.Ed. 2d 305, 321 (1986) (citations omitted).]

Therefore, "[o]ur courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). For this reason, "trial courts ordinarily should grant evidentiary hearings to resolve ineffective-assistance-of-counsel claims if defendant has presented a prima facie claim in support of post-conviction relief," provided resolution of the

-19-

Da141

ineffectiveness cannot be decided upon the trial record.  Id. at
462.  To establish a prima facie case, defendant must demonstrate
a reasonable likelihood that his or her claim will ultimately
succeed on the merits.  State v. Marshall, 148 N.J. 89, 158, cert.
denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed. 2d 88 (1997);
Preciose, supra, 129 N.J. at 463.  Moreover, in determining whether
to grant an evidentiary hearing, the PCR court must consider the
facts in the light most favorable to defendant to determine whether
a defendant has established a prima facie claim.  Marshall, supra,
148 N.J. at 89; Preciose, supra, 129 N.J. at 462-63.  If there are
disputed issues as to material facts regarding entitlement to PCR,
a hearing should be conducted.  State v. Russo, 333 N.J. Super.
119, 138 (App. Div. 2000); State v. Pyatt, 316 N.J. Super. 46, 51
(App. Div. 1998), certif. denied, 158 N.J. 72 (1999).

    The federal decisional law on the right to effective
assistance of counsel was synthesized in Strickland v. Washington,
466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed. 2d at 674 (1984).  The Court
announced a two-part requirement that a defendant must meet in
order to show ineffectiveness of assistance:

> First, the defendant must show that counsel's performance
> was deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both
> showings, it cannot be said that the conviction or death

-20-

Da142

> sentence resulted from a breakdown in the adversary
> process that renders the result unreliable.
> [Id. at 687, 104 S.Ct. at 2064, 80 L.Ed. 2d at 693.]

With respect to deficient performance, the Court noted that adequate consultation is relevant in determining whether assistance was effective. However, it eschewed any more specific test: "[N]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Id. at 688-89, 104 S.Ct. at 2065, 80 L.Ed. 2d at 694.

In order to satisfy the second prong – that a defendant has been prejudiced by counsel's actions – there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed. 2d at 698. In setting forth such guidelines, the Court cautioned that "the principles... stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id. at 696, 104 S.Ct. at 2069, 80 L.Ed. 2d at 699.

The Strickland Court proceeded to note, however, that in cases in which counsel's performance is tantamount to a complete denial

-21-

Dq143

of representation, prejudice can be presumed.  <u>Id.</u> at 692, 104 <u>S.Ct.</u> at 2067, 80 <u>L.Ed.</u> 2d at 696.   The Court explained that constructive denial of assistance of counsel altogether is an example of <u>per se</u> ineffective performance.   Elaborating on this concern in <u>United States v. Cronic</u>, 466 <u>U.S.</u> 648, 104 <u>S.Ct.</u> 2039, 80 <u>L.Ed.</u> 2d 657 (1984), decided the same day as <u>Strickland</u>, the Court explained that when counsel's errors are so grave that "no amount of showing of want of prejudice could cure it," it is unnecessary for a defendant to demonstrate prejudice.  <u>Id.</u> at 659, 104 <u>S.Ct.</u> at 2046, 80 <u>L.Ed.</u> 2d at 668 (citations omitted).

Relying on state constitutional principles, the New Jersey Supreme Court adopted the <u>Strickland</u> standards in <u>State v. Fritz</u>, 105 <u>N.J.</u> 42 (1987).  There the Court noted that "[e]ven if we are not constitutionally compelled to adopt the <u>Strickland-Cronic</u> test,... [we]... recognize the substance and formulation of this... standard to defining our own State Constitutional guarantee." <u>Id.</u> at 58.  Thus, as a matter of state law, the Court declared that "if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated."  <u>Ibid.</u>

With this overview of ineffective-assistance-of-counsel claims in the context of PCR, defendant examines the particular grounds of ineffectiveness.

-22-

Da144

A.   Counsel Failed To Consult Adequately With Defendant And
     Failed To Conduct An Adequate Investigation.

Defense counsel asserted at the PCR hearing:

> Petitioner has indicated that there was very little time
> spent with her prior counsel, very little attention given
> to her in terms of trial preparation, pre-trial motions.
> And the upshot of that is that she was not adequately
> prepared to testify at the motion to suppress, not
> adequately prepared to testify at the trial, that the
> investigation -- she had witnesses who were not fully
> interviewed by counsel or any investigative staff who
> would do such work for counsel.
>                 [22T 9-19 to 10-2.]
>     *                    *                         *
>
> She had many issues regarding her psychological years
> growing up, a lot of problems in school, a lot of things
> that I think counsel could have used early on to perhaps
> do something more with this case.  And then later if it
> did still proceed to trial, again, that would have been
> -- that would have helped to amplify and help explain
> many things.  [K]athy Farthing [defendant's stepmother]
> for example.   Yes, she did testify, but my client
> maintains that she was never really interviewed by her
> attorney.
>
> She was never really spoken to at any kind of length as
> to what it was like when she was growing up, what type of
> treatment she had, what kinds of problems in school.
>
> There were a lot of other issues that would have been
> relevant to the psychiatric defense.  And that -- that
> just didn't come out there.
>
> And I -- I think what happened early on with the first
> meeting was the fact that he didn't share discovery with
> her, told her she didn't need it, in her words to me, it
> really -- it really put up a barrier.  There was not the
> kind of communication that was required.
>                 [22T 12-11 to 13-18.]

The reference that defendant "was not adequately prepared to

testify at the motion to suppress" actually occurred at the joint

-23-

Da145

<u>Miranda</u>/motion-to-suppress-the-evidence hearing, when the court interrupted her testimony and conducted a sidebar conference with counsel. (2T 70-23 to 75-2). After the conference, the following colloquy occurred:

> THE COURT: [Defense counsel] indicated to me he really needed a little more time to prepare the witness and speak to her. Is that correct?
>
> [DEFENSE COUNSEL]: That's correct, Judge.
> [2T 75-11 to 14.]

After defendant conferred with counsel, she elected not to continue her testimony at this critical hearing. (2T 75-23 to 76-2).

<u>State v. Savage</u>, 120 <u>N.J.</u> 594 (1990), is particularly instructive to the instant matter. There the defendant asserted that his trial attorney consulted with him only once during trial preparation. Consequently, the defendant contended that he was denied effective assistance of counsel due to his attorney's failure, among other grounds, (1) to consult with him adequately in preparing the case and (2) to investigate and pursue a psychiatric and/or diminished capacity defense. Defense counsel countered that though he had only one meeting with the defendant, he communicated with him at least 15 or 30 times by phone. The Court, in evaluating the defendant's successful ineffectiveness claim, stated, in part:

> We recognize that it is not the frequency of consultation that reveals whether a defendant has been effectively denied legal assistance. Rather, the proper inquiry is

-24-

Da146

whether as a result of that consultation, counsel was able to investigate the case and develop a reasonable defense.

[Id. at 617.]

Moreover,

[S]trategy decisions made after less than complete investigation are subject to scrutiny. Indeed, counsel has a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." A failure to do so will render the lawyer's performance deficient.

[Id. at 618 (internal citations omitted).]

And as Strickland, supra, observed:

In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

[Id. at 691, 104 S.Ct. at 2066, 80 L.Ed. 2d at 696.]

Thus, in order for the lower court to have ensured that counsel provided defendant with adequate consultation and investigation - essential components of effective assistance of counsel - it was essential that an evidentiary hearing, in accordance with Precise, supra, be held.


B.   Counsel Failed To Move That Defendant's Antidepressant Medication That Had Been Terminated Be Readministered.

Prior to the resumption of defendant's joint Miranda/motion-to-suppress-the-evidence hearing on June 11, 1996, defense counsel addressed the court after being asked if he was ready to proceed:

-25-

Da147

> Judge, I'm concerned about Miss Farthing's ability to
> proceed today. When I was in the lock up with her, she
> did nothing but cry. She seemed to be almost
> hyperventilating, Your Honor. She advised me she had
> been on antidepressant medication until about one or two
> weeks ago, and the medication is Buspar, B U S P A R.
> For whatever reasons, the jail doctors took her off of
> the medication one or two weeks ago. I have real
> concerns, Judge.
>                          [3T 9-19 to 10-1.]

The court denied counsel's "application for an unspecified

adjournment because of [his] feeling, only way I can phrase it,

that Miss Farthing may not be able to proceed today." (3T 10-24 to

11-3).

Inexplicably, counsel failed to request that defendant's

antidepressant medication be readministered.

N.J.S.A. 2C:4-4, "Mental Incompetence Excluding Fitness to

Proceed" provides, in part:

> a.   No person who lacks capacity to understand the
> proceedings against him or to assist in his own defense
> shall be tried, convicted or sentenced for the commission
> of an offense so long as such incapacity endures.
>
> b.   A person shall be considered mentally competent to
> stand trial on criminal charges if the proofs shall
> establish:
> *                        *                        *
>
> (g)  That he has the ability to participate in an
> adequate presentation of his defense.

For decades, competency to stand trial has been defined as the

ability to consult intelligently with counsel in the preparation of

a defense, sometimes stated as the ability to assist or cooperate

in such preparation. State v. Auld, 2 N.J. 426, 435 (1949); State

-26-

D2148

v. Spivey, 65 N.J. 21, 36 (1974).   "[W]hile it may be that defendant was aware of what was going on... such knowledge is not necessarily conclusive on the question of one's ability to consult intelligently with counsel and assist in his own defense." Id. at 43.   Indeed, if medication will make the defendant competent to stand trial, the court may order the defendant to take it.   State v. Otero, 238 N.J. Super. 649 (Law Div. 1989).

Here, as a result of defendant's medication never being readministered - a direct consequence of counsel's inexcusable inaction by not so moving - she was unable to assist in her own defense.

Therefore, a prima facie case of ineffectiveness was established pursuant to Strickland, supra, and Cronic, supra, mandating an evidentiary hearing in accordance with Preciose, supra.

C.   Counsel Failed To Move For A Mistrial Regarding The Jury's Apparent Rejection Of Her Diminished Capacity Defense.

During a recess from Dr. Apolito's testimony, Juror Number One was summoned into the court's chambers regarding "some problem in the jury room." (15T 37-23 to 38-1).   With counsel present, the juror addressed the court, in part:

> JUROR NUMBER ONE:  [W]e took an oath to listen to all the evidence and listen to the witness.... And it's just a little upsetting -- the whole thing is upsetting but when we're trying to make a decision and I don't find anything

-27-

Da149

humorous about any of this.    And I -- and I just
sometimes when -- there's just too much laughter
regarding when we come back to the jury room, that's all,
with regards to a witness or whatever.

        [15T 38-2 to 10.]

      \*                          \*                                      \*

[P]erhaps a reminder that listening to psychologists and
psychiatrists was part of the oath we took, that we would
listen to the facts and there's -- there's nothing
humorous about any of it, the facts and what they're
talking about and their opinions and their expert
opinions, et cetera.

        [15T 40-9 to 14.]

After the jury left chambers, defense counsel stated:

[T]he impression I got was that she's concerned because
other jurors are making fun of the defense mental health
experts who have testified.  They're joking about them
and making fun of them and if that's the case then in a
sense you know, jurors who had been told not to prejudice
things have prejudiced things and if that's the case then
the jurors have violated their oath and we're in a
mistrial situation.

        [15T 44-10 to 18.]

Each juror consequently was brought into chambers and
questioned as to whether there had been discussions among
themselves regarding the expert witnesses.  None of the jurors
admitted having prejudged the case or having engaged in substantive
discussions.  (15T 47-5 to 90-25).

However, Juror Number Four disclosed that other jurors had
made fun of Dr. Apolito's accent (15T 54-24 to 56-10); Juror Number
Five revealed that the jurors had "discussed" Dr. Apolito's
"demeanor a little bit," specifically his accent and that his
testimony was "a little slow going" (15T 62-3 to 63-3); Juror
Number Twelve related that another juror had "mimicked" Dr.

-28-

Da 150

Apolito's "snorting sound when he was on the stand and when he went to breathe in" (15T 79-13 to 80-6); and Juror Number Fifteen admitted that due to Dr. Apolito's accent, "I said it was hard to understand and it was almost like you wanted to make him spit out the words." (15T 85-25 to 86-17).

Despite these revelations of disrespect for Dr. Apolito - and, as an inevitable extension, his significant testimonial conclusion that "a state of diminished capacity can be amply proved by the data which are available, both historically and from our clinical examination" of defendant (15T 25-10 to 12) - counsel failed to move for a mistrial. (15T 92-21).

The standard for granting a mistrial - whether or not the error is such that manifest injustice would result from continuance of the trial and submission of the case to the jury, State v. Winter, 96 N.J. 640 (1984) - was manifest in this matter and, in accordance with Strickland, supra, and Cronic, supra, counsel's failure to move for a mistrial constituted a prima facie case of ineffectiveness of counsel.

Therefore, pursuant to Preciose, supra, an evidentiary hearing should have been conducted.


D.   Counsel Failed To Secure A Legitimate Plea Offer And
     Engage In Effective Plea Bargaining.

It is clear that plea bargaining is a critical stage of the criminal proceeding at which the right of representation attaches.

-29-

Da151

State v. Powell, 294 N.J. Super. 557, 564 (App. Div. 1996). See
also State v. Tacetta, 351 N.J. Super. 196 (App. Div.), certif.
denied, 174 N.J. 554 (2002), where it was held that the defendant
was entitled to an evidentiary hearing regarding his PCR contention
that he received ineffective assistance of counsel with respect to
plea negotiations.

Defendant reiterates that no real effort was made by counsel
to use her psychiatric testimony, as documented in school records
and psychiatric reports, to obtain a suitable plea offer.  (22T 12-
12 to 18).

Pursuant to Tacetta, supra, only an evidentiary hearing would
have resolved whether or not defendant received effective
assistance of counsel.

Notwithstanding defendant's prima facie claims of
ineffectiveness, the lower court, in rejecting defendant's PCR
application, ruled, in part:

> There's nothing in this case that warrants me to render
> an order for evidential hearing.  I'm not going to do
> that.  There is nothing in this case that, very frankly,
> even under the Strickland standard, would I adjudge,
> adjudicate counsel below to be ineffective, below the
> standard of what a -- an attorney would have done at that
> time.  So, I don't even get to the second prong because,
> very frankly, based on everything I've seen here, he did
> a damn good job for the defendant.
> [22T 41-10 to 18.]

As set forth herein, the record below belies the lower court's
unsupported and hasty conclusion and, in accordance with Preciose,

-30-

Da152

supra, and its progeny, defendant was entitled to an evidentiary hearing so that her claims could be fully explored.

Da153

<u>CONCLUSION</u>

For the reasons stated herein, it is respectfully requested that the denial of defendant's PCR petition be reversed and this matter be remanded for an evidentiary hearing.

Respectfully submitted,

YVONNE SMITH SEGARS
Public Defender
Attorney for Defendant-Appellant

BY: _____
STEVEN M. GILSON
Designated Counsel

Dated:  April 11, 2006

-32-

Pa154

Jamie Farthing #18567
New Jersey State Prison
Po Box 861  1EE
Trenton, N.J. 08625

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION

STATE OF NEW JERSEY,        :        COUNTY OF BERGEN
Plaintiff,                  :
                            :        CRIMINAL ACTION
        vs.                 :
                            :
JAMIE FARTHING,             :        PETITION FOR POST CONVICTION
    Defendant               :        RELIEF

The Petitioner, Jamie Farthing, appearing as
Co-Counsel, <u>Pro se,</u> respectfully petitions the courts for Post
Conviction Relief, pursuant to <u>Rule</u> 3:22-1 of the Rules Governing
the courts of the State of New Jersey and alleges:

1. That the Petitioner was charged with:
CT.1:Kidnapping-2C:13-1b(1). CT.2: Robbery- 2C:15-1. CT.3: Poss.
Weapon (Firearm) for unlawful Purpose- 2C:39-4a. CT.4: Unlawful
Poss. of Weapon (Revolver) W/O A Permit- 2C:39-5b/2C:58-4. CT.7:
Murder- 2C:11-3a (1) and/or (2). CT.8: Felony Murder- 2C:11-
3A (3). CT.9: Felony Murder- 2C:11-3A (3). CT.10:  Kidnapping-
2C:13-1b (1) and/or (2). CT.11: Armed Robbery- 2C:15-1. CT.12:
Poss. Weapon- 2C:39-4a. CT.13: Poss. Weapon W/O a Permit- 2C:39-
5b/2C:58-4.

2. That the Petitioner, Jamie Farthing:

(a) That the Petitioner went to trial and was found
guilty on November 26, 1996.

3. That the Petitioner was sentenced on the above
mentioned charges on February 14, 1997, before the Honorable
Timothy J. Sullivan, Judge of the Superior Court of New Jersey
- Law Division, County of Bergen.

4. That the court imposes a term of Life plus 60 years
with 40 year period of parole ineligibility, with respect to
the Petitioner's conviction.  A total fine of $2,500.00 was
imposed pursuant to the Violent Crimes Compensation Bureau.
(A copy of the Judgment of Conviction and Order for Commitment

DA 155

appears in the Appendix along with Judgment of Conviction amended on September 22, 1997 and Judgment of Conviction from resentence per Appellate decision dated May 18, 2000.

5. That the Petitioner was represented through the appeal process as follows and all orders and opinions are attached respectively.

a- The Petitioner was represented by Ruth Bove Carlucci, Asst. Deputy Public Defender of the Appellate Division Public Defenders Office for the Direct Appeal which was denied on May 18, 2000.

b- The Petitioner was represented by Ruth Bove Carlucci, Asst. Deputy Public Defender of the Appellate Division Public Defenders Office for the Petition for Certification which was denied on September 20, 2000.

c- The Petitioner was represented by Ruth Bove Carlucci, Asst. Deputy Public Defender of the Appellate Division Public Defender of the Appellate Division Public Defenders Office for the filing of an Appeal for Resentencing. Sentence was affirmed by an order dated May 9, 2002.

d- The Petitioner was represented by Ruth Bove Carlucci, Asst. Deputy Public Defender of the Appellate Division Public Defenders Office for the Petition for Certification Regarding Affirmance of Sentence. Order from the Supreme Court denying Certification is dated September 25, 2002.

e- The Petitioner was represented by Linda E. Peterson, Esquire of the PCR Unit for the Motion for Post Conviction Relief. The corrected order denying the Post Conviction Relief is dated August 8, 2005.

f- The Petitioner was represented by designated counsel Steven M. Gilson, Esquire for the Appeal for the Denial of the Motion for Post Conviction Relief. Sentence was affirmed by order dated February 14, 2007.

g- The Petitioner filed the Petition for Certification, Pro-se. The order denying the Petition for Certification is dated April 10, 2007.

6. That Petitioner desires to proceed with the

Petition for Post Conviction Relief as Co-Counsel, <u>Pro se</u>, and
requires the services of the Bergen County Public Defenders
Office, at the time of the Hearing, pursuant to <u>Rule 3:22-6</u>.

      7. That the Petitioner is presently incarcerated
by the State of New Jersey, at the New Jersey State Prison in
Trenton, pursuant to the above mentioned sentence and is
unlawfully retained for the reasons below:

      A.   INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE COUNSEL
DID NOT OBJECT TO THE JURY NOT PROPERLY INSTRUCTED THAT AN
ACCOMPLICE MAY INTEND TO COMMIT A LOWER-DEGREE OFFENSE THAN
THE MAIN ACTOR(S), AND BECAUSE THERE WAS NO EVIDENCE THAT THE
DEFENDANT INTENDED FOR A WEAPON TO BE USED DURING THE COMMISSION
OF THE ALLEGED OFFENSE, NOR FOR A HOMICIDE TO RESULT, HER
CONVICTION OF FIRST-DEGREE FELONY MURDER MUST BE AMENDED TO
ANY LESSER-INCLUDED OFFENSE.

      B.   INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE
TO OBJECT TO THE DISPARITY BETWEEN THE SENTENCE IMPOSED ON THE
17-YEAR OLD CO-DEFENDANT, AS COMPARED TO THE AGE OF THE DEFENDANT
WHO HAD JUST TURNED 18-YEARS OF AGE, RENDERS DEFENDANT'S SENTENCE
MANIFESTLY UNJUST AND UNDULY PUNITIVE, THUS REQUIRING REVERSAL
AND A REMAND FOR RESENTENCING.

      C.   PETITIONER OR HER COUNSEL WERE NOT AFFORDED THE
OPPORTUNITY TO CROSS EXAMINE WITNESS WHEN THEIR STATEMENTS WERE
READ IN OPEN COURT BY THE JUDGE AND PROSECUTOR.   THIS IS A
VIOLATION OF DEFENDANTS 6TH AMENDMENT RIGHTS.

      D.   PETITIONER WAS DENIED THE RIGHT TO PROPERLY DEFEND
HERSELF DURING HER APPEAL PROCESS SINCE ALL OF HER DISCOVERY
FILES HAVE BEEN LOST AND WERE NOT PRODUCED BY PROSECUTOR WHEN
AN ORDER TO COMPEL DISCOVERY WAS SIGNED BY JUDGE DONALD R.
VENEZIA, JSC ON 3/2/05.

      E.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR
THE FAILURE TO INCLUDE POINTS FROM PCR ON THE APPEAL DENIAL
OF PCR.

      F.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL PER
RULE 3:22-6(d) WHICH STATES THAT ASSIGNED COUNSEL SHOULD ADVANCE
ALL GROUNDS INSISTED UPON BY DEFENDANT/PETITIONER.

G.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR
SUBMISSION OF INCOMPLETE BRIEF; FAILURE OF COUNSEL TO COMPILE
NECESSARY RECORDS, RE:  DISCOVERY — CONSISTENT LACK OF EVEN
THE MINIMAL PREPARATION FOR A CRIMINAL MATTER.  THE ADJUDICATION
OF THIS CASE COULD HAVE BEEN DIFFERENT IF COUNSEL PROPERLY
PREPARED.

H.  DEFENDANT/PETITIONERS CONSTITUTIONAL RIGHT TO
TESTIFY WAS VIOLATED WHEN JUDGE REMOVED HER FROM THE STAND DURING
TESTIMONY AT A SUPPRESSION OF EVIDENCE HEARING.  IF DEFENDANT
WAS AFFORDED THE RIGHT TO CONTINUE TESTIFYING WITHOUT BEING
INTIMIDATED BY THE JUDGES ATTITUDE AND AGGRESSIVE DEMEANOR THE
OUTCOME OF THIS HEARING AND TRIAL COULD HAVE BEEN DIFFERENT.

I.   DEFENDANT WAS OVER CHARGED HAVING BEEN INDICTED
AND FOUND GUILTY OF MULTIPLE COUNTS OF FELONY MURDER AND MURDER
WITH ONLY ONE BODY.

J.   PETITIONER FURTHER SEEKS LEAVE TO AMEND THIS
PETITION, AS WELL AS LEAVE TO FILE SUPPLEMENTAL PETITION AND
MEMORANDUM IF IT SHOULD BECOME NECESSARY TO DO SO.


8. It is for these reasons and others, that the
Petitioner requests a Hearing for Post Conviction Relief.

WHEREFORE, the Petitioner prays as follows:

I CERTIFY that the foregoing statements made by me
are true.  I am aware that if any of the foregoing statements
made by me are willfully false, I am subjected to punishment.


Respectfully submitted,

Dated:_____

JAMIE FARTHING #18567
New Jersey State Prison
Po Box 861  1EE
Trenton, New Jersey 08625

DA 158

Jamie Farthing  #18567/985369-B
New Jersey State Prison
PO Box 861 – 1EE
Trenton, NJ 08625

STATE OF NEW JERSEY          :          SUPERIOR COURT OF NEW JERSEY
         Plaintiff,              :          LAW DIVISION
                         :          COUNTY OF BERGEN
                         :
          v.                :          INDICTMENT NO: 95-07-0889
                         :
JAMIE FARTHING               :          <u>CRIMINAL ACTION</u>
       Defendant.            :
                                 NOTICE OF MOTION FOR
                                  A NEW TRIAL

TO: Bergen County Prosecutor's Office
     Justice Center
     10 Main Street
     Hackensack, NJ 07601-7681
     Attn: John L. Molinelli, Prosecutor

Mr. Molinelli:

      PLEASE TAKE NOTICE THAT on Friday, January 18, 2008, at 9:00 o'clock in
the forenoon or as soon thereafter as petitioner may be heard, a Motion for a New Trial
will be moved before the Honorable Donald R. Venezia, J.S.C. in the courtroom of his
Honor or such other designated place as the Court may direct or require for the hearing of
this petitioner.

      Petitioner will rely upon oral argument, her petition, supporting affidavits, and
various other pleadings. This petition is taken in good faith and not for the purpose of
delay or confusion. Petitioner believes she is lawfully entitled to the relief sought.

      WHEREFORE, Petitioner prays that his Honorable Court will grant relief sought.

                              Respectfully submitted;

DATED: January 3, 2008          X _____
                                   JAMIE FARTHING

Da 159

**STATE OF NEW JERSEY**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – CRIMINAL
**BERGEN** COUNTY

**v.**

INDICTMENT #: 95-07-00889-I
CASE OR PROMIS #:94-2165-002

Jamie Farthing
**Defendant**

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, Jamie Farthing, by:

☐ Petition for Post-Conviction Relief determined to be defendant's

       ☐ first petition

       ☐ second or subsequent petition

☐ Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

☒ Motion for <u>New Trial</u> and Motion for Assignment of Counsel, filed pro se

_____, Assistant Deputy Public Defender

_____, Retained or Designated Counsel *(circle one)* or

☐ The court having concluded that there was no good cause entitling the assignment of counsel

on the application, and the State having been represented by:

_____ Assistant Prosecutor; and

☐ There having been proceedings conducted on the record on _____, 2007or

☒ The matter having been disposed of on the papers;

It is on this 10th day of January, 2008 ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

☐ Granted

☒ Denied.  Motion for New Trial Filed out of time pursuant to R: 3:20-2

☐ Other

For the reasons:

Expressed in the court's written opinion of _____

Expressed orally on the record on _____

Donald R. Venezia, J.S.C.

1/10/08

DA 160

A-3198 077Y

## NOTICE OF APPEAL

### SUPERIOR COURT OF NEW JERSEY - APPELLATE DIVISION

FILED
APPELLATE DIVISION
FEB 1 9 2008

**TITLE OF ACTION AS CAPTIONED BELOW:**          **ATTORNEY OF RECORD**

| | |
|---|---|
| STATE OF NEW JERSEY,<br>    Plaintiff-Respondent, | Jamie Farthing, Sprosse CLERK<br>#18567/SBI#985369-B<br>New Jersey State Prison<br>P.O. Box 861 - 1EE<br>Trenton, N.J. 08625<br>(609)-292-9700<br>Attorney for Appellant<br>    ON APPEAL FROM: |
| v. | |
| JAMIE FARTHING<br>    Defendant-Appellant. | Order from Superior Court<br>Ind. No.: 95-07-0889 |

CIVIL [ ] CRIMINAL [X] JUVENILE [ ]

NOTICE IS HEREBY GIVEN THAT JAMIE FARTHING
APPEALS TO THE SUPERIOR COURT OF NJ, APPELLATE DIVISION, FROM
THE JUDGMENT [ ] ORDER [X] OTHER (SPECIFY) [ ]
ENTERED IN THIS ACTION ON January 10, 2008, IN FAVOR OF
Respondent.
IF APPEAL IS FROM LESS THAN THE WHOLE, SPECIFY WHAT PARTS OR
PARAGRAPHS ARE BEING APPEALED:

### Not Applicable

ARE ALL ISSUES AS TO ALL PARTIES DISPOSED OF IN THE ACTION BEING
APPEALED? YES [X] NO [ ]
IF NOT, IS THERE A CERTIFICATION OF FINAL JUDGMENT ENTERED
PURSUANT TO R. 4:42-2? YES [ ] NO [ ]
PRIORITY UNDER R. 1:2-5 YES [X] NO [ ] APPLICABLE SECTION UNDER
THIS RULE. This Appeal Is Of A Criminal Nature And Affects The
Conviction Of Defendant, Length Of A Prison Term, and Sentence
Imposed.
IN CRIMINAL, QUASI-CRIMINAL, AND JUVENILE CASES...NOT
INCARCERATED [ ] INCARCERATED [X]
CONFINED AT: Trenton State Prison, P.O. Box 861 - 1EE, Trenton,

DA 16P

New Jersey 08625-0861.

GIVE A CONCISE STATEMENT OF THE OFFENSE AND OF THE JUDGMENT, DATE ENTERED AND ANY SENTENCE OR DISPOSITION IMPOSED This Appeal Is From An Order Denying A New Trial, Dated On January 10, 2008, by Honorable Donald R. Venezia, J.S.C. Upholding The Current Holding Of Defendant-Appellant's Conviction And Sentence Imposed, Thus Denying Defendant-Appellant Relief Sought. (See Annexed Exhibit A).

DA 162

A-3198-0774

ORDER ON MOTION
-----------------

STATE OF NEW JERSEY
VS
JAMIE FARTHING

**FILED**
APPELLATE DIVISION

APR 0 3 2008

CLERK

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A -003198-07T4
MOTION NO.   M -003911-07
BEFORE PART: H
JUDGE(S):    STERN

MOTION FILED:   FEBRUARY 19, 2008   BY: JAMIE  FARTHING
ANSWER(S) FILED:

**RECEIVED**
APPELLATE DIVISION

APR  3 2008

SUPERIOR COURT
OF NEW JERSEY

SUBMITTED TO COURT:  MARCH 31, 2008

O R D E R
---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS
1st  DAY OF April        , 2008, HEREBY ORDERED AS FOLLOWS:

|  | GRANTED | DENIED | OTHER |
|---|---|---|---|
| MOTION BY APPELLANT | (✓) | (✓) | ( ) |

- TO PROCEED AS AN INDIGENT, FOR FREE
  TRANSCRIPTS AND FOR ASSIGNMENT OF COUNSEL
- TO SET ASIDE VERDICT AND ORDER NEW TRIAL

SUPPLEMENTAL: This is a timely appeal from an order
of January 10, 2008 denying post conviction relief.
This was not defendant's first post conviction application.
Counsel was not assigned, and the application was
denied on the papers.  The motion to proceed as
an indigent is granted. The motion, including
assignment of counsel and for other relief, is otherwise

BER 95-07-0889          FOR THE COURT:

denied. There is no transcript of the application
which resulted in

JUKAK1   the order of January 10, 2008.

EDWIN H.  STERN  P.J.A.D.

I hereby certify that the foregoing
is a true copy of the original o
file in my office.

CLERK OF THE APPELLATE DIVISI

DA 110.3

SUPERIOR COURT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,   : | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | BERGEN COUNTY |
| : | |
| | INDICTMENT NO.: 95-07-0889 |
| v.   : | |
| | <u>CRIMINAL ACTION</u> |
| : | |
| | PETITION FOR POST CONVICTION |
| JAMIE FARTHING,   : | RELIEF |
| Defendant. | |
| : | |

Sat Below: Honorable Donald R.
Venezia, J.S.C.

---

BRIEF AND APPENDIX IN SUPPORT OF PETITION FOR POST CONVICTION
RELIEF ON BEHALF OF DEFENDANT-PETITIONER

---

Jamie Farthing #18567
New Jersey State Prison
P.O. Box 861 – 1EE
Trenton, New Jersey 08625

<u>Presently Confined</u>

Da 164

## TABLE OF CONTENTS

PAGE NO(S)

PROCEDURAL HISTORY.................................................................................1

STATEMENT OF FACTS............................,............................................5

STATEMENT OF FACTS ON MOTION FOR NEW TRIAL..............................17

LEGAL ARGUMENTS

POINT I

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND
BECAUSE SHE WAS PRJUDICED THEREBY, THE COURT SHOULD GRANT
HER PETITIONER FOR POST CONVICTION RELIEF. AND BECAUSE THE
PETITIONER PRESENTED ENOUGH PROOF FOR A PRIMA FACIE CASE
SHOWING THAT T SHE WAS DEPRIVED EFFECTIVE ASSISTANCE OF
COUNSEL, THE COURT SHOULD GRANT HER AN EVIDENTIARY HEARING
ON THIS ISSUE.................................................................................19

A. Ineffective assistance of counsel because counsel did not object to the jury not
   properly instructed that an accomplice may inted to commit a lower – degree
   offense than the main actors(s), and because there was no evidence that the
   defendant intended for a weapon to be used during the commission of the
   alleged offense, nor for a homicide to result, her conviction of first degree
   felony murder must be amended to any lesser-included offense.

B. Ineffective assistance of counsel for failure to object to the disparity between
   the sentence imposed on 17-year old co-defendant as compared to the age of
   the defendant wh had just turend 18-years of age, renders defendant's sentence
   manifestly unjust and unduly punitive, thus requiring reversal and a remand for
   resentencing.

Da 165

PAGE NO(S)

POINT II

FAILURE OF POST CONVICTION RELIEF COUNSEL TO ADVANCE ALL OF
THE ISSUES RAISED BY DEFENDANT. R. 3:22-6(d).......................................27

    A. Counsel failed to vigoroursly challenge the PCR denial by failing to include
       those points from PCR on appeal of denial of PCR.

    B. Counsel failure to request a new trial or move for mistrial when prosecutor
       failed to produce discovery in direct violation of duty to disclose.

    C. Counsel failed to raise and argue the defendant's diminished capacity defense
       in conjuction with volutary intoxication defense for presentation to the jury.

CONCLUSION...............................................................................................39

## APPENDIX

INDICTMENT........................................................................Da 1 to 7

VERDICT SHEET..................................................................Da 8 to 15

JUDGMENT OF CONVICTION/ORDER FOR COMMITMENT...........Da 16 to 17

AMENDED JUGEMNT OF CONVICTION/
    ORDER FOR COMMITMENT............................................Da 18 to 20

STATEMENT OF REASONS FOR SENTENCE.........................Da 19

NOTICE OF APPEAL...........................................................Da 21

APPELLATE DIVISION OPINION..........................................Da 22 to 54

JUDGE VENEZIA'S LETTER TO DEFENDANT........................Da 55

APPELLATE DIVISION ORDER.............................................Da 56

SUPREME COURT'S ORDER DENYING PETITION
    FOR CERTIFICATION........................................................Da 57

Da 166

PAGE NO(S)

PETITION FOR POST CONVICTION RELIEF................................Da 58 to 64

AMENDED PETITION FOR POST CONVICTION RELIEF................Da 65 to 71

SUPPLEMENTAL PETITION FOR POST-CONVICTION
       RELIEF..................................................................Da 72 to 74

ORDER DENYING PETITION FOR POST-CONVICTION
       RELIEF..................................................................Da 75 to 76

NOTICE OF APPEAL.......................................................Da 77

BRIEF IN SUPPORT OF POST-CONVICITON RELIEF.............Da 78 to 115

APPEAL BRIEF DENYING PETITION FOR
       POST-CONVICTION RELIEF.......................................Da 116 TO 154

PETITION FOR POST-CONVICTION RELIEF...........................Da 155 to 158

## CASES CITED

State v. Anderson, 117 N.J. Super. 507, 519 (App. Div. 1971), modified, 60 N.J. 437
       (1972)........................................................................20

State v. Bellucci, 81 N.J. 531 (1980)...........................................20

State v. Bielkiewicz, 267 N.J. Super. 520, 528-534 (App. Div. 1993)................21, 22

State v. Blake, 234 N.J. Super. 166 (1989)..................................32

State v. Bridges, 254 N.J. Super. 541, 56 (App. Div. 1992), 133 N.J. 447 (1993)....21

State v. Buonadonna, 122 N.J. 22, 39 (1991)...............................20

State v. Carter, 85 N.J. 300, 314 (1981)....................................34

State v. Clark, 347 N.J. Super. 507.........................................32

State v. Coruzzi, 189 N.J. Super.273, 319 (App. Div) certif. den. 94 N.J. 531
       (1983)....................................................................27

Da 107

TABLE OF CONTENTS
CASES CITED
(Continued)

PAGE NO(S)

State v. Delibero, 149 N.J. 90, 101 (1997)...................................................37

Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 836 (1985).......................28

State v. Farthing, 165 N.J. 530 (2000).......................................................3

State v. Farthing, 331 N.J. Super. 58 (App. Div. 2000)..................................2

State v. Fritz, 105 N.J. 42 (1987)......................................................19, 20

State v. Giorgianni, 189 N.J. Super. 220, 230 (App. Div.) certif. den. 94 N.J. 569
     (1983)..........................................................................28

State v. Gregg, 278 N.J. Super. 182 (1994).................................................32

State v. Harris, 181 N.J. 391 (2004).......................................................21

State v. Hicks, 54 N.J. 390, 391 (1969)....................................................24

State v. Johnson, 309 N.J. Super. 257, 268 (App. Div.) certif. den., 156 N.J. 387
     (1998)...27

State v. Jordan, 147 N.J. 409, 422-23 (1996)..............................................23

State v. Lee, 235 N.J. Super. 410 (App. Div. 1989)........................................24

State v. Malloy, 324 N.J. Super. 525, 533 (App. Div. 1999)...............................23

State v. Morant, 241 N.J. Super. 121, 142 (App. Div. 1999)..............................24

State v. Norman, 151 N.J. 5, 37 (1997)....................................................22

State v. Pineda, 119 N.J. 621, 625 (1990).................................................24

Powell v. Alabama, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L.Ed. 2d 158, 172
     (1932).........................................................................28

State v. Preciose, 129 N.J. 451 (1992).................................................17, 33

Da 168

TABLE OF CONTENTS
CASES CITED
(Continued)

PAGE NO(S)

State v. Roach, 146 N.J. 208, 232 (1996)……………………...……………..24

Rodriguez v. Rosenbalt, 58 N.J. 281, 295 (1974)……………………………...29

State v. Rue, 175 N.J. 1, 811 A. 2d 425 (2002)……………………………….29, 31

State v. Russo, 330 N.J. Super. 119, 140 (App. Div. 2000)………………………34

State v. Sparano, 249 N.J. Super. 419……………………………………………38

State v. Sugar, 84 N.J. 1, 17 (1980)……………………………………………28

State v. Towey, 114 N.J. 69, 78-79 (1989)………………………………………24

State v. Vick, 117 N.J. 288-289 (1980)…………………………………………23

State v. Webster, 185 N.J. 399, 866 A. 2d 663 (2006)……………………………28, 33

State v. Weeks, 107 N.J. 396, 404-410 (1997)……………………………………21

Strickland v. Washington, 466 U.S. 688, 104 S. Ct. 2052, 80 L.Ed. 2d 674
    (1984)…………………………………………………17, 19, 20, 21, 34, 35, 38

STATUTES CITED

N.J.S.A. 2C: 11-3a(1)……………………………………………………………1

N.J.S.A. 2C: 11-3a(3)……………………………………………………………1

N.J.S.A. 2C: 13-1b(1)……………………………………………………………1

N.J.S.A. 2C: 15-1……………………………………………………………1

N.J.S.A. 2C: 39-4a……………………………………………………………1

N.J.S.A. 2C: 39-5b……………………………………………………………1

Da 169

## RULES CITED

PAGE NO(S)

R. 3:13-3(c)..................................................................................32

R. 3:13-3(g)..............................................................................27, 32

R. 3:22-1....................................................................................31

R. 3:22-2(a)................................................................................28

R. 3:22-6(d)................................................................................27

Da 170

## TRANSCRIPTS CITED

"1T"   refers to the transcript of pretrial hearings held on May 29, 1996.
"2T"   refers to the transcript of pretrial hearings held on May 30, 1996.
"3T"   refers to the transcript of pretrial hearings held on June 11, 1996.
"4T"   refers to the transcript of the Judge's decisions on pretrial motions On July 17, 1996.
"5T"   refers to the trial transcript of November 6, 1996.
"6T"   refers to the trial transcript of November 7, 1996.
"7T"   refers to the trial transcript of November 8, 1996.
"8T"   refers to the trial transcript of November 12, 1996.
"9T"   refers to the trial transcript of November 13, 1996 (volume two).
"10T"   refers to the trial transcript of November 14, 1996 (volume one).
"11T"   refers to the trial transcript of November 14, 1996 (volume one).
"12T"   refers to the trial transcript of November 14, 1996 (volume two).
"13T"   refers to the trial transcript of November 18, 1996.
"14T"   refers to the trial transcript of November 19, 1996.
"15T"   refers to the trial transcript of November 20, 1996.
"16T"   refers to the trial transcript of November 21, 1996.
"17T"   refers to the trial transcript of November 25, 1996.
"18T"   refers to the trial transcript of November 26, 1996.
"19T"   refers to the trial transcript of February 14, 1996.
"20T"   refers to the resentencing conference transcript of November 3, 2000.
"21T"   refers to the resentencing transcript of February 2, 2001.
"22T"   refers to the PCR hearing of June 22, 2005.

Da 171

## PROCEDURAL HISTORY

Bergen County Indictment Number 95-07-0889 charged defendant Jamie Farthing with two counts of first degree kidnapping, contrary to N.J.S.A. 2C:13-1b(1) (counts 1 and 10); two counts of first degree robbery, contrary to N.J.S.A. 2C:15-1 (counts 2 and 11); two counts of second degree possession of weapons for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (counts 3 and 12); two counts of third degree unlawful possession of handguns without permits, contrary to N.J.S.A. 2C:39-5b (counts 4 and 13); purposeful or knowing murder of James Polites, contrary to N.J.S.A. 2C:11-3a(1) and/or (2) (count 7); felony murder (during commission of kidnapping) of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 8); felony murder (during commission of armed robbery) of James Polites, contrary to N.J.S.A. 2C:11-3a(3) (count 9). Three co-defendants, Ivie Demolina, Thomas Christopher James, and Efrain Papaleo, were also named in the indictment. (Da 1 to 7).

A Miranda hearing and a motion to suppress evidence seized at the time of defendant's arrest were held before the Honorable Sybil R. Moses, J.S.C., on May 29, 30, and June 11, 1996. On July 17, 1996, Judge Moses ruled that both defendant's oral and written statements and all the physical evidence seized would be admissible at trial. (4T 39-25 to 40-4; 4T 44-19 to 47-18).

Following a jury trial held before the Honorable Timothy J. Sullivan, J.S.C., from November 6 through 26, 1996, defendant was found guilty of all counts in the indictment. (18T 49-23 to 54-6; Da 8 to 15).

1

Da 172

On February 14, 1997, Judge Sullivan merged the convictions for felony murder (counts 8 and 9) into the conviction for knowing and/or purposeful murder (count 7) and sentenced defendant to life imprisonment with a 30-year period of parole ineligibility on the merged conviction. Judge Sullivan also merged one of the convictions for possession of a weapon for an unlawful purpose (count 3) into one of the robbery convictions (count 2) and imposed a sentence of 20 years with a ten-year period of parole ineligibility to be served consecutively to the sentence imposed on the murder conviction. A 30-year sentence for kidnapping charge (count 1) was ordered to be served consecutively to the murder sentence. Judge Sullivan then imposed another 30-year term of imprisonment on the second kidnapping charge (count 10) to run consecutively to all previously imposed sentences. The sentences on the remaining counts (4, 11, 12, 13) were either merged or ordered to be served concurrently with the previously imposed sentences, for an aggregate sentence of life plus 60 years' imprisonment with a 40-year period of parole ineligibility., (19T 32-17 to 35-11; Da 16-17).

A Notice of Appeal was filed on April 30, 1997. (Da 21). (Da 21).

On May 18, 2000, the Appellate Division, in a published opinion, State v. Farthing, 331 N.J.Super. 58 (App. Div. 2000), reversed defendant's conviction for purposeful or knowing murder but affirmed her remaining convictions, including that for felony murder. (Da 22 to 54). The Appellate Division concluded that the State had the option of retrying defendant for purposeful or knowing murder, but if the State elected to do so, the trial court would have to recast the aggregate sentence imposed. 331 N.J. Super at 86.

2

Da 173

Defendant filed a petition for certification that was denied by the Supreme Court on September 20, 2000. State v. Farthing, 165 N.J. 530 (2000).

At a resentencing conference on November 3, 2000, the State elected not to retry defendant for purposeful or knowing murder. (20t 13-11 to 16).

On February 2, 2001, Judge Sullivan dismissed the count for purposeful or knowing murder and resentenced defendant to an aggregate sentence of life imprisonment with 40 years of parole ineligibility. (21 T 3-21 to 4-6; 21T 18-22 to 20-4).

By letter dated August 16, 2001, the Honorable Donald R. Venezia, J.S.C., informed defendant that he had received her petition for post-conviction relief (PCR), but that he was unable to address the petition because her matter still was on appeal. Judge Venezia asked that defendant contact his chambers once the appeal was resolved so that he could consider the petition. (Da 55).

Defendant had appealed from the resentencing, and by order dated May 9, 2002, the Appellate Division affirmed the sentence. (Da 56).

Defendant filed a petition for certification regarding the affirmance of her sentence, and by order filed September 25, 2002, the Supreme Court denied certification. (Da 56).

Defendant's PCR petition, which originally had been filed with the Bergen County Superior Court in August 2001, was marked "Received" by the Bergen County Superior Court on November 13, 2002, (Da 58 to 64).

On February 14, 2005, defendant filed an amended PCR petition and also filed a supplemental PCR petition. (Da 65 to 74).

3

Da 174

On June 22, 2005, Judge Venezia ruled that defendant's PCR petitions were not time-barred. (22T 8-14 to 20). However, defendant's claims were rejected, and Judge Venezia found that she was not entitled to an evidentiary hearing. (22T 42-12 to 16).

On August 30, 2005, defendant filed a Notice of Appeal. (Da 77).

Da 175

<u>STATEMENT OF FACTS</u>

A. The Trial Testimony

On August 8, 1994, James Polites was found dead in his apartment in Edgewater, New Jersey. (7T 58-1 to 61-9). Investigator Carlos Rodriguez of the Bergen County Prosecutor's Office was assigned to investigate and process the scene. (7T 87-11 to 88-14). He noticed that the apartment was in "total disarray". (7T 90-7 to 13; 7T 95-1 to 2). When he saw the body, he noticed that the wrists and ankles had been bound with neckties and could tell from the way in which one of the neckties had been ripped that at one point the victim's wrists had been "hog-tied" to his ankles. There was also a pillowcase over the victim's head and an electrical cord around his neck, the other end of which had been tied to the doorknob of the bedroom door causing his upper torso to be suspended approximately six inches off the floor. (7T 107-18 to 109-8). There was a 25-pound weight found a few feed from the body which Rodriguez determined belonged to a set of weights discovered in a second bedroom. (7T 115-14 to 116-4).

Donald Sposa, the manager of the Fort Lee Saloon, owned by the victim, and a friend of Polites, indicated that the last time he had spoken with this friend was on the night of Thursday, August 4, 1994. (8T 106-3 to 5). When Polites arrived at the Fort Lee Saloon at approximately 10:30 p.m., Polites told Sposa that he had just received a "strange" telephone call from a woman he had been involved with a year before. When the woman, whom Sposa recalled had a name that sounded like "Mia, Thea, Fia," called that evening, she told Polites that she and another woman wanted to meet

5

Da 176

him at his apartment later that night, presumably for a "ménage a trois." Polites received another phone call from the same woman at approximately 12:30 a.m. Sposa answered the phone and then gave it to Polites, who talked for five minutes before he hung up. Polites then left with "a couple of paper bags," Sposa assumed to contain Budweiser beer. (8T 103-10 to 106-2).

The medical examiner who performed the autopsy observed a single ligature mark around Polite's neck and determined that his death was cased by asphyxia due to a single fracture of the thyroid cartilage. (12T 181-12 to 23; 12T 184-19 to 185-12). He further determined that this injury would have required considerable force applied for a minimum of 30 seconds and a maximum of three minutes, and that it could not have been caused by the electrical cord found around the victim's neck. (12T 182-2 to 13; 12T 188-1 to 189-20). It was more likely that the victim was strangled with the neckties found loosely tied around his neck. (12T 182-14 to 22).

The State presented evidence of another robbery which was later linked to the Polites incident. On August 3, 1984, Robert Hippman received a telephone call at work from a woman he knew as Erica. She said that she was in the New York area with a friend from Florida and that they needed a place to stay. Hippman told her that he had a date that night so he probably would not be available, but he gave her his home phone number and told her to call him later that night. (8T 137-3 to 20).

On the night of August 4, 1994, Erica called Hippman at his apartment and he told her to come over with her friend. (9T 34-7 to 35-20). Erica arrived at approximately 2:00 a.m. with a woman introduced as Alexis. Unexpectedly, a man

6


Da 177

was also with them. (8T 138-3 to 139-12). Hippman served each of the women a

glass of wine and then took Erica onto the balcony to talk. When they came back into

the living room and sat on the couch, he did not see Alexis or the man. As he was

talking to Erica, Alexis came into the living room pointing a gun and said, "this is a

stickup. (8T 142-18 to 143-7).

Hippman was told to lie face down on the carpet, and when he resisted, the man

also pointed a gun at him, and he complied. (8T 145-19 to 146-16). The man used

gray duct tape to bind Hippman's hands behind his back and to bind his ankles. He

also taped Hippman's mouth (8T 146-18 to 147-3). Unable to move, Hippman lay

face down on the carpet for approximately an hour and a half while the three

ransacked his apartment. (8T 147-4 to 25). When they were done, they taped

Hippman to a chair and left. (8T 149- 18 to 152-10).

Hippman freed himself within minutes after they left. His telephones had been

disconnected, so he went down to the lobby of his apartment building and had the

doorman call the police. Among the items taken from Hippman's apartment was his

automatic teller machine card. Hippman recognized the man who was recorded by the

bank cameras attempting to use the card at 4:30 a.m. the morning after the robbery as

the man who had been in his apartment that night He was later identified as Thomas

Christopher James. (8T 159-24 to 161-22).

In September 1994, Hippman identified Erica, and a month or two later identified

Alexis and the man in his apartment from photographic arrays. (8T 164-14 to 166-

12). Hippman made an in-court identification of defendant as the woman he knew as

7

Da 178

Alexis. (8T 175-18 to 176-4).

Lieutenant John Hynes of the Hackensack Police Department investigated the Hippman robbery. (9T 97-10 to 99-3). Hynes interviewed Hippman, but then went on vacation for two weeks. When Hynes returned to work on September 2, 1994, he read an article in The Bergen Record regarding the Polites murder. He noticed the similarities between the Polites and Hippman incidents and contacted the Bergen County Prosecutor's Office. Hynes then began working with Investigator Terrance Alver on the two cases. (9T 105-24 to 108-3).

Hynes gave the members of the Bergen County Prosecutor's office the phone bill supplied to him by Hippman. (10T 178-17 to 179-2; 10T 182-24 to 183-5). Investigator Frank Kelaher traced collect phone calls "Erica" had placed to Hippman to an apartment located at 456 Grant Avenue in Brooklyn and two pay telephone booths in the vicinity of that apartment. (10T 179-3 to 180-5; 10T 183-6 to 15). Further investigation revealed that the phone number for the Grant Avenue residence was issued to a Maria Rios, and that Rios's daughter, Evia Demolina, also lived at that address "at one time or another." (10T 180-13 to 24).

Kelaher obtained Demolina's photograph and worked in conjunction with the New York City Police Department to locate her. (10T 180-25 to 181-20). The investigation led New York City police officers to the Cross Bay Motel in Queens on September 13, 1994 at approximately 1:30 a.m. (19T 189-25 to 190-10). Both Thomas Christopher James and Ivy Demolina were apprehended as they were in the process of leaving the motel. They were both placed under arrest. The police seized

8

Da 179

luggage and transported the pair to Demolina's mother's apartment where Ivy's half-brother Benigno Rosario, was also arrested. (10T 193-2 to 197-11; 10T 224-9 to 17).

After the three suspects arrived at the police precinct, Bergen County Prosecutor's Office was notified of the arrests. Evidence linking the three suspects to the Hippman and Polites robberies was discovered when the luggage was inventoried. Among the items seized were wigs, several pairs of gloves, one of which had duct tape around the finger, a Finger Hut catalog that had been mailed to Jamie Farthing, and six or seven rolls of undeveloped film. (8T 57-2 to 8; 8T 170-8 to 174-22; 10T 198-11 to 18; 10T 202-4 to 213-24; 12T 207-4 to 13). The developed photographs showed James, Demolina, Rosario, a man named Efrin Popalayo, who was later arrested in connection with the investigation, and a woman who the police later identified as Jamie Farthing, (11T 28-12 to 39-23).

Kelaher also executed several search warrants at Demolina's mother's apartment. Among the items seized were a Jets jacket which belonged to Hippman found in Rosario's bedroom. On the dining room table, he found an invoice for Chelsea Mini Storage rented to Thomas Christopher James. (11T 13-11 to 141-1; 11T 46-7 to 24; 11T 89-2 to 6). Hanging on a chair in the living room area  was a pocket book which contained a wallet with identification belonging to Magda Rahey. Also found in Rahey's pocketbook were night club cards belonging to Polites, a credit card belonging to Polites, his vehicle registration, and a temporary insurance card issued to Thomas Christopher James. (11T 17-7 to 23-4). Kelaher also recovered jewelry linking the suspects to the crimes at the King's Jewelry Store in Brooklyn. In addition, Investigator Kelaher

9

Da 180

executed a search warrant at Chelsea mini storage and seized items identified as having

been stolen from Hippman and Polites. (8T 54-7 to 18; 8T 167-20 to 25; 10T 235-12 to

241-1).

On September 13, 1994, after being contacted by Detective Duggan of the New

York City Police Department about the arrests of Demolina, James and Rosario,

Investigator Terrance Alver of the Bergen County Prosecutor's Office went to the

Midtown South Precinct in Manhattan where he interviewed Demolina and James.

(12T 201-15 to 203-23). As a result of that conversation, he and detective Hynes flew

to Conyers, Georgia, to arrest Jamie Farthing two days later. (12T 209-5 to 210-24).

Alver testified that before going to Georgia, he had arrest warrants for murder and

robbery for Jamie Farthing. (12T 210-3 to 17).

Working in conjunction with U.S. Marshals in Georgia, Alver and Hynes set up a

surveillance of Farthing's mother's house in Union City, Georgia. (12T 211-3 to 212-

14). After several hours of observing the comings and goings of defendant and her

family, defendant was arrested as she, her mother, Lupe Anderson, and her stepfather,

Luke Anderson, attempted to leave the house in a pick-up truck. Alver advised

defendant that she was under arrest for robbery and murder and obtained her consent

to the search of her house. Alver also obtained Lupe Anderson's consent to search the

house. (12T 217-15 to 221-5). During the search of the house, Alver recovered

property linking defendant to the crimes. (13T 7-6 to 11-7).

After defendant was advised that she was under arrest, she was questioned by

Alver and Detective Hynes. A statement was taken that was neither tape-recorded nor

10

Da 181

taken down by a stenographer. (13T 12-7 to 18-10).

According to Alver, Jamie told him that she had first met Demolina with Chris James in late June or July of 1994 in Conyers, Georgia. Janie had known James because he went to high school with one of her brothers. Jamie had indicated that she had recently been thrown out of the house by her father and that she would occasionally visit Demolina and James where they were staying. At Demolina's invitation, Jamie hitchhiked to New York with her and James late July, and the three of them stayed at Demolina's mother's house in Brooklyn. Demolina's younger brother, who Jamie knew as Ben or Junior, was also staying at the apartment. While at the apartment, Demolina told Jamie that she knew of "coke heads that have money and deserve to get ripped off." Demolina and James had a telephone book with the names and numbers of the people they planned to "set up." (13T 18-11 to 22-7).

Two of those people were Robert Hippman and James Polites. According to Alver, Janie said that Demolina called Hippman's residence from a phone booth near Demolina's mother's house, and Demolina told Jamie that they would get into the apartment under the pretense of having sex with Hippman and that they would rob him. According to Alver, Jamie admitted her involvement in the robbery and admitted that she held a gun on Hippman but claimed that it was James who removed the gun from the bag and handed it to Demolina, who handed it to Jamie. (13T 22-15 to 28-14).

The next day, they planned the Polites robbery. Jamie allegedly told Alver she had no idea that Polites would be killed until she was in his apartment and overheard Demolina tell James that they had to kill him because he could identify her. (13T 30-1 to-

11

Da 182

9).

After the trio arrived at the apartment, Polites was ordered inside and told to lie on his stomach in the living room. The apartment was ransacked, money and valuables were taken, and Polites was strangled to death by James. (13T 32-13 to 36-8).

Alver also indicated that Jamie admitted that she went to a jewelry store in Brooklyn and that she, James, and Demolina traded in stolen property for several pieces of jewelry. Eventually, Jamie flew back to Georgia. One evening, her boyfriend, Eddie Kummer, received a telephone call from Demolina telling him that she and James had been arrested and that Jamie should keep a low profile. (13T 37-6 to 13). At the conclusion of this oral interview, Jamie was to give a tape-recorded statement. Since Alver could not locate a tape recorder, he went tot the store to buy one. When he returned 45 minutes later, Jamie said she wanted to talk to someone before making any further statements, and the interview was terminated. (13T 37-23 to 40-1).

Alver and Hynes flew back to New Jersey with Jamie on September 17, 1994. Jamie was brought to a satellite office of the Bergen County prosecutor's Office at about 2:00 p.m. (13T 48-1 to 23). Another statement was taken from Jamie. This one was in stenographic form. The statement was much like the first but differed in a few respects. (13T 111-1 to 167-13).

At trial, Jamie's boyfriend, Eddie Kummer, testified that he had also been friends with James and first met Demolina, who was dating James, in the Spring of 1994. Early that same summer, Jamie's father kicked her and her brother out of the family home and Jamie had nowhere to go. Jamie often stated at James' grandmother's house during which

12

Da 183

time she and Kummer socialized with Demolina and James frequently. When James and Demolina left to go to New York, Jamie went with them because "she really didn't have a place to stay and she was going to go up there because they had a place to stay up there and she wanted to see New York." (11T 96-18 to 99-25; 11T 99-23 to 100-17; 11T 119-12 to 122-19). Kummer did not go with them because he had a job. (11T 98-8 to 11).

A month later, Jamie flew back to Georgia and Kummer picked her up at the airport. She stayed at her mother's house for a week and then returned to New York. Some time later, Jamie called Kummer from New York and asked him to come up. He flew up to New York and stayed at a hotel with Jamie, James, and Demolina, for about four or five days. Kummer noticed that James had a lot of money and paid for everything they did. He also had two guns. He observed new clothes, camcorders, and jewelry. 911T 108-10 to 110-10).

Kummer kept asking Jamie where all the money was coming from, and Jamie admitted that she, Demolina and James had robbed people and that James had killed a man. (11T 110-11 to 111-14). When Kummer asked Jamie why she went along with it, Jamie said she had no idea it would go that far and no idea James would kill someone. (11T 111-23 to 113-1). Kummer asked Jamie to leave New York with him, but she said that she could not leave but would not say why. Kummer got the impression that James was keeping her there, but James denied this. Three weeks later, Jamie retuned to Georgia. Kummer did not see Jamie before Demolina called to tell him that she had been arrested. (11T 113-2 to 115-23).

One of the defenses raised at trial was diminished capacity. Dr. Jonathan

13

Da 184

Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents,

Jamie was suffering from post-traumatic stress disorder, which kept her from being able

to form either purposeful or knowing states of mind. (14T 132-1 to 135-12). Kleinman

explained that when he first interviewed Jamie, he found that she was generally in good

contact with reality, but that she had a difficult time expressing things having to do with

the events surrounding Polites's death. (14T 105-11 to 23). When he asked her for

personal background information, Jamie's responses indicated to him that she had been

physically or sexually abused, but she was incapable of telling him what had happened.

(14T 105-24 to 106-11). Having a strong suspicion that there had been abuse, Klienman

recommended that a forensic social worker be employed to get background information.

His suspicions were confirmed by the report and he re-interviewed Jamie and found that

as a child she had been physically abused by her father and sexually abused by two

teenage cousins when she was five or six years old. (14T 118022 to 120-6).

Jamie's father testified on her behalf and confirmed that he had been extremely

unstable. He admitted that he drank to excess and had violent fights with the children's

mother in front of the children. After he separated from the children's mother, the

children were moved from one parent's home to the other as the parents fought over the

children.

Klienman also learned that Jamie had been molested by her father on one

occasion when she was between the ages of 12 and 14. He concluded that her basic

childhood needs to be nurtured and cared for were never met. (14T 122-3 to 11). Jamie's

father remarried, and her stepmother was bitter, abusive, and rejecting. (14T 121-12 to

14

Da 185

17). Jamie and both of her brothers eventually turned to substance abuse as a form of self-medication. 914T 121-2 to 6). Finally, Jamie reported that when she was older, she was sexually assaulted by a man with a knife one night when her car broke down. She had flashbacks after this incident and intensified her use of drugs and alcohol. 914T 122-15 to 24). Given this background, when Jamie met Demolina at the age of 18, developmentally she was closer to being 12-14 years old in terms of maturity. Jamie was very needy and se ceded control over her life to Demolina. (14T 129-9 to 131-25).

Dr. Arnaldo Apolito, a forensic psychiatrist, also found post-traumatic stress disorder and add that, in his opinon, Jamie was also in a dissociative state at the time of the crimes. (14T 14-8 to 17-4) Dr. Kleinman, however, felt that Jamie's symptoms did not reach the degree of disturbance or frequency required for a diagnosis of dissociative disorder, but did find that she had experienced episodes of depersonalization, a feeling that you are watching events over which you have no control, rather than experiencing them yourself. (14T 115-3 to 15; 14T 132-22 to 133-14; 15T 182-24 to 185-6).

Dr. Steven Simring, a psychiatrist called by the State on rebuttal, testified that while he was sure Jamie had experienced severe problems at home, he found no evidence of post-traumatic stress disorder. (16T 169-9 to 170-6). Dr. Simring further opined that the relationship between post-traumatic stress disorder and committing robberies was an "irrelevant concept." (16T 158-1 to 7). Dr. Simring agreed that Jamie showed "considerable immaturity as she discussed her past life," and diagnosed her with a personality disorder "not otherwise specified." Simring also diagnosed a drug and alcohol dependence. (16T 144-1 to 25; 14T 162-2 to 8; 14T 200-8 to 202-13; 15T 113-17 to 116-

15

Da186

6). Dr. Simring opined that "she may have been high on drugs or alcohol" during the commission of the crimes and "that may have affected her judgment," but in his opinion it did not affect her awareness of what she was doing. (16T 151-22 to 152-15).

### B.  The PCR Hearing

In her PCR petition and at the PCR hearing, defendant claimed that she was denied effective assistance of trial counsel. Among the grounds asserted for ineffectiveness of counsel were the following: (a) counsel failed to consult adequately with her and failed to conduct an adequate investigation; (b) counsel failed to move that her antidepressant medication that he been terminated be readministered; (c) counsel failed to move fro a mistrial regarding the jury's apparent rejection of her diminished capacity defense; (d) counsel failed to secure a legitimate plea offer and engage in effective plea bargaining. (Da 67 to 68; 22T 9-13 to 20-11).

16

Da 187

## STATEMENT OF FACTS ON MOTION FOR NEW TRIAL

Defendant was sentenced to a total custodial term of life imprisonment with 40-years parole ineligibility. (21T 3 31-46; 21T 18-22 to 20-4).

On Post Conviction Relief (PCR), Jamie Farthing contended that her trial counsel provided ineffective assistance of counsel. Since this matter represents the defendant's second petition for PCR, and attorney was not assigned to represent her. The defendant is attacking the quality or legal skills of the trial and appellate attorneys.

Defendant's trial counsel did not testify at her first PCR hearing, her attorney (hereinafter "hearing counsel"). Explained that essentially, the primary focus of PCR is the claim of ineffective assistance of the defendant's trial attorney, Hearing counsel noted that the defendant was attacking the quality of legal skills of the trial attorney. Judge Venezia relied on counsel's direct appeal, trial transcripts and oral argument in rendering the decision in the matter. The State contended that the defendant failed to establish prima facie case under the Sixth Amendment to warrant an evidentiary hearing regarding any of the issues outlined in her petition.

The Judge ruled that the trial counsel was not deficient in his representation but he did a damn good job for the defendant. (PCR Hearing T41 11 to 25; T42 1 to 11). The Judge denied the defendant's petition for PCR due to the fact defendant was unable to satisfy both prongs of the Strickland test. (T41 12 to 19). See. Strickland v. Washington, 466 U.S. 688, 104 S. Ct. 2052 (1984).

The court refused to conduct a full hearing under the procedure established by State v. Preciose, 129 N.J. 451 (1992), "Since it held that the defendant failed to establish

17



a prima facie claim of ineffective assistance of counsel.

Judge Venezia denied appointment of counsel prior to submission of this brief. It is clear that the points in this second PCR differ greatly from previous points.

Da 189

## LEGAL ARGUMENT

## POINT I

**PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND BECAUSE SHE WAS PRJUDICED THEREBY, THE COURT SHOULD GRANT HER PETITION FOR POST CONVICTION RELIEF. AND BECAUSE THE PETITIONER PRESENTED ENOUGH PROOF FOR A PRIMA FACIE CASE SHOWING THAT SHE WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL, THE COURT SHOULD GRANT HER AN EVIDENTIARY HEARING ON THIS ISSUE IT IS A VIOLATION OF PETITONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

The petitioner argues that the actions of her defense counsel before and during trial, her post conviction and appellate counsels constituted ineffective assistance of counsel contrary to the Sixth Amendment of the United States Constitution and the New Jersey State Constitution. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984); State v. Fritz, 105 N.J. 42 (1987). The Sixth Amdenment right to an attorney as guaranteed by the United States Consstitution ensures that a defendant will receive "effective assistance" of counsel. Strickland v. Washington, supra, 466 U.S. at 686, 80 L.Ed. 2d at 692. In essence, the benchmark for judging a claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having a just result." Id. at 687, 80 L.Ed. 2d at 692-693.

To succeed on a claim of ineffective assistance of counsel an aggrieved defendant must satisfy a two-prong test set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). The first prong requires the defendant to show the counsel's representation fell "below an objective standard of reasonableness" considered in light of

Da 190

all the circumstances of the case. Id. at 690. The defendant must overcome a strong

presumption that counsel's actions fell within sound trial strategy. Id. at 689. "In

assessing the adequacy of counsel's performance, strategic choices made after through

investigation of law and facts relevant to plausible options are viturally unchallengeable."

Id. at 690. "To second guess whether a course chosen by defendant's counsel was the

best strategy, or even a good one, is not the role of a reviewing court, so long as the

defendant was afforded meaningful representation." State v. Buonadonna, 122 N.J. 22, 39

(1991).

   Our own Supreme Court in State v. Fritz, 105 N.J. 42 (1987) has held that this

right to assistance of counsel is also guaranteed by the New Jersey Constitution. Counsel

must be effective in both the preparation and trial of a fair trial and a new trial will be

awarded when mistakes and miscalculations are so incompetent as to thwart this

fundamental protection Id. at 48. A defendant is entitled to a standard of adequacy of

legal services equal to the exercise of normal customary skill and knwoledge. State v.

Anderson, 117 N.J. Super. 507, 519 (App. Div. 1971), modified, 60 N.J. 437 (1972).

   In the present case, the petitioner received ineffective assistance of counsel on all

levels of her case. State v. Bellucci, 81 N.J. 531 (1980). A defendant must receive the

guarantees of a fair trial, counsel failed to raise the issues highlighted below. If one refers

to the attached Appendix to review the briefs prepared by post conviction and appellate

attorneys it is clear that the quality of legal defense for this petitioner is questionable.

   The defendant must satisfy the second prong of Strickland by demonstrating there

is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

20



proceeding would have been different." Harris, 181 N.J. 391 (2004). A reasonable

probability is one sufficient to undermine confidence in the outcome. Strickland, 466

U.S. at 694. The error must be serious enough to undermine the court's confidence in the

jury's verdict. See Harris, 181 N.J. at 431. These are issues which counsel failed to raise

in petitioner's previous post conviction relief matters.

**A. Ineffective assistance of counsel because counsel did not object to the jury not properly instructed that an accomplice may intend to commit a lower - degree offense than the main actors(s), and because there was no evidence that the defendant intended for a weapon to be used during the commission of the alleged offense, nor for a homicide to result, her conviction of first degree felony murder must be amended to any lesser-included offense.**

The liability of each participant in a criminal venture, "is dependent on his own

state of mind, not on anyone else's. State v. Bridges, 254 N.J. Super. 541, 566 (App. Div.

1992), rev'd in part on other grounds, 133 N.J. 447 (1993). To be an accomplice, "the

defendant must actually foresee and intend the result of his or her acts." Bridges, 133 N.J.

477, 456 (1993). Our courts have made clear in cases such as State v. Weeks, 107 N.J.

396, 404-410 (1987), and State v. Bielkiewicz, 267 N.J. Super. 520, 528-534 (App. Div.

1993), that judges are imperative that juries be advised that while the principal in a crime

may have intended to commit a more serious offense, but, the defendant, rather, might

only have intended to commit a lesser-included offense. Thus, even if a defendant aids in

the commission of a felony, she is not guilty of a felony unless she shared the purpose to

use a weapon during the crime or commit the crime at all. Weeks.

Specifically, in State v. Bielkiewicz, 267 N.J. Super. at 520, this Court reversed a

murder conviction for failure to charge that an accomplice could be convicted of a lesser

Da 192

offense that the principal." The court, did not inform the jury that it could find one defendant guilty of murder as a principal and the other defendant guilty of aggravated manslaughter, manslaughter, or assault as an accomplice." Id. at 531; See State v. Norman, 151 N.J. 5, 37 (1997), (approving decision in Bielkiewicz).

In the instant matter, the trial judge did vaguely inform the jurors generally of the theory of accomplice liability. He failed, however, to specifically inform them that unless the defendant had shared Ms. Demolina's and Mr. James' intent to commit robbery, she could be found guilty of only the second degree offense or any lesser-included offense, if not assault as an accomplice. The defendant in this matter, never personally possessed or used a weapon during the incident, and gave no indication that she intended or approved of Ms. Demolina's and Mr. James's use of a weapon. In fact, the jury implied an acquittal of the defendant's count of possession of a weapon for unlawful purpose, thus clearly indicating its belief that she was not an accomplice to Ms. Demolina's and Mr. James' act of murder and/or robbery. Under these circumstances, the Court's failure to provide this charge was error clearly capable of producing an unjust result.

It is undisputed that Ms. Demolina and Mr. James had used a weapon found in the room. However, with the defendant not present in the room at the time of the instant offense, nor having had any access to the weapon used...since she was never present in the room at any time, all the testimony was also entirely consistent as top the fact that Ms. Demolina and Mr. James were the only persons to use a weapon and commit a robbery. Thus, a properly-charged jury could certainly have concluded that the State had proven beyond a reasonable doubt that the defendant had shared in the plan to commit

Da193

robbery, if not murder, but had failed to meet its burden of proving that she had intended

that a weapon be used, a robbery be committed, and/or a murder occur. That finding

would have resulted in a conviction for second degree rather than first degree. Because

the charge was not given, the first-degree conviction must be amended to a second-degree

conviction, if not a lesser-included offense. If the Court is unwilling to exercise its

original jurisdiction to apply these remedies, it is respectfully requesting to vacate the

defendant's first-degree felony murder sentence, and remand the matter for retrial of that

charge.

   Defense counsel did not object to the judge's proposed jury instruction.

Nonetheless, as noted in State v. Malloy, 324 N.J. Super. 525, 533 (App. Div. 1999),

quoting, State v. Vick, 117 N.J. 288, 289 (1980), "charging errors are usually regarded as

poor candidates for rehabilitation by harmless error treatment." Indeed, as noted in State

v. Jordan, 147 N.J. 409, 422-23 (1996), and again quoted in Malloy, 324, N.J. Super. at

533, "[n]o surer showing of a clear capacity to bring about an unjust result can be made

than a basis error in instructing the jury." Because the erroneous charge in the instant

matter had the clear capacity to bring about unjust result, reversal is warranted, despite

the lack of objection below.

   **B. Ineffective assistance of counsel for failure to object to the disparity
   between the sentence imposed on 17-year old co-defendant as compared to the age
   of the defendant who had just turned 18-years of age, renders defendant's sentence
   manifestly unjust and unduly punitive, thus requiring reversal and a remand
   resentencing.**

   Mr. Rosario, a co-defendant, by all accounts (including his own), and one of the

masterminds and main actors in this criminal venture, pled guilty pursuant to the

23

DA 194

prosecutor's recommendation, but ultimately received a 15-year term. The defendant, by contrast, was sentenced to a life term with a 40-year parole ineligibility, despite the fact that her role was relatively minor compared to that of her co-defendant's. This is a prime example of intolerable sentencing disparity.

Ten years before the Criminal Code was enacted, the Supreme Court declared that "grievous inequities in sentences destroy a prisoner's sense of having been justly dealt with, as well as the public's confidence in the even-handed justice of our system." State v. Hicks, 54 N.J. 390, 391 (1969). Accordingly, the Court ordered that the greater sentence imposed on one of two co-defendants be reduced. With the advent of the Code, the Supreme Court has repeatedly emphasized that "[t]he essence of the Code's sentencing provisions lies in the pursuit of uniformity and the avoidance of sentencing disparity." State v. Towey, 114 N.J. 69, 78-79 (1989); See State v. Pineda, 119 N.J. 621, 625 (1990) ("The polestar of the Code's sentencing provisions is uniformity in sentencing."); State v. Morant, 241 N.J. Super. 121, 142 (App. Div. 1990) (in light of sentencing laws' goals of uniformity and lack of disparity, trial courts must be concerned with "proportionality" of co-defendants' sentences); State v. Lee, 235 N.J. Super. 410 (App. Div. 1989) (remanding for reconsideration of sentence where the defendant, convicted of the same offenses as the co-defendant, and with a similar prior record, received longer sentence).

In State v. Roach, 146 N.J. 208, 232 (1996), our Supreme Court held that "[d]isparity may invalidate an otherwise sound and lawful sentence...because 'there is an

24

Da 195

obvious sense of unfairness in having disparate punishments for equally culpable for perpetrators.'" (citations omitted) The Court announced specific rules for the sentencing of co-defendants.

> [T]he sentencing court must exercise a broader discretion to obviate excessive disparity. The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria. The court should then inquire into the basis of the sentences imposed on the other defendant. It should further consider the length, terms, and conditions of the sentence imposed on the co-defendant. If the co-defendant insufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order avoid excessive disparity. Sentencing based on such added considerations will accommodate the basic discretion of a sentencing court to impose a just sentence of the individual defendant in accordance with the sentencing guidelines while fulfilling the court's responsibility to achieve uniform sentencing when that is possible. Id. at 233-34.

The Court failed to follow these principles in the instant matter. Mr. Rosario, clearly one of the most culpable of the defendants, received a substantially lower sentence than the other defendants in this matter, including Ms. Farthing. It was Mr. James who knocked the victim to the ground, resulting in the victim's death.

Neither the co-defendant's nor Ms. Farthing had any prior indictable convictions. The only apparent mitigator working in Mr. Rosario's favor was the fact that he had cooperated with the State. The disparity is particularly glaring with regard to defendant,

Da 196

who at the time of her sentencing was first-time offender.

        For all of the forgoing reasons, the Court is respectfully requested to vacate the sentence imposed of defendant and remand the matter for the court below to reconsider the term imposed in light of relevant disparity principles, and re-sentence the defendant, Ms. Farthing, to a term not exceeding the presumptive for any lesser-included offense.

Da 197

# **LEGAL ARGUMENT**

## **POINT II**

FAILURE OF POST CONVICTION RELIEF COUNSEL TO ADVANCE ALL OF THE ISSUES RAISED BY DEFENDANT. R. 3:22-6(d).

Defendant contends that the failure of her PCR counsel to brief and argue all claims regarding prosecutorial failure to comply with discovery obligations based on R. 3:13-3(g) and thus warrants a new trial.

Defendant asserts she has presented a <u>prima</u> <u>facie</u> case of ineffective assistance of counsel that warrants an evidentiary hearing. Defendant has satisfied her burden to demonstrate the failure of counsel that could have changed the outcome of her trial. She was denied the effective assistance of counsel on both the trial and appellate level for the reasons cited below. It is further asserted that the defendant was prejudiced by the ineffective assistance of counsel she received. Because there can be no valid strategic reason for these failures; it is asserted that the Court should grant the defendant's Petition for Post Conviction Relief.

The right to counsel is guaranteed both by the State and Federal Constitution. <u>U.S. Const.</u> amends. VI, XIV; <u>N.J. Const.</u>, (1947), <u>Art.</u> I, <u>Par.</u> 10. This critically important right insures more than the mere presence of a lawyer. Rather, the accused is entitled to an advocate who is free of any conflict of interest, and will effectively represent his/her position, <u>State v. Belluci</u>, 81 <u>N.J.</u> 531, 538 (1980). The essence of the right is not merely the assistance of an attorney, but the effective assistance of counsel, <u>State v. Coruzzi</u>, 189

27


Da 198

N.J. Super. 273, 319 (App. Div.), certif. den. at 94 N.J. 531 (1983). In assessing whether the defendant has been afforded his rights under the State and Federal Constitution's our Court's have frequently noted that counsel must be both available and effective. State v. Giorgianni, 189 N.J. Super. 220, 230 (App. Div.), certif. den. At 94 N.J. 569 (1983). This concept of effective assistance of counsel encompasses both the preparation and trial of the case. State v. Sugar, 84 N.J. 1, 17 (1980), quoting, Powell v. Alabama, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L.Ed. 2d 158, 172 (1932). In Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 836 (1985), the Supreme Court held that due process also guarantees a criminal defendant effective assistance of counsel on a first appeal as of right to prosecute his appeal. "[a] defendant is entitled to have assigned to his counsel one who has sufficient ability to ensure capable representation on appeal, and who will in good faith and full vigor undertake that representation."

An evidentiary hearing would allow the judge to determine whether PCR counsel violated Rule 3:22-6(d) by failing to advance all of the issues raised by defendant. Defendant contends that the failure of PCR counsel to brief and argue all of the claims advanced in her pro-se submission of supplemental letter-brief warrants a new trial. Consequently, it is clear that the right to the effective assistance of appellate counsel and/or post-conviction counsel are both within the purview of R. 3:22-2(a) and thus cognizable for PCR.

In State v. Webster, 187 N.J. 254 (2006), the Supreme Court held that PCR counsel must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by

28

DA 199

reference so that the judge may consider them. Since the Public Defender's brief did not refer to or incorporate all of the claims raised by defendant the matter should be reversed and remanded to the trial court.

Rule 3:22-6(d) provided that "counsels should advance any grounds insisted upon by defendant, not withstanding that counsel deems them without merit. State v. Rue, 175 N.J. 1 (2002), interpreted Rule 3:22-6(d) as requiring that PCR counsel must communicate with client, investigate the claims urged by the client and determine whether there are additional claims that should be brought forward. Thereafter, counsel should advance all of the legitimate arguments that the record will support. If after investigation counsel can formulate no fair legal argument in support of a particular claim raised by defendant, no argument need be made on that point.

The Constitutional guarantee of effective assistance recognizes the "average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty." Rodriguez v. Rosenbalt, 58 N.J. 281, 295 (1974).

In the instant matter, the defendant's original discovery was not disclosed by the prosecution. The trial attorney despite many requests for the discovery never responded to its whereabouts. He did respond saying that he was not in possession of trial transcripts which is not what the defendant requested. The defendant still remains concerned about the unanswered question of where is the discovery and was the discovery ever used in the original trial? Since the defendant is not a qualified professional in legal practice she did not know that these documents would support the contentions that she needed her

29

Da 200

attorneys to assert. Despite the defendant's requests and insistence that the discovery was

not disclosed, it was not until after a motion to compel was submitted and right before her

PCR hearing after her briefs had been prepared and submitted, that the prosecutor

disclosed the discovery to her then attorney, Linda E. Peterson, Esq.  (PCR Hearing T4 6

to 10). An evidentiary hearing is required to establish what discovery was produced by

the State through the order to compel. To date the defendant does not have possession of

this discovery to use in her appeal process.

      The defendant has made several requests to her previous PCR attorney to submit

this discovery to the Court and provide her and her counsel with copies. The attorney

realized the importance of this discovery, albeit too late. However, it was never

recommended to the defendant that she should request for a motion for a new trial.  Her

PCR attorney asserted that his representation was limited to the appeal for Certification

on PCR denial and had nothing to do with discovery since he returned all of the

documents he used to the Public Defender's Office.

      In October 2004, my post-conviction counsel, Linda E. Peterson, Esq. did not

have possession of my trial folder or the entire discovery pertaining to my case. This

information was necessary for her to become familiar with all issues in order to be able to

review and analyze any defects so she could prepare a brief defending my stance. This

attorney despite

submitting a motion to compel which His Honor Donald. R. Venezia, J.S.C. granted on

March 2, 2005, did not matter to the prosecutor, who did not comply until last minute

before defendant's PCR Hearing, after all the briefs were submitted,

30


Da 201

To date the prosecutor in this case failed to comply with the granted motion. (A copy of said order attached in Appendix), the defendant still does not have a copy of said discovery in her possession.

Post-conviction counsel did not meet the level of preparation due to the defendant in this case. There was a failure to investigate and review all documents, mainly discovery. It is impossible to say that the most effective arguments and all issues could be raised without the review of the attorney. Pursuant to R. 3:22-1, post-conviction rules constitute "New Jersey's Analogue to federal writ of habeas corpus."

Post-Conviction Relief involves issues that are not part of the written transcript. Defendant must raise all her issues in PCR review in order to prevent ramifications of later federal habeas corpus review. The defendant does not want to default claims on State level which would procedurally bar her from raising them on the Federal level. In such cases of ineffective assistance of counsel of the direct appeal lawyer the proper forum is Post-Conviction Relief for resolution.

In State v. Rue, 175 N.J. 1, 811 A.2d 425 (2002), this Court interpreted the rule to require that counsel communicate with the client, investigate the claims and, based on that communication and investigation, fashion the most effective arguments possible.

Despite not having all necessary and pertinent information she needed in order to prepare the defendant's brief, she did so without having it, as did the attorneys before her. prepare the defendant's brief, she did so without having it, as did the attorneys before her.

Ineffective assistance of counsel is prevalent in this instant matter from its onset, originating from trial counsel through to appellate counsel. Her attorneys continuously



asserted to the defendant that this discovery was not available and that it was lost. In response to this, the defendant began to request on her own for this discovery information.

This petition for post conviction relief is based on ineffective assistance and prosecutorial failure to comply with discovery obligations and appellate counsel's failure to raise its absence during the appeal process, depriving the defendant of vigorous representation.

This continued and willful violation by the prosecutor of his discovery obligations requires reversal of the conviction because the defendant has been deprived of a fair trial and post-conviction proceedings.

Discovery according to R. 3:13-3(c), the prosecutor shall permit defendant to inspect and copy or photograph the following relevant material if not given as part of the discovery package: R. 3:13-3(g) – continuing duty to disclose was violated. The consequences of the prosecutor's failure to comply with discovery obligations and the standards to be applied in considering the effect of violations are the same both for the initial obligation and the obligation of continuing discovery.

A willful violation by the prosecutor of his discovery obligations may, however, require reversal of the conviction if defendant deprived of a fair trial. State v. Blake, 234 N.J. Super. 166 (1989), State v. Clark, 347 N.J. Super. at 507, State v. Gregg, 278, N.J. Super. 182 (1994).

In the instant case, defendant's post-indictment right to discovery is automatic,

Da 203

but not scrupulously honored. This violation to date has prevented the defendant to present a complete defense in PCR proceedings. This discovery is relevant to the defendant in the preparation of her PCR defense.

In the defendant's Post-Conviction Relief counsel's briefs for appeal of the denial of PCR to the Appellate Division, her attorney relied on PCR counsel's briefs and files in order to prepare his appeal. The PCR brief was prepared without discovery, incomplete paperwork and lack of investigation. Appellate counsel failed to communicate and investigate defendant's claims as well as incorporate her issues into his argument.

In State v. Webster, 185 N.J. 393, 866 A.2d 663 (2006), held PCR counsel must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by reference, so that the judge may consider them.

In the instant matter, this was impossible because the defendant was denied her discovery and was unable to raise issues regarding her discovery in her appeals.

The prosecution was in violation. In addition a defendant should not be deprived of his ability to raise a "question of constitutional dimension" due to the "inattention of his appellate counsel, who should have raised the matter on direct appeal. Preciose, 129 N.J. at 477.

It is apparent that the defendant has consistently attempted to secure all necessary documents in order to be able to raise issues on appeal for a judge to decide. Defendant's counsels have vitiated her rights to appeal and this must be rectified in the interest of justice.

33



Da 204

Defendant asserts that she repeatedly addressed this issue with PCR attorney who took no curative action, thus resulting in the subsequent petition for post conviction relief for determination of the issues raised by the defendant.

In State v. Carter, 85 N.J. 300, 314 (1981), holding that the evidence must be material and not merely cumulative, must be discovered after the trial and not reasonably discoverable prior thereto and must be of a nature as to probably have affected the jury's verdict. In the instant matter, the discovery would have been properly submitted and interpreted during the defendant's trial it would have allowed the jury to decide on its relevance during their deliberations. The defendant has suffered years of incarceration because of the possibility of how great this discovery could have impacted on their verdict.

State v. Russo, 330 N.J. Super. 119, 140 (App. Div. 2000), holding if a prima facie case is made, a hearing must be held; the court, even if it conducted the trial, may not assume that the result would not have been different. With respect to defendant's claim of denial of effective assistance, the judge erred in finding that defendant had failed to establish that the outcome of her case would have been different. These claims present a prima facie case of ineffective assistance under Strickland v. Washington, 466 U.S. 668, 678–9, 104 S. Ct. 2052, 2064 – 65 (1984).

In conclusion, defendant asserts that the outcome would have been different had the trial, appellate and PCR counsel briefed and argued the absence of pertinent discovery. The matter therefore, should be reversed and remanded to the trial judge for determination of the issues raised by the defendant.

Da 205

**C. Counsel failed to raise and argue the defendant's diminished capacity defense in conjuction with volutary intoxication defense for presentation to the jury.**

Defendant requests an evidentiary hearing to determine whether trial counsel's failure to raise the defendant's diagnosis for presentation to the jury during the presentation of diminished capacity to the jury was trial strategy or ineffective assistance of counsel so serious as to deprive her of a constitutionally guaranteed fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed. 2d 674, 693 (1984).

During the trial, diminished capacity was raised, but counsel failed to raise the issues of what the defendant's diagnosis was for the jury. If these diagnosis would have been raised and further discussed the jury would have been able to deliberate and weigh their value as to the defendant's guilt. If the court's have recognized that this defendant lacked the mens rea to support knowing and purposeful murder of Mr. Polites during direct appeal, why wouldn't the mindset of this defendant be further analyzed for culpability? This defendant has the following diagnosis from expert witnesses, her attorney failed to raise them properly.

Dr. Jonathan Kleinman, a psychologist, opined that at the time of the Hippman and Polites incidents, the defendant was suffering from post-traumatic stress disorder, which kept her from being able to form either purposeful or knowing states of mind. (14T 132-1 to 135-12). Kleinman explained that when he first interviewed the defendant, he found that she was generally in good contact with reality, but that she had a difficult time expressing things having to do with the events surrounding Polites's death. (14T 105-11

35



to 23). When asked for her personal background information, the defendant's responses indicated that she had been physically or sexually abused, but she was incapable of telling what had happened. (14T 105-24 to 106-11). These events took place when she was five or six years old. (14T 118-22 to 122-16).

Finally, the defendant reported that when she was older, she was sexually assaulted by a man with a knife one night when her car broke down. She had flashbacks after this incident and intensified her use of drugs and alcohol. (14T 122-15 to 24). Given this background, when the defendant met Demolina at the age of 18, developmentally she was closer to being 12-14 years old in terms of maturity. The defendant was very needy and she ceded control over her life to Demolina. (14T 129-9 to 131-25).

Dr. Arnaldo Apolito, a forensic psychiatrist, also found post-traumatic stress disorder and added that, in his opinion, the defendant was also in a dissociative state at the time of the crimes. (14T 14-8 to 17-4). Dr. Klienman, however, felt that the defendant's symptoms did not reach the degree of disturbance or frequency required for a diagnosis of dissociative disorder, but did find that she had experienced episodes of depersonalization, a feeling that you are watching events over which you have no control, rather than experiencing them yourself. (14T 115-3 to 15; 14T 132-22 to 133-14; 15T 182-24 to 185-6).

Dr. Steven Simring, a psychiatrist called by the State on rebuttal, testified that while he was sure the defendant had experienced severe problems at home, he found no evidence of post traumatic stress disorder. (16T 169-9 to 170-6). Dr. Simring further opined that the relationship between post-traumatic stress disorder and committing

Da 207

robberies was an "irrelevant concept." (16T 158-1 to 7). Dr. Simring agreed that the defendant showed "considerable immaturity as she discussed her past life," and diagnosed her with a personality disorder "not otherwise specified." Dr. Simring also diagnosed a drug and alcohol dependence. (16T 144-1 to 25; 14T 162-2 to 8; 14T 200-8 to 202-13; 15T 113-17 to 116-6). Dr. Simring opined that "she may have been high on drugs or alcohol during the commission of the crimes and "that may have affected her judgment, but in his opinion it did not affect her awareness of what she was doing. (16T 151-22 to 152-15). Counsel failed to move for a mistrial regarding the jury's apparent rejection of her diminished capacity defense.

Despite the above the defense counsel failed to argue voluntary intoxication as a defense to the felony murder charge, it is clear that the State's expert gave a report relating to the defendant's intoxication and drug use during the commission of these crimes. Clearly, raising these issues as part of the defense of diminished capacity as requested by the defendant would have bolstered this defense. There is no conclusion from the court that the failure to raise the diminished capacity defense in conjunction with the intoxication defense was a trial strategy because counsel failed to raise it.

N.J.S.A. 2C:4-2, imposes no burden of proof upon a defendant and recognizes that evidence of diminished capacity serves to negate the mens rea element of the offense charges. State v. Delibero, 149 N.J. 90, 101 (1997). See State v. Johnson, 309 N.J. Super. 237, 268 (App. Div.), certif. den., 156 N.J. 387 (1998). Thus, unlike a voluntary intoxication defense that may negate purposeful or knowing conduct, but not recklessness, diminished capacity negates any mental state and results in a defendant

37



being set free. See State v. Humanik, 199 N.J. Super. 283, 299 n.6 (App. Div.), certif. denied. 101 N.J. 266 (1985), rev'd o.g. sub. nom. Humanik v. Beylu, 871 F.2d 432 (3rd Cir.), cert. denied, 493 U.S. 812, 110 S. Ct. 57, 107 L.Ed. 2d 25 (1989).

Defendant had medical records that diagnosed her previous to the fatal killing. She contends that these records were available to her trial counsel, and that she discussed her mental condition with counsel and was examined by experts in the field. Trial counsel failed to raise the defense of diminished capacity to the best of his ability because the record is void of any argument raised by him or post conviction or appellate counsel.

It is for the forgoing reasons that the defendant requests an evidentiary hearing. Such a hearing will permit the development of a record from which the trial court can more meaningfully determine whether ineffective assistance of counsel, as claimed by the defendant, was trial strategy that comports with reasonable professional standards, See Sparano, supra, 249 N.J. Super. at 419, or was ineffective assistance of counsel under the Strickland test.

Da 209

## CONCLUSION

For the foregoing reasons, it is urged that the defendant's petition for post conviction relief should be granted, an evidentiary hearing is warranted because the judge did not comment in any way on the defendant's remaining claims, it is clear that he did not consider them. The matter should be reversed and remanded to the trial judge for determination of the issues raised by the defendant pro se. This defendant's incarceration violates her State and Federal Constitutional rights to fair trial and jury, due process of law and must be remanded for further proceedings and modification.

Respectfully submitted,

DATED: January 3, 2008

JAMIE FARTHING

39

Da 210

JOHN L. MOLINELLI
BERGEN COUNTY PROSECUTOR
BERGEN COUNTY JUSTICE CENTER
HACKENSACK, NEW JERSEY  07601
(201) 646-2300

                                     SUPERIOR COURT OF NEW JERSEY
                                     LAW DIVISION - BERGEN COUNTY
                                     INDICTMENT NO. 95-07-0889-I

----------------------------------
STATE OF NEW JERSEY,                 :
     Plaintiff-Respondent,                   Criminal Action
                                     :
          -vs-                       :
                                     ORDER DENYING SECOND
                                     : PETITION FOR POST-CONVICTION
                                     RELIEF
JAMIE FARTHING,                      :
                                             **FILED**
     Defendant-Petitioner.           :
                                           **FEB 2 5 2008**
----------------------------------
                                         **DONALD R. VENEZIA,**
                                                 **J.S.C.**

This matter having been brought before the Court by

defendant-petitioner Jamie Farthing by way of pro se petition

for post-conviction relief and brief dated January 3, 2008, and

supplemental brief dated February 11, 2008, and the State,

represented by Assistant Prosecutor Annmarie Cozzi on behalf of

Bergen County Prosecutor John L. Molinelli, having filed a

brief opposing such relief,

     And the Court having reviewed the written submissions of

the parties and having learned that defendant, who was writted

from New Jersey State Prison to the Bergen County Jail asked to

be returned to State Prison prior to February 20, 2008, and the

Court having decided to proceed and decide the matter on the

papers and having issued an oral opinion on February 20, 2008,

Da 211.

IT IS ON this 25th day of February, 2008,

ORDERED that the defendant's second petition for post-conviction relief is denied on the merits. This Court makes the following findings of fact and conclusions of law with respect to the issues raised in this second post-conviction relief action:

The governing standard is that set forth in <u>Strickland v. Washington</u>, 466 <u>U.S</u>. 668 (1984). <u>See also</u>, <u>State v. Marshall</u>, 148 <u>N.J</u>. 89 (1997). There are two prongs to this standard. The first "requires a showing that counsel made errors so serious tht counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id</u>. at 687. The second prong requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id</u>. For the second prong, defendant must show that "there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different." <u>Id</u>. at 694.

(1) <u>Failure of Trial Counsel to Object to Accomplice Liability Charge</u>: the trial judge, the Honorable Timothy J. Sullivan, J.S.C., utilized the model jury charge for accomplice liability and tailored the charge to the facts adduced at trial. Accordingly, there is no merit whatsoever to

Da 212

defendant's claim that trial counsel was ineffective for not objecting to the accomplice liability charge.  In addition, any challenge to the charge could have been raised on direct appeal, and on the first post-conviction relief petition, and therefore, the claim underlying this alleged ineffective assistance by trial counsel is procedurally barred.

(2) Failure of Prior Counsel to Argue That Defendant's Sentence is Disparate with that of her Codefendants:

The Court initially notes that defendant's sentence of life with forty year of parole ineligibility, imposed at a resentencing hearing on February 2, 2001, was affirmed by the Appellate Division on May 9, 2002.  Thereafter, the New Jersey Supreme Court denied defendant's petition for certification.

Defendant's trial counsel, PCR counsel and PCR appellate counsel could not have raised a disparity argument regarding defendant's sentence and that of codefendant Benigno Rosario. This is because the Appellate Division opinion that gave Mr. Rosario access to the New Jersey plea offer that called for a sentence of up to 30 yearsm was not decided until 2007.  See State v. Benigno Rosario, 391 N.J. Super. 1 (App. Div. 2007).

In addition, this Court finds that petitioner has not alleged that her sentence is illegal, and further concludes that an allegation of disparate sentences does not amount to an

Da 213

illegal sentence claim under <u>State v. Murray</u>, 162 <u>N.J.</u> 240
(2000).   For this reasons, petitioner is not entitled to any
affirmative post-conviction relief on this ground.

   (3) <u>Performance by PCR Counsel in First Post-Conviction
Proceeding</u>:   There is nothing in the record to support
defendant's contention that PCR counsel, Linda Peterson,
A.D.P.D., did not receive discovery.   In fact, this Court
entered an order during the first PCR proceeding directing the
State to supply Ms. Peterson with the discovery, even though
the State typically does not  have to provide the trial file to
PCR counsel.   Defendant's claim that Ms. Peterson, who filed a
detailed brief and an amended PCR petition, rendered deficient
performance, is totally without merit.

   (4) <u>Performance of PCR Counsel in Appellate Division</u>:
The <u>Strickland</u> standard applies when evaluating appellate
counsel's performance.   The Court finds that the alleged lack
of communication between defendant and her PCR appellate
counsel does not <u>per se</u> amount to ineffective assistance of
counsel and that defendant's allegations do not establish a
<u>prima facie</u> showing of ineffective assistance of counsel.

   (5) <u>Failure of Trial Counsel to Argue Certain Defenses, in
Particular Intoxication</u>:   There was no basis in the record for
trial counsel to advance this defense.   This claim fails to

Da 214

establish even a _prima_ _facie_ showing of ineffective assistance

of counsel.

HONORABLE DONALD R. VENEZIA, J.S.C.

Da 215

STATE OF NEW JERSEY

v.

*Jamie Farthing*
**Defendant**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – CRIMINAL
_Bergen_ COUNTY

INDICTMENT #: _95-07-0889_

CASE OR PROMIS #: _____

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, _Jamie Farthing_ by: _Pro Se._

☐ Petition for Post-Conviction Relief determined to be defendant's

_____ first petition

✔ second or subsequent petition

☐ Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

☐ Motion for _____ and the defendant having been represented by:

_____, Assistant Deputy Public Defender

_____, Retained or Designated Counsel *(circle one)* or

☐ The court having concluded that there was no good cause entitling the assignment of counsel on the application, and the State having been represented by:

_____ Assistant Prosecutor; and

☑ There having been proceedings conducted on the record on _February 20, 2008_  or

☑ The matter having been disposed of on the papers;

It is on this _20th_ day of _Feb_, 200 _8_ ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

_____ Granted
✔ Denied
_____ Other

For the reasons:

☑ Expressed in the court's written opinion of

☑ Expressed orally on the record on

_2/20/08_

DONALD R. VENEZIA, J.S.C.    , J.S.C.
Judge _____

ORIGINAL:    Office of the Public Defender
c:          Criminal Division Manager's Office
            Prosecutor's Office
            Defendant

Form Order Promulgated by Directive # 7-07, Published, 09/20/2007, CN: 11151-English

Da 216

## NOTICE OF APPEAL

### SUPERIOR COURT OF NEW JERSEY - APPELLATE DIVISION

TITLE OF ACTION AS CAPTIONED BELOW:          ATTORNEY OF RECORD

| | |
|---|---|
| STATE OF NEW JERSEY,        : | Jamie Farthing, pro se |
|     Plaintiff-Respondent, : | #18567/SBI#985369-B |
| : | New Jersey State Prison |
| : | P.O. Box 861 - 1EE |
| : | Trenton, N.J. 08625 |
|         v. : | (609)-292-9700 |
| : | Attorney for Appellant |
| : |     ON APPEAL FROM: |
| JAMIE FARTHING          : | Order from Superior Court |
|     Defendant-Appellant. : | Ind. No.: 95-07-0889 |

CIVIL [] CRIMINAL [X] JUVENILE []

NOTICE IS HEREBY GIVEN THAT JAMIE FARTHING
APPEALS TO THE SUPERIOR COURT OF NJ, APPELLATE DIVISION, FROM
THE JUDGMENT [ ] ORDER [X] OTHER (SPECIFY) [ ]
ENTERED IN THIS ACTION ON February 25, 2008, IN FAVOR OF
Respondent.

IF APPEAL IS FROM LESS THAN THE WHOLE, SPECIFY WHAT PARTS OR
PARAGRAPHS ARE BEING APPEALED:

### Not Applicable

ARE ALL ISSUES AS TO ALL PARTIES DISPOSED OF IN THE ACTION BEING
APPEALED? YES [X] NO [ ]
IF NOT, IS THERE A CERTIFICATION OF FINAL JUDGMENT ENTERED
PURSUANT TO R. 4:42-2? YES [ ] NO [ ]
PRIORITY UNDER R. 1:2-5 YES [X] NO [ ] APPLICABLE SECTION UNDER
THIS RULE. This Appeal Is Of A Criminal Nature And Affects The
Conviction Of Defendant, Length Of A Prison Term, and Sentence
Imposed.
IN CRIMINAL, QUASI-CRIMINAL, AND JUVENILE CASES...NOT
INCARCERATED [ ] INCARCERATED [X]
CONFINED AT: Trenton State Prison, P.O. Box 861 - 1EE, Trenton,

Da 217

New Jersey 08625-0861.

GIVE A CONCISE STATEMENT OF THE OFFENSE AND OF THE JUDGMENT,
DATE ENTERED AND ANY SENTENCE OR DISPOSITION IMPOSED This Appeal
Is From An Order Denying A Second Petition For Post-Conviction
Relief, Dated On Febraury 25, 2008, by Honorable Donald R.
Venezia, J.S.C. Upholding The Current Holding Of
Defendant-Appellant's Conviction And Sentence Imposed, Thus
Denying Defendant-Appellant Relief Sought. (See Appendix)

Doc218

A-3481-0774

ORDER ON MOTION
----------------

STATE OF NEW JERSEY          SUPERIOR COURT OF NEW JERSEY
VS                           APPELLATE DIVISION
JAMIE FARTHING               DOCKET NO.  A -003481-07T4
                             MOTION NO.  M -004454-07
I hereby certify that the foregoing     BEFORE PART:  H
is a true copy of the original on       JUDGE(S):  STERN
file in my office.

_Sarl M. Chacko_
CLERK OF THE APPELLATE DIVISION    _Sarl M. Chacko_
                                   CLERK

MOTION FILED:      MARCH 19, 2008      BY: JAMIE  FARTHING
ANSWER(S) FILED:

RECEIVED
APPELLATE DIVISION

MAY   5 2008

SUBMITTED TO COURT:  APRIL 30, 2008

SUPERIOR COURT
OF NEW JERSEY

O R D E R
---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS

_1st_ DAY OF _May_ , 2008, HEREBY ORDERED AS FOLLOWS:

                                    GRANTED    DENIED    OTHER
                                    ( ✓ )      ( ✓ )      ( )
MOTION BY APPELLANT
- TO PROCEED AS AN INDIGENT, FOR FREE
  TRANSCRIPTS AND FOR ASSIGNMENT OF COUNSEL

SUPPLEMENTAL: _The motion to proceed as an indigent is granted. This is an appeal from the denial on February 20, 2008 of defendant's second or subsequent petition for post conviction relief. Counsel was not assigned, and is not assigned in this court. See_ R. 3:22-6(b); R. 2:7-2(a). _The order of February 20, 2008 and orders of_

BER 95-07-0889                      FOR THE COURT:

_February 25, 2008 reflect the reasons for the denial and that it was based on the papers. There is_
JUKAK1                              EDWIN H. STERN  P.J.A.D.
_no transcript or need for a transcript. See_

Case 2:10-cv-00572-CCC Document 11 Filed 09/13/... Page 113 of 113

NEW JERSEY STATE PRISON

Department of Corrections
Inmate Management
PROGRESS NOTES REPORT

VTCH: 22 OF 72

| SBI# | Last Name | First Name | Init | Six | Location | Status | Date | PED | PDS | Admin Hold |
|---|---|---|---|---|---|---|---|---|---|---|
| 0008635098B | FARTHING | JAMIE | | | NJSP-SOUTH-1 EE-CELL 48; | MAX | 03/09/2007 | | | N |

| Date | Seq | Type | Note | Case Action |
|---|---|---|---|---|
| 02/08/1998 | 12 | GN | PAROL | Book PED 9/17/2034 |
| 01/06/2000 | 13 | GN | wrt | Bergen Sup Ct - 11-3-00- Re-Sentence |
| 01/29/2001 | 14 | GN | WRIT | Bergen Sup Ct - 2-2-2001-Re-sentence |
| 07/16/2001 | 15 | GN | CRTTP | Bergen Sup Ct - 2-2-01 - Re-Sentence ***life w/40 yrs parole stip- CT 7 was dismissed ***Rcvd & Dist amended JOC*** |
| 08/29/2001 | 16 | GN | Megan Law review | Kidnapping offense circumstances reviewed: Does not meet registration requirements |
| 08/29/2001 | 17 | GN | Alert Status | Verification Completed |
| 04/25/2002 | 18 | PRO | Into lifeskills 4/28/02 | |
| 10/02/2002 | 19 | GN | dna testing | dna test completed, sent to state police on 12/2/02 |
| 06/06/2003 | 20 | PRO | Into woman is the word 9/17/03: | |
| 08/20/2004 | 21 | PRO | Into daywriting 1/16-3/22/04 | |
| 08/20/2004 | 22 | PRO | Into play writing 1/26/04 | |
| 04/26/2004 | 23 | PRO | Into Women's book club 5/5-6/23/04 | |
| 03/28/2005 | 24 | RCT | Approved restoration of 30 days CT | |
| 04/14/2005 | 25 | CRTTP | Bergen Sup Ct 6-17-05 Motion seg transport CANCELLED | |
| 06/03/2005 | 26 | CRTTP | Bergen Sup Ct 6-21-05 PCR 96 07 00889 I SOG TRANSPORT ***DENIED*** | |
| 02/05/2007 | 27 | ORIENT | Institutional Orientation | Institutional Orientation Completed on march 7, 2007. |
| 03/08/2008 | 28 | CRTTP | Bergen County Superior Court, **HIGH RISK** SOG TO TRANSPORT | Appear before Judge Donald R. Venezia for PCR on Indictment 9507000889I. |
| 03/20/2008 | 28 | CRTTP | Bergen County Superior Court, **HIGH RISK** SOG TO TRANSPORT | Appear before Judge Donald R. Venezia for PCR on Indictment 9507000889I. |

Education Summary

Education Level   5TH GRADE     GENERAL EDUCATION DIPLOMA     Occupation

TABE Test Results

| Test Date | Test Type | Test Form | Reading Score | Reading Grade Equiv | Math Comp Score | Math Comp Grade Equiv | Writing Score | Writing Grade Equiv | Social Studies Score | Social Studies Grade Equiv | Science Score | Science Grade Equiv | Applied Math Score | Applied Math Grade Equiv | Language Score | Language Grade Equiv | Spelling Score | Spelling Grade Equiv | Total Math Score | Total Math Grade Equiv | Total Battery Score | Total Battery Grade Equiv |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

GED Test Results

| Test Date | Test Type | Pass/Fail | Writing Score | Writing Grade Equiv | Social Studies Score | Social Studies Grade Equiv | Science Score | Science Grade Equiv | Reading Score | Reading Grade Equiv | Math Score | Math Grade Equiv | English Fluency Score | English Fluency Grade Equiv | Total Score | Total Score Grade Equiv |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

