EXHIBIT 18

47

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL PART
BERGEN COUNTY
INDICTMENT NO. S-889-95
APP. DIV. NO. A-4776-96T4

STATE OF NEW JERSEY,          :

       Plaintiff,          :          TRANSCRIPT OF
                                 MOTIONS

    -vs-                     :

JAMIE FARTHING,               :

       Defendant.          :
------------------------

                       Place: Bergen County Courthouse
                            10 Main Street
                            Hackensack, NJ     07601

                    Date: July 17, 1996

BEFORE:

    HONORABLE SYBIL R. MOSES, J.S.C.

TRANSCRIPT ORDERED BY:

    RUTH BOVE CARLUCCI, ESQ.
    (Office of the Public Defender - Appellate Section)

APPEARANCES:

    PATRICIA BAGLIVI, ESQ.
    Assistant Prosecutor For Bergen County
    Attorney For The State.

    JOHN L. WEICHSEL,. ESQ.
    (John L. Weichsel, Esq.)
    Attorney For The Defendant.

                         Barry Gold, C.S.R.
                         Official Court Reporter
                         Bergen County Courthouse
                         10 Main Street
                         Hackensack, NJ     07601

Colloquy

1          THE COURT: Be seated.

2      For the State.

3          MS. BAGLIVI: Patricia Baglivi appearing for the

4  State.

5          THE COURT: For the Defendant.

6          MR. WEICHSEL: John Weichsel for Jamie Farthing.

7          THE COURT: This is the return date of the motions to

8  suppress evidence and to suppress statements in the matter of

9  State against Jamie Farthing, Indictment 889-95.

10          In the matter before me the Defendant was indicted on

11  July 29th, 1995 in Indictment 989-95 with one count of first

12  degree robbery, one count of first degree murder and related

13  charges.

14          On March 7th, 1996 Mr. Weichsel, Defendant's attorney,

15  filed a notice of motion to suppress.

16          Both Ms. Baglivi, the prosecutor on the case, and Mr.

17  Weichsel submitted appropriate legal briefs prior to oral

18  testimony.

19          Testimony was heard on May 29th, May 30th and June 11th,

20  1996.

21          Post hearing summations were filed in writing within

22  thirty days thereafter.

23          The State relied on the testimony of four witnesses.

24          Senior Investigator Terrence Alver, Bergen County

25  Prosecutor's Office.

Colloquy

3

1    Lieutenant Roger Kane, Bergen County Prosecutor's Office.

2    Lieutenant Michael Trahey, Bergen County Prosecutor's

3    Office.

4    And Sheriff's Corrections Officer Brian Shore.

5    Defendant Farthing testified briefly, but early in her

6    direct testimony.  After a luncheon recess decided not to

7    continue testifying, which all parties agreed was her right.

8    She then stepped down from the witness stand.

9    The defense then presented the Defendant's mother, Lupe

10    Anderson, who testified on her behalf.

11    I think that before I review the testimony of the

12    witnesses, comment on their credibility, I'm giving you the

13    outline of my decision, comment on their credibility, review

14    the arguments of counsel, give you findings of fact concerning

15    the issues in controversy, review the applicable law, then

16    apply the law to the facts that I find.

17    I think I should review what I believe for purposes of

18    this motion, these motions I should say, is uncontroverted.

19    It's obviously going to be controverted at trial, should we go

20    to trial.

21    But for purposes of these motions I believe it is

22    uncontroverted that on August 8th, 1994 the body of James

23    Polites was discovered in his apartment at 1321 River Road,

24    Edgewater, New Jersey.

25    It is believed by the Prosecutor's investigators that a

Colloquy

1   murder took place, that he was murdered, that it was a

2   homicide, that the same took place on Friday, August 5, 1994.

3        Missing from the residence were Mr. Polites' wallet,

4   credit cards, watch, neck chain, VCR, a Super Bowl ring and

5   various other items.

6        On September 2 of 1994 Detective-Sergeant John Hynes of

7   the Hackensack Police Department contacted the Bergen County

8   Prosecutor's Office.  He reported that a similar type of crime

9   had occurred in his jurisdiction, that is in Hackensack, on

10  August 4th of '94.

11       In that incident one man by the name of Robert Hippman of

12  380 Prospect Avenue in Hackensack reported to the police that

13  two women and a man had arrived at his apartment, produced

14  guns and announced that they were going to do a robbery.

15       Hippman was bound at the ankles and wrists while the

16  perpetrators ransacked his apartment.

17       After they left with items taken from his apartment he

18  was able to free himself and call the police.

19       After the incident he later identified a woman by the

20  name of Ivie Demolina as one of the individuals who robbed

21  him.

22       Leonard Marshall, a friend of Mr. Polites, the decedent,

23  also positively identified Ivie Demolina as a woman that James

24  Polites had dated prior to his death.

25       On September 13th, 1994 the Prosecutor's Office received

1    information that Ivie Demolina, Thomas Christopher James and

2    Benigno Rosario had been arrested in New York for a robbery of

3    the Iroquois Hotel on September 6th, 1994.

4        Found in their possession at the time of their arrest

5    were two handguns and property from both the Hippman robbery

6    and the Polites homicide.

7        Both Demolina and James were interviewed by members of

8    the Bergen County Prosecutor's Office.  Both admitted to being

9    involved in the Hippman robbery and the Polites homicide.

10   Both implicated Jamie Farthing and Efrain Papaleo in both

11   crimes.  They did indicate that James did the actual killing

12   of Polites at Demolina's request.

13       They told investigators from the Prosecutor's Office that

14   Ms. Farthing had gone back to Georgia after the September 6th,

15   1994 robbery of the Iroquois Hotel.

16       I find, for purposes of this hearing, those facts are

17   uncontroverted.

18       Detective, Senior Investigator Terrence Alver testified

19   about the underlying facts in this case which I have just

20   discussed with counsel.

21       He testified that after the information in September of

22   1994 was received from Demolina and James he went to the State

23   of Georgia on September 16th, 1994.

24       He had obtained photographs and records concerning the

25   warranted fugitive Jamie Farthing and learned of her address

1  in Union City, Georgia as well from the U.S. Marshall's Office

2  in Georgia.

3      Mr. Alver had an arrest warrant for Ms. Farthing which

4  had been signed I believe by Judge Gaeta and on which a bail

5  had already been set I believe in the amount of $1,000,000.

6      On September 15th of 1994 he was with Hynes and he staked

7  out Ms. Farthing's mother's house because it was apparent that

8  she was living with her mother in Union City, Georgia.

9      To make a long story short, he got there at about 2:45 in

10 the afternoon, he testified, and then about six o'clock that

11 night or that evening Alver received a radio transmission that

12 two women and a man were leaving in a truck.

13     The Marshall's Office thought that the Defendant was in

14 the truck.  They stopped it, and in the truck was Jamie

15 Farthing, Luke Anderson, her stepfather, and Lupe Anderson,

16 her mother.

17     The Defendant identified herself as Jamie Farthing, and

18 she was arrested by the U.S. Marshall for murder and robbery,

19 put in the Marshall's car.

20     She gave the Simpson Avenue address as her home and told

21 Alver that she was living in the dining room.

22     While she was in the Marshall's car Alver asked her if

23 she would consent to a search of her room.  She said she

24 would, according to Alver.

25     He then said he took out a consent form, filled out the

1  address and read it to her.  He then asked her, he testified,

2  that if she understood it.

3      Alver said that Ms. Farthing answered "yes."

4      He then gave it to her to read, removed her handcuffs.

5  She read the form, according to the investigator, and signed

6  it while sitting in the Marshall's car.  She also wrote her

7  name at the top.

8      That form was marked S-2 In Evidence, and she did

9  identify her signature at the time she testified and I have

10  that before me.

11      Alver witnessed the form, as did one of the Marshalls.

12      Subsequent to that time Investigator Alver testified he

13  spoke with Lupe, Ms. Farthing's mother, who told him that she

14  would be living in the dining room off and on for two months.

15      She was aware, according to Terrence Alver, the mother

16  was aware, according to Terrence Alver that Defendant Farthing

17  was involved not only in a murder charge in New Jersey, but on

18  a murder charge in New York, and she learned this from a

19  boyfriend of the Defendant, who had received a call from Ivie,

20  who told the boyfriend, who told the mother that James had

21  implicated the Defendant and the boyfriend told the mother

22  that Farthing should keep a low profile.

23      Alver testified that he told Lupe that he wanted to

24  search the Defendant's room and she agreed.

25      He gave S-2, the consent form, to Ms. Anderson and read

Colloquy

1    it to her.

2        She gave her consent, according to Alver, and she signed

3    it, and, indeed, I see at the top of S-2 the signature of Lupe

4    Anderson.

5        She did identify her signature during her testimony.  But

6    I will address her testimony in a little while.

7        He then, Alver testified, he then went to the Simpson

8    Avenue house.

9        Although the form says that they were given permission to

10   search the entire house, Alver was emphatic that he did not

11   search the entire house, just the Defendant's room, which was

12   about ten by ten, and it took about ten minutes.

13       He testified he found a red wig and he testified

14   parenthetically that a red wig had been worn by a woman who

15   did the robbery at the Iroquois Hotel.

16       Both, Alver testified that both Lupe and Luke, mother and

17   stepfather, were very cooperative.

18       Alver testified that he left not only a receipt for the

19   items that were taken, but his business card, giving the

20   Metropolitan Georgia Fugitive Squad address in response to

21   Lupe's question as to where they were taking her.

22       Alver was also emphatic that there was no mention during

23   this discussion in regard to an attorney being retained, or

24   being called for Ms. Farthing by her mother or in regard to

25   prior brushes with the law by Ms. Farthing.

1    Alver then testified he went to the Marshall's Office,

2    where she had been taken, arriving there at about 6:45 P.M.

3        Ms. Farthing was in an interview room, according to

4    Alver, with a female U.S. Marshall.

5        He went into a conference room or interview room with

6    Detective-Sergeant Hynes, and asked the Defendant if she

7    wanted to use the bathroom or eat.

8        She asked for water, according to Alver, which was given.

9        Detective, Investigator Alver then gave her her <u>Miranda</u>

10   rights.  He read each aloud to her from S-3 In Evidence, which

11   I have before me.

12       He filled in the date, time and place.  Everything else,

13   according to Alver, was filled out by the Defendant.

14       When asked if she understood, as he read aloud each

15   right, she answered "yes" in a loud voice, according to Alver.

16       Alver said he then gave the Defendant the form, read each

17   right aloud to her, which I just stated, and wrote "yes," and

18   she wrote "yes" next to each question, and initialed it with

19   the initials J F, and, as I review the form, there are

20   initials J F to each of the five rights.

21       She then signed the waiver portion and signed at the

22   bottom.

23       This, it is uncontroverted that this interview was not

24   tape recorded or videotaped.

25       But Alver did take notes from which he wrote a report,

1  which was identified as S-4.

2      The details of the interview are not really important for

3  purposes of this motion.

4      But basically in June or July of '94 she met Ivie and

5  James at her grandmother's house.  She hitchhiked to New York

6  with them.

7      Ivie told her that she knew of a couple of coke heads

8  that they could rip off.

9      Ivie set up the Hippman robbery using a pay phone.

10     She testified that Ivie had a silver gun which she gave

11  to James.  They carried the duct tape and two guns.

12     Ivie did, and that Ivie gave one of the guns to Farthing,

13  which she pointed at Hippman and said it's a robbery.

14     She told Alver that she searched Hippman's apartment and

15  described some of the things that were taken.

16     She also described that after Hippman was placed on the

17  bed and tied up with duct tape they then removed the tape and

18  tied him to a chair.

19     She then told the, Investigator Alver, according to

20  Alver, that they drove to a cash machine twenty minutes away

21  and $100 in cash was withdrawn from Hippman's card.

22     They then went to a hotel in New York.

23     Farthing told Alver, according to Alver, that Ivie

24  planned to murder James Polites the next day because she used

25  to date him and he would know who she was.  She said that he

1   had money because he owned a business.

2       Ms. Farthing testified how Ivie phoned Polites, how she

3   set up the meeting, how she went to the apartment, how she

4   searched the house while James held the gun and then the

5   others tied him up.

6       She found four or $5,000 in cash, as well as a Super Bowl

7   ring, which the cash was given to Ivie.

8       Ms. Farthing saw Polites with a pillowcase over his head,

9   an electric cord around his neck hanging from the doorknob.

10      They ran back downstairs, packed up the stolen goods.

11      It may have been a duplex apartment.  That's what I

12  gather from that, and then they left, taking credit cards, et

13  cetera, went to New York, to a hotel.

14      She also spoke about the Iroquois Hotel robbery in New

15  York.

16      Investigator Alver said that the interview began at 6:55

17  P.M., after S-3 In Evidence was completed, and ended at 8:50

18  P.M.

19      He asked the Marshalls then after he did this oral

20  interview, he testified, if a stenographer was available.

21  Because she indicated that she would give a stenographic or

22  taped statement.

23      Since no stenographer was available and there was no tape

24  recorder in the U.S. Marshall's Office, he drove to a Wal-Mart

25  and purchased a tape recorder.

12

1    Detective Alver said that the Defendant remained in the

2    conference room at the Marshall's Office in Georgia with

3    Detective-Sergeant Hynes of the Hackensack P.D. until he

4    returned and set up the tape recorder.  By now it was about

5    9:45, about an hour after the interview concluded.

6    He set up the tape recorder, he testified.

7    He testified he readvised the Defendant of her rights.

8    At this point Jamie Farthing asked if she could speak

9    with someone first.  Alver testified he immediately turned off

10   the tape recorder and he testified that he was frustrated.

11   She apologized for changing her mind.

12   He then asked her, according to his testimony, who she

13   wanted to speak with.

14   She said her mother.

15   He asked her how she got involved with these people.

16   She said Ivie said she wouldn't get caught.

17   At this point he did not speak to her any more.

18   She was taken, I believe, to the Fulton County Jail, if

19   memory serves me correctly.

20   He did not see her again after she was taken to the

21   Fulton County Jail in the evening on September 15th until the

22   morning of September 17th when he flew back to New Jersey with

23   the Defendant.

24   He testified that, however, that he learned that she

25   waived extradition before a Georgia Court on the morning of

1   September 16th and then that she had a lawyer with her on that

2   morning.

3       Alver testified that he flew back to New Jersey with her.

4       She was met by a female officer, Aurora Randazzise, and

5   taken to the Linden Street office of the Bergen County

6   Prosecutor's Office.

7       The reason for her being taken to the Linden Street

8   office as opposed to being taken to the jail, according to

9   Alver, was that the Suffolk County police were present because

10  they had a homicide where she was allegedly involved as well

11  and they wanted to interview her.

12      Alver testified he had no further contact with her on

13  that date except at one point to ask if she wanted to eat or

14  drink.

15      Cross examination zeroed in on several points.

16      It is, as a result of the cross examination it was

17  brought out that Alver was using a New Jersey arrest warrant

18  to arrest the Defendant in Georgia, and that there was not a

19  Federal warrant, nor was there a fugitive complaint out of the

20  State of Georgia.

21      Detective Alver indicated repeatedly on cross examination

22  that it was the U.S. Marshalls that stopped defendants' car,

23  and they, and that he received a radio report and went to that

24  location.

25      He reiterated that the Marshalls had arrested the

1   Defendant on the New Jersey warrant and told her of the

2   robbery and murder charges.

3        He also reiterated that she was in the Marshall's Jeep

4   when he asked her for her address, and did she pay rent, and

5   that then her Miranda warnings were given at that point.

6        He then asked if she would consent to the search and he

7   was very candid I thought.  He testified that if she had not

8   consented, he would have immediately gone for a search

9   warrant.

10       He reiterated on cross examination that she read the

11  form, and he also conceded that the Defendant, I thought very

12  candidly, was looking frightened, not unrealistic testimony in

13  the position which she was.

14       Under pressing cross examination Alver testified,

15  emphatically denied that Lupe said that she would get an

16  attorney for Ms. Farthing.

17       Furthermore, he was emphatic that he explained to Lupe

18  about the consent form.

19       He was emphatic that he gave Lupe his card in order to

20  tell her where her daughter was being taken.

21       He was emphatic that Lupe signed the form giving consent

22  to search.

23       He reiterated again that he made Lupe a receipt for the

24  items and again reiterated that she was arrested on the New

25  Jersey warrant alone.

1    Detective Alver testified he's, Investigator Alver

2  testified he's taken hundreds of statements, none of which

3  were with a videotape or suspect, hundreds of them, using

4  stenographers.

5    Alver testified on cross examination that when he gave

6  Defendant her Miranda rights at about 6:55 P.M. on the 15th of

7  September she appeared much more relaxed, she did not want

8  food.  Although he conceded he did not ask when she had last

9  eaten.

10    During the interview he did ask, he conceded candidly he

11  asked leading questions, but he never got angry.

12    He also told the Defendant it would be to her advantage

13  to tell them what happened.

14    When the Defendant said she wanted to speak to her mother

15  he immediately stopped talking to her, and the Marshall told

16  him that she could make all the calls she wanted from the

17  Fulton County Jail and that's where she was taken.

18    The captain at the jail told him about the waiver of

19  extradition.

20    Detective, Investigator Alver I thought was calm.  In

21  fact, he was almost placid in his answers.  He answered the

22  questions directly.

23    He was very candid on cross examination, conceding points

24  to defense counsel which, of course, he felt had to be

25  conceded.  I found him as an extraordinarily credible witness

16

Colloquy

1          The second witness to testify for the State was

2   Lieutenant Roger Kane.

3          Let me back up a bit.

4          I tried to divide the testimony or the statements of the

5   Defendant into three interviews, so to speak.

6          Interview number one was the oral interview taken on

7   September 15, '92. (Sic)

8          Interview number two was the aborted interview started

9   with the tape recorder, but then never carried out because she

10  said she wanted to speak with her mother.

11         Interview number three, I'll address, was taken by

12  Detective-Lieutenant Kane.

13         And interview number four was after she was in the Bergen

14  County Jail there was an interview taken by Lieutenant Trahey.

15         Lieutenant Kane testified that he was in charge of the

16  Homicide Squad in 1994.

17         Alver was the case detective.

18         He was at the Linden Street office on September 17th when

19  she was brought back from the airport after returning by air

20  from Atlanta, Georgia.

21         He testified the Defendant and the officers got to Linden

22  Street at about 2 P.M.

23         He was told of her oral statement as well as the aborted

24  taped statement.

25         It was not his intention, according to Kane, to take a

colloquy                                    17

1  statement from her on the afternoon of September 17th.  The
2  reason for that being she was taken to Linden Street, and he
3  corroborated Alver's testimony, to be available to the Suffolk
4  County police so they could interview her.

5      Kane testified she was given food.  Pizza, and soda and
6  cigarettes were made available to her.

7      No attempt was made to speak to her while she was in the
8  room with the female officer Aurora Randazzise.

9      When the Suffolk County Police arrived they were given a
10 background briefing.  They were shown to her, and they spoke
11 to her beginning at about 4:45 P.M.

12     It was Kane's recollection they gave her her rights.
13 They took a statement, which was handwritten, and she signed
14 each page.  It was a very lengthy statement which did not end
15 until close to 10 o'clock at night, at which point Kane
16 testified that she ate again, went to the bathroom and had
17 something to drink.

18     He went over her handwritten notes with the Suffolk
19 County case officers and they left some time between 11 and
20 11:30.

21     At that point the female officer, Ms. Randazzise, was
22 still at the Linden Street office.

23     Kane went into the room, told her she was going to be
24 moved to the Bergen County Jail, and asked her again if she
25 needs to go to the bathroom, use the ladies' room or eat

1   something.

2       At this point Kane testified that the Defendant said, and

3   I believe this is a verbatim quote of the conversation, "Can I

4   talk to you?

5       "Kane: You told the two detectives you wanted to speak to

6   someone in Georgia.

7       "Defendant: I lied.  I want to tell the truth.

8       "Kane: It's your idea.  You could have a lawyer.

9   Anything can be used against you.

10      "Defendant: I don't want an attorney.  Just want to tell

11  the truth."

12      At this point Lieutenant Kane testified he told

13  Lieutenant Trahey to stay with her while he made arrangements

14  to get a stenographer.

15      I find really that Kane had no intention of taking a

16  statement from her because if he had he would not have gotten

17  a stenographer at 12:30 in the morning.  This is now September

18  18th.

19      A formal statement, however, was taken, and it was marked

20  S-11 In Evidence, on September 18th.

21      There was no need to have a prestatement interview,

22  according to Kane.  They went immediately on the record.

23      He explained to her why she was there, and he went over

24  her rights with her, and asked her once again on page three

25  "If you want a lawyer you will get a lawyer, is that correct?

1    "Answer: Yes.

2    "Question: Are you speaking now without the presence of a

3    lawyer?

4    "Answer: Yes.

5    "Question: And you had your rights given to you by the

6    detectives in Georgia?

7    "Answer: Yes.

8    "Question: And you understand your rights today?

9    "Answer: Yes."

10   At that point she did not ask for an attorney and she

11   proceeded to give the statement which has been marked S-11 In

12   Evidence.  It began at 12:41 in the morning and it was

13   completed an hour and 29 minutes later at 2:10 A.M. on

14   September 18th.

15   Kane testified not only that Farthing never asked for an

16   attorney, he never received any phone calls whatsoever from

17   her mother or from the, from an attorney which the mother

18   allegedly or purportedly had retained to represent her.

19   It was conceded by Lieutenant Kane that no judge was

20   contacted to set bail between 2 P.M. and 11:30 P.M. on

21   September 17th.  It is also testified to that bail has been

22   set on the arrest warrant which was signed by Judge Gaeta.

23   Lieutenant Kane said he provided cigarettes or cigarettes

24   were provided to her all night long.  I don't know if that's

25   such a wonderful thing, parenthetically, but she wanted them.

1    Her testimony, according to Lieutenant Kane, was very

2   calm.   Notwithstanding some fear due to her arrest, she was

3   not timid.

4    He testified it took fifteen minutes, he took fifteen

5   minutes to make it absolutely clear to the Defendant that she

6   had stopped the interview in Georgia, and to make it

7   absolutely clear that if she wanted to talk that she could get

8   a lawyer, and she kept saying that she understood her rights

9   and wanted to talk.

10    Kane denied on cross examination that she was crying

11   during the interview.

12    Lieutenant Kane was extremely credible.   Without

13   overdoing it, he's clearly the voice of experience, and in

14   being the voice of experience I conclude he bent over

15   backwards to make sure that the Defendant understood her

16   rights and knew what she was doing.

17    Corrections Officer Brian Shore testified as well, and I

18   think his testimony is uncontroverted, and I will make his

19   testimony the fact in regard to what happened.

20    On September 21, 1994 Defendant Farthing was already in

21   the Bergen County Jail.   At about 2 P.M. that day he was on

22   direct supervision of female inmates in Part B.   He's there to

23   check the rooms, make sure everyone is all right, along with a

24   female officer.

25    At about 2:05 P.M. Jamie Farthing approached him.   She

1   had learned she had a $1,000,000 bail.  She told Shore she

2   wanted to speak to the investigator she had spoken to earlier.

3       She said she's not taking, according to Shore, she's not

4   taking the whole rap.  She wants to speak to the

5   investigators.

6       She started talking about the case.  Shore testified he

7   stopped her immediately.  He didn't want to hear it.

8       And he got a hold of his supervisors, who in turn got a

9   hold of the Prosecutor's Office and he really had nothing

10  further to do with it.

11      He never asked her if she had an attorney.  He never

12  asked her anything about the case.

13      Shore was emphatic.  He didn't want to have anything to

14  do with it.  He turned it over immediately to his supervisor.

15      The final witness for the State was Lieutenant Michael

16  Trahey.

17      On September 21, 1994 he then received a call from the

18  Sheriff's Department, according to his testimony, that Ms.

19  Farthing wanted to speak, I'm sorry, to the Prosecutor's

20  investigator.

21      She was taken to 29 Linden Street at about 3:40 P.M., an

22  hour and 35 minutes after she approached Shore.

23      According to Lieutenant Trahey he told the Defendant that

24  she had contacted the Prosecutor's Office and he immediately

25  had her handcuffs removed.

1    The Sheriff's Officers who transported her to Linden

2    Street were not in the room with her.

3        Trahey testified he read her her rights again, and, in

4    fact, S-14 was marked into evidence, which he testified was

5    executed by her.  Each right was initialed and dated 9/21/94

6    at 3:40 P.M.

7        When he read the rights to her, and she read the rights

8    herself, she was asked if she understood every right she

9    should say yes.  Trahey testified she said "yes" to each

10   right.  She then read the form to herself, and wrote "yes"

11   next to each question, and initialed each answer and signed

12   the form.

13       Then he asked the Defendant to explain the steps she took

14   to reach the prosecutor, and she told him about how she

15   contacted Shore to tell the investigator something about a

16   pawnshop.

17       Trahey then interviewed her and he asked her what

18   information she had to give.

19       She told him, according to his testimony, that she forgot

20   information with regard to a pawnshop that they went to in

21   late August in regard to three other defendants. She told him

22   about, where it was, described the shop, and the statement

23   revolved around the pawnshop incident.

24       She was, he was with her, according to Trahey, no more

25   than thirty minutes.  He did not call in a stenographer

1   because he already knew of the pawnshop and it was not

2   significant at the time.

3        He told the Defendant there was no need to keep her there

4   and returned her.

5        Trahey conceded he made no determination if she had yet

6   been interviewed by the 5-A unit, and she said she was not yet

7   represented by an attorney, and he made no check to see if the

8   lawyer had been elected or selected to represent her.

9        The Defendant began to testify on May 30, 1996.  She

10  testified that she was age 18 on September 15th, 1994.

11       She testified that at approximately 6 P.M. she was in a

12  van with her stepfather and mother and she pulled out of a

13  driveway attempting to go to her boyfriend's house.  She was

14  in a truck.  A van pulled up and she was not sure if weapons

15  were drawn.

16       She identified herself.  She walked to the maroon colored

17  car behind the truck and her parents stayed in the truck.

18       She testified that about five, maybe ten minutes later,

19  someone read her the rights about search and seizure and she

20  signed the paper.

21       Nothing happened before she signed the paper.

22       She said she could not see the house from where she was

23  arrested.

24       She said maybe ten to twenty minutes from the time of the

25  stop to signing the consent form the New Jersey officer gave

1   her the form and told her that he needed permission to search

2   the, her room.

3        She said that she was shocked being arrested.

4        We then broke for lunch and when we returned from lunch

5   she decided not to continue her testimony.

6        In pertinent part her testimony corroborated what

7   Investigator Alver testified to.

8        The last witness that testified in these motions was Lupe

9   Anderson, who then lived in Georgia, but now lives in West

10  Palm Beach, Florida.  She testified that on September 15th she

11  was living at the Simpson Avenue home in Union City with her

12  two sons, her husband and her daughter.

13        She said that on September 14th she spoke to Ms.

14  Farthing's boyfriend, who told her that Chris and Eva had been

15  arrested and Chris had pleaded to a crime.

16        She testified on direct that she didn't know what crimes

17  were involved and she only thought that the Defendant was

18  wanted for questioning.

19        At about 6 P.M. she got in the pick-up truck with Luke

20  and the Defendant and was on her way to see Jamie's boyfriend

21  Eddie, who lived in Conyers, about five to ten miles away.

22        She said that Jamie had her purse with her in the back of

23  the truck.  She said she knew about other, nothing about other

24  bags being in the back of the pickup truck.

25        Alver testified that there were several bags containing

1    items belonging to Farthing in the back of the pick-up truck.

2         Anderson testified that as they were leaving a grey Jeep

3    blocked their car, and a man jumped out with a gun, showed an

4    FBI badge, and that Farthing got out, was handcuffed and

5    placed in the police car.

6         Anderson testified that when she went back to the house

7    she drove herself.  Two police officers had her son Jason with

8    his hands on the car, and a gun pulled, threatened to shoot

9    him.  She thought she had to do whatever they said, according

10   to her testimony, because Jason had a gun pointed at him.

11        S-2, the consent to search form, was shown to Ms.

12   Anderson on direct.  She said she had never seen S-2, but then

13   she did acknowledge that her signature was at the top of the

14   page.

15        She said that all she signed was a receipt for the items

16   which were taken her from her daughter's room, but she did not

17   have the receipt with her.  She testified that she had the

18   receipt at her home.

19        I note for the record she testified on June 11th, 1996.

20   It is now July 17th, 1996.  I have yet to receive the receipt

21   from defense counsel or from Ms. Anderson, although it was

22   indicated that if she had it she would send it.

23        She also testified that she signed nothing until the

24   officers were done searching, which directly contradicted her

25   daughter's testimony.

1     She said that after they made a list of the items which
2 they took they asked her to sign it.  She said she gave the
3 police permission to search Farthing's room because she
4 thought she had to since they had put a gun to her son.

5     Anderson was emphatic in her testimony that they tried to
6 get a lawyer for Farthing and told the agents not to question
7 her daughter as they had a lawyer for her, but he was out of
8 town.

9     Apparently, according to Anderson, the conversation with
10 regard to the lawyer took place during the search and was a
11 few seconds in duration.

12     She said the police stayed half-an-hour.  She signed the
13 paper and they left.

14     Anderson testified she reached the lawyer the next day,
15 which was the 16th, but he didn't get together with them for
16 two days, by which time Ms. Farthing had already left Georgia.

17     She also testified, and I think it's probably
18 uncontroverted, that she had had very little contact with
19 Jamie for about ten years and had just been reunited with her
20 daughter in 1994.

21     She was aware on cross examination that Jamie was wanted
22 for questioning for murder in New Jersey, which contradicted
23 her direct testimony.

24     She also testified that on the 15th she had been awaiting
25 for her attorney all day long, that her husband would call the

1   attorney when he got home, and that she learned on September

2   14th about questioning for murder.

3       Her testimony in regard to calling the attorney, reaching

4   an attorney, knowing about what Jamie was wanted for was

5   grossly inconsistent on direct and cross and inconsistent with

6   Jamie's testimony.

7       She conceded that no other rooms other than the dining

8   room were searched.

9       She was not able to identify her daughter's signature on

10  the consent to search, and she continued to deny she signed

11  the form F-2, yet she continued to acknowledge the signature.

12      She continued to say she had a receipt which she signed,

13  yet the Court has never received it.

14      She denied that Alver gave her a business card with the

15  address of the Marshall's Office.

16      She denied that she signed or read the rights form.

17      She continued to reiterate she knew of a lawyer, but then

18  said she didn't know his name, had never used him before.

19      She reiterated that she didn't reach out for any other

20  lawyers even though her daughter was charged for murder and

21  she made no arrangements in New Jersey for a lawyer for Jamie

22  Farthing.

23      In regard to Lupe Anderson I must comment that her

24  testimony was less than candid, to put it mildly.  It was full

25  of inconsistencies and evasions.

1    I've listed the contradictions in the course of reviewing

2    her testimony.

3    She was contradictory.  Her testimony was contradictory

4    to Alver, but it also contradicted all the major, relevant

5    points of the testimony of her daughter.

6    I can give no credence whatsoever to the testimony of

7    Lupe Anderson.

8    In regard to the arguments of counsel.  As we know, there

9    are two issues before the Court.

10    One is a Fourth Amendment issue, whether a free, fully

11    voluntarily, knowing and intelligent consent to search was

12    given.

13    And, of course, the Fifth Amendment, did the Defendant

14    knowingly, intelligently and voluntarily waive her rights

15    before she gave a statement?

16    The State maintains in regard to the consent to search

17    that the items seized from the Georgia residence should not be

18    suppressed since the search of her room was proper based upon

19    Defendant's consent and her mother's consent.

20    The State relies on Alver's testimony, which is orally,

21    and on the written forms that spelled out the right to refuse

22    to consent to search, and argue that a voluntary consent was

23    given by both Farthing and Lupe after being given their

24    rights.

25    Defense counsel asserts that the police searched the room

1    first, then had Farthing execute a consent to search form, and

2    then had Lupe sign, and, therefore, the searches are invalid.

3    Counsel argues that she was not really advised of her rights,

4    that she didn't understand the significance of what she

5    signed, and that Lupe's consent was obtained after the search

6    took place and that she was coerced because the police held a

7    gun to Jason's head.

8         In regard to the Fifth Amendment issue revolving around

9    the statements of Farthing, the State maintains that shortly

10   after her arrest in Georgia, Investigator Alver advised

11   Farthing of her rights pursuant to Miranda and Hampton, and

12   that she stated she understood all of her rights and wanted to

13   make a statement.

14        The State points out that a written waiver form was

15   executed by Defendant, that she gave an oral interview for

16   about an hour and 45 minutes, and then when she was again

17   advised of her rights preparatory to a typed interview she

18   asked to speak to someone, her mother, and at which point all

19   questions ceased.

20        The State argues that as far as the statements given when

21   she returned to New Jersey, both at Linden Street and after

22   she was lodged in the County Jail, it was the Defendant who

23   initiated the request to speak both times and was given her

24   rights again.

25        Mr. Weichsel maintains that the, that the statements are

Colloquy

1  inadmissible since they violated her Fifth and Sixth

2  Amendments' rights to the assistance of counsel since, first

3  of all, that she had been up for a long time, she hadn't eaten

4  enough, she was very young, she was frightened and scared, and

5  that the statement made at the U.S. Marshall's Office should

6  be suppressed since Alver ignored Lupe's attempt to invoke

7  Jamie's right to counsel.

8       The defense argues that the Court should suppress the

9  statements given in New Jersey considering her lack of

10 education, young age, lack of criminal history, the fact, as I

11 just pointed out, that she had little to eat and little sleep,

12 that 17 to 18 hours had passed between the time she woke up in

13 Georgia and confessed in Hackensack and that by the time she

14 was in the Bergen County Jail she did not have a swift

15 processing of her request for counsel.

16      Defense counsel makes some miscellaneous arguments as

17 well.

18      He argues that the provisions of the Uniform Criminal

19 Extradition Law were not complied with, and, therefore, I

20 should grant Defendant's motion to suppress the evidence,

21 although there's no evidence to support that argument, and he

22 notes that the statements must be suppressed because failure

23 to tape record them or videotape them violates her due process

24 rights under the United States and New Jersey Constitution.

25      Defense counsel concedes there is no New Jersey case

1  holding that due process, or in a Federal case as well, that

2  due process requires tape recording of a confession in a

3  criminal case.

4      He relies on case law from Alaska, and Minnesota as well

5  as other authorities which conclude that due process requires

6  the preservation of a defendant's confession with the use of a

7  tape recording.

8      The cases are set forth in his brief and I incorporate

9  them by reference as is set forth at length.

10     He also cites the Model Code of Prearraignment Procedure

11 as well as some case books.

12     The Court has reviewed the testimony, the Court has

13 considered the arguments of counsel in their posthearing

14 submissions and I make the following findings of fact in

15 regard to the relevant facts for the purposes of these two

16 motions.

17     Basically, as I think it's clear, I adopt the testimony

18 of Alver, Kane and Trahey in relevant part as credible and

19 believable, and I reject Lupe's testimony as absolutely to the

20 contrary, incredible and unbelievable.

21     For purposes of this hearing Jamie Farthing was arrested

22 in Georgia on September 15, 1994 by the United States

23 Marshall's Metro-Fugitive Squad in the presence of

24 Investigator Alver of the Bergen County Prosecutor's Office

25 and Detective-Sergeant Hynes of the Hackensack Police

Colloquy 32

1   Department on a New Jersey warrant for armed robbery and

2   murder.

3        The arrest took place just a few blocks from her mother's

4   home where she was living in Union City, Georgia.

5        She told the police before she was taken to the office of

6   the Marshall that she had been living with her mother, in the

7   dining room, at 5726 Simpson Avenue, Union City, Georgia.

8        Investigator Alver asked Farthing if she would consent to

9   the search of her room.  She agreed to it.

10       He indicated that he needed her permission, and she also

11  indicated that, in order for him to search the room.

12       He read her the Bergen County Prosecutor's Office consent

13  to search form, which she understood, and which she then

14  signed, after reading it herself.

15       Farthing's mother, Lupe Anderson, also signed the consent

16  to search form and actually accompanied the police to the

17  location in the home for the search of the dining room.

18       I find the search of the dining room took about ten

19  minutes.

20       Among the items seized were silk ties, a red wig, a Mont

21  Blanc pen, a black leather bag with a brass golf ball, nine

22  glass balls.  A men's leather band Gucci watch was on

23  Farthing's arm.

24       I find that Alver gave Lupe a receipt for the items.

25  Lupe agreed she was given a receipt for the items.  However,

1    she did not have it with her in Hackensack when she testified

2    in June.  She said she had it at home and I asked counsel if

3    he would submit it.  It has never been submitted.

4         I, therefore, find, A, that she did receive a receipt.

5         B, that she did sign the consent to search form prior to

6    the search.

7         C, that she did understand the search.

8         And, D, the reason she never sent it back is that she's

9    probably lost it.

10        I also find that nothing was said to Investigator Alver

11   in regard to retaining an attorney for Jamie Farthing, and, in

12   fact, she had not retained an attorney on September 15th.

13        After the arrest and search Farthing was transported to

14   the U.S. Marshall's Metro-Fugitive Squad office in Forest

15   Park, Georgia.

16        Investigator Alver and Sergeant Hynes also returned to

17   the Marshall's Office after the search of her room was

18   finished.

19        Alver then met with Farthing, and in the presence of

20   Hynes informed her of her Miranda and Hampton rights.

21        Farthing indicated in writing and orally that she

22   understood her rights, agreed to waive them and to talk to the

23   investigators.

24        During the interview Farthing admitted participating in

25   the Hippman robbery, the Polites homicide, the Iroquois Hotel

1   robbery, implicated Demolina, James Rosario and Papaleo in

2   those crimes.

3       Although she was asked if she wanted to eat, she did not

4   eat.  She did receive water and all of this took place within

5   a very few hours of her arrest.

6       I find that Investigator Alver then asked Farthing if she

7   would give a taped statement and she agreed to do so.

8       Since there was neither a stenographer nor a tape

9   recorder at the office of the U.S. Marshall, Alver left for

10  about an hour to purchase a tape recorder at the Wal-Mart in

11  Georgia.

12      When he returned he asked Farthing if she wanted to give

13  a taped statement.

14      I find that she asked if she could talk to someone first.

15      He asked her "Who"?

16      She replied her mother.

17      At this point all questioning ceased.

18      She was transported to the jail where she was, where the

19  U.S. Marshall told Alver that she would be given the

20  opportunity to make all the phone calls she wanted.

21      The following morning, September 16th, 1994, or the

22  following day, I'm not sure what time, Farthing waived

23  extradition.

24      She was represented by an attorney, but not one that her

25  mother had supposedly retained for her.

Colloquy

1        So, therefore, I find that in less than twenty-four hours

2   she was taken before a judicial officer.  It is unclear from

3   the testimony whether it was a magistrate or a judge.  But it

4   was a judicial officer.

5        She was represented by a lawyer.  I infer from that that

6   she knew her rights before she waived extradition, understood

7   the nature of the charge.  I infer that the same rights that I

8   give to everybody who wants to waive extradition were given to

9   her and she was returned to New Jersey on September 17, 1994

10  by Alver and Hynes.

11       A female officer met the plane and the three went to the

12  Prosecutor's Office on Linden Street.

13       She was interviewed by law enforcement officials from

14  Suffolk County for quite a lengthy period of time, close to

15  six hours.

16       I find that she was given bathroom privileges, food,

17  drink and cigarettes on several occasions during the entire

18  period from about 2 in the afternoon until about 2 in the

19  morning, a period of about 12 hours, when she was in Linden

20  Street on September 17th.

21       Parenthetically Kane testified that she confessed to

22  participating in the murder of a Suffolk County man shortly

23  after the murder in New Jersey.

24       After the Suffolk County interview was completed I find

25  as fact that Kane entered the room to tell her that she was

1  going to the Bergen County Jail, and asked her if she wanted

2  to eat, drink or go to the bathroom.  This was about 11:30

3  P.M.

4      I find as fact that Farthing initiated a conversation

5  with him, saying "Can I talk to you"?

6      Kane told her he could not since she had told Alver and

7  Hynes in Georgia that she wanted to speak to someone before

8  going any further with the statement that she had given in

9  Georgia.

10     Farthing insisted, saying she had previously lied and now

11  wanted to tell the truth.

12     At this point she was given her rights again.  When I say

13  "she was given her rights again," she was told about her

14  ability to have a lawyer.  She was asked if she remembered

15  having been given her rights in Georgia and she understood

16  them.  She indicated she did.  She wanted to speak.

17     A stenographer was called in and she gave a statement.

18     She was then transported to the Bergen County Jail.  It's

19  undisputed that bail had been set even prior to her being

20  arrested.

21     On September 21, 1994 the Sheriff's Department contacted

22  the Prosecutor's Office indicating that Farthing, an inmate

23  now in the jail, requested if she can speak to investigators

24  of the Prosecutor's Office, that she had additional

25  information to give them, that she didn't want to take the rap-

Colloquy

1   for the whole thing herself.

2       She was brought by the Sheriff's Officers from the jail

3   to Linden Street, given her Miranda rights orally and in

4   writing by Sergeant Trahey.  Parenthetically, his testimony

5   was not controverted either.

6       After indicating both orally and in writing that she

7   understood her rights and agreed to waive them, she provided

8   additional information with regard to a pawnshop which was

9   relevant to the Polites murder and the Hippman robbery.

10      The applicable law concerning the search of Farthing's

11  room at the Simpson Avenue address in Georgia is set forth in

12  the Fourth Amendment to the United States Constitution and

13  Article I, Paragraph Seven of the New Jersey Constitution.  It

14  requires the approval of an impartial judicial officer based

15  on probable cause be gained before most searches may be

16  undertaken.  State v. Patino, 83 N.J. 1 (1980).

17      The officer says after this I'm going to have to make an

18  application.

19      The warrant requirement of these provisions may be

20  dispensed with only if the State can prove that the search

21  falls within one of the narrow exceptions to the search

22  warrant requirement.

23      Consent is such an exception.

24      See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); State

25  v. King, 44 N.J. 346 (1965).

1    Thus, where a valid consent is given a search may be

2    conducted without a warrant and without probable cause.

3        Although the issue before me is not whether probable

4    cause was lacking.   The issue before me in the motion to

5    suppress is that whether or not there was a valid consent.

6        In order to be valid consent must be voluntarily given

7    and not the result of duress or coercion, express or implied.

8    State v. Johnson, 68 N.J. 349 1975.

9        "If the individual has merely acquiesced to a show of

10   authority, he should not be found to have consented."

11       See United States v. Vazquez, 638 F.2d 507 (2d Cir.

12   1980), cert. Den.  454 U.S. 975 (1981); as well as State v.

13   Speid, 255 N.J. Super. 398 (Law Div. 1992).

14       However, Schneckloth v. Bustamonte points out very

15   clearly at pages 248 to 249 that "Voluntariness is a question

16   of fact to be determined from all the circumstances."

17       In addition, in New Jersey as a matter of state

18   constitutional law when the prosecution attempts to justify a

19   search on the basis of consent the State must prove that the

20   defendant knew she had the right to refuse to consent.  State

21   v. King, already cited, at 353-354.

22       The State has to prove that the validity of the

23   warrantless search, that is the validity of the consent, by a

24   preponderance of the credible evidence.  State v. Whittington,

25   142 N.J. Super. 45 (App. Div. 1976).

Colloquy

In regard to the Fourth Amendment I have already found as fact that Investigator Alver and the Defendant Farthing's testimony is on all fours.  She clearly understood that she had to give permission to allow a consent to search, to allow a search of the room in which she is living.

I find that not only were the rights and the right to refuse consent read to her aloud, she read it to herself.

I find that her not handcuffed at the point this was taken.  She was sitting in a car.  She was not in an institutional setting.  She was near her home.  Her parents, her mother and stepfather, were in another car.

No physical force was used.

There's no indication that this was late at night, that she had not had anything to eat, or that she did not understand what she was doing.

The mother's testimony that the consent to search was given after the search was actually undertaken is rejected out of hand, and I believe that the surrounding circumstances indicate that the consent was voluntarily given, there was no duress or coercion.

I further find that the Defendant knew she had the right to refuse to consent.

She said under oath before me she had, she knew she had the right to refuse to consent.  She granted the consent.

Therefore, the State has proved by a preponderance of the

Colloquy                                    40

1  evidence that this was a valid, knowing, intelligent,

2  intelligent and voluntary consent.  The search is upheld and

3  all the items will be admitted into evidence during the course

4  of the trial.

5       In regard to the Fifth Amendment arguments and the

6  confession.

7       Prior to any custodial interrogation an individual must

8  be warned that:

9       One, she has the right to remain silent.

10      Two, any statement she does make may be used against her.

11      Three, she has the right to have an attorney present

12  during, present during questioning.

13      And, four, if she cannot afford an attorney one will be

14  appointed for her prior to questioning if she so desires.

15      Miranda v. Arizona, 384 U.S. 436 (1966).

16      New Jersey Law has an additional requirement.  It says

17  that an individual must also be warned that she has a

18  continuing right to exercise her right to remain silent or to

19  have counsel present at any time during questioning.  State v.

20  Hampton, 61 N.J. 250 (1972).

21      If the defendant asserts the right to counsel all

22  questioning must cease until a lawyer has been provided,

23  unless the accused initiates further communication, exchanges,

24  or has conversations with the police.  See Edwards v. Arizona,

25  451 U.S. 477 (1981); as well as State v. Kennedy, 97 N.J. 278

(1984).

Once a suspect has invoked her right to counsel "*** courts may admit her responses to further questioning only on finding that she (a) initiated further discussion with the police, and (b) knowingly and intelligently waived the right she invoked." Smith v. Illinois, 469 U.S. 91 (1984).

If a defendant asserts her right to silence, then the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his right to cut off questioning was scrupulously honored. Michigan v. Mosley, 423 U.S. 96 (1975).

At a minimum prior to any renewed questioning the police must issue the suspect a new set of Miranda warnings and the circumstances must indicate that the individual was not pressured into speaking.

If a defendant chooses to waive his rights and gives a statement to the police the burden is on the state to show that the defendant knowingly, intelligently and voluntarily waived her privilege against self-incrimination and her right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478 (1964).

This burden is a heavy one. Courts must presume that the defendant did not waive her rights. Tague v. Louisiana, 444 U.S. 469 (1980).

Although the United States Constitution requires the

State to prove waiver of Fifth Amendment Rights by only a preponderance of the evidence, see Colorado v. Connelly, 479 U.S. 157 (1986), in New Jersey a higher standard of beyond a reasonable doubt is imposed upon the State.

See State v. Dixon, 125 N.J. 223 (1991) and State v. Bey II, 112 N.J. 123 (1988).

The State must establish the voluntariness of a confession, the waiver of all rights, beyond a reasonable doubt, and, in fact, a signed waiver form is not conclusive to show an intentional relinquishment or abandonment of a known right or privilege.  One has to look to all of the circumstances involved.  See Sullivan v. United States, 389 F.2d 985 (10th Cir. 1968).

And, of course, the Schneckloth v. Bustamonte that the Court already has cited.  The confession must be a product of a free and unconstrained choice by the maker of the statement.

The Court has to consider the length of defendant's detention, the nature of the interrogation, whether the defendant was advised of her constitutional rights, whether she endured physical punishment or mental exhaustion, her age and her intelligence.

I note that there was conflicting testimony, I note again, given by Lupe and Alver with respect to whether or not Lupe informed the police she was going to retain a lawyer for Jamie.

1    Even if I were to assume that Lupe told Farthing, told
2  Alver that she was going to retain an attorney for her
3  daughter, and I have found that she did not, but even assuming
4  arguendo if I found that she did, the officers were under no
5  constitutional duty to convey the information to the
6  Defendant.

7    See State v. Reed, 133 N.J. 237 (1993), where in that
8  case the failure of the police to advise a murder suspect that
9  an attorney was actually present and was asking to speak to
10 him rendered his statement inadmissible, and, therefore, in
11 that case the confession was not allowed.

12    The court held the duty to inform the defendant that an
13 attorney is present, wants to speak to her is narrow and
14 specific.  It arises only, I underscore only, where counsel
15 has made known that he or she has been retained to represent
16 the person held in custody, is present or readily available,
17 and makes a request to consult with the suspect in a
18 reasonably diligent, timely and pertinent fashion.

19    In this case it is clear no attorney had made known to
20 anybody that he or she had been retained because no attorney
21 had been retained.

22    No attorney was present.  No attorney was readily
23 available and no attorney had requested to consult with Jamie
24 Farthing.  Therefore, that argument of counsel is rejected out
25 of hand.

1    But in regard to the totality of circumstances I find

2    that the initial interview with Investigator Alver took place

3    at 6:55 P.M. to 8:05 P.M.  She was in custody less than three

4    hours at this point.

5        At that point it was a very calm interview.  She was

6    advised of her rights.  She incurred no physical punishment or

7    mental exhaustion.  She asked for water and got water.

8        She denied wanting anything to eat.

9        She was 18 years old.

10       It is unclear whether she was a high school graduate, but

11   she at least went through the 11th grade.  She could read and

12   write.  She read the rights form to herself, read it out loud

13   and signed it.

14       She clearly was street wise in my opinion, having just

15   spent several months with some real street wise people in New

16   York.

17       No lawyer was ever called in.  Her mother never hired a

18   lawyer.

19       I conclude that the State has shown beyond a reasonable

20   doubt that Ms. Farthing knowingly, intelligently and

21   voluntarily waived her right to remain silent and waived her

22   right to have an attorney appear or retained to represent her.

23       I would just query, it was not addressed in either of the

24   briefs, whether even if an attorney, if the mother actually

25   did, which I am saying and finding that she never did, could

Colloquy

1    the mother assert a constitutional right for an 18 year old

2    adult?

3         We don't have to address that issue since she never did,

4    and we further don't have to address that issue since the

5    minute she asked to speak to someone, not even a lawyer, the

6    minute she asked to speak to someone at approximately 10

7    o'clock at night questioning ceased and no one spoke to her

8    again until she got to New Jersey two days later.

9         So, in regard to interview number one at the Marshall's

10   Office in Georgia the State has met its burden clearly beyond

11   a reasonable doubt.

12        In regard to interview number two, which I will call the

13   Kane interview, I find at this point it took place about

14   11:30/12 o'clock, into the early morning hours of September

15   17th, into the early morning hours of September 18th.

16        I find that on that date she had arisen at a normal hour

17   because she had been in the Fulton County Jail for over 24

18   hours.

19        There's nothing before me to indicate she didn't have

20   proper food, drink and a place to sleep in the county jail.

21        No one spoke to her on the flight to New Jersey from

22   Georgia.

23        I further find that it is true she had been questioned by

24   the Suffolk County investigators, and had given a handwritten

25   confession, which confession took close to six hours.   She

1    apparently had waived, had received her rights and waived her

2    rights there.

3        I further find that this was also a very calm

4    surrounding, and most important, most important, given the

5    case law which I've just alluded to, the Defendant initiated

6    the conversation with Lieutenant Kane at approximately 11:30

7    P.M.

8        She received her rights again.  She understood them

9    orally.  She said so.  It's in the transcript.

10       Not only did she not endure physical punishment or mental

11   exhaustion, she was given food, drink, and cigarettes and

12   bathroom privileges, and once again, her age and intelligence,

13   et cetera has already been dealt with.

14       I conclude that this was never the intention of Kane to

15   interview her.  She initiated it.

16       Given the surrounding circumstances, analysis the State

17   has shown beyond a reasonable doubt this was a knowing,

18   intelligent, voluntary waiver of rights initiated by the

19   Defendant.  Interview number two will go into evidence.

20       In regards to interview number three, it's the Trahey

21   interview.

22       The length of detention.  Well, now she's incarcerated.

23   She has received her rights in Georgia once, in Georgia twice,

24   in New Jersey once from Suffolk County, in New Jersey again

25   from Kane.  Now she's in the Bergen County Jail.  She's

Colloquy

1    clearly had food, drink and rest.

2        She initiates, she initiates the conversation.

3        She is taken to Linden Street.  Very calm.

4        Trahey gives her her rights orally and in writing.  She

5    understands them.  She orally and in writing waives them.

6        She has had all the food, drink and rest that she would

7    want.  There's nothing else to do over in the jail but eat,

8    drink and sleep.

9        And I find that the State has shown beyond a reasonable

10   doubt that this statement was initiated by the Defendant and

11   that she knowingly, intelligently and voluntarily waived her

12   rights.

13       The law that I have referred to in my discussion of the

14   law pursuant to State v. Bey, State v. Dixon has been met.

15       Furthermore, each time the Defendant initiated the

16   conversation she received her rights anew.  Even though that's

17   not always necessary, she did, and all three statements will

18   go into evidence.

19       Let me deal with the miscellaneous arguments.

20           (Discussion off the record.)

21           THE COURT: In regard to the Uniform Criminal

22   Extradition Law I'm a little unclear as to counsel's argument.

23       The arrest of a person without a warrant under 2A:160-22

24   is allowed if a person is reasonably suspected of having

25   committed a crime punishable by at least one year in prison.

1     Here we have a warrant signed by a judge who had found

2  probable cause existed.  So, I don't understand why this law

3  is applicable.  Be that as it may.

4     I think the argument here is that portion of the Uniform

5  Criminal Extradition Law that says the person must be taken

6  before a judge or magistrate with all practicable speed and a

7  complaint must be made against him or her under oath, setting

8  forth the ground for the arrest.

9     In this case she was arrested on September 15th, 1994 at

10  about 6 o'clock.  The following day, less than 24 hours later,

11  and I think it was the morning, but I'm not sure, and I won't

12  make that finding of fact, she was taken before a judge where

13  she waived extradition.

14     Defendant herself testified that she was arrested on a

15  New Jersey warrant.  She also testified that she knew what the

16  charges were.  The Marshalls told her what the charges were.

17     Bail had already been set.

18     Any delay could not be in any stretch of the imagination,

19  could not be unreasonable.  But even if I were to find it,

20  unreasonable delay, this does not render Defendant's

21  statements inadmissible.  See State v. Reyes, 237 N.J. Super.

22  250 (App. Div. 1989).

23     Where the failure to take a defendant promptly before a

24  judge after his arrest for a New York robbery in violation of

25  the Uniform Criminal Extradition Law did not render the

1   defendant's confession involuntarily.

2       Now, in regard to the argument that her due process

3   rights were violated because neither tape recording nor

4   videotape were made of the confession, this Judge declines the

5   opportunity to find that New Jersey due process requires

6   police to tape all statements given by defendants.

7       Counsel cites no New Jersey authority, counsel cites no

8   Federal Authority which reaches such a conclusion, and given

9   the facts of this case where I have found that Defendant's

10  statements were clearly knowing, intelligent and voluntarily

11  beyond a reasonable doubt, and that statements two and three

12  were made at her own initiation, I will not conclude, even

13  having read the Minnesota and Alaska cases, where apparently

14  they find as a matter of their state constitutional due

15  process rights a tape recording must be made of, must be made

16  of a custodial confession, and it's clear she was in custody,

17  I find this is not the case where the issue should be brought

18  up.

19      This is not the case where there is even a scintilla of

20  evidence that the Defendant was coerced, or traduced, or

21  beaten, or harped on or anything whatsoever to confessing.

22      The credibility of the interrogating officers is not even

23  in issue here.

24      There is no due process violation of any sort.

25      I will not conclude that New Jersey's Constitution

Colloquy

1  requires a tape recording to be made of any confessions of

2  defendants who are in custody and that the lack of such a tape

3  recording would render a confession inadmissible.

4       Given the conclusions I have made, applying the law to

5  the facts in this case, and given the findings of fact,

6  Defendant's motions are denied in toto.

7       Submit an order.

8       Now, Counsel, we have to set a trial date.  Right?

9            MS. BAGLIVI: Yes.

10           THE COURT: How long a trial do you anticipate?

11           MS. BAGLIVI: Two weeks.  Two weeks.

12           THE COURT: Two weeks.

13      Judge Miller will be the trial judge and the trial will

14  take place in November.

15           MS. BAGLIVI: Is there any chance of giving a

16  September date?

17           THE COURT: No.

18           MS. BAGLIVI: No?

19           THE COURT: No.

20           MS. BAGLIVI: I thought I'd ask.   I just thought I'd

21  ask.

22           THE COURT: I can give you October 28th.  No good?

23           MS. BAGLIVI: No.

24           THE COURT: Yes.

25           MS. BAGLIVI: The last week in October I'll be at a

Colloquy

1  seminar out cf State.

2           THE COURT: Well, and Judge Conte is out October 7th.

3  So, I really can't do without Judge Miller.  That week.

4       So, let's start it.  You can start it November 4th or

5  November 6th.  Why don't we say November 6th, which is the day

6  after election day.

7           MR. WEICHSEL: Judge, I submitted a report.

8           THE COURT: I received it.

9           MR. WEICHSEL: Dr. Ippolito.  Has Dr. Simmring seen

10 it yet?

11          (Discussion off the record.)

12          THE COURT: How long do you need for Dr. Simmring?

13          MS. BAGLIVI: I told him the report was due by the

14 beginning of September.  So --

15          THE COURT: Why don't we say a day after Labor Day.

16          MS. BAGLIVI: Yes.

17          MR. WEICHSEL: Okay.

18          THE COURT: Put that in a letter to Mr. Weichsel.

19 Trial.

20      You can put in the order, Ms. Farthing, your trial will

21 take place on November 6th, 1996 before Judge Miller.

22

23

24

25

52

## CERTIFICATION

I, BARRY GOLD, C.S.R., license number XI00436, an

Official Court Reporter in and for the State of New Jersey, do

hereby certify the foregoing to be prepared in full compliance

with the current Transcript Format for Judicial Proceedings

and is a true and accurate transcript of my stenographic notes

taken in the above matter to the best of my knowledge and

ability.


_____

BARRY GOLD, C.S.R.
Official Court Reporter
Bergen County Courthouse
10 Main Street
Hackensack, NJ     07601

03-15-99
Date