EXHIBIT 29

1ST

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
BERGEN COUNTY
DOCKET NO. 95-07-00889
A.D. #_____

STATE OF NEW JERSEY,              )
                                 )
              Plaintiff,          )
     vs.                          )        TRANSCRIPT OF
                                 )           TRIAL
JAMIE FARTHING,                   )
                                 )
              Defendant.          )
                                 )

Place: Bergen County Courthouse
       Hackensack, NJ 07601

Date:  November 20, 1996

BEFORE:

     HONORABLE TIMOTHY J. SULLIVAN, J.S.C. AND JURY

TRANSCRIPT ORDERED BY:

     DEBORAH COLLINS, ESQ. (Office of the Public Defender)

APPEARANCES:

     PATRICIA BAGLIVI, ESQ. (Assistant Prosecutor)
     Attorney for the State of New Jersey

     JOHN WEICHSEL, ESQ.
     Attorney for the Defendant

Transcriber Dolores Hastings
KEMCO TRANS, INC.
P.O. Box 900
Clark, New Jersey 07066
(908) 382-8500

Video Recorded
Recording Operator, L. Ostapeck

2

1                              I N D E X

2   WITNESSES

3   FOR THE DEFENSE        DIRECT    CROSS    REDIRECT    RECROSS

4   Arnaldo Apolito           6       25

5   (BREAK IN TESTIMONY – CONFERENCE IN CHAMBERS AT PAGE 37)

6   Arnaldo Apolito                   94        161        167

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  Ms. Baglivi, I did receive your re --

2   your model charges on flight, which I have.

3          MS. BAGLIVI:  Right, that comes out of the model jury

4   charge, judge.

5          THE COURT:  And I also have the charge on diminished

6   capacity.  So you have that one too and that's not any

7   different than I had.

8          MS. BAGLIVI:  Right.  I think that's a little extra

9   that you did in Harris that you had gotten from Morris County

10  and that's what I just gave Mr. Weichsel.

11         THE COURT:  Yeah, that's the same.

12         MS. BAGLIVI:  Okay.

13         THE COURT:  Okay.

14         MS. BAGLIVI:  Other than that, my Appellate Section

15  said there was nothing new on those areas.

16         THE COURT:  All right.

17         MR. WEICHSEL:  This seems to embody, you know, the --

18  the (inaudible) decision in it.

19         THE COURT:  It does.

20         MR. WEICHSEL:  Yeah.

21         THE COURT:  Yeah, I used that in Harris.

22         MR. WEICHSEL:  Yeah.

23         THE COURT:  I eliminate I think reckless in there,

24  I'm not -- I did.  We'll go over that to make sure.

25              The model charge on the accomplice liability is -- is

Colloquy

4

1    a model charge that was issued in May of 1995 and the case that

2    this court was just reversed on, <u>Cook</u>, was from the old model

3    charge which had a problem in it and they -- and the new model

4    charge covers that.  So I've been over that, I've been reading

5    it twice, or two or three times this week and I'll give you a

6    copy of it.  You should have a copy of the model charge?

7            MS. BAGLIVI:  I do.

8            THE COURT:  I think I said I would give you one, and

9    I think it covers that -- that issue where co-defendants or the

10   multi-defendants on a product -- on accomplice liability issue

11   as to the same state of mind that could be a lesser degree then

12   the actual person who could be responsible for the -- for the

13   crime.

14           MR. WEICHSEL:  Okay, and --

15           THE COURT:  It deals with <u>Cook</u>.

16           MR. WEICHSEL:  Yeah, it deals with different --

17           THE COURT:  It really was confused in that they asked

18   three questions and they found him not guilty, Mr. Cook, of

19   robbery and felony murder.  They also found him not guilty of

20   those two and found him guilty of the knowingly and -- so there

21   was a problem there and the Appellate Division picked it up.

22   Even when the verdict came out we realized that there was --

23   there was a problem there.  So -- but I prepared this case with

24   a similar legal situation with the new model that we should --

25   we should not have that kind of problem.

1          Anything else?

2          MS. BAGLIVI:  No.

3          MR. WEICHSEL:  No.

4          THE COURT:  All right, Dr. Apolito is here?

5          MR. WEICHSEL:  Um-hum.

6          THE COURT:  Why don't we bring up the jury please?

7  And you have your other witnesses here today?

8          MR. WEICHSEL:  They're all here, judge.

9          THE COURT:  Everybody's here?

10          MR. WEICHSEL:  Everybody's here.

11          THE COURT:  And Dr. --

12          MS. BAGLIVI:  Simring is tomorrow afternoon.

13          THE COURT:  Will be tomorrow afternoon or tomorrow

14  morning?

15          MS. BAGLIVI:  Tomorrow afternoon.

16          THE COURT:  Oh, he can't make it in the morning?  All

17  right, so then there will be -- summations will be on Monday,

18  we won't be able to do them tomorrow, is that right?

19          MS. BAGLIVI:  Correct.

20          THE COURT:  And charge; summations and charge on

21  Monday.  All right.

22          MR. WEICHSEL:  Um-hum.

23              (PAUSE - THE JURY ENTERS THE COURTROOM)

24          THE COURT:  Answer when your name is called please?

25              (JURY ROLL CALL TAKEN - ALL PRESENT)

1          THE COURT:  All right, good morning, ladies and

2    gentlemen, we are ready to proceed. Dr.  Apolito, will you

3    resume the stand please?  You are still under oath.

4          MR. WEICHSEL:  Your Honor, just one thing.  There was

5    also an article this morning.

6          THE COURT:  Yeah, I was just reminded of it.

7          THE WITNESS:  Good morning, Your Honor.

8          THE COURT:  All right, ladies and gentlemen, before

9    we start, there was an article in the newspaper this morning

10   pertaining to this case, did any of you read it?  All right,

11   you're avoiding the newspapers, are you not?  Any cases at all?

12   All right, thank you.

13          All right, you may proceed, Mr. Weichsel.

14   DIRECT EXAMINATION OF DR. ARNALDO APOLITO (CONTINUED)

15   BY MR. WEICHSEL:

16      Q.   Good morning, Dr. Apolito.

17   A.   Good morning, Mr. Weichsel.

18      Q.   Doctor, I think we -- we left off yesterday when you

19   were beginning to relate what Jamie Farthing told you regarding

20   the Hippman robber I believe?

21   A.   Yes.

22      Q.   Okay.  You want to go through that please?

23   A.   The -- first of all I have to apologize to the court for

24   the rather boring -- last night I was very tired.  I become

25   very tired when -- when I'm not doing anything and I spent the

Apolito - Direct                            7

1   whole day, the whole afternoon yesterday not doing anything.

2   There is nothing that gets me tired more than --

3              THE COURT:  All right, do you feel better this

4   morning?

5              THE WITNESS:  I feel much better.  Thank you.

6              If I will recall we're at the point where Ms.

7   Farthing was -- put the gun in her hands to -- to threaten Mr.

8   Hippman and she informed that she was so frightened and shaky

9   that Mr. Hippman laughed and he actually attempted to leave the

10  room, evidently not taking Ms. Farthing seriously because he

11  saw her to be so shaky and frightened.

12             She also mentioned I believe at one point that she

13  actually -- I think this -- in her statement to the police,

14  that she had found the need to reassure him that nothing was

15  going to happen.

16             Then she was -- and then -- and then Ms. Demolena

17  took another gun, although I'm not very sure at this point

18  whether she took the gun from Ms. Farthing's hand and pointed

19  it at Mr. Hippman or she took the other gun that they had taken

20  with them and showed how decisive she was and which -- to Mr.

21  Hippman then, that they meant that they meant business, so he

22  desisted from his attempt to -- to leave the room.

23             Next Ms. Farthing was instructed and was handed some

24  duct tape to tie Mr. Hippman -- Mr. Hippman's limbs. And she

25  again floundered and she was unable to carry out the task and

Apolito - Direct                                    8

1   so one of the other -- I don't remember whether Ms. Demolena

2   herself or Mr. James took the job.

3          And they -- when they left, because she had been

4   helping herself I believe to some wine during the course of the

5   -- this operation and she was -- had also been taking some

6   drugs which had been supplied to her by a -- another member of

7   the group.

8          And after they left she asked to have some of the

9   monies that had been stolen, I believe some of that had been

10  taken through a -- some automatic bank card that they had taken

11  from Mr. Hippman.  And she was told that there was no money for

12  her because they had expenses and they could not share any of

13  the monies with her.

14         And then on the following day there was the -- the

15  other -- the other crime was committed and it was evidence that

16  Ms. Farthing was not -- not only unaware of the possibility

17  that this time there was going to be a more severe crime with

18  the killing or the murder of the victim.  But she seemed to --

19  to be in that -- in a frame of mind as though they were going

20  to go to a party because the understanding she had been given

21  was that this was rich coke heads and they were going to -- to

22  be fooled into -- this gentleman that was going to receive them

23  with the idea, with the understanding that they were going to

24  have a -- a sexual party the whole night and that there was

25  going to be wine and cocaine and all kinds of merry making

Apolito - Direct                    9

1    stuff.   And she asked -- in fact she asked Ms. Demolena about

2    the social status of this man; is he married.   And also she

3    ordered the wine which she had tasted at Mr. Hippman's on the

4    day before which was Pino Grigio Santa Marguerita, and she said

5    she wanted that kind of wine.   And so she went along and I

6    believe that she was given a wig to wear and that again her

7    participation in this murder was to my knowledge nil but she

8    did go with Ms. Demolena upstairs to look for valuables and

9    money.   And at a certain point she was the one who actually

10   found the money, I believe it was the sum of about $3,000 in a

11   pillow.   And this is also a point to be -- to keep in mind

12   because while she had said -- she said more than once that she

13   needed money and she wanted money and apparently the enticement

14   for her to go along with these projects was to get money and

15   low and behold she finds the money. And instead of putting it

16   in her pocket she says hey, here, here is money, you know, and

17   she promptly handed it to Ms. Demolena.   And she -- I do not

18   recall exactly whether it was at Mr. Hippman's or Mr. Polites'

19   house where instead of looking for valuables and money which

20   she claimed that she needed and wanted, she became interested

21   in cute things like ties.   She -- I think it was at Mr.

22   Hippman's where she was attracted by some ties which obviously

23   she had no personal use for; she said they were pretty.   And by

24   some Mexican coins which she also thought -- said that they

25   were real neat.   And as to this operation, the second operation

1    where they feigned a much more in the way of money and

2    valuables, she also received very little.  She was allowed to

3    keep a few items of not very high value.  She was -- I think

4    including a ring and they bought her a ring of clear stone I

5    believe worth about $30 and this was the -- the payment, the

6    share that she received.  And she -- by this time she had

7    become quite uncomfortable.  She apparently quite consciously

8    understand what she was -- she had become associated with, but

9    she had this vague terror in her -- in her head and she

10   apparently spoke to her boyfriend and she said this is

11   terrible, I don't like these people, but -- and she wanted to

12   go home.  She told -- she said that she was going to attend a

13   concert and she was given the money for a round trip fare.  And

14   she was not -- they did not allow her to have access to her

15   clothes, evidently as an additional enticement to -- for her to

16   come back.  And she went home and she saw her boyfriend.  I

17   believe she also saw her mother, but she would not tell them

18   what she had been through and she did come back.  Finally,

19   apparently this pair, Ms. Demolena and Mr. James, realized that

20   she was no asset to them and they let her go home; they gave

21   her money only for one way, a one ticket.  And --

22          Q.   Doctor, based on all of your review of everything,

23   including her background and review of what you reviewed and

24   her accounting of the events did you make a diagnosis?

25   A.   Yes.  The -- do you -- do you want me to -- to go through

1   the data I used in order to arrive to my diagnosis?

2       Q.   I think you -- didn't you do that yesterday, Doctor?

3   Didn't you review --

4   A.   No, I didn't.

5       Q.   Okay.   Then go through your data then.

6   A.   Because I think that this is very important and which is

7   missing, you know, in other reports.

8       Q.   Okay, then go ahead, go through your data then.

9   A.   Fine?

10      Q.   Go through your data.

11  A.   There are some very heavy psychological traumas in Ms.

12  Farthing's history which are well known to produce severe

13  mental illness as either during childhood -- childhood itself

14  or as the child grows up.   And these factors are very

15  important.   As a matter of fact last night, even though I was

16  tired, I still am compulsive about it, I go through my mail,

17  and I found this letter, this announcement from my good friend,

18  Dr. Dang (phonetic), who is director of psychiatry at Barnerth

19  (phonetic) Hospital, and inviting me, and of course some other

20  professionals, to go to his grand rounds presentation by this

21  Professor Rickmire (phonetic) on impact of childhood

22  experiences in adult psychopathology.   This is -- this is a

23  very well known roots of mental illness.   And in this case I

24  think we have to -- to go through them because this is a --

25  almost a unique situation.   We always do this actually when we

1   assess or try to assess the roots and the development of mental
2   illness. And when we find for instance that a child, that this
3   individual is a product of a broken home we make sure to
4   investigate how -- what an impact that had in the child's mind
5   as a factor for the development of this mental illness.  And
6   when one of the parents has disappeared following the breaking
7   of the home that we consider as an additional psychological
8   trauma.  And if the mother has disappeared that we consider as
9   being even more severe.

10          If we find that there was violence in the child's
11  home as the child was growing up, whether the parents were
12  battering one another or they were making severe threats of
13  battering one another we consider that as being a rather
14  significant psychological trauma which may have impacted on
15  this child's mind, the insecurity, the terror is naturally
16  significant.

17          And then if we find that even though there was a --
18  an intact home and there was no significant violence but there
19  was sexual molestation, we consider that even more severe,
20  potentially severely so of psychological trauma to the child,
21  especially if it is repeated and even more so if it is
22  accomplished by a member of the family.

23          And finally if a person even if they have had a
24  stable home and they have grown psychologically family strong
25  and at a certain point they are a victim, a victim of rape,

Apolito - Direct                                    13

1    this by itself can produce tremendous psychological distress,

2    and mental illness, especially the one that we are going to

3    talk about later.

4            What may be also very unusual and traumatic in the --

5    for the mind of any person, adult or child, especially a

6    younger person, if this person is kidnapped.  I think we all

7    remember what some well known people, you know, who came into

8    the media like Patricia Hearst who was kidnapped and the

9    psychological trauma that she suffered, and of course we have

10   not heard how much she recovered, whether she never did this

11   frankly I do not know.

12           But now if one of these traumas that I have

13   enumerated can be sufficient enough to produce a mental illness

14   in a person or at least to be an important factor in the

15   development of a mental illness in a person.

16           In this case we have all of them.  This -- Ms.

17   Farthing was subjected to all these traumas; broken home,

18   family violence, twice kidnapped, once by the mother, once by

19   the father, sexually molested by cousins and father, and

20   finally raped.

21           Now, this -- anybody who examined Ms. Farthing should

22   take this -- all these traumas into account, especially because

23   the results of these traumas did produce symptoms which are

24   characteristic of a very specific form of mental illness which

25   is in our books of clinical psychiatry in our diagnostic

1   manuals.  Experiences of the sort I have recounted, if the

2   child is not very vulnerable usually will lead to the

3   development of either post-traumatic stress disorder,

4   borderline personality disorder which was classified at one

5   time as being part of the schizophrenia so -- but it's milder,

6   or disassociative disorders.  And you may have heard of the one

7   that's been in the media a lot, multiple personality disorder.

8            In -- in this -- in the case of Ms. Farthing she

9   developed a post-traumatic stress disorder as a consequence of

10  these traumas.  Now this post-traumatic stress disorder used to

11  be recognized only among soldiers who were exposed to the

12  terror of war. And it used to be -- this condition used to be

13  known as battle fatigue.  It was found out through studies that

14  any experience which include fright, terror, a threat to one's

15  psychological or physical integrity or life can produce this --

16  this disorder.

17           And the main symptoms of this disorder were quite

18  clearly enunciated by -- told to us by Ms. Farthing.  A state

19  of numbness is one of the main symptoms and Ms. Farthing told

20  me that she had felt numb, she had felt dead.  And she had been

21  using a great deal of drugs starting with alcohol and all of

22  others.  But what she -- apparently she particularly liked was

23  the LSD, because LSD brought her back to life like.  And I am

24  far from being in favor of using drugs, but in this case most

25  likely Ms. Farthing did something very wrong by using drugs and

1    alcohol and LSD, but most likely these drugs and alcohol saved

2    her from committing suicide or becoming psychotic or in

3    becoming a criminal.  And instead she struggled with this sense

4    of numbness, with a sense of deadness which she experienced not

5    only in her awake life, but she also experienced in her dreams

6    because these repetitive dreams are also very much part of the

7    -- this post-traumatic stress disorder where scenes of the

8    traumas, either concretely or disguised, you know, I really --

9    are you sure he lived.  And she had these repetitive violent

10   dreams.  And also a very repetitive dream which reoccurred

11   where she was falling and people say she's dead, you know,

12   she's dead; but she felt that.

13           The insomnia is also a very typical symptom of this

14   condition.  And the hyper-vigilance we call it, the state of

15   anxiety where any change in the environment, especially if this

16   change reminds the person of -- in some way of the traumas they

17   have suffered in the past that would make them jump or react --

18   overreact like she did when this teacher of hers touched her in

19   the arm and she went berserk and made threats which were very

20   inappropriate and she was suspended or ejected from school.

21           Of course we -- we do know that some of these people

22   have been exposed to all these traumas may become -- become

23   what we call psychopaths, become criminals which was not the

24   case in -- of Ms. Farthing because we know that before this

25   present -- instant offenses she had never been involved in any

1  criminal behavior unless you want to consider that threat to

2  the teacher, you know, as her only previous offense.

3           Now it is rather common that a person who is

4  suffering from a condition, an illness which post-traumatic

5  stress disorder, is faced with a -- a traumatic situation like

6  she was when she was taken to the first offense, to Mr.

7  Hippman's house, that people with her condition, you may call

8  it space out, but we say that they go into a disassociative

9  state.

10          Now a disassociative state is a -- I could call it --

11 define it for you as the scrambling of the ego.  We --

12 individuals, we function as a unit which includes our

13 consciousness, our identify, ourselves, our memory of what we

14 have been and our perception of the environmental around us.

15 And when all this -- our mind, this functioning as an

16 integrated unit, then we see to a certain extent the reality as

17 it is and we relate our identify, what we are, to that reality

18 and we act accordingly.  And then we are known as acting with

19 knowledge and with our judgment and we are then responsible for

20 what we are doing because we knew what the reality was an we

21 acted accordingly.

22          In this case it's quite apparent that Ms. Farthing

23 went into this -- this disassociative state where her sense of

24 reality and her ability to deal with that reality as she

25 usually would was not there.  She -- in fact she told Dr.

1   Simring that she -- even though she was told by Ms. Demolena

2   that they were going rob a couple of rich coke heads, that she

3   really didn't take her seriously.  She -- she told Dr. Simring

4   I never thought that normal people would rob other people.

5        Q.   Doctor, who -- who -- just because the jury doesn't

6   know, who is Dr. Simring?

7   A.   Well Dr. Simring is -- I'm sorry, that's -- I stand

8   corrected.  Dr. Simring is the psychiatrist who examined Ms.

9   Farthing for the Prosecutor's Office.

10       Q.   And you had an opportunity subsequent to your report

11  to review his report, is that correct?

12  A.   Yes.

13       Q.   And you're now narrating what Ms. Farthing told him,

14  is that correct?

15  A.   I'm sorry?

16       Q.   You're now telling the jury what Ms. Farthing told

17  Dr. Simring, is that correct?

18  A.   Yes.

19       Q.   Okay.

20  A.   Yeah.

21       Q.   I'm sorry, Doctor, I just --

22  A.   Okay.  And the -- he also -- she also said -- she also

23  narrated this -- these events, not later, not as one who had

24  been really part and participant of this scene, but as she were

25  recounting some scenes from movies, in a dreamy like, confused

1    state.   She had no clear cut recollection of the sequence and

2    nature of events.

3              So it was on the basis of this historical and

4    clinical data that I concluded that Ms. Farthing was -- had

5    been suffering from a post-traumatic stress disorder which was

6    based on very severe, repeated traumas which she suffered and

7    she couldn't be invulnerable to all this traumas. We do see the

8    -- superman or superwoman on T.V. where they are shot at and

9    the bullets you know, bounce off of their skin, but we -- you

10   know, things are not really that invulnerable, especially

11   children.   And that under the impact of this traumatic scenes

12   to which she was led and exposed she did space out, she did go

13   into a disassociative state.   And she was in a state of -- of

14   course additionally she continued to take drugs and alcohol and

15   she was intoxicated.   And so the part of her participation to

16   these offenses was undoubtedly in a state of diminished

17   capacity. And she was really manipulated and handled and

18   directed almost -- well of course Christmas is coming and you

19   will see a number of puppets -- animated puppets in the windows

20   of the stores and I had this kind of image of Ms. Farthing

21   going through this -- through these offenses, in that kind of a

22   state.

23        Q.   Now, Doctor, you had mentioned Dr. Simring's report.

24   A.   Yes.

25        Q.   Now you've reviewed Dr. Simring's report?

Apolito - Direct                                    19

1    A.    Yes, I did.

2          Q.    And have you reviewed the conclusions in his report?

3    A.    Yes.

4          Q.    And do you agree with those conclusions?

5    A.    No, I strongly disagree because really Dr. Simring -- Dr.

6    Simring's reports -- Simring's report frankly reads more like a

7    lawyer's brief then a doctor's, especially a psychiatrist's

8    report.

9          Q.    What were Dr. Simring's conclusions?

10   A.    Well Dr. Simring -- Dr. Simring did not --

11         MS. BAGLIVI:   Judge, I would object to him giving Dr.

12   Simring's conclusions and report.  I mean if he relied on it or

13   disagree with it he can say how he disagreed, but it's

14   objection -- I object to him going through and reading Dr.

15   Simring's report and conclusions.

16         MR. WEICHSEL:   Well, judge, I don't see how he can

17   testify that he disagreed with the report unless the jury

18   determines what Dr. -- or unless he testifies what Dr.

19   Simring's conclusions were and how he differs from them.

20         THE WITNESS:   Well I -- I --

21         THE COURT:   One minute, Doctor, it's my turn now.

22         THE WITNESS:   Oh, sure.

23         THE COURT:   The jury is going to have the benefit of

24   Dr. Simring testifying, is that correct?

25         MS. BAGLIVI:   Correct.

1          THE COURT:  All right, Dr. Simring will testify as to

2    his findings and his report is here, right? And you reviewed

3    his report?

4          THE WITNESS:  Yes, I did.

5          THE COURT:  I'm going to allow him to and let the

6    jury, as long as they understand that this is a report by --

7    that you will hear the testimony of Dr. Simring who will be

8    testifying in this court on behalf of the State.  It's called a

9    rebuttal and I will give Dr. Apolito an opportunity to respond

10   to this, that's all.

11         MR. WEICHSEL:  Okay.  Thank you.

12   BY MR. WEICHSEL:

13     Q.   Doctor --

14         THE COURT:  As long as the jury knows that's --

15   that's -- and that you have to ultimately come to a conclusion

16   which I said to you, these are the experts. They will give you

17   their benefit of their experience and their training and their

18   interpretation.  Ultimately you are the ones who decide the

19   issues in the case.  All right?  Go ahead.

20   BY MR. WEICHSEL:

21     Q.   Dr. Apolito, you may answer the question.  What --

22   what are Dr. Simring's conclusions?

23   A.   Well his conclusions were -- did not include any critique

24   of any of the -- of any of these events and severe

25   psychological traumas which I have enumerated. And I also take

1   objection to the summary way in which he disposed of my reports

2   and the other mental health professionals' reports.

3        He stated that she -- he did enumerate these

4   historical events which I also enumerated, but he -- if he

5   believed that these traumatic events were manufactured, that

6   they were not true, then he should have said so.  He did not

7   say so, so apparently he believed that they were -- that they

8   had actually taken place.  And he did not offer any reason why

9   he would discount them completely and claim that they had been

10  -- even though he himself said that Ms. Farthing narrated the

11  events not as though she had been part of it, of them, but as

12  though they were coming out of some movie scenes, which means

13  that even at a distance, sometime later after she had read the

14  discoveries and she knew at least from the discoveries what she

15  was supposed to have done, those facts still sounded unreal to

16  her. And Dr. Simring is an astute physician, he understood --

17  he had the perception of this -- the fact that these facts

18  still sounded -- were perceived as being unreal, you know, by

19  Ms. Farthing yet he made nothing of that.  And he says, "I do

20  not believe that any of them have much to do with the issue of

21  criminal responsibility."  In order to make such a responsible

22  statement -- such a statement, such a heavily, so important a

23  conclusion I mean you have to say why, you have to -- why you

24  dismiss all these traumas, why you dismiss all the symptoms

25  which Ms. Farthing reported, and even if he did not get them

1   from Ms. Farthing directly he had read my report and Dr.

2   Kleinman's report, and he did not dismiss our findings.  And he

3   concluded that our conclusions were dictated not by our

4   scientific knowledge, our clinical discipline, and our critical

5   minds, but he said my colleagues sympathetic attempts to

6   portray Jamie Farthing as the victim rather then the

7   perpetrator -- we never did portray Ms. Farthing as the victim

8   except as a follower of this peer.  "Grotesquely distort the

9   reality of her brutal crime"; and frankly I take objection to

10  this because I think that we should have a little bit more

11  respect for each other and this grotesquely distort just you

12  know, bothers me.  I don't think that this is proper.

13          And his diagnosis is -- his conclusion is that Ms.

14  Farthing was fully knowledgeable of these acts that she was

15  involved in and that she was acting on her own even though he

16  does admit that she -- her personality is characterized by

17  dependency and immaturity.  He makes -- he portrays her as

18  being decisive, independently acting with purpose and

19  knowledge, and he makes a diagnosis of addiction to drugs and

20  alcohol which we know. And then personality disorder not

21  otherwise specified.  Now a personality disorder not otherwise

22  specified is a diagnosis which we should not make when it comes

23  to such an important issue as criminal responsibility. And if

24  we decide that this person has a personality disorder  which we

25  cannot quite define we should again specify, analyze what we

1    see which leads us to make a diagnosis of simple, you know,

2    personality disorder and what makes us unable to define this

3    personality disorder.

4          Q.    Now, Doctor, did -- did you find this personality

5    disorder or did you find something else?

6    A.    I found a -- something which I already -- illness which I

7    already mentioned, described, which is post-traumatic stress

8    disorder which had been pre-existing and of course the abuse

9    and dependency on drugs and alcohol and the -- then a

10   disassociative disorder at the time of -- which was caused by

11   the impact of these crimes to which she was exposed.

12         Q.    Now, Doctor, as a result of the findings that you

13   made, the post-traumatic stress disorder, the dependency, the

14   disassociation, did you render an opinion as to Jamie

15   Farthing's capacity to either purposely or knowingly commit the

16   crime of murder?

17   A.    Well I -- naturally I render my opinion with the humility

18   that comes from my experience, that I'm not 100% certain, but

19   within reasonable medical certainty I believe that Ms. Farthing

20   was in a state of diminished mental capacity at the time that

21   she participated in these offenses.

22         Q.    Okay.   Does -- does that go to the murder or does it

23   go to all the offenses, Doctor?

24   A.    To all the events.

25         Q.    Okay.   That -- that she could not have the state of

1   mind of either purposeful or knowing?

2   A.    Yes.

3         MS. BAGLIVI:  Judge, objection, it's a leading

4   question.

5         MR. WEICHSEL:  I'm just rephrasing --

6         MS. BAGLIVI:  Well, judge, that's not what the doctor

7   testified to, he said diminished capacity.

8         THE COURT:  That's an issue for the jury to decide,

9   counsel.  The question you asked is directly a jury call.  Now

10  the expert is asked to assist the jury in making that call and

11  he's made his determination that in his opinion that she

12  suffered from diminished mental capacity to all the offenses.

13  I sustain the objection.

14        THE WITNESS:  Actually if I may --

15        THE COURT:  There's no question now.

16        THE WITNESS:  Okay, sorry, Your Honor.

17  BY MR. WEICHSEL:

18    Q.    Do you need to further explain your opinion on

19  diminished capacity, Doctor?

20  A.    Well I -- when I --

21        MS. BAGLIVI:  Judge, I just made that objection.

22  That's the same -- it's the same question.

23        THE COURT:  No, it's not, go ahead.

24        MR. WEICHSEL:  No, it's not.

25        THE WITNESS:  Well what -- what I said in my report,

1    and I'm sorry I didn't refresh my mind enough, and I still

2    abide by that, that personally I believe that the degree of Ms.

3    Farthing's mental impairment really reaches the degree of total

4    incapacity to -- to be responsible, to act responsibly and

5    knowingly and purposely, but I am fully also aware of the fact

6    that being that she was not actually psychotic in the sense

7    that she was -- that she was hallucinating, that she was

8    delusional, that she had a thought -- that she was incoherent,

9    so I'm aware of the fact that this total incapacity cannot be

10   easily proved.  And so I -- but I do believe that a state of

11   diminished capacity can be amply proved by the data which are

12   available, both historically and from our clinical examination.

13   And this is my honest -- honest expression of my -- of my

14   clinical judgment and my appreciation of the reality of the

15   situation.

16           MR. WEICHSEL:  Thank you, Doctor.  I have nothing

17   further.

18           THE COURT:  Ms. Baglivi?

19           MS. BAGLIVI:  Yes.

20   CROSS EXAMINATION BY MS. BAGLIVI:

21       Q.   Doctor, you've put on the front of your report all

22   the different things that you read and digested I assume before

23   you came to these conclusions, is that correct?

24   A.   Yes, ma'am.

25       Q.   Okay.  Did you consider anything else other than what

1   you listed right here?  Other than Dr. Simring's report and the

2   other mental health reports?

3   A.   I'm sorry, I don't know what you're referring to.

4        Q.   Okay.  Let me ask you, did you -- you've mentioned

5   this incident about the teacher.  Did you have the police

6   report in that case?

7   A.   The police report, the case of the teacher's incident?

8        Q.   The teacher's incident that you mentioned previously

9   where she claims she told you she was grabbed by the arm and

10  that she threatened this teacher.  Did you have the police

11  report?

12  A.   I do not remember viewing that, a police report.  I don't

13  even -- I don't think I ever read it, no.

14       Q.   Okay.  Okay, so you got all of your information

15  regarding that incident from the defendant, is that correct?

16  A.   Yes.

17       Q.   Okay.  Wouldn't it have been helpful to you to have

18  the police report in that matter?

19  A.   I'm sure, yes.

20       Q.   Okay.  Sir, did you also have any of her school

21  records?

22  A.   I do not recollect.

23       Q.   Okay.  And again, sir, would that have been helpful

24  to you in reaching your conclusions, looking at her school

25  records when she was a juvenile?

1    A.    I am not sure that it would have unless there were some

2    incidents which did not -- were not -- not agree with this

3    presentation that I have made on the basis that I received;

4    frankly I don't know.

5         Q.    All right, so then if you don't have them you don't

6    know what's in them, correct?

7    A.    Obviously, yes.

8         Q.    Okay.  Now, sir, did you have with you any of the

9    jail records of Jamie Farthing for the past two years?

10   A.    Yes.

11        Q.    Okay.  Did you review those?

12   A.    Yes.

13        Q.    And did you rely on those -- did you consider them I

14   should say in coming to your conclusions?

15   A.    Well I must specify that I received a copy of those

16   records after I wrote my report --

17        Q.    Okay.

18   A.    -- and after I made my conclusions.

19        Q.    Sure.  Now, Doctor, after reading those jail records

20   and reports would you change your opinion in any way?

21   A.    No.

22        Q.    Okay.  Now, sir, did you have the records from the

23   Department of Human Services in Georgia?  Did you consider

24   those?

25   A.    Which -- I believe I reviewed those, of course I don't

1   know exactly what you are referring to and maybe I should ask

2   Mr. Weichsel whether the document --

3           THE COURT:  Why don't you show the Doctor what you're

4   referring to?

5           MS. BAGLIVI:  Sure.

6           THE COURT:  Just let us -- look at it; do you recall

7   seeing that, Doctor?

8           THE WITNESS:  Yes, I reviewed this.

9   BY MS. BAGLIVI:

10      Q.   Okay.  And did you consider that in coming to your

11  conclusion?

12          THE COURT:  Well does the jury know what it is?

13  BY MS. BAGLIVI:

14      Q.   Okay, Doctor, are those the Department of Human

15  Services records from Georgia?

16  A.   Yes.

17      Q.   Okay.

18          THE COURT:  Okay.

19  BY MS. BAGLIVI:

20      Q.   Did you consider those reports in coming to any of

21  your conclusions?

22  A.   Again, I must remind you that I reviewed this only

23  recently.

24      Q.   Okay.

25  A.   After I -- I rendered my report.

1    Q.    I understand that, Doctor.  Now after you rendered

2   your report and rendered your conclusions and you reviewed

3   those, does that in any way change your opinion?

4   A.    No.

5    Q.    Okay.

6   A.    No.

7    Q.    Thank you. Sir, did you have the court records from

8   the divorce of Loopey Anderson and Paul Farthing, her parents?

9   Did you have any of those court records dealing with the issue

10  of child custody and divorce?

11  A.    I don't believe so.

12   Q.    Okay.  Doctor, would they have been helpful to you in

13  coming to your conclusions in this case?

14  A.    Naturally if they did not concur with the information that

15  I did gather they would, yes.

16   Q.    So would it be fair to say that it would have been --

17  would have been a good idea to look at them if you access -- if

18  you had them?

19  A.    I'm sure that they would have been, yes.

20   Q.    Okay.  Well did you request them, Doctor?

21  A.    Pardon?

22   Q.    Did you request to get these documents?

23  A.    I did not -- see Mr. Weichsel showed me this mountain of

24  records that he had in his office and he asked me to go through

25  them and see what might be meaningful to me in formulating my

1    opinion.  And I did my best in selecting out of that mountain

2    of records. And whether I missed those or not I do not know.

3         Q.   Okay.  Doctor, did you also have a letter or did you

4    rely on or consider a letter that Jamie Farthing wrote from the

5    jail to a -- another -- a person by the name of Greg?

6    A.   Yes.

7         Q.   Now again, sir, did you read that before or after you

8    rendered your conclusions?

9    A.   After I rendered my conclusions.

10        Q.   Okay.  And, Doctor, in reading that letter did that

11   change your conclusion or opinion at all?

12   A.   No.

13        Q.   Okay.  Now, sir, you told us what you've considered

14   and I take it you also -- you interviewed this defendant, is

15   that correct?

16   A.   Yes, I did.

17        Q.   How long did your interview of this defendant take?

18   A.   It was about two hours.

19        Q.   Okay.  At the Bergen County Jail?

20   A.   Yes.

21        Q.   Okay.  And based on that information and the

22   information that you've considered you rendered a decision in

23   this case, is that correct?

24   A.   Yes.

25        Q.   Okay.  Now, sir, defendant told you her remembrance

1  of the incidents in this case, the crimes?

2  A.   Yes.

3       Q.   Okay.  And, Doctor, did you accept as true everything

4  she had told you?

5  A.   Well we -- I did primarily because Ms. Farthing had

6  volunteered a confession to the police and she -- and I

7  correlated the information that she had -- that she had given

8  me with the confession she made to the police which were

9  voluntary and I assumed that they were mostly to the best --

10 given to the best of her knowledge.  Frankly I am a man of this

11 world and with a great deal of experience and I do not think

12 that any of us are saints and I don't think that any of us is

13 perfect and we either consciously or unconsciously do tend to

14 color the truth which may be -- put things in our favor.  So I

15 am not here to state that I am sure that Ms. Farthing's

16 communication to the police or to me or to Dr. Simring were you

17 know, 100% accurate, 100% truthful.  This is -- this was have

18 to consider as a margin, you know, of doubt.

19      Q.   A margin of doubt?

20 A.   Yeah.

21      Q.   So, Doctor, you say that most people tend to color

22 the truth?

23 A.   Yes.

24      Q.   Is that what you're saying?  Okay.

25 A.   That includes me and I'm sure everybody.

1    Q.   Okay.  Doctor, wouldn't you agree with me though that

2    someone charged with murder and armed robbery and kidnapping

3    has even more of a reason to color the truth?

4    A.   Sure.

5    Q.   Okay.  Now, sir, you say you take at face value but

6    you understand that there's a margin of error with what she's

7    telling you.  Did you compare her statement to the police with

8    what she told you?

9    A.   Yes.

10   Q.   Okay.  Did you compare her statement to the police,

11   what she told you and then compared that to the statements of

12   the other defendants in this case?

13   A.   Oh, yes.

14   Q.   Okay.  And, Doctor, did you find any major

15   discrepancies between what you saw in those other statements ad

16   then what she told you?

17   A.   Not to my recollection. As a matter of fact I found quite

18   a bit of confirmation and I could tell you a couple of examples

19   if you want -- wish me to.

20   Q.   Okay.  If you could, Doctor, give us a couple of

21   those confirmations that you found.

22   A.   Well I remember James -- Christopher James telling the

23   police that when shortly after he and Ms. Demolena met Ms.

24   Farthing and they got together and they were trying to -- to

25   tell --  to plan what they were going to do in New York and

1    they were trying to convince Ms. Farthing to go with them, he

2    said that yes, they did talk about these plans, but it was

3    quite understood that she was -- that she really, Ms. Farthing,

4    was not really part of the plans. So they were going to take

5    her along but they were not counting on her as being a -- an

6    actual aid, an actual instrument in accomplishing what they

7    were going to accomplish.

8            Q.   Okay. Doctor, I'm going to show you Mr. Thomas

9    Christopher James' statement, and I'm going to ask you, could

10   you please show me where you see any of that like you just told

11   us?

12               MR. WEICHSEL:  Judge, objection, Your Honor.  The

13   doctor is going to go through a 50 or 60 page statement?

14               THE COURT:  Well it's not so much where he says it,

15   it's he -- he can look at it and what he based that on in the

16   statement.  Can he show it in the statement without having to

17   go through -- are we going to open that whole door up?

18               MS. BAGLIVI:  Judge, --

19               MR. WEICHSEL:  Yeah, I -- I'm concerned.

20               MS. BAGLIVI:  The doctor said it and, judge, I have a

21   right to cross him on.

22               THE WITNESS:  I'm sorry I didn't bring my --

23               MS. BAGLIVI:  I have --

24               THE WITNESS:  -- my copy -- no, because I had

25   underlined -- because I had underlined the -- the passages in

Apolito - Cross/Colloquy                    34

1  this reports which I relied on.

2  BY MS. BAGLIVI:

3      Q.   No problem.

4  A.   So if you want me to find that passage I will.   The court

5  and the jury will have to -- may have to be patient.

6          MS. BAGLIVI:  Judge, I'm showing him Thomas

7  Christopher James' transcribed statement.

8          THE COURT:  I never really responded to the

9  objection.

10         MS. BAGLIVI:  I'm sorry?

11         THE COURT:  I'm going to ask the jury to step

12 downstairs and I'm going to -- in fact I'll let the jury go for

13 coffee right now.  Take a 15 minute break.  Don't discuss the

14 case amongst yourselves.

15             (PAUSE - THE JURY LEAVES THE COURTROOM)

16         THE WITNESS:  I found it.  I'm rather quick, Your

17 Honor.

18         THE COURT:  Okay.  My concern is that I don't know

19 the exact number of pages in that statement by Mr. James.  How

20 many pages is it?

21         MS. BAGLIVI:  Judge, can we have the doctor step

22 outside?  I'd like to make my argument.  I -- I don't want to -

23 -

24         THE COURT:  I just asked how many pages.

25         MS. BAGLIVI:  I'm sorry?  I don't know, he has it.

1          THE COURT:  Okay.

2          MR. WEICHSEL:  Judge --

3          MS. BAGLIVI:  Doctor, how many pages are in that

4    statement?

5          MR. WEICHSEL:  Ninety one, judge.

6          THE COURT:  All right, that's my concern.  My concern

7    is that when we -- the State --

8          THE WITNESS:  Ninety one.

9          MS. BAGLIVI:  Okay.

10         THE COURT:  When the State opens the question and it

11   brings it onto the table and then asks the witness to find

12   where it is in the 91 page statement --

13         MS. BAGLIVI:  Okay.

14         THE COURT:  -- and then we spend all the time -- I'm

15   concerned with time.

16         MS. BAGLIVI:  Okay.  That's not a problem because all

17   of the things that I picked out, I have the page numbers of

18   that statement of where they are.

19         THE WITNESS:  Well --

20         MR. WEICHSEL:  No.

21         MS. BAGLIVI:  See, judge, I don't want to get into it

22   with the witness on the stand, this argument.

23         THE COURT:  I'm not getting into anything.  All I'm

24   telling you is my concern and --

25         MS. BAGLIVI:  Right, and I have the page numbers.

1        THE COURT:  I'm not asking for any response, Ms.

2  Baglivi.  Please stand back there.  You're on the attack,

3  you're on the attack here, you're on the attack here.  Just

4  stand back there, I know you're excited.  Now, all I'm

5  expressing is my concern.  My concern is that when we drop

6  something on a witness and give him a 91 page document and ask

7  him to pick out where he -- and then every -- the trial stops.

8        MS. BAGLIVI:  Okay.

9        THE COURT:  The jury sits there and the witness has

10  to then go through, that's my concern, I want to avoid that,

11  that's my concern.  He found it, it's a moot -- it's a moot

12  issue on this one.

13        MS. BAGLIVI:  Sure.

14        THE COURT:  But that's -- that's why I'm concerned

15  and I don't want to hear anymore, we're taking a break.

16        MS. BAGLIVI:  I just want to -- all right.

17        THE COURT:  All right?  We will continue when we come

18  back.

19        MR. WEICHSEL:  Judge, I have another concern which is

20  the prosecutor opening the door to Thomas Christopher James'

21  statement which, judge, I'm not -- I'm not able to cross

22  examine Thomas Christopher James, judge.  She's getting

23  something in through the back door that she couldn't get in

24  through the front door.

25        MS. BAGLIVI:  Not true.

1          THE COURT:  No she's not, not at all.  No, Mr.

2    Weichsel, that's not what's happened at all.  She asked -- the

3    prosecution asked the witness did he review these particular

4    statements, and he has.  He says this in his -- in his --

5          MR. WEICHSEL:  In his report.

6          THE COURT:  -- in his report, that these are the

7    things he reported.  Now even with their statements, did he see

8    any inconsistencies; I believe that's what it was.  That's not

9    getting anything in the back door.

10          MR. WEICHSEL:  Okay.

11          THE COURT:  It's very limited.

12          MR. WEICHSEL:  Well I just want to make sure it stays

13    limited, judge.

14          THE COURT:  Yeah, it will be limited.

15          THE COURT:  All right, we'll take -- a quarter to

16    eleven, all right?

17                         (RECESS)

18                    (CONFERENCE IN CHAMBERS WITH

19              JUROR NUMBER ONE, THE COURT AND COUNSEL)

20          THE COURT:  Now it's on, see?

21          THE COURT CLERK:  Okay.

22          THE COURT:  Okay, now you see you're on the screen.

23    My -- all right, let the record reflect that we have both

24    attorneys here and juror number one.  My -- one of my officers

25    indicated that you said to them that there was some problem in

Conference in Chambers                                38

1   the jury room?  What is that?

2          JUROR NUMBER ONE:  Well we took an oath to listen to

3   all the evidence and listen to the witnesses.

4          THE COURT:  Yeah?

5          JUROR NUMBER ONE:  And it's just a little upsetting -

6   - the whole thing is upsetting but when we're trying to make a

7   decision and I don't find anything humorous about any of this.

8   And I -- and just sometimes when -- there's just too much

9   laughter regarding when we come back to the jury room, that's

10  all, with regards to a witness or whatever.

11         THE COURT:  Are there any discussions about the case?

12         JUROR NUMBER ONE:  Nothing -- nobody talks about the

13  facts, it's just --

14         THE COURT:  Okay, so --

15         JUROR NUMBER ONE:  I don't know, it's just --

16         THE COURT:  Now are you saying you're having a

17  difficult time with the -- the case itself, the nature of the

18  case, is that what it is?

19         JUROR NUMBER ONE:  No, no, I didn't mean to say that

20  at all.  We're just supposed to be listening very carefully.

21         THE COURT:  Are you listening very carefully?

22         JUROR NUMBER ONE:  Yes.

23         THE COURT:  All right.

24         JUROR NUMBER ONE:  In the courtroom it's not a

25  problem.

1          THE COURT:  Okay.  is there any indication that

2     nobody else is listening carefully?

3          JUROR NUMBER ONE:  No, that's not why I'm here, to

4     turn someone in or anything like that, that's not why I'm here.

5     It's just it gets loud and boisterous and --

6          THE COURT:  It gets loud and boisterous, does it --

7          JUROR NUMBER ONE:  In the jury room.

8          THE COURT:  In the jury room?  Is it matters

9     concerning the case that's causing the loudness and boisterous?

10         JUROR NUMBER ONE:  No, I guess it's release of

11    tension -- release of tension sometimes.

12         THE COURT:  Yes, now everybody deals with -- with

13    tension differently, all right?  Now is that what's happening

14    here?  You understand that concept?

15         JUROR NUMBER ONE:  Yes, I understand that concept.

16         THE COURT:  All right.

17         JUROR NUMBER ONE:  And I guess there's nothing we can

18    do about the situation in the jury room.

19         THE COURT:  All right, sometimes even -- even in the

20    courtroom there's been some levity because of the -- and that

21    happens because of the -- and that happens, it's -- in my

22    opinion it happens because of the -- the seriousness of the

23    issues that we deal with every -- we deal with this every day

24    and it becomes such that it's one in which tension has to be

25    broken.  Now --

1          JUROR NUMBER ONE:  Okay.

2          THE COURT:  -- the jurors, 14 of you are introduced

3    to a world that you haven't been in before.

4          JUROR NUMBER ONE:  That's right.

5          THE COURT:  And everybody deals with it differently.

6    Is that what's happening or is it -- see my concern is that is

7    there a problem in the jury room where it's -- where it's

8    interfering with the case?

9          JUROR NUMBER ONE:  No, but perhaps a reminder that

10   listening to psychologists and psychiatrists was part of the

11   oath we took, that we would listen and listen to the facts and

12   there's -- there's nothing humorous about any of it, the facts,

13   and what they're talking about and their opinions and their

14   expert opinions et cetera.

15         THE COURT:  Well I can only say that to the jury if

16   that's what's happening.

17         JUROR NUMBER ONE:  Can you say that again?

18         THE COURT:  Say --

19         JUROR NUMBER ONE:  That the psychologists and

20   psychiatrists -- when you interviewed us we're suppose to

21   listen and -- to the point that they're experts.

22         THE COURT:  Is it your impression and is it your

23   concern that they are not listening?

24         JUROR NUMBER ONE:  No.

25         THE COURT:  All right.  Is there discussion in the

Conference in Chambers                          41

1   jury room as regarding the testimony?

2              JUROR NUMBER ONE:  No, specifically it's just making

3   fun of a witness's --

4              THE COURT:  Demeanor?

5              JUROR NUMBER ONE:  Yes, just -- you know.

6              THE COURT:  You mean -- are you talking about the

7   expert witnesses?

8              JUROR NUMBER ONE:  Yes, and that has nothing -- and

9   it's -- sometimes I guess --

10             THE COURT:  And that -- is that your concern you're

11   saying, that's your concern, that they're not -- well I --

12             JUROR NUMBER ONE:  No, I'm not concerned about what

13   anybody else decides and how they're dealing with this.  I know

14   I have to deal with it. And if -- I don't think -- I think just

15   a little reminder from you would be -- I remember something

16   that's said in the courtroom and I look to you to make sure

17   that you know, this is part of the case because it gets --

18   there's two sides going on here and we're supposed to be

19   weighing it.

20             THE COURT:  All right, you're asking me to say

21   something to the -- to the jury.  I have to know what it is

22   that's the problem, it has to be said.

23             JUROR NUMBER ONE:  I'm sorry I even brought this up.

24             THE COURT:  No.  No, if it's a concern for you -- can

25   you go on?

1          JUROR NUMBER ONE:  Of course, absolutely.

2          THE COURT:  Would you -- would you want to be

3   excused?

4          JUROR NUMBER ONE:  No.

5          THE COURT:  Okay.

6          JUROR NUMBER ONE:  I --

7          THE COURT:  All right, I have to ask you that.

8          JUROR NUMBER ONE:  No.  I mean am I going to be

9   excused because of this?

10         THE COURT:  No, no, I'm asking whether you want to be

11  excused, that's all.

12         JUROR NUMBER ONE:  No, what happens, at the end of

13  the day and you remind us or at various times after a break and

14  before a break -- your reminders are very important to me.

15         THE COURT:  Yes, and you follow them?

16         JUROR NUMBER ONE:  Yes.

17         THE COURT:  All right.  And you're concerned that

18  some of the jurors are not following those reminders not to

19  discuss the case?

20         JUROR NUMBER ONE:  No, that's not it.

21         THE COURT:  What else do I remind them of?

22         JUROR NUMBER ONE:  The orig -- the original

23  discussion was that we understand that we're going to be

24  hearing from expert witnesses regarding -- or from the

25  psychiatrist and psychologist, and do we have any opinion one

1   way or another on their testimony up front. And I don't know, I

2   just find that --

3           THE COURT:  I see.

4           JUROR NUMBER ONE:  That they are part of --

5           THE COURT:  They're part of the case.

6           JUROR NUMBER ONE:  They're part of this case, yes.

7           THE COURT:  Okay.  All right, I'm going to ask you to

8   go back to the jury room.  Do not discuss this with any of the

9   other -- other jurors, okay?  And then I'll decide what I want

10  to do with it, okay?  I thank you for bringing it to my

11  attention.  Don't get upset now.  You were especially

12  concerned.  We have to make a record of a juror's concern, so

13  it's all subject to review at the end of the case.

14          JUROR NUMBER ONE:  Okay.

15          THE COURT:  Okay?  Thank you.

16          JUROR NUMBER ONE:  Thank you.

17          THE COURT:  Bye now.  See if my officer -- is my

18  officer out -- outside?  He should escort you back.

19          JUROR NUMBER ONE:  Okay.

20          (JUROR NUMBER LEAVES THE COURT'S CHAMBERS)

21          THE COURT:  All right, we're still on the record.  Do

22  you have any thoughts?

23          MS. BAGLIVI:  No, judge.  She said they're not

24  discussing the case, she doesn't like the fact that people are

25  laughing like you just brought out, you laughed in the

Conference in Chambers                        44

1    courtroom today.  Like you said, it's nervous tension.  She

2    seems to be very serious and I don't think there's anything I

3    mean wrong.  She said that they're -- you know, they're not

4    discussing the case, they're not going into the facts, they're

5    just -- they're too happy for her.

6              MR. WEICHSEL:  Well I take what she said a little bit

7    differently, judge.

8              THE COURT:  Um-hum?

9              MR. WEICHSEL:  Obviously she seemed very conflicted,

10   very torn, and she also seemed wrought in the sense to -- to

11   turn anybody in and kind of torn.  And the impression I got was

12   that she's concerned because other jurors are making fun of the

13   defense mental health experts who have testified. They're

14   joking about them and making fun of them and if that's the case

15   then in a sense you know, jurors who have been told not to

16   prejudge things have prejudged things and if that's the case

17   then the jurors have violated their oath and we're in a

18   mistrial situation.

19             MS. BAGLIVI:  Judge, she never said anybody has

20   prejudged anybody.  I mean hear testimony and of course they're

21   thinking to themselves does this make sense.  That's what

22   they're supposed to be doing when they listen to it.  They

23   don't -- they're not prejudging.  I mean you have to listen to

24   someone and come to your own conclusions and then based on the

25   law you come to a verdict.  I don't -- that's not -- that's not

1    what she's saying and you have to go by what she said, not by

2    what anyone's impression is.  And she said they're not --

3    there's just too much levity.

4            MR. WEICHSEL:  Well she said a little bit more.  She

5    said, you know, they were making -- I think what she said is

6    that they're making fun of the experts.

7            MS. BAGLIVI:  No, they're laughing at an expert's

8    demeanor.

9            MR. WEICHSEL:  Well I think an expert's demeanor --

10           MS. BAGLIVI:  Demeanor has got --

11           THE COURT:  Okay, I don't want you to get into a big

12   colloquy over it.

13           MS. BAGLIVI:  Okay.

14           THE COURT:  You've expressed what your concerns are.

15   My concerns are also that there's a juror who indicates that

16   she feels that the -- what the -- the admonition of the court,

17   that they should keep an open mind until the end of the case

18   and not to prejudge.  She seems to think that there are remarks

19   being made on a levity -- nothing in particular but as to the

20   particular witnesses that are there.  I'm going to call each

21   juror in one at a time and make inquiry as to whether they have

22   been able to follow -- follow what their oath is and do they

23   understand that the -- they are to keep an open mind.

24           MS. BAGLIVI:  You wouldn't just do that in an open

25   courtroom, an admonishment to them?  You know, say the same

1    things but say it all -- to all of them instead of calling them

2    in one by one?

3                    THE COURT:  What is your thought on that, Mr. --

4                    MR. WEICHSEL:  My thought is that you know, merely to

5    -- to go into open court and admonish them, I -- given what

6    this juror said is probably not sufficient.  In fact if there

7    is --

8                    THE COURT:  Not call them in one at a time?

9                    MR. WEICHSEL:  No, I think we should call them in one

10   at a time.

11                   MS. BAGLIVI:  I disagree.  If you're going to tell

12   them individually why can't you tell them --

13                   THE COURT:  You know, I don't want a mistrial, I'll

14   put it right on the record here.  If the defense wants this

15   we're going to go through each one of them and we're going to

16   find out whether they have prejudged this case.  Have they come

17   to a -- have they discussed this with somebody else or have

18   they kept -- have they kept an open mind.  And if we find out

19   that they haven't come with an open mind we'll deal with that.

20   And that's really what the issue is.

21                   This juror indicates that's there's some -- something

22   going on here where they are -- is it just that they're --

23   they're -- they were -- I don't know what it is, what their

24   levity is.  Is it the demeanor of the witnesses or what?  It

25   was very difficult for her to express that.  I just -- I don't

1    know what it is so I'm going to have them come in one at a

2    time.   We -- that was juror number one, so let me get my jury

3    list.

4                              (PAUSE)

5              (JUROR, MR. SEER (PHONETIC) JOINS IN CHAMBERS)

6              THE COURT OFFICER:  Have a seat right there, okay?

7              JUROR, MR. SEER:  Thank you.

8              THE COURT:  I just want to make sure my -- my tape is

9    on.

10             Would you ask Lucie to make sure that the tape is

11   moving upstairs because I'm getting a flashing mark?

12             UNIDENTIFIED:  It's okay.

13             THE COURT:  Is it on?

14             UNIDENTIFIED:  Yes, it's all set.

15             THE COURT:  Thank you.

16             All right, good morning.

17             JUROR, MR. SEER:  Good morning.

18             THE COURT:  I'm just calling you in, I want to ask

19   you a couple questions I'm going to ask of each -- each of the

20   jurors, so it's not just -- I'm not just singling you out.

21             There's been some concern expressed as to the levity

22   in the -- in the jury room with regard to some of the expert

23   witnesses and I just want to ask, do you -- you haven't

24   discussed this case with any other juror?

25             JUROR, MR. SEER:  No, not with anyone.

1          THE COURT:  Okay, and you have -- have you kept an

2    open mind as to this case?

3          JUROR, MR. SEER:  Yes.

4          THE COURT:  Because until I ask you to deliberate,

5    it's only at that time that you should begin to evaluate. And

6    the question also is have you pre -- prejudged any of the

7    mental experts that have been presented?

8          JUROR, MR. SEER:  No, I'll wait until the trial is --

9    until the trial is done.

10          THE COURT:  And the -- and there's another question I

11   have too.  I think when we first started we -- we did ask the

12   jury did they have any problems with psychiatric testimony that

13   will be presented, and you -- and the indicated that I had from

14   each juror was that they would be able to evaluate it --

15          JUROR, MR. SEER:  That's right.

16          THE COURT:  -- and they no preconceived or opinions

17   about psychiatric or psychological testimony.

18          JUROR, MR. SEER:  That's correct.

19          THE COURT:  Now is that the case with you?

20          JUROR, MR. SEER:  As far as I'm concerned, yes.

21          THE COURT:  All right.  And you have no problem

22   continuing?

23          JUROR, MR. SEER:  No.

24          THE COURT:  All right.  All right, I'm going to ask

25   you to return to the jury room, Mr. Scher (phonetic) is it?

1      JUROR, MR. SEER:  Seer.

2      THE COURT:  And do not discussed what I discussed

3  with your here with any of the other jurors at this time, okay?

4      JUROR, MR. SEER:  Yes.

5      THE COURT:  I thank you.

6      JUROR, MR. SEER:  Sure.

7      THE COURT:  All right.

8      (PAUSE - JUROR, MR. SEER, LEAVES CHAMBERS)

9      THE COURT:  Is that sufficient?

10     MS. BAGLIVI:  Yes.

11     MR. WEICHSEL:  Yeah, I think so, judge.

12     THE COURT:  All right.

13     MS. BAGLIVI:  The only thing is, if you ask juror

14  number -- was it the young girl, if she has any reason why she

15  can't continue, if we're going to get into that whole

16  discussion of her job and everything.

17     MR. WEICHSEL:  Juror number four?

18     THE COURT:  No, I'm not going to get into that.

19     MS. BAGLIVI:  Okay, just -- all right, the young

20  girl, the problem that she had brought up --

21     MR. WEICHSEL:  Juror number four.

22     MS. BAGLIVI:  -- because we're going into

23  Thanksgiving?

24     THE COURT:  Yeah, no, she said if it goes into

25  Thanksgiving.

Conference in Chambers                    50

1          MR. WEICHSEL:  I think she meant going past

2  Thanksgiving.

3          MS. BAGLIVI:  Okay.

4          THE COURT:  Yeah. Well I'll ask her about the

5  Thanksgiving, is that a problem with her on coming in on

6  Monday, I understand you can get here on Monday.  We'll bring

7  it out now.

8          MS. BAGLIVI:  Do you think you can charge Monday

9  afternoon?

10          THE COURT:  I'm sure we could.

11          MS. BAGLIVI:  Okay.

12          MR. WEICHSEL:  I'd say -- how long will your

13  summation be?

14          MS. BAGLIVI:  An hour.

15          THE COURT:  Come in.

16          MS. BAGLIVI:  You an hour.  Okay.

17          (PAUSE - JUROR NUMBER THREE JOINS IN CHAMBERS)

18          THE COURT OFFICER:  Juror number three, Your Honor.

19          THE COURT:  Thank you.

20          THE COURT OFFICER:  Sir, you can have a seat right

21  there.

22          JUROR NUMBER THREE:  How you doing?

23          THE COURT:  Just sit down.

24          JUROR NUMBER THREE:  Sure.

25          THE COURT:  Just so you know, we're on the record

 1  here, it's being recorded.

 2              JUROR NUMBER THREE:   Okay.

 3              THE COURT:   It's come to our attention that there's

 4  been some -- not discussion in the court -- in the jury so much

 5  as a certain levity that's going on that's becoming a concern

 6  for some other jurors.

 7              First of all, let me ask you a couple of questions.

 8              JUROR NUMBER THREE:   Sure.

 9              THE COURT:   And I'm going to ask each juror.

10              JUROR NUMBER THREE:

11              THE COURT:   So you're not singled out.

12              JUROR NUMBER THREE:   Okay.

13              THE COURT:   Have you discussed the case with any of

14  the other jurors at all?

15              JUROR NUMBER THREE:   Not really, no.

16              THE COURT:   What do you mean by not really?

17              JUROR NUMBER THREE:   You know, there have been

18  comments back and forth, but nothing strictly about the case.

19  I'd say comments about --

20              THE COURT:   Comments on what?

21              JUROR NUMBER THREE:   Just I guess the -- you know,

22  some of the people in there, their reactions.  Nothing that had

23  to do really with the case that meant anything; stupid

24  comments.

25              THE COURT:   Are there comments on -- with regard to

1   some of the mental health experts that have been presented, as

2   to them?

3            JUROR NUMBER THREE:  I don't think so, no.

4            THE COURT:  All right, you -- you recall that at the

5   time when we started the case that you -- we had indi -- we had

6   asked whether anybody had any opinions as to mental health

7   experts and psychiatrists or psychologists, one fixed opinion?

8            JUROR NUMBER THREE:  Right.

9            THE COURT:  And that we informed you that you would

10  be hearing testimony of experts, psychiatric experts?

11           JUROR NUMBER THREE:  Yeah, I remember that.

12           THE COURT:  And that you would have to make an

13  evaluation of their testimony.

14           JUROR NUMBER THREE:  Right.

15           THE COURT:  Will you -- do you still feel that you

16  can make an evaluation of the testimony --

17           JUROR NUMBER THREE:  Sure.

18           THE COURT:  -- as -- do you still have an open mind?

19           JUROR NUMBER THREE:  Yes.

20           THE COURT:  As to this case?  And you haven't what we

21  would -- I guess the word is prejudged any of the testimony at

22  this time?  You haven't heard the whole case yet?

23           JUROR NUMBER THREE:  No.

24           THE COURT:  Are you still in that position where you

25  have an open mind and you --

1        JUROR NUMBER THREE:  Yes, I do.

2        THE COURT:  All right.  See the seriousness of the

3  charges and the events as I mentioned to some of the other

4  jurors, that we -- we live with this kind -- this is our

5  living, we live with cases like this. But for many of your --

6  for 15 of you or 14 of you this is a -- you've entered into a

7  world that -- many of you have entered into a world that is --

8  is new and --

9        JUROR NUMBER THREE:  Oh, yes.

10        THE COURT:  And it may -- it may -- it may trigger

11  some levity as a tension release and I understand that.

12        JUROR NUMBER THREE:  Right.

13        THE COURT:  And if that's what it is I don't see any

14  problem, but if it's more than that then it's a concern.  Is it

15  more than that, of any --

16        JUROR NUMBER THREE:  No, no.

17        THE COURT:  Okay.  I thank you and you can return --

18  do not discuss anything we discussed in here --

19        JUROR NUMBER THREE:  All right, no, I will not.

20        THE COURT:  -- with any of the other jurors, okay?

21        JUROR NUMBER THREE:  Yes.

22        THE COURT:  Thank you.

23        JUROR NUMBER THREE:  Thank you.

24            (JUROR NUMBER THREE LEAVES CHAMBERS)

25        THE COURT:  Any concerns?

1          MR. WEICHSEL:  Something about stupid comments about

2     some of the witnesses.  I mean --

3          MS. BAGLIVI:  No, he didn't say witnesses, he said

4     people in the courtroom, their reactions.  He never used the

5     word witnesses, he says reactions of people in the courtroom.

6          THE COURT:  I -- I -- for the record I find that not

7     to be any -- any cause for concern.

8                              (PAUSE)

9          THE COURT:  Come in.

10             (JUROR NUMBER FOUR JOINS IN CHAMBERS)

11         THE COURT OFFICER:  Juror four, Your Honor.

12         THE COURT:  Thank you.

13         THE COURT OFFICER:  Have a seat right there.

14         THE COURT:  Hello.

15         JUROR NUMBER FOUR:  Hello.

16         THE COURT:  Sit down.  I'm calling each juror in

17    because I have to ask you some questions.  It's come to our

18    attention that some -- some levity has crept into the jury room

19    -- not in the courtroom so much but -- and it's a concern for

20    some of the jurors and I really want to make sure that each one

21    of your have kept an open mind.  Have you kept an open mind in

22    this case?  You still --

23         JUROR NUMBER FOUR:  Oh, absolutely.

24         THE COURT:  All right. And there seems to be some

25    thought about making fun of the -- or making levity of the

Conference in Chambers                              55

1   health experts that -- is that -- is that's what happening,

2   that have testified?

3                    JUROR NUMBER FOUR:  Actually I -- I was in defense of

4   them.  I have no -- no problem with them at all and how they --

5   how they testify and stuff.

6                    THE COURT:  Yeah.

7                    JUROR NUMBER FOUR:  There may have been some

8   comments.  I have no -- no concern or comment on that.

9                    THE COURT:  All right, you say you were in defense of

10  them. What did you have to defend?

11                   JUROR NUMBER FOUR:  Just -- you know, I mean I guess

12  it was more the accent of one individual and I happen to be

13  from that heritage so to speak and I'm used to that and I --

14                   THE COURT:  Are you referring to Dr. -- Dr. Apolito?

15  Dr. Apolito?

16                   JUROR NUMBER FOUR:  Yeah, I -- I'm used to that.

17                   THE COURT:  Oh, so you're saying the comments are

18  with regard to his accent?

19                   JUROR NUMBER FOUR:  That's -- that's what I recall.

20                   THE COURT:  In trying to understand him and his

21  accent?

22                   JUROR NUMBER FOUR:  Yeah.

23                   THE COURT:  Okay.

24                   JUROR NUMBER FOUR:  That's -- that's what I recall.

25  And I just -- I -- I laugh because I'm -- I'm used to that.

1          THE COURT:  Oh, all right, so when you say you're

2   talking about a defense you're defending someone's comment on

3   the Italian accent?

4          JUROR NUMBER FOUR:  Yeah.

5          THE COURT:  And that was done in -- in levity?

6          JUROR NUMBER FOUR:  I'm not sure I understand that.

7          THE COURT:  Was it done lightheartedly, the person

8   who was -- who commented on it?

9          JUROR NUMBER FOUR:  Yeah, it seemed to have been,

10  yeah.  I kind of walked into it.

11         THE COURT:  All right, but they weren't seriously

12  discussing it, they were just --

13         JUROR NUMBER FOUR:  Oh, absolutely.  Not -- not that

14  I -- in my presence.

15         THE COURT:  All right.  Now the other question I have

16  is where you did take an oath as to the -- and we did ask

17  questions about your ability to evaluate psychological

18  testimony and everybody indicated that they would have -- they

19  have no fixed opinion one way or another, at least one way or

20  another with regard to the psychiatric testimony. And can you

21  keep -- can you keep an open mind and listen to all of this?

22         JUROR NUMBER FOUR:  Sure.

23         THE COURT:  And then come to your conclusion?

24         JUROR NUMBER FOUR:  Um-hum.

25         THE COURT:  And you still have an open mind in this

Conference in Chambers                     57

1   case?

2              JUROR NUMBER FOUR:  Yes, I do.  Yes, I do.

3              THE COURT:  And there's been, as far as you're

4   concerned, no discussion in the -- in the jury room with regard

5   to the case?  I admonish you each night not to discuss the case

6   amongst yourselves.

7              JUROR NUMBER FOUR:  Yeah -- I mean no one's talked

8   about any of the details.  You know, people may have talked

9   about like observations, expressions, things like that, but no

10  one talks about any of the details or -- at least in my

11  presence.

12             THE COURT:  Expressions of whom, the judge?

13  Witnesses?

14             JUROR NUMBER FOUR:  Yeah.

15             THE COURT:  Attorneys, who?

16             JUROR NUMBER FOUR:  Just people in general.

17             THE COURT:  Is there -- is there a great deal of talk

18  about the expressions of people?

19             JUROR NUMBER FOUR:  No, it's really -- again, most

20  people -- I mean everything is pretty much simple, everybody

21  just talks about every day things.  There's not -- there's not

22  been any discussion in my presence -- again, that's all I can

23  speak about -- as far as the case itself.

24             THE COURT:  All right.  Now you had indicated

25  earlier, now that I have you in here, your problem with time.

1  Will it be a problem going into next week, to Monday?

2          JUROR NUMBER FOUR:  I'm going to call our director of

3  human resources, cause I had told her that it could go up -- up

4  until Thanksgiving and she said --

5          THE COURT:  Right.

6          JUROR NUMBER FOUR:  Because I'm still trying to work

7  outside of here, so she said that she would take that into

8  account and try to compensate me accordingly.

9          THE COURT:  Well the schedule the way I see it now is

10  -- is we should finish the defense case today.

11          JUROR NUMBER FOUR:  Okay.

12          THE COURT:  Now -- and it will probably be earlier

13  this afternoon then later.

14          JUROR NUMBER FOUR:  Okay.

15          THE COURT:  And if we didn't have to go through this

16  we might have been able to finish this morning.  Now we will

17  not be gathering here tomorrow until 1:30, so we only have one

18  -- really one afternoon, tomorrow.

19          JUROR NUMBER FOUR:  Oh, okay.

20          THE COURT:  And then we're off Friday and we will

21  then have summations by the counsels on Monday morning and I

22  will charge you with the -- with the law by the afternoon or

23  maybe even the morning.

24          JUROR NUMBER FOUR:  Okay.

25          THE COURT:  And you will have the case Monday to

1  deliberate.  So the case will be over Monday, that's --

2            JUROR NUMBER FOUR:  Okay.

3            THE COURT:  I was really trying this week as I

4  indicated to you to get it all in by Thursday but --

5            JUROR NUMBER FOUR:  Yeah.

6            THE COURT:  -- it was just too -- too hard to press

7  and I don't think it would be healthy for any of us to push it

8  at this point, so we're just going to -- and that's the

9  schedule.  Do you think you can make that?

10           JUROR NUMBER FOUR:  Yeah, like I said, I was going to

11  call her.  In fact I'll -- I'll just go into work tomorrow and

12  I'll --

13           THE COURT:  Well you call her -- yeah, when you tell

14  her tomorrow you tell her that you have to go; in other words,

15  I'm calling the shots, not her.  All right?

16           JUROR NUMBER FOUR:  Um-hum.

17           THE COURT:  You're going -- you know, you're going to

18  have to -- I'm very reluctant to excuse you.  If you were going

19  on vacation or you're flying out or something like that it

20  would be different, it was a pre-planned --

21           JUROR NUMBER FOUR:  Well I counted the number of days

22  from the day that I had come in which was Friday till the

23  Wednesday before Thanksgiving and that was 11 days, but if

24  tomorrow is a half day, and like I said, I've been working off

25  hours --

1        THE COURT:  Then maybe we'll get you -- we'll get you

2   some time today too if you -- where do you work?

3        JUROR NUMBER FOUR:  I'm not really that concerned.  A

4   day or two isn't going to matter.  I think where they were

5   concerned more was for weeks, you know, another week or two --

6        THE COURT:  Oh, no, no.

7        JUROR NUMBER FOUR:  -- beyond --

8        THE COURT:  All right, so --

9        JUROR NUMBER FOUR:  But I'm here and I'm -- and I'd

10  like to finish out what I --

11        THE COURT:  Okay.  All right, thank you Ms. Gia --

12        JUROR NUMBER FOUR:  Gildonello (phonetic).

13        THE COURT:  Gildonello, I think that's an Italian

14  name, right?

15        JUROR NUMBER FOUR:  Okay, thanks.

16        (PAUSE - JUROR NUMBER FOUR LEAVES CHAMBERS)

17        THE COURT:  Any comments?

18        MS. BAGLIVI:  No.

19        MR. WEICHSEL:  I don't have any, judge.

20        THE COURT:  On that -- on that witness -- on that

21  juror?

22        MR. WEICHSEL:  No.

23                       (PAUSE)

24        THE COURT OFFICER:  Juror number five, Your Honor.

25        (JUROR NUMBER FIVE JOINS IN CHAMBERS)

Conference in Chambers                                    61

 1              THE COURT:  Juror number five, please?

 2              THE COURT OFFICER:  Have a seat right there, okay?

 3              THE COURT:  Hi.

 4              JUROR NUMBER FIVE:  Hi.

 5              THE COURT:  Now I'm asking each of the jurors to come

 6    in, so we're not singling you out or anybody in particular out,

 7    but --

 8              JUROR NUMBER FIVE:  Um-hum.

 9              THE COURT:  -- it's come -- it's been brought to our

10    attention that some levity has surfaced inside the jury room

11    with regard to the case.  I just want to ask you a few

12    questions, I want to make sure that everything is going as it

13    is supposed to go.

14              Have you spoken to anybody, any of the other jurors,

15    about the case?

16              JUROR NUMBER FIVE:  No, I have not.

17              THE COURT:  And you kept an open mind and you still

18    have an open mind as to the --

19              JUROR NUMBER FIVE:  Absolutely.

20              THE COURT:  Okay.  The -- the information we had

21    received was that with regard to the mental health experts,

22    that there was been some levity discussed -- discussion amongst

23    the jurors as to each of them.  Have you been -- do you know of

24    any -- any discussion with regard to the mental health experts

25    that have been presented?

1          JUROR NUMBER FIVE:  Do I know what mental health

2   experts say?

3          THE COURT:  Has there been any discussion in the jury

4   room with regard to the testimony of the -- of the mental

5   health experts who have testified?

6          JUROR NUMBER FIVE:  Oh, no.

7          THE COURT:  Either yesterday's or today's?

8          JUROR NUMBER FIVE:  Not as far as their testimony is

9   concerned, no.

10         THE COURT:  What --

11         JUROR NUMBER FIVE:  I mean their demeanor a little

12  bit.

13         THE COURT:  Yeah, what -- what discussion has there

14  been with their demeanor that you can recall?

15         JUROR NUMBER FIVE:  Just that it's a little slow

16  going and --

17         THE COURT:  Are you referring now to Dr. Apolito?

18         JUROR NUMBER FIVE:  Yes.

19         THE COURT:  More than Dr. --

20         JUROR NUMBER FIVE:  Yeah -- oh, yeah.

21         THE COURT:  What was the other doctor's --

22         MR. WEICHSEL:  Kleinman.

23         THE COURT:  Kleinman?

24         JUROR NUMBER FIVE:  Yeah.

25         THE COURT:  All right, it's slow going with Dr.

Conference in Chambers                        63

1    Apolito?

2              JUROR NUMBER FIVE:  Yes, and the fact -- his accent I

3    think and his -- just his hesitating in between his words, but

4    nothing as far as his testimony.

5              THE COURT:  All right, have you still -- you did take

6    an oath or every one of you took an oath that you would be able

7    to listen to the psychiatric testimony and you still have no

8    fixed opinion with regard to mental health experts and you

9    would keep an open mind and evaluate all of the testimony

10   presented by mental health experts in coming to your decision,

11   your ultimate decision as to the guilt or the innocence of the

12   defendant, and you can still do that?

13             JUROR NUMBER FIVE:  Yes.

14             THE COURT:  So primarily what you're saying is that

15   there has been some remarks made with regard to Dr. Apolito's

16   accent and the slowness of his testimony?

17             JUROR NUMBER FIVE:  Yes.

18             THE COURT:  Other than that has there been anything

19   else?

20             JUROR NUMBER FIVE:  No, that I've heard.

21             THE COURT:  All right. And you have no problem

22   continuing?

23             JUROR NUMBER FIVE:  I don't have any problem, no.

24             THE COURT:  Okay.  Thank you.  You may return, thank

25   you.

Conference in Chambers                                    64

1                (PAUSE - JUROR NUMBER FIVE LEAVES CHAMBERS)

2          THE COURT:  Any comment?

3          MS. BAGLIVI:  No.

4          MR. WEICHSEL:  No.

5          MS. BAGLIVI:  I guess it was so fast yesterday with

6    me and Kleinman that it seems so slow today --

7          MR. WEICHSEL:  Yeah.

8          MS. BAGLIVI:  -- with Apolito.

9          THE COURT:  Yeah, I think --

10         MR. WEICHSEL:  He hasn't been that long on.

11         MS. BAGLIVI:  Well after yesterday, which was very

12   fast paced today is going much slower.

13         MR. WEICHSEL:  Yeah; well it's different in style.

14         THE COURT:  Well this is on the record now, and --

15         MS. BAGLIVI:  Yes, we know.

16         THE COURT:  Well we'll have a discussion later when I

17   get everybody out.

18         MR. WEICHSEL:  Yeah, okay.

19         THE COURT:  It's juror number six I believe.  Come

20   in.

21         THE COURT OFFICER:  Juror number six, Your Honor.

22         THE COURT:  Thank you.

23              (PAUSE -  JUROR NUMBER SIX JOINS IN CHAMBERS)

24         THE COURT OFFICER:  Okay, you can have a seat right

25   there.

1          THE COURT:  Hi.

2          JUROR NUMBER SIX:  Hi.

3          THE COURT:  I'm interviewing each of the -- of the

4   jurors, so we're not singling you out.  It's come to our

5   attention that some levity has surfaced in the jury room with

6   regard to the testimony of the mental health experts.  And I

7   have to ask each of you questions.

8          Have you -- first let me ask you, have you -- have

9   you discussed anything about this case with any -- any jurors,

10  anything at all?

11         JUROR NUMBER SIX:  No.

12         THE COURT:  All right, now with regard to that

13  particular alertness that we have brought to our attention, do

14  you -- do you experience any levity with regard to the

15  testimony of any of the mental health experts so far, that is

16  Dr. Fineman?

17         MR. WEICHSEL:  Kleinman.

18         MS. BAGLIVI:  Kleinman.

19         THE COURT:  Kleinman, and Dr. Apolito?

20         JUROR NUMBER SIX:  Exactly what do you mean by

21  levity?

22         THE COURT:  Fool heart -- you know, just off the cuff

23  remarks or lightheartedness is levity.  Levity is sort of like

24  when every once in a while in the courtroom we'll get a

25  situation where although the seriousness of these charges,

1   there will be some humorous thing happen and we all laugh;

2   that's levity.   That's usually caused by you know, tension --

3   breaking the tension or something in a situation like this and

4   I understand that kind of levity.   But has there been levity

5   whereas a -- we're concerned whether there's a disregard or a

6   prejudgment as to the testimony of these -- these witnesses by

7   the jury. Has there been?

8           JUROR NUMBER SIX:  No.

9           THE COURT:  You haven't prejudged anybody yet?

10          JUROR NUMBER SIX:  No.

11          THE COURT:  You can keep an open mind?

12          JUROR NUMBER SIX:  Yes.

13          THE COURT:  All right.   Okay, thank you.   Thank you

14   very much. And you can continue, you have no problem?

15          JUROR NUMBER SIX:  Yes.

16          THE COURT:  All right.

17          (PAUSE - JUROR NUMBER SIX LEAVES CHAMBERS)

18          THE COURT:  Any comments?

19          MR. WEICHSEL:  No.

20          MS. BAGLIVI:  No, judge.

21                          (PAUSE)

22          THE COURT OFFICER:  Juror number seven, Your Honor.

23          THE COURT:  Thank you.

24          JUROR NUMBER SEVEN JOINS IN CHAMBERS)

25          THE COURT OFFICER:  You can have a seat right there,

1    okay?

2                  JUROR NUMBER SEVEN:   Thank you.

3                  THE COURT:   How are you feeling?

4                  JUROR NUMBER SEVEN:   I'm doing okay, sir.

5                  THE COURT:   Okay.   I'm calling each juror in because

6    I have to make some inquiry.   There's been some information we

7    received that -- from some of -- some of the jurors that

8    they've experienced some levity in the jury room that may be a

9    problem and we want to investigate.

10                 You still have an open mind, have you, with regard to

11   this case?

12                 JUROR NUMBER SEVEN:   Yes.

13                 THE COURT:   All right. And did you witness or

14   experience any levity in the -- in the jury room that would be

15   of concern do you think?

16                 JUROR NUMBER SEVEN:   Not really concern, just you

17   know, people acting normal, not --

18                 THE COURT:   Okay.

19                 JUROR NUMBER SEVEN:   Nothing excessive.

20                 THE COURT:   Nothing excessive?

21                 JUROR NUMBER SEVEN:   No.

22                 THE COURT:   Did you -- did you hear or did you

23   discuss anything about this case with anybody?

24                 JUROR NUMBER SEVEN:   No, I haven't, sir.

25                 THE COURT:   Did you hear anybody else discussing the

1   case?

2                JUROR NUMBER SEVEN:  No, I haven't heard anybody.

3                THE COURT:  All right.  Have you heard any remarks

4   made with regard to the demeanor or the -- of the mental health

5   experts that have testified thus far by any of the other

6   jurors?

7                JUROR NUMBER SEVEN:  No, sir.

8                THE COURT:  No?  All right, you have no problem

9   continuing?

10               JUROR NUMBER SEVEN:  No, sir.

11               THE COURT:  All right, I'll let you go back.

12               JUROR NUMBER SEVEN:  Thank you.

13               THE COURT:  Thank you.

14               JUROR NUMBER SEVEN:  I just wanted to say one thing

15  if I could --

16               THE COURT:  Sure.

17               JUROR NUMBER SEVEN:  -- while we're here.  I know I'm

18  not allowed to speak, but I would like if you would to -- I

19  wanted to apologize to these two attorneys if I'm holding up

20  anything when these things occur.  I just feel bad about it and

21  I know it's been a long time and I know it makes me feel better

22  I guess, but if it bothers their thing -- I know they do a lot

23  of work and I'm sorry, I just can't control it, I know, but I

24  would just like them to know that I'm -- hope I'm not holding

25  up anything, I'm sorry.

1          THE COURT:  Yeah, well let me tell you something.  It

2   doesn't bother the attorneys, I know that.  And I feel very

3   privileged to be able to go through a trial and have you be

4   able to sit on it and participate.  It's -- and because of your

5   -- your affliction that we're able to get through this and

6   you're doing fine and I'm -- you know, I have no doubts in my

7   mind that you're -- you're a good juror and you're not holding

8   anything up.

9          JUROR NUMBER SEVEN:  Thank you.

10         THE COURT:  You're not all, you have absolute right

11  to be there and you're there and we're -- we're getting through

12  it.  So don't you -- don't you worry about a thing.

13         JUROR NUMBER SEVEN:  I just wanted to apologize to

14  them, I know there's a lot of work.

15         MS. BAGLIVI:  Nope, no problem.

16         MR. WEICHSEL:  No, it's -- it's fine.  You know, we

17  really appreciate your serving.

18         JUROR NUMBER SEVEN:  Okay; thank you.

19         (PAUSE - JUROR NUMBER SEVEN LEAVES CHAMBERS)

20         THE COURT:  I mean that.  Next.

21         MR. WEICHSEL:  He's an -- he's an incredible guy,

22  judge.

23         THE COURT:  Yeah, any -- any other comments on this?

24         MS. BAGLIVI:  No.

25         THE COURT:  You're sure?

1          MR. WEICHSEL:  No.

2          THE COURT:  All right.

3          MR. WEICHSEL:  Just I think he's amazing.

4                         (PAUSE)

5          MS. BAGLIVI:  Don't keep yawning because I keep

6    yawning.

7          MR. WEICHSEL:  I know -- well you started and --

8          MS. BAGLIVI:  It's these late nights.

9          THE COURT:  Come in.

10         THE COURT OFFICER:  Juror number eight, Your Honor.

11   Okay, you can have a seat right there.

12              (JUROR NUMBER EIGHT JOINS IN CHAMBERS)

13         JUROR NUMBER EIGHT:  Hi.

14         THE COURT:  Hello.  I'm calling each juror in as you

15   can probably figure out by now one at a time.

16         JUROR NUMBER EIGHT:  Yeah.

17         THE COURT:  So I'm not singling you out at all.  It's

18   been brought to our attention that there is some -- there has

19   been some levity surfaced in the jury room regarding some of

20   the witnesses, especially the expert witnesses.

21         JUROR NUMBER EIGHT:  Some what?

22         THE COURT:  Levity, lightheartedness and remarks made

23   about the witnesses that have been presented, especially the

24   expert witnesses, the health -- mental health.  Did you hear

25   any of that?

Conference in Chambers                    71

1              JUROR NUMBER EIGHT:  No I didn't, no.

2              THE COURT:  Did you participate in any of it?

3              JUROR NUMBER EIGHT:  No.

4              THE COURT:  Did you -- have you discussed anything

5    about this case with any of the other jurors?

6              JUROR NUMBER EIGHT:  No.

7              THE COURT:  All right.  Do you still have have an

8    open mind?

9              JUROR NUMBER EIGHT:  Yes, I believe so; yes I do.

10             THE COURT:  And you -- I remind you of the -- the

11   oath you took that -- with regard that I did make that question

12   earlier on when we did the voir dire whether you could be

13   objective as to testimony of a expert witness?

14             JUROR NUMBER EIGHT:  Yes, I recall that.

15             THE COURT:  And the psychiatric and you said you

16   could?

17             JUROR NUMBER EIGHT:  Yes.

18             THE COURT:  So you have no problem with that?  You

19   have no problem con -- continuing on till Monday, have you?

20             JUROR NUMBER EIGHT:  No.

21             THE COURT:  All right, good; thank you, that's all I

22   have.

23             JUROR NUMBER EIGHT:  You're welcome; bye-bye.

24             THE COURT:  Bye.

25             (PAUSE - JUROR NUMBER EIGHT LEAVES CHAMBERS)

1    THE COURT: Any comment on juror number eight?

2    MS. BAGLIVI: Ny -- no, I'm sorry.

3    MR. WEICHSEL: The only thing, I'm amazed with a

4 number of these jurors, they don't understand the word levity.

5    THE COURT: I know, can we -- well that's the word

6 the other juror used so I'm going with her.

7    MS. BAGLIVI: Laughter? I mean --

8    MR. WEICHSEL: Joking around.

9                (PAUSE)

10    THE COURT: Come in.

11    THE COURT OFFICER: Juror nine, Your Honor.

12    (JUROR NUMBER NINE JOINS IN CHAMBERS)

13    THE COURT OFFICER: Sir, you can have a seat right

14 there.

15    THE COURT: Mr. Maze (phonetic)?

16    JUROR NUMBER NINE: Yes.

17    THE COURT: I'm calling each juror in, so I'm not

18 singling you out.

19    JUROR NUMBER NINE: I realize that.

20    THE COURT: Yeah. It's come to our attention -- I

21 don't want you to discuss anything, I did tell the others not

22 to discuss anything with the others in the -- in the jury room

23 as to what we talked about here. It's come to our attention

24 that some levity has risen, in other words joking in the -- in

25 the jury room regarding some of the witnesses, especially the

1    mental health witnesses.  Did you participate in any of that?

2              JUROR NUMBER NINE:  No.

3              THE COURT:  Did you hear any of it?

4              JUROR NUMBER NINE:  No.

5              THE COURT:  Do you still have an open mind as to this

6    case?

7              JUROR NUMBER NINE:  Yes, I do.

8              THE COURT:  And --

9              JUROR NUMBER NINE:  I've taken this very seriously.

10             THE COURT:  Yeah, well I --

11             JUROR NUMBER NINE:  That's why I'm here in the first

12   place.

13             THE COURT:  I expect you to.  Now you did take an

14   oath or part of your oath was as part of the questions I asked

15   was could you be objective and did you not have any fixed

16   opinions as to psychiatric testimony prior to trial and you

17   would be able to evaluate psychiatric testimony in helping you

18   come to your conclusions on this case.

19             JUROR NUMBER NINE:  Yes, sir, I can.

20             THE COURT:  And you can?

21             JUROR NUMBER NINE:  I can.

22             THE COURT:  Okay.  And you will have no problem

23   staying with this until Monday?

24             JUROR NUMBER NINE:  Right.

25             THE COURT:  Okay; thank you very much, Mr. Maza, you

Conference in Chambers                          74

1  may return.

2              (PAUSE - JUROR NUMBER NINE LEAVES CHAMBERS)

3          THE COURT:  Any remarks with regard to number nine?

4          MS. BAGLIVI:  No.

5          MR. WEICHSEL:  No, Your Honor.

6          MS. BAGLIVI:  We have 14 jurors or 15?

7          THE COURT:  Fourteen.

8          MR. WEICHSEL:  We lost one after the first day.

9          THE COURT:  I think we lost 14 and then we moved 15

10  up.

11          MR. WEICHSEL:  Um-hum.  The gentleman said he

12  suffered from depression.

13          MS. BAGLIVI:  That's right, okay.

14          THE COURT:  Yeah.

15                          (PAUSE)

16          THE COURT:  Come in please.

17          THE COURT OFFICER:  Juror number ten, Your Honor.

18              (JUROR NUMBER 10 JOINS IN CHAMBERS)

19          THE COURT:  Juror number ten.

20          THE COURT OFFICER:  Have a seat right there.

21          THE COURT:  Mrs. Stuart (phonetic)?

22          JUROR NUMBER TEN:  Yes.

23          THE COURT:  I'm calling each juror in and -- so I'm

24  not singling you out.  It's been brought to our attention that

25  some -- some levity has risen inside the -- inside the jury

1   room, not the courtroom and we just want to make some inquiry

2   as to was there any -- with regard to the mental health experts

3   especially.  Did you participate in any discussion with --

4   jokingly -- with regard to the mental health experts that have

5   testified?

6              JUROR NUMBER TEN:  I said that he was cute, that's

7   all.

8              THE COURT:  You said he was cute?  I'm not going to

9   ask you which --

10             JUROR NUMBER TEN:  The little one, the little Italian

11  man.

12             THE COURT:  That's Dr. Apolito?

13             JUROR NUMBER TEN:  Yes.

14             THE COURT:  Other than that?

15             JUROR NUMBER TEN:  No, I don't recall anything or

16  anyone for that matter.

17             THE COURT:  All right.  Do you still have an open

18  mind as to this case?

19             JUROR NUMBER TEN:  Yes.

20             THE COURT:  And you have not discussed anything about

21  the case with your fellow jurors?

22             JUROR NUMBER TEN:  No.

23             THE COURT:  All right.  You were asked to keep an

24  open mind with regard especially to psychiatric testimony, that

25  you would be able to evaluate that in -- in helping you coming

1    to your decision and you'll be able to do that?

2              JUROR NUMBER TEN:  I'll do my best, yes.

3              THE COURT:  Okay, thank you.

4              MS. BAGLIVI:  Judge, you wanted to tell her about not

5    discussing?

6              THE COURT:  Oh, yeah; don't discuss what we talked

7    about with anybody else.

8              JUROR NUMBER TEN:  Oh no, I know -- I noticed that,

9    nobody's talking.

10             THE COURT:  Okay.

11             JUROR NUMBER TEN:  Okay.

12             THE COURT:  Thank you.

13                  (JUROR NUMBER TEN LEAVES CHAMBERS)

14             MS. BAGLIVI:  When she sees Dr. Simring, he's not

15   very good looking.

16             THE COURT:  Please, you're on the record.

17                            (PAUSE)

18             THE COURT:  Come in.

19             THE COURT OFFICER:  Juror number 11, Your Honor.

20                  (JUROR NUMBER 11 JOINS IN CHAMBERS)

21             THE COURT OFFICER:  Sir, you can have a seat right

22   there.

23             THE COURT:  Come in.

24             MR. WEICHSEL:  Good morning.

25             THE COURT:  Mr. Vanomeran (phonetic)?

1          JUROR NUMBER 11:  Yes, sir.

2          THE COURT:  Yeah.  I'm calling each of the jurors in,

3  I'm not singling you out at all, but has -- let me just close

4  this window, we have a -- because this is being recorded what

5  we're doing here, see, it's on tape.

6          JUROR NUMBER 11:  Okay.

7          THE COURT:  It's been brought to our attention that

8  some levity has arisen in the -- in the court -- in the jury

9  room; joking -- jokes as to -- with regard to some of the

10 witnesses that have testified, especially the mental health

11 witnesses; that would be Dr. Kleinman and Dr. Apolito.  Did you

12 hear any -- any of that?

13         JUROR NUMBER 11:  Not really, no.

14         THE COURT:  Well not really meaning what?  What did

15 you hear?

16         JUROR NUMBER 11:  Well as far as joking around, I

17 mean I think everybody's just loosened up and you know, gotten

18 to know each other a little bit, but I don't think there's been

19 any -- not that I can remember hearing anything.

20         THE COURT:  All right, was there any discussion about

21 the case at all?

22         JUROR NUMBER 11:  No.

23         THE COURT:  And you -- you still have an open -- you

24 still have an open mind as to the outcome of the case?

25         JUROR NUMBER 11:  Yes, sir, I do.

1              THE COURT:  And you re -- you recall my admonishing

2    the -- well not admonishing -- asking the question at the time

3    we did the voir dire whether you would be able to evaluate

4    psychiatric testimony in helping you come to a conclusion, that

5    you didn't have any preconceived ideas or opinions about

6    psychiatric testimony?  You remember that?

7              JUROR NUMBER 11:  Yes, sir.

8              THE COURT:  And you still have no problem with that,

9    your evaluating --

10             JUROR NUMBER 11:  Not at all.

11             THE COURT:  All right; thank you very much, you may

12   return.  Don't discuss anything we discussed in here with the

13   other jurors, all right?

14             JUROR NUMBER 11:  Okay.

15                   (JUROR NUMBER 11 LEAVES CHAMBERS)

16             THE COURT:  Any comments as to juror number 11?

17             MS. BAGLIVI:  No.

18             MR. WEICHSEL:  No, Your Honor.

19                           (PAUSE)

20             THE COURT:  Come in.

21             THE COURT OFFICER:  Juror number 12, Your Honor.

22                   (JUROR NUMBER 12 JOINS IN CHAMBERS)

23             THE COURT OFFICER:  Sir, you can have a seat right

24   there.

25             THE COURT:  Mr. Boliteri?

1      JUROR NUMBER 12:  Yes, Your Honor?

2      THE COURT:  I called -- I'm calling each one of the

3  jurors in, so I'm not singling out or anything.

4      JUROR NUMBER 12:  Yeah, I realize that.

5      THE COURT:  There has come to our attention that

6  there has been some levity has arisen in the -- in the jury

7  room, some of the other jurors are concerned with it.  And I

8  say -- when I say levity I mean joking around or something with

9  regard to the testimony or the witnesses themselves.  Not the

10  testimony so much, but the witnesses that have appeared,

11  especially the mental health witnesses.  Did you hear anything

12  like that at all?

13     JUROR NUMBER 12:  The only thing I heard, someone

14  made a snorting sound that I -- I associated with the most

15  recent doctor, I don't remember his name, the Italian

16  gentleman.

17     THE COURT:  Dr. Apolito?

18     JUROR NUMBER 12:  He kind of snorted -- yeah, when he

19  -- he would snort when he breathed in once in a while but aside

20  from that I don't recall hearing anything directly you know,

21  making a joke or --

22     THE COURT:  A comment --

23     JUROR NUMBER 12:  -- a comment, no, not that I

24  recall.

25     THE COURT:  A comment was made as to the demeanor of

1  Dr. Apolito?

2          JUROR NUMBER 12:  Well it wasn't a comment made;

3  someone just made a -- he once or twice made a snorting sound

4  when he was on the stand when he went to breathe in?

5          THE COURT:  Yeah.

6          JUROR NUMBER 12:  And someone mimicked that sound,

7  that's the only thing like that I heard.

8          THE COURT:  All right, and that was done in jest?

9          JUROR NUMBER 12:  Oh, as far as I could tell, yes.

10          THE COURT:  And levity?

11          JUROR NUMBER 12:  Yeah.

12          THE COURT:  Okay.  All right, you still have an open

13  mind to -- with regard to the case itself, have you?

14          JUROR NUMBER 12:  Oh, yes.

15          THE COURT:  All right.  And you recall my questioning

16  the jurors as to their ability to evaluate psychiatric

17  testimony as --

18          JUROR NUMBER 12:  Yes.

19          THE COURT:  -- to assist them to make their final

20  conclusion?

21          JUROR NUMBER 12:  Um-hum.

22          THE COURT:  And you can still do that?

23          JUROR NUMBER 12:  Oh, most certainly.

24          THE COURT:  All right, thank you very much.

25          JUROR NUMBER 12:  Okay, thank you.

1    THE COURT:  You didn't discuss anything with the

2  other jurors about the case at all?

3    JUROR NUMBER 12:  Oh, no.

4    THE COURT:  All right.  You just can go back to the

5  jury room.

6    JUROR NUMBER 12:  That I can.

7    THE COURT:  And don't discuss anything that we

8  discussed in here with the other jurors.

9    JUROR NUMBER 12:  All right.

10    THE COURT:  All right, thank you.

11    JUROR NUMBER 12:  Thank you.

12              (JUROR NUMBER 12 LEAVES CHAMBERS)

13    THE COURT:  Any comments?

14    MS. BAGLIVI:  No.

15    MR. WEICHSEL:  I guess we have two jurors who are

16  going to have to fess up to the snorting sound.

17    MS. BAGLIVI:  Yeah, but that's only his

18  interpretation

19    MR. WEICHSEL:  I know.

20    MS. BAGLIVI:  -- that he was mocking somebody.

21  Somebody else could be --

22    THE COURT:  Why did they do it.

23    MS. BAGLIVI:  I must have missed that.

24    MR. WEICHSEL:  So did I -- I didn't --

25    THE COURT:  I just wonder what they say about us.

1    Anyway, there's no comment and we have two more.

2                          (PAUSE)

3              THE COURT:  Come in please.

4              THE COURT OFFICER:  Your Honor, juror number 13.

5              (JUROR NUMBER 13 JOINS IN CHAMBERS)

6              THE COURT OFFICER:  You can have a seat right there.

7              THE COURT:  Hello.

8              JUROR NUMBER 13:  Hello.

9              THE COURT:  Ms. Dechinko?

10             JUROR NUMBER 13:  Desiko (phonetic).

11             THE COURT:  Desiko, okay.  It's been brought to our -

12   - I'm calling each juror in, so I'm not singling you out at

13   all.  It's been brought to our attention that there has been

14   some levity that has arisen in the -- in the jury room, not the

15   courtroom, the jury room amongst the jurors with regard to some

16   of the witnesses who have testified, primarily the mental

17   health witnesses.  Did you hear anything like that?  When I say

18   levity I mean joking.

19             JUROR NUMBER 13:  Not -- not really, not joking.

20             THE COURT:  Well what did you hear, if anything?

21             JUROR NUMBER 13:  I don't even remember.

22             THE COURT:  Was there any discussion with regard to

23   any of the testimony amongst --

24             JUROR NUMBER 13:  Not that I'm aware of.

25             THE COURT:  All right.  You didn't participate in any

1    discussion with regard to any of the witnesses or anything

2    about the case at all?  Have you discussed anything about the

3    case with any other jurors?

4              JUROR NUMBER 13:  Um-um.

5              THE COURT:  Thus far?  All right.  And do you

6    remember my asking each of you whether you could listen to the

7    testimony of a -- of a mental psychiatric testimony to assist

8    you in coming to your final decision as to the guilt or

9    innocence of this defendant?  Do you remember me asking that?

10             JUROR NUMBER 13:  Yes.

11             THE COURT:  And the indication was that you have --

12   you have no fixed opinions or -- or preconceived ideas as to

13   the testimony of psychiatrists or psychologists, right?  And

14   that still stands, is that correct?

15             JUROR NUMBER 13:  Yes.

16             THE COURT:  You still have an open mind --

17             JUROR NUMBER 13:  Yes.

18             THE COURT:  -- in this case?

19             JUROR NUMBER 13:  Um-hum.

20             THE COURT:  Okay, now, let's get to the real business

21   in your life.  You have a wedding to go to on Saturday?

22             JUROR NUMBER 13:  Yes.

23             THE COURT:  All right.  Now you will be able to get

24   there, will you be able to get back here for Monday?

25             JUROR NUMBER 13:  Yes.

Conference in Chambers                84

1          THE COURT:  You're not getting married?

2          JUROR NUMBER 13:  No.

3          THE COURT:  So you're not on your honeymoon?  All

4    right, so that should not interfere?

5          JUROR NUMBER 13:  No.

6          THE COURT:  You'll be able to go on?

7          JUROR NUMBER 13:  Um-hum.

8          THE COURT:  And we will not be working on Friday

9    here, so you're free Friday.

10         JUROR NUMBER 13:  Okay, great.

11         THE COURT:  And so that's the 22nd and 23rd is your

12   wedding.

13         JUROR NUMBER 13:  Um-hum.

14         THE COURT:  You can recuperate Sunday and come back

15   here.

16         JUROR NUMBER 13:  I don't drink, so I don't have to

17   recuperate.

18         THE COURT:  Okay, well whatever, from dancing, okay?

19         JUROR NUMBER 13:  Just have to clean the house.

20         THE COURT:  All right, go back to the jury room now

21   and do not discuss this with any of the -- what we discussed in

22   here with any of the other jurors, okay?

23         JUROR NUMBER 13:  Okay.

24         THE COURT:  All right, go ahead.

25         JUROR NUMBER 13:  Thank you.

1     THE COURT:  Okay.

2              (JUROR NUMBER 13 LEAVES CHAMBERS)

3     THE COURT:  Any comments on juror number 13?

4     MS. BAGLIVI:  No, judge.

5     MR. WEICHSEL:  No, judge.

6                   (PAUSE)

7     THE COURT:  Come in please.

8     THE COURT OFFICER:  And juror number 14, Your Honor.

9              (JUROR NUMBER 14 JOINS IN CHAMBERS)

10    THE COURT OFFICER:  Ma'am, you can have a seat right

11    there, okay?

12    JUROR NUMBER 14:  Sure.

13    THE COURT:  Ms. -- Mrs. Trilla (phonetic)?

14    JUROR NUMBER 14:  Yes.

15    THE COURT:  I am calling each juror in, so it's not -

16    - I'm not singling you out or anything, but it's come to our

17    attention that there has been some levity in the jury room, not

18    the -- not the courtroom now, the jury room with regard to some

19    of the witnesses that have appeared, primarily the mental

20    health witnesses.  Did you experience any of that? Did you hear

21    anything or notice any levity with regard to that?

22    JUROR NUMBER 14:  Levity meaning?

23    THE COURT:  Making jest or joking about the demeanor

24    of the witness -- of the witnesses by anybody?

25    JUROR NUMBER 14:  I said it was hard to understand

Conference in Chambers                                      86

1   the one, only because of his accent.

2           THE COURT:  Is that Dr. Apolito, the one that's on

3   the stand now?

4           JUROR NUMBER 14:  Yes.

5           THE COURT:  All right.  Are you having difficulty

6   understanding him?

7           JUROR NUMBER 14:  No, as long as you concentrate.

8           THE COURT:  Okay.  All right, so he has an -- an

9   Italian accent?

10          JUROR NUMBER 14:  Yes.

11          THE COURT:  All right.  And you -- what was your

12  remark that you found that you had to -- well I don't want to

13  put the words in your mouth, but you had to do extra

14  concentration which -- when he's talking?

15          JUROR NUMBER 14:  I said it was hard to understand

16  and it was almost like you wanted to make him spit out the

17  words.

18          THE COURT:  Yes, okay.  Are you -- do you understand

19  what he is saying?  I mean in -- in --

20          JUROR NUMBER 14:  In jest?  Yes.

21          THE COURT:  No, not in jest.  I'm talking in general.

22          JUROR NUMBER 14:  Yes.

23          THE COURT:  As to what he -- his testimony, you had

24  no difficulty understanding him?

25          JUROR NUMBER 14:  No, no.

1          THE COURT:  It's the pace of his testimony that --

2          JUROR NUMBER 14:  Yes.

3          THE COURT:  -- that -- that you're concerned with?

4    All right.  But that doesn't -- does that interfere with your

5    ability to understand what he's saying?

6          JUROR NUMBER 14:  No.

7          THE COURT:  All right, now remember I did say in the

8    beginning of the trial -- I asked each of·you whether you had

9    any preconceived ideas with regard to psychiatric testimony?

10         JUROR NUMBER 14:  Um-hum.

11         THE COURT:  And would you be able to listen to

12   psychiatric testimony and evaluate it in -- in aiding you in

13   coming to your ultimate conclusion as to the guilt or innocence

14   of Ms. Farthing?

15         JUROR NUMBER 14:  Um-hum.

16         THE COURT:  And the indication was that you did, and

17   is that still -- still the case, that you're able to evaluate

18   this --

19         JUROR NUMBER 14:  Yes.

20         THE COURT:  -- this testimony?  Do you still have an

21   open mind with regard to this case?

22         JUROR NUMBER 14:  Yes.

23         THE COURT:  All right.  Have you discussed any of the

24   case with any of the other jurors?

25         JUROR NUMBER 14:  No.

1          THE COURT:  Has anybody discussed it with you?

2          JUROR NUMBER 14:  No.

3          THE COURT:  Okay, I think that's it.  I'm going to

4    ask you not to mention this to the other jurors what we

5    discussed in here.  Each juror I -- I talked to and I asked

6    them not to discuss what I talked with them about in here, so

7    I'll ask you to do the same.

8          JUROR NUMBER 14:  Okay, there's only thing -- one

9    thing that I might mention and I don't know if it means

10   anything.

11         THE COURT:  Sure.

12         JUROR NUMBER 14:  My daughter was reading the paper

13   and she had asked me what case I was on.

14         THE COURT:  Uh-huh?

15         JUROR NUMBER 14:  I just happened to mention the name

16   and she went back running through the papers and that and it

17   turns out a girl that my daughter works with is dating Robert

18   Hippman.

19         THE COURT:  Um-hum.  Do you know the girl?

20         JUROR NUMBER 14:  I have met the girl, she's 37 years

21   old, 38.

22         THE COURT:  And when did you discover this?  Just

23   recently.

24         JUROR NUMBER 14:  The beginning of the week.

25         THE COURT:  All right, but you didn't know who Mr.

1   Hippman was before we started the case?

2            JUROR NUMBER 14:  I never -- no, never met him, never

3   saw him, I just thought I might mention it.

4            THE COURT:  Okay.  Did you daughter make any remarks

5   at all about the case other than the fact that she may have a

6   friend that she works with dating Mr. Hippman?

7            JUROR NUMBER 14:  Only to the fact that he was

8   supposed to testify in the trial.

9            THE COURT:  Um-hum.  Did you get into any -- did you

10  get into any discussion with your daughter regarding the case?

11           JUROR NUMBER 14:  No, I told her I wouldn't discuss

12  it with her.

13           THE COURT:  All right, that fact now that you find

14  that your daughter knows somebody and somebody you've met too.

15           JUROR NUMBER 14:  No, I haven't -- I know the

16  girlfriend, I have never seen or met Mr. Hippman.

17           THE COURT:  Except here?

18           JUROR NUMBER 14:  Except here.

19           THE COURT:  I'm talking about the girlfriend, your

20  daughter's girlfriend.  Do you know her?

21           JUROR NUMBER 14:  I know her but they mostly see each

22  other at work.

23           THE COURT:  Okay, someone that your daughter works

24  with?

25           JUROR NUMBER 14:  She works with; occasionally they

Conference in Chambers                    90

1  will --

2          THE COURT:  Okay, would that affect your ability in

3  this case, the fact that Mr. Hippman now is dating someone that

4  your daughter works with?

5          JUROR NUMBER 14:  No.

6          THE COURT:  Could you set that aside and listen to

7  the case as it has been presented?

8          JUROR NUMBER 14:  Oh, it has nothing to do with it, I

9  just thought I should --

10          THE COURT:  No, I'm glad you did and I have to ask

11  you these questions now.

12          JUROR NUMBER 14:  Oh, no, it wouldn't.

13          THE COURT:  it wouldn't affect you at all?

14          JUROR NUMBER 14:  No.

15          THE COURT:  Okay, thank you very much.

16          JUROR NUMBER 14:  You're welcome.

17          THE COURT:  Don't discuss anything now with anybody

18  in there and don't tell anybody in the jury room that your

19  daughter --

20          JUROR NUMBER 14:  Oh, I haven't mentioned it.

21          THE COURT:  -- works with someone that goes out with

22  --

23          JUROR NUMBER 14:  I haven't mentioned it.

24          THE COURT:  Okay, please don't, okay?

25          JUROR NUMBER 14:  Thank you.

1          (JUROR NUMBER 14 LEAVES CHAMBERS)

2          THE COURT:  Any comments?

3          MS. BAGLIVI:  No.

4          MR. WEICHSEL:  No.

5          THE COURT:  All right.  Any comments on that juror?

6          MR. WEICHSEL:  No, judge.

7          THE COURT:  Okay.

8          UNIDENTIFIED:  Oh, I didn't know anybody else was in

9  here, I'm sorry, okay.

10         THE COURT:  Do you have any thoughts at all?  Do you

11 want to make a record as to what we've just -- we've

12 interviewed 14 jurors after Ms. Donna Monteck (phonetic), who

13 is juror number one, indicated her concern, do you have any

14 thoughts?  I have -- I'll make some findings, but if you want

15 to make a record you can.

16         MS. BAGLIVI:  No.

17         MR. WEICHSEL:  No, judge.

18         THE COURT:  All right, I find that there's -- the

19 jury is intact.  I think they're still open minded -- not still

20 open minded -- they are open minded and I think juror number

21 one may have been overly reacting to something in -- certainly

22 the case itself, the nature of the case is a very serious one

23 and as I did say to her these people -- and I will say to them

24 when I dismiss them too, that they enter into a world that you

25 normally do not visit and it can be very stressful.  Some

Conference in Chambers                            92

1  people relieve that stress by making offhanded levity remarks

2  which I think if anything was done here.  I don't think that it

3  affects the case one way or the other.  Their comments about

4  Dr. Apolito are -- are well taken.  He does have an accent, he

5  does speak very slowly and he does have you at the edge of your

6  seat to -- the next sentence you're waiting for him to say and

7  you actually even know what it is he's going to say and the

8  comments by the jurors at that level are certainly not

9  prejudicial and is well taken.  I think he still is a witness

10 that is highly respected and I don't think there was any

11 indication that they didn't respect him.  So I'm going to

12 continue.  I am not going to admonish the jury any further and

13 we will just continue the case.  And I will, if I feel it's

14 necessary that they -- I think they got the message, I really

15 do, that they -- that they shouldn't be making these remarks if

16 they are.  I didn't want to in any way -- and I do not find

17 that these remarks made by the jurors in any way is indicative

18 of any tainted jury.

19          Anything else, counsels?

20          MS. BAGLIVI:  No.

21          MR. WEICHSEL:  No.

22          THE COURT:  All right, we'll continue then, thank

23 you.

24          MS. BAGLIVI:  Do I have time to just run to the

25 ladies room?

1        THE COURT:  Yeah, hurry up.

2        MS. BAGLIVI:  I will.

3              (END OF CONFERENCE IN CHAMBERS)

4        THE COURT:  Ready to proceed, counsels?

5        MR. WEICHSEL:  Yeah.  Judge, I just wanted to put

6   something on the record.  Dr. Apolito advises me that he has --

7   you know -- and he's been very good about this.  He was here at

8   11:30 yesterday, he didn't get reached until 4:00 and he

9   cancelled all his patients this morning.  He has dental surgery

10  at 2:30 and I guess he has an abscess and he says he has to go.

11       THE WITNESS:  All right, 3:15 is my surgery and I

12  have to leave at 2:30 from here.

13       THE COURT:  Okay.

14       MR. WEICHSEL:  I just wanted to make you aware of it.

15       THE COURT:  Now it's my burden, right?  All right,

16  Doctor, we'll get you out.

17       MR. WEICHSEL:  That's why -- that's why you wear the

18  robes, judge.

19       THE COURT:  That's why -- yeah, that's why I got the

20  robe. All right, bring the jury up.

21       THE COURT OFFICER:  Yes, Your Honor.

22       THE COURT:  We were delayed on something.

23       THE WITNESS:  Yeah, I understand, you have your

24  problems.

25            (PAUSE -  THE JURY ENTERS THE COURTROOM)

1    THE COURT:  All right, ladies and gentlemen, in an

2    effort to try to keep a schedule I am going to continue with

3    this witness, Dr. Apolito, until he is finished.  If it goes

4    past 12:30 we'll go into the lunch period.  You'll get an hour

5    lunch, it will just be when we finish this, okay, because I

6    want to finish this witness this morning or before lunch break

7    or when -- before we break for lunch, so we'll just continue

8    into it until we get finished with him.  We have witnesses

9    lined up for this afternoon and we'll get them later.

10    Go ahead.

11    MS. BAGLIVI:  Okay.

12    CROSS EXAMINATION CONTINUES OF DR. ARNALDO APOLITO BY

13    MS. BAGLIVI:

14    Q.   Doctor, I think we left off with you were going to

15    find me the section in Thomas Christopher James' statement that

16    you said was consistent with Jamie Farthing's, is that correct?

17    A.   Yes.

18    MS. BAGLIVI:  Okay, judge, may I approach the

19    witness?

20    THE COURT:  Yes.

21    BY MS. BAGLIVI:

22    Q.   Okay, Doctor, I believe you pointed out page 11?

23    A.   Yes.

24    Q.   Is that correct?

25    A.   Yes, I did.

1      Q.   Okay.  And, sir, are you referring to this question,

2  "And was this plan discussed with Jamie Farthing?"  Is that

3  what you're referring to?

4  A.   Yes, yes.

5      Q.   Okay.  And the answer is, "And she heard about it,

6  but it wasn't really discussed as her being part of doing it."

7  Is that --

8  A.   Yes.

9      Q.   -- what you're referring to?

10  A.   Yes.

11      Q.   Okay.  And, Doctor, you're telling us that that is

12  consistent with Jamie Farthing's statement or what Jamie

13  Farthing told you about this plan?

14  A.   Yes.

15      Q.   Okay.  Well, Doctor, don't you mention in your report

16  that she in fact told you that she was invited to go along to

17  New York to commit these robberies?

18  A.   To benefit from these robberies.

19      Q.   But not to commit them?

20  A.   That was not specified to her, right.

21      Q.   She did not know that they were going to New York to

22  commit robberies -- that she would have to commit the

23  robberies?  Only that they would commit them and hand -- give

24  her money?

25  A.   Well this is the state which her mind worked.  Again, as I

1  mentioned --

2      Q.   I'm asking you what she told you.  This is what --

3  I'm not asking what happened actually that day; what did she

4  tell you when you asked her about the facts?  You're saying she

5  told you that she was going to go with them, they were going to

6  commit the robberies and she was going to get the money?

7  A.    This was not specified.  She was promised -- the promise

8  that was made to her was that she would not have to work one

9  day in her life, that they were going to rob these two rich

10  coke heads and she was going to buy a house.

11      Q.   But she told you she was going to go along with this

12  plan, correct?

13  A.   She went along, she went to New York with them.

14      Q.   No, Doctor, I understand what you're saying, that she

15  did in fact go along.  I'm asking you what she told you in

16  terms of the facts of this case.  Did she tell you that she

17  went to New York City to go along with this plan to rob coke

18  heads?

19  A.   No.

20      Q.   Doctor, did you not say in your report when you're

21  reciting the facts on page three, "She seduced Jamie with an

22  offer to take her under her protection, to take her to New York

23  City where they would rob a few rich coke heads and she would

24  not have to work one day in her life."?

25  A.   Yes.

Apolito - Cross                                                97

1          Q.    Did I read that correctly?

2    A.    Yes.

3          Q.    Okay.   Now, Doctor, getting back to these other

4    statements that you looked at, did you find -- I don't know if

5    I asked you this.   Did you find any inconsistencies between

6    what she told you and what you read in her statement with the

7    co-defendant statements?   Did you find any inconsistencies?

8    A.    With the co-defendants' statements?

9          Q.    Yeah, with the co-defendants.   I'm -- let's -- let's

10   narrow that area down.   On the issue of her participation in

11   these crimes.

12   A.    What about it?

13         Q.    Okay, let me ask you this.   She -- you said in your

14   report and when you testified to this jury that in your opinion

15   she minimally participated in these crimes, correct?

16   A.    Yes.

17         Q.    Okay.   Did you review the other two statements, or

18   any of the other co-defendants' statements, in this case

19   regarding this issue of minimal participation?

20   A.    Yes.

21         Q.    Okay.   And, Doctor, isn't it a fact that in the other

22   two statements -- and let's just refer to Ivy Demolena and

23   Thomas Christopher James, that didn't you find from reading

24   these statements that in fact based on their statements they

25   place her up in the bedroom when the crime is taking place,

1  where the murder is taking place?

2  A.    They placed --

3          MR. WEICHSEL:  Objection, at what time, judge?  I

4  mean --

5          MS. BAGLIVI:  Judge, I don't know what the objection

6  is so I can't respond.

7          THE COURT:  Mr. Weichsel?

8          MR. WEICHSEL:  Judge --

9          THE COURT:  Sidebar?

10          (CONVERSATION AT SIDEBAR -- OFF THE RECORD)

11                    (PAUSE)

12  BY MS. BAGLIVI:

13      Q.    Let's refer to Thomas Christopher James' statement.

14  Do you recall reading that?

15  A.    Which one please?

16      Q.    The stenographic statement?  Thomas Christopher

17  James?

18  A.    Yes, I refer to it.

19      Q.    Okay.  Did you read both the stenographic statement

20  and the oral report of his confession?

21  A.    You got me there, I don't know what --

22      Q.    Okay, does this look --

23          MS. BAGLIVI:  Judge, may I approach?

24          THE COURT:  Yes, please.

25  BY MS. BAGLIVI:

1        Q.    Does this report look familiar at all?

2   A.    Yes.

3        Q.    Okay.  So you read both --

4   A.    But you're referring two different sections and I -- I

5   cannot answer you on --

6        Q.    Okay.

7   A.    -- on that, I don't remember --

8        Q.    But you did read the stenographic statement because

9   you pointed out something in it to us previously?

10  A.    Oh, yes, if that is part of it then I did, yeah.

11       Q.    Okay.  And then you read the --

12  A.    Yes.

13       Q.    -- the report of the officer who did the interview

14  orally, is that correct?

15  A.    Yes.

16       Q.    Okay.  And, Doctor, you're saying that there was

17  nothing inconsistent with the testimony -- with what Jamie

18  Farthi8ng told you about where she was when the murder took

19  place and comparing it to Thomas Christopher James' statement?

20  A.    I believe no.

21       Q.    Okay.  Doctor, I'm going to read from page 73 and ask

22  you if you recall reading this.

23            "Q.    When you were pondering or thinking about what

24  to do with Jamie, the male, what was Ivy doing at that time?

25  A.    She was looking at me and telling me to come on and do it

1    and that I had to do it because she couldn't do it.

2         Q.   And where was the female, Jamie, at this time?

3    A.   At the time she was still standing in the room with Ivy

4    and myself.

5         Q.   And Ivy is telling you to get on with it, to kill

6    him?

7    A.   Yes."

8              Do you recall reading that?

9    A.   Yes.

10        Q.   Okay.  And, Doctor, this is inconsistent with what

11   Jamie Farthing told you about where she was when the murder

12   took place, isn't that correct?

13             MR. WEICHSEL:  Judge, objection.  Is -- is the

14   witness arguing or asking questions here?  It sounds

15   argumentative to me, judge.

16             MS. BAGLIVI:  Judge, I asked a question.

17             THE COURT:  I'm going to sustain the question whether

18   it's inconsistent or not.  It's has he read that and is the

19   opinion still the same, that's where you're going.

20   BY MS. BAGLIVI:

21        Q.   What did Jamie Farthing tell you where she was when

22   the murder took place?

23   A.   I don't think I mentioned that point.  I never stated that

24   Aimee -- Jamie Farthing was not there.  I referred to what she

25   did or did not do.

1        Q.    I understand that.

2   A.    I'm not -- I'm not discussing the -- her presence.

3        Q.    But I'm asking you that question, sir.

4   A.    Fine.

5        Q.    Where did she tell you she was when the murder took

6   place?  In what part of the apartment?  Did she tell you?

7   A.    For part of the time I remember her telling me that she

8   was with Ms. Demolena upstairs looking for valuables and money.

9        Q.    I understand that, Doctor, but my question is did she

10  tell you where she was at the time the actual murder took

11  place?

12  A.    I don't believe I asked her that question unless I'm

13  forgetting something.

14       Q.    Okay.

15  A.    I don't -- I don't believe I asked her that question.

16       Q.    Okay.  Did you read it in her statement, in the

17  statement that she gave to the police? Do you remember reading

18  where she says she was at the time of the murder?

19  A.    No, frankly I don't remember.

20       Q.    Okay.  May I show you a page of her statement?

21  A.    Sure.

22                          (PAUSE)

23       Q.    I'm going to show --

24            MS. BAGLIVI:  Your Honor, may I approach?

25  BY MS. BAGLIVI:

1      Q.   I'm going to show you page 48.  Do you have her

2   statement there with you?

3   A.   No.

4      Q.   Oh, okay.

5           THE COURT:   That's S-224?

6           MS. BAGLIVI:   Yes.

7   BY MS. BAGLIVI:

8      Q.   S -- page 48 of that statement.  I believe it

9   actually starts at the bottom of page 47.  Do you recall her

10  answering -- them asking her, Jamie Farthing --

11          "Q.   What did they do when they brought him upstairs?

12  A.   They took him upstairs, I went downstairs to look and I

13  stayed down there for I don't know how long, it was probably

14  15, 20 minutes and I walked upstairs and his feet are outside

15  of the door and he was laying like in the doorway and they had

16  -- I don't know what it was, it may have been a tie, it may

17  have been a cord or something -- they had it tied around his

18  neck, they had it tied around the door and he was like hanging.

19  His face wasn't touching the ground, it was just hanging there

20  and there was blood all over the pillow case and it was all

21  over the carpet."

22          Do you recall reading that section?

23  A.   Yes, oh yes.

24      Q.   Okay.  And do you recall them further asking,

25          "Q.   Do you know if he was saying anything?  Could

1  you hear him breathing?

2  A.   No, I just -- I just walked in and I saw the blood on the

3  pillow case.

4       Q.   What did you think?

5  A.   On the floor.

6       Q.   I'm sorry, what did you think?

7  A.   I just thought they killed him."

8            Do you recall reading that?

9  A.   Yes.

10      Q.   Doctor, assume for a moment that the statement of

11 Thomas Christopher James is correct; does that change your

12 opinion in any way regarding this defendant's mental state or

13 her diagnosis of post-traumatic stress disorder?

14 A.   I'm sorry, I don't get the sense of your question.

15      Q.   Okay.

16           MR. WEICHSEL:   Judge, can we approach a second

17 please?

18           (CONVERSATION AT SIDEBAR -- OFF THE RECORD)

19               (SIDEBAR -- NOW ON THE RECORD)

20           MS. BAGLIVI:   Going.

21           MR. WEICHSEL:   It doesn't say.

22           MS. BAGLIVI:   It does.

23           THE COURT:   Counsels, I'm not going to get into a big

24 argument over this, you can rehabilitate it if you want, but I

25 don't --

1       MR. WEICHSEL:  Okay, all right.

2       THE COURT:  On page 73 -- do we have a number?

3       MS. BAGLIVI:  Yeah, we -- it -- oh, no, it hasn't

4   been marked.

5       THE COURT:  In the statement of Thomas Christopher

6   James, "When you were pondering, thinking about what to do with

7   Jamie, the male..." -- and you mean the victim?

8       MS. BAGLIVI:  Correct.

9       THE COURT:  "...what was Ivy doing at the time?

10  A.   She was looking at me and telling me to come on and do it

11  and then -- and I had to because she couldn't -- he couldn't do

12  it.

13      Q.   And where was the female, Jamie, at the time?

14  A.   At the time she was still standing in the room with Ivy

15  and myself.

16      Q.   And Ivy is telling you to get on with it, to kill

17  him?

18  A.   Yes.

19      Q.   Did you two become argumentative?  Did you get into

20  an argument?  What was she telling you to do?"

21      MS. BAGLIVI:  If you continue reading it says what he

22  does and he -- and then he kicks Jamie Farthing out of the

23  room.  so it -- this is inconsistent with her statement that

24  says she was downstairs when they dragged him upstairs and I

25  think I'm going to have to find out because he says she

1  minimally --

2           THE COURT:  Just point out -- just point out the

3  inconsistency --

4           MS. BAGLIVI:  Sure.

5           THE COURT:  -- and with that inconsistency would that

6  change your opinion really is what you're talking about.

7           MS. BAGLIVI:  Okay.

8                          (END OF SIDEBAR)

9  BY MS. BAGLIVI:

10      Q.   Doctor, you said that this defendant minimally

11  participated in the crimes.  Assume for a moment that what we

12  just read out of Thomas Christopher James' statement is true.

13  Would that change your opinion at all about this defendant

14  minimally participating?

15  A.   I'm sorry, unless I forget what you just read to me I do

16  not remember that passage indicating participation of --

17      Q.   Well when I read you the page were you -- when they

18  were discussing -- do you recall --

19           THE COURT:  Counsel, read it again to him.

20           THE WITNESS:  Please.

21           MS. BAGLIVI:  Sure.

22           THE COURT:  In fact why don't you come up and let him

23  see it again.

24           THE WITNESS:  Yes.

25  BY MS. BAGLIVI:

1      Q.   "Q.  Now when you were pondering or thinking about

2 what to do with Jamie, the male, what was Ivy doing at this

3 time?

4 A.   She was looking at me and telling me to come on and do it

5 and that I had to because she couldn't do it.

6      Q.   And where was the female, Jamie, at this time?

7 A.   At the time she was still standing in the room with myself

8 -- with Ivy and myself."

9           Turn the page to page 76 -- I'm sorry, it's --

10 actually it's page 75 is the bottom, okay?  Where he's just --

11 where Thomas Christopher James is discussing how he actually

12 killed him.

13 A.   Yeah.

14           "Q.  So the tie was either not strong enough or not

15 long enough or ripped and therefore you used the electrical

16 cord?

17 A.   Yes.

18      Q.   At this point did everyone decide to leave?

19 A.   Yes, we started to walk downstairs and --

20      Q.   Who started to walk downstairs?

21 A.   Myself and Jamie.

22      Q.   The female?

23 A.   Yes."

24           Okay, do you recall reading that?

25 A.   Yes.

1      Q.    Okay.  And, sir, did Jamie Farthing tell you that she

2   was present in the room when they were discussing killing Jamie

3   Polites?  Did she tell you that?

4   A.    I do not remember asking the specific questions, but I do

5   know that she was there in the first part --

6      Q.    Okay.  Well, Doctor --

7   A.    -- when she was asked to place a pillow case on the head

8   of the prospective victim.

9      Q.    Doctor, you said she minimally participated.  Where

10  did you get that information from to come to the conclusion

11  that she minimally participated?

12         MR. WEICHSEL:  Judge, you know, the prosecutor is

13  trying to take Thomas Christopher James' statement as Jamie

14  Farthing participating.  There is nothing in there that she

15  read that indicated she participated other than --

16         THE COURT:  Overruled.

17  BY MS. BAGLIVI:

18     Q.    Doctor, where did you get the -- how did you come to

19  the conclusion that she minimally participated?   Is it because

20  you believed that the only thing she did was put a pillow case

21  over his head?

22  A.    Well she was directed to put the pillow case over his

23  head.

24     Q.    Okay.

25  A.    And the -- I am referring to the essential -- to the

1   principle, to the actual crime, the killing of Mr. Polites.

2        Q.    My question to you is, did she tell you she was

3   present when the killing happened?

4             THE COURT:   I think -- I think he's answered it.  He

5   said he's referring -- when he says minimal participation he's

6   referring to the actual killing.

7             MS. BAGLIVI:   Okay.

8   BY MS. BAGLIVI:

9        Q.    And, Doctor, let me read you another section.

10            MS. BAGLIVI:   May I approach?

11            THE COURT:   Go ahead.

12  BY MS. BAGLIVI:

13       Q.    Page -- the bottom of page 76, after they had the

14  discussion about the ties and the electrical cords, do you

15  recall reading:

16            "Q.   You walked back to Jamie, the male?

17  A.   I was standing about a foot away; I stepped back over and

18  bent down to where I could listen and I wasn't sure if he was

19  breathing.   I think it was just bodily fluids coming out of his

20  mouth that made it sound like that.

21       Q.    So you were hearing sounds from the body but you

22  don't know what sounds they were, whether they were breathing

23  or spit or whatever?

24  A.   Yes.

25       Q.    What did you proceed to do then?

1  A.   I walked to the room at the other end of the hall and I

2  picked up a steel weight.  I walked back into Jamie's

3  bedroom..." -- Jamie, the male -- "...I sat the weight down the

4  floor besides him and I told Jamie, the female, to go ahead and

5  go downstairs.  And she went down and I sat there for a few

6  seconds kind of like in a daze or something."

7           Do you recall reading that?

8  A.   Yes.

9      Q.   Now, sir, can we go back to the Hippman robbery for a

10 few moments?  You had given us some information regarding what

11 this defendant told you about Robert Hippman's armed robbery,

12 is that correct?

13 A.   Yes.

14     Q.   Okay.  And, sir, you told us that Ivy Demolena was

15 giving Jamie Farthing a new identity, a new name, is that

16 correct?

17 A.   Yes.

18     Q.   Okay.  Well, Doctor, have you ever heard of people

19 committing crimes using aliases?

20 A.   Oh, yes.

21     Q.   Okay.  So, Doctor, wouldn't it be fair to say that

22 really what they were dong here was using aliases, using fake

23 names, not taking on new identities?

24 A.   I don't know what is the difference.

25     Q.   Okay.  Well, Doctor, they weren't going to live the

1   rest of their lives under these different names, correct?

2   A.   I do not know what the intentions of -- the exact

3   intentions or plans of Ms. Demolena were.

4        Q.   Well do you find any evidence of that, that they were

5   going to assume these false names for the rest of their lives?

6   A.   No, of course not.

7        Q.   Okay.

8   A.   But as I said, I don't know what her intentions were, why

9   she did that.

10       Q.   Now, sir, you said that Ivy Demolena showed Jamie

11  Farthing a gun in another room and wanted her to take it, is

12  that correct?

13  A.   Yes.

14       Q.   Okay.  And you got that from this defendant and her

15  statement to the police, is that correct?

16  A.   Yes.

17       Q.   Okay.  Well, Doctor, let me -- assume for a moment

18  that Mr. Hippman comes into the courtroom and testifies before

19  this jury that this defendant pulled out the gun, that nobody

20  gave it to her, that in fact he was sitting with Erica -- the

21  other woman, Ivy Demolena, on the couch and she appears with a

22  gun in her hand.  Now, Doctor, who do you believe?  Do you

23  believe the statement of the defendant when she tells you that

24  this gun was forced into her hand?

25  A.   In that case I do not know.  If there are two different

1   versions I do not know who's telling the truth.

2        Q.   Okay.

3   A.   One of them obviously must be lying.

4        Q.   Right, obviously one would be lying.  But again, as I

5   think I've asked you, you would -- people that are charged with

6   murder have a reason to lie, do they not?  More so than the

7   average person?

8            MR. WEICHSEL:  Judge, it's been asked and answered

9   already.

10           THE COURT:  Yeah, I'm going to ask you to move on.

11  You're begging the question.

12           MS. BAGLIVI:  Okay.

13  BY MS. BAGLIVI:

14       Q.   Doctor, --

15           MS. BAGLIVI:  I'm sorry, I'll move on.

16           THE COURT:  You're begging the question on that one,

17  go ahead.

18  BY MS. BAGLIVI:

19       Q.   Doctor, I believe you told us that Jamie Farthing

20  again told you that Mr. Hippman was laughing at her and thought

21  the whole thing was a joke?

22  A.   Yes.

23       Q.   Okay.  Doctor, assume for a moment that Mr. Hippman

24  came in here and testified that that never happened?

25  A.   Again, one of them must be lying.

1    Q.    Okay.   Now, sir, you said that -- you told us that

2 she -- Jamie Farthing told you that Ivy Demolena pulled out the

3 second gun, correct?

4 A.    Well I said that on this point I'm not clear whether Ivy

5 Demolena took the gun from -- which Ms. Farthing was handling

6 and used that to point at Mr. Hippman or she took the other

7 gun, because I know they had two guns.

8    Q.    Okay, so --

9 A.    And then she --

10    Q.    Okay, I'm sorry.

11 A.    Yes.

12    Q.    Regardless of which gun it is, she told you thought

13 that Ivy Demolena at one point during this armed robbery had a

14 gun, is that correct?

15 A.    Yes.

16    Q.    Okay.   And, Doctor, again assuming for a moment that

17 Mr. Hippman came in here and testified that only Thomas

18 Christopher James and -- and Jamie Farthing had guns, assume

19 that that were true; is this going to change your opinion about

20 her minimally participating in this crime?

21 A.    Well naturally if she had been handling the gun all along

22 and on her own accord pulled the gun and pointed naturally that

23 would change my opinion to a certain extent because I know that

24 it would be a matter of when she was schooled, and when she was

25 prepared and propped, whether at the moment or while they were

1  riding to Mr. Hippman.

2      Q.   Well let me ask --

3  A.   But we --

4      Q.   I'm sorry.

5  A   Yeah; but we do know that Ms. -- Ms. Farthing was not the

6  --  originally in possession of the gun and that she was

7  propped, schooled, she was dressed up in a dress that Ms.

8  Demolena gave to her, she was given a different name and

9  recommend that she should remember that name.  And she was

10  instructed on what to do, this we do know.

11      Q.   Okay.

12  A.   It's only a question of whether these instructions came

13  immediately before the action or some time before.

14      Q.   Doctor, have you ever heard of crimes being planned

15  in advance?

16  A.   Of course I have.

17      Q.   Now, sir, I believe you said that this defendant told

18  you that she was drunk and high on drugs at the time that she

19  committed the Hippman crime, is that correct?  Or she was

20  drinking at Mr. Hippman's house?

21  A.   Yes.

22      Q.   Okay.  Doctor, are you aware that there was only a

23  half a bottle of Pino Grigio found open in the house that

24  night?

25  A.   No, I'm not aware of it.

1    Q.    Okay.  And, Doctor, assume for a moment that in fact

2    only a half a bottle of Pino Grigio was open and there were no

3    other empty beer cans, wine bottles, liquor bottles, whatever,

4    assume that that's true; would that change your opinion as to

5    what her state of mind was at the time of this offense if you -

6    -

7    Q.    If it is true that Ms. Farthing had also been

8    consuming a quantity of marijuana and cocaine and then she

9    drank half a bottle of Pino Grigio or wine, she could have been

10   quite high.

11   Q.    Okay, well let's not get into the drugs, let's deal

12   with the alcohol first.

13   A.   Well I cannot answer that question without --

14   Q.    Okay, that's all you have to say, that you can't

15   answer the question as I proposed it.

16        Doctor, assume further that two people drank that

17   half a bottle of wine and not one person; would that change

18   your opinion?

19   A.   Well if that were the case then naturally the -- the

20   question would be how much -- what quantity of drug had she

21   used plus the wine.  Certainly a quarter of a bottle of wine

22   could not make a person drunk, high.

23   Q.    Right.  Now, Doctor, you say that there was some drug

24   use and the defendant told you this, is that your testimony?

25   A.   Yes.

1        Q.    Okay.  Doctor, are you aware that they searched her

2   home in Georgia, they searched an apartment in New York where

3   she was staying, they searched luggage of the co-defendants,

4   they searched a storage bin in New York City and found no

5   evidence of any drugs or paraphernalia?  Doctor, would that

6   change your opinion in this case?

7   A.    Well I really don't know because I -- as far as

8   paraphernalia, Ms. Farthing never said that she used syringes

9   or any pipes for her use, so I don't know about paraphernalia.

10       Q.    Well to smoke marijuana what besides pipes --

11            THE COURT:  Well wait; did he finish his answer?  Did

12   you finish your answer, Doctor?

13            THE WITNESS:  Yes.  So whether she had any -- any of

14   this gadgets on herself, I do not know.,

15   BY MS. BAGLIVI:

16       Q.    Okay.  Well, Doctor, I'm telling you that they --

17   when they arrested her they searched her.  They found no pipes,

18   no bongs, no rolling papers, no paraphernalia whatsoever on

19   her, on the co-defendants, they found -- there's no evidence in

20   this case of any drugs.  Would that change your opinion?

21   A.    Well it could throw some doubts on the role of -- that the

22   drugs played.

23       Q.    Okay.

24   A.    But let's not forget that my judgment -- my conclusion was

25   primarily arrived at on my diagnosis of a post-traumatic stress

1    disorder and disassociative reaction at the -- caused by the

2    impact of these sudden scene of crime with which she was

3    exposed.

4         Q.    Correct.  But you do say in your report that the drug

5    and alcohol use, if it is true, played a role in this, isn't

6    that correct?

7    A.    Yes.

8         Q.    Okay.  Now, sir, you also told us that at the Hippman

9    house it was the other two that took the cash and this

10   defendant just took pretty things, is that correct?

11   A.    Yes.

12        Q.    Well, Doctor, were you aware that it was only $40 of

13   cash that they took from his wallet and $200 from a MAC

14   machine?

15   A.    Yes.

16        Q.    Okay.  Now, Doctor, you told us that Jamie Farthing

17   said that she couldn't have any of the money because Ivy

18   Demolena and Thomas Christopher James had expenses?

19   A.    That's what they told her, yeah.

20        Q.    Okay.  And that also goes for the money that was

21   found at Mr. Polites' house, they had expenses?

22   A.    Well I don't remember that she told me that she had asked

23   then for a share of the money at that time.

24        Q.    Okay, so at Polites' you don't recall if she asked

25   for a share, but at Hippman's you do recall that?

1   A.    Yes.

2         Q.    Okay.   Well, Doctor, were you aware that some of the

3   expenses in this case were the fact that they were staying at

4   hotels that cost $850 a night without tax?

5   A.    Yeah, I found out afterwards, yes.

6         Q.    Well, Doctor, were you also found out -- did you also

7   find out that they were staying at other hotels that cost $350

8   a night?

9   A.    Yeah.

10        Q.    Plus tax?

11  A.    Um-hum.

12        Q.    And hotels costing $150 a night plus tax?

13  A.    Yes.

14        Q.    Okay.   And did you also find out that the defendants,

15  Ivy Demolena and Thomas Christopher James were paying for all

16  her meals and all of her expenses during this six week stay in

17  New York City?

18  A.    Oh, sure.

19        Q.    Okay.   So, Doctor, knowing all of that, that the $240

20  wasn't shared at Mr. Hippman's house because they went to

21  expenses and the expenses benefitted this defendant, does that

22  change your opinion as to this defendant -- defendant's minimal

23  participation in these crimes?

24  A.    No, she wasn't -- she was just being housed and fed.   I

25  don't see any basis for my -- changing my opinion.

1      Q.   Okay.  Doctor, she was being housed and fed and

2   clothed with the money from -- that was stolen from these

3   robberies; you don't see any benefit to the defendant?

4   A.   But she was not aware of these details.

5      Q.   Okay.  Doctor, she gave a 60 page detailed statement

6   to the police, did she not?

7   A.   Yes.

8      Q.   She had a very good recall of the events in terms of

9   describing people's houses, wouldn't that be fair to say?

10  A.   Yeah.

11     Q.   Describing -- even going so far as to describe a

12  stairway in Mr. Polites' house, that it had a railing on one

13  side and it had a little bit of carpet on each of the steps; do

14  you recall that?

15  A.   Oh, yes.

16     Q.   Okay.  Now, sir, you told us with regard to Mr.

17  Polites' homicide that she was unaware that Mr. Polites was

18  going to be killed before she went there?

19  A.   Yes.

20     Q.   Is that what you told us?

21  A.   Yes.

22     Q.   Okay.  And, sir, you got that from the defendant and

23  from reading her statement, is that correct?

24  A.   Yes.

25     Q.   Okay.  Well, Doctor, assume for a moment -- assume

1  for a moment that a witness came into court and testified that

2  Ivy Demolena made a phone call while these three were

3  hitchhiking up to New York and during that phone call she told

4  this witness that they were going to New Jersey to kill a man.

5  And assume further that the only two people with Ivy Demolena

6  when she made the call were Jamie Farthing and Thomas

7  Christopher James and they were standing right there so that

8  this person -- assume that this person could overhear them.

9  Would that change your opinion as to her minimal participation

10 because she wasn't -- she didn't know that the crime was going

11 to happen?

12 A.   No, it would not because I am a psychiatrist and

13 unfortunately we are discussing my diagnosis in a -- in a place

14 where a -- some horrendous crimes were committed.  So I know

15 it's not easy to tune into the description of this illness

16 which I'm describing.  If we were discussing this illness in a

17 clinical -- in a clinical set up where there was no -- where

18 this was not over our heads and we could listen with our open

19 ears and objectively this would make much more sense.  But when

20 I say that this girl was in this dreamy like state and her only

21 interest was this urgent need to leave the place where she had

22 been traumatized and where she had no -- no more support, no

23 more relationships and she was dreaming about the fabled New

24 York and the house where this woman whom she dreamed as

25 adopting as her mother, new mother, would -- she would live

Apolito - Cross                    120

1  with her forever after in happiness; this would make sense in a

2  -- as I said, in a clinical --

3       Q.   Doctor, --

4  A.   -- professional setting, but here it will make less sense.

5       Q.   So, Doctor, are you saying it makes no difference to

6  you that you -- that Jamie Farthing was lying to you about what

7  happened while she was up here in New Jersey?

8            MR. WEICHSEL:  Objection, judge.

9            THE COURT:  Sustained.

10 BY MS. BAGLIVI:

11      Q.   Doctor, this whole testimony you're giving about

12 being in this dream like state and watching everything from a

13 film, that comes from this defendant, does it not?  That she

14 wasn't aware of what was going on, she didn't know what was

15 happening, she -- it was like watching a film strip? That comes

16 out of her mouth, doesn't it?

17 A.   Yes.

18      Q.   Okay.  Well the, Doctor, how do you know when she

19 told you that she wasn't lying?

20 A.   Well then we have to -- if naturally, as I said before, I

21 cannot exclude that possibility, but if we have to hold a

22 person just because they have been involved in a crime and we

23 have to -- before we -- we hear them we have to assume that

24 they are going to lie, then there is no need for me to be here

25 if this is your assumption.

1      Q.    Doctor, you have many documents here to back-up or

2  discredit this defendant's testimony, did you not?

3  A.    I do not think so.

4      Q.    You didn't have -- you have a statement of Thomas

5  Christopher James and Ivy Demolena, isn't that correct?

6  A.    Yes.

7      Q.    Okay.  And, Doctor, would you like me to point out

8  some more inconsistencies to you?  Did you see any other

9  inconsistencies in Thomas Christopher James' statement and Ivy

10  Demolena's statement?

11          MR. WEICHSEL:  Judge -- it's argumentative, Your

12  Honor.

13          THE COURT:  I'll sustain it.

14  BY MS. BAGLIVI:

15      Q.    Doctor, she told you she wasn't aware that the murder

16  was going to take place until after it happened, correct?

17  A.    Yes.

18      Q.    Are you aware that Ivy Demolena tells the police that

19  they were discussing the killing while they were out on the

20  porch, before they even went into the house? Are you aware of

21  that?  I'll show you the page, just give me one moment.  Page

22  58 -- page 58.

23          Actually the bottom of page 57, this is Ivy

24  Demolena's statement.  Do you recall reading, "I said I would

25  have to kill him because he was going to identify me.

1          Q.    I know, but when did you decide that though?

2    A.    I mentioned it in Georgia and then I said it at the front

3    door of his house, maybe we won't have to because he'll just

4    see Farthing's face."

5          Are you familiar with that?

6    A.    Yes.

7          Q.    Do you recall reading that?

8    A.    Yes.

9          Q.    Okay.  And that was while they were standing at the

10   front door before they went into the home?

11         MR. WEICHSEL:  Objection, judge, that's not what that

12   statement says.  It doesn't say my client was present in any

13   occasion and the prosecutor is mischaracterizing the statement.

14         THE COURT:  Does it say that Ms. Farthing is -- I'm

15   not privy --

16         MR. WEICHSEL:  No.

17         THE COURT:  -- to that statement.

18         MS. BAGLIVI:  Well, judge, the testimony in this case

19   was that they were both standing at the front door when James

20   Polites opens the door.

21         THE COURT:  The jury is admonished that that's a

22   statement by someone who was not here on cross examination;

23   there's no evidence that she was there at that statement -- at

24   the time that statement was given.

25   BY MS. BAGLIVI:

1       Q.    Doctor, assume --

2             THE COURT:  Counsel, you're asking the doctor to

3    assume testimony --

4             MS. BAGLIVI:  I know.

5             THE COURT:  -- that we may have heard here in court

6    that he hasn't heard.

7             MS. BAGLIVI:  I'm sorry, that's my mistake, you're

8    right.

9             THE COURT:  And that's not proper.

10            MS. BAGLIVI:  Okay.

11            THE COURT:  You're not being fair there.

12   BY MS. BAGLIVI:

13      Q.    Assume, Doctor, that there was testimony in this case

14   that it was Jamie Farthing and Ivy Demolena that went up to the

15   top of the stairs to get Mr. Polites to open the door and

16   assume further he opened the door and he went downstairs,

17   leaving only Ivy Demolena and Jamie Farthing upstairs, okay?

18   And assume further that the statement says that she discussed

19   it -- Ivy Demolena discussed killing -- maybe we won't have to

20   kill him because he'll only see Farthing's face, okay?  Doctor,

21   the fact of that, how does it compare with what she told you

22   that she had no idea that there was even any discussion of a

23   killing?  Would that change your opinion; yes or no?

24            MR. WEICHSEL:  Judge, I -- again I'm going to object.

25   Let me come to sidebar.

1          THE COURT:  Counsel, you said change your opinion;

2  change his opinion as to what?

3          MS. BAGLIVI:  The minimal participation.

4          THE COURT:  Okay.  There's an opinion as to the

5  mental state of the defendant.

6          MS. BAGLIVI:  Correct.

7          THE COURT:  That's not what you're talking about?

8          MS. BAGLIVI:  Well minimal -- he's saying minimal

9  participation goes to her mental state if I'm reading the

10 report correctly.

11         THE COURT:  Doctor, what is your opinion so we get it

12 straight with Ms. Baglivi.

13         THE WITNESS:  No, I would not change my opinion.

14         THE COURT:  Just a minute, your opinion --

15         THE WITNESS:  Oh, I'm sorry -- I'm sorry.

16         THE COURT:  Your opinion is that the defendant

17 suffers from post-traumatic stress disorder?

18         THE WITNESS:  And them complicated by a

19 disassociative reaction.

20         THE COURT:  A disassociative disorder?

21         THE WITNESS:  Yes, that's right.

22         THE COURT:  All right, that's your opinion?

23         THE WITNESS:  Right.

24         THE COURT:  Is that what you're talking about when

25 you say does that change his opinion?

1          MS. BAGLIVI:  No.

2          THE COURT:  Does it change that opinion?

3          MS. BAGLIVI:  No, I'm not -- I'm not asking that.

4          THE COURT:  All right, so then that's precisely why

5     I'm stepping in, to make it clear as to what --

6     BY MS. BAGLIVI:

7          Q.   Doctor, referring to page -- I guess it's page -- it

8     says page five -- of your report.  Do you not say, "My careful

9     review of all the facts and statements contained in the

10    discoveries reveal that Ms. Farthing played no significant role

11    in either the planning or executing the criminal acts and that

12    she accrued no personal benefit from them."

13          Do you say that in your statement -- in your report?

14    A.    Yes, yes.

15          Q.   Doctor, you said that at -- after the -- after the

16    Polites homicide that Ms. Farthing only got a ring for $30, is

17    that correct?

18    A.    No, she got some other -- I think it was a radio, there

19    was another piece of jewelry, not a very expensive piece of

20    jewelry, and some other few items which were found in her home

21    -- in her mother's home in -- in Georgia.

22          Q.   And, Doctor, you told us the ring was worth $30?

23    Where did you get that information from?

24    A.    I think from Ms. Farthing.

25          Q.   Okay.  And again, sir, I'm going to show you

1   something that's been marked for identi -- it's actually marked

2   into evidence already.

3          MS. BAGLIVI:  Judge, I'm sorry, I didn't bring up the

4   boxes of evidence, I don't have it with me.

5   BY MS. BAGLIVI:

6      Q.    Assume, Doctor, that the -- during the course of this

7   trial the State produced a receipt that showed the ring was

8   worth $150.

9          MR. WEICHSEL:  Judge, objection because the results

10  of the testimony was that we had a second ring, a Goofy ring

11  that was worth like fifteen or twenty bucks.

12         THE COURT:  That's right.

13         MS. BAGLIVI:  Judge, there was testimony she received

14  a motion ring and how much the motion ring was.

15         MR. WEICHSEL:  And there's also testimony of the

16  Goofy ring.

17         THE COURT:  So now we got two rings.

18         MR. WEICHSEL:  Okay.

19  BY MS. BAGLIVI:

20     Q.    She's -- how many rings did she tell you she got?

21  A.    She got two rings; one I believe was from the properties

22  that were stolen from Mr. Polites' home.

23     Q.    Are you referring to the Super Bowl ring?

24  A.    Pardon me?

25     Q.    A Super Bowl ring?

1  A.   There was another ring, but then the one that was -- the

2  one that was purchased which was a -- called -- I think it was

3  called -- she called a clear -- oh, no, no, I guess they did

4  purchase two rings.   For one there was a clear stone -- a clear

5  stone and one was a Goofy ring.

6       Q.   Right.   And the Goofy ring, Doctor, I'm going to ask

7  you to assume that there was testimony produced that the Goofy

8  ring did in fact cost I think $12 or $15, but she received the

9  other ring which I believe was $145 to $150.   Doctor, do you

10 place any weight in that, that it's inconsistent with what she

11 told you?

12 A.   Well --

13      Q.   Doctor, just yes or no; do you place any weight in

14 the fact that she told you it was $30 and it turns out to be

15 $145 and $12?

16 A.   There would be some -- some change in the sense that she

17 minimized her reward.

18      Q.   Okay.   Now, Doctor, you're aware or she told you that

19 she in fact, during the course of -- well actually after these

20 crimes she went back down to Georgia and then in fact came back

21 up, is that correct?

22 A.   Yes.

23      Q.   Okay.   And, Doctor, are you aware that you're the

24 only doctor that she told that to?

25 A.   No, not aware of that, no.

1     Q.   Okay.  It's -- you don't find it though in Dr.

2  Simring's report or even Dr. Kleinman's report, do you?

3  A.  I don't believe so.

4     Q.  Okay.  Now, did you find it in her statement?

5  A.  I do not remember.

6     Q.  Okay.  Now, Doctor, assume for a moment that that is

7  true.  Assume that there was testimony from a witness in this

8  courtroom that this defendant in fact left New York by herself,

9  went back down to Georgia, stayed for a short period of time

10  and came back up to New York.  Doctor, doesn't that indicate

11  that nobody had any control over here, that she came back to

12  New York?

13  A.  Her condition had not changed and she still believed that

14  she should pursue her relationship with Ivy Demolena.

15     Q.  Doctor, assume for a moment that the same witness

16  testified that when Jamie Farthing came back down to Georgia he

17  and Loopey Anderson both asked her to stay --

18  A.  Yes.

19     Q.  -- and her response was I'm going back up to New York

20  because I want to get more stuff.  Would that have any impact

21  on this defendant and your perception of her mental state at

22  the time of the offense?

23     MR. WEICHSEL:  Judge, I -- I don't recall that

24  testimony, Your Honor, and I think it's a mischaracterization.

25     THE COURT:  Well I'll leave it to the jury to recall.

1    BY MS. BAGLIVI:

2        Q.    Assume that that's true for a moment; would that

3    change your opinion -- or let me rephrase it this way.

4    Wouldn't that suggest to you that it wasn't like she had to go

5    back because she was afraid of Ivy Demolena, but that she was

6    having too much of a good time and she wanted to get more

7    stolen property?

8    A.    She had gotten practically nothing.

9        Q.    That's what she told you, she got nothing.  Doctor,

10   let me ask you, are you aware what the others got in this case?

11   A.    Pardon?

12       Q.    Are you aware of what Ivy Demolena and Thomas

13   Christopher James got?

14   A.    Not a huge amount of money or goods.

15       Q.    Right.  Well, Doctor, were you aware that all of them

16   got just little trinkets and all of the good jewelry was pawned

17   to pay for the expensive hotels?  Were you aware of that fact?

18   A.    Yes, I heard that, yeah.

19       Q.    Doctor, were you also aware -- or let me ask you

20   this.  Assume for a moment that a witness came into the

21   courtroom and testified that Jamie Farthing when she finally

22   confessed to this witness about what had happened in New York,

23   that she told him, in response to a question why did you do it,

24   she said it was easy.  Doctor, the fact that she said

25   committing these crimes was easy --

1          MR. WEICHSEL:  Judge, I -- I'm going to object;

2    that's never been testified to.

3          MS. BAGLIVI:  Judge, I -- it was testified --

4          THE COURT:  Sidebar please.

5                    (SIDEBAR)

6          MS. BAGLIVI:  Mr. Kummer, when I asked him when she's

7    up in New York and they're in the park and she -- she confesses

8    and I said did you ask her why she did it; yes, because it was

9    easy.

10         THE COURT:  All right, we'll have to rely upon their

11   recollection.

12         MR. WEICHSEL:  Okay.

13                    (END OF SIDEBAR)

14         THE COURT:  The jury is to rely upon their own

15   recollection as to the testimony; testimony by other witnesses

16   in the trial.  Go ahead.

17   BY MS. BAGLIVI:

18      Q.   Doctor, the fact that Jamie Farthing told someone

19   that committing these crimes was easy, doesn't that show you

20   that she knew what she was doing when she did it, knew what she

21   was doing when she was committing these crimes?

22   A.   Which crimes are you referring -- which actions, criminal

23   actions are you referring to?

24   A.   You've got the Hippman crimes and the Polites crimes.

25   Without delineating all the different counts of those crimes,

1   you know, armed robbery, kidnapping, possession of a weapon --
2   when I'm talking about those two incidents doesn't the mere
3   fact or doesn't -- isn't this one fact to consider that she
4   said it was easy?  Doesn't that suggest to you she knew what
5   she was doing?
6   A.   But I think in -- I mean forgive me, I'm not being
7   lighthearted in this respect, but we have to say that for her
8   actually it was easy because she really didn't do the hard core
9   of -- perform the hard core of the crimes.  She was given a few
10  side tasks to do and she really didn't have to make any real
11  hard decisions, she didn't have to do -- to confront herself
12  with doing the real criminal acts like killing somebody.
13       Q.   Okay.  Well, Doctor, let me ask you a question then.
14  You are familiar with accomplice liability, you're a forensic
15  psychiatrist?
16  A.   With a what please?
17       Q.   Accomplice liability?
18  A.   Oh yes.
19       Q.   Okay.  And, Doctor, how many -- for instance, let's
20  take something -- let's take another crime.  How about a
21  shooting?  It only takes one person to pull a trigger, isn't
22  that correct?
23  A.   Yes.
24       Q.   Okay.  And if other people participated in the
25  planning or the execution of it or in the rewards are you

1    saying that because they're not the ones that actually pulled

2    the trigger they're not responsible?

3              MR. WEICHSEL:  Judge, that's three questions;

4    planning, execution and rewards.

5              THE COURT:  I'll allow it.

6              THE WITNESS:  If Ms. Farthing had -- had a clear mind

7    and an ability to be part, conscious and purposeful part of a

8    crime, then I would fully agree with you.  But my presence here

9    is due to the question of whether Ms. Farthing was in effect

10   mentally -- fully mentally lucid and clear as to what she was

11   participating in and being an accomplice to.  This is really

12   the crux of the matter.

13   BY MS. BAGLIVI:

14       Q.   I understand that, but, Doctor, in your report you

15   actually point out -- isn't the fact that it was minimal

16   participation one of the factors you considered in coming to

17   your opinion?

18             MR. WEICHSEL:  That's been asked and answered, judge.

19             THE COURT:  Yeah, it has.  I think we've gone over it

20   enough times; that's what he says.

21   BY MS. BAGLIVI:

22       Q.   That minimal participation is one of the factors?

23   A.   One of the factors.

24       Q.   Okay.

25   A.   Yes.

1    Q.   So if you -- if you assume that it wasn't minimal

2    participation, that it was much more than what you thought it

3    was then would that change your opinion?

4         MR. WEICHSEL:   Judge, that's argumentative.

5         MS. BAGLIVI:   It -- judge, it's not argumentative.

6    He says that minimal participation was one of the factors he

7    considered and I'm saying assume it was more participation.

8         THE COURT:   I sustain the objection.  Let the jury

9    make a determination; that's what it's here for.

10   BY MS. BAGLIVI:

11        Q.   Doctor, where in your report do you say that this

12   defendant could not act with purpose or knowledge in committing

13   the crimes?

14   A.   I believe in my conclusion.

15        Q.   Okay.  Could you please point it out for me and tell

16   me what page you're on?

17   A.   The state of mind which I --

18        Q.   I'm sorry, what page are you on?

19   A.   Last page.

20        MS. BAGLIVI:  May I -- judge, may I go see where he's

21   pointing to?

22        THE COURT:  Yeah.

23        MS. BAGLIVI:  Did you say yes?

24        THE COURT:  Yes.

25        THE WITNESS:  Page number six.

BY MS. BAGLIVI:

    Q.   The pages are not numbered; this is the page?

A.   Yeah.

    Q.   Okay.  Got it, okay.  So, Doctor, show me in this report where it says she did not act with purpose and knowledge?

A.   The specific words you are asking me about I do not know whether I used.

    Q.   Well read the whole thing to yourself, Doctor, and see if in your conclusion you say anywhere in that report that she was not able to act with purpose or knowledge.

                        (PAUSE)

A.   I did not use -- you are right, I did not use the terminology that is -- would have been more appropriate in expressing my opinion.

    Q.   Okay.  Doctor --

A.   Yes?

    Q.   I'm sorry.  So you did not use the words purposely and knowing?

              MR. WEICHSEL:  Judge, I --

              THE WITNESS:  I did not.

BY MS. BAGLIVI:

    Q.   Okay.

              MR. WEICHSEL:  I think he had more --

              MS. BAGLIVI:  Judge, my question was did he use the

1    words.

2              THE WITNESS:  I did not use the words.

3    BY MS. BAGLIVI:

4         Q.    Okay.  Doctor, assume that there was testimony in

5    this case that the defendant got a message to her that the

6    others had been arrested and to lay low, and to assume further

7    that she then packed up her bags, told her boyfriend that she

8    wanted to go to Florida.  Assume those facts are correct.

9    Doctor, would that not indicate to you that she was fleeing

10   from the police because she knew her actions were wrong?

11   A.    My information is --

12        Q.    No, not what your information is.  I'm asking you to

13   assume those facts.  Assume that there was a phone call from

14   Ivy Demolena --

15   A.    Yes.

16        Q.    -- to her -- to Jamie Farthing's boyfriend.

17   A.    Um-hum.

18        Q.    Assume further that the message was we've been

19   arrested, that she -- that she should lay low so she doesn't

20   get caught.  Assume further she packed up the car with her

21   luggage and then her parents began to drive her away and assume

22   further -- I'm sorry, I forgot that when the message was

23   delivered to her that the -- she told the boyfriend, and he

24   testified in court that she said she was going to take off to

25   Florida.  Doctor, would that evidence of flight indicate to you

1    that this woman knew her actions were wrong and was trying to

2    get out of the area before the police got there?

3    A.    I address the court to allow me to qualify that answer.  I

4    cannot answer yes or no because it would be unfair to --

5              THE COURT:  Well answer it the best way you can,

6    Doctor.

7              THE WITNESS:  Apparently before Ms. Demolena called

8    her and spelled her defects --

9    BY MS. BAGLIVI:

10       Q.    I'm sorry, what?

11   A.    Apparently before Ms. Demolena made that call you mention

12   that -- which brought the light to Ms. Farthing that she had

13   been part of something very wrong, she had not realized before

14   then that that was the case.  In fact she had -- she had gone

15   home and left these people who she had said they don't like

16   anybody, they were hateful people.  And she had made plans to

17   move into her mother's home, I think they had brought furniture

18   there, and asked her boyfriend to move in with her so that they

19   would start a nice happy life.

20       Q.    Okay.  And, Doctor, you got that from the statement

21   from the defendant and what she told you?

22   A.    Of course.

23       Q.    Okay.  But now I'm asking you to assume that that is

24   not true.  I'm giving you a hypothetical.  Assume that that

25   information was a lie that she told you and assume that the

1   testimony was that the call from Ivy Demolena down to Georgia

2   to Edward Kummer was we just got arrested, tell Jamie to law

3   low.  Edward Kummer tells that to this defendant, her response

4   is I'm going to take off to Florida.  And assume further that

5   there was testimony that the police were watching the house,

6   the car was packed with her luggage and her parents were

7   driving her off.  Doctor, would that not infer to you -- or

8   would you not believe that that flight on her part inferred

9   that she knew what she had done was wrong?

10  A.   I don't think you heard me.

11       Q.   I'm sorry?

12  A.   I don't think you heard me; I answered that question.

13       Q.   No, you said that there was other --

14           THE COURT:  No, no, he says he answered it.

15           MS. BAGLIVI:  Judge, we didn't -- I didn't -- he

16  didn't give an answer.

17           THE WITNESS:  I told you what my opinion is, that Ms.

18  Demolena -- that Ms. Farthing realized for the first time her

19  implications which something very serious.

20  BY MS. BAGLIVI:

21       Q.   When?

22  A.   When Ms. Demolena made the call; that she had not realized

23  that she was in such trouble before Ms. Demolena made that

24  call.

25       Q.   Okay.

1   A.    Yes.

2         Q.    Then you're saying she didn't understand prior to

3   that phone call what she had done was wrong?

4   A.    Yes, right.

5         Q.    Okay.  But then you're saying once the phone call

6   came in --

7   A.    Yes.

8         Q.    All of those actions after that call, doesn't that

9   indicate to you that she knew what she had done was wrong and

10  she was attempting to flee from the police?

11  A.    Well I think this proves my opinion, not yours with all

12  due respect.

13        Q.    Doctor, answer the question.

14              THE COURT:  Wait.

15              MR. WEICHSEL:  He is answering.

16              THE COURT:  He is answering it.

17              THE WITNESS:  I think this proves my opinion, not

18  yours.

19  BY MS. BAGLIVI:

20        Q.    Doctor, does this show she knew then after the call?

21  A.    After the call.

22        Q.    Correct, that her actions were wrong?

23  A.    Yes.

24        Q.    Okay.

25  A.    Or at least she was afraid that -- naturally once she's

1   told by Demolena that they had been arrested and that naturally

2   she realizes that she -- or she knew that she had been with

3   them.   Obviously fear got to her that she was -- that she was

4   in trouble, there is no question about that.

5          Q.   Okay.   So now all of a sudden down in Georgia she has

6   a completely clear mind, is that what you're telling us?

7   A.   No.

8          Q.   Doctor, are you aware that the first mention ever of

9   sexual abuse, any allegations by this defendant that she was

10  sexually abused comes after she's charged with murder?

11  A.   I'm sorry?

12         Q.   The first time anybody hears this defendant claim

13  that she was sexually abused, isn't it a fact it comes after

14  she's charged with murder?

15  A.   No, I believe that there is some history that there was

16  some awareness that she had been sexually abused while she was

17  in school and at that time the -- I think it was the school or

18  -- or was DYFS, I'm not sure, advised that they -- that the

19  family go -- undergo some treatment.

20         Q.   Okay.   And, Doctor, were you aware that DYFS, the

21  Department of Human Services down in Georgia looked into

22  whether or not this defendant and her brothers was physically

23  abused and found absolutely no evidence of that?

24  A.   Yeah, there was no evidence found, right.

25         Q.   All right.   And they interviewed this defendant, they

Apolito - Cross                     140

1  interviewed the father, they interviewed the mother, they

2  interviewed the brother, correct?

3  A.   Well none of them admitted that they had done or had been

4  witness to the deeds.

5       Q.   Doctor, didn't the Department of Human Services close

6  out this case and did not refer it to the prosecutor's office

7  down there?

8  A.   I believe so.

9       Q.   Okay.  Doctor, have you ever heard of a case where

10 people deny committing a crime and it ends up going to trial or

11 it gets indicted anyway?

12 A.   I'm sorry, I don't get what --

13      Q.   Well have you ever heard of a case where someone's

14 accused of a crime, they tell the police they didn't do it, but

15 yet they go forward with the trial anyway?

16           MR. WEICHSEL:  Judge, objection.

17           THE WITNESS:  I'm sorry, I don't --

18           THE COURT:  Sustained.

19 BY MS. BAGLIVI:

20      Q.   Oh, Doctor, you had talked about this allegation that

21 the defendant Jamie Farthing made that she was raped, is that

22 correct?

23 A.   Yes.

24      Q.   Okay.  And, Doctor, other than the defendant telling

25 you this did you find any police reports on this?

1   A.   No, as a matter of fact she stated that she had not told

2   anybody.

3        Q.   Okay.

4   A.   She --

5        Q.   And the first person she told was the medical people

6   after she was charged with murder?

7   A.   Yes. Actually she had not told Dr. Kleinman who had been

8   the first one to interview her.   And he -- she had told him

9   very little about all these traumas that she had undergone.

10       Q.   Okay.   So she didn't tell the first doctor, it was

11  only on the second interview where she finally told?

12  A.   With a woman, yes.

13       Q.   Okay.

14  A.   Yes.

15       Q.   Now let me ask you another question, Doctor.   Prior

16  to your and Dr. Kleinman diagnoses of post-traumatic stress

17  disorder in this case, had there ever been a diagnosis of this

18  defendant in her 18 years of post-traumatic stress disorder?

19            MR. WEICHSEL:   Judge, objection; there has to be an

20  opportunity for a diagnosis.

21            MS. BAGLIVI:   Well, judge, this is cross examination.

22            THE COURT:   Yeah, I'll allow it.   Do you know of any

23  diagnosis of this nature before?

24            THE WITNESS:   No.

25  BY MS. BAGLIVI:

1      Q.    Okay.  But you did refer earlier to the fact that she

2    went into counselling while she was in school, she had some

3    kind of mental health intervention?

4    A.    They had -- they had observed that Ms. Farthing when she

5    was about ten years old had a great deal of anger in her, that

6    was the report.  And they seemed to have related to some sexual

7    molestation and treatment was advised which apparently was

8    really never actually followed.

9      Q.    Okay.  As far as you know it was never followed?

10   A.    Yes.

11     Q.    Okay.

12   A.    But one of the other reasons why this post -- post-

13   traumatic stress disorder may not have been diagnosed was that

14   -- well let's face it, Ms. Farthing had never gotten into

15   trouble, serious trouble as she did in this case and had never

16   come under anybody's examination.

17     Q.    Well, Doctor, you just testified that there was a

18   Department of Human Services, the Division of Youth and Family

19   services in Georgia did an investigation?

20   A.    Well they did -- they just referred, as far as we know to

21   the fact that this girl, ten years old, was very angry.   There

22   was never really -- we have no reports that there was actually

23   an in depth workup of her case.

24     Q.    Okay.  So there were no reports saying that there

25   was, but that doesn't mean they don't exist, isn't that

1  correct?

2          MR. WEICHSEL:  Object, speculation, Your Honor.

3          THE COURT:  Sustained.

4  BY MS. BAGLIVI:

5      Q.   Doctor, you also testified earlier in your

6  examination of this defendant in coming to your conclusions you

7  also did read in fact the letter that this defendant wrote to a

8  Greg, is that correct?

9  A.   To please?

10      Q.   To a person by the name of Greg?

11  A.   Oh, the other inmate?

12      Q.   Yes.

13  A.   The male inmate?

14      Q.   Yes.

15  A.   Yes.

16      Q.   Okay.  And, Doctor, do you recall reading a portion

17  of the statement that, "I like Liz, but I don't trust her.  I

18  like her, she's got a good heart.  Well Corrections Officer

19  Garrow wouldn't play blind so he'd see and I'd get charged if I

20  beat the shit out of her.  It's far from over.  I went up to

21  her room and told her bitch, don't let my name come out of your

22  mouth, don't look at me, don't even look in my direction."

23          Did you read that?

24  A.   Yes.

25      Q.   Okay.  And, Doctor, in your report you say that Jamie

1    Farthing told you that she was a good girl in jail, is that

2    correct?

3    A.    Yes, at least at the time I saw her.

4         Q.    Okay.

5    A.    Yes.

6         Q.    Okay.  And did you have an opportunity to read this

7    before coming to court to testify today?

8    A.    Yes.

9         Q.    Okay.  And did she tell you about -- that she had a

10   problem with another woman, that she wanted to beat her up?

11   A.    No.

12        Q.    Did she tell you about the problems in the jail with

13   being charged with different violations?

14   A.    No, actually I didn't ask her.  I wasn't aware that there

15   was any problem at the time.  But she did say that she had been

16   a good girl in jail; yes, you're right.

17        Q.    Okay.  Did you recall reading this section of the

18   letter, "Bitch didn't say nothing till I walked off and I

19   barely heard her call me a murderer.  I told her she was next."

20   A.    She was what?

21        Q.    She was next.

22   A.    Oh.

23        Q.    Okay.  Doctor, does that change your -- well let me

24   put it to you this way; why would you put in there that she

25   said she was a good girl?  Is that your findings too?

1   A.    I didn't say that.

2        Q.    No, that's what I'm asking you.  It's in your report

3   that she told you she was a good girl in jail.  Why is it in

4   your report?  Does it have any relevance to your opinion?

5   A.    Well I didn't know any different.  She told me that she

6   had been a good girl in jail.

7        Q.    Okay.  But -- I understand that, but my point to you

8   is you put that in your report -- does that have -- is that a

9   factor that you considered in coming to your opinions in this

10  case?

11  A.    No.

12       Q.    Okay.

13            THE COURT:  Ladies and gentlemen of the jury, I have

14  to instruct you now to make sure you understand.  The evidence

15  that you just heard, or at least the discussion by the attorney

16  -- by Ms. Baglivi indicating that there's a letter where there

17  are some alleged threats, where it being permitted or into the

18  case where you can review it, but the purpose of it is to -- is

19  a question of credibility.  When she says now that she is a

20  good girl in jail, the prosecution is presenting evidence that

21  that may not be true and that's the purpose of that particular

22  piece of information that you can consider.  You are not, and I

23  stress this, you are not to consider it in any vein as to any

24  propensity by this defendant to commit any harmful acts or

25  violent acts.  That's not the in -- that's not the reason

1  you're allowed to hear this.  You are not to draw any negative

2  references.  You are to consider it only in the framework of

3  credibility.  You understand?  You cannot consider any prior

4  bad acts or any allegations of bad acts to prejudicial to the

5  defen -- to the prejudice of the defendant.  You are con -- I

6  allow you to listen to that only because of the credibility

7  issue that the State is raising, so it's within that framework.

8  Okay? Go ahead.

9  BY MS. BAGLIVI:

10      Q.    Doctor, do you recall reading a further line, "Could

11 I pay someone to beat him up and say Jamie says hi?"  Do you

12 remember reading that?

13 A.    Yes, I read the whole letter, yes.

14      Q.    Okay.  And, Doctor, does that change your opinion as

15 to the diagnosis of this defendant as to what she's suffering

16 from?

17 A.    No, it's -- a matter of fact it confirms because let's not

18 forget that the first indication that Ms. Farthing was a

19 troubled person was when she was ten years old.  And it was the

20 -- this was the remark that through some kind -- allowed out

21 that she was very angry.  She had a great deal of anger in her.

22 And I'm sure that this anger, you know, has not disappeared.

23 She has not had any treatment, she has gotten worse rather than

24 -- rather than better.  And when she was outside and she was --

25 she was taking care of this anger with her alcohol and drugs

1  and LSD and now she's there in prison, she doesn't have any of

2  this -- of these props or any of these sedatives.

3       Q.   Okay.  Doctor, are you saying that people that act in

4  anger are not responsible for their acts?

5  A.   I never said that.

6       Q.   Okay.  That's what I'm asking you.

7  A   No, I never said that.

8       Q.   But, Doctor, you've referred to LSD and a few other

9  drugs.  I know we've touched on, you know, the marijuana and

10 the cocaine and everything.  Again, where do you get this

11 evidence of LSD?

12 A.   Oh, she told me.

13      Q.   Okay.  Any other independent evidence as to LSD?

14 A.   No.

15      Q.   I'm sorry, I missed something on your report, we have

16 to go back a bit on Mr. -- when they're all discussing the

17 crimes up in New York.  Your report on page three you say,

18 "Apparently Jamie did ask Ms. Demolena about the risks they

19 would face from these planned robberies, but again, she was

20 easily reassured that she would be protected from any danger."

21 Okay, did you say that in your report down towards the bottom,

22 Doctor?

23 A.   At the bottom?

24      Q.   Towards the bottom.

25 A.   At the bottom of the page --

1          THE COURT:   Which page?

2          MS. BAGLIVI:   It's the -- that one long paragraph

3    towards the back, the fifth line.

4          THE COURT:   Are we on the right page?

5          MS. BAGLIVI:   Page --

6          THE WITNESS:   We're talking about page three?

7    BY MS. BAGLIVI:

8      Q.   Yes.

9          THE COURT:   There's three paragraphs on page three.

10         MS. BAGLIVI:   Judge, mine says page three and it's --

11   I'll show -- may I show the doctor what page I'm on?  Mine is

12   numbered three.

13         THE WITNESS:   Oh, maybe there is -- how can that be?

14   These are all copies of my original report.

15   BY MS. BAGLIVI:

16     Q.   I don't know, let me show you; this one, this page.

17   A.   Oh, that's two.

18     Q.   Oh, I'm sorry, I'm reading the fax page, my

19   apologies.

20   A.   Oh, that's fine, okay.

21     Q.   Page two, down towards the bottom.  "Apparently Jamie

22   did ask Ms. Demolena about the risks they would face from these

23   planned robberies but again she was easily reassured that she

24   would be protected from any danger."  Did you say that?

25   A.   Yes.

1      Q.    Okay.  Well, Doctor, isn't it a fact that at that

2  point in time what she's referring to is that she did a risk

3  assessment; should I go, shouldn't I go, I might get caught,

4  maybe I won't get caught.  Isn't she doing a risk assessment?

5  A.    No.

6      Q.    She asked Ms. Demolena about the risks that they

7  would face?

8  A.    She was in a state of fear, of course she is, but she's

9  not in the state of clear mind and reasoning that you are

10  talking about, that's not the same thing.

11      Q.    Well what other reason, Doctor, would she ask about

12  the risks then?  If you're saying she would have just done

13  anything Ivy Demolena said why would she tell you that she

14  asked them about the risks they would face?

15  A.    But I did not say, Ms. Baglivi, that she was in a state of

16  unconsciousness.

17      Q.    Doctor, you said that she was like a puppet; were

18  those your words?

19  A.    Yes.

20      Q.    Okay.  A puppet doesn't question, a puppet just goes

21  when you pull the strings, isn't that correct?

22  A.    Well look, let's not carry now the analogy to the -- to

23  the very end.  I did not say -- I repeat, that she was

24  unconscious; she was not unconsciousness.  She was going

25  through these motions but she -- she knew she was

1   uncomfortable. She did not appreciate what we -- what she

2   actually was doing.  We do know that when she was older she was

3   directed to perform concrete acts and actually tie the men up

4   or point the gun.  She -- she just became frazzled, but as far

5   as her -- so being there was already painful to her.  She knew

6   that -- I mean she had these vague notions, but she did not

7   have that purposely, you know, determination which you are

8   talking about. There is a big difference.

9        Q.   But then, Doctor, why ask for reassurances from Ivy

10  Demolena?

11  A.   Because she was in that state.  She was following Demolena

12  but she was saying hey, but look, you are bringing me here and

13  this doesn't look -- you know, this doesn't look right and

14  Demolena says no, that's okay, you know, it is -- it is all

15  right and she continued to go along.

16       Q.   But --

17  A.   But she was never comfortable in doing it but she went

18  along.

19       Q.   Okay.  But she -- she said to Ms. Demolena this

20  doesn't look right.  Doesn't that suggest to you that she knew

21  committing robberies was wrong even though Ms. Demolena assured

22  her --

23            THE COURT:  I think -- counsel, I think the doctor's

24  answered the question; move on.

25  BY MS. BAGLIVI:

1    Q.   Didn't she then go on to tell you that, according

2    from your report, that, "She was easily reassured that she

3    would be protected from any danger, we wouldn't get caught, it

4    was foolproof."  Do you say that in your report?

5    A.   Yes.

6         Q.   Okay.  And, Doctor, are you aware that in fact it was

7    almost foolproof because they didn't get caught for six week?

8    Were you aware that it took six weeks --

9              MR. WEICHSEL:  Judge, object.

10             MS. BAGLIVI:  I'm sorry.

11             THE COURT:  Sustained.

12   BY MS. BAGLIVI:

13        Q.   In this recitation of the facts there's no mention of

14   alcohol or drugs in this report, in the recitation of these

15   facts, isn't that true, Doctor?

16   A.   I'm sorry, what?

17        Q.   In -- when you're going through what she told you

18   about the crimes, the particular crimes about what happened

19   when they went into each apartment and everything like that,

20   she does not mention in the recitation of the facts any drug or

21   alcohol use?

22   A.   Well we know about the Pino Grigio and --

23        Q.   I'm talking about in the recitation of the facts,

24   Doctor, not when you get into your conclusion later on.

25   A.   Well which fact are you referring to me?

1      Q.   Well on page two --

2  A.   Yes.

3      Q.   -- when she talks about you know, in the -- down at

4  the bottom of the page where they started to go -- you know,

5  where they discuss these plans and she comes up to New York and

6  she goes to the victim's house; there's no discussion or

7  there's nothing in here that talks about the drugs, the fact

8  that she was high or drunk when she committed the Hippman

9  robbery in this recitation of the facts?

10 A.   That's true.

11     Q.   And same thing with Mr. Polites' house, Doctor.  In

12 her recitation of the facts to you there is no mention of

13 alcohol or drugs, correct?

14 A.   In my report, yes.

15     Q.   She does say though that she asked for Pino Grigio,

16 isn't that correct?

17 A.   Yes.

18     Q.   Because she liked it at Mr. Hippman's house?

19 A.   Yes.

20     Q.   Okay.  So she even -- Doctor, do you attach any

21 significance to the fact that she even remembered the name of

22 the wine and the brand, Pino Grigio Santa Marguerita?  Do you

23 attach any significance to that?

24 A.   No, as I said, I did not say that Ms. Farthing was

25 unconscious.

1     Q.    I understand that, Doctor.  I'm asking you if you

2   attached any significance to that particular point?

3   A.    Well the significance to me, I already told you, that she

4   was in this kind of mental state, as if this were going to a

5   party.  She also asked Ms. Demolena whether Mr. Polites was

6   married or single.

7     Q.    Okay.  Well, Doctor, don't you take that to mean that

8   she was concerned to make sure there would be nobody else in

9   the apartment when they got there?

10  A.    That is -- that sense is not apparent.

11    Q.    I'm sorry?

12  A.    That sense was not apparent.

13          MS. BAGLIVI:  Judge, I'm sorry, I didn't under -- I

14  don't know what --

15          THE WITNESS:  That she was -- that her concern was

16  whether there would be any witness in the house or not.

17          THE COURT:  That's not apparent.

18          MS. BAGLIVI:  Oh, I'm sorry.

19          THE WITNESS:  It's not apparent, no.

20  BY MS. BAGLIVI:

21    Q.    Oh, okay.  Well, Doctor, in your vast experience, the

22  fact that somebody asked -- asks if there's going to be another

23  person present, doesn't that indicate to you that they didn't

24  want any witnesses around?

25  A.    Could be, but it was not necessarily apparent in this

1    case, that's all I'm saying.

2         Q.   Now, Doctor, are you saying based on this defendant's

3    childhood of abuse that because of all of these traumatic

4    events that you talked about she is not responsible for any of

5    these crimes?

6    A.   I did not --

7         Q.   Legally -- legally responsible.

8    A.   I did not say that.

9         Q.   Okay.

10   A.   I said that because of what this -- believe me, in my -- I

11   have to say, in my long career as a psychiatrist I don't

12   remember having been around anybody who had been exposed to so

13   many psychological traumas.   I mean this is a museum of abuse.

14        Q.   Okay.

15   A.   This is a museum.   And this is -- this should not be

16   minimized and the signs were there.   I'm not saying that

17   because of this trauma she's not responsible, I'm saying that

18   because of what the psychological traumas did to her mind she

19   was not capable of fully understanding what she was going --

20   what she was taking part to.

21        Q.   Okay.   Doctor, were you aware that Dr. Kleinman

22   testified that his theory in this case is that people who are

23   traumatized physically, emotionally, sexually should not be

24   responsible for their crimes?   Have you ever heard of a theory

25   like that?

1   A.   No, I haven't; I do not approve of that.

2        Q.   Okay.

3   A.   I don't think it's automatic -- I don't think it's

4   automatic, no.

5        Q.   You think it's automatic or not automatic?

6   A.   Not automatic.

7        Q.   Okay.

8   A.   No.

9        Q.   And, Doctor, are you aware of the statistics that say

10  that 95% of people who are abused both sexually and physically

11  as children go on to lead law abiding lives?

12  A.   Ninety five percent?

13       Q.   Ninety five percent.

14  A.   No, I have not heard of such statistics.  I thought they

15  were -- it was lower than that even though that is besides the

16  point --

17       Q.   Okay.

18  A.   -- because if -- if your statistics --

19       Q.   Doctor, I just want to know, are you aware of that

20  statistics?

21  A.   I thought there was --

22            THE COURT:  I'm going to let him comment on it

23  because I don't know where that statistic is coming from, but -

24  -

25            THE WITNESS:  Well if -- if your statistics is

1    correct then unfortunately Ms. Farthing belonged to that

2    unfortunate 5%, but I also have to say that your statistics

3    most probably do not contemplate, do not include people with

4    multiple psychological traumas which I have listed in her case.

5    BY MS. BAGLIVI:

6        Q.   Doctor, would you agree with the statement that

7    childhood abuse, whether it's physical or emotionable --

8    emotional -- emotional is not the inevidentable and -- I'm

9    sorry -- a life of crime is not the inevitable conclusion of

10   someone who is abused physically and emotionally and sexually

11   as a child?

12           MR. WEICHSEL:   Judge, I object to the --

13           THE COURT:   Sustained.

14   BY MS. BAGLIVI:

15       Q.   Doctor, are you aware of the National Institute of

16   Justice study done in 1994 on victims of childhood sexual abuse

17   later criminal consequences?

18   A.   No, I'm not.

19       Q.   Okay.   You never read the article by Kathy Spatz

20   Widon, W-I-D-O-N?

21   A.   No, I haven't.

22       Q.   Okay.   Well, Doctor, would you agree -- I'm sorry,

23   strike that.   Do you try to stay up, Doctor, on all of the

24   periodicals, articles, books, things of that nature dealing

25   with this issue that you're an expert in?

1    A.    Oh, yes.

2                   MR. WEICHSEL:   Judge --

3                   THE COURT:   Sidebar please.

4                          (SIDEBAR)

5                   THE COURT:   I don't know who's name you threw out

6    there but it's nothing to anybody here.

7                   MS. BAGLIVI:   It's the article that I -- it's a

8    national institute -- that Dr. Simring is going to refer to it

9    too about the --

10                   THE COURT:   Well who's the person?

11                   MS. BAGLIVI:   It's a National Institute of Jus --

12   it's a Justice Department study by this woman.   I'm asking if

13   he knows it.

14                   THE COURT:   No, (inaudible).

15                   MS. BAGLIVI:   She's a -- she's a psychologist from

16   New York.

17                   THE COURT:   No, unless she's a recognized expert in

18   the field you can't bring in any testimony that would challenge

19   his testimony.

20                   MS. BAGLIVI:   I'm just asking him if he's aware of

21   it.

22                   THE COURT:   He's the expert, he's going to -- he's --

23

24                   MR. WEICHSEL:   He said he's not read it.

25                   THE COURT:   He's been determined -- he's been

1    determined by this court to be an expert.

2              MS. BAGLIVI:  Right.

3              THE COURT:  And he knows nothing about that and

4    you're challenging him with something that --

5              MS. BAGLIVI:  No, I'm not challenging him with that.

6    My question was do you keep up on all the --

7              THE COURT:  He says he doesn't know.

8              MS. BAGLIVI:  No, that article.  But then my next --

9    I dealt with that article.  My next question to him was, where

10   the objection was, is do you keep up on all of the articles and

11   books and periodicals that are written on this.

12             THE COURT:  All right.  Suppose he says yes?

13             MS. BAGLIVI:  Okay.  And --

14             THE COURT:  Then where are you going?

15             MS. BAGLIVI:  Fine, then the question is answered

16   because he says he doesn't know that one so it's attacking his

17   credibility.

18             MR. WEICHSEL:  Judge, (inaudible).

19             THE COURT:  All right, well you can ask the question

20   -- you can ask the question.

21                       (END OF SIDEBAR)

22             THE COURT:  Go ahead.

23   BY MS. BAGLIVI:

24        Q.    Doctor, you're a forensic psychiatrist, correct?

25   A.    Yes.

1          Q.    Okay.   Do you have any sub-specialties in the area of

2     childhood abuse?

3     A.    No.

4          Q.    Okay.   You said that this defendant could not act

5     with purpose or knowledge in either of these two crimes,

6     correct?

7     A.    Yes.

8          Q.    Okay.   Doctor, when this defendant went to Robert

9     Hippman's house did she realize that she was going to the house

10    of someone that they were going to rob?

11    A.    Yes, that's what she was told.

12         Q.    Now when she pulled out the gun in Mr. -- well

13    whether Ivy Demolena gave her the gun or she actually pulled

14    the gun out, when she had the gun in her hand did she know it

15    was a gun?

16    A.    Oh, she knew it was a gun, yes.

17         Q.    Okay.   When she put socks on her hands and began

18    rummaging through the apartment did she know that she was

19    looking for things that she wanted?

20    A.    Yes.

21         Q.    Okay.   When Thomas Christopher James tied up or taped

22    up Robert Hippman did she know that Robert Hippman was being

23    taped up?  And I don't mean did she see it, but did she realize

24    he was being taped up so that he couldn't get away?

25    A.    Yes.

1    Q.   Okay.   Now when they went to Robert Hippman's house
2 did she know the purpose for which they were going there?
3 A.   Yes.
4    Q.   To commit this robbery?
5 A.   To rob, yes.
6    Q.   Mr. Polites', let's deal with that crime.   When she
7 went to Mr. Polites' did she also know in that particular case
8 their purpose was to again rob this person?
9 A.   Yes.
10    Q.   Okay.   And again, sir, when he was -- Mr. Polites was
11 tied up with these neck ties did she realize that that was so
12 he couldn't escape?
13 A.   Yes.
14    Q.   Okay.   And as a matter of fact, Doctor, did you learn
15 or did you know or did the defendant tell you that she was the
16 one who threw down the neck ties from the upstairs so that Mr.
17 Polites could be tied up?
18 A.   Yes; she was asked to do that, yes.
19    Q.   Okay.   And, sir, when she again put socks on her
20 hands and was rummaging through Mr. Polites' house did she
21 realize again it was to look for money or jewelry or you know,
22 things that she liked?
23 A.   Yes.
24    Q.   Okay.   And in her statement she -- do you recall her
25 telling you or do you recall reading in her statement that she

1   says when she goes upstairs and sees Mr. Polites dead she goes,

2   runs back downstairs and continues packing up all of the bags

3   to take away the loot?

4   A.    I don't recall that information.

5         Q.   Okay.  Again, sir, did -- did she realize that the

6   purpose in going to Mr. Polites' house was to commit a robbery?

7   A.    Yes.

8         Q.   Okay.

9              MS. BAGLIVI:  Thank you, I have nothing further.

10  REDIRECT EXAMINATION BY MR. WEICHSEL:

11        Q.   The prosecutor referred to this -- to this jail

12  letter.

13             MS. BAGLIVI:  It's been marked at the top.

14  BY MR. WEICHSEL:

15        Q.   It's been marked --

16             MS. BAGLIVI:  On the front page up in the right

17  corner.

18  BY MR. WEICHSEL:

19        Q.   -- S-260.  Have you had a chance to review that?

20  A.    Yes.

21        Q.   Okay.  And you said that this letter confirms your

22  opinion of post-traumatic stress disorder?

23  A.    Yes.

24        Q.   Why?

25  A.    Well as I mentioned, not typical -- this would not be

1    actually specific or typical of the post-traumatic stress

2    disorder.  This would be more the expression of this first

3    problem that was spotted in Ms. Farthing's deteriorating mental

4    state as she was growing up, all this tremendous amount of

5    anger that she harbored in herself.  And I think that that --

6    that letter reflects primarily that part of Ms. Farthing's

7    psychological problems.

8          Q.   Now, Doctor, there's no evidence that she carried out

9    any -- anything that she wrote in this letter, is there?

10   A.   No.

11         Q.   And -- and did -- did you see how she -- she signed

12   the letter?

13   A.   I don't remember.

14         Q.   Take a look.  See the signature?

15   A.   Love and kisses, Jamie Farthing.

16         Q.   And -- and just the type of signature, does that show

17   anything to you?

18   A.   Well it is a -- especially with drawing that she made,

19   it's -- certainly reflects a mind in a state of an unsettled

20   mind where she -- she makes this -- at first the character of

21   the letter is so tough and then at the end it's love and kisses

22   and funny drawings, smiling -- you know, the -- this smiling

23   picture like the sun, yeah.

24         Q.   Now, Dr. Apolito, the prosecutor quoted from page two

25   of your report, is that correct?

A.    I have it.

Q.    Right.   And I think she started out with, "Apparently Jamie did ask Mr. -- Ms. Demolena about the risks that they would face from these planned robberies, but again she was easily reassured that she'd be protected from any danger." Then you go on to say, "We couldn't get caught, it was foolproof because she had it all planned out so good and everything as Jamie stated to the police.  Actually she had understood very little of what she had heard from Ms. Demolena about these robberies."

MS. BAGLIVI:  Judge, I object to him reading this. Is there a question?  This is -- this is redirect, this is leading --

MR. WEICHSEL:  I -- yes, judge, yeah -- I think -- I'm asking the doctor if there was more to that sentence, the phrase, then the prosecutor brought out, judge.

MS. BAGLIVI:  Judge, there's seven pages of this.

MR. WEICHSEL:  Just this one part.

MS. BAGLIVI:  Judge, he's hit about periods since he read the first line; I read the whole sentence.  I mean if he wants -- I mean, judge, it's an improper -- to sit here and read this whole paragraph, because that's what he's doing. There's no question.

BY MR. WEICHSEL:

Q.    Dr. Apolito, was that --

1          THE COURT:  Just a minute; may I make a ruling?

2          MR. WEICHSEL:  Yes, judge.

3          THE COURT:  Thank you.  Overruled; do what you have

4    to do.  Let's go, move on.

5          MR. WEICHSEL:  Thank you.

6    BY MR. WEICHSEL:

7       Q.    About the -- let me backtrack because I just lost my

8    track.  Go back to, "Jamie said to -- actually she had

9    understood very little of what she had heard from Ms. Demolena

10   about these robberies.  The latter had talked about escort

11   services as part of the plan but Jamie did not know what escort

12   service until later."

13         Basically, Doctor, when the prosecutor read that part

14   of your report did she read -- was she -- did she take that out

15   of context?

16         MS. BAGLIVI:  Judge, that's leading.

17         THE COURT:  Sustained.

18   BY MR. WEICHSEL:

19      Q.    Is there anything you need to add to what the

20   prosecutor had read?

21         MS. BAGLIVI:  Judge, I'm going to object unless

22   there's a specific question.  Do you have anything to add?

23   It's --

24         THE COURT:  Sustained as to the form of the question.

25   BY MR. WEICHSEL:

1    Q.    Doctor, what -- what did you mean when you wrote,

2  "She was easily reassured that she would be protected from any

3  danger"?

4  A.    Well she was in this state of partial consciousness,

5  partial awareness, and so she had this vague fear that she was

6  in a situation which was not right but on the other hand she

7  had this full feeling of dependence of Ms. Demolena.  And so

8  she was reassured that she -- that Ms. Demolena knew what she

9  was doing and that she was not in any -- in any danger.  She

10  knew -- she had not full consciousness, full awareness, but she

11  had this -- this vague notion that things she were -- that

12  where she was she should not be.

13    Q.    Now, Doctor, the prosecutor asked you about items of

14  value.  Do you --

15  A.    About what please?

16    Q.    Items of value?

17  A.    Yes.

18    Q.    Do you recall reading that Mr. James got a motorcycle

19  worth $6,500?

20        MS. BAGLIVI:  Judge, again objection, it's leading;

21  this is redirect.

22        THE COURT:  Sustained.

23  BY MR. WEICHSEL:

24    Q.    Do you recall, Doctor, either Mr. James or Ms.

25  Demolena getting items of value?

1    A.    Getting items of value?

2          Q.    Yeah, Mr. James and Ms. Demolena?

3    A.    From --

4          Q.    From the proceeds?

5    A.    From the proceeds?

6          Q.    Yes.

7    A.    Yes, they did.

8          Q.    Now has anything that you received subsequent to your

9    report changed your opinions?

10   A.    No.

11         Q.    And while you did not use the words purposeful and

12   knowing in your report did -- do you make a determination as to

13   diminished capacity?

14   A.    Yes.

15         Q.    And what's that determination?

16         MS. BAGLIVI:   Judge, I object to the words diminished

17   capacity. That is a legal --

18         THE COURT:   Overruled.

19   BY MR. WEICHSEL:

20         Q.    You may answer that, Doctor.

21   A.    As I -- I think I answered this question before, but --

22         THE COURT:   You did.

23         THE WITNESS:   Pardon?

24         THE COURT:   You did, but he wants you to do it again.

25         THE WITNESS:   Okay.   I said that professionally,

1    personally I am convinced that the level of awareness that Ms.

2    Farthing had of what she was participating to amounts to a --

3    really to a lack of -- of a criminal responsibility or mental

4    capacity to form criminal intent however, I'm fully -- I'm

5    aware of the fact that this is not easily provable because we

6    do not have symptoms of what is commonly known as psychosis

7    with incoherent thoughts, with delusions, hallucinations and --

8    and so on.  And so -- but I do believe that there is very

9    significant evidence that Ms. Demolena -- that Ms. Farthing was

10   at least in a state of diminished mental capacity whereby she

11   was not able to fully -- to be fully knowing and purposeful in

12   the -- in her -- whatever her participation was with these two

13   offenses.

14            MR. WEICHSEL:  Thank you; I have nothing further.

15            THE COURT:  Ms. Baglivi?

16            MS. BAGLIVI:  Just a couple quick questions.

17   RECROSS EXAMINATION BY MS. BAGLIVI:

18       Q.   Doctor, you said that she was -- she didn't have this

19   full awareness of the consequences of her actions, is that what

20   you said?

21   A.   The meaning and consequences, yes.

22       Q.   Okay.

23   A.   Yes.

24       Q.   Well, Doctor, in your experience -- this is not the

25   first defendant that you've ever interviewed, correct?

1   A.   Oh, not by all means.

2        Q.   Okay.  So you've had vast experience with people

3   charged with crimes, isn't that correct?

4   A.   Oh, yes.

5        Q.   And, Doctor, wouldn't it be fair to say that most

6   criminals never think about the consequences of their acts?  Or

7   they wouldn't do them?  Isn't that correct?  They don't think

8   past the actual crime?

9             MR. WEICHSEL:  Judge, this is beyond the scope of my

10  redirect.

11            MS. BAGLIVI:  Judge, it's -- it's not because it was

12  brought up by the full awareness by this doctor when Mr.

13  Weichsel --

14            THE COURT:  It's beyond the scope.  Go ahead.

15            MS. BAGLIVI:  Judge, it was --

16            THE COURT:  I gave my ruling, counsel.

17  BY MS. BAGLIVI:

18       Q.   You just told us that you said that you thought that

19  this opinion was hard to accept?  Is that what you just told

20  Mr. Weichsel I think you said?

21  A.   The full lack of capacity, yes.

22       Q.   Okay.  In fact you say in your report do you not, "I

23  am aware of the possibility that the court may have some

24  difficulty to accept this opinion"?

25  A.   Of the full lack of capacity, yes.

1      Q.    Okay.  And, Doctor, isn't that because this whole

2   opinion is really so ludicrous that you -- you even put that in

3   your report that you can't believe -- you -- let me get the

4   words right -- "I am aware of the possibility that the court

5   may have some difficulty to accept this opinion because Ms.

6   Farthing appeared to be mentally lucid"?

7   A.    I beg your pardon, why do you have to use --

8           THE COURT:  Now wait a minute, Doctor.  Read the

9   whole sentence, counsel.

10          THE WITNESS:  No, Your Honor, I object to the terms

11  of this ludicrous.

12          THE COURT:  They object.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  All right?  Read the entire sentence,

15  doctor --

16  BY MS. BAGLIVI:

17     Q.    Did you say in your report --

18          THE COURT:  Wait a minute.  Turn to page six of your

19  report.  Read the entire sentence please?

20          THE WITNESS:  Where do you want me to start?

21          THE COURT:  No, not you.

22  BY MS. BAGLIVI:

23     Q.    Did you --

24          THE COURT:  "I am aware..." -- do you see where it

25  says that?

 1              THE WITNESS:  Okay.

 2 BY MS. BAGLIVI:

 3      Q.   Did you say in your report, "I am aware of the

 4 possibility that the court may have some difficulty to accept

 5 this opinion because Ms. Farthing appeared to be mentally lucid

 6 at the time of these offenses and may only be able to go as far

 7 as considering a state of diminished mental capacity as an

 8 element to both these offenses."  Do you say that?

 9 A.   I said -- yes, that -- yes.

10      Q.   And, Doctor, didn't you say it because everything

11 here in this case indicates that this defendant knew she was --

12 she knew exactly what she was doing?  Yes or no?

13 A.   Well you are not reading my words correctly, you are

14 giving them a different interpretation.

15      Q.   Doctor, do you agree --

16 A.   I object; I have to qualify that.

17              THE COURT:  Go ahead.

18 BY MS. BAGLIVI:

19      Q.   Did --

20              THE COURT:  Now wait a minute, he's saying that

21 you're giving it a different interpretation.

22              MS. BAGLIVI:  Oh, I understand that, but he said I

23 didn't read his words correctly?

24              THE COURT:  No, you're giving it a different

25 interpretation.

1              THE WITNESS:  Yes.

2              THE COURT:  What is your interpretation?

3              THE WITNESS:  Well because Ms. Baglivi equates

4    appeared with was.

5              THE COURT:  No, no, don't talk to me.

6              THE WITNESS:  You are equating appeared with was.  I

7    did not say that Ms. Farthing was mentally lucid, I said she

8    appeared to be mentally lucid.

9    BY MS. BAGLIVI:

10        Q.   Was she psychotic?

11   A.   Pardon me?

12        Q.   Was she psychotic?

13   A.   I didn't say she was psychotic, I --

14             MR. WEICHSEL:  Judge --

15             THE WITNESS:  -- said what she was.

16   BY MS. BAGLIVI:

17        Q.   I'm asking you was she psychotic?

18   A.   No.

19        Q.   Okay.  And psychotic means that you have a break with

20   reality, correct?

21   A.   That's not the only state, the only form of mental illness

22   when you have a break with reality.  I made the diagnosis of

23   disassociative disorder.

24        Q.   I understand that.

25   A.   Which also -- which also has got to do with impairment of

1   perceiving reality.

2       Q.   My question to you is, Doctor, regarding psychosis.

3   I understand what you diagnosed.  My question is in this case

4   is psychosis -- if somebody is psychotic, does that mean that

5   they had a break with reality?

6           MR. WEICHSEL:  Objection, judge, this is beyond the

7   scope of my redirect examination.

8           THE COURT:  Sustained.

9   BY MS. BAGLIVI:

10      Q.   Doctor, the -- the -- to finish up that line there

11  you say that this would be regrettable, correct?

12  A.   Yes.

13      Q.   "Ms. Farthing has been punished severely enough by

14  her life circumstances... --

15          MR. WEICHSEL:  Judge, this --

16  BY MS. BAGLIVI:

17      Q.   "...before she fell into this nightmarish trap."

18          MR. WEICHSEL:  Judge, again, this is beyond the

19  scope.

20          THE COURT:  It's beyond.

21          MS. BAGLIVI:  Judge, he brought up this line out of

22  his report for Mr. Weichsel.

23          THE COURT:  No, he didn't.

24          MR. WEICHSEL:  No.

25          MS. BAGLIVI:  Yes, he did, judge.  The Doctor

1  testified to this -- this -- that particular line about aware

2  of the possibility.

3          THE COURT:  It's beyond the scope, counsel.

4          MS. BAGLIVI:  Nothing further.

5          MR. WEICHSEL:  Nothing, judge.

6          THE COURT:  Thank you.  Doctor, you may step down.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  All right, ladies and gentlemen, I thank

9  you for staying over your lunch period.

10          THE WITNESS:  Thanks for taking this time for me so I

11  can get to my -- my dentist.

12          THE COURT:  It's ten minutes to three -- ten minutes

13  to two.  I'll expect you back at ten minutes to three.  Get

14  some lunch, don't discuss the case amongst yourselves.  We have

15  some other witnesses today and then we'll be finished and then

16  we'll come back again tomorrow but maybe not in the morning.

17              (PAUSE -  THE JURY LEAVES THE COURTROOM)

18          THE COURT:  All right, 2:00.

19          MS. BAGLIVI:  Three o'clock.

20          MR. WEICHSEL:  Ten to three.

21          THE COURT:  Ten to three, about a quarter to three be

22  back.

23          MR. WEICHSEL:  Okay.

24                      (RECESS)

25          THE COURT:  Counsel, sidebar.

1           MR. WEICHSEL:  Yeah.

2                          (SIDEBAR)

3           THE COURT:  My officer reported to me that -- did he

4   tell you?

5           MR. WEICHSEL:  No.

6           THE COURT:  That juror number four says that she's

7   not feeling well.  She called her doctor and her doctor's made

8   an appointment for her at 3:30.  So I'm going to call her in

9   and ask her how she feels and whether she can make it.  If she

10  can't, if she's not up to it then I'm going to adjourn and your

11  people will have to testify in the morning.

12          MR. WEICHSEL:  Very well, whatever -- whatever, you

13  know, the juror's wish is.

14          MS. BAGLIVI:  It's 3:00 already anyway, so.

15          MR. WEICHSEL:  Yeah.

16          MS. BAGLIVI:  All right.

17          THE COURT:  You've got -- how many have you got,

18  three?

19          MR. WEICHSEL:  They're not going to be long.  No, no,

20  I have the brother and the stepmother and the father.

21          MS. BAGLIVI:  Well are we going to start at 9:00 then

22  tomorrow even though, or are we going to do it --

23          THE COURT:  Well let's see what she tell us first.

24  If so we'll start at 9:00.

25          MS. BAGLIVI:  Okay.

1      THE COURT:  (TO THE OFFICER)  Bring up juror number

2  four?

3      THE COURT OFFICER:  Yes, sir.

4      MS. BAGLIVI:  We just might have a longer lunch or

5  something if we finish quicker.

6      MR. WEICHSEL:  You just want time to talk to Simring?

7      MS. BAGLIVI:  Yeah, I -- well I do, I need time after

8  they're finished.

9      THE COURT:  We're on the record.

10      MS. BAGLIVI:  Yes, that's okay, but I need time to

11  talk to my expert after the rest of the case in terms of

12  testimony.

13                      (PAUSE)

14      THE COURT:  You're not feeling -- come on up so your

15  voice is on here.  You're not feeling well?

16      JUROR NUMBER FOUR:  Well I've been dizzy all week and

17  I've had a bad cold.

18      THE COURT:  I know you have.

19      JUROR NUMBER FOUR:  And my doctor has been trying to

20  treat me over the phone, but this morning I've been really

21  dizzy, like -- I'm like --

22      THE COURT:  Well did it interfere with your ability

23  to hear and understand what's going on?

24      JUROR NUMBER FOUR:  No, when I said -- it's okay but

25  she can't see me tonight and I don't know -- well I have an

1   HMO.

2                THE COURT:  Is --

3                JUROR NUMBER FOUR:  She's my primary care, that's the

4   problem is I can't --

5                THE COURT:  She can only fit you in at 3:30?

6                JUROR NUMBER FOUR:  Yeah, because I just called her

7   and she said well 3:30 is the latest time I can see you, so.

8                MR. WEICHSEL:  Where is she?

9                JUROR NUMBER FOUR:  She's in Ramsey.

10               MR. WEICHSEL:  Then you've got to go.

11               THE COURT:  Well no, my point is we're going to have

12   to postpone the rest of the case today and maybe come back

13   tomorrow.  Do you think you'll be able to come back tomorrow?

14               JUROR NUMBER FOUR:  Yeah, I just -- you know, I

15   haven't been feeling well and so she's trying to do this over

16   the phone and at this point she just said that you know, I have

17   to see you.

18               THE COURT:  Oh, I understand that.  I'm just a little

19   tired of doctors dictating how we do things.

20               JUROR NUMBER FOUR:  Well believe, I can't even walk

21   down the hall and you know.

22               THE COURT:  Well my concern really with you now is

23   that you understand everything this morning, would that affect

24   you?

25               JUROR NUMBER FOUR:  Yeah.  No, I understand -- I mean

1    you know, I'm fine that way, it's just you know I -- because I

2    had been dizzy in the morning but then it would subside, so I

3    thought it was maybe associated with my sinus.

4              THE COURT:  Are you on any medication?

5              JUROR NUMBER FOUR:  Yeah.

6              THE COURT:  Do you think you should be excused from

7    the jury?

8              JUROR NUMBER FOUR:  Well I wasn't really asking that.

9              THE COURT:  I know.  But what do you think?  I know

10   you're not asking me that.

11             JUROR NUMBER FOUR:  I wouldn't want to be.  Like I

12   said this morning, I want to finish it out.

13             THE COURT:  All right, why don't we do this --

14             JUROR NUMBER FOUR:  But I don't want to hold

15   everything up either.

16             THE COURT:  No, we're going to -- well I have two

17   choices; we have a couple more witnesses that we could finish

18   today, and all tomorrow morning you will not have to be here

19   until 1:30, otherwise you'll go now, I'll send everybody home

20   and you will have to be here at 9:00 to take those witnesses

21   that we have planned for this afternoon.

22             JUROR NUMBER FOUR:  Yeah.

23             THE COURT:  That's the alternative.

24             JUROR NUMBER FOUR:  I don't know if I should call her

25   back and -- basically she left it up to me.  She just said --

1           THE COURT:  And so I'm leaving it up to you.

2           JUROR NUMBER FOUR:  Yeah, I know.  Well I guess --

3           THE COURT:  Can you see her tomorrow morning,

4  wouldn't that be good enough?  Or do you need something today?

5           JUROR NUMBER FOUR:  Why don't I just see if she's

6  there?  She's -- she's not there a lot, that's the problem too

7  and --

8           THE COURT:  Yeah, why don't you --

9           Augie?

10          THE COURT OFFICER:  Yes, sir?

11          THE COURT:  Let her use the phone with my secretary,

12  she's got to call her doctor, okay?

13          JUROR NUMBER FOUR:  Yeah, let me see if she's there.

14          THE COURT:  Okay.  We'll do that.

15          MR. WEICHSEL:  Judge, even if we start now, with

16  three witnesses we won't be done by 4:00.

17          THE COURT:  No?  I don't know, it's your witnesses.

18          MR. WEICHSEL:  I mean they're going to be relatively

19  quick but I don't know how much cross examination Patty has.

20          MS. BAGLIVI:  But I don't really know what they're

21  testifying to, so I can't really say.  I mean you say abuse;

22  that's kind of broad.  If we're going to go over 18 years of

23  abuse I might have a little bit of cross.  Do you want to just

24  adjourn it to tomorrow morning or are you going to try to

25  start?

1          THE COURT:  I think maybe we ought to adjourn.  If

2    you -- if you've got three witnesses and they could take up all

3    morning --

4          MR. WEICHSEL:  I don't know if they will, but you

5    know, it may take close.

6          THE COURT:  You'll have -- you'll have your lunch

7    hour to go over with Simring.

8          MS. BAGLIVI:  Right.

9          THE COURT:  I'm not going to hold the case up over

10   anything.

11         MS. BAGLIVI:  I know, but we also, -- well I think we

12   already discussed all the charges.  I don't think there's

13   anything else that has to be done before we sum up, right?

14         THE COURT:  All right.

15         MR. WEICHSEL:  Okay.

16                    (END OF SIDEBAR)

17                       (PAUSE)

18         THE COURT:  All right, so it's clear on the record,

19   one of the -- juror number four is not feeling well and she had

20   called her doctor during the break and the doctor made an

21   appointment for 3:30 for her.  So what I am going to do is

22   excuse the entire jury and have them come back tomorrow at 9:00

23   and we'll pick it up tomorrow.  It's only an hour.  We only

24   have a couple more witnesses and I think we can get everybody i

25   tomorrow, so I believe that will be the best way to proceed.

1    She's not feeling well, and she'll call us in the morning if

2    there's any problem, if not she'll be here.   All right?

3                 Bring up the jury please?

4                 THE COURT OFFICER:   Yes, Your Honor.

5                 (PAUSE - THE JURY ENTERS THE COURTROOM)

6                 THE COURT:   All right, good afternoon, ladies and

7    gentlemen.

8                 THE JURORS:   Good afternoon.

9                 THE COURT:   I'm going to let you go home at this time

10   because we have -- one of the jurors is not feeling well and

11   she has to -- she has a doctor's appointment and she's going to

12   go there. And we can do whatever it was that we planned for

13   this afternoon tomorrow morning.   So we'll let you go.   I'm

14   sorry you didn't know this an hour or so ago, but you know,

15   just -- nobody's fault, it's just one of those things, a

16   decision we have made, we want to proceed in this way, that we

17   will excuse you for the day and ask you to be here at 9:00

18   tomorrow.   We have witnesses lined up for the morning and we

19   have witnesses lined up for the afternoon.   So it will be a

20   full day tomorrow and we should finish the case tomorrow.   This

21   is really not going to interfere with our timing, it just

22   interferes with your -- your -- your day, but you're getting

23   out of here a little early today.   I -- I saw the sun out there

24   somewhere, didn't I?

25                 All right, do not discuss the case amongst

1  yourselves, do not discuss it with anybody at home and we'll

2  see you here at 9:00 tomorrow morning.  All right?

3                  (PAUSE - THE JURY LEAVES THE COURTROOM)

4          THE COURT:  All right, we'll see you 9:00 tomorrow

5  morning, we'll pick it up from there.

6          MR. WEICHSEL:  Okay, fine.

7          MS. BAGLIVI:  I think it was snowing out before,

8  judge.

9          THE COURT:  Well we could go over some matters

10 ourselves.  We've got a few minutes.  Why don't you come down

11 to chambers and we'll go over some things and then we'll put it

12 on the record later?

13         MR. WEICHSEL:  Judge, can I just tell the family

14 members that they're not needed today?

15         THE COURT:  Yeah, then come into my chambers, both of

16 you.

17         MR. WEICHSEL:  Yeah, I will.

18         MS. BAGLIVI:  Okay.

19                  *              *              *

20

21

22

23

24

25

1           <u>CERTIFICATION</u>

2           I, Dolores Hastings, the assigned transcriber, do

3   hereby certify the foregoing transcript of proceedings in the

4   Bergen County Superior Court, Law Division, Criminal Part, on

5   November 20, 1996, on tape number 188-96, index number from

6   00:00:00 to 04:05:53, is prepared in full compliance with the

7   current Transcript Format for Judicial Proceedings and is a

8   true and accurate non-compressed transcript of the proceedings

9   as recorded.

10

11   _____          ___417___

12   Dolores Hastings                     AOC Number

13

14   <u>KEMCO TRANS, INC.</u>                    7/4/97

15   Agency Name                          Date

16

17

18

19

20                                          

21

22

23

24

25