EXHIBIT 30

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
BERGEN COUNTY
DOCKET NO. 95-07-00889
A.D. #_____

16 T

STATE OF NEW JERSEY,                )
                                    )
                Plaintiff,          )
     vs.                            )          TRANSCRIPT OF
                                    )             TRIAL
JAMIE FARTHING,                     )
                                    )
                Defendant.          )

                         Place: Bergen County Courthouse
                                Hackensack, NJ 07601

                         Date:  November 21, 1996

BEFORE:

     HONORABLE TIMOTHY J. SULLIVAN, J.S.C. AND JURY

TRANSCRIPT ORDERED BY:

     DEBORAH COLLINS, ESQ. (Office of the Public Defender)

APPEARANCES:

     PATRICIA BAGLIVI, ESQ. (Assistant Prosecutor)
     Attorney for the State of New Jersey

     JOHN WEICHSEL, ESQ.
     Attorney for the Defendant

                    Transcriber Dolores Hastings
                    KEMCO TRANS, INC.
                    P.O. Box 900
                    Clark, New Jersey 07066
                    (908) 382-8500

                    Video Recorded
                    Recording Operator, L. Ostapeck

1  I N D E X

2  WITNESSES

3  FOR THE DEFENSE          DIRECT    CROSS    REDIRECT   RECROSS

4  Jessie Farthing            5         32      49, 54       53

5  Kathy Farthing            58         68        80

6  Paul Farthing             83        103       117

7  FOR THE STATE ON REBUTTAL

8  Dr. Steven Simring        128        165       176         178

9

10  EXHIBITS                              I.D.      EVID.

11  S-261     Report of Dr. Simring       127

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Are we ready to proceed, counsel?

2        MR. WEICHSEL:  Yes, judge.

3        THE COURT:  Did you get a chance to read that

4   accomplice liability?

5        MR. WEICHSEL:  Yes, Your Honor.

6        THE COURT:  Any problems with it?

7        MR. WEICHSEL:  No.

8        THE COURT:  You just have to fill in the blanks,

9   that's all.

10        MR. WEICHSEL:  Yeah, obviously.  I've got to put --

11   got to put the right offenses in.

12        THE COURT:  Felony murder is not a lesser included

13   offense, is that correct?

14        MS. BAGLIVI:  Of murder?  No.

15        MR. WEICHSEL:  No.

16        THE COURT:  And there's no -- and there are no lesser

17   included offenses --

18        MR. WEICHSEL:  It was --

19        MS. BAGLIVI:  Not of felony murder.

20        MR. WEICHSEL:  No, no.

21        THE COURT:  I just wanted to know that we all are

22   agreed.

23        All right, bring up the jury please?

24        THE COURT OFFICER:  Yes, Your Honor.

25            (PAUSE - THE JURY ENTERS THE COURTROOM)

1    THE COURT:  All right, please answer when your name

2  is called.

3              (JURY ROLL CALL TAKEN - ALL PRESENT)

4    THE COURT:  All right, good morning, ladies and

5  gentlemen.

6    THE JURORS:  Good morning.

7    THE COURT:  Juror number four, you're feeling better

8  are you?

9    JUROR NUMBER FOUR:  Yes.

10    THE COURT:  You made it through the night? And you're

11  clear thinking?

12    JUROR NUMBER FOUR:  I'm sorry?

13    THE COURT:  I say you're clear thinking?

14    JUROR NUMBER FOUR: Yes.

15    THE COURT:  Okay.  Now we're ready to proceed.

16    MR. WEICHSEL:  Yes, Your Honor.

17    THE COURT:  Mr. Weichsel, call your next witness

18  please?

19    MR. WEICHSEL:  Jessie Farthing please?

20              (PAUSE)

21  J E S S I E   F A R T H I N G, WITNESS FOR THE DEFENSE, SWORN.

22    THE COURT OFFICER:  You may be seated, sir.  For the

23  record would you please state your name and spell your last

24  name?

25    THE WITNESS:  Jessie Farthing, F-A-R-T-H-I-N-G.

1    THE COURT OFFICER:  And the town you reside in, sir?

2    THE WITNESS:  Conyers.

3    THE COURT OFFICER:  Is that Conyers, Georgia?

4    THE WITNESS:  Um-hum.

5    THE COURT OFFICER:  Thank you, sir.

6  DIRECT EXAMINATION BY MR. WEICHSEL:

7        Q.   Jessie, --

8        THE COURT:  Just a minute, counsel.  Mr. Farthing,

9  you're going to speak up now.  Don't just whisper, these people

10  have to hear everything you say, so if you'd lean a little

11  further -- not all the way up, but that microphone will pick up

12  your voice and they'll hear it, okay?

13       THE WITNESS:  Okay.

14       THE COURT:  All right, Mr. Weichsel, go ahead.

15  BY MR. WEICHSEL:

16       Q.   Jessie, how old are you?

17  A.   Twenty two.

18       Q.   And are you related to Jamie Farthing?

19  A.   Yes, sir, I am.

20       Q.   And what's your relationship?

21  A.   I'm her brother.

22       Q.   And do you see Jamie in court?

23  A.   Did I see Jamie in court?

24       Q.   Do you see her in court now?

25  A.   Yes, I do.

1       Q.    Point her out.

2  A.    That's my sister.

3            MR. WEICHSEL:  The record shows that he pointed out

4  my client, Your Honor.

5            THE COURT:  So noted.

6  BY MR. WEICHSEL:

7       Q.    Now who -- who is your dad?

8  A.    Paul Farthing.

9       Q.    And your mother's name?

10 A.    Kathy Farthing.

11      Q.    Is that your natural mother?

12 A.    No; my natural mother is Loopey Anderson, used to be

13 Loopey Farthing.

14      Q.    Now where -- where were you born?

15 A.    Huntington, Indiana.

16           THE COURT:  I'm sorry, where?

17           THE WITNESS:  Huntington, Indiana.

18           THE COURT:  Huntington?

19 BY MR. WEICHSEL:

20      Q.    And when you were little do you remember who you were

21 living with?

22 A.    Loopey and Paul and a bunch of different people.

23      Q.    A bunch of different people?

24 A.    A whole bunch of different people at a bunch of different

25 places.  I can't really -- I couldn't really tell you how many

1  places and how many people.

2       Q.   Okay, can you remember how many different states

3  you've lived in?

4  A.   Indiana, California, Florida and there's some my brother

5  recalls that I don't even remember.

6            MS. BAGLIVI:  Judge, objection.  Judge, objection.

7  BY MR. WEICHSEL:

8       Q.   Only tell us what you remember.

9            THE COURT:  We don't want to hear about what your

10  brother recalls, we only -- you can only testify about you,

11  okay?

12           THE WITNESS:  Oh, understood.

13           THE COURT:  Okay?

14           THE WITNESS:  What I remember?  California, Florida,

15  Indiana.

16  BY MR. WEICHSEL:

17       Q.   Georgia?

18  A.   Georgia is one, yes.

19       Q.   Now --

20  A.   All over Georgia.

21       Q.   A lot of different places in Georgia?

22  A.   Yes.

23       Q.   And who -- who did you live with?

24  A.   I lived with Loopey and Paul, my Aunt Phyllis, my Aunt

25  Barb, a lady named Carla, a woman name Sue, and sometimes with

1    just Loopey because my dad would go off on jobs for long

2    periods.

3         Q.   When your dad -- let me ask you a question; how old

4    is Jamie?

5    A.   Twenty now.

6         Q.   And you're 22?

7    A.   Yes.

8         Q.   And when you were little, when you can first start

9    remember things, you -- do you remember what the relationship

10   was between your dad and Loopey?

11   A.   From what I recall not a very good one.

12        Q.   And what -- what do you remember?

13   A.   A lot of fighting.  I never hung around that much, the

14   fighting was so bad.  They would throw stuff at each other,

15   pretty much anything they could get their hands on; pots, pans,

16   just -- I didn't even want to be inside our trailer, I just

17   didn't want to be in there.  I stayed outside until it was

18   absolutely necessary that I came in and only then that I would

19   go inside the trailer because it was -- it was a war zone in

20   there, you didn't want to stay inside the house when they lived

21   together.

22        Q.   Do you remember, did there come a time that Loopey

23   and Paul separated?

24   A.   I don't really remember when they separated.  I remember

25   her being gone, but I had become used to people just coming in

1  and out of my life so it didn't really affect me until I

2  noticed she was gone for a really long time.  Then I stated to

3  -- started to notice.

4      Q.   About how old were you when she was gone for a really

5  long time?

6  A.   Six -- five or six.

7      Q.   And was Jamie living with you then?

8  A.   Yes.

9      Q.   Okay.  Do you --  was there a time -- now you have an

10  older brother, Jason?

11  A.   Yes.

12      Q.   Okay.  And there were the three of you?  You're all

13  natural brothers and sisters, right?

14  A.   Yes.

15      Q.   You -- Jason is what, 24, 23?

16  A.   Twenty three.

17      Q.   Okay.  You're 22 and Jamie's 20, right?

18  A.   Twenty, yes.

19      Q.   No did -- did there come a time in your life when you

20  wind up in California?

21  A.   Yes.

22      Q.   With Loopey?

23  A.   Yes.

24          MS. BAGLIVI:  Judge, I'm going to object to the

25  leading nature of the questions.

1          THE COURT:  Mr. Weichsel?

2          MR. WEICHSEL:  Judge, I'm trying to direct him to a

3   particular point in time.  I'm not trying to lead, judge, and I

4   will not lead from here on in.

5          THE COURT:  All right, I understand, but be careful

6   of the leading where you're putting answers in there.  You're

7   leading him into an area, I'll let you -- I'll give you some

8   leeway on that.

9   BY MR. WEICHSEL:

10     Q.    Tell me what you remember about how you got to

11  California?

12  A.    Well I remember -- actually I remember just about

13  everything about that day because it was an exciting time

14  because she said that she was going to take us to the zoo.

15          MS. BAGLIVI:  Judge, objection as to what somebody

16  else told him.

17          THE COURT:  I'll allow it, go ahead.

18  BY MR. WEICHSEL:

19     Q.    You can answer it.

20          THE COURT:  You can answer that.

21          THE WITNESS:  No one else told me anything.

22          THE COURT:  Okay.

23          THE WITNESS:  This is straight from recall.

24  BY MR. WEICHSEL:

25     Q.    Go ahead.

1    A.    I woke up and Loopey had told me we were going to the zoo.

2    She said we were going to the zoo which was exciting to me. And

3    I thought we were going to the zoo and we ended up getting on a

4    bus and the trip to the zoo took two days and we ended up in

5    California. And all three of us were under the assumption that

6    we were going to the zoo.

7              MS. BAGLIVI:  Judge, objection as to what -- judge, I

8    object as to what other people assumed.

9              THE COURT:  I'll allow it.

10   BY MR. WEICHSEL:

11        Q.    Go ahead -- go ahead, Jessie.

12   A.    Well I personally assumed we were going to the zoo and we

13   ended up in California.  I didn't know it was California until

14   later.  We could have been in Georgia for all I knew, but it

15   was a two day bus trip.

16        Q.    Where -- where did you stay in California?

17   A.    At a bunch of different places.

18        Q.    Who did you stay with?

19   A.    Loopey and Luke at one time, in a cabin in the mountains.

20   Loopey's grandmother one time -- and I think it was Fresno,

21   California, with some of her relatives -- some of her relatives

22   that I don't really like to remember, but I have to.

23        Q.    Why don't you like to remember them?

24   A.    And Arthur.

25        Q.    Who was Arthur?

1  A.   I think it was her nephew, our cousin.

2       Q.   And how old were you when you were out in California

3  about?

4  A.   I had a birthday, six going on seven.

5       Q.   And how old was Arthur?

6  A.   Probably in his teens.

7       Q.   And was Jamie with you in California?

8  A.   Yes -- yes, we all three stayed together.

9       Q.   And what don't you like to remember about Arthur?

10 A.   Pretty mean person.

11      Q.   Tell -- tell us about it.

12 A.   Well he -- he made Jason rob a store one time -- not rob

13 it as in give me all your money, but take some candy bars

14 because I remember him coming back with candy and I also

15 remember before he left Arthur would have a gun and he would

16 like come up to us sometimes and he would come up to me, he'd

17 hold the gun up to my head and say do you feel lucky today

18 little kid and then he'd pull the trigger and make it click.

19 And he did that often, two or three times a day.

20      MS. BAGLIVI:  Judge, I'm going to object to this line

21 of testimony as not relevant to this case.

22      THE COURT:  Sidebar.

23                  (SIDEBAR)

24      MS. BAGLIVI:  Judge, I would ask that you --

25      THE COURT:  All right, I want to see what's the

1    relevance?

2            MR. WEICHSEL:  The relevance is that you know, Jamie

3    told the social worker and the psychologist about being

4    terrorized by Arthur and that -- that's -- that's come out in

5    the testimony of the psychologist, judge.

6            MS. BAGLIVI:  What does that have to do with this

7    defendant -- this witness being terrorized?

8            MR. WEICHSEL:  Because they were living together.

9            MS. BAGLIVI:  I haven't heard -- I've heard nothing,

10   absolutely nothing to suggest --

11           THE COURT:  (Inaudible) that Arthur did to this

12   witness has nothing to do with this defendant.

13           MR. WEICHSEL:  Well I'll redirect it and ask him if

14   he remembers anything regarding Arthur with Jamie then, okay?

15           MS. BAGLIVI:  But -- but that's my concern.  I want

16   to make sure he was present and saw it.  I mean if someone --

17   if she told him or someone else told him that's hearsay.  If he

18   was present that's a different story but I haven't heard any of

19   that.

20           MR. WEICHSEL:  Well I also think, judge, you could

21   assume that if these three children were together and living

22   together and Arthur was there that, you know, that Arthur did

23   this to --

24           THE COURT:  Yeah, --

25           MS. BAGLIVI:  How can you --

1          THE COURT:  -- but we can't assume that the

2     defendant's perception is the same as this young man's

3     perception at the age of six; there's a difference of almost

4     two years between them. She's four, so her perception as to

5     what's happening --

6          MR. WEICHSEL:  I think he said he was about seven, so

7     she's five, okay.

8          THE COURT:  He said six -- between six and seven.

9          MS. BAGLIVI:  Going on seven.

10         MR. WEICHSEL:  When he was out in California.

11         THE COURT:  Yeah.

12         MR. WEICHSEL:  His seventh birthday was out in

13    California.

14         THE COURT:  He said between six and seven, he doesn't

15    remember which one.

16         MR. WEICHSEL:  Okay.

17         THE COURT:  That brings her down to about four or

18    five.

19         MR. WEICHSEL:  Okay.

20         THE COURT:  What effect did any of this have -- that

21    it has on her I don't know.

22         MR. WEICHSEL:  Okay, so I'll ask him, judge, you

23    know, regarding Arthur, whether he was present during any

24    activities between Arthur and Jamie and if he says yes I'll ask

25    him what he remembers.

1              THE COURT:  All right.

2              MR. WEICHSEL:  Okay?

3              MS. BAGLIVI:  I don't have a problem with that.

4              THE COURT:  Okay.

5                         (END OF SIDEBAR)

6    BY MR. WEICHSEL:

7         Q.    Jessie, regarding your cousin Arthur -- are you okay,

8    Jessie?

9    A.    Yeah.

10        Q.    Okay.  Regarding your cousin, Arthur, were you

11   present with Arthur when there were any activities between

12   Arthur and Jamie?

13   A.    I remember that they would --

14             THE COURT:  Just answer yes --

15   BY MR. WEICHSEL:

16        Q.    Just answer that yes or no.

17             THE COURT:  Yes or no.

18             THE WITNESS:  I don't remember.

19   BY MR. WEICHSEL:

20        Q.    You don't remember whether you were there when -- I'm

21   just trying to clarify this.  You don't remember --

22             THE COURT:  Okay, just a minute.  What is it you

23   don't remember?

24             MR. WEICHSEL:  Yeah.

25             THE COURT:  I think that would clarify it.

1            MR. WEICHSEL:  Okay, fine.

2            THE WITNESS:  There was a lot of situations with

3    Arthur.

4            THE COURT:  No, the question is were you ever present

5    between any activity between Arthur and the defendant, Jamie?

6            THE WITNESS:  Yes.

7            THE COURT:  You said you don't remember.

8            THE WITNESS:  Yes.

9            THE COURT:  You don't remember any activity between

10    the two of them?

11            THE WITNESS:  Yes, I do.

12            THE COURT:  Okay.

13    BY MR. WEICHSEL:

14       Q.    What -- what do you remember between Arthur and

15    Jamie?

16    A.    He shot her dog one time right in front of her and I

17    remember her crying.

18            THE COURT:  Just a minute; were you there?

19            THE WITNESS:  Yes, I was.

20            THE COURT:  Okay.

21            THE WITNESS:  I was standing right beside her.

22            THE COURT:  That's all we have to know, is you were

23    there and -- and witnessed it or observed it.  Not what you

24    heard, you understand?

25            THE WITNESS:  Yes, I --

1          THE COURT:  Okay.

2    BY MR. WEICHSEL:

3          Q.   What -- what did you see?

4    A.   We had got a little puppy dog and Jamie was more fond of

5    the dog, it was Jamie's dog.  But we were playing with it one

6    day and he came up with his car and when you seen his car it

7    meant get out of the area, but he got out and we were playing

8    with the dog.  And he picked up the dog and he was like -- look

9    -- something like we got a puppy or something like that, and he

10   put the dog -- he was messing around with it at first, telling

11   us what he could do with it. And then he ended up -- he put it

12   in a plastic bag and he was like I could strangle it. Anyway,

13   he took -- he took the dog, tied the bag around the puppy where

14   just his head was sticking out and then he hung it up on the

15   clothes line and he let it sit there for a while and then he

16   just -- he took his gun out and he just -- he blew the puppy's

17   head off.  And we just sat there and watched.  And I remember

18   Jamie leaning over the puppy for a long time just crying.

19         Q.   Do you remember anything else regarding Jamie?  Just

20   from what you -- what you saw, not what Jamie or anybody else

21   told you?

22   A.   I remember that he loaded us up in his truck one time and

23   I don't like remembering this either, but like I said, I have

24   to.  And he had all three of us in his truck.

25         Q.   Meaning you, Jason and Jamie?

1   A.    Yeah, he had a truck.  We -- he got us inside the truck

2   and he took us down a dirt road and he was telling us about how

3   he had killed somebody, put cigarette --

4         MS. BAGLIVI:  Judge, I'm going to object as to what

5   Art told this -- this witness, it's hearsay.

6         THE COURT:  Well it's not -- it's not being offered

7   for the truth of the statement that he killed somebody, it's

8   being offered for the fact that he said it.  Okay?  So that's

9   really not the hearsay problem.  It's being offered that it was

10  said.  Hearsay is a problem because it's -- when testimony is

11  offered for the truth of the statement that's hearsay and that

12  would be hearsay from somebody else because there's no

13  opportunity to question the person who is giving the statement

14  as to whether it's true or not.  But this statement is not

15  being offered -- if in fact Arthur makes that statement it's

16  not being offered to the jury as the truth of the fact that he

17  killed somebody, just being offered for the fact that he said

18  it.  All right?  So I'm allowing it.  Go ahead.

19  BY MR. WEICHSEL:

20        Q.    You can answer it.

21  A.    He -- we were going down a dirt road and he said that he

22  had tortured somebody, put cigarette butts out in his eyes and

23  done all kinds of stuff to him.  And he dropped us off at the

24  end of the dirt road where there was like a pond and he said

25  that if we screamed or made any noise that it would make the

1   body float to the top and it would come and get us.  And he

2   dropped us off there and left.  And we all three, we just

3   huddled together and we -- we were there -- I don't know how

4   long it was, but it could have been -- it could have been

5   forever it seemed like and he came back and picked us up

6   laughing the whole time.

7        Q.   Do you remember anything else with Jamie there?  No?

8   A.   No.

9        Q.   How long were you living -- you were living with

10  Arthur?

11  A.   For a while he lived in that same house.

12       Q.   Do you know for how long?

13  A.   No.

14            THE COURT:  Careful in leading now, counsel.

15            MR. WEICHSEL:  I know.

16  BY MR. WEICHSEL:

17       Q.   Tell me, did there come a time that you wound up back

18  with your dad, or the three of you did?

19  A.   Yeah, we were --

20       Q.   Tell me -- tell me how that happened?

21  A.   We were at school.  One of the schools we --

22       Q.   Where -- where was the school?

23  A.   I don't know, it was --

24            THE COURT:  Sorry -- this is in California?

25            THE WITNESS:  Yes.

1          THE COURT:   You were in school in California; okay.

2          THE WITNESS:   One of the schools and we were out in

3    the playground and he just -- he just walked up and got us and

4    took us and we got in the car and we were back in Georgia.

5    BY MR. WEICHSEL:

6          Q.   How old were you when you went back to Georgia?

7    A.   Seven.

8          Q.   Okay.  At that time, by the time you were seven,

9    could you -- do you remember how many different schools you had

10   attended?

11   A.   No.

12         Q.   Could you approximate, like more than five or more

13   than ten?

14   A.   More than five.

15         Q.   What about Jamie?   How many schools did she attend

16   during that period of time?

17   A.   The same amount we did.   The only people that remained

18   constant in my life is Jamie and Jason and until recently not

19   even them.

20         Q.   Now when -- when you went back to Georgia who did you

21   live with first?

22   A.   Paul for a while and then Aunt Phyllis for a long time.

23         Q.   And did -- did Jamie come with you?

24   A.   Yes.

25         Q.   And do you remember -- where did Aunt Phyllis live?

1    A.    Monroe.

2          Q.    And where's that?

3    A.    Georgia.

4          Q.    How long did you stay with Aunt Phyllis?

5    A.    Six months to a year.

6          Q.    And then -- then where did you go?

7    A.    After Aunt Phyllis' I think we lived with our Aunt Barb

8    for a while, Aunt Barb and Uncle Rick in -- in Winder County.

9          Q.    Is that in Georgia too?

10   A.    Yes.

11         Q.    And every time you moved Jamie came with you?

12   A.    Yes.

13         MS. BAGLIVI:    Judge, objection to the leading

14   questions.

15         THE COURT:    I'll allow it, go ahead.  Be careful.  I

16   don't have any problem with that.

17   BY MR. WEICHSEL:

18         Q.    When you moved did you stay in the same school or did

19   you have to change schools?

20   A.    Changed schools.

21         Q.    And after Aunt Barb, and I think you said Uncle Rick

22   I think?

23   A.    Yes.

24         Q.    Where did you -- how long did you stay there?

25   A.    For about a year.

1     Q.    Where did you go after that?

2   A.    I think we went back to Conestoga (phonetic) Trailer Park

3   for a while, I'm not for sure.

4     Q.    And who was in the Conestoga Trailer Park?

5   A.    Paul; dad.

6     Q.    Was he living with anybody?

7   A.    I think Sue and five other kids.

8     Q.    How long did you stay at the Conestoga Trailer Park?

9   A.    It all blurs together; I don't even know if it occurred in

10  that order, but I guess we stayed there for a while; a year, I

11  -- I don't really know times.

12    Q.    And when you went to Conestoga Trailer Park did you

13  all have to change school again?

14  A.    Yes.

15    Q.    And where -- where else did you live?

16  A.    We lived with a woman named Darla and a guy named Doc for

17  a while in a house that I don't even know where it was and that

18  was for a short period of time.

19    Q.    Who were Darla and Doc?

20  A.    I can't really remember them, I just remember living with

21  them.

22    Q.    Was Jamie there too?

23  A.    Yes.

24    Q.    And did you have to make a change in schools?

25  A.    Yes.

1       Q.    Where else?

2   A.    There was -- then after that I think he met Kathy and we

3   lived in Rosewood Trailer Park for a while.

4       Q.    And did that -- you were changing schools?

5   A.    Yes, to Conyers School System.

6       Q.    About how old were you when -- when Paul met Kathy?

7   A.    Eight.

8       Q.    And how long did you live in that trailer park?

9   A.    Not even a year.

10      Q.    Then where did you go?

11  A.    From the trailer park?  Yeah, I went from Rosewood -- we

12  moved to the house I'm living in right now in Conyers.

13      Q.    Now do you remember -- how did -- how did Paul --

14  when you lived with Paul how did he discipline you, Jason and

15  Jamie?

16  A.    With a paddle.

17          MS. BAGLIVI:  Judge, I'm going to object as to how he

18  disciplined this person or the other brother; it's only

19  relevant to this issue and only if he was present.

20          THE COURT:  Overruled.

21  BY MR. WEICHSEL:

22      Q.    You can -- you can answer the question.

23  A.    With a paddle.

24      Q.    What kind of paddle?

25  A.    A wooden paddle.

1      Q.   Did you see him discipline Jamie with a wooden

2  paddle?

3  A.   Yes.

4      Q.   What kind of things would he discipline Jamie with --

5  with the wooden paddle?

6  A.   You mean what would she do to get a paddling?

7      Q.   Yeah, uh-huh.

8  A.   Bad grades, not cleaning up.  If he came home and the

9  house was dirty it would -- it would mean five licks for us and

10  three for Jamie.  And for bad grades.

11      Q.   And how long -- till what age did -- did he use the

12  paddle if you remember?

13  A.   Probably around 14; 13 or 14.

14      Q.   And what was Jamie's relationship with -- with Kathy?

15  Do you remember?

16           MS. BAGLIVI:  I'm sorry, could you repeat that

17  question?

18  BY MR. WEICHSEL:

19      Q.   What was Jamie's relationship with Kathy.

20           MS. BAGLIVI:  Judge, again I'm going to object unless

21  it's from personal knowledge.

22           THE COURT:  Sustained.  Sustained -- sustained, it's

23  too broad a question to begin with and what he knows, there's

24  no foundation to the question.

25  BY MR. WEICHSEL:

1      Q.    Did you observe -- did you see Jamie and Kathy

2  together?

3  A.    Yes.

4      Q.    Did you see when they were together how they got

5  along?

6  A.    Never too good; Jamie and Kathy never really got along.

7      Q.    Describe what you saw.

8  A.    They just wouldn't get along; arguing, sometimes -- I saw

9  them fight one time where -- we lived in Eastman at the time.

10  After we got through living in Rosewood we moved to Conyers, we

11  stayed in Conyers for four years and then we moved to Eastman,

12  change of schools.   Now before we moved to Eastman after

13  Conyers we moved to Hawkinsville and stayed there for two

14  years, change of schools. And then in Hawkinsville Jamie and ma

15  never got along. And then after Hawkinsville we moved to

16  Eastman and stayed there for a year.   And in Eastman one

17  morning I came in and Jamie was sitting watching T.V. and she

18  had -- she had a glass of milk that had been sitting out over

19  night and ma came in and she was so mad that Jamie didn't put

20  the glass of milk in the sink that -- and I don't even know how

21  I'm remember this -- that she took the glass of milk and threw

22  it at Jamie and it went all down Jamie.   And Jamie got up and

23  it wasn't going to -- she wasn't going to slap her, I think she

24  was going to run to her room and lock the door, which she did

25  all the time in Eastman.   But she got up and mom grabbed her

1   arms and threw her back down in the chair and Jamie just had a

2   startled look on her face and she went to slap ma and then

3   Jamie started slapping her and I pulled them apart.  So the

4   relationship was never good, never.  I don't ever remember them

5   getting along.

6        Q.   Do you remember summer 19 -- do you remember 1994,

7   two years ago? Did there come a time that --

8             THE COURT:  I'm sorry, I didn't hear an answer.

9             MR. WEICHSEL:  He shook his head.

10  BY MR. WEICHSEL:

11       Q.   Sir, did you shake your head yes?

12  A.   Yes.

13       Q.   You've got to answer verbally because everything in

14  this courtroom is being recorded.

15  A.   Okay.

16       Q.   There are video cameras all around that -- that

17  record everything and -- and take down words and if there's a

18  transcript made they can't take down nods of the head, they can

19  only take down words.  Do you understand that?

20  A.   Yes.

21       Q.   So you've got to answer in words.  So what was the

22  answer to that question?

23  A.   Yes.

24       Q.   Now what happened in the -- did anything unusual

25  happen in --

A.     Loopey came.

       Q.    -- the late spring of 1994?

A.     Loopey came back.  She was wanting to see us and gain
custody again.

       Q.    Now did anything else happen regarding Jamie and
living at the house in Conyers?

A.     Not that I recall.

       Q.    Well was anybody asked to leave the house?

A.     Yes.

            MS. BAGLIVI:  Judge, objection; leading.

            THE COURT:  I'll allow it, go ahead.

BY MR. WEICHSEL:

       Q.    Who -- who was asked to leave the house?

A.     Me and Jamie.

       Q.    Do you know why Jamie was asked to leave the house?

            MS. BAGLIVI:  Judge, objection unless he was there
for that conversation.

BY MR. WEICHSEL:

       Q.    Were you there for the conversation?

A.     Yes, I was; for staying out all night.

       Q.    For staying out all night?  Okay.

A.     Yes.

       Q.    And why were you asked to leave the house?

A.     Jason had been kicked out of the house all the time so
when I graduated I was expecting to get kicked out.  It didn't

1   even come as a shock or surprise because Jason had been thrown

2   out all the time.   When we moved to Eastman there wasn't -- he

3   was only around for short periods of time before he -- dad

4   would tell him -- you'd see him in the living room packing up

5   his stuff again and he told -- when he told me to get out of

6   the house it didn't come as a surprise, I was expecting it sort

7   of.   But when he told Jamie that she had to leave too then it

8   -- huge amounts of responsibilities because then I had to take

9   care of my sister.   But he told us -- he told the both of us to

10  get out.   And we -- we stayed in -- we slept in her station

11  wagon for three or four nights and I got her a place to stay

12  with some of her friends and I traded my bass guitar with an

13  aunt for a bike so I could get around while she stayed with

14  some of her friends in her car.   And I slept on -- I slept on

15  the ground a couple of nights and I slept with friends here and

16  there for a while.   And then I got in touch with Jason and he

17  said that he had --

18          MS. BAGLIVI:   Judge, objection as to what Jason said.

19          THE WITNESS:   He said he had Loopey's phone number.

20          THE COURT:   There's an objection.

21          THE WITNESS:   We somehow got Loopey's phone number.

22          MS. BAGLIVI:   Judge --

23  BY MR. WEICHSEL:

24      Q.   You can't -- you can't answer until the judge makes a

25  ruling.

1           THE COURT:  He answered it, he got her phone number.

2   Go ahead; he got Loopey's phone number somehow.  Go ahead.

3           THE WITNESS:  I somehow got Loopey's phone number and

4   so I called her because I didn't have no place to go and

5   someone told me that they had a house --

6           MS. BAGLIVI:  Judge, objection.

7           THE WITNESS:  -- in Union City.

8           MS. BAGLIVI:  Judge, objection.

9           THE COURT:  When -- when there's an objection you

10  have to stop, all right?

11          THE WITNESS:  Okay.

12          THE COURT:  You can't tell us what someone else told

13  you.

14          MS. BAGLIVI:  That was my objection.

15          THE COURT:  All right, Mr. Weichsel, would you just

16  ask a question?  I don't want to continue with a colloquy like

17  this because we get problems.

18          MR. WEICHSEL:  Fine.

19  BY MR. WEICHSEL:

20      Q.   As a result of this conversation you got a phone

21  number, is that right?

22  A.   Yes.

23      Q.   And what was that phone number to?

24  A.   Loopey.

25      Q.   Did you get in touch with Loopey?

1  A.    Yes.

2        Q.    Did -- do you know if Jamie got in touch with Loopey

3  of your own personal knowledge?

4  A.    Yes.

5        Q.    And what happened with Jamie and Loopey?

6  A.    We didn't get to stay there the first night because we

7  couldn't find it, but Jamie talked to Loopey a lot over the

8  phone before we got there.  And we couldn't find the place in

9  Union City so we went back to Conyers and stayed there for a

10 couple of nights.

11       Q.    Do you know who Ed Kummer is?

12 A.    Yes, she was one of the persons Jamie stayed with for a

13 couple of nights.

14       Q.    And where does he live?

15 A.    In Conyers.

16       Q.    Okay.  Was he a friend of yours?

17 A.    Yes.

18       Q.    Do you know where else Jamie stayed?

19 A.    With a girl name Amber Reed and Eddie Kummer; those are

20 the two people she stayed with.

21       Q.    When was the last time that you saw Jamie before she

22 went to New York?

23 A.    She lived with us in -- with Loopey in Union City for a

24 while, for two or three weeks.

25       Q.    And how big was Loopey's house?

1   A.    It was average size; it wasn't that bad.

2        Q.    And who else -- who all was living there?

3   A.    Me, Jason, Jamie and Luke lived there.

4        Q.    And Loopey?

5   A.    And Loopey.

6        Q.    Okay.  Before the summer of 1994 when as the last

7   time that you had had any contact with Loopey?

8   A.    The last time I saw her was when I left California.

9        Q.    And do you know when the last time was that Jamie had

10  had any contact with Loopey before the summer of 1994?

11  A.    Just that summer when Loopey came back to get us Jamie saw

12  her on what we called the trails where we had rode our bikes.

13  She pulled up and Jamie gave her a hug and then she came -- dad

14  went and got her and she came back to the house crying.

15       Q.    How old was Jamie then?

16  A.    Nine, ten.

17       Q.    So -- just so I understand it, so from the time Jamie

18  was nine or ten till the time the summer of 1994 she hadn't any

19  contact with her mother, is that right?

20  A.    Right.

21            THE COURT:  If he knows.

22  BY MR. WEICHSEL:

23       Q.    If you know.

24            THE COURT:  Do you know if she had any contact?

25  That's the answer, just yes or no.  Do you know whether she had

1   any contact?

2              THE WITNESS:  Yes; I know she didn't have no contact.

3              THE COURT:  She didn't as far as you know?

4              THE WITNESS:  She didn't.

5              THE COURT:  Go ahead.

6              MR. WEICHSEL:  Thank you.

7              THE COURT:  Is that it, Mr. Weichsel?

8              MR. WEICHSEL:  Yes, it is, judge.

9              THE COURT:  Your witness.

10             MS. BAGLIVI:  Thank you.

11  CROSS EXAMINATION BY MS. BAGLIVI:

12       Q.   Mr. Farthing, you were born September of 1974?

13  A.   Yes.

14       Q.   Okay.  And Jamie was born in 1976, is that correct?

15  A.   Correct.

16       Q.   Okay.  Now, sir, do you know what year your parents,

17  Loopey and Luke, split up?

18  A.   No.

19       Q.   Do you know -- do you know what year they got

20  divorced?

21  A.   No.

22       Q.   Well you say that you went to the zoo -- when you

23  went on this trip, supposedly you were going to the zoo and you

24  ended up in California, you said you were six going on seven,

25  is that correct?

1   A.   Yes.

2        Q.   Okay.  How much time had elapsed between Loopey

3   disappearing and she coming to get you all to go to the zoo?

4   A.   She got visitation rights and I remember we could see her

5   on every weekend.  We went to the trailer to visit her every

6   weekend.

7        Q.   Okay.  So you said there was a point in time though

8   when she disappeared?  When was that in relationship to the bus

9   ride?

10  A.   I don't know.

11       Q.   Six months?  A year?

12  A.   We seen her every weekend and one weekend she came and

13  took us.

14       Q.   Okay.  Sir, didn't you just tell Mr. Weichsel though

15  that when your parents used to fight there was -- there came a

16  point in time when Loopey just disappeared?

17  A.   I said there came a point when dad would disappear.

18       Q.   You didn't say Loopey disappeared?

19  A.   No, dad would disappear during those times.

20       Q.   And who would you stay with?

21  A.   I guess Loopey.

22       Q.   You don't remember?

23  A.   I -- I stayed outside as much as I could.

24       Q.   Sir, are you aware your parents separated in 1980 and

25  got divorced in 1981?  Do those years ring a bell with you?

1  A.    Between '80 and '81?

2       Q.    Yes.

3  A.    I remember things happening; I don't remember dates.

4       Q.    Okay.  So in 1980 you were six years old, is that

5  correct?

6  A.    Yes.

7       Q.    Okay.  And you said that the trip to California was

8  when you were going on -- on six going on seven, is that

9  correct?

10  A.    Yes.

11       Q.    So that had to be '80, '81, correct?

12  A.    I guess.

13       Q.    Okay.  And that would make Jamie at the time four

14  years old on that trip to California, is that correct?  She's

15  two years younger than you?

16  A.    Four or five, yes.

17       Q.    Okay.  Now you said that you stayed in different

18  places in California.  First you stayed with Loopey -- Loopey

19  and Luke, is that correct?

20  A.    I stayed with them the whole time, but sometimes they

21  couldn't afford a place to stay and they lived with some other

22  family.

23       Q.    Okay.  The grandmother, the cousin, all those people,

24  correct?

25  A.    Correct.

1          Q.    Okay.  And you say that during that time you went to

2     school in California, correct?

3     A.    Yes.

4          Q.    Okay.  But you moved around to different places?

5     A.    Yes.

6          Q.    Okay.  And who put you in school?

7     A.    I don't know.

8          Q.    Did your mother enroll you in school?

9     A.    I guess she had to have.

10         Q.    Okay.  And you said during that time you were at five

11    or six different schools?  Is that correct?

12    A.    In California?

13         Q.    Yes.

14    A.    I don't know; all I remember -- I don't even really

15    remember going to one.

16         Q.    Sir, did you tell Mr. Weichsel that -- that before

17    you left California with your father you were in five or six

18    different schools?

19    A.    Probably so, yes.

20         Q.    Okay.  And Jamie was in four or five?

21              THE COURT:  Well wait a minute, wait a minute.

22    Probably so that you said -- you told Mr. Weichsel that or is

23    it the fact that you're in five or six different schools?

24    That's -- the answer is -- I think it's a twofold question.

25              The question is, did you tell Mr. Weichsel that you

1  were in five or six different schools?  Answer that yes or no,

2  did you tell him that?

3          THE WITNESS:  Yes.

4  BY MS. BAGLIVI:

5      Q.   Okay, and Jamie was in at least five?

6  A.   Yes.

7      Q.   Sir, wasn't Jamie only four years old at the time in

8  California?

9  A.   Four or five.

10     Q.   Four or five and she was in five or six different

11 schools at age four or five?

12 A.   We would go to three or four different schools in one

13 year.

14     Q.   Okay.  Now you said your father came and took you

15 back and you lived with him for a while?

16 A.   I don't remember if I lived with him or my Aunt Phyllis

17 when we got back.

18     Q.   Sir, did you not say on direct examination that when

19 you got back from California you lived with Paul?

20 A.   I lived with my father for a while.

21     Q.   Okay.  And he was a -- he's a carpenter by trade,

22 correct?

23 A.   Correct.

24     Q.   And he would have to go out and stay away for long

25 periods of time so he could make a living to support you and

1   your brother -- your brother and sister, isn't that correct?

2   A.    I don't know.   He was a carpenter, yes, and I guess he

3   would have had to make -- go out of town for business, yes.

4        Q.    Okay.   Now you said you lived -- how long did you

5   live with him before you moved on to one of the other people?

6   A.    Two or three months.

7        Q.    Okay.   And you said Aunt Phyllis, six months to a

8   year, is that correct?

9   A.    Yes.

10        Q.    Okay.   And Aunt Laura, Barbara and Rick, is that one

11   year -- was that all together or were they separate houses?

12   A.    Separate houses.

13        Q.    Okay, how long at Aunt Laura's?

14   A.    Aunt Barb's?

15        Q.    No, Aunt -- didn't you say Aunt Laura?

16   A.    No.

17        Q.    You didn't say Aunt Laura and then Barbara and Rick?

18   A.    I don't have an Aunt Laura.

19        Q.    Or Dora or something?

20   A.    Dorothy.

21        Q.    Dorothy?

22   A.    Dora --

23        Q.    And how long --

24   A.    -- and Doc.

25        Q.    -- were you at -- how long were you at her house?

1   A.    Not even a year.

2         Q.    Give me an estimate; nine months?

3   A.    Six months.

4         Q.    Six months?  Okay.  And you were at Barbara and

5   Rick's for one year you said?

6   A.    Yes.

7         Q.    And then at the Conestoga Trailer Park with your

8   father approximately how long?

9   A.    I'm vague on times; I'd say around two months, a year, --

10  I --

11        Q.    All right, two -- well can you give me an estimate?

12  Just estimate?

13  A.    I'm just vague on dates.  I --

14        Q.    No, I'm not asking for dates.  I'm asking for

15  approximately how much time did you live in the Conestoga

16  Trailer Park?

17  A.    About a year.

18        Q.    Okay.  And then you lived with Sue and these five

19  other kids I believe you said for a year, correct?

20  A.    It could have been a month, it could have been a year.

21        Q.    Give me your best estimate of the time.

22  A.    A year.

23        Q.    Okay.  And Darla and Doc, how long did you live with

24  them for?  Best estimate.

25  A.    Two months.

1      Q.   Okay.

2  A.   I -- I really don't know.

3      Q.   Okay.  And then there was the trailer park -- the

4  next trailer park, I'm sorry, what was the name of that one?

5  A.   Two trailer parks; Conestoga was one.

6      Q.   All right, Conestoga we already talked about.  What's

7  the second one?

8  A.   Rosewood.

9      Q.   Rosewood; and that's where your father met Kathy, is

10 that correct?

11 A.   Yes.

12     Q.   And in fact, sir, she married your father and then

13 eventually adopted you, your brother and your sister, correct?

14 A.   Correct.

15     Q.   Okay.  Now how long did you stay in California?

16 A.   It seemed like forever.

17     Q.   Give -- approximately how long were you there?

18 A.   Six months.

19     Q.   Okay, six months.  Okay, sir, so you were six going

20 on seven when you first got to California, so then you stayed

21 approximately six months so you were about seven and a half at

22 that point when you go back to Georgia?  You've got to answer

23 yes or no.

24 A.   Yes.

25     Q.   Okay.  So you're seven and a half, then you lived

1   with Paul two to three months, so that makes you seven and

2   three quarters, then Aunt Phyllis six months to a year, let's

3   say six months, that would make you eight and a half, correct?

4   Okay, then Aunt Barbara and Rick for a year, that makes you

5   nine and a half, correct?

6   A.    Correct.

7        Q.   Okay.  And then you've got Conestoga Trailer Park for

8   a year, that makes you ten and a half, is that correct?  Just

9   yes or --

10  A.   As far as you're trusting my dates go, yes, that makes it

11  correct.

12       Q.   Okay.  All right, and then Sue with the five kids was

13  one year, so that makes you 11 1/2, is that correct?

14  A.    Correct.

15       Q.   And then Darla and Doc for two months, so that makes

16  you not even 11 and three quarters, correct?

17  A.    Correct.

18       Q.   Okay.  And then you've got the trailer park where

19  your father met Kathy, is that correct?

20  A.    Yes.

21       Q.   You're saying that you were approximately, give or

22  take six months, about 11 and three quarters when you were in

23  that last trailer park and your father met Kathy, correct?

24  A.    I was eight years old when Paul met Kathy.

25       Q.   Exactly; when Kathy and your father got married you

1  were only eight years old, isn't that correct?

2  A.   Correct.

3       Q.   So all of these houses and places and times you were

4  and all these different schools, they didn't happen, did they?

5  A.   Yes, they did.

6       Q.   Now, sir, do you have any good memories of your life

7  with your family?

8  A.   Yeah, everybody has good memories I would hope.

9       Q.   Okay.   Everybody has bad memories, wouldn't you say?

10 A.   Some more than others, yes.

11      Q.   Okay.   And your father used to hit you with a wooden

12 paddle?

13 A.   Yes.

14      Q.   Is that correct?

15 A.   Yes.

16      Q.   Your father -- do you know your father was in the

17 Army as a military person?

18 A.   He was in Vietnam.

19      Q.   Yes.

20 A.   For a year.

21      Q.   Okay.   He set strict rules for you and your sister,

22 didn't he?   You've got to answer yes or no.

23 A.   Strict?

24      Q.   He set you curfews?

25 A.   I have nothing to compare it to, but if you want to -- if

1    you say it was strict then yes.

2        Q.   No, I'm asking you; was it strict rules that he set

3    for you and your sister?

4            MR. WEICHSEL:   Judge, I don't -- I don't know, strict

5    is a vague term, judge.   I mean what's strict for one person

6    may be --

7            THE COURT:   Rephrase the question.

8    BY MS. BAGLIVI:

9        Q.   Did he set curfews for you and your sister?

10   A.   Yes.

11       Q.   Okay.  Did he have rules that you had to follow

12   around the house?

13   A.   Yes.

14       Q.   Did he make you and your sister clean up your room?

15   A.   Yes.

16       Q.   Did he help -- did he make you and your sister clean

17   up the dishes after dinner?

18   A.   We cleaned them up, yes.

19       Q.   Did he -- well did he make you do it or you just did

20   it on your own?

21   A.   Made us.

22       Q.   Okay.  Now you said in the summer of 1994 you were

23   asked to leave the house with your sister, is that correct?

24   A.   Yes.

25       Q.   Okay.  And you left in the car, is that correct?

1    A.    Yes.

2          Q.    The station wagon?

3    A.    Yes.

4          Q.    And, sir, that's the station wagon your father bought

5    your sister, isn't it?

6    A.    Yes.

7          Q.    And he didn't -- he let her take the car, didn't he?

8    You've got to answer yes or no.

9    A.    Yes.

10         Q.    He didn't try to stop her, yet he paid for that car,

11   correct?

12   A.    It was the least amount of thing you could for -- when you

13   kick your daughter out of the house you could at least give her

14   a place to sleep.  Yes, he gave her that car.

15         Q.    Okay.  Well he didn't give her the car when he kicked

16   her out of the house; she had that station wagon before that?

17   He had bought her that car previously while she was in high

18   school, isn't that correct?

19   A.    Correct.

20         Q.    Okay.  Sir, you're in college right now?

21   A.    Yes, sir -- I mean yes, ma'am.

22         Q.    That's okay.  Is your father helping you with your

23   expenses?

24   A.    Yes, they are.

25         Q.    Kathy and your father, isn't that correct?

1   A.   Kathy; my dad's unemployed right now.

2        Q.   Okay, but your dad and Kathy are still together,

3   isn't that correct?

4   A.   Yes.

5        Q.   Okay.  And you call Kathy mom, correct?

6   A.   Ma; and she doesn't like to be called mom because that's

7   what we called Loopey.

8        Q.   So you call her ma?

9   A.   So I cal her ma.

10       Q.   Okay.  But you don't call her Kathy?

11  A.   No; she don't like it when I call her Kathy.

12       Q.   Now when you got kicked out of the house you

13  eventually ended up at Loopey's, isn't that correct?

14  A.   Correct.

15       Q.   And you stayed there for a while, isn't that correct?

16  A.   Correct.

17       Q.   Did you have any good times there during those two to

18  three weeks?

19  A.   Yes.

20       Q.   Was Jamie there also?

21  A.   Yes, for a while.

22       Q.   And was she having good times with you?

23            MR. WEICHSEL:  Objection, how would --

24            THE WITNESS:  She -- she seemed sad all the time.

25            MR. WEICHSEL:  Objection.

1              THE COURT:  I'll allow it.

2              THE COURT:  She seemed -- she seemed to be.

3              MS. BAGLIVI:  Okay.

4              THE COURT:  Did she seem to have a good time like you

5   were having?

6              THE WITNESS:  She --

7   BY MS. BAGLIVI:

8        Q.   Now, sir, you were --

9              THE COURT:  Wait a minute.

10             MS. BAGLIVI:  I'm sorry, I thought he just said he --

11   she seemed.

12             THE WITNESS:  After she got thrown out of the house

13   she just -- she never was like herself.

14             THE COURT:  Just a minute, that's not responsive to

15   the question.  All right, ask another question, counsel.

16   BY MS. BAGLIVI:

17        Q.   You had good times you just told us while you were

18   living those two to three weeks with Loopey, correct?

19   A.   Correct.

20        Q.   Was -- was Jamie there?

21   A.   For a while.

22        Q.   For how long?

23   A.   Not very long.

24        Q.   Approximately?

25   A.   Two or three weeks.

1    Q.    Okay.  Where did you go after the two or three weeks?

2 A.    I stayed there.

3    Q.    And then after --

4 A.    I stayed there for a long time.

5    Q.    -- that -- how did you end up -- you're living on

6 High Rock Road now, isn't that correct, in Conyers, Georgia?

7 A.    Yes, yes.

8    Q.    And that's the big house, the big blue house on the

9 top of the hill in the woods that your father built for you,

10 isn't that correct?

11 A.    He built, yes.

12    Q.    Okay.  And it's on a very pretty lake, isn't it?

13 A.    Yes.

14    Q.    Okay.  And it's a pretty big house, isn't it?

15 A.    Yes, my Aunt Phyllis lives downstairs.

16    Q.    And you -- I'm sorry?

17 A.    My Aunt Phyllis lives downstairs.

18    Q.    There's -- it's like a mother/daughter type of

19 apartment situation, correct?  You -- you all live upstairs and

20 then they have a small section downstairs for your Aunt

21 Phyllis, isn't that correct?

22 A.    Yes.

23    Q.    And this is in the wood in Conyers, Georgia, isn't

24 that correct?  It's a pretty nice setting, isn't it?

25 A.    Despite the neighbors staying drunk all night and playing

1  his guitar in the two trashy trailers that we try to clean up,

2  yeah, it's a nice -- it's -- it's nice.

3         Q.    That house is not in a trailer park, sir, is it?

4  A.    If you would -- the people across the street from us would

5  give you an argument.

6         Q.    Sir, aren't there all houses along that street of

7  High Rock Road?

8  A.    Houses.

9         Q.    Some absolutely gorgeous houses, sir?  Some big

10 houses?

11        MR. WEICHSEL:  Judge, he's already answered the

12 question.

13        THE COURT:  He can answer yes or no.

14        THE WITNESS:  Yeah, nice houses, decent.

15 BY MS. BAGLIVI:

16        Q.    Nice, lots of park -- lots -- lots --

17 A.    Decent houses.

18        Q.    Lots of property?  Must better than like Milstead or

19 something, correct?

20 A.    If you go back in High Rock no, it's a lot worse than

21 Milstead which is --

22        Q.    No, I'm talking about where you live, because High

23 Rock --

24 A.    Kids of our age lived in that neighborhood and they live

25 back in High Rock.

1          Q.    I'm not -- I'm not asking about further, I'm talking

2     about where your house is.  It's on a big lake?

3     A.    Yes, it is.

4          Q.    Correct?  And there's all -- as you're coming up High

5     Rock Road there's nothing but beautiful houses, isn't that

6     correct?

7     A.    Decent houses, yes.

8          Q.    And you're living there now, correct?

9     A.    Correct.

10         Q.    And you're living now with this person, this father

11    who used to paddle you and where you had no good times, is that

12    what you're telling us?

13    A.    He's changed a lot; he was an alcoholic back then.

14         Q.    Back when?

15    A.    When he --

16         Q.    Back when?

17    A.    -- got back from Vietnam.

18         Q.    Okay.  Well when did he get back from Vietnam?  You

19    weren't even born yet, were you?

20    A.    No, I wasn't.

21         Q.    And neither was your sister, was she?

22    A.    When we lived in our trailer park.

23         Q.    I'm asking -- you said when he got back from Vietnam

24    -- were you born then?

25    A.    No.

1      Q.    Was Jamie born then?

2  A.    No.

3            MS. BAGLIVI:  I have nothing further.

4            THE COURT:  Mr. Weichsel, anything else?

5            MR. WEICHSEL:  I have a few questions.

6  REDIRECT EXAMINATION BY MR. WEICHSEL:

7      Q.    The prosecutor -- you told the prosecutor about your

8  dad being an alcoholic?

9  A.    Yes.

10     Q.    Do you remember how long in your memory he was an

11  alcoholic?

12  A.    He -- Jessie was go get me a beer was yeah, all the time.

13  He used to drink before -- when we lived in Conestoga and he --

14  he told me last night that he --

15            MS. BAGLIVI:  Judge, objection as to what he told

16  him.

17            THE COURT:  Sustained.

18  BY MR. WEICHSEL:

19     Q.    You can't tell us what he told you.

20            THE COURT:  You can't say what he told you.

21  BY MR. WEICHSEL:

22     Q.    Just your own memory.

23  A.    He said he drank a lot and he doesn't remember half of

24  what happened.

25            MS. BAGLIVI:  Judge --

 1          THE COURT:  Strike that.

 2  BY MR. WEICHSEL:

 3      Q.   You can't --

 4          THE COURT:  The jury is to ignore any statement made

 5  by this witness' father, what he told him last night.  It's

 6  hearsay, it's not permitted.

 7          THE WITNESS:  Okay, I'm sorry.

 8          THE COURT:  We can't cross-examine that.  And you were

 9  told not to respond to what anybody else says.  I wish you

10  would follow that, the court's instructions, okay?

11          THE WITNESS:  Okay.

12          THE COURT:  Go ahead, Mr. Weichsel.

13          MR. WEICHSEL:  Okay.

14  BY MR. WEICHSEL:

15      Q.   Jessie, the prosecutor asked you about curfews.  Do

16  you recall like your last year of high school what your curfew

17  was?

18  A.   The last year of high school I didn't really -- I didn't

19  really have one.

20      Q.   Do you recall what Jamie's curfew was?

21  A.   Twelve o'clock.

22      Q.   Was that weekends or during the week?

23  A.   All around I think; 11:30 on weekdays, 12:00 on the

24  weekends.

25      Q.   Now this car the prosecutor asked you about that

1    Jamie had, the station wagon?

2    A.    Yes.

3          Q.    What year was it?

4    A.    '83 I think; '83 and '84 Lynx Mercury.

5          Q.    Do you know what happened to that car?

6    A.    I crashed it.

7          Q.    When?

8    A.    I don't remember the date.

9          THE COURT:   How long ago?

10          THE WITNESS:   Three years ago I'd say.

11          THE COURT:   Thank you.

12   BY MR. WEICHSEL:

13          Q.    Now the prosecutor asked you about paddling.  Do you

14   remember if your father hit Jamie with anything other than a

15   paddle?

16   A.    One time we were playing around with a bull whip.  We had

17   a bull whip and I would pop and pop it and I accidentally

18   caught her with it -- no, she accidentally caught me with it

19   and it hurt and I ran and I told dad, so dad told me that I had

20   to give her --

21          MS. BAGLIVI:   Judge, objection.

22          THE COURT:   Sustained, do not tell us --

23          THE WITNESS:   This is anything but the paddle.

24   BY MR. WEICHSEL:

25          Q.    You can't tell us what any -- what your dad said.

1   Did your dad use anything other than a paddle on Jamie?

2   A.    He made me use the bull whip on Jamie for -- because he

3   said you had to give back what you received or something and I

4   didn't want to and he told me to hit her with the bull whip.

5            MS. BAGLIVI:  Judge, I -- judge --

6            THE WITNESS:  So I did.

7            MS. BAGLIVI:  Judge, how many times do I have to

8   object to what -- he keeps telling us what the father said.

9            THE COURT:  As many times as he says it, that's how

10  many times you have to object to it.

11           MS. BAGLIVI:  I don't want to --

12           THE COURT:  I can't give you the answer to that one,

13  counsellor.  I cannot --

14           MS. BAGLIVI:  Judge, --

15           THE COURT:  -- give you the answer.  You asked me how

16  many times must I object.

17           MS. BAGLIVI:  Sorry, judge, it was a rhetorical

18  question, it wasn't proper.

19           THE COURT:  Okay.

20           MS. BAGLIVI:  Judge, I object.

21           THE COURT:  All I can do is instruct him and I can

22  instruct the jury to disregard the answer.

23           MS. BAGLIVI:  Thank you.

24           THE COURT:  That's all I can do.  Now you are to

25  disregard it.  My instructions to the witness is not to tell us

1    what someone else said.

2                MR. WEICHSEL:  That's all I have.

3    RECROSS EXAMINATION BY MS. BAGLIVI:

4         Q.   Mr. Farthing, you crashed the car three years ago?

5    A.   Yes.

6         Q.   And what happened to the car after you crashed it?

7    A.   It's still sitting in the impound lot for all I know or

8    wherever it's set.

9         Q.   Does it run?

10   A.   I crashed it pretty good.

11        Q.   Okay.  And that was approximately three years ago?

12   A.   Yes.

13        Q.   And yet this is the same car that you and your sister

14   left home in, in August of 19 -- in July of 1994, correct?

15   A.   It might not have been three years ago.

16        Q.   Your memory is not too good, is it, sir?

17                MR. WEICHSEL:  Objection, judge.

18                THE WITNESS:  Everything runs together.

19                MS. BAGLIVI:  Judge, it's a proper question.

20                THE COURT:  I know it's a proper question. Go ahead,

21   everything runs together you said?  Was that your answer?

22        THE WITNESS:  Yes, my memory is keen but dates and time I

23   -- they just run together.

24                MS. BAGLIVI:  Nothing further.

25                MR. WEICHSEL:  Judge, I -- I just forgot one

1  question, judge.

2  REDIRECT EXAMINATION BY MR. WEICHSEL:

3      Q.    Could you describe the paddle that your dad used?

4  A.    I guess it was about -- Jamie found it in the yard one day

5  and he went on her a long time for finding that paddle in the

6  yard.

7           THE COURT:   Describe the paddle.

8  BY MR. WEICHSEL:

9      Q.    Describe it.

10          THE COURT:   That was the question; what does it look

11  like?

12          THE WITNESS:   It was -- it was about that big.

13          THE COURT:   Being what?  About a foot long?

14          THE WITNESS:   Yeah; it was a two by four, that long;

15  someone had carved it and it was about that big.

16          MS. BAGLIVI:   Judge, could we have the record reflect

17  what size he just showed since it won't show up in the

18  transcript?

19          THE COURT:   I didn't see it.

20  BY MR. WEICHSEL:

21      Q.    Okay, can you describe it again?

22  A.    A foot.

23          THE COURT:   Well why don't you describe it and we'll

24  agree to it?

25          THE WITNESS:   It was about a foot by four inches and

1    it had a string on it like a racket ball.

2              MS. BAGLIVI:  Judge, can we have -- the sides he

3    showed of the paddle, can we have Mr. Weichsel --

4    BY MR. WEICHSEL:

5         Q.   It was about a foot long?

6    A.   It was about a foot long.

7         Q.   And -- and show us the width of it.

8    A.   It was about four inches.  We would get spanked and me and

9    my brother would compare bruises in the mirror because it would

10   leave an outline on your butt.

11             MR. WEICHSEL:  Thank you; that's all I have.

12             THE COURT:  Anything else, Ms. Baglivi?

13             MS. BAGLIVI:  No, Your Honor.

14             THE COURT:  All right, you may step down; thank you.

15             Do you have another witness?

16             MR. WEICHSEL:  Yes; Kathy Farthing?

17             THE COURT:  Kathy Farthing?

18             MR. WEICHSEL:  Kathy Farthing.  Judge, can -- can he

19   remain in the courtroom?

20             MS. BAGLIVI:  Judge, I object; sequestration and the

21   -- I don't want to get into an argument in front of the jury,

22   but --

23             MR. WEICHSEL:  Let's go to sidebar then.

24                            (SIDEBAR)

25             THE COURT:  Yes?

1        MS. BAGLIVI:  Judge, I object.  There's a

2  sequestration order and I had asked the same thing because some

3  of -- Mr. Acunto and the other witnesses had wanted to stay in

4  and I told them, you know, after that day they weren't allowed.

5  Mrs. Polites --

6        THE COURT:  When?

7        MS. BAGLIVI:  Remember when Mr. Acunto asked -- you

8  had said no, the sequestration was in effect, they all had to

9  leave?  All of the witnesses.

10       THE COURT:  Yeah.

11       MR. WEICHSEL:  Judge, you know, the prosecution has

12  had the family members in for the trial.  My client's had no --

13  my client's had no family members in because of the

14  sequestration order.

15       THE COURT:  Who is -- who are your other witnesses?

16       MR. WEICHSEL:  Kathy and Paul.

17       THE COURT:  Is Paul outside?

18       MR. WEICHSEL:  Yeah.

19       THE COURT:  Well he'll have to give testimony.  After

20  she testifies I'll let him back in --

21       MR. WEICHSEL:  Okay.

22       THE COURT:  -- because he -- he would then be privy

23  to the testimony that she has made --

24       MR. WEICHSEL:  Okay.

25       THE COURT:  -- and then relay that to Paul.

```
 1                MR. WEICHSEL:  Okay.

 2                THE COURT:  And that's the whole purpose of the

 3   sequestration order.  But after this witness testifies you'll

 4   have the father take the stand and --

 5                MR. WEICHSEL:  Okay, fair enough.

 6                THE COURT:  Just so there's no danger.

 7                MS. BAGLIVI:  Judge, I object.  I mean I had to keep

 8   mine out even though there was nothing that they were going to

 9   --

10                THE COURT:  No, this is -- you know, it's -- it's not

11   fair, the State has the burden.  I --

12                MS. BAGLIVI:  No, I understand that.

13                THE COURT:  I'm allowing it.

14                MS. BAGLIVI:  I'm sorry?

15                THE COURT:  I'm allowing it.

16                MS. BAGLIVI:  Well I just put my objection on the

17   record.

18                MR. WEICHSEL:  I let Mrs. Polites stay.

19                THE COURT:  His -- his reason for asking is for

20   support.

21                MS. BAGLIVI:  Well then I don't have any problem with

22   them, the mother and the father.

23                THE COURT:  Witnesses -- the victim's family have

24   been here all the time.

25                MS. BAGLIVI:  They were not witnesses.
```

1            THE COURT:  Yeah, but they're -- they're here.

2            MS. BAGLIVI:  Yes.

3            THE COURT:  They're looking at the defendant.  Now

4  she has her family here from Georgia, they are finished

5  testifying there's no reason in the world to sequester them,

6  there isn't.  There absolutely is no reason so therefore I'm

7  going to allow the request.  That's it.

8            MR. WEICHSEL:  Thank you.

9                     (END OF SIDEBAR)

10 K A T H Y   F A R T H I N G, WITNESS FOR THE DEFENSE, SWORN.

11           THE COURT OFFICER:  You may be seated, ma'am. For the

12 record would you please state your name, spell your last name?

13           THE WITNESS:  Kathy Farthing, F-A-R-T-H-I-N-G.

14           THE COURT OFFICER:  And the town in which you reside,

15 ma'am?

16           THE WITNESS:  I live in Conyers, Georgia.

17           THE COURT OFFICER:  Thank you very much.

18 DIRECT EXAMINATION BY MR. WEICHSEL:

19    Q.   Mrs. Farthing, I ask you to keep your voice up so the

20 jury can hear.

21           THE COURT:  Speak right into that microphone, Mrs.

22 Farthing.

23 BY MR. WEICHSEL:

24    Q.   Also, all your answers have to be verbal; you can't

25 nod your head because everything is being taped here in the

1    court and eventually there may be a transcript and the

2    stenographer can only take down words, not gestures or nods.

3    Do you understand?

4    A.   Yes, sir.

5              THE COURT:  Just a minute, Mr. Weichsel.  Mrs.

6    Farthing, you don't have to lean up that far, you can lean

7    back.

8              THE WITNESS:  Okay.

9              THE COURT:  The microphone will pick your voice up if

10   you just sit there naturally, all right?  Go ahead.  Mr.

11   Weichsel?

12             MR. WEICHSEL:  Thank you.

13   BY MR. WEICHSEL:

14        Q.   Do you know Jamie Farthing?

15   A.   Yes, sir.

16        Q.   Can you point her out?

17             MS. BAGLIVI:  Judge, I'll stipulate.

18   BY MR. WEICHSEL:

19        Q.   Okay, she just point out my client.  Now how -- how

20   do you -- how do you know Jamie?

21   A.   Jamie is my daughter.

22        Q.   And who are you married to?

23   A.   I'm married to her father, Paul Farthing.

24        Q.   And how old was Jamie when you and Paul got married?

25   A.   She was seven.

1      Q.    And when you first got married where were you living?

2  A.    We were living in Jackson County Georgia, outside of

3  Athens.

4      Q.    What kind of housing?

5  A.    It was a trailer.

6      Q.    And do you recall how long you stayed at that trailer

7  park?

8  A.    It wasn't really a trailer park, but we lived there -- I

9  had been there for a couple of years.  We stayed there until

10 April of '84.  They moved in with me in June of ninety -- in --

11 in June of '93 -- I mean '83, in June of '83, and we moved out

12 of the house -- out of the trailer in April of '94.

13     Q.    '94 or '84?

14 A.    '84, I'm sorry; '84.

15     Q.    Where did you go from there?

16 A.    Well I was working -- I had started working in Conyers and

17 so we moved there to a -- a small house out in the country so

18 the commute wouldn't be so long.

19     Q.    And how -- how long did you live in that small house?

20 A.    We lived there from April of '84 until November of '84.

21     Q.    And then where did you move?

22 A.    We had bought a house in October of '83 but it had --

23 after we bought it it had burnt on the inside.  So we repaired

24 the basement of the house and moved into it, it was an

25 apartment.  And we lived in that apartment, in the basement

Kathy Farthing - Direct                                    61

1     apartment from -- for a year and then we were able to repair

2     the top and we moved up there in November of '85.

3          Q.    And is that the house you're presented in?

4     A.    Yes, sir.

5          Q.    Now could you describe your relationship with Jamie?

6     A.    You men from the beginning?

7          Q.    From the beginning.

8     A.    Sometimes it was good and sometimes it was bad.

9          Q.    What was bad about it?

10    A.    I think the competition over her dad, that was the

11    beginning I guess of the bad.

12         Q.    Okay.  And what was good about it?

13    A.    I mean I loved her, she was a precious child.  She was

14    very needy of attention and -- and it was also -- I don't know,

15    it's hard to explain.  It was hard for Jamie to -- to accept

16    love and I think sometimes maybe it was hard for me to give it

17    and that just started a relationship where there wasn't a lot

18    of you know, giving, on either of us.

19         Q.    And were there times during -- from when you and Paul

20    married in 1983 to 1994 where Jamie lived with other people

21    other than you and Paul?

22    A.    She moved in with Paul's sister, Barbara Pace, in

23    September of 1993.

24         Q.    Where -- where did she live?

25    A.    She lived about 40 miles from us in a town called Winder,

1  Georgia.

2      Q.    Why did she -- do you know why she moved there or why

3  you had her moved there?

4  A.    Well the family just wasn't getting along and Jamie's

5  grades had gone down and -- and I don't know if they were the

6  general teenage problems maybe everybody had but I -- I had

7  never been through that.  And things were real tense at home

8  and she had been doing things like -- well she had been caught

9  smoking pot and just wouldn't obey our rules and so Barb said

10  let me take her for a while because she and Barb had already --

11  had always had a good relationship.  So that's what we did.

12      Q.    How long did she stay at Barb's?

13  A.    She stayed at Barb's from September to December of '93.

14      Q.    Then where did she go?

15  A.    She came back home.

16      Q.    And where was she -- where was she going to school

17  then?

18  A.    Where did she go to school? She went to -- when she moved

19  in with Barb she started going to a high school in Jackson

20  County and she continued to go there. We would go there -- you

21  know, she would drive there every day because she was in that

22  school and making up some credits that she had not gotten and I

23  thought it was good to leave her there.

24      Q.    During the years that you and -- were living with

25  Jamie and Paul do you know how Paul disciplined Jamie?

1  A.    With a paddle.

2       Q.    And could you describe the paddle?

3  A.    It looked like a teacher's paddle that you used to see,

4  you know, when we were kids and teachers were allowed to

5  discipline in school.

6       Q.    And could you recall how often Paul would use that

7  paddle on Jamie?

8  A.    Whenever they didn't do what they were supposed to do

9  which was clean up their room, which could be fairly often

10  sometimes because if she didn't want to clean up her room

11  basically then she --

12       Q.    What -- what else would she be paddled for?

13  A.    That's one of the big things.  I mean if -- if she lied,

14  like for instance if they told a story like they hadn't got a

15  test paper back or they didn't tell him about getting in

16  trouble at school or then he found out and they hadn't told him

17  they would get a paddling.

18       Q.    How long would -- how many times would he paddle

19  Jamie?

20  A.    I think usually three times.

21       Q.    Well were they like soft, hard?

22  A.    Sir?  Soft or hard?  I don't know -- I don't know.

23       Q.    Okay.  Would -- would Jamie cry?

24            MS. BAGLIVI:  Judge, objection to the leading nature

25  of the questions.

1          MR. WEICHSEL:  It's not leading.

2          THE COURT:  Sustained; yes it is.

3    BY MR. WEICHSEL:

4          Q.    What was -- what was Jamie's reaction?

5    A.    Sometimes she would cry, yeah, and sometimes she wouldn't.

6          Q.    And after she was paddled what would happen?

7    A.    Sometimes she would do what she was supposed to do and

8    sometimes she wouldn't.

9          Q.    Now you said when Jamie was living with Barb or after

10   she lived with Barb she had a car?

11   A.    We bought a car.

12         Q.    What kind of car was it?

13   A.    It was a -- it was a Ford Escort Station Wagon and it was

14   like a 1984 or '85 maybe, I can't remember what year it was, it

15   was an older car.

16         Q.    Do you know what happened to that car?

17   A.    Yeah.

18         Q.    What happened?

19   A.    Jessie wrecked it.

20         Q.    When?

21   A.    When?  He wrecked it in March of '95.

22         Q.    Did there come a time that Jamie was asked to leave

23   your house in Conyers?

24   A.    Yes.

25         Q.    When was that?

1    A.    It was in June of 1994.

2          Q.    Okay.   Why was she asked to leave?

3    A.    Well they had been -- she and Jessie had been going out

4    and -- well a couple of times we had found beer cans down by

5    the lake and -- and once we found some marijuana butts down by

6    the lake.   Paul had told them if they didn't come home or

7    stayed out all night again they would have to leave or if they

8    came home messed-up or what he thought was messed up they'd

9    have to leave.   And I wasn't there when he made them leave, I

10   was -- I was at a meeting, but it was a weekend of the Rockdale

11   County High graduation in 1994.   I think that was the weekend

12   they graduated. And they came home and -- well they didn't come

13   in that night and he waited up. And they came in like in maybe

14   6:00 that morning and he told them they had to leave.

15         Q.    Okay.   And that was in June of '94?

16   A.    That was in June of '94.

17         Q.    Okay.   Did they leave the house?

18   A.    They left.

19         Q.    And from your own personal knowledge do you know

20   where Jamie went?   Not from what somebody told you, from your

21   own personal knowledge?

22   A.    I know that she stayed at her boyfriend Eddie's aunt's

23   house for a while.

24         Q.    Okay.   Now I want to take you back to -- I want to

25   take you to late July of '94.   Do you remember a time that

1    Jamie went to New York?

2    A.    I remember that shortly after Paul made them leave, which

3    was in maybe the beginning of the second week in June or

4    something, it was shortly after that that our third son, third

5    child Jason, he's the oldest, he came up from Florida and Paul

6    sent him to look for Jessie.  And he found Jessie at some boy's

7    house in Conyers and brought him home.  And at that time we

8    didn't really know where Jamie was at, but she ended up at

9    Loopey's house but anyway then she -- I would call over to try

10   to talk to Jessie and Jamie but I would have to get someone

11   from work to do that because Loopey wouldn't let me talk to

12   them if I called.  So when I would get them on the phone in the

13   beginning they said that Jamie was in Paramount City.

14          MS. BAGLIVI:  Judge, I'm going to object as to what

15   other people said to where she was.

16   BY MR. WEICHSEL:

17       Q.    You can't tell us where other people said she was.

18   A.    Okay.

19       Q.    From your own --

20   A.    Okay, I was just --

21       Q.    Did there come a time --

22   A.    -- getting to -- she -- wherever she was at she came back

23   and she came to our house in -- in -- toward the end of July in

24   1994.

25       Q.    Okay.

1   A.   And I remember this clearly because it rained a lot that

2   night and the fireworks were delayed for almost three weeks and

3   also because Paul's brother J.D. was there visiting, he and his

4   son.   And J.D. had cancer and he was dying, so you know, I got

5   in touch with Jamie and asked her to please come over and see

6   him and she did.

7        Q.   Do you remember when that was?

8   A.   Well I can't like say whether it was the 24th or 25th or

9   26th, but it was toward the end of July because we had a lot of

10  relatives coming in and out at that time and they always come

11  at the same time of the year.

12       Q.   And do you know where Jamie went after that of your

13  own personal knowledge?

14  A.   I know that she went back to Loopey's house when she left

15  because we had another falling out at that point because she

16  took J.D.'s son Jeffrey out and they didn't come home -- well

17  they didn't come home when they were supposed to come home so I

18  went to Eddie's aunt's house and got the car which she had had

19  up until that time. And I took the car and I know from that

20  point that -- that she ended up at Loopey's house.

21       Q.   So at the end of July you took Jamie's car from her?

22  A.   Um-hum.

23       Q.   And that was the Ford Station Wagon?

24  A.   That right -- that's right.

25       Q.   And why did you take the car from her?

1  A.   Because the car was in my name, it wasn't in her name, it

2  was on my insurance and I was afraid that -- that somebody was

3  going to wreck it that was under the influence, so I took it.

4       Q.   Okay.  So at that point, just so that I understand

5  it, Jamie was out of your house and didn't have a car, is that

6  correct?

7  A.   Right.

8            MR. WEICHSEL:  That's all I have.

9  CROSS EXAMINATION BY MS. BAGLIVI:

10      Q.   Mrs. Farthing, what's your occupation?

11 A.   I'm a social worker.

12      Q.   Okay.  And -- and -- MSW?

13 A.   Yes, ma'am.

14      Q.   And who do you work for?

15 A.   I work for Piedmont Dialysis in Atlanta, Georgia.

16      Q.   I'm sorry, you have to keep your voice up, I can't

17 hear you.

18 A.   I work for Piedmont Dialysis in Atlanta, Georgia.

19      Q.   What is that?

20 A.   It's a dialysis center.

21      Q.   Okay.  And what do you do there?

22 A.   I'm a social worker, a medical social worker.

23      Q.   You counsel people that are going through dialysis?

24 A.   That's right.

25      Q.   Okay.  And prior to -- how long have you been working

1   there?

2   A.   I've been a dialysis social worker for -- since 1987.

3        Q.   Okay.

4   A.   I've been there for a year and a half.

5        Q.   Okay.  And -- and prior to 1987 where did you -- what

6   did you work?

7   A.   I was a nursing home (inaudible), I worked for Georgia

8   Legal Services out of Conyers.

9        Q.   Okay.  And you were a social worker back then?

10  A.   Yeah, I was an MSW.

11       Q.   Okay.  When did you get your degree?

12  A.   In June of -- in June of '83.

13       Q.   Okay.  So you went through college and then you went

14  and got your master's in social work, is that correct?

15  A.   That's right.

16       Q.   Okay.  And you said that you -- what year was it that

17  you met Luke -- I'm sorry, not Luke.

18  A.   Paul.

19       Q.   Paul?

20  A.   I met him in 1983.

21       Q.   Okay.  And what year did you get married?

22  A.   1983.

23       Q.   Okay.  And at the time you were living in a trailer,

24  is that correct?

25  A.   That's right.

1      Q.   Okay.  But you said it was not a trailer park?

2  A.   Well it was a -- it was three fourths of an acre that I

3  rented from a lady.  I -- I owned my trailer.

4      Q.   Okay.  Was it a stationary trailer then?  Pretty much

5  like a -- almost like a house?  It wasn't one you can move

6  around?

7  A.   Well it was one that could be moved.  It was a 70 foot by

8  14 foot trailer.

9      Q.   Okay.  And before you met him you lived there alone?

10  I mean you had no -- what I'm trying to say is -- I don't mean

11  to pry -- you had no children living there?

12  A.   No.

13      Q.   Okay.  And when you two got together, everybody --

14  Jessie, Jason and Jamie all moved in?

15  A.   They moved in.

16      Q.   Okay.  How many bedrooms in the trailer?

17  A.   Two.

18      Q.   Okay.  And you were on a half acre of property?

19  A.   About that.

20      Q.   Was it a nice place?

21  A.   It was a new trailer.

22      Q.   I'm sorry?

23  A.   It was a new trailer.

24      Q.   Okay.  And it was in the woods, a nice setting?

25  A.   Yeah.

Kathy Farthing - Cross                                          71

1          Q.    Okay.  and you stayed there for I guess June of '93 -

2    - '83, I'm sorry, I'm doing the same thing -- to April of '84,

3    is that correct?

4    A.    That's right.

5          Q.    And then you moved to a -- a small county house?

6    Okay, and again with Jessie -- I'm sorry, you have to answer.

7    A.    I'm sorry, I moved there with the whole family.

8          Q.    Okay.  And you stayed there because you were fixing

9    up the house that you had just bought, is that correct?

10   A.    That's right.

11         Q.    Okay.  And that's the house on High Rock Road?

12   A.    That's right.

13         Q.    Okay.  And eventually you were able to move into the

14   whole house when it was all fixed, is that correct?

15   A.    That's correct.

16         Q.    Okay.  And Jamie had her own bedroom, is that

17   correct?

18   A.    That's correct.

19         Q.    Okay.  And she was responsible for keeping it neat as

20   --

21   A.    That's right.

22         Q.    -- as were the other boys?

23   A.    That's right.

24         Q.    Okay.  And did they have chores around the house to

25   do?

1  A.    They had to clean the kitchen up, they took turns or they

2  could do it together.  They were supposed to keep the -- their

3  stuff picked up out of the den.

4        Q.    Um-hum, okay.  And there came a point in time when

5  you adopted the three children, correct?

6  A.    That's right.

7        Q.    Do you know what year that was?

8  A.    I think the year was 1985.

9        Q.    Okay.  And do you -- you adopted them because you

10  loved them and you loved Paul, is that correct?

11  A.    That's right.

12        Q.    And you tried your best to give them a good home?

13  A.    The best that I could do.

14        Q.    Okay.  And you said the relationship with Jamie was a

15  good one and a bad one, is that correct?

16  A.    That's right.

17        Q.    And I think you said that there was some comp -- that

18  the bad part was the competition over her father, is that

19  correct?

20  A.    Well -- yes, ma'am, in the beginning it was the

21  competition.

22        Q.    Okay.

23  A.    In later years it was other things I guess.

24        Q.    Okay.  Well, ma'am, as a social worker did you find

25  that that was unusual, when a new woman comes in and marries a

1  man with children that the little girl gets a little jealous?

2  A.    It's not unusual.

3       Q.    Okay.   And -- and you loved Jamie and you tried your

4  best, isn't that correct?

5  A.    I did the best that I knew how to do.

6       Q.    Right, okay.   Now you said that for a while there

7  Jamie moved in with her Aunt Barbara, is that correct?

8  A.    That's right.

9       Q.    And you said that they had a pretty good

10 relationship?

11 A.    When she moved in they did.

12      Q.    Okay, that's what --

13 A.    But that rapidly declined.

14      Q.    No, I understand that, but she had a good

15 relationship?   Did you all get together with her over the

16 holidays and different events, birthdays or whatever?   Did you

17 see this woman --

18 A.    You mean in prior years?

19      Q.    Yeah, in prior --

20 A.    Yes.

21      Q.    -- to when she moved in?

22 A.    We did.

23      Q.    Okay.   Did -- did you have a -- at the holidays would

24 you have family gatherings?

25 A.    Yes, ma'am.

1          Q.    Okay.  And you said that you -- whose idea was it

2    that she would move in with Barbara Pace?

3    A.    It was Barbara's.

4          Q.    Okay.  And you said that there were some general

5    teenage problems going on and you thought it was best?

6    A.    I think they went beyond general.

7          Q.    Okay, well didn't -- weren't those your words to Mr.

8    Weichsel?  General teenage --

9    A.    Well I said --

10          Q.    -- problems?  Ma'am, did you --

11    A.    Well I said general, but -- but if I personalize that it

12    was not problems that I went through as a teenager.  I said

13    maybe they were general teenage problems.

14          Q.    But you had nothing to compare it to, correct?

15    A.    But I've had -- no, I had nothing to compare rebellious

16    behavior to because that's not what I had experienced when I

17    was a teenager.

18          Q.    Okay.  And you made sure she was enrolled in school,

19    correct, when she went to Barbara's?

20    A.    Barbara enrolled her in school.

21          Q.    Okay.  And eventually there came a point in time when

22    she came back home, is that correct?

23    A.    Barbara basically deposited her back home on Christmas

24    Eve.

25          Q.    Okay.

1  A.    And --

2        Q.    Ma'am, my question was did she eventually come home?

3  A.    Yeah.

4              MR. WEICHSEL:  She's answering the question.

5              MS. BAGLIVI:  Judge, it's not responsive to my

6  answer.

7              THE COURT:  Well I'm going to allow it.  You said she

8  returned.  Go ahead.

9              THE WITNESS:  I said she returned back home but it

10 was under very stressful circumstances. Barbara basically threw

11 her out; brought her back on Christmas Eve and --

12             MS. BAGLIVI:  Judge, I'm going to ob -- that's

13 exactly what I'm objecting to.  If this is something that

14 Barbara told her or Jamie told her it's hearsay.

15             THE WITNESS:  I'm not -- nobody told me this; I'm

16 telling you what happened.

17             THE COURT:  Please, please.  I've overruled you,

18 counsellor and I'm asking the witness to continue --

19             THE WITNESS:  Barb --

20             THE COURT:  -- her answer.

21             THE WITNESS:  Barbara was mad at Jamie because Jamie

22 wouldn't act the way she wanted her to act.  She brought her

23 back on Christmas Eve with all of her stuff and just said here

24 she is, she's your's, I want nothing else to do with it.  And

25 basically as far as I recall we didn't have a very good

1    Christmas with Barb that year because Barb took the problem,

2    made it worse and brought it back to me.

3    BY MS. BAGLIVI:

4        Q.    Okay.  But Jamie was your daughter, correct?

5    A.    Right, Jamie was my daughter.

6        Q.    Okay.  And now at this point in time you did not want

7    to remove her from the school that she was attending by

8    Barbara's, isn't that correct?

9    A.    No, I didn't.

10       Q.    Okay.  Because you felt that that might be -- it

11   wouldn't be good for her, correct?

12   A.    I thought it was best that she stay in the school she was

13   in.

14       Q.    Okay.  And is that when you and your husband got her

15   a car, so she could continue --

16   A.    No, we bought her the car in September before she --

17       Q.    Ma'am, could you please let me finish my question?

18   Is that when you bought her the car so that she could commute

19   back and forth to school?

20   A.    No, we bought her the car before she moved to Barb's.

21       Q.    Okay.  Oh, so when she went off to Barb's she took

22   the car with her?

23   A.    That's right.

24       Q.    Okay.  And even though it was under your name she was

25   allowed to use it, it was technically her car?

1  A.    That's right.

2       Q.    And she responsible for keeping it clean, things of

3  that nature?

4  A.    Um-hum.

5       Q.    You have to verbalize.

6  A.    Yes, ma'am.

7       Q.    Okay.  And now you said that sometimes she would get

8  paddled by your husband, is that correct?

9  A.    That's right.

10       Q.    Okay.  And you said that it was because sometimes she

11  wouldn't clean up her room or often she wouldn't clean up her

12  room?  Did you say --

13  A.    That's right.

14       Q.    Okay.  And, ma'am, again, as a social worker did you

15  find it unusual that a teenager wouldn't want to clean up her

16  room?

17  A.    I didn't find it unusual but let me -- let me just say

18  this, and I know --

19       Q.    That was my question.

20  A.    Okay.

21       Q.    Was it unusual?  Did you find that that was unusual,

22  that Jamie Farthing was a teenager and didn't want to clean up

23  her room?

24  A.    Yeah, I did find it unusual.

25       Q.    Well did Jessie and Jason clean up their rooms?

1    A.    Most of the time Jessie did.

2          Q.    Okay.  Well what about Jason?

3    A.    Yeah, most of the time Jason was a very -- probably the

4    neatest one of them all.

5          Q.    And Jamie was messy?

6    A.    Yes.

7          Q.    Okay.  And you said that sometimes she got hit

8    because she would lie?

9    A.    Well about school work, yes.

10         Q.    Okay.  Now you said that there came a point in time

11   in I believe June of 1994 that she was kicked out of that

12   house, is that correct?

13   A.    That's correct.

14         Q.    Well ma'am, isn't it a fact that she had been warned

15   numerous times to abide by the rules or she would be kicked out

16   of the house?  Isn't that correct?

17   A.    That's correct.

18         Q.    Okay.  So this wasn't just she did something wrong

19   and you just threw her out of the house, is that correct?

20   A.    Well I wasn't there, I didn't throw her out.

21         Q.    Okay.  But did you join in your husband's decision to

22   kick her out?

23   A.    No.

24         Q.    Okay.  You didn't want him to kick her out?

25   A.    No, I didn't.

1       Q.   Okay.  Why not?

2   A.   Because I loved her and I didn't want anything to happen

3   to her.  And I knew that -- that Jamie couldn't cope with life

4   without some guidance.

5       Q.   Okay.  Well did you -- other than you and your

6   husband and your family members, did you try to get her any

7   guidance?

8   A.   My husband was opposed to counselling.

9       Q.   Okay.  Well what about you, ma'am?  You're a social

10  worker?

11  A.   I know that I'm a social worker.

12      Q.   Did you attempt to get Jamie any help?

13  A.   I did go to the school and ask her counsellor when she was

14  in -- in the county school if she could receive counselling

15  through the school, but it was a very stressful sometimes at

16  home and it was a whole lot easier if I did what my husband

17  said to do.

18      Q.   Okay.  And, ma'am, when was that, when you asked the

19  school to give counselling?  How old was Jamie?

20  A.   Maybe 14.

21      Q.   Okay.  Well let me ask you -- in June of 1994 she was

22  18, is that correct?  When she was kicked out of the house she

23  was --

24  A.   Yeah, she had just turned 18.

25      Q.   She had just turned 18?

1    A.    She turned 18 in May, right.

2          Q.    Okay.  Did you attempt -- when you saw these things

3    that were going on did you attempt to get her counselling at

4    that particular point in time?

5    A.    No.

6          MS. BAGLIVI:  I have nothing further.

7          THE COURT:  Mr. Weichsel, anything else?

8          MR. WEICHSEL:  Just a few questions, judge.

9    REDIRECT EXAMINATION BY MR. WEICHSEL:

10         Q.    The prosecutor asked you about the stress in your

11   relationship with Jamie and you had started talking about other

12   things, remember that?

13   A.    I think I do.

14         Q.    What other things?

15   A.    Well it was just a ongoing battle of -- between Jamie and

16   I as how she was going to present herself, how she was going to

17   dress.  You know, I wanted her to look -- to look proper.  And

18   I think as they got older they were all kind of opposed to that

19   and maybe -- you know, I said maybe that was normal.  I don't

20   know because I didn't go through a rebellious period.  But you

21   know, I think that all -- I felt like -- that -- I mean it was

22   just very stressful.  She -- she didn't do you know, what I

23   wanted her to do so -- which was dress like a proper person.

24   She wanted to -- to -- I didn't feel like she needed a lot of

25   makeup.  She wanted to wear makeup so she really never got the

1    chance to I guess learn how to do that.  I wanted her to wear

2    her hair like she's got it now, but that's not what she wanted

3    it -- wanted it to be like.  She wanted to wear it in strange

4    sorts of ways.  You know, I wanted their rooms to look nice but

5    she wanted her room to look weird.  I used to try to do things

6    like -- you know, it would upset Paul if he came home and we

7    wasn't getting along, and I used to make them do stuff like --

8    you know, dad's going to be home soon, let's please sit down

9    and act like we're being normal and maybe we can play some

10   cards or maybe we can do something like that.  But, you know,

11   things wasn't normal from -- I can't think -- I mean comparing

12   my own life to the life they lived, I mean I think my life was

13   normal when I was a kid but when they moved in with me things

14   were never really normal.  They were afraid of the dark, and

15   they were afraid of dolls.  I couldn't -- I mean I couldn't --

16   I could never give her a doll because she would tear it up;

17   they thought they were walking around at night.  I don't know

18   what happened to them in California but I know they had a very

19   traumatic experience.

20        MS. BAGLIVI:  Judge, I'm going to object about --

21   anything about California; she wasn't there.

22        THE COURT:  Well she said she didn't know what

23   happened in California.

24        MR. WEICHSEL:  Thank you.

25        THE COURT:  Anything else, Mr. Weichsel?

1           MR. WEICHSEL:  No.

2           MS. BAGLIVI:  No.

3           THE COURT:  All right, thank you, Ms. Farthing, you

4    may step down.

5           All right, we'll take a break, 15 minutes; ten after

6    eleven I'll expect you back.  Do not discuss the case. And did

7    you -- I don't think there was anything in the newspapers

8    today, I didn't see any.  But if there was none of you read

9    anything about the case, is that correct?  All right, thank

10   you.

11              (PAUSE - THE JURY LEAVES THE COURTROOM)

12          THE COURT:  We have one more witness, is that

13   correct?

14          MR. WEICHSEL:  Yes, judge.

15          THE COURT:  All right.  All right, and we should

16   finish that witness this morning, is that correct?

17          MR. WEICHSEL:  I don't think he's going to be any

18   longer than the other witnesses, judge.

19          THE COURT:  All right, so ten after eleven please.

20                           (RECESS)

21          THE COURT:  All right, ask the jury to come up

22   please?

23              (PAUSE - THE JURY ENTERS THE COURTROOM)

24          THE COURT:  Defense, call its next witness please?

25          MR. WEICHSEL:  Fine; Paul Farthing please?

Paul Farthing - Direct                    83

1          THE COURT:  Paul Farthing.

2                    (PAUSE)

3  P A U L   F A R T H I N G, WITNESS FOR THE DEFENSE, SWORN.

4          THE COURT OFFICER:  You may be seated, sir.  For the

5  record can you please state your name and spell your last name?

6          THE WITNESS:  Paul Farthing, F-A-R-T-H-I-N-G.

7          THE COURT OFFICER:  And the town in which you reside,

8  sir?

9          THE WITNESS:  Conyers, Georgia.

10          THE COURT OFFICER:  Thank you.

11  DIRECT EXAMINATION BY MR. WEICHSEL:

12      Q.   Mr. Farthing, I'd ask you to keep your voice up so

13  that the jury can hear you and if you slightly lean in towards

14  that mike it -- it will help.  All your answers have to be

15  verbal because we're being picked up by video records and if

16  there's a transcript they can only take down words, they can't

17  take down nods of the head.  Do you understand that?

18  A.   Yes, sir.

19      Q.   You're related to Jamie Farthing?

20  A.   Yes, sir, I'm her father.

21      Q.   Do you see Jamie here in court?

22  A.   Yes, sir.

23      Q.   Paul, how old are you?

24  A.   Pardon?

25      Q.   How old are you?

Paul Farthing - Direct                                    84

```
 1   A.    Forty six.

 2         Q.   And you live in Conyers, Georgia?

 3   A.   Yes, sir.

 4         Q.   And you're married, sir?

 5   A.   Yes.

 6         Q.   What's your wife's name?

 7   A.   Kathy Farthing.

 8         Q.   Tell me -- go back, a little bit to your background.

 9   Were you in Vietnam?

10   A.   Yes, sir.

11         Q.   Did you see combat duty?

12   A.   Yes, sir, I was -- I was with a land clearing operation

13   there.   Took bulldozers and if there was areas -- I don't know

14   how to explain it, the first areas the infantry had trouble

15   patrolling we'd take bulldozers and clear the area and set up

16   towers then, a watch area.

17         Q.   Now what year did you come back from Nam?

18   A.   1971.

19         Q.   Did -- did you marry a woman by the name of Loopey --

20

21         MS. BAGLIVI:   Judge, can we -- I have an objection to

22   leading questions.

23         THE COURT:   I'll allow it -- this one, go ahead.

24   BY MR. WEICHSEL:

25         Q.   Did you -- did you marry a woman by the name of
```

1   Loopey?

2   A.   Yes, sir.

3        Q.   And when was that?

4   A.   Well we married -- we lived together for a long time

5   before we -- before we got married.

6        Q.   Okay, when did you start --

7             THE COURT:  I'm sorry, Mr. Farthing, you're going to

8   have to speak up so that they can hear you.  Your voice drops,

9   all right?

10            THE WITNESS:  Oh, yes, sir.

11            THE COURT:  That microphone will pick you up, but

12  make sure your voice gets out there so that -- I don't want the

13  jurors missing what you're saying.

14            THE WITNESS:  Thank you, sir.

15            THE COURT:  All right?  Go ahead.

16  BY MR. WEICHSEL:

17       Q.   When did you start living with Loopey?

18  A.   It was in the first part of '72, 1972.

19       Q.   And where were you living?

20  A.   It was in California, I was stationed out in California at

21  that time.

22       Q.   When -- what year was your oldest child born?

23  A.   Jason was born in 1973.

24       Q.   When -- what year did you marry Loopey?

25  A.   We married -- believe it was the end of 1975.

1          Q.    Okay.   And when was Jamie born?

2   A.    May 3rd, 1976.

3          Q.    And when Jamie was born where were you living?

4   A.    Let's see, we was -- we was living in Florida at that

5   time.

6          Q.    And from Florida where did you go?

7   A.    We went back to Indiana.

8          Q.    How long did you stay in Indiana?

9   A.    Almost two years.

10          Q.    And where -- where did you go from there?

11   A.    Then we moved out to California.

12          Q.    And where did you go from there?

13   A.    Let's see; see we went back to Indi -- I believe we went

14   back to Indiana.  I moved around a lot and I just -- I -- it's

15   hard for me to --

16          Q.    During those years what kind of work were you doing?

17   A.    I was always construction.

18          Q.    Now could you tell me after Jamie was born in '76

19   could you describe your relationship with Loopey?

20   A.    Well I -- the relationship was about the same always.  It

21   was -- it was -- I mean we'd -- it was kind of a love/hate

22   thing.  It was -- we was just attracted physically, I mean

23   there was no -- there was nothing else.  And I think that when

24   we'd have bad times making up was what -- that's all we had, so

25   I -- I guess we was caught in something like that.

1          Q.    Now, when there were bad times were there fights?

2    A.    Yes, sir.

3               MS. BAGLIVI:  Judge, objection.  I object to the

4    leading nature of all of these questions; suggesting the answer

5    by suggesting fights.

6               THE COURT:  I know what a leading question is.

7               MS. BAGLIVI:  I know, but that's --

8               THE COURT:  Counsel, I know, and I'm going to caution

9    you.

10              MR. WEICHSEL:  Thank you.

11   BY MR. WEICHSEL:

12         Q.    Just tell me, during the bad times what went on?

13              THE COURT:  That's it, now you asked what went on

14   instead of telling him.

15              MR. WEICHSEL:  Fine.

16              THE COURT:  Now the jury knows, so.

17   BY MR. WEICHSEL:

18         Q.    Well tell us, Mr. Farthing, what went on?

19   A.    Well I drank -- I drank a lot back then.  I was -- I drank

20   a whole lot and a lot of times I wouldn't know.  I mean at

21   first it probably wasn't bad but then it -- like I said, making

22   up was our mainstay, so I guess it had to get worse for it to

23   get better.  It was -- it progressed.

24         Q.    Okay, when it got worse -- you've got to describe and

25   tell us what was going on.  I know --

 1            MS. BAGLIVI:   Judge, I have an objection unless this
 2   -- unless Jamie -- the defendant was present during these
 3   times.  I don't know, I mean I --
 4            THE COURT:   Yeah, I think we can move on.  He's
 5   explained that there was bad times.  I don't know -- he's
 6   explained it, you've asked him three times, counsel; move on.
 7   BY MR. WEICHSEL:
 8       Q.    During these bad times was -- was Jamie present?
 9   A.   Yes, sir.
10       Q.    Okay.  And during these bad times when Jamie was
11   present an you tell us what went on between and Loopey?
12   A.   I don't know, we'd just get in quarrels.  I mean one time
13   she stabbed me.  I mean I probably slapped her around and I'd
14   throw things, I know that.
15       Q.    And during this time would Jamie be present?
16   A.   Some of the time she probably would, yes.  I don't -- if
17   they were in bed I guess -- you know, the kids was around.  I
18   guess it didn't matter whether they was around or not, I mean
19   when we got -- when we got going.
20       Q.    Did there come a time that you and Loopey separated?
21   A.   Yes, sir, we separated off and on.
22       Q.    Starting when?  I'm talking about after Jamie was
23   born.
24   A.   We was separated when Jamie was born.
25       Q.    Separated when Jamie was born?

1    A.    Right.

2          Q.    After that did you get back together?

3    A.    Right.

4          Q.    Did you separate again?

5    A.    Yes, well we went out to California and she was running

6    around on me a lot and I -- I'd overlook it, I don't know why.

7    But then I -- I just left, I just --

8          Q.    When you left where did you go?

9    A.    I came to Georgia.

10         Q.    Did anybody go with you?

11   A.    Right, I had all three of the -- the kids with me at that

12   time.

13         Q.    Okay.  How old was Jamie at that time?

14   A.    She was -- she would have been about two and a half years

15   old.

16         Q.    And how long did you stay in Georgia?

17   A.    Well I've resided there since.

18         Q.    Now when you left with the kids when Jamie was two

19   and a half where was Loopey?

20   A.    She stayed in California.

21         Q.    Did there come a time after that that Loopey came to

22   Georgia?

23   A.    Yes, sir, about a -- probably about a year later.  Well

24   she -- she called me on the phone and said she wanted to see --

25               MS. BAGLIVI:  Judge I'm -- judge, I'm going to

1   object.

2           THE COURT:  Yeah, sustained.  You cannot tell us, Mr.

3   Farthing, what other people have said, okay?  You cannot

4   testify as to other people's conversations.

5           THE WITNESS:  Okay, what -- what did I say?

6           THE COURT:  That's all right, you didn't do anything

7   wrong.

8           THE WITNESS:  No, but I mean I don't know what I

9   said, so I don't know --

10          THE COURT:  Well you were going to tell us what

11  someone said to you on the phone.

12  BY MR. WEICHSEL:

13      Q.   You were going to tell us what Loopey said.

14  A.   Oh.

15          THE COURT:  And you can't tell us that, okay?

16          THE WITNESS:  Okay.

17  BY MR. WEICHSEL:

18      Q.   You had a phone conversation with Loopey?

19  A.   Yes, sir.

20      Q.   And as a result of that phone conversation did -- did

21  anything happen?

22  A.   Yes, I -- I -- I allowed her to come to Georgia and see

23  the kids and I don't know, I figured it would be all right.  So

24  I went to work and she just took the kids and left and went

25  back to California.  Of course I didn't know she went back to

 1   California.  She -- she knew people in North Dakota, the

 2   Carolinas, North Carolina, Florida, Indiana, Ohio and --

 3        Q.   How old was Jamie when she took the kids to

 4   California?

 5   A.   Jamie would have been about three and a half then.  This

 6   was about a year later when they left.

 7        Q.   Excuse me?  It was about a year after you left?

 8   A.   Right.

 9        Q.   Were you divorced from Loopey at that time?

10   A.   No, sir.

11        Q.   Now after Loopey took the three kids to California

12   what did you do to get the kids back, if anything?

13   A.   Okay.  I -- I -- the first thing I did was I went to the

14   bus station.  They don't keep records, but the man told me that

15   --

16        Q.   You can't tell us what a man told you.

17   A.   Oh, I'm sorry.

18        Q.   That's okay.  You went to the bus station, what else

19   did you do?

20   A.   Okay, I found out that she had taken a bus with the kids.

21   I couldn't find out where she had went and I just kind of

22   travelled around to different places that I knew that she might

23   have went. And I went to California and -- from her sisters and

24   brothers houses and her mom's house -- I went to the schools

25   that was surrounding them -- them areas.  And I finally found a

1  school where the kids had been, but they was no longer there,

2  they already changed.  And I talked with the principal at the

3  school for a long time.  And she sent me a --

4          MS. BAGLIVI:  Judge, I'm sorry, I'm going to object

5  to what the teacher said.

6          MR. WEICHSEL:  Judge, I don't think this is being

7  admitted for the truth of -- you know, but it deals with his

8  efforts to get his kids back, judge.

9          THE COURT:  Yeah, I'm going to allow it as to what he

10  was told, that he was told this.  Whether it's true or not is

11  something that -- it's not being offered for that purpose.  I'm

12  allowing it.   You can even say what is the result of your

13  conversation with the -- with the principal, what did you do

14  next.   That I think would be a proper way to get around it.

15          THE WITNESS:  Okay.  And then next the -- the

16  principal called me and -- I had went back to Georgia and the

17  principal called me when she received transcripts from the

18  school where they had been attending then and let me know the

19  name and location of that school.  So it was a Friday -- I

20  believe it was a Friday.  I left and went to California I -- I

21  just stayed till Monday morning and then Monday morning I went

22  to the school and I just went into the school ground and found

23  all three of them and got them in my car and I just left and

24  come on back to Georgia.

25  BY MR. WEICHSEL:

1        Q.    How long were the kids away from you?

2   A.    Approximately six months.

3        Q.    What was -- before Loopey took the kids, and I'm

4   talking about Jamie now, when she was three and a half, what

5   was your relationship with Jamie?

6   A.    I mean we -- we was -- I mean it was good.  It was just

7   good.  I mean we -- the biggest thrill I think they ever had in

8   their lives was some -- just a little trivial thing.  Every

9   Friday I would take them to -- there was a TGY store and I let

10  them pick out one little thing.  And the boys always got a Hot

11  Wheel and Jamie, she would -- she would -- she was a little

12  young and she would just get little makeup stuff or something,

13  but all they could spend was a dollar and that was a real big

14  deal and big event.  And then we went and eat and I mean it was

15  nice.

16       Q.    When Jamie -- you got Jamie in California and brought

17  her back to Georgia, was there -- was there -- did you notice

18  anything different about Jamie?

19  A.    Well we never was close after I got them back.  I guess --

20  I guess they lost trust in me because -- well I can't say what

21  she said.  I guess they kind of assumed that I -- they -- they

22  -- they didn't think I wanted them is why they had to go to

23  California.  So while I wasn't -- I wasn't around for six

24  months.  They didn't think that I was even looking, they didn't

25  think anything.  They thought I just didn't -- didn't care.  So

Paul Farthing - Direct                    94

1   when I got them back I guess they -- they never trusted me, but

2   they would never -- they never shared with me things that they

3   should have after that.

4       Q.   Now when -- when they got back to Georgia who did --

5   did Jamie stay with any relatives?

6   A.   Well this was a long time after that, that she did stay

7   with relatives.  Before -- before -- I don't know, we're

8   jumping around a lot of time span here.

9            THE COURT:  Just a minute.  Why don't you be more

10  precise in your questions?

11           MR. WEICHSEL:  Okay.

12  BY MR. WEICHSEL:

13      Q.   Let me -- I'll withdraw that.  When you first got

14  back to Georgia where -- where were you living?

15  A.   We lived --

16           THE COURT:  Wait a minute, just -- Georgia when?

17           MR. WEICHSEL:  I'm withdrawing that.

18  BY MR. WEICHSEL:

19      Q.   When you -- when the kids came back from California.

20           THE COURT:  When he picked up the children and --

21  BY MR. WEICHSEL:

22      Q.   When you picked up the kids in California and went

23  back to Georgia where were you living?

24  A.   I believe I moved in with my sister at first because I had

25  to sell everything I had while I was searching --

1           THE COURT:  You were living with your sister.

2  BY MR. WEICHSEL:

3      Q.   And what was -- what's your sister's name?

4  A.   Phyllis Farthing -- Phyllis Wright (phonetic), I'm sorry.

5  Phyllis Wright.

6      Q.   And what town was that in?

7  A.   It was in Monroe, Georgia.

8      Q.   And how long did you stay with Phyllis?

9  A.   Probably three months.

10      Q.   And where did you go from there?

11  A.   Then I got my own place, I rented a trailer.

12      Q.   And where was that?

13  A.   That was in Monroe, Georgia too.

14      Q.   How long did you stay in Monroe?

15  A.   We stayed in Monroe probably three years.

16      Q.   And where did you go from there?

17  A.   Then we moved to Athens; that's when I met Kathy.

18      Q.   And when you were living in Athens where were you

19  living?

20  A.   We -- I was living in a trailer in Athens also.  It was a

21  little town, Arcaid (phonetic) outside of Athens.

22      Q.   Now how old was Jamie when you -- when you met Kathy?

23  A.   Let's see, she -- Jamie would have been six years old.

24      Q.   Now do you -- when -- did you divorce Loopey?

25  A.   Yes, sir.

Paul Farthing - Direct                    96

1       Q.    What year was that?

2   A.    1983.

3       Q.    After you brought Jamie back from California did she

4   see Loopey on a regular basis, her mother?

5   A.    No, sir. When I -- when I brought the kids back from

6   California I wouldn't let her see them.  I wouldn't -- I just

7   couldn't allow it.  And then well she -- she never made an

8   attempt to see them that I know of.

9       Q.    Now --

10  A.    Let's see, it was -- it was -- I don't know, she just

11  never made no attempt to see them, so I wouldn't have allowed

12  her to.

13      Q.    Now, Mr. Farthing, you've been convicted of a crime,

14  isn't that correct?

15  A.    Yes, sir.

16      Q.    And what's that crime?

17  A.    Pointing a pistol at another.  That was --

18      Q.    Who did you point a pistol at?

19  A.    It was -- it was Loopey, my ex-wife.

20      Q.    And when was that?

21  A.    I guess it was -- we -- this was after we'd moved to

22  Conyers, Georgia.  Let's see, well I was already married to my

23  wife now, Kathy, and she had already adopted the three kids and

24  Loopey came -- there's a dead end street beside our house and

25  Loopey came there and the boys come running up, they was --

1   Jason was real scared.  So I followed -- I followed her into

2   town, they went to I believe it was a K-Mart parking area.  We

3   had had a court proceeding before this and she was not allowed

4   -- she was on probation and she was not allowed to come within

5   so many yards or something of the school, of my house.

6           MS. BAGLIVI:  Judge I'm sorry, I didn't hear that

7   word.  He had a?

8           MR. WEICHSEL:  Court proceeding.

9           MS. BAGLIVI:  Oh, a court proceeding, I'm sorry.

10  BY MR. WEICHSEL:

11      Q.   Go ahead.

12  A.   And the -- and the bus route.  Well I called the police

13  and I told them where she was at that time because they had not

14  served her; she didn't know she was on probation for this, they

15  had to serve her first or that's the way that I understood it,

16  that she had to be served before it meant anything.  Well the -

17  - she was in the -- I was in the parking lot there for about 45

18  minutes and the vehicle didn't move or anything.  So I called

19  the police back and they just told me that they could not find

20  her.  I didn't see a police car or nothing and I sat there the

21  whole time.  So I don't know how long it was later, it was

22  within a one week span.  I was going to Lawrenceville, I

23  believe to see a lawyer because I wanted this served.  And I

24  just happened to pass her on the street.  I turned around, I --

25  I just -- I was in my Blazer, and she pulled into that little

1    town of Greyson -- she didn't know I was behind her.  She

2    pulled in so I just took my Blazer and I just blocked her where

3    she couldn't get out.  I just reached and got my gun and I just

4    opened the door and put it on her.  And there was some people

5    standing there and I just asked them if they'd call the police.

6    I knew the gun would get their attention and they'd be there

7    right quick.  That's what I -- well I went -- when I went to

8    court for that -- that's -- I mean that's exactly what I told

9    the judge and that's all I wanted to accomplish and I guess I

10   did, I don't know.

11        Q.   And you -- you were convicted of pointing a gun?

12   A.   Yes, sir.

13        Q.   And you were sentenced?

14   A.   Yes; well I pled guilty, sir.

15        Q.   Now how did you -- after Jamie came back to you from

16   California and began living with you, how did you discipline

17   Jamie?

18   A.   At that point she was kind of -- kind of real young, there

19   was -- I mean there wasn't much of a problem.

20        Q.   Did there come a time that Jamie did become a

21   problem?

22   A.   Later on, yes.

23        Q.   How old was she?

24   A.   It probably -- she was probably 14 -- 14 probably when --

25   there was probably no more than just normal, you know, trying -

1    - trying out her own wings, you know, trying to be her own

2    person and all.  I just -- I guess I'm a dominating person.

3         Q.   And how -- how did you discipline her?

4    A.   I disciplined them -- I'd -- I'd either send them to their

5    room or I'd paddle them; I had a paddle I used.

6         Q.   What would you paddle Jamie for, what kind of things?

7    A.   I mean talking back, talking back you know, if it just

8    went on, lying to me, that was -- I didn't like being lied to

9    at all.

10        Q.   Anything else you can remember?

11   A.   Well sometimes if I -- if I had to tell her like two or

12   three times I might -- I might use the paddle you know, if

13   words didn't do any good.

14        Q.   What was -- describe Jamie's relationship with Kathy?

15   A.   I always thought everything was good.  I could tune things

16   out.  I could just ignore things.  It was like if I ignored

17   them they didn't -- they didn't happen, so there was a lot of

18   things that was going on just that I didn't accept, I ignored,

19   I don't know what.

20        Q.   Well --

21   A.   But her relation -- her relationship with Kathy I guess

22   was one of resentment.  She come in -- she took my ex-wife's

23   place, Loopey, her natural mother's place and at -- at this

24   time my older son was really giving me a lot of problems and I

25   don't know, I just -- I didn't give Jamie a chance.  I -- I

1    would -- Jason could manipulate.  When -- when -- when I'd get

2    home from work, within ten minutes he could have me just in a

3    frenzy and then it would affect the way I treated the whole

4    household.

5         Q.   Well you had said when you were married to Loopey

6    that you were doing a lot of drinking, right?

7    A.   Yes, sir.

8         Q.   How long did that continue?

9    A.   I wasn't -- let's see, when I met Kathy, let's see, I was

10   probably just drinking sociably then, I would not get drunk

11   then.  Then I don't really know when I quit drinking.  It just -

12   - it just happened.  I don't -- I don't really think of myself

13   as quitting or anything.  I mean sometimes I'll still have a

14   beer maybe on New Years or something.

15        Q.   Now --

16   A.   I just quit over a period.  I mean I just -- I don't know,

17   I just quit, I didn't want it.

18        Q.   Did there come a time that Jamie went to live with

19   her Aunt Phyllis?

20   A.   Yes, sir.

21        Q.   And when was that?

22   A.   She was -- I believe she was 17 years old then; it was the

23   end of her 16th year or the first part of her 17th year.

24        Q.   And why did you have her go live with Phyllis?

25   A.   Well she -- for -- for some reason -- that's not right.

1        Q.    I'm sorry?

2   A.    She -- she started -- she just got a different set of

3   friends I think, but these friends had started coming around.

4   They would never look at me.  If I said hey -- we say hey in

5   the south, up here it's hi.  If I said hey to them they'd never

6   -- they would never respond to me.  They'd just park, walk

7   around the side of the house and go down to the beach.  We -- I

8   dug out a little place to put a beach area in.  They'd go down

9   there and then I'd start finding empty beer cans and roaches

10  and stuff down there and I just told Jamie and Jessie that I

11  couldn't be having that, but I mean I just couldn't have it;

12  they should have enough respect for me if they want to do stuff

13  like that go elsewhere.  Well it went on and went on and I

14  couldn't -- and I couldn't do anything about it.  And I told

15  them they had to leave.  And I kicked them out of the house,

16  but I -- gosh, I'm getting all confused here.  I think I -- I

17  think my sister volunteered -- before this, before I kicked

18  them out I think my sister volunteered to have Jamie stay with

19  her because things were so bad and all.  And then --

20       Q.    How long did she stay with your sister?

21  A.    That was probably about three months that she stayed with

22  her.

23       Q.    And did she come back to the house in Conyers?

24  A.    Yes -- yes, sir and that's -- that's when -- that's when I

25  noticed these different friends, that she was -- I think she

1   was having some contact with Loopey at this time also, that she

2   was seeing Loopey.

3        Q.   Do you know that?

4   A.   I can't say I know if for a fact, I've just been told, so

5   --

6            MS. BAGLIVI:   Judge, objection.  I would ask that it

7   be stricken?

8            THE COURT:   The jury can make a distinction on it;

9   that's what he was told, he doesn't know it for a fact.

10  They're not to consider it though.

11  BY MR. WEICHSEL:

12       Q.   And then did there come a time that you asked Jamie

13  to leave the house?

14  A.   Yes, sir.

15       Q.   When -- do you remember when that was?

16  A.   The date?   No, sir.

17       Q.   The season of the year?

18  A.   It would have been -- they were crazy days.  I don't

19  remember the season or anything.  It was summertime because it

20  was warm.

21       Q.   Do you remember the year?

22  A.   That would have been -- I believe it was '93, 1993.

23       Q.   And when you asked her to leave the house what did

24  you say to her?

25  A.   I just -- I just told her she had to pack her clothes and

1   go.

2          Q.    How old was Jamie then?

3   A.    She was -- I believe 17, maybe -- yeah, 17 at that time.

4          Q.    And you just told her to pack her clothes and go?

5   A.    Yes, sir.

6          Q.    Did you tell anybody else to leave the house at that

7   time?

8   A.    My son Jessie also.

9          Q.    And did you give them any money?

10  A.    No, sir.

11         Q.    Was Jamie in school then?

12  A.    She had -- no, she wasn't in school then I don't think;

13  she was going back to school.

14         Q.    She was going to go back to school?

15  A.    I don't know, I didn't -- at that time I did not believe

16  she would.

17         Q.    Okay.  Did she have a job?

18  A.    No, sir.

19              MR. WEICHSEL:  That's all I have.

20  CROSS EXAMINATION BY MS. BAGLIVI:

21         Q.    Mr. Farthing, you were living in Indiana for a time?

22  A.    Yes, ma'am.

23         Q.    You have family there, correct?

24  A.    Yes.

25         Q.    Okay.  Is that where you're originally from?

1  A.    I was born and raised there, yes.

2        Q.    Okay.  And California, Loopey -- you were stationed

3  in California when you were living there at one point in time,

4  correct?

5  A.    Yes, ma'am.

6        Q.    Okay.  You had no choice in the matter, you were

7  stationed there by the government?

8  A.    Yes, ma'am, in the Army.

9        Q.    Okay.  And, sir, you're a construction worker by

10  trade, is that correct?

11  A.    Yes, ma'am.

12        Q.    Okay.  And as a matter of fact you rebuilt that house

13  on High Rock Road, isn't that correct, for your family?

14  A.    Yes, ma'am, I did.

15        Q.    Okay, you had -- you didn't -- you didn't build the

16  original house, you had fixed it up after you --

17  A.    Yeah, I remodelled it.

18        Q.    After it had been destroyed by a fire?

19  A.    Well smoke damage.

20        Q.    Okay.  And that's a pretty nice house up -- set back

21  from the road with a lake in the back, isn't that correct?

22  A.    Yes, ma'am.

23        Q.    With some nice woods around it?

24  A.    Yes, ma'am.

25        Q.    Okay.  And High Rock Road has got a lot of nice

1   houses along that road, doesn't it?

2   A.   At that time it -- it was --

3        Q.   No, now.  What is it -- now, what does it look like

4   in 1994?

5   A.   Well there's a lot of trailers and stuff down --

6        Q.   Down back by the lake, correct? But what about on

7   High Rock Road, as you come in on High Rock?

8   A.   Well --

9        Q.   Off of that main highway?

10  A.   Yeah, that's -- that's what I'm saying.

11       Q.   Yeah, aren't there all houses on that street?

12  A.   No, ma'am, there's --

13       Q.   There's no houses?

14  A.   There's trailers on both sides of me.  There's a house

15  next to me with trailers there and then trailers on the other

16  side.

17       Q.   No, I'm not -- okay.

18            MR. WEICHSEL:  Judge, let --

19            THE COURT:  Let him finish describing it.

20  BY MS. BAGLIVI:

21       Q.   Okay.  I'm asking you about the --

22            THE COURT:  No, let him finish describing it.

23  Describe your surroundings to your home.

24            THE WITNESS:  Okay, when -- when you come down

25  highway -- you come in on -- I don't -- if I just describe it

1  High Rock starts I guess where a little -- this little dead end

2  road is.  There's two trailers, then there's two houses and

3  mine is the second one.  Then there's one, two -- I believe

4  three more trailers and then there's another house and then the

5  rest is trailers.  On the left the road goes back and that's a

6  trailer court.

7  BY MS. BAGLIVI:

8      Q.   Sir, when you come in off the high -- that highway,

9  it's like a four lane road?  When you hit the traffic light you

10 make a left onto High Rock Road, do you know where I'm talking

11 about?

12 A.   Yes, ma'am.

13     Q.   That's all houses, isn't that correct?

14 A.   The first stretch of that road.

15     Q.   Right.

16 A.   There's a subdivision on the right hand side.

17     Q.   There's a what?

18 A.   A subdivision.

19     Q.   Okay.

20 A.   I think it's Kings Wood.

21     Q.   And pretty nice houses, correct?

22 A.   Yes, ma'am.

23     Q.   Okay.  And the road is pretty wooded, a lot of trees,

24 that kind of thing?

25 A.   Yeah.

1          Q.    Okay.   Now Jamie had her own room in this house on

2    High Rock Road?

3    A.    Right.

4          Q.    Okay.   Was she responsible for cleaning it?

5    A.    Well she -- she was responsible for it.

6          Q.    That's what I'm saying.   But she was a little messy?

7    A.    Right.

8          Q.    She didn't clean her room when she was supposed to?

9    A.    Yes, ma'am..

10         Q.    You have to verbalize, okay?   Now you said when

11   Loopey took the kids to California that Jamie was approximately

12   two and a half -- I'm sorry, three and a half years old,

13   correct?

14   A.    Yes, I -- yes, that would be correct.

15         Q.    Okay.   And Jamie was born in 1976, correct?

16   A.    Yes, ma'am.

17         Q.    Okay.   And was she born in Florida?

18   A.    Yes.

19         Q.    Okay.   And you were living all down in Florida at

20   that time?   You, your -- your wife, Loopey, and your other son

21   -- or actually both sons?   Jamie is the youngest?

22   A.    Jamie's the youngest, yes.   We was --

23         Q.    Okay.   So in Florida when Jamie was born you're all

24   living down there as a family, correct?

25   A.    No, ma'am.

1       Q.    Who was living in Florida?

2   A.    Loopey was living in Florida with Jason and Jessie at the

3   time, we were separated.

4       Q.    Okay.   And Jamie was born when you were separated, is

5   that what you're saying?

6   A.    Yes, ma'am.

7       Q.    Okay.   When did you get back together again with

8   Loopey?

9   A.    When Jamie was born.

10      Q.    Okay.   And how long did you stay in Florida?

11  A.    We didn't stay in Florida.

12      Q.    Okay, you left Florida?

13  A.    Right, we went back to Indiana.

14      Q.    Okay.   And that's where you family is from, correct?

15  A.    Yes, ma'am.

16      Q.    Okay.   And then eventually from Indiana you moved to

17  Georgia, is that correct?

18  A.    No, ma'am.

19      Q.    Where did you go?

20  A.    We might have went back down to Florida one time, but I

21  believe we went to California.

22      Q.    Okay.   Were you working in California?

23  A.    Yes, ma'am.

24      Q.    Okay.   And did there come a point in time however,

25  when Loopey left for sort of like the last time, correct?

A.    Yes, ma'am.

     Q.    Okay.   And when was that?

A.    See I -- I believe it was 1980, I can remember that, it
was --

     Q.    Okay.   Sir, --

A.    -- March of 1980.

     Q.    Sir, didn't you tell Mr. Weichsel that when you sent
back to Georgia you took the children from Loopey and you went
back to Georgia and Jamie was only two and a half years old?

A.    Yes.

     Q.    Okay.   So that would actually be 1978 and a half,
correct?   She's born in '76, two and half years later it would
only be '78 -- halfway through '78, correct?

A.    I'm not following.

     Q.    Let me rephrase that.  When you took Jamie out of the
environment with Loopey and went back to Georgia she was two
and a half years old, correct?

A.    Yes.

     Q.    Okay.

A.    That makes it '78 and a half say.

     Q.    Okay.   Now --

A.    But that wasn't our final time with breaking up.

     Q.    Sir, you went back to Georgia.   Didn't you tell the -
- this jury that you went back to Georgia and you separated
from her and you took the kids to Georgia and that's where you

1  resided ever since?

2  A.    That's what we did, I went back to Georgia and we -- when

3  we separated in Georgia -- I went back to Georgia and we

4  separated in Georgia.

5       Q.    No.

6  A.    That's what I thought I said.

7       Q.    Okay.  And, sir, as a matter of fact, Loopey gave you

8  full custody of the children, isn't that correct?

9  A.    Yes, ma'am.

10      Q.    Okay.  And she even signed a court agreement to that

11 effect giving you custody of the children?

12 A.    Yes, ma'am.

13      Q.    Okay.  And now you said that your relationship with

14 Jamie was good up until the point she went to California?  I

15 mean up until the point that Loopey took them to California?

16 A.    Yes, ma'am.

17      Q.    Okay.  And you said that when they got back you felt

18 like they didn't trust you because they didn't know that you

19 had been looking for them, they thought that you had abandoned

20 them?

21 A.    Yes, ma'am.

22      Q.    Okay.  Did you tell them that you had been searching

23 all over for them?

24 A.    I don't -- I don't remember.

25      Q.    Okay.  And did you try to reassure them in any way

1   that you loved them?

2   A.    I think I just assumed they knew it.

3        Q.    Did you provide a roof over their heads?

4   A.    Yes.

5        Q.    Food and clothing for them?  You have to verbalize.

6   A.    Yes, ma'am.

7        Q.    Okay.  And you said that during this point in time

8   you had stayed with your sister, Phyllis, with the three

9   children, correct?

10  A.    Yes, for about three months I think.

11       Q.    Three months.  Then you got a place, a trailer I

12  think you said?  And did you move all three children into that

13  trailer with you?

14  A.    Yes, ma'am.

15       Q.    Okay.  And then it was right after that that you said

16  you met Kathy, is that correct?

17  A.    It was a time after that.  I had --

18       Q.    That's what I'm saying.  After the trailer, the next

19  event is that you meet Kathy and you eventually get married, is

20  that correct?

21  A.    Well I mean if we want to get events --

22       Q.    Sir, I'm asking you if that's the next event that

23  came after that?  I mean I realize there's a time difference.

24  A.    I'm trying to answer, but I mean you're -- you're putting

25  this into like events that happened that might --

1      Q.     That's what I'm asking you.

2  A.     -- effect this or something?  I'm trying to give you the

3  next event.

4      Q.     Well I'm -- but I'm not asking you -- I'm asking --

5          THE COURT:  Don't argue, let him answer. What's the

6  next event?  Go ahead.

7          THE WITNESS:  When -- I mean -- I had a lot of

8  girlfriends that I -- well a couple of them I -- I moved -- I

9  lived with, with the kids.

10  BY MS. BAGLIVI:

11      Q.     Oh, you had a couple of girlfriends that you lived in

12  different locations or still in this trailer?  Or a different -

13  - different places?

14  A.     Different places.

15      Q.     Okay.  Well, sir, do you remember Mr. Weichsel asking

16  you where did you go next after Phyllis', I rented a place of

17  my own and I stayed there for three years, then we went to

18  Athens and met Kathy.  Do you recall saying that?

19  A.     I said I stayed in Monroe for three years and I did.

20      Q.     Okay.  And you never mentioned anything about these

21  other locations with these girlfriends, is that correct?  You

22  didn't mention it to this jury before when you were asked about

23  the different places that you lived, did you?

24  A.     No, ma'am.

25      Q.     Okay.  Now, sir, you said you met Kathy and you moved

1   into the trailer with her and the three kids, is that correct?

2   A.   Yes, ma'am.

3        Q.   Okay.   And then after that is when you started fixing

4   up the High Rock Road house, is that correct?   You moved to a

5   small house and you were working on the big house, is that

6   correct?

7   A.   Well we bought the house on High Rock Road and it burnt

8   after -- after the closing.   I think it was five days after we

9   closed on it.

10       Q.   Okay.

11  A.   And yes, we rented a -- a small house on 138 while I was

12  dealing with the insurance company.

13       Q.   Okay.   And then you said there came a point in time

14  after that, that Loopey came by Conyers, is that correct?

15  A.   Yes, ma'am.

16       Q.   Okay.   And that's when you talked about this gun

17  thing, isn't that correct?   The gun incident?

18  A.   Right, it was after --

19       Q.   When she came back?

20  A.   After that, yes.

21       Q.   Okay.   And would it be fair to say, sir, that you

22  risked a criminal conviction to protect your daughter, Jamie

23  Farthing?   Isn't that correct?   Would that be a fair statement?

24  A.   I did what I did.

25       Q.   Because you loved your daughter and you sons?

Paul Farthing - Cross                    114

1   A.    Oh, I love them, yes.

2         Q.    Okay.  You did it to protect them?

3              MR. WEICHSEL:  Objection, asked and answered.

4              THE WITNESS:  I --

5              THE COURT:  I'll let him answer it.

6              THE WITNESS:  I didn't want her to see them.  I guess

7   you'd call that protecting them from her.

8   BY MS. BAGLIVI:

9         Q.    Okay.  Now you said that at age 14 Jamie was trying

10  out her wings, is that correct?  Is that the expression you

11  used?

12  A.    That -- yeah.

13        Q.    Okay.  And she was going to school at the time?

14  A.    Yes, ma'am.

15        Q.    And you were all living on High Rock Road, is that

16  correct?

17  A.    Yes, ma'am.

18        Q.    Okay.  And you said sometimes she got hit because she

19  was talking back to you?

20  A.    If she would talk back and -- and -- I mean continue; yes,

21  she would.

22        Q.    Okay.  So --

23  A.    She'd get paddled, I would say --

24        Q.    Right, so if she showed you disrespect or your wife

25  disrespect too many times she'd get paddled?

1   A.   Yes, ma'am.

2        Q.   Okay.  And if she lied too often she'd get paddled?

3   A.   She probably got paddled if I found out she lied period.

4        Q.   Okay.  So if she lied once she got paddled?

5   A.   Yes, ma'am.

6        Q.   Okay.  And if you had to sometimes tell her to do

7   something three times she would get paddled, is that correct?

8   A.   She might, yes.

9        Q.   Okay.  And what about Kathy?  Would Kathy paddle --

10            MS. BAGLIVI:  Judge, the witness would like some

11  water?

12            THE WITNESS:  Could you ask that again?

13  BY MS. BAGLIVI:

14       Q.   All right, you want to wait for water?

15            THE COURT:  Go ahead, ask the question.

16  BY MS. BAGLIVI:

17       Q.   Would Kathy paddle Jamie?

18  A.   I don't believe Kathy ever paddled Jamie, no.

19       Q.   Did Kathy ever physically abuse Jamie?

20  A.   Not to my knowledge.

21       Q.   Okay.

22  A.   But now they kept a lot of -- there was a lot of stuff

23  that --

24       Q.   Sir, there's no question before you.  Sir, when you

25  said you asked Jamie to leave you said it was 1994.  Could it

Paul Farthing - Cross                    116

1   have been 1994, June around '94?

2   A.    Yes, ma'am.

3        Q.    When you asked her to leave the house?

4   A.    Yes.

5        Q.    It was right around the time that all these other

6   things had happened, isn't that correct?

7   A.    Yes -- yes.

8        Q.    It was '94?  You said '93, but wasn't it '94?

9   A.    I'm not good with dates, ma'am.

10       Q.    Okay.  When you told her she had to leave the house

11  you let her take the car with you?  With her?

12  A.    Yes.

13       Q.    Okay.  The car that you and Kathy had bought for her

14  so she could go back and forth to school and use to do whatever

15  she wanted to do?

16  A.    That's right.

17       Q.    Okay.  And get to her job?  She worked in a comic

18  book store, didn't she, part time?

19  A.    She had -- I don't know if she was working at that book

20  store at that time.  I -- I didn't think she was.

21       Q.    When was she working at the comic book store, do you

22  recall?

23  A.    No, I don't recall.  She -- she didn't work there all that

24  long.

25       Q.    Okay.  Well approximately how old was she?

1  A.    Seventeen.

2        Q.    Okay.  And she had a part time job there at the book

3  store, the comic book store?

4  A.    Yes, I -- yes, it had to be part time.

5        Q.    It was part time, it wasn't full time?

6  A.    Yes, it had to be part time.

7        Q.    Okay.  And she was going to school at the time?

8  A.    Yes.

9        Q.    Okay.  And you had no problem with her working at the

10 comic book store?

11 A.    No -- I didn't -- at that -- at that time -- you asked me

12 if I had a problem with it.  I didn't even --

13       Q.    Well did you --

14 A.    I wasn't involved in it.

15       Q.    Well that's what I'm saying; I mean did you allow

16 your children to have part time jobs if they wanted to have

17 them?

18 A.    I wouldn't deny it, no.

19            MS. BAGLIVI:  Okay, I have nothing further.

20 REDIRECT EXAMINATION BY MR. WEICHSEL:

21       Q.    Now the prosecutor asked you when Loopey took the

22 kids to California.  Are you sure of the date?

23            MS. BAGLIVI:  Judge, he didn't give a date, he just

24 gave a year -- I mean a age.

25 BY MR. WEICHSEL:

1          Q.    Are you sure the -- are you sure of that age, three

2     and a half?

3               MS. BAGLIVI:  Judge, I'm going to object.  It was --

4               THE COURT:  The age of two and a half?

5               MR. WEICHSEL:  Three and a half.

6               THE COURT:  I'll sustain the objection; you're asking

7     whether he's sure of an answer?

8               MR. WEICHSEL:  Well --

9               THE COURT:  You can't do that.

10    BY MR. WEICHSEL:

11         Q.    Do you -- let me ask you another way.  You said

12    you're not good with dates and times?

13    A.    No, sir.

14         Q.    You started giving an answer to the prosecutor

15    regarding things between Jamie and Kathy and you started

16    talking about lots of stuff.  Could you -- what were you

17    talking about then?

18               MS. BAGLIVI:  Judge, could -- could I have a -- I

19    have to object to the form of the question.  I have no idea

20    what it means.

21               MR. WEICHSEL:  That's why I was asking him --

22               MS. BAGLIVI:  About the stuff, the --

23               THE COURT:  He's saying he didn't complete his answer

24    and I think his answer was objectionable.  Sidebar please.

25                              (SIDEBAR)

1          THE COURT:  I anticipate -- I anticipate what you're

2    saying, that he was giving an answer and then he stopped.

3          MR. WEICHSEL:  Right.

4          THE COURT:  And he was saying that he didn't -- in

5    response to the prosecutor's question that he did not see Kathy

6    hit her or anything like that.

7          MR. WEICHSEL:  NO, no, it was -- okay, yeah.

8          THE COURT:  And he was going to go on to say that --

9    what I anticipated is that there were a lot of things that were

10   kept from him.

11         MS. BAGLIVI:  Right.

12         MR. WEICHSEL:  Yes.

13         THE COURT:  That's what you want to get in?

14         MR. WEICHSEL:  Right.

15         MS. BAGLIVI:  You can't.  My -- my objection is if

16   they kept it from him he didn't witness it --

17         THE COURT:  That's right.

18         MS. BAGLIVI:  -- so everything he knows is through

19   hearsay.

20         THE COURT:  You can't go after that.  A lot of things

21   were kept from him (inaudible) heard about, were kept from him

22   and (inaudible) true or not.

23         MR. WEICHSEL:  I --

24         THE COURT:  Okay?  All right, sustained.

25                      (END OF SIDEBAR)

1    BY MR. WEICHSEL:

2         Q.    Let me ask you about living in Georgia and before you

3    met Kathy and you started telling about girlfriends.   Could you

4    tell me, did you live with other women?

5    A.    Yes, sir.

6         Q.    How many, if you know?

7    A.    There was two -- two.

8         Q.    And where were the kids when you were living with

9    these women?

10   A.    They was with me.

11        Q.    Do you remember the names of these women?

12   A.    Yes.

13        Q.    What were they?

14   A.    The one was Darla Rice and the other one was Susan

15   Johnson.

16        Q.    Do you remember how long you lived with them, one at

17   a time?

18   A.    No, sir, I don't.   It wasn't a long period.

19        Q.    Are you talking about months, years?

20   A.    Months.

21        Q.    And where were they living?   When they lived with you

22   where -- where were you living?

23   A.    We'd -- we'd just get a place.   Me and Darla, I rented a

24   house on just a side road, and then with Susan I just rented a

25   trailer outside of Monroe.

1      Q.    Were there any times when you were living with Kathy

2   that you and Kathy separated?

3               MS. BAGLIVI:  Judge, objection; beyond the scope.

4               MR. WEICHSEL:  I forgot, judge, I apologize.

5               THE WITNESS:  Well --

6               THE COURT:  Well just a minute.  If you forgot you're

7   leading him into something.  I'll allow you to ask the

8   question, but rephrase it.  Since you say you forgot I'm

9   allowing you to go back into direct and --

10               MR. WEICHSEL:  Thank you.

11               THE COURT:  -- rephrase that question.

12               MR. WEICHSEL:  Okay.

13   BY MR. WEICHSEL:

14      Q.    Were there any times when you were married to Kathy -

15   - let me rephrase it.  While you were married to Kathy were

16   there any times that -- that you had separated from her?

17               MS. BAGLIVI:  Judge, it's --

18               THE COURT:  I'll allow it.

19               MR. WEICHSEL:  Okay.

20               THE WITNESS:  Yes, sir.  WE moved down to south

21   Georgia, that's where Kathy was raised.  And this was  a time

22   that my older son and me was having some bad problems and it

23   was -- it was rough.  I wasn't a very good person through that.

24   I know I'd get mad and I'd yell, I probably threw things,

25   plates or something.  And it just -- it was just building up and

1  building up and there just seemed to be no end to it or no way

2  to -- to stop what was happening around the house.  And I love

3  Kathy very much and I wanted to give her a way out of it so I

4  thought that if I left and went to Indiana her father is a man

5  I respect very highly and I figured if she wanted to divorce

6  me, which I guess she should have, that that would give her the

7  opportunity, that her dad could talk her into doing that.

8  BY MR. WEICHSEL:

9      Q.    How long were you up in Indiana?

10 A.    It was just for the summertime, three months.

11     Q.    And where was Jamie during that time?

12 A.    Jamie was with me.

13     Q.    And then after the summer did you go back to Georgia?

14 A.    Right.

15         MR. WEICHSEL:  Thank you.

16         THE COURT:  Anything else?

17         MS. BAGLIVI:  Is he finished.

18         THE COURT:  He's finished.

19         MS. BAGLIVI:  Nothing, judge.

20         THE COURT:  Okay, you may step down.  Thank you, Mr.

21 Farthing. Watch your step.

22         Does the defense have another witness?

23         MR. WEICHSEL:  No, the defense rests, judge.

24         THE COURT:  The defense rests?

25         MR. WEICHSEL:  Yes.

1          THE COURT:  Does the State have any witnesses?

2          MS. BAGLIVI:  Yes, judge, Dr. Simring.

3          THE COURT:  All right, Dr. Simring will be prepared

4   to testify this afternoon?

5          MS. BAGLIVI:  Yes.

6          THE COURT:  All right.

7          All right, ladies and gentlemen, the defense has

8   finished his case, the State has also finished its case, they

9   have rested, however, the State is permitted to bring a

10  rebuttal witness in which would be the psychiatrist that has --

11  is going to testify on behalf of the State, that's Dr. Simring.

12  He will be available at 1:30 and I believe that should be --

13  are there any other rebuttal witnesses?

14         MS. BAGLIVI:  Judge, there may be one very short one,

15  I have to --

16         THE COURT:  We'll discuss that.

17         MS. BAGLIVI:  Okay.

18         THE COURT:  But we should finish the case today.  And

19  then tomorrow -- on Monday we will have summations and I'll

20  charge you on Monday, but I'll discuss a little bit more of

21  that with you this afternoon. But just anticipate that Monday

22  you should get the case.  All right?   In other words,

23  summations by the attorneys.   First thing Monday morning

24  they'll give their summations as to the case and then I will

25  charge you with the law and then it's your case, 12 of you

1   anyway.

2            All right, now don't discuss the case amongst

3   yourselves now, come back at 1:30 and we'll be prepared to go

4   and hear testimony this afternoon.  All right?

5                 (PAUSE - THE JURY LEAVES THE COURTROOM)

6            THE COURT:  Now, Ms. Baglivi, it's a quarter after

7   twelve. I expect that you have conference with your witness.

8            MS. BAGLIVI:  We'll be ready to go at 1:30.

9            THE COURT:  Be ready at 1:30.

10           MS. BAGLIVI:  Yes, sir.

11           THE COURT:  You'll have enough time to do that?

12   Okay.  All right, 1:30 then.

13           MR. WEICHSEL:  Thank you.

14           MS. BAGLIVI:  Thank you.

15                        (RECESS)

16           THE COURT:  Before we begin with the jury there's one

17   other matter I wanted to touch base with, and that is this --

18   the -- the defense is indicating that it has rested its case.

19   I'm going to ask that Ms. Farthing, would you please stand?  As

20   I mentioned to you earlier, your right to testify in this case,

21   it's your right.  You don't have to testify, you have

22   absolutely no obligation however, if you choose not to testify

23   that must be your choice, not your attorney's.  It must be a

24   choice that you have made.  Have you thought about what I did

25   mention to you a day or so ago?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  Is it your desire not to testify in this

3    case?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  All right, and no one's -- no one's

6    forcing you not to testify?

7           THE DEFENDANT:  No, sir.

8           THE COURT:  All right, now I did read to you a -- a

9    form of charge to the jury regarding that matter, you remember

10   that?

11          THE DEFENDANT:  Yeah.

12          THE COURT:  Have you made a -- have you thought about

13   whether you'd like me to charge the jury --

14          THE DEFENDANT:  Yeah, I'd like you to read that to

15   them.

16          THE COURT:  You would like me to read that to them?

17   Okay, then I will.  And that's the -- the charge indicating the

18   fact that you have not testified, they do not in any interpret

19   that as any guilt in your part and you have an absolute right

20   to -- not to testify, in fact the language I did read to you,

21   in essence it's that in arriving at their verdict the fact that

22   the defendant did not testify nor should that fact that she

23   didn't testify enter into their deliberations or discussions in

24   any manner at any time.  I will remind them that they're --

25   that you are entitled to have the jury consider all of the

1   evidence and that you are entitled to the presumption of

2   innocence even if you do not testify as a witness.  Correct?

3   Do we understand each other on that?

4               THE DEFENDANT:  Yes.

5               THE COURT:  All right.  And I will tell -- I will

6   instruct the jury.  Anything else, counsel?

7               MR. WEICHSEL:  No, judge.

8               THE COURT:  All right, thank you.

9               All right, with that any other -- I have potential

10  verdict sheets that have been completed.  I'd like you to at

11  least -- to some degree I'd like you to review those.  I'm

12  going to give you a copy.  I'll give you a copy after the --

13  after we have finished testimony.  But remind me that I have

14  them here and I want you to take them and review them and if

15  you see any corrections, changes, deletions, amendments you are

16  to let me know.  All right?

17              MS. BAGLIVI:  Sure.

18              THE COURT:  And you have a witness ready?

19              MS. BAGLIVI:  Yes, judge.

20              THE COURT:  All right, bring up the jury please.

21              THE COURT OFFICER:  Yes, Your Honor.

22              THE COURT:  Dr. Simring's report is -- does that have

23  a --

24              MS. BAGLIVI:  A number?

25              THE COURT:  I.D.?

1            MS. BAGLIVI:  Yes, judge.

2            THE COURT:  If we make reference to it.  I just want

3    to mark it on my --

4            MS. BAGLIVI:  Sure.  Actually, judge, I don't think I

5    marked it.  I'm sorry, it's not on my exhibit list.

6            THE COURT:  Well we'll do that after we start.

7            MS. BAGLIVI:  Sure. It would be S-260.

8            (PAUSE - THE JURY ENTERS THE COURTROOM)

9            THE COURT:  Good afternoon, ladies and gentlemen. We

10   are ready to proceed.  The exhibit is marked S-260?

11           MS. BAGLIVI:  Yes, judge.

12           THE COURT:  Mr. Weichsel, it's S-260.

13           MS. BAGLIVI:  I'm sorry, 261; 260 is the letter.  I'm

14   sorry, judge.

15           THE COURT:  261, that's Dr. Simring's report.

16           MS. BAGLIVI:  Yes.,

17           THE COURT:  All right, call your next witness.

18           MS. BAGLIVI:  Your Honor, the State would call Dr.

19   Steven Simring.

20           THE COURT:  Dr. Simring?

21                              (PAUSE)

22   S T E V E N   S I M R I N G, REBUTTAL WITNESS FOR THE STATE,

23   SWORN.

24           THE COURT OFFICER:  You may be seated, sir.  For the

25   record please state your name and spell your last name?

1              THE WITNESS:  Steven Simring, S-I-M-R-I-N-G.

2              THE COURT OFFICER:  And your field of expertise, sir?

3              THE WITNESS:  I am a licensed physician and board

4    certified psychiatrist.

5              THE COURT OFFICER:  Thank you.

6              THE WITNESS:  Good afternoon, Your Honor.

7    DIRECT EXAMINATION BY MS. BAGLIVI:

8         Q.    Doctor, your -- Dr. Simring, you're a doctor?

9    A.   Yes.

10        Q.    Okay.  Sir, by whom are you employed?

11   A.   I'm on the faculty of New Jersey Medical School, the

12   Newark Campus of University of Medicine and Dentistry of New

13   Jersey.  I'm also in private practice.

14        Q.    What do you do there at the university?

15   A.   Well I'm full time faculty and my basic area of

16   responsibility is I'm Director of Medical Student Education in

17   the Department of Psychiatry.

18        Q.    Do you also teach there?

19   A.   Yes, well I put together the courses and I do a good deal

20   of teaching, yes.

21        Q.    Okay.  And, sir, you also said you have a private

22   practice?  Is that correct?

23   A.   I do.

24        Q.    And where do you conduct that practice out of?

25   A.   The practice is also conducted at the medical school in

1    Newark.   There are two parts to the practice; one is the

2    treatment of individual patients on an out-patient basis who

3    present with a variety of psychiatric problems.   And the other

4    part of the practice is forensic psychiatry, or the interface

5    of psychiatry and legal issues such as my involvement in this

6    case.

7         Q.   Okay.   And, Doctor, could you please give us the

8    benefit of your education, your higher education?

9    A.   I graduated from Columbia College and then from New York

10   University School of Medicine in 1965.   I did an internship at

11   Bellevue Hospital and then I completed a psychiatric residency

12   at Columbia Presbyterian in 1970.   From 1970 through 1973 I was

13   in the U.S. Army Medical Corp in Nuremburg, Germany.   In 1973 I

14   received board certification as a psychiatrist by the American

15   Board of Psychiatry and Neurology, our accrediting board.   I

16   received a master of public health degree in community and

17   social psychiatry from Columbia in 1974.   From '73 when I left

18   the Army to '76 I was Medical Director of Mt. Carmel Guild

19   Community Mental Health Center in Newark, part of Catholic

20   Charities.   And from 1976 until the present, for the last 20

21   years, I've been on the faculty of the medical school.   I'm

22   licensed in New York, New Jersey and California, licensed as a

23   physician.

24        Q.   Okay.   Now, sir, besides teaching at the school or

25   putting the curriculum together do you also guest lecture?

1   A.    Yes, I -- I do.

2         Q.    Where?  Can you give us some examples?

3   A.    Well I've lectured to a variety of audiences.  I've

4   lectured to any number of hospitals in -- in -- in the region

5   and outside the state as well.  I've lectured to groups of

6   lawyers.  I'm lecturing tomorrow to a group of associated press

7   reporters.  I lecture regularly at judicial college and at the

8   Prosecutor's Conference and at various defense attorneys'

9   conferences.

10        Q.    Okay.  Sir, have you ever written any articles in the

11  field of psychiatry?

12  A.    I've written a number -- a few articles, mainly in the

13  field of medical student education.

14        Q.    Okay.  And how about books?

15  A.    I've written -- co-authored a few, I guess it would be

16  called popular psychology books.  Right now I've written and in

17  press a -- a medical textbook for third year medical students.

18        Q.    Okay.  And, sir, have you ever testified as an expert

19  in superior court?

20  A.    I have.

21        Q.    In just the state of New Jersey?

22  A.    I've testified in New Jersey, in New York, I think once or

23  twice in Delaware and maybe some other states.  I've also

24  testified in the federal court system here in New Jersey and in

25  New York.

1      Q.   Okay.  And, sir, have you ever been a court appointed

2   psychiatrist?

3   A.   I have many times, yes.

4      Q.   Okay.  And approximately how many times have you been

5   qualified as an expert to testify in the field of psychiatry?

6   A.   I've been involved in forensic psychiatry for perhaps two

7   years before I came to the medical school, so that's over 20

8   years.  And I've been qualified several hundred times in state

9   and in federal court as an expert in psychiatry.  I should say

10  that two years ago I received board certification in -- there's

11  a brand new board in forensic psychiatry as a sub-specialty or

12  legal psychiatry and I received board certification in forensic

13  psychiatry.

14     Q.   Okay.  Forensic psychiatry is what?  Could you just

15  explain it for us please?

16  A.   Forensic means legal, it's a sub-specialty of psychiatry

17  like child or geriatric; it's a sub-specialty of psychiatry

18  dealing with psychiatry and the law.  I've been qualified as

19  both a general psychiatrist and as a forensic psychiatrist.

20     Q.   Okay.  And, Doctor, the times that you've qualified

21  as an expert to testify, has it been in civil cases, criminal

22  cases?

23  A.   Both of those as well as other cases such as

24  administrative law cases, licensing issues for physicians or

25  for lawyers.  The major two categories of forensic involvement

1   are civil cases and -- and criminal cases such as this one.

2        Q.   Okay.  And, Doctor, in your expert -- in the times

3   that you've testified as an expert in criminal cases could you

4   tell me, was it for the prosecution or for the defense?

5   A.   For both.

6        Q.   Okay.  And how would you say that was split?

7   A.   About twice as frequently for the prosecution as for

8   defense; about two to one.

9        Q.   Okay.

10            MS. BAGLIVI:  Your Honor, at this time I would offer

11  -- offer Dr. Steven Simring as an expert in the field of

12  psychiatry with a sub-specialty in forensic.

13            THE COURT:  Any voir dire?

14            MR. WEICHSEL:  A few questions.

15  VOIR DIRE BY MR. WEICHSEL:

16       Q.   Dr. Simring, what you've told us is that about two

17  thirds of your criminal cases as for the prosecutor and about

18  one third are for the defense?

19  A.   Yes.

20       Q.   In recent years, say the last two to three years, was

21  that percentage higher for the prosecution?

22  A.   I don't believe so in terms of evaluations.  They're -- in

23  terms of the number of cases that I actually evaluate for

24  various lawyers and for the Prosecutor's Office it's remained

25  about two to one.  It may vary in terms of the number of cases

1    that actually go to court.

2        Q.   Okay.   In terms of the cases that actually to to

3    court, what percentage of those are for the prosecutor?

4    A.   It's probably somewhat higher because there are -- I've

5    been retained -- you know, often I've been retained by defense

6    and defense based on my report chooses not to use my report, it

7    chooses not to call me if I find that the defense -- the

8    psychiatric defense is not meritorious.   A prosecutor operates

9    under somewhat different rules, so I believe it's somewhat

10   higher percentage of prosecution retained cases actually go to

11   court.

12       Q.   And of the -- of the testimony in criminal cases

13   could you estimate what percentage is prosecution related as

14   opposed to defense related?

15   A.   It's hard to do that.   The -- the times I'm retained

16   pretty much run two to one, and I think that I probably --

17   probably a higher percentage of consultations -- you know, the

18   vast majority of cases don't go to court as -- as you know.

19   Probably the -- a higher percentage of prosecution retained

20   cases go to court.   When a prosecutor retains me they're pretty

21   much stuck with my report.   When defense retains me if they

22   don't like what I say they can look for somebody else.

23       Q.   Thank you.

24            MR. WEICHSEL:   Judge, he's -- I -- I have no further

25   questions on voir dire.   And I -- I agree with his

1   qualifications.

2            THE COURT:  All right, he's -- again, the

3   determination by the court is that Dr. Simring is an expert.

4   And again I remind you that his function in this case is -- is

5   his expertise and his training and background and experience is

6   to assist you in making the ultimate determination as to the

7   issues of this case.  And he's not the fact finder, you are.

8   He's here to -- an expert will give you his opinion as to

9   aspects of the case that are in issue.  Thank you.  You're up,

10  Ms. Baglivi.

11           MS. BAGLIVI:  Thank you, Your Honor.

12  BY MS. BAGLIVI:

13       Q.   Now, Dr. Simring, how did you get involved in this

14  case of the State of New Jersey versus Jamie Farthing?

15  A.   Your office called me in September of 1995, a little bit

16  more than a year ago and told me about this case and asked me

17  if I would evaluate Ms. Farthing for you and I agreed to do so.

18  You -- some period of time went by for various legal purposes.

19  You then provided me with discovery, that is medical reports

20  and other reports that I reviewed and all of which I have here,

21  and then eventually I examined Ms. Farthing at the Bergen

22  County Jail on September 27th 1996, close to two months ago.  I

23  spent two hours and about two and a quarter hours with her.

24       Q.   And, Doctor, prior to going to see the defendant,

25  Jamie Farthing, did you review any of the discovery that was

1  provided to you?

2  A.    I did.

3       Q.    And, sir, what did you -- what were you provided with

4  an what did you review?

5  A.    The vast amount of discovery that I was provided with I

6  had before I did my interview and certainly before I wrote my

7  report.   There is one report in this case which I wrote on

8  October 4th 1996 consisting of nine pages and this contains all

9  of my conclusions, diagnostic opinions and opinions about the

10 case.   There were a few items of co-called discovery or

11 material that came after this report.

12       Now the records that I reviewed are listed on pages -

13 - on page one of the report.   They're broken down into large

14 categories, and if I will -- I won't go through every single

15 piece and item, but give the jury an idea of the type of

16 material I reviewed.   And there are seven items here.   There

17 are the Bergen County Prosecutor's Investigation Reports of

18 this case including witness interviews and prosecutor's case

19 summaries; there are many witness statements including

20 statements of Ms. Farthing herself, there were three of them I

21 believe; and statements of co-defendants and other witnesses.

22 There's the indictment, there were mental health evaluations by

23 Dr. Apolito and Dr. Kleinman who testified here, also a social

24 work evaluation by a Ms. Feinberg.   And then there are records

25 from the Bergen County Jail covering some of her activities in

1    the jail since she has been incarcerated.

2           There are -- subsequent to receiving this material I

3    received a few other items.  I received office notes and raw

4    data from Kleinman, some of the testing and notes he did which

5    formed the basis of his report which of course I had at the

6    time.

7           I received information from the Georgia Department of

8    Human Resources concerning the -- their equivalent of our DYFS,

9    their child welfare, documenting their involvement in the

10   Farthing family and their involvement with the Farthings and

11   the children.

12          I received office notes by Ms. Feinberg, that's the

13   social worker who produced a report.  And then I received

14   copies of letters written by Ms. Farthing in the jail to --

15   well one individual named Greg and I believe there was another

16   letter written in the jail as well.

17          Those materials I received subsequent to my report.

18     Q.    Okay.  Now, sir, after you reviewed these things did

19   you have an occasion to do -- to do an examination of Ms.

20   Farthing?

21   A.    I did.

22     Q.    Could you just point her out please for us?

23   A.    Ms. Farthing is the young woman sitting next to her

24   attorney at counsel table.

25          MS. BAGLIVI:  Your Honor, let the record reflect he's

1    identified the defendant.

2           THE COURT:  Not noted.

3    BY MS. BAGLIVI:

4       Q.   Sir, could you tell me what your exam of Ms. Farthing

5    consisted of?

6    A.   I performed a standard psychiatric examination of Ms.

7    Farthing.  There was no physical examination. And that

8    consisted of an interview which can be broken into two major

9    sections and then a mental status examination. So part one of

10   the interview was I elicited from her, her own version of what

11   happened, of what the alleged crime was about and her

12   involvement in this alleged crime from her point of view, her

13   thinking about it, her point of view, what -- how she viewed

14   it, what thoughts she was having at the time.  I then compared

15   that and asked her some questions about any disparities if

16   there were any between what she told me or any questions that

17   arose between what she told me and what she had told the police

18   on their interrogations, what co-defendants and other witnesses

19   had said, and that was part one.

20          Part two, I elicited a past history from her.  I

21   asked her about her early childhood, her education and

22   development and her life experiences up to the time that she

23   was -- that she -- that this incident began.

24          Third, I performed a mental status examination.  This

25   is a psychiatrist's evaluation, an assessment of her thinking,

1  an assessment of whether or not there were peculiarities in her

2  thinking such as false beliefs or delusions, voices, anxiety

3  and a whole list of issues which might be pathological points

4  in her thinking.

5       Based on the interview, the current issues, the past

6  issues, the mental status examination, I arrived at a

7  diagnostic conclusion and then I offered you my opinion as to

8  her state of mind at the time of the alleged crimes.

9       Q.   Okay.  Doctor, dealing with the first part of your

10  examination could you please tell me what you gleaned from this

11  defendant regarding the facts of the crimes?

12  A.   Yes.

13       Q.   By way of history the -- my understanding just in

14  summary is that she is 20 years old, unmarried, and she was

15  arrested at her home in Georgia on September 15th 1994 and she

16  was accused in participating in two robberies in New Jersey,

17  one of which resulted in the death of the victim.

18       She was, according to the police records, cooperative

19  during the arrest procedure in Georgia.  She consented to a

20  search of her room and that search, which was conducted I

21  believe by local authorities in conjunction with Bergen County

22  authorities, but I'm not certain, revealed several stolen items

23  that were -- allegedly stolen items that were supposedly

24  connected to the -- to the accused crimes.  I remember there

25  was a tie and some other items of clothing which tied to Mr.

1  Hippman and Mr. Lapedy -- Mr. Polites.

2           The -- she was then taken into custody, she was given

3  her rights and she gave an initial statement in Georgia where

4  she revealed very little.

5           She was then -- she waived extradition back to New

6  Jersey, that is she agreed to extradition.  She came to New

7  Jersey and then she gave another one or two statements in which

8  she was much more forthcoming.  Although her statements, still

9  there were some disparities between what she said and between

10 earlier statements of her co-defendants, Evia Demolena and

11 Thomas Christopher, or Chris James. There were disparities;

12 exactly who did what, exactly who drew the gun first, issues

13 like that.  As a general issue however, she basically

14 acknowledged that she had agreed to participate in these crimes

15 in Georgia, that she had come up to New Jersey for the purpose

16 of doing these crimes and that she gave details about her --

17 her participation in both of these crimes which again may have

18 varied in certain details, but the broad scope of what she said

19 comported, agreed with what the co-defendants said.

20          She said, again, as a matter of summary that she

21 agreed to participating in the Robert Hippman robbery in

22 Hackensack on August 4th 1994.  She admitted that she took

23 place in -- took part in the Polites robbery.  She insisted to

24 the police however, that she did not know that Mr. Polites was

25 going to be killed.  She told the investigators -- she names

1    Ms. Demolena and Thomas Christopher James as her co-actors in

2    these incidents.   She also said that a third individual was

3    involved too, but not directly.

4         Now she was expecting my visit.   She had known that I

5    -- she was clear that she knew that I was sent to see her by

6    your office, the Bergen County Prosecutor's Office.   She

7    understood that this was not a treatment evaluation but it was

8    a legal evaluation and that the results of the evaluation were

9    not doctor/patient confidential but would be put into a report

10   and turned over to the court system to use specifically.

11        She was -- she was friendly and cooperative.   She

12   presented herself to me as friendly, cooperative, with a

13   certain amount, I described in my report as a kind of

14   irrepressible, almost flirt -- flirtatious charm, coquettish

15   charm, flirtatious in the way of a young -- of a young person.

16        There was -- she made a very good impression. She --

17   she was cooperative, she was respectful to me, she was

18   deferential to me, she smiled appropriately even at those

19   things that were appropriate to smile at, she became

20   appropriately serious when we talked about the -- the -- the --

21   the death and about the robberies themselves.

22        She expressed a certain amount of remorse about what

23   had happened, although it was not clear whether she was

24   remorseful about the victims or whether she was remorseful

25   about the fact that she was in serious trouble.

1           She described -- then went on to describe the

2    individual incidents in what I characterized as a fairly

3    immature way.  As she got into describing the details she was

4    telling it to me almost as if she were describing the kind of

5    details of a movie she had seen.  I mean she was always aware

6    that she was there and participating but she presented it to me

7    in a kind of gee whiz way, you know, like this happened next

8    and this happened next and what do you know, I never expected

9    that would happen.  That's not her words but that's my

10   characterization.

11          She -- she knew -- I asked  her a series of questions

12   to measure her competency, that is her -- her understanding of

13   the charges and her fitness to stand trial.  I won't go through

14   the answers to those because she is -- had been found fit or

15   competent to stand trial and that's not been an issue.

16          She told me at the outset that she had a long history

17   of alcohol and drug abuse.  There was only one prior criminal

18   incident; her record is clean in other words, except for one

19   incident at age 18.  And this was very important because she --

20   although she had had some difficulties in high school, she

21   claimed that she was beginning to get things together for

22   herself but she got into a argument with a high school 11th

23   grade teacher and she said some threatening things to him.  And

24   he then charged her with a criminal offense, terroristic

25   threats.  And she later told me she apologized to the teacher

1   and these charges were down graded.  But the significance of

2   the charges were as a result of this she was suspended from

3   school and her father threw her out of the house according to

4   her, even though she'd apologized to the teacher.  And she

5   linked this directly with her receptivity, with her readiness

6   to accept the Demolena offer to come to New Jersey because she

7   had been thrown out of school and thrown out of her house.

8           She met Evia Demolena through her -- her -- I think

9   it was through her boyfriend, Mr. Ed Kummer.  Both Ivy Demolena

10  and Chris James, as I understand it, were friends of Edward

11  Kummer.  I believe Mr. Kummer has testified and he has been Ms.

12  Farthing's boyfriend for some period of time.  Although when

13  Mr. Kummer was not involved in these discussions themselves,

14  Evia Demolena first, according to her now, Evia made the

15  initial suggestion in Georgia during the visit that she join

16  them, come up to New Jersey and rob some of Evia's prostitution

17  customers.  Evia had worked apparently for a escort service or

18  a prostitution service, was familiar with some males in the

19  neighborhood, had -- was familiar with the layout of their

20  apartments or houses and suggested that Jamie Farthing join

21  her.  And I'm not sure exactly what Chris James' role was, but

22  the overall plan was that the two woman would come into the

23  men's apartments, the victims' apartments pretending to be

24  prostitutes.  That is, they would call and be invited to come

25  up there for purposes of prostitution, they would do the

1    robbery, and then at some point Chris James would come in and

2    help them carry this out.

3          What Ms. Farthing told me is she readily agreed to do

4    this; again, because she had been thrown out of her house and

5    school.  She told me, and this is a direct quote, "I thought

6    she was joking.  Normal people don't just rob people."

7    However, in addition to her other problems Ms. Farthing said

8    she was short of money at the time and she had been using a

9    good deal of drugs and alcohol.

10          Now there is I learned in the reports -- there are

11   different versions of this although everybody agrees that --

12   all the principal players agree that Demolena went to Georgia,

13   that she suggested the idea and that Ms. Farthing signed on.

14   According to other statements she had asked whether this was

15   risky or dangerous and she was assured by Ms. Farthing that it

16   was not risky, that they would not get caught, that the crime

17   had been carefully planned and that it was a safe thing to do.

18          Ms. Farthing told me that when they hitchhiked up to

19   this area, I believe they took a hotel in New York, and Ms.

20   Farthing then contacted Robert Hippman.  And I believe Mr.

21   Hippman has testified also.  Ms. Farthing -- Ms. Demolena asked

22   Mr. Hippman if she could come over for purposes of prostitution

23   and I think Ms. Demolena said she had another girl that she

24   would bring with her.  Then according to Ms. Farthing, quote --

25   this is a direct quote --

1    "So we got there and she called him into the bedroom.

2    The guy.." -- that's Hippman -- "...had fixed us some drinks.

3    Evia said take this and she handed me the gun.  I'm flipping

4    out and she's yelling at me." -- still quoting -- "Hippman

5    looked at me and I just looked at the gun.  He was laughing at

6    me because the gun was shaking.  Evia took the gun, told him to

7    get on the floor and tied him up.  I remember holding out a cup

8    for him to take leak; I felt like such an asshole.  I was high

9    at the time on cocaine and alcohol."

10    Now she said other things but that's a direct quote

11    and the gist of what she said.  Again, Ms. Demolena had a

12    somewhat different version and you've heard -- not heard I

13    don't suppose, but a somewhat different version of who took the

14    gun first and who took the gun when, but there seemed to be --

15    her statement was in general agreement that she was there, that

16    she entered, and that she held the gun at some point.

17    She told me that the very next day Ms. Demolena

18    suggested that -- visiting another customer named James Polites

19    or Polites.  The two women entered the victim's apartment and

20    they were followed shortly thereafter by Christopher James and

21    a youngster called Tato Papolayo.  She told me -- Ms. Farthing

22    told me -- she was high on marijuana and cocaine at the time.

23    Before she realized what was happening, according to her, her

24    friends had tied up the victim and told her to wait downstairs.

25    She denied seeing the actual murder however, she said on the

1    way out she observed the victim, Mr. Polites, hanging from a

2    door knob tied up.

3           Now again, there are differences in different

4    versions of exactly what happened or exactly where she was at

5    the time that the actual killing took place.  But in terms of

6    the broad scope of her statement she was there according to

7    her, took part in the robbery although she insisted repeatedly

8    that it was never her intention to kill Mr. Polites and in fact

9    didn't participate in it directly.

10          She then began to weep after she described these

11   crimes and she said, quote, "It pisses me off because I could

12   have done something," -- meaning maybe I could have done

13   something to help.  "But they killed Polites and they could

14   have killed me, they didn't like anyone.  Evia once put a gun

15   up to my head and clicked it."  Unquote.  We talked some about

16   that and Ms. Farthing said little more.  She specifically

17   denied that she was held hostage by Demolena and James, that

18   she was forced to do it.  She seemed to be referring to a kind

19   of pressure that they put on her, the best that I could

20   determine it.

21          Now she told me that several weeks later -- actually

22   almost six weeks later -- she and her friends had been living

23   in the Hotel Iroquois in New York.  She finally wanted to go

24   back home.  All she got out of the robberies was a airplane

25   ticket and some items of personal property not worth a whole

1    lot and she went back home.

2         In reviewing the record again that's not exactly what

3    happened.  Apparently she went back home, flew back home, saw

4    Mr. Kummer, her boyfriend, flew back here, then flew back home

5    again.  And it could have been that I didn't question her

6    carefully enough on that and I don't know if there's any

7    significance to the detail, but apparently there was a trip

8    back home and a trip back here and a trip back home.

9         She told me that even though she was in Georgia, now

10   six weeks after, she did not think she was going to get caught.

11   She was rather surprised when the police arrested her.  She

12   commented to me, quote, and direct quote again,

13        "Maybe this was God's way of opening up my eyes.  God

14   didn't kill me so God had me locked up.  Now I can't believe

15   that it happened; I've never done anything so stupid in my

16   life.  I try not to talk about it even though I know that not

17   talking about it doesn't help.  I just can't believe it.  I

18   know it happened, but it just doesn't seem real."

19        I asked her again if she was remorseful and she

20   responded, quote,

21        "Maybe if I hadn't -- didn't come to New York none of

22   this would have happened.  I regret not saying anything or

23   doing anything. I feel sad knowing that both of these people

24   died.  I am pissed at Evia and Chris and I hope they get the

25   gas chamber -- no, I don't, I know they're sick people and they

1    need help."

2             That was my history.

3         Q.   Okay, did you then -- you told us you took a

4    background history from this defendant, is that correct?

5    A.   Yes.

6         Q.   Could you tell us what she told you about her

7    background?

8    A.   Yes.  Again, I was quite familiar with various parts of

9    the background.  They were reported by Dr. Apolito, Dr.

10   Kleinman, Dr. -- Ms. Feinberg, you saw her before, and then

11   subsequently I received some actual eye witness information

12   from the Georgia Department of Social Services.  I understand

13   that family members have testified to you, I have not spoken to

14   any of them directly.

15            So coming directly from her, her father, Paul, age 43

16   or 44, is a construction worker.  She described her father as

17   quote, "Overpowering, overbearing, critical and narrow minded."

18            Her father's second wife, Kathy, is a social worker

19   in her 30's.  She described her stepmother as quote, "As

20   devicive..." -- that was in a quote, as dividing a family, and

21   quote, "cold."  -- cold.

22            Her natural mother, Loopey Anderson, was absent for

23   much of her growing up; they've only recently been reunited.

24   And the patient regards Loopey Anderson more like a friend than

25   like a mother.  She also likes her mother's -- natural mother's

1    second husband, Luke Anderson.  She regards both of them as

2    friends.

3               There are two older brothers, Jason age 24, who lives

4    in Massachusetts, and Jessie age 22, who attends college in

5    Georgia.

6               Now she told me that there were several instances of

7    sexual abuse when she was a child.  According to her when she

8    was four or five, after the divorce, the separ -- her parents

9    separated when she was something like three or four -- and I

10   think she was awarded custody to her father.  However,

11   according to her, her mother kidnapped her and took her to

12   California.  While she was in California she recalled that her

13   cousin Arthur fondled her although he never penetrated her

14   digitally or -- or with his penis.  She remembers she was

15   afraid of Arthur, not so much because of the fondling but

16   because Arthur would threaten her and be cruel to animals.

17              Her father retrieved her in California and brought

18   her back to either Georgia or Indiana and then Georgia; I'm not

19   sure, they lived in a few states.  And she remained with her

20   father ever since.

21              At age seven or eight while living with her father,

22   her cousin Brian she said engaged in sex play with her and

23   penetrated her with his finger.

24              At age 13 or 14 at one point when her father had

25   broken up with his second wife, according to her on one

Simring - Direct                                    149

1   occasion her father fondled her breasts.  I asked her

2   specifically if there were any other sexual contact between her

3   and her father; she said there was no other sexual contact

4   between her and her father, on that one occasion he fondled her

5   breasts.

6        At age 18 at about the time she was having all these

7   other problems, the terroristic threats with a teacher, being

8   thrown out of the house, she claims she was raped by a

9   stranger.  And although she was not forced to engage in sexual

10  intercourse I don't believe she reported the rape to the

11  authorities.

12       She told me her schooling was frequently interrupted

13  because her family moved a great deal. She always attended

14  public schools however, her father suggested a private school

15  but she resisted that suggestion because she did not want to

16  wear a uniform.  She claimed that -- she said she did poorly in

17  school but she was getting, as I testified, she was getting her

18  -- she was getting things together in 11th grade at Jefferson

19  County High School and it was unfortunate because just when she

20  thought she was going to make it and graduate she had the

21  terroristic threat incident.

22       She's had almost no work history. She has -- she was

23  once -- worked very briefly at a comic book store and she also

24  worked very briefly at a pony ride concession, but except for

25  that she's had no gainful employment.

1          She thinks that she and her brother had once been

2    seen by a psychologist or a counsellor way back in grade

3    school.  She's not certain of the details however, there is no

4    other history of therapy, she's not been seen by any

5    psychologists, psychiatrists, drug and alcohol specialists,

6    she's never been hospitalized or treated and never been

7    evaluated by anybody until the present court related

8    evaluations.

9          She told me she began drinking alcohol at age ten and

10   she has drunk heavily since that time; that would have been

11   eight years until her arrest.  She started smoking marijuana at

12   age 11 and 12, she used methamphetamine, that's a form of

13   speed, plus cocaine at age 15.  She first tried LSD at age 15

14   or 16 and she said that her favorite drug of all of them was

15   LSD or other hallucinating -- hallucinogens or hallucination

16   producing drugs.  She's also taken pills such as Zanax or

17   Valium since age 16 or 17.  She's never participated in drug

18   treatment, she's never used heroin or needles. She used to

19   smoke a pack of cigarettes a day but has cut back to about a

20   pack a week.

21         She was raised as a Baptist, had little to do with

22   the church however, in jail she's become a born again Christian

23   and she has found solace in her faith.

24   Q.   Doctor, did you come to a conclusion about her mental

25   status?  Did you do a mental status examination and what did

1    you find?

2    A.    I did.    The mental status examination was basically

3    negative.    In other words there were no abnormal signs or

4    symptoms that I could see.    She presented as an attractive

5    young woman, cooperative, I mentioned somewhat flirtatious in a

6    childlike coquettish way, rather articulate and forthcoming

7    with information.    Her intelligence appeared normal and she was

8    subsequently -- received formal psychological testing, that is

9    a formal I.Q. which confirmed that her intelligence is average.

10            She showed considerable immaturity as she discussed

11   her past life.    Her speech was logical, coherent, and goal

12   directed.    There was absolutely no evidence of a thinking

13   disorder, of delusions, of false beliefs.    She denied -- thank

14   you -- voices or visual hallucinations although she said that

15   she did see flashback kind of vision after taking acid or LSD.

16   She was not delusional, she was not at all suspicious.    Her

17   memory appeared to be quite good and, as I noted, her

18   intelligence appeared to be average.

19       Q.    Doctor, after all of that did you come to a diagnosis

20   of this defendant?

21   A.    I did.

22       Q.    And what, sir, was your diagnosis?

23   A.    Basically two diagnoses.    Diagnosis number one is alcohol

24   and drug dependence now in remission; she's not using any drugs

25   or alcohol now obviously.    And number two, a personality

1  disorder NOS, Not Otherwise Specified, which means a

2  personality disorder with several different features.

3      Q.    Okay.   Sir, could you just tell us briefly what a

4  personality disorder is?

5  A.    Yes.   The drug and alcohol disorder is pretty obvious I

6  think.

7          Personality disorder is -- means the way that she

8  adapts to life, the way that she relates to others, the way

9  that she deals with issues.   It is her personality style which

10  probably was manifested when she was a youngster and certainly

11  by the age of 18 it becomes fairly manifested.   She has

12  evidence in her personality of histrionic traits, that is

13  rather dramatic traits.   There are narcissistic traits, which

14  is a big word meaning kind of self-centered traits, and

15  dependent traits, which just means that she -- she has a

16  feeling of needing and wanting to be taken care of rather than

17  work for herself.   It means basically a maladjustment, but what

18  it does not mean is it's -- it's a separate diagnosis from

19  traditional mental illness.   It -- it means basically a

20  maladjustment.

21      Q.    Doctor, did you come to a conclusion based on your

22  examination, all your reading of the discovery materials, et

23  cetera, did you come to a conclusion as to the state of mind of

24  this defendant at the time of the Hippman robbery and the

25  Polites homicide?

1  A.    I did, yes.

2        Q.    Okay.  And, sir, could you please tell us what that

3  is?

4  A.    Well the -- the question of the -- the -- this is -- the

5  question of whether she participated in the robbery and the

6  homicide is your question, not mine.  Assuming that -- that she

7  did participate in the robbery and the homicide, it is my

8  opinion that at the time she participated in this robbery and

9  homicide she was completely aware of what she was doing.  She

10 said that during these times she used varying quantities of

11 drugs or alcohol which is difficult to pin down with any

12 specificity.  But at all times she was aware of the actions

13 that were happening.

14       To step back one step, she acknowledged fully that

15 she met Ms. Demolena and Mr. James, that she was invited to

16 participate in robberies and she accepted this offer.  She knew

17 that she was coming to New York, to New Jersey for the purpose

18 of committing robberies.  And whether or not -- whether or not

19 you believe that she wanted to commit a murder or not, she said

20 that she wanted to commit robberies.  She had no illusion about

21 why she was coming.

22       When Ms. Demolena suggested that she go to the

23 Hippman home she knew that she was supposed to participate as

24 another prostitute, she knew that it was not to engage in

25 prostitution, this was a ruse, that the purpose was to rob him.

1          She knew at the time that -- the next day, that

2     another robbery, the robbery notwithstanding, another robbery

3     had been scheduled, she knew that she went to the Polites home

4     for the purpose of robbing Polites.  She claims that she did

5     not want to murder him, she claims that she did not see the

6     murder, but she claims that she took certain objects which were

7     from the home and aided in the robbery.  Therefore, it is my

8     conclusion as follows.

9          First, she may have been high on drugs or alcohol at

10    the time.  That may have affected her judgment but it did not

11    effect her ability to think.  At all times she was aware of

12    what she was doing, that is she knew what she was doing and she

13    was able to act on purpose or act with purpose, that is there

14    was a goal to her actions, whether it's murder or robbery; the

15    goal was robbery.

16         Second, she knew at all times the nature and qualify

17    of her acts.

18         Next, she knew at all times that what she was doing

19    was wrong, that is wrong according to the law even though she

20    believed that she could get away with it.

21         And therefore, it is my conclusion that she does not

22    meet the standards as I understand them for either diminished

23    capacity, because she was able to act with purpose and

24    knowledge, and that she certainly does not meet the standard

25    for legal insanity.

1      Q.    And, Doctor, is that conclusion to a reasonable

2    degree of medical certainty?

3    A.    Yes.

4      Q.    Okay.  Now, Doctor, you're familiar with the -- the

5    reports of Dr. Kleinman and Dr. Apolito, is that correct?

6    A.    Yes.

7      Q.    Okay.  And is it true that Dr. Kleinman says that

8    this defendant suffered from a disassociative state?

9    A.    Yes.

10      Q.    Okay.  Doctor, what is a disassociative state?

11    A.    Dr. Kleinman falls short of saying that she had a

12    disassociative disorder which could be something like a

13    multiple personality disorder or some other condition like

14    this.  He specifically falls short of it and says in some

15    language that she doesn't have that but she has a lighter

16    version of that, a disassociative state, which means I believe

17    that during the time of commission of these crimes she was

18    feeling spacey.

19      Q.    Doctor, do you agree with that?

20    A.    She might have been feeling spacey.

21      Q.    Okay.  Doctor, does that have anything -- does that

22    affect a person's ability to act with purpose or knowledge?

23    A.    Absolutely not except for -- I don't know, criminals for

24    hire, cold blooded criminals with experience in crime.  Most

25    people who engage in crimes, assuming that she engaged in a

1    crime, are nervous when they do it.  I have no doubt that she

2    was nervous during this time.

3         Q.    Okay.  Dr. Simring, Dr. Kleinman and Dr. -- assume

4    Dr. Kleinman -- well you saw the reports -- Dr. Kleinman and

5    Dr. Apolito diagnosed that this defendant with post-traumatic

6    stress disorder, are you aware of that?

7    A.    I am, yes.

8         Q.    Could you please tell us what that is?

9    A.    Well post-traumatic stress disorder is -- it basically

10   comes out of a war time model, people who have been in say the

11   Vietnam War who've -- who've seen horrible destruction of their

12   friends and buddies, who themselves were subjected to life

13   threatening situations will develop a syndrome after that, a

14   clinical picture where they are anxious, where they startle

15   easily, where they have flashbacks of the Vietnam experience,

16   where they have intrusive and recurrent nightmares of the

17   experience and so forth.  That concept has been applied to

18   civilian life and individuals who've been subjected to

19   horrendous experiences such as rape, or serious automobile

20   accidents -- not of all of them, but can develop again repeated

21   recollections of the automobile accident, of the -- of the

22   rape, can have social withdrawal.  That is a woman has been

23   raped for example, may withdraw from her friends, her loving

24   husband, her family and children, may have a psychological

25   numbing as a result of that, may have repeated dreams about the

1  rape, may have flashbacks and fearfulness about dealing with

2  men or with others, may feel guilt about having survived the

3  rape.   There's a syndrome -- concentration camp or hostage

4  survivors.   I expect survivors of the Oklahoma City bombing and

5  such other casualties develop this kind of syndrome.   The

6  significant thing about this is that people with post-traumatic

7  stress disorder don't go out to commit crimes.   It usually

8  arises in the context of the evaluation of -- of -- of harm or

9  damages after someone has been raped or there's been an

10 explosion or a car wreck.

11     Q.   Doctor, do you agree with that diagnosis?

12 A.   There's no evidence for that in this case, even the

13 psychological testing that Dr. Kleinman did doesn't support it,

14 there is no justification for it in this case.

15     Q.   Doctor, if you assume that the -- the crimes in this

16 case were pre-planned, can that occur with a post -- tell me

17 how that relates to post-traumatic stress disorder?

18 A.   There's no relationship.

19     Q.   Okay, why not?

20 A.   They unrelated concepts.   I -- I think what -- what Dr.

21 Apolito, Dr. Kleinman, et al., said through really a lot of

22 words is she had a bad childhood, therefore -- therefore she's

23 stressed out and that's why she committed the crimes or

24 something like this.   I don't see any connection.   Whether she

25 did or did not have a bad childhood, there's no evidence of

1    post-traumatic stress disorder, the flashbacks and so forth.

2    Even if there were it would be irrelevant if she had post-

3    traumatic stress.  It would be relevant only insofar as

4    individual treatment is concerned or suffering or if she sued

5    her parents or something like this.   There's no relationship

6    between that and committing purposely robberies.  It's an

7    irrelevant concept.

8         Q.   Doctor, assume that the family members -- her father,

9    her stepmother, her brother all testified and assume further,

10   Doctor, that there was absolutely no evidence of physical abuse

11   other than some paddling on the butt when she lied or didn't

12   clean her room, and assume that there was no evidence of sexual

13   abuse and assume that there was only one incident or -- or I

14   should say an incident where she's -- at age three she saw a

15   dog being shot.  Could you tell me, sir, if you assume all of

16   those facts what effect would that kind of testimony have on

17   your evaluation?

18        MR. WEICHSEL:  Judge, I'm going to object to the

19   hypothetical.

20        THE COURT:  Tell me why, over here.

21                    (SIDEBAR)

22        MR. WEICHSEL:  Because I think the prosecutor is

23   mischaracterizing the testimony.  I mean there's also testimony

24   about Jamie witnessing violence between -- you know --

25        MS. BAGLIVI:  At age one or two?

1          MR. WEICHSEL:  At the age three and a half or four.

2          MS. BAGLIVI:  Judge, my argument is hypotheticals are

3    proper for experts and the defense on redirect is always

4    allowed to fill in or change --

5          THE COURT:  You can add -- you can add --

6          MR. WEICHSEL:  Okay.

7          THE COURT:  (Inaudible).  But the hypothetical that's

8    set out by the prosecutor is -- has been testified, there's

9    evidence in the case that support (inaudible).

10         MR. WEICHSEL:  Yeah, um-hum.

11         THE COURT:  So I'll allow it, all right?

12         MR. WEICHSEL:  Okay, fine.

13                        (END OF SIDEBAR)

14   BY MS. BAGLIVI:

15         Q.   Doctor, assume that hypothetical; could you please

16   tell me what affect that would -- that testimony would have on

17   your evaluation?

18   A.   It would have no affect, Ms. Baglivi.  It's all -- it's

19   all -- if I may say, it's all irrelevant.  Ms. Farthing

20   presented to me, as I've told you, what she said happened to

21   her, the good and the bad.  She told the other doctors you

22   know, somewhat different versions.  I've read the Georgia

23   Division of Youth report, they don't confirm any of what things

24   she said.  There were problems in the home, they didn't

25   necessarily react or reflect her.  I understand family members

1   said something else.  I'm sure that there were problems in the

2   home as there are in many homes. They probably weren't as bad

3   as Ms. Farthing has told the other doctors, they may have been

4   worse than the parents testified here.  But it's all

5   irrelevant.  Assuming that she had a bad home, even as bad as

6   she said, I don't see any connection between that and these

7   purposeful robberies.

8        Q.   Why not?  Assume she had a horrible, horrible

9   childhood and was traumatized by sexual abuse, physical abuse,

10  all of that, assume that for a -- for a moment.  What affect

11  does that have on your evaluation?

12  A.   Well unless the abuse reached the point combined with

13  other factors of triggering a -- a serious mental illness

14  marked by a break with reality in which case we were dealing

15  with a different issue, except for that it's irrelevant.  I

16  understand by reading the Kleinman report for example and

17  wading through you know, lots of words, the bottom line, at

18  least the way I read it, seems to be she had a bad life

19  therefore she can't be responsible for a crime.  That's silly,

20  it's just silliness.

21       Q.   Okay.  Doctor, did you find any evidence with any

22  break with reality of Jamie Farthing on the night of those

23  crimes?

24  A.   There is none; I haven't found any and nobody else has

25  found any either; Dr. Apolito has not, Dr. Kleinman has not and

1   Ms. Feinberg has not.  No one has found a break with reality.

2        Q.    Doctor, you described Jamie Farthing's presentment to

3   you as -- I think you said immature, coquettish.  Could you

4   please tell us what effect that has on your evaluation or

5   please describe what that means to you?

6   A.    Well again, it's a -- it's a detail.  It doesn't deal with

7   anything, whether she came across as nice, nasty or anywhere in

8   between it has really not much relevance on the bottom line

9   issue that I'm asking to determine, that is what was her state

10  of mind; could she act with knowledge and purpose, did she

11  suffer from a major mental illness, did she know that it was

12  wrong, was she precluded from doing so, was she hearing voices,

13  you know, issues like that.  The significance, and again it's a

14  detail, is that she made a very good impression with me, a very

15  good appearance with me.  She -- she was likeable in a -- in a

16  youthful kind of way, she knew how to talk to me.

17              I -- it's interesting that they letter that was

18  produced for me later was a letter she wrote to Greg which was

19  filled with curse words and filled with angry statements about

20  somebody else and really kind of tough street talk.  What I

21  take from this is she knows how to behave with adults, she

22  knows how to deal with doctors in suits with gray hair and she

23  knows how to -- you know, she'll talk one way to the doctor and

24  the minister and the priest and she'll talk another way out

25  there in the street.  So all psychiatric interviews are biased

1   to some degree by that.  You know, the fact that she made a

2   good impression and she's sympathetic; it's again irrelevant to

3   the question of her state of mind, but she knows how to

4   ingratiate and how to be likeable.  I don't think that what I

5   saw or Dr. -- Dr. Kleinman or -- or Dr. Apolito saw is

6   necessarily the flavor os what she's really like there as -- as

7   these crimes went down.  And that's not because she's a

8   multiple personality, it's because she knows how to manipulate

9   and she can present herself in different ways.  And she

10  presents herself to me in the way that you present yourself to

11  an older authority figure.

12        Q.    Doctor, I want to show you what's been marked S-260,

13  the letter that you've just referred to.  Have you seen this?

14  A.    I have my copy right here.

15        Q.    Okay.  Do you need it?

16  A.    I do not.

17        Q.    Okay.  What flavor do you get of the defendant from

18  this letter?

19              MR. WEICHSEL:  Judge, I think that's already been

20  testified to.

21              THE COURT:  Well if the doctor has already answered

22  that then I don't think he has to.  Did you answer that

23  question before?

24              THE WITNESS:  I did, Your Honor.

25              THE COURT:  Yeah, I thought so.

BY MS. BAGLIVI:

Q.   Well you -- you say she presents through the letter
as one way and then when you're meeting her and the other
doctors met her as another way.  Could you give us an
evaluation of what you believe is her real true self?

A.   Well her real true self for my purposes, for the letter's
purposes, is she's not psychotic.  There is no break with
reality, she doesn't suffer from a major mental illness, there
is no confusion, she was aware at all times, whatever you find
she did, of what she was doing.  If she wasn't holding the gun
or she was holding the gun, she's perfectly capable of lying or
distorting the facts or telling the truth.  The point is that
she was aware at all times of what was happening.  In terms of
the kind of person she is, if there's a question that how can
such a sweet, nice, pleasant person do a terrible alleged crime
like this, the answer is simple; the way she presents herself
to some old guy like me is different from the way she talks in
the street to her friends.

In the letter she starts it -- just -- I won't read
the whole thing, it's -- "Greg, hey, what's up?  Same shit,
different day."  A little further on, "I'm not in the jail's
hand anymore, I feel sorry for Laurie.  That bitch, Laura,
really F'd Laurie and Liz.  I don't understand Liz.  This is
the second time Laura rated on Liz -- yeah, the second.  The
day she right back under her.  Does that make sense to you?

1   It would only take one time..." and so forth.  "She ratted to

2   that and told Liz I've never seen so many fake, plastic,

3   superficial bitches.  It's like I don't trust her but I like

4   her."

5          Now again, there's nothing that -- this is not

6   relevant to her state of mind but it helps to understand that

7   she presents that sweet cherubic you know, nice young girl,

8   young woman that I've seen here is probably not the same

9   presentation she -- she made when she engaged in these crimes,

10  but that does not mean that she has a multiple personality.

11  We're all of us capable of acting differently under different

12  circumstances.  We act differently in church than we do on a

13  baseball field.   There's an element of manipulation.  I'm not

14  saying she's the world's biggest manipulator, but it's an

15  element of manipulation.  She knows how to talk to me under

16  these circumstances but this just shows another side of her.

17  But to emphasize again, none of this has anything to do with

18  the ultimate question you asked me.

19      Q.   And, Doctor, is it your testimony then that she had a

20  full awareness of what was going on the two nights in question?

21  A.   Yes.

22          MR. WEICHSEL:  Objection; leading.

23          THE COURT:  Overruled.  Your answer is yes, Doctor?

24          THE WITNESS:  The answer is yes.

25          MS. BAGLIVI:  I have nothing further.

1.              THE COURT:  Mr. Weichsel?

2               MR. WEICHSEL:  Thank you.

3  CROSS EXAMINATION BY MR. WEICHSEL:

4       Q.   Good afternoon, Dr. Simring.

5  A.   Good afternoon.

6       Q.   You took notes, Dr. Simring?

7  A.   Yes.

8       Q.   Okay.  I'd like to show you this.  Is this a copy of

9  your notes?

10  A.   Yes.

11      Q.   On the first page -- God bless you, Doctor, you've

12  got worse handwriting than I do.

13              You wrote something about sexy and -- and I just

14  can't read it.  Can you --

15  A.   Yes, there is on page I.1 of my notes a line drawing.

16  This is meant only to remind me when I write the report of some

17  distinguishing features and observations.  And it's just a line

18  drawing of a stick figure with long hair.  It says, "Right

19  handed, five foot three to five foot four, 135 pounds,

20  attractive, long brunette hair, sexy, charming in a girlish

21  way, flirtatious, green jumpsuit, articulate, open, unguarded,

22  immature but appealing."

23              THE COURT:  Excuse me, and these are the notes you

24  take as you interview?

25              THE WITNESS:  Yes, Your Honor.

1           THE COURT:  On like a yellow pad?

2           THE WITNESS:  Yes, sir.  These are --

3           THE COURT:  I want the jury to understand.

4           THE WITNESS:  Oh, I'm sorry, Your Honor, these are 25

5    pages of notes that I took during my interview.  And relying on

6    the discovery and my notes I formulate the report which is a

7    summary of the important parts.

8    BY MR. WEICHSEL:

9           Q.   Now, Doctor, you -- your testimony was that Jamie

10   Farthing was not in a disassociative state during either the

11   Hippman or the Polites crime?

12   A.    She might have been.

13          Q.   In fact she related to you the events like they were

14   in a movie, isn't that correct?

15   A.    I said that, yes.  All right, my answer is she might have

16   been nervous and she related the events like they were in a

17   movie, yes.

18          Q.   Well disassociative state, it's sort of almost a

19   state of bewilderness, not -- not -- not reality?

20   A.    Well I think that's an exaggeration.  We've all been in

21   disassociative states at times.  Example; if --

22          Q.   It --

23   A.    Well it's a normal phenomenon.  I've testified to this jury

24   that disassociative disorder is different.  Disassociative

25   states are -- are normal states that all of us will enter under

1    times of high anxiety, it's a kind of nervousness, it's a kind

2    of spaceyness.   I -- I accept her characterization that she

3    felt nervous and spacey.

4         Q.   And -- and sort of unreal, that it really wasn't

5    happening?

6    A.   Well I wouldn't go that far.  As she told me during my

7    evaluation as I've testified to you, she repeated these things

8    to me with this kind of oh, gee whiz, and it happened then and

9    happened then and as she got into it she described these things

10   not with the kind of mature contemplation say that an older

11   more mature person would think of the -- the meaning of all of

12   this, but basically what happened.

13        Q.   Now, Doctor, even in your report you put down that

14   she was immature even for a 20 year old, isn't that correct?

15   A.   Yes.

16        Q.   In terms of --

17   A.   Whatever that means.

18        Q.   Whatever that means.  That was in your report, wasn't

19   it?

20   A.   Yes, it was.

21        Q.   Was she more like a 14 year old or a 15 year old?

22   A.   Well her intelligence was --

23        Q.   I'm talking about maturity.

24   A.   All right, but I don't want to confuse it.  Her

25   intelligence was that of a 20 year old, she was perfectly

1  normal in intelligence.  Her girlishness, her level of

2  sophistication, her immaturity would be of a younger person, a

3  teenager.

4       Q.   A teenager?  And, Doctor, isn't it fair to state that

5  a disassociative state could be an element of post-traumatic

6  stress syndrome or a symptom of post-traumatic stress syndrome?

7  A.   Anything could be.

8       Q.   Now, Doctor, you -- in your report you took the

9  history that she gave you of -- of her family history as she

10 related to you and Dr. Apolito and -- and the social worker,

11 Billie Feinberg and Dr. Kleinman, basically as true, isn't that

12 correct?

13 A.   Yes.

14      Q.   You didn't find that in terms of her family history,

15 her background that she -- she was a malingerer because if you

16 did you would -- if she did -- if you found that you would have

17 put it in your report, correct?

18 A.   Now I'm confused.

19      Q.   Well did you basically take a family history as she

20 gave it to you and as she gave to the other professionals as

21 true?

22 A.   Well for the purposes of reaching my conclusion I assumed

23 that it was true.  I realized perfectly well that this is one

24 side of the story and as she presented it to me that was her

25 side of the story.  She told Dr. Apolito something somewhat

1  different and she told Ms. Feinberg something a little bit

2  different, but I assumed that there were problems at home and

3  that there was a divorce and there were allegations of sexual —

4  — sex play, mainly with cousins.  And I assumed that there were

5  problems in her home.  And for the purpose of reaching my

6  conclusions I assumed that.  Subsequently I learned that there

7  are other sides of the story or other aspects of the story, but

8  I'm sure that her home was not picture perfect.

9       Q.    Well not picture perfect, you know, were there severe

10  problems in the home?

11  A.    I'm sure there were problems at home, they were probably

12  severe problems.  Were they the most severe?  Probably not.

13  She had significant problems at home.

14       Q.    And is it -- you know, is it -- now, Doctor, assume

15  there was testimony by her brother Jessie today that when she

16  went to California she was kidnapped by her mother, went to

17  California, lived in different habitations in California,

18  observed her puppy being shot, head being blown off, that she

19  was kidnapped back to Georgia by her father, was taken back to

20  Georgia by her father, and her father testified that in many

21  respects when she came back from California she was a much

22  different person.  Would any of that have a bearing on whether

23  she suffered from post-traumatic stress disorder?

24  A.    Well she doesn't suffer, she doesn't meet the criteria

25  now.  In -- in theory could a -- a history of being fought over

1  by two parents and remembering an incident of an animal being

2  shot -- I mean assuming she had recollection at age three --

3  would any of this -- could any of this lead to post-traumatic

4  stress disorder?  I suppose it could, but it didn't and I don't

5  find any evidence for it in her case.  In any event it's not

6  relevant in my opinion.

7       Q.   Doctor, is it fair to say that according to the DSM

8  when they discuss the general diagnostic criteria for a

9  personality disorder -- and the DSM-4, this is the Diagnostic

10 and Statistical Manual?

11 A.   Yes.

12      Q.   And that's what all psychiatrists use and it's a

13 standardized way of formulating diagnoses?

14 A.   Yes.

15      Q.   And, Doctor, is it fair to say that when they discuss

16 general diagnostic criteria for a personality disorder that

17 when they discuss personality disorders they state in the book,

18 "The enduring pattern is not better accounted for by a

19 manifestation or consequence of another mental disorder?"

20 A.   Yes.

21      Q.   Okay.  And, Doctor, what you say -- what you're

22 saying is that you disagree with a fellow psychiatrist, Dr.

23 Apolito, in terms of whether there was post-traumatic stress

24 disorder or not?

25 A.   Yes.

1      Q.    And is it fair to say, Dr. Simring, that reasonable

2  psychiatrists can differ in terms of the diagnoses that they

3  make?

4  A.    Yes; the DSM is supposed to help standardize reliability,

5  or that is reliability between different psychiatrists however

6  I suppose there will always be differences.

7            THE COURT:  DSM meaning, Doctor?

8            THE WITNESS:  Oh, I'm sorry, Your Honor.

9  BY MR. WEICHSEL:

10     Q.    The Diagnostic and Statistical Manual?

11           THE COURT:  Please; for the jury's edification, tell

12  them what the DSM is.

13           THE WITNESS:  I'm sorry, Your Honor, the -- the

14  Diagnostic and Statistic Manual, the red book that counsel

15  raised is a -- a standard reference which lists criteria for

16  making diagnoses.  And it -- one of the major purposes of it is

17  it's supposed to help reliability, that is agreement between

18  different evaluators.  But the answer to counsel's question is

19  yes, there can be disagreement.

20  BY MR. WEICHSEL:

21     Q.    Now, Doctor, you also put in your report that she had

22  a sparse work history, is that correct?

23  A.    Yes.

24     Q.    Well isn't it typical of an 18 year old to have a

25  sparse work history?

1   A.   Most 18 year olds who leave school -- not most -- many 18

2   year olds who leave school are a bit more industrious.

3       Q.   Is it true that she left school in May 1994 and these

4   -- and was kicked out of the family home at that time?

5   A.   About that time, yes.

6       Q.   And -- and these incidents occurred right after that

7   in early August 1994, correct?

8   A.   Three months later, yes.

9       Q.   So if she was in school up till May 1994 would it be

10  atypical to have two part time jobs while going to school?

11  A.   Many students are more industrious.

12      Q.   And some students -- some students --

13  A.   Some students never work a day in their life, yes.

14      Q.   That's right, or somewhere in between.  Now Ms.

15  Farthing told you in your report, I refer to page five, words

16  to the effect I knew it happened but it just didn't seem real,

17  is that what you wrote?

18  A.   Yes.

19      Q.   You also put in your report that -- that, "There was

20  immaturity as she discussed her past life and her current

21  situation," is that correct?

22  A.   Yes.

23      Q.   And you also put in your report that while she denied

24  hallucinations she had complained of flashbacks, correct?

25  A.   On acid, yes.

1       Q.    Yes, and that was on page six of your report,

2   correct?

3   A.    I testified to that, yes.

4       Q.    Okay.   Also, is it fair to say that the history that

5   she gave you, she -- she attended many, many different schools?

6   A.    I don't know how many schools there were, I didn't trace

7   the history. There -- I've given you the history, I did not

8   verify it more than that.  Certainly there is a tendency to

9   blame her past on others, that's not unusual for young people

10  that may have maladjustment problems.  How accurate that is and

11  how accurate her parents are or how accurate the Georgia

12  Division of Youth Services are I really don't know.  My

13  estimate would be that things weren't quite as bad as she made

14  out and they may not have been as good as her parents

15  portrayed.  Again, none of this is relevant to my determination

16  of her mental state at the time of these alleged crimes.

17      Q.    Now, Dr. Simring, when you say things weren't as good

18  as her parents portrayed, you weren't -- you weren't here for

19  either her stepmother's or her father's testimony this morning,

20  were you?

21  A.    I was not.  Ms. Baglivi told me what they testified to.

22      Q.    And did she characterize it as things being pretty

23  good?

24  A.    She characterized, as I recall -- this was a brief

25  conversation because I believe it was just this morning -- her

1    stepmother is actually a social worker, a trained professional,

2    said that the -- that -- well we use the word kidnapping;

3    another way to see this is her parents were fighting over her.

4    In some broken homes nobody wants the child, but here parents

5    were fighting over her.  They characterized her as having gone

6    to California when she was very young, that this -- at an age -

7    - I don't remember, I'm now recalling a brief conversation --

8    some doubt about of what she may or may not have remembered

9    about this time, at this time, that there was -- I believe

10   there was some discounting of the pattern of -- there was the

11   one episode that came out that was reported about an animal

12   being shot and I believe the overall thrust of it -- and I'm

13   telling you something you've heard directly and I've only heard

14   second hand -- but that the parents at least tried to justify

15   their -- their role in -- in raising her.  But again, you've

16   heard it, I haven't.

17        Q.   Did Ms. Baglivi tell you that Paul Farthing pulled a

18   gun on -- on Loopey Anderson?

19   A.   Well what Ms. Baglivi told me is that supposedly whatever

20   happened between them happened when Jamie Farthing was less

21   than three I believe.   But again, I'm telling the jury

22   something that they've heard.  I don't know I should do that.

23        Q.   Fine.  Now if you believe the history, Jamie was

24   subject to physical abuse, emotional abuse -- well assume she

25   was subject to physical abuse, emotional abuse, sexual abuse,

1  numerous moves, assume that she didn't see her natural mother

2  for many, many years, had no contact with her, all that put

3  together you're saying, Doctor, would not change your opinion

4  as to whether there's post-traumatic stress syndrome?

5  A.   Well you're mixing a number of things.  First on the

6  hypothetical I saw no evidence of physical abuse.  Jamie

7  Farthing claimed that her father would spank her.  I believe

8  there was some testimony about he would hit her on the rear end

9  for -- as a means of punishment.  The question of whether there

10 was physical abuse, as we define physical abuse of a child,

11 goes beyond spanking and goes beyond methods of discipline.

12 There are definitions for physical abuse.  Assuming that there

13 were multiple moves, that there was a broken family and that

14 there was sexual abuse, that could have -- these could have

15 been factors in causing a post-traumatic stress disorder

16 although most post-traumatic stress disorder is a result of --

17 of serious threats to bodily integrity in adult life.  It would

18 be more likely in thinking about it that the alleged rape by a

19 stranger at age 18 led to post-traumatic stress if I'm looking

20 for potential factors.  It is more likely that assuming there

21 were a rape that would have been a more likely candidate then

22 something she observed when she was three years old.  But all

23 that as it may, she does not have post-traumatic stress

24 disorder in my opinion.

25     Q.   That's your opinion, Doctor, and others may differ?

1    A.    That's what I'm testifying to is my opinion.

2              MR. WEICHSEL:  Thank you, Doctor.

3              THE COURT:  Ms. Baglivi, anything else?

4              MS. BAGLIVI:  Just a couple quick questions.

5    REDIRECT EXAMINATION BY MS. BAGLIVI:

6       Q.    Doctor, a couple times you talked about the word

7    maladjustment.  Could you just tell the jury what that -- you

8    said Jamie Farthing was maladjusted; what is that in laymen's

9    terms?

10             MR. WEICHSEL:  Judge, I think that's beyond the scope

11   of my cross.

12             MS. BAGLIVI:  It came out through Ms. Weichsel, Your

13   Honor.

14             THE COURT:  No, I'll allow it, go ahead.

15             THE WITNESS:  A personality disorder is a psychiatric

16   term which I think can probably be best translated in every day

17   talk as a maladjustment.  And I -- I have no doubt that this

18   young woman is -- is -- is maladjusted in the sense that you

19   know, she's had school difficulties, she's had relationship

20   difficulties, she's had difficulties with her anger, she's had

21   interpersonal difficulties and she's now accused that if these

22   accusations are true in engaging in a serious crime without

23   giving a whole lot of thought to it.  There seems to be some

24   lack of development of her -- of her conscience, of her sense

25   of responsibility.  The work history is, you know, there are

1   other children who don't work, but there's a trend of a lack of

2   -- of --  a willingness to sign onto a plan to make an easy

3   buck, not -- not giving a whole lot of thought to something as

4   horrific as a robbery plan.  All of that speaks to

5   maladjustment.  It's got nothing whatsoever to do with a

6   thinking disorder or with a psychotic thinking or with an

7   inability to understand.  And -- and therefore, to the extent

8   that I agree with Dr. Apolito, Dr. Farthing, I think we'd all

9   agree that she's maladjusted.  She could have used some help in

10  counselling.  I am sure there are many, many young people who

11  are maladjusted.  But that -- you know, that may help in sort

12  of understanding the roots of the crimes she committed.  But

13  you know, looking backwards many people if not most people who

14  commit crimes, assuming she committed a crime, are maladjusted.

15  You know, it's sort of circular reasoning.  It takes a kind of

16  maladjustment to commit a crime, therefore the maladjustment is

17  not an excuse for the crime.  Normal, well adjusted, healthy,

18  well functioning kids in school generally don't go out and

19  commit crimes.

20      Q.    Is mal -- is maladjustment a mental disease?

21  A.    Maladjustment is -- is a -- it's not really a mental

22  disease, it's probably the closest equivalent to a -- a lay

23  term for personality disorder.

24      Q.    Okay.  Doctor, assume for a moment -- just assume for

25  a moment that Jamie Farthing did suffer from post-traumatic

1 │ stress disorder, would that preclude her from acting with

2 │ purpose or knowledge?

3 │ A.    Absolutely not.  Post-traumatic stress disorder as I've

4 │ testified is usually seen in the context of people who suffer

5 │ with symptoms; flashbacks, social withdrawal.  It is sometimes

6 │ raised in a context of damages say in an accident or an

7 │ explosion.  It doesn't -- it doesn't lead to -- it doesn't lead

8 │ to crimes, nor does -- it doesn't lead to crimes.  Nor -- nor

9 │ does -- does a bad background.  You know, there are a lot of

10 │ people who come from bad backgrounds, some go out to commit

11 │ crimes, most do not.  I understand that Dr. Kleinman thinks

12 │ that if you have a bad background you're not responsible for a

13 │ crime.  Not too many people believe that, I certainly don't.

14 │          MS. BAGLIVI:  Nothing further.

15 │          THE COURT:  Mr. Weichsel, anything else?

16 │ RECROSS EXAMINATION BY MR. WEICHSEL:

17 │    Q.    Well a personality disorder is -- is classified as a

18 │ mental disease in the DSM-4, isn't it?

19 │ A.    Well it's -- I -- as you know, I teach DSM-4.  It's --

20 │ it's -- mental disorder is the word that's chosen, but in there

21 │ too is -- are marital -- marital disharmony an overeating and

22 │ adjustment disorder and work inhibition problems.  This is a

23 │ comprehensive book that goes from the most severe mental

24 │ diseases to the problems of every day living.

25 │    Q.    And one of -- one of the personality disorder traits

1  you found in Jamie was a dependent personality disorder?

2  A.    Yes.

3          MR. WEICHSEL:  Thank you.

4          MS. BAGLIVI:  Nothing.

5          THE COURT:  Dr. Simring, thank you very much.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Sidebar, counsel.

8                    (SIDEBAR)

9          THE COURT:  Do you have any other witnesses?

10         MS. BAGLIVI:  No.

11         THE COURT:  That's it?

12         MS. BAGLIVI:  That's it.

13         MR. WEICHSEL:  That's it.

14         THE COURT:  Mr. Weichsel?

15         MR. WEICHSEL:  That's it for me.

16         MS. BAGLIVI:  The State rests.  You want me to say

17 that out in front of the jury?

18         THE COURT:  I'll ask you.

19         MS. BAGLIVI:  Okay.

20                  (END OF SIDEBAR)

21         THE COURT:  It's my understanding that the State

22 rests?

23         MS. BAGLIVI:  That's correct, Your Honor, the State

24 rests.

25         THE COURT:  No other witnesses?

1          MS. BAGLIVI:  No, sir.

2          THE COURT:  All right, ladies and gentlemen of the

3    jury, we're finished now, it's 3:00 on Thursday the 21st,

4    that's about what we calculated, we would be finishing the case

5    today and the outside possibility that you would go over the

6    first day or so into the Thanksgiving week and that's just

7    where we are.

8          Both the State and the defense have finished

9    presenting their cases.  What's left in this case is the

10   summations by both counsels and they'll do that Monday as I

11   said to you and I will give you the law and then you will get

12   the case to deliberate.

13         Now do not read anything in the newspapers as

14   pertaining to this case as the weekend goes on.  Do not discuss

15   the case with anybody.  You will be at this time next Monday in

16   the -- probably deciding the issues in this case; so it's only

17   you.  You are the ones who will decide the case.  Nobody else

18   who is not here or -- it's only what you hear in this courtroom

19   that will help you decide the -- or that you have to decide the

20   case with.  I haven't given you the law at all yet, so you have

21   -- you may have heard all the evidence but you haven't got the

22   whole case yet, so I appreciate your -- your work this week.

23   It's been a long, long tedious work for -- for you and I know

24   some of you are tired, get a good rest over the weekend and be

25   prepared to -- to take that last day or so into the case.

1          There's one other thing I wanted to mention.  When we
2  -- when the attorneys delib -- enter their or present their
3  summations on Monday, they anticipate -- we had talked about
4  this -- they anticipate about an hour each given their -- so it
5  will take two hours for their summations. We'll -- one will
6  present theirs -- the defense goes first and is followed by the
7  prosecution.  We anticipate an hour a piece possibly, so it
8  will be two hours.  My charge will be about two hours.  It's
9  about two hours worth of instructions that I have to give you.
10 So that's what the schedule is.  In between that time there
11 will be a lunch break.  If we have finished everything by the
12 time you get -- depending on the timing of all this either
13 you'll be permitted to go out to lunch -- if we feel that we --
14 I guess we could order lunch if -- if you're already in
15 deliberating I'm going to order lunch for you, I'm not going to
16 let you out of the jury room.  I won't know that.  If I order
17 lunch for you it's not going to be anything from the -- it will
18 be from the cafeteria downstairs on the third floor, so if you
19 want to bring your own bag of lunch you can, it's up to
20 yourself.  Again, if -- if we're not finished I'm not going to
21 order you lunch.  If I'm going to charge you after lunch with
22 the law, which I don't like to do.  I like to get the case to
23 you and then just let you take it.  If I charge you in the
24 afternoon from 1:30 say till 3:30 you're getting the case
25 pretty late then because it's a two hour charge.  So there's --

1    there may be a possibility of an early lunch, in other -- in

2    other words when the -- when the attorneys finish their

3    summations if they -- if we get started at 9:00, a little after

4    9:00, then we're talking into 11:30 or so.  If we get an early

5    lunch, maybe a half hour lunch I can get that for you and have

6    it here, you'll have your lunch and then I'll charge you and

7    you'll get the case earlier than three of 4:00 in the afternoon

8    on -- on Monday.  So it's all that kind of timing. And as I'm

9    talking to you I'm thinking too, I'm verbalizing, and I think

10   what I'm going to do is just you prepare to have us order your

11   lunch one way or the other, if it's a early lunch or a late

12   lunch, okay?  But if you want to bring your own you can.  When

13   I say lunch, you're going to get a list and you're going to

14   pick out a sandwich or something and you're going to pick out a

15   drink and then you're going to come out here and it will be

16   delivered up and it will be in there for you when you come

17   back.  All right?  That's the way it will work.

18          All right, with that then I'm going to let -- I'm

19   going to ask you to safe home, stay well, keep your health up

20   and we'll see you on Monday and we should be finishing the case

21   in the next couple of days.  All right?  Thank you.

22          MR. WEICHSEL:  Judge, maybe you should tell the

23   jurors so they're not surprised that the rest of the courthouse

24   is going to be closed on Monday?

25          THE COURT:  Yeah, the rest of the courthouse will be

1   -- no, there's another case going on I believe. The rest of the

2   courthouse will be closed.  When you get here you'll see no one

3   around. That judicial college that Dr. Simring referred to is -

4   - is going on.  All the judges in the State of New Jersey are

5   assembled -- they assemble for -- for courses, except people

6   like myself who are still working, so, I would have normally

7   been there except I'm excused because of the case.  I think

8   there's another case in the courthouse that's going on that

9   will continue through also.  So when you do get here Monday

10  you won't see many people around but don't think we're closed,

11  you just come up the way you regularly do.  There won't be any

12  judges around, there will be staff, but there won't be any

13  jurors, there won't be any people.  You'll see an empty parking

14  lot out there and you'll wonder what happened but don't get --

15  I'm glad you mentioned that because some of you might look and

16  say oh, they're closed and go on back home; don't do that.

17  We're here.

18          MS. BAGLIVI:  Is the cafeteria open?  The cafeteria

19  on Monday?

20          THE COURT:  I believe the cafeteria is open.  It's

21  open; no, the staff is still here, everybody else -- the only

22  ones missing are the judges.  Don't -- and as I said, don't

23  read anything in the newspaper or the media, okay?  You're

24  excused.  Ask -- ask over here.  I don't want to take -- I

25  don't want to open the floor to questions from the jury.

1          MS. BAGLIVI:  What time?

2          THE COURT:  Nine o'clock, always, 9:00 --

3          UNIDENTIFIED:  What time?

4          THE COURT:  9:00 on Monday.

5          UNIDENTIFIED:  Oh, okay.

6          THE COURT:  We've got to get all that in, we start at

7    nine.

8              (PAUSE - THE JURY LEAVES THE COURTROOM)

9          MR. WEICHSEL:  Judge, just one minute?

10         THE COURT:  You want me?

11         MR. WEICHSEL:  Yeah.

12                        (PAUSE)

13         THE COURT:  Mr. Weichsel?

14         MR. WEICHSEL:  Yeah, judge, just -- I'm asking for --

15   or the family is asking for a favor.  Apparently visiting --

16   female visiting tonight is from 9:00 to 11:00 and the family

17   wants to get Jessie back to Atlanta, to Conyers, because he has

18   school and then Mr. and Mrs. Farthing may drive back to be back

19   here Monday morning and we're just wondering if you can call

20   the jail and see if they can get an early visiting -- I know

21   the jail opens up for visiting at 6:30 or 7:00 but female

22   visiting isn't until 9:00 to 11:00 and they -- they'd like to

23   head back to Atlanta, to see if they can have the visit --

24         THE COURT:  Yeah, I -- I really have absolutely no

25   control over what happens in the jail.  It's not within the

1    jurisdiction of the court.

2              MR. WEICHSEL:  Well I'll -- I'll call.

3              THE COURT:  I'll make the call if you want me to.

4              MR. WEICHSEL:  Okay, I appreciate it.

5              THE COURT:  Whether it has any effect or not I have

6    no --

7              MR. WEICHSEL:  Okay.

8              THE COURT:  I mean the -- the -- the -- the hours and

9    the routines in the jail are really controlled by the jail

10   itself.

11             MR. WEICHSEL:  I understand.

12             THE COURT:  And I -- I wouldn't be surprised if so I

13   call and say well we can't -- we can't disrupt anything over

14   here because they've got their system and I'm not going to -- I

15   can't -- in fact I'm pretty sure I can't.

16             MR. WEICHSEL:  Well then I'll call over there, judge.

17             THE COURT:  Yeah, why don't you call and if they want

18   a call from me then I'll call.

19             MR. WEICHSEL:  Okay, fine.

20             THE COURT:  All right?  If they say -- I have no

21   problem with it, okay?

22             MR. WEICHSEL:  Okay, fine.

23             THE COURT:  Do it that way.  But if they say I don't

24   care who calls then we're not going to address it.

25             MR. WEICHSEL:  Okay, thank you.

1          THE COURT:  I have your verdict sheet for both of

2     you.  I'd like you to look at them today, now -- between now

3     and 4:00 and if there's any problems with these that you see

4     let me know and then we'll correct them --

5          MS. BAGLIVI:  Sure.

6          THE COURT:  -- so that we'll have it ready.  I mean I

7     don't want to be working on this Monday morning or something

8     like that.

9          MS. BAGLIVI:  No problem.

10         THE COURT:  All right, this matter is recessed until

11    9:00 Monday morning.

12         MS. BAGLIVI:  Thank you.

13                    *              *              *

14

15

16

17

18

19

20

21

22

23

24

25

1      ### CERTIFICATION

2          I, Dolores Hastings, the assigned transcriber, do

3  hereby certify the foregoing transcript of proceedings in the

4  Bergen County Superior Court, Law Division, Criminal Part, on

5  November 21, 1996, on tape number 189-96, index number from

6  00:00:00 to 03:59:12, is prepared in full compliance with the

7  current Transcript Format for Judicial Proceedings and is a

8  true and accurate non-compressed transcript of the proceedings

9  as recorded.

10

11 _____              __/417_____

12 Dolores Hastings                       AOC Number

13

14 KEMCO TRANS, INC.                      7/4/97

15 Agency Name                            Date

16

17

18

19

20

21

22

23

24

25