EXHIBIT 31

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
BERGEN COUNTY
DOCKET NO. 95-07-00889
A.D. #_____

STATE OF NEW JERSEY,            )
                               )
            Plaintiff,         )
    vs.                        )            TRANSCRIPT OF
                               )               TRIAL
JAMIE FARTHING,                )
                               )
            Defendant.         )

Place: Bergen County Courthouse
       Hackensack, NJ 07601

Date:  November 25, 1996

BEFORE:

    HONORABLE TIMOTHY J. SULLIVAN, J.S.C. AND JURY

TRANSCRIPT ORDERED BY:

    DEBORAH COLLINS, ESQ. (Office of the Public Defender)

APPEARANCES:

    PATRICIA BAGLIVI, ESQ. (Assistant Prosecutor)
    Attorney for the State of New Jersey

    JOHN WEICHSEL, ESQ.
    Attorney for the Defendant

Transcriber Dolores Hastings
KEMCO TRANS, INC.
P.O. Box 900
Clark, New Jersey 07066
(908) 382-8500

Video Recorded
Recording Operator, L. Ostapeck

1

## I N D E X

2  Summations:

3        Mr. Weichsel                          5

4        Ms. Baglivi                          35

5  The Court's Charge to the Jury           81

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

3

1        THE COURT:  Are we ready to proceed, counsels?

2        MS. BAGLIVI:  Yes, Your Honor.

3        MR. WEICHSEL:  Yes, judge.

4        THE COURT:  Bring the jury up please.

5             (PAUSE - JURY ENTERS THE COURTROOM)

6        THE COURT:  All right, please answer when your name

7   is called.

8             (JURY ROLL CALL TAKEN - ALL PRESENT)

9        THE COURT:  You have a cold?  You'll be able to

10  communicate with your fellow jurors do you think?

11       JUROR:  Yes.

12       THE COURT:  Okay.

13       Good morning, ladies and gentlemen. Did you -- any of

14  you read any newspaper articles or hear anything about this

15  case over the weekend?  And did anybody -- did any of you

16  discuss this case with anybody else?  All right.

17       The reason my clerk was delayed, she was downstairs

18  in the cafeteria trying to make sure we had our signals all

19  correct.  Both Ms. Baglivi and then -- I'm sorry, Mr. Weichsel

20  will address you first and then Ms. Baglivi will afterward.

21  And when they -- when they are finished their summations either

22  between the two of them or after they both present their

23  summations we will have a -- what is it, a list?

24       THE COURT CLERK:  Yeah.

25       THE COURT:  That you can order any lunch from

Colloquy
4

1  downstairs and then by then you will come back in again and I

2  will then give you the charge and when you -- when you leave

3  the courtroom to deliberate your lunch will be ready for you

4  then, hopefully.  All right? So that's -- that's the plan.  Now

5  whether we -- whether you order your lunch between summations

6  by the attorneys or after their summations or before I give you

7  the charge is something that will depend on the time.  All

8  right?

9           Now counsel will present their final arguments to you

10  this morning.  As I mentioned, counsel for the defendant will

11  have the opening argument this morning. And that is just a

12  reverse of how we started.  If you recall, the prosecution went

13  first and the defendant's attorney followed her.  And when we

14  end the case it's the -- it's the reverse.

15           Now counsel for the State will then have its

16  opportunity when Mr. Weichsel is finished to present her

17  argument.  Now the attorneys in making these arguments to you

18  will be commenting upon the testimony that you have heard and

19  the evidence which had been presented to you in this case.  Now

20  they, as you will be recalling the evidence that has been

21  presented.  They will not intentionally try to mislead you

22  however, if their recollection of the evidence differs from

23  what your recollection is you must follow your own

24  recollection.  What the attorneys say is not evidence.  These

25  final arguments as I mentioned are not to be considered by you

1  as evidence in this case or are they instructions in the law; I

2  will give you the instructions in the law.  Their arguments are

3  however, intended to help you better understand the contentions

4  of each side the issues that you are to decide.  You should

5  give both sides your close attention.

6         Now, Mr. Weichsel, if you are ready you may proceed

7  with your final argument.

8         MR. WEICHSEL:  Thank you.

9         May -- may it please the court, Ms. Baglivi, Jamie,

10  ladies and gentlemen of the jury.  I just want to start out by

11  sincerely thanking all of you for the time and devotion that

12  you put into this case.  We've been here about three weeks now

13  and the attention that you've paid has just been remarkable.

14  I've had an opportunity to observe you and you've been riveted

15  by the testimony.  And it's a wonderful tribute to our jury

16  system to have jurors that are as attentive and as careful and

17  thoughtful as you. And whatever the outcome of the case, I

18  really, really want to thank all of you for serving her and

19  being jurors in this case.

20         Ms. Baglivi told you in her opening statement that

21  this case was about the American Dream.  And she told you her

22  version of the American Dream and James Polites' version of the

23  American Dream. And as this case has unfolded and I've thought

24  about it I too think this case is about the American Dream,

25  only it's -- it's a different American Dream.

 1          We all as parents and children have an American

 2   Dream, a dream that we'll grow up in a safe and secure home, a

 3   dream that as children we will be unconditionally loved by our

 4   parents, a dream as parents that we will give our children

 5   stability and emotional support, that we will be there to

 6   nurture and take care of and love our children.  And in the

 7   case of Jamie Farthing it is a case of the American Dream gone

 8   awry.

 9          She came into this world, and she's only 20 years

10   old, she was 18 at the time of these events.  And we heard a

11   whole litany from her family, from Dr. Kleinman, from Dr.

12   Apolito, from Dr. Simring about her upbringing and what

13   happened to her as she was growing up. And Ms. Baglivi is going

14   to tell you in her closing well, she's had a bad upbringing, so

15   what.  Why should it make a difference that she had a "bad

16   upbringing"?  And I want to talk about that because it's --

17   we're not here because she had bad upbringing.  We're here, and

18   I'm here as her attorney because of what this horrible litany

19   of events did to her mental state, did to her psyche, did to

20   her ability to consciously make decisions.  And those are all

21   issues that you, ladies and gentlemen of the jury, are going to

22   have to deal with in the jury room.  And each of you took an

23   oath as jurors that you could deal with those issues honestly,

24   dispassionately, carefully and with no bias and no sympathy.

25   And that's really all that I can ask for you when you go into

1   the jury room and deliberate, because one of the elements of

2   all of these offenses is state of mind; it is purpose and

3   knowledge or recklessness depending on the offense.  And I'll

4   talk about that a little bit more.

5           You know, we all have our functions here.  Judge

6   Sullivan's going to tell you about the law.  He's going to tell

7   you about the law of robbery and kidnapping and purposely and

8   knowing murder and aggravated manslaughter and manslaughter and

9   felony murder and reckless possession.  And in the context of

10  that law you're going to have to make your decision as to what

11  is going on and what the facts were and how we interpret the

12  facts to the law.

13          And as Jamie Farthing sits here today I don't think

14  there's tremendous argument here about certain facts; that

15  Robert Hippman was robbed, that James Polites was murdered.

16  What you have to decide is not what Ivy Demolena's role was,

17  not what Christopher James' role was, not what Beninio

18  Rosario's role was, not what Efrim Popolayo's role was, but

19  Jamie Farthing's role.  Did she -- was she an accomplice to a

20  purposeful and knowing murder?  Did she purposely and knowingly

21  engage in robberies?  Did she purposely and knowingly engage in

22  kidnappings?  Did she possess weapons with intent to use?  Did

23  she possess weapons with an unlawful purpose?  Those are the

24  basically gamut of the charges that you're going to have to

25  decide here.

1       Now let's step back.  It's the spring/summer of 1994.

2   Jamie Farthing is kicked out of her parents' house.  Oh, the

3   prosecutor says, Dr. Simring would say, she had a car.  She

4   didn't have any money, she didn't have any skills, she had

5   nowhere to go.  She had a boyfriend but she couldn't stay

6   there. And her boyfriend introduces her to Chris James and Ivy

7   Demolena.

8       And you've heard a lot about Ivy Demolena during this

9   trial, but you know, one thing I -- I think that comes across

10  through this trial is Ivy Demolena's personality, the fact that

11  she's domineering, she's older, she's 26 or 27 years old.

12  Jamie Farthing's 18 years old.

13      You heard Edward Kummer testify.  He -- he was

14  Jamie's boyfriend.  He said you know, Jamie had demons, she was

15  really afraid to go to her mother's house because of some

16  Satanism and she talked about what happened to her when she was

17  a child between her mother and her father.  And remember Edward

18  Kummer was a State's witness, he came in here for the

19  prosecution. But he -- you know, the prosecutor is going to say

20  well all this stuff about Jamie Farthing is made up after her

21  arrest.  Well it's not, it wasn't made up after the arrest,

22  because she talked to Edward Kummer about it in the summer of

23  1994 before she went to New York and discussed her fears, her

24  traumas, the abuse, the emotional pain, the physical pain; she

25  talked about all that to Edward Kummer.

1          And Edward Kummer also tells you that Ivy Demolena

2     was a very dominating person.  Ivy Demolena dominated Chris

3     James and Ivy Demolena dominated Jamie Farthing.  One of the

4     things Dr. Simring said, and he's the State's doctor that

5     testified on Thursday, was well she's got a personality

6     disorder of an unspecified type and one of the traits is

7     dependency, tremendous need.  And -- and I don't think Dr.

8     Apolito or Dr. Kleinman disagrees with that.  They -- they go

9     further, they talk about post-traumatic stress syndrome, being

10    like a shell shocked war veteran from the years of trauma and

11    abuse.  I mean the testimony of Edward Kummer is very, very

12    important in terms of Jamie Farthing's state of mind, in terms

13    of you determining what Jamie Farthing's state of mind is.

14    It's very important testimony.  And -- and you recollect what

15    he said about her background and her fears and her fears of

16    going to her mother.

17          Well the prosecutor may come in and say well, you

18    know -- but certainly Jamie Farthing went to Robert Hippman's

19    house and it was voluntary on her part, she voluntarily did

20    that.  But if you recall her statement -- and her statement was

21    read to you by Investigator Alver -- and when you recount her

22    statement, her statement was given on the 17th which was about

23    two days after she was arrested, two and a half days or so.  It

24    was given up here in Hackensack after she waived extradition

25    and she flew up to Bergen County with Investigator -- with

1   Detective Hines and Investigator Alver.  And when you recall

2   that statement being read to you, and I submit the one thing

3   you can say about that statement was that it really didn't

4   sound like she was telling something that was happening to

5   herself; it sounded like it was in a movie.  It sounded like it

6   wasn't happening to her.

7          And what's -- what's the importance of -- what's the

8   importance of the fact that it didn't sound like it happened to

9   her?  Well when you -- you listen to what Dr. Kleinman and Dr.

10  Apolito say, they say that she, Jamie, because of a post-

11  traumatic stress syndrome goes into disassociative states where

12  you kind of act where you -- where you're really not there.

13  You know, you're there but you're not there.  And certainly

14  Jamie Farthing was there on August 4th 1995 in a physical

15  sense, but was she really there in a mental sense.  Did she

16  really understand the gravity of her acts?  Did she act with

17  purpose in the sense that she intended to do this, or did she

18  act with knowledge, did she really know?  I mean if -- if you

19  look -- if you look at some of the words in her statement --

20  you know, it's -- it's like a child talking.  She -- when she's

21  talking about, you know, her discussions with -- with Ivy

22  Demolena and she says, "It was foolproof because she had it

23  planned out so good and everything."  You know, then

24  Investigator Alver asked her about, you know -- you know,

25  acting as an escort or whatever she said that, "Well, I didn't

1    know how we were going to meet them until we got to New York

2    and she worked in an escort service which I didn't know what it

3    was till later."

4              "And what did you find out it was?"

5              "It was like girls coming over to like do stuff with

6    guys."

7              Question, "By stuff do you mean sex?"

8              Answer, "Yes."

9              "Sex for money?"

10             "Uh-huh, yes."

11             It's like a child talking.

12             "And you didn't realize that you were dressed for

13   this act of being an escort and having sex with this

14   gentleman?"

15             Now she's referring to -- to Mr. Hippman.

16             "Ivy told me that I just had to dress nice, that the

17   place we were going to because they might have though

18   something, I don't know because she knew him and everything."

19             You know, it's -- it's this other worldly quality.

20             "And you took those -- these ties for what reason?"

21             "Because they were pretty."

22             "And what were you going to do with them?"

23             "I was going to keep them."

24             Is this -- is this an adult, a mature adult talking?

25             "Another item is a Mexican coin.  Actually it's more

1    than one, these are three Mexican coins.  Do you recognize

2    them?"

3              "Yes, they came from his desk."

4              Question, "Meaning Mr. Hippman?"

5              "Yes."

6              Question, "And you kept them also?"

7              "Yes."

8              "Why did you keep them?"

9              "Because they looked neat.  I never saw any money

10   like that."

11             "Did you ever see any money like that after this

12   robbery?"

13             "No, that's why I kept them, it looked neat."

14             "Was there any conversation about that robbery after

15   it was over?"  Again, referring to Hippman.

16             "Not really.  I just was telling them I couldn't

17   believe I had done that and I told them I was shaking the

18   whole.  And Ivy was just telling me it was going to be okay and

19   all of this other stuff and that's it."

20             "Was there any talk of killing James Polites prior to

21   going to the house?"

22             Answer, "No, not that I know of, not while I was

23   around."

24             Well you know, the prosecutor is going to say Bob

25   Hippman testified that Jamie held the gun and she held it

1   steady and all that, but Jamie in her statement says, you know,
2   I was so nervous I couldn't even hold the gun.  Ivy grabbed --
3   grabbed it from me because Mr. Hippman was laughing at me.  And
4   you're going to have to assess credibility.  And Robert Hippman
5   is the same man who tells you that when he got the phone cal
6   from Ivy Demolena earlier that day or that night and he agreed
7   to have Ivy Demolena and Jamie Farthing come over that he
8   wasn't -- there was no intention of having any sexual relations
9   with these women. And when he called up Laffaire Escort Service
10  that Christmas Eve from his parents' house in Oradell because
11  he -- because he was lonely and he had just broken up with his
12  girlfriend or fiance or whatever and he was going to pay $200
13  an hour or $300 or whatever it was he was going to pay -- oh, I
14  really wasn't calling up to -- to have sex with them.  And then
15  when he went -- went to the motel, the Oritany Best Western and
16  called up Laffaire again, well he wasn't going to have sex with
17  them either.

18          And he's the same gentleman who testified well I saw
19  a photo array of -- of Jamie Farthing's picture and I picked
20  out her picture, and even though I saw her picture in the
21  newspaper earlier before that, that really didn't influence me
22  at all and that really had nothing to do with me picking out
23  Jamie's picture.  Well the fact that he picked out Jamie's
24  picture is irrelevant because I -- you know, obviously Jamie
25  Farthing was there.  But it goes to Mr. Hippman's credibility

1    when he testifies and when he says that you know, Jamie

2    Farthing held the gun as opposed to what Jamie said, was I was

3    so nervous, I couldn't go through with it, I was shaking and I

4    -- Ivy grabbed the gun from me.  And it really goes to Jamie

5    Farthing's state of mind whether she was there acting with

6    purpose and acting with knowledge, and those are all issues

7    that you're going to have to decide in the jury room.

8            Now we come to the next day, August 5th.  The person

9    that arranged all this was Ivy Demolena. She set it up, she put

10   it all in motion.   And Jamie Farthing tells you in her

11   statement I didn't know -- I had no idea that James Polites was

12   going to be killed, I didn't know that in advance.  I didn't

13   know it, I didn't contemplate it, I didn't think of it.  And on

14   that night in question it's pretty clear that Jamie Farthing

15   wasn't carrying any weapons.  She went along; she didn't know

16   there was going to be a murder. She didn't know that there was

17   going to be a killing.  She didn't participate as an

18   accomplice, as an aider, as an abetter in a murder.  She didn't

19   take part in the murder.  She was there because Ivy Demolena

20   asked her to be there.

21           And one of the things the judge is going to charge

22   you on and he's going to talk to you about is this concept of

23   felony murder, that if somebody knowingly or purposely

24   participates in certain enumerated felonies in the statute and

25   -- and one of them is robbery and one of them is kidnapping, if

1  they act with purpose and knowledge they may be guilty of

2  felony murder even though they didn't kill somebody themselves.

3  But there's certain affirmative offenses that the judge is

4  going to talk to you about in the felony murder statute that

5  the actor, meaning Jamie, did not commit the homicidal act or

6  in any way solicit, request, command, cause or aid the

7  commission thereof.  And not armed with a deadly weapon and had

8  no reasonable ground to believe that any other participant was

9  armed with a weapon and had no reasonable ground to believe

10 that any other participant engaged -- intended to engage in

11 conduct likely to result in death or serious physical injury.

12         It's pretty clear that Jamie Farthing didn't know

13 what Ivy Demolena's intention was when she went to Edgewater on

14 August 5th 1994.  It's pretty clear that Jamie never went there

15 and it's pretty clear that she didn't aid or abet or assist or

16 help in the murder of James Polites.  And these are all very

17 difficult concepts.  And these are all things that you're going

18 to have to go over in the jury room carefully.

19         Another thing you're going to have to deal with is

20 Jamie Farthing telling Dr. Kleinman and telling Dr. Apolito and

21 telling the social worker, Billie Feinberg, who Dr. Kleinman

22 and Dr. Apolito and to a certain extent Dr. Simring relied

23 upon, about her substance abuse.  The fact that she -- she

24 started using alcohol at a very, very young age, marijuana at a

25 young age, cocaine.  But it appears that her favorite drug was

1   hallucinogens, drugs like LSD that cause hallucinations and

2   flashbacks.

3           And the prosecutor is going to say well, you know,

4   she really wasn't wiped out with Hippman or wiped out with

5   Polites because there really wasn't a drink.  But what we don't

6   know and there hasn't been testimony on is what Jamie Farthing

7   had before she went to Hippman and before she went to Polites.

8   We know that -- that wine was served at Hippman's residence, it

9   was the Pino Grigio Santa Marguerita.  And we know that there

10  was Gavi de Gavi and Gold Schlagher liqueur served at the

11  Polites and in terms of the Gold Schlagher, the bottle was

12  almost empty and there was a glass with Gold Schlagher liqueur

13  in it, that's the testimony, that's the cinnamon flavored

14  liqueur with little flecks of gold in it, and we know that.

15  And we wonder if, you know, Jamie Farthing was straight and

16  hadn't had years of drug abuse whether she would have taken --

17  participated in any of this.  I submit not -- I submit not,

18  ladies and gentlemen of the jury.

19          You know, to show you Jamie Farthing's role.  At

20  Polites' house who finds this big wad of cash?  Jamie Farthing

21  does in a pillow.  Who winds up with the big wad of cash?  Ivy

22  Demolena.  When they go to New York and they go to King

23  Jewelers and that Super Bowl ring is pawned well what -- what

24  does Jamie Farthing wind up with?  A $15 Goofy ring, that was

25  in her statement, and this -- she doesn't use drugs, look what

1  she picks out, a little ring with -- I think it was $150 or

2  $180, there's testimony, and it's got -- you know, it spins and

3  it's got a marijuana leaf.  That's -- that's what Jamie

4  Farthing winds up with.

5          And what -- what do the police find when they -- when

6  they go back to Georgia?  This very mature person, three ties -

7  - three ties -- three neckties.  What else did they find at her

8  mother's house in Georgia?  A Mont Blanc pen, three Mexican

9  coins because they're neat -- they were neat, three Mexican

10  coins.  And what else -- what else have we got here?  Glass

11  balls -- I'm not going to take them all out -- and some brass

12  golf balls.

13          This is your -- this is your vicious criminal?  This

14  is your robber, your murderer?  Mexican coins, ties, brass

15  balls and a Mont Blanc pen, and a ring with a marijuana leaf

16  and -- and a Goofy ring.  The prosecutor is going to say well,

17  you know, the money went to the fancy hotels.  Well you don't

18  think in a million years Jamie Farthing, who had never been to

19  New York before, didn't know New York, couldn't find her way

20  around New York in -- in all her years because she's never been

21  here.  You don't think Jamie picked out those hotels, do you?

22  Don't you think it was Chris James and Ivy Demolena who picked

23  out those hotels?  Do you think it was Jamie who signed in as

24  Mr. Farthing from High Rock Road, Conyers, Georgia?  Or even

25  the one time where -- where it was her own name, do you think

1   she's the one that registered?  I think in the case of Mr.

2   Farthing it was Chris James and in the other case Ivy Demolena.

3   Again, she was used by Ivy Demolena.  Ivy Demolena used her,

4   Ivy Demolena used Chris James, Ivy Demolena even used her own

5   brother.

6           The prosecutor is going to say but what about Magda

7   Rahey?  Ivy Demolena's sister, half sister, whatever, who says

8   well on the telephone I heard some voices in the background

9   when -- when -- when she called me and said that she's going to

10  have to do something to some guy or something like that.  Well

11  you wonder about Magda Rahey, Magda Rahey who got some of the

12  stolen property here that was found on her possession, Magda

13  Rahey who wasn't prosecuted for that.  And you wonder, you

14  know, is Magda Rahey telling the truth here.  Did Ivy Demolena

15  really in advance tell anybody about what she was going to do

16  to James Polites?  Does this crime look like it was planned out

17  in advance, to use neck ties and electrical cord?  Doe it sound

18  like anybody was planning this in advance and planning it

19  before they got there, where they were going to use neck ties

20  and electrical cords to strangle somebody?  I submit that

21  that's incredible, that it's absolutely preposterous.  This

22  wasn't planned in advance because Ivy Demolena didn't tell

23  anybody in advance about her scheme.  She didn't tell anybody

24  in advance about what she was going to do because it was in her

25  mind.  Jamie Farthing didn't have to kill James Polites, James

Summation - Mr. Weichsel                                    19

1   Polites didn't know her at all, didn't know her from a hole in

2   the wall; she had never been up here.   Ivy -- Jamie Farthing

3   didn't date James Polites like Ivy Demolena did.   The only

4   person who had a motive here was Ivy Demolena, because Ivy

5   Demolena knew that James Polites knew her real name.   He didn't

6   know Jamie Farthing and he didn't know anybody else.   The one

7   he knew was Ivy Demolena.   And Ivy Demolena is the master mind

8   to this, the one who put this together, the one who should be

9   punished and punished severely.

10          You know, it's really not a pretty picture what

11  happened here.   And Jamie Farthing told Dr. Simring that she is

12  sorry, that she is remorseful.   But that's not going to make

13  anything better and that's not going to bring James Polites

14  back.   And nothing that you do or I do or any of us do can make

15  that go away.   But I know want to hone in on the testimony of

16  Dr. Kleinman and Dr. Apolito, Jessie Farthing, Paul Farthing,

17  and Kathy Farthing, and Dr. Simring.   And I want to discuss it

18  in light of diminished mental capacity and in light of post-

19  traumatic stress disorder and disassociative disorder.

20          Every doctor that testified, testified that Jamie is

21  immature for her years.   Dr. -- Dr. Apolito said she's more

22  like a 14 year old.   Dr. Simring comes in and says yeah, she --

23  she's very immature for her years.   He only saw her like about

24  a month, a month and a half ago.   He saw her I guess in

25  September sometime, his report was written in October.   You

1   know, she's 20 years old and -- and she's very, very immature

2   for her years.  And Dr. Simring -- and you heard him on -- last

3   witness you heard on Thursday afternoon -- and he's very --

4   he's very glib and he's very experienced as -- as a witness,

5   he's testified in numerous cases, finds in essence the same

6   facts that Dr. Apolito does and Dr. Kleinman does, but he

7   interprets them differently.  And Dr. Apolito, you know, says

8   you know -- I mean Dr. Simring comes in and says you know,

9   Jamie came in and she's very coquettish was his word, and kind

10  of sexy and -- and words like that.  And Dr. Kleinman and Dr.

11  Apolito tell you that this kind of coquettishness, this

12  precociousness, this sexiness is evidence of sexual abuse.

13  It's evidence of sexual trauma.  And it's a way of coping, it's

14  a way of dealing with things.  But the interesting thing is Dr.

15  Simring finds that too.

16          And you heard the testimony of Kathy and Paul and you

17  heard the testimony of Jessie on Thursday.  And Dr. Simring

18  comes in here after talking to the prosecutor and says well you

19  know, it probably wasn't as bad as Jamie made it out to be, but

20  it's probably worse than what Kathy and Paul and Jessie

21  testified to.   Well Dr. Simring didn't have the benefit of

22  their testimony.  And if things were probably worse than Kathy

23  and Paul and Jessie testified, and I submit you've had the

24  benefit of that testimony, things had to be pretty darn bad for

25  Jamie Farthing growing up because what -- what have we learned.

Summation - Mr. Weichsel                    21

1   We've learned that there's really no -- of stability in her

2   life.  We learned that her -- her mother Loopey and her father

3   Paul married shortly before Jamie was born, they had two other

4   kids before that, they fought constantly.  Paul Farthing told

5   you and you know, she stabbed me once and we used to fight and

6   we used to throw things at each other, I used to throw dishes,

7   we used to fight all the time, we used to separate a lot and

8   then she'd come back, then we'd separate again, then she'd come

9   back, we would separate again and we lived all over the place.

10  I can't even keep track of California, Indiana, Georgia,

11  Florida, you know, those of us who have stability in our lives,

12  and I know many of you are parents and you all try to give love

13  and stability and guidance to your children; and it wasn't

14  there.

15          And what happens?  Mr. Farthing at some point gets

16  custody of Jamie.  She doesn't see her mom for -- for long

17  periods of time.  One day her mother walks into her life and as

18  Jessie said, you know, we're going to go for a bus ride to the

19  zoo and -- and you know, days later they're in California,

20  we're to California.  And here, you know, you -- you've been

21  with your father and maybe it wasn't perfect and all of a

22  sudden you're with this woman.  And there's been testimony that

23  -- that Satanism and Cousin Arthur and I think Jamie told the

24  social worker that she was molested at a young age by Cousin

25  Arthur.  And we're not sure if it was three and a half or four

Summation - Mr. Weichsel                    22

1  and a half or five because nobody -- nobody that came in was

2  really very sure of dates and times and things like that.  But

3  she was in California for six months and because her mother was

4  hiding she -- she was living in different places and -- and not

5  staying in one place.  And one day her father Paul comes to the

6  school yard without any warning, picks up the kids and returns

7  them back -- and I forgot whether it was Georgia or Florida,

8  but you heard a whole litany of places where they lives,

9  different aunts and different girlfriends and -- and nobody

10  really knows how many schools Jamie attended.  And -- and what

11  does this really have to do with anything?  It's -- it's --

12  because of what Dr. Apolito said and I know that some of you

13  may have been put off by Dr. Apolito's accent, but you know

14  he's -- he's a board certified forensic psychiatrist.  He's

15  been a psychiatrist since I think 1952.  And he too teaches at

16  UMDMJ and as Dr. Simring said, you know, reasonable

17  psychiatrists can differ.  And Dr. Apolito, despite his accent,

18  I submit his testimony was clear, his testimony was cogent.

19  And yet he -- he did take some -- and some offense at some

20  things that Dr. Simring said in his report.  And I submit he did

21  that because he felt so strongly about his diagnosis of Jamie

22  and the diagnosis of post-traumatic stress disorder and the

23  effect that it had on her and the resultant disassociative

24  state that she was in during the Hippman crime and the Polites

25  crime.  And what does he say?  What does he tell you?  He says

Summation - Mr. Weichsel                    23

1    I've never seen a case as bad as Jamie's.  I've never one

2    person have to go or suffer through as many traumas as this

3    girl has had to suffer.  And what -- what has she had to

4    suffer?  She's had no stability in her -- in her family life,

5    she's been tormented at a young age with her cousin Arthur.

6    I'll tell you, you know her and Kathy -- you know, and she was

7    -- during her testimony she was crying and she was pleading.

8    She said well I grew up in a normal home and ever since Jamie

9    came into this house and I married Paul we haven't had a normal

10   home, it hasn't been normal, it's just been wrong.  And -- and

11   she talks about Jamie's fears -- you know, you couldn't even

12   give this girl a doll.  And you wonder why.  You think it has

13   something to do with -- with Cousin Arthur and -- and -- and at

14   a young age taking her puppy and -- you know, probably, even at

15   that young age there were a few things that Jamie could

16   unconditionally love because you're shifted back and forth from

17   place to place, from parent to parent, and you have this new

18   puppy.  And what does Cousin Arthur do?  He puts the puppy on a

19   clothes line, he puts it in a sack and blows the puppy's brains

20   out.  And -- and then there's talk of Satanism and dolls and

21   you wonder why Jamie is the way she is.  And you wonder and I

22   think it becomes clear why she started abusing alcohol and

23   drugs at a very early age.  You didn't just have one thing

24   here, you had many things.

25        You know, Dr. Kleinman in -- he gave you a list of 20

1   -- 23 different -- different factors and you know, I'm not --

2   not going to go through all of them, but you know, there are

3   just so many here.  If you go through Dr. Kleinman's factors,

4   you know, Loopey Anderson, Ms. Farthing's mother, remarried and

5   said Paul Farthing pulled a gun on them twice and threatened to

6   kill all of them.  We do know that Paul Farthing did pull a gun

7   on Loopey because he came in here and he told you, you know,

8   one day she came around and she wasn't supposed to be around so

9   I went with my trusty gun and -- and I pulled a gun on her and

10  I was convicted of it.  Ms. Farthing is traumatized -- Ms.

11  Farthing is traumatized by being kidnapped father by Loopey.

12  And he goes on and he repeats about Arthur and about the dirt

13  road and you know, he also talks about the beatings.  You know,

14  and we all -- you know, have been led to discipline our

15  children and I agree with that.  But you heard the testimony,

16  you know, and I think we all have to -- you know, when we

17  discipline our children we have to reassure them that we love

18  them when we discipline them.  Did any of that happen here?

19  What -- you know, what would you get paddled for?  It was --

20  Jessie described the paddle and Mr. Farthing described it and

21  Kathy described it and you know, you get paddled for getting

22  bad grades, you get paddled for not doing your chores, you get

23  paddled for having a messy room, you get paddled for talking

24  back, you get paddled for lies.  I don't know that there's a

25  single child around who at one time or another hasn't lied to

1  their parents.  And I don't think there's a single child

2  around, not excluding of course that don't have a messy room.

3  And I don't think there's a single child that at one time or

4  another hasn't maybe gotten a bad grade.  But you know that's -

5  - you know, maybe it was just the paddling, well that's okay.

6  But if you have a paddling and you know, at one point Paul was

7  asked, you know, Paul said, you know, Jamie and the kids were

8  never the same when they got back from California.  And

9  somebody asked -- I don't know whether it was the prosecutor or

10  myself -- well did you -- did you reassure Jamie and the other

11  kids that you loved them.  And he basically said yeah, I really

12  didn't think I had to do that.  And you know, Jamie really I

13  guess in a sense never accepted Kathy or Kathy never accepted

14  her, I really don't know what it was and I'm not casting blame,

15  but that's just another factor in this whole potpourri, this

16  whole mess that sounds like -- you know, almost sounds like it

17  comes out of you know, if it wasn't real it would be a movie.

18  It's just -- just incredible.

19         And you know, then to top all this off, you know,

20  she's raped I guess one night, she has that trauma.  And she's

21  -- she's you know, she goes and lives with her aunt for a while

22  and you know, there is this charge where supposedly she

23  threatened a teacher and I think Jamie's version was you know,

24  the teacher touched me and -- and with all the history of

25  molestation I thought he was going to molest me and -- and I

1  over reacted.  And then on Christmas Eve 1993, the middle of

2  the holidays, her aunt deposits her on the doorstep back in --

3  in Conyers, Georgia and deposits her back with Kathy and her

4  father, and they're at wits end.  And again, you know, Jamie's

5  in a -- Jamie's been rejected another time, you know, because

6  she had gone through all these residences, a number of

7  girlfriends that her father lived with for a few months at a

8  time.  It's -- it's really a mess.

9           So what happens in -- in the spring of 1994?  We come

10 full circle.  You know, Jamie is staying out perhaps too late

11 at night and she's drinking some beers down at the lake and

12 she's -- she's smoking -- she smoked a little marijuana down at

13 the lake.  And she hasn't graduated high school yet.  You know,

14 Dr. Simring says well you know, she doesn't have much of a work

15 history.  Well I don't know too many kids who just turned 18

16 who've got a huge work history and -- and their resume is three

17 pages long and -- and they can go in and you know, get a really

18 good job because they don't have the skills.  I mean she's not

19 even a high school graduate at this point.  What happens at

20 that point?  You know, Paul, without even consulting Kathy,

21 says you've got to go.  You can't live at this house anymore

22 because you were -- you know, you're being a rebellious

23 teenager, a rebellious kids.  And not we're going to find you a

24 place to stay or we're going to find you maybe, you know, a

25 group home or a place with a relative.  No, here's a car,

1   here's no money, you're on your own.  And -- and we come -- we
2   come full circle, ladies and gentlemen of the jury.
3          You know, post-traumatic stress disorder, it's --
4   it's a disease that in the -- it's in the DSM-4, the -- the --
5   that everybody alluded to.  And Dr. Apolito and Dr. Kleinman
6   said you know, when you don't have personality disorders, and I
7   went through this with Dr. Simring, there's a part where they
8   talk about diagnoses of personality disorders that says that
9   you can't diagnose a personality disorder if the pattern is not
10  better accounted for as a manifestation or consequence of
11  another mental disorder.  Now Dr. Kleinman comes in here and
12  says, you know, I saw Jamie the first time and I saw her for a
13  long period of time.  And I really had -- really couldn't make
14  a diagnosis.  So I -- I called you, Mr. Weichsel, and I asked
15  you to get a social worker in there to talk to her because a
16  social worker can spend more time than I can because there's
17  some real, real nagging doubts that they have here and -- and
18  that I have.  And I don't want to give you a report, I don't
19  want to give you a diagnosis till -- till a social worker comes
20  in.  And Dr. Kleinman testifies about how the social worker
21  spent the time with Jamie and for the first time in her life
22  Jamie was able to open up and acknowledge a lot of the things
23  that happened to her in the past.  And she was able -- the
24  social worker was able, because this is what social workers do,
25  is they -- she goes to other family members and puts together

1  the pieces of Jamie Farthing like you put together a puzzle.

2  And there was -- Billie Feinberg, the social worker, was able

3  to -- to put together the pieces of the puzzle, the pieces of

4  Jamie Farthing that we've heard about there in the trial

5  through the testimony of the doctors and the testimony of her

6  family members.  And it was only after that and after real

7  careful consideration and after reviewing psychological testing

8  that he did, because one of the differences between a

9  psychologist and a psychiatrist is they're both doctors but the

10 psychologist is not a medical doctor, he's got a Ph.D., a

11 doctor in psychology, is that psychologists administer tests

12 and they interpret tests.  And he -- and he gave Jamie a number

13 of tests and one of them, the post-traumatic syndrome test that

14 he gave her, indicated that she suffered from post-traumatic

15 stress disorder.  And then Billie Feinberg picked up the pieces

16 and put it together.  And it was only after then when he said

17 you know, I don't want to -- you know, I want to go back and

18 interview her again.  So even after he got Billie Feinberg's

19 report he went back a second time to interview her.  And you

20 know, he comes in and he says you know, not only did -- do I

21 find that she suffers post-traumatic stress disorder but that

22 she -- she goes into these disassociative states.  And that in

23 all degree of psychological possibility she was in a

24 disassociative state at the time of the Polites and the Hippman

25 offenses.  And the post-traumatic stress disorder isn't because

1  she had a bad childhood.  It's because, as Dr. Apolito said,

2  there was so many things happening in her life that caused her

3  to suffer the post-traumatic stress disorder and that caused

4  her to disassociate that on a -- on a psychiatric or a

5  psychological level she really couldn't act with knowledge or

6  with purpose.  And that's really what you're going to have to

7  decide here.  And that's really what you're going to have to

8  wade through.

9         And the other thing is, let's -- you know, Dr.

10  Simring again found the same set of facts.  He didn't say you

11  know, Jamie Farthing's personal history and family history was

12  a lie.  He didn't -- he didn't say that all, you know, because

13  if that was the case he would have testified to that nd he

14  would have put it in his report.  He said I find the same set

15  of facts that Dr. Apolito does and Dr. Kleinman does and Billie

16  Feinberg does, but I'm just going to interpret it differently.

17  And I guess you know, reasonable people can interpret things

18  differently.  And obviously you're going to have to make your

19  own decision.  But you're going to have to make it in the

20  context of the fact that Jamie Farthing even today, even now is

21  presumed innocent. And the State has the burden of proving each

22  and every element of each and every offense to the satisfaction

23  of every one of you beyond a reasonable doubt.  And when you go

24  in the jury room, that umbrella, that presumption of innocence

25  permeates and is part of you until you reach an ultimate

Summation - Mr. Weichsel                                    30

1    verdict in this case.

2           You know, I -- I've gone on for a long time and --

3    and there are a lot more things that I could say to you.  And -

4    - and there are a lot more factors that I could go into, but

5    you're all heard the testimony of the witnesses and I'm certain

6    that you recollect the testimony probably better than I do.

7    And when you go into that jury room, and this is my last

8    opportunity to speak to you, and after I'm done Ms. Baglivi is

9    going to have her closing argument and then -- and she's going

10   to put on a show and tell show for you and prove the crimes all

11   over again it looks like and show you all the evidence.  But if

12   there are things that come to your mind regarding Jamie

13   Farthing and her role in -- in this or her lack of role in this

14   -- and it's something I haven't mentioned.  It's not because

15   it's not important, it's because there's so much here that's

16   happened to Jamie Farthing and happened in her life and -- and

17   you're all aware of it and you've all heard the testimony.  And

18   I just -- I just can't go over it anymore.

19          And in summation I'm just going to implore you to

20   look at everything very carefully and when you reach your

21   decision think about an 18 year old who's functioning like a 14

22   year old.  And think about the post-traumatic stress disorder

23   and think about the disassociation and think about how she was

24   lured into this and think about Ivy Demolena and think about

25   Jamie Farthing.  Thank you.

1          THE COURT:  Thank you, Mr. Weichsel.  Now, ladies and

2   gentlemen, it's 10:30.  I think you're ready to go into the

3   prosecutor's summation now which will be another hour I assume.

4   Why don't you take a break.  You can go down to the third

5   floor, get yourselves some coffee and come back in about ten

6   minutes and then we'll begin, all right?  Don't discuss the

7   case amongst yourselves.

8          (PAUSE - THE JURY LEAVES THE COURTROOM)

9          THE COURT OFFICER:  All quiet please until the judge

10  leaves the bench; remain seated.

11         THE COURT:  Ten minutes?

12         MS. BAGLIVI:  Judge, I wanted to put something on the

13  record?

14         THE COURT:  Close the door?  Yes?

15         MS. BAGLIVI:  Judge, I have an objection to something

16  Mr. Weichsel said during his summation when he was referring --

17  it was about the middle of his summation -- when he was talking

18  about Dr. Simring he said that Dr. Simring only interviewed

19  this defendant recently, I believe he -- I think he said it was

20  October and only wrote a report his past month, judge,

21  inferring that maybe Dr. Simring didn't do his job or didn't

22  take the time that was needed in this case. And, judge, that's

23  not -- the timeframe is true, but the inference that Mr.

24  Weichsel was giving was not true because what happened in this

25  case, for a year and a half after Mr. Weichsel indicated there

Colloquy

1   was gong to be a diminished capacity defense he was supposed to
2   submit a report. Judge Moses set down the time limits for
3   those reports to be submitted. Many, many time limits kept
4   going by and Mr. Weichsel said you know, it's not my fault,
5   judge which Judge Moses understood, it was the doctors. I had
6   on numerous occasion asked Judge Moses if Dr. Simring would be
7   allowed to start his examination and then obviously if he
8   didn't use the diminished capacity we would not be able
9   disseminate the report. And Judge Moses kept saying no, she
10  didn't want to do that. And finally in July of this past year
11  because the reports were so late in forthcoming from the
12  defense she allowed Dr. Simring to start at -- I believe it was
13  the end of July in fact she signed an order to that -- to that
14  point. So the inference he makes -- I don't want to get into
15  start arguing with the jury about what happened because there's
16  been no testimony to that, but the point is, is that I am just
17  asking you to tell this jury that you can't draw any
18  inferences, that there are legal reasons why certain doctors
19  can't do their examinations until certain points in time
20  because, judge, Dr. Simring was only following Judge Moses'
21  order and was not allowed to see this defendant until late
22  summer and that's what happened here. So there's -- there
23  should be no inference before this jury because it's really
24  incorrect.

25          MR. WEICHSEL: Judge, I think it was in the context

1   that I said this was in the context that even at this late date
2   Dr. Simring found that she was very immature.  And I don't
3   think I cast any aspersions or even intimated that -- that --
4   that he didn't do a competent job because he didn't see her
5   until the fall.  I -- I think it was really in context of that.
6   The other thing, judge, is I submitted Dr. Apolito's report in
7   -- in -- in June, judge, and you know, what can I say, judge?
8   I don't recall that -- that order.

9         THE COURT:  Was there an order signed --

10        MS. BAGLIVI:  Yes.

11        THE COURT:  -- by Judge Moses?

12        MS. BAGLIVI:  Yes, judge.  Then it should be in -- in
13   the court file?

14        MS. BAGLIVI:  Yes, it should be.

15        MR. WEICHSEL:  I wasn't even discussing that issue at
16   all, judge, at that point in my summation.  I was discussing
17   the immaturity problem.  And I wasn't trying to cast aspersions
18   on Dr.  Simring.

19        MS. BAGLIVI:  But that's the way I took it, that's
20   the way it came out, that --

21        MR. WEICHSEL:  I don't think it did.

22        MS. BAGLIVI:  -- you know, there was something wrong
23   and as I said, I think Mr. Weichsel can agree, I kept asking
24   Judge Moses if Dr. Simring could start and she wanted to hold
25   off.

1          THE COURT:  All right.  That's the way you took it.

2          MS. BAGLIVI:  No, I mean that was Judge Moses, that

3  she wouldn't --

4          THE COURT:  No, I'm saying that's the way you took

5  his remark?

6          MS. BAGLIVI:  Oh, yes.

7          THE COURT:  Yeah; I didn't.

8          MR. WEICHSEL:  I --

9          THE COURT:  I didn't.  I don't think he indicated to

10  this jury that Dr. Simring wasn't doing his job or it was

11  really as I saw it, it was within the context that his

12  interview with Ms. Farthing was -- was relatively recent which

13  would be -- he said September because the report is dated in

14  October.  And it was in that context that it's a recent

15  interview.  He comes to his -- he comes to his conclusions

16  based upon a recent interview and even those conclusions.  No

17  way did I get the impression that Mr. Weichsel was saying to

18  this jury that Simring didn't do his job.  And I don't really

19  find that it's necessary to bring that to your attention, no.

20  I -- that inference was not drawn by me.  It was drawn by you,

21  but I didn't -- he says he didn't.  I'm going to leave it that

22  way, I'm not going to make comment on it.  Okay?  Ten minutes.

23          MR. WEICHSEL:  Thanks, judge.

24          MS. BAGLIVI:  John, do you know where that coin went?

25                      (RECESS)

1    THE COURT:  We're ready to proceed, counsel.  Bring

2  up the jury please?

3            (PAUSE - JURY ENTERS THE COURTROOM)

4    THE COURT:  All right, you all ordered lunch?  All

5  right, what we're going to do is -- my plan now is when the

6  State finishes it's summation we're going to break for lunch,

7  you'll have a half hour break, and then I'll give you the

8  charge, all right?

9            Ms. Baglivi, if you're ready?

10           MS. BAGLIVI:  Thank you.

11           May it please the court, Mr. Weichsel, ladies and

12  gentlemen of the jury, as I told you in my opening and Mr.

13  Weichsel alluded to it in his summation, this case was about

14  the American Dream.  And made no doubts about it, that the

15  American Dream as it pertains to this defendant was to rob and

16  to kill so she could get money so she could live a good life.

17  This case is about greed, the greed of this defendant put her

18  in that chair today; not me, not the judge, nobody else.  It's

19  greed, pure and simple.  This is not about Jamie Farthing's

20  American Dream because she didn't have a stable home life.  The

21  one thing that is glaring and obvious here is that this

22  defendant participated fully in all of these crimes, that she

23  acted with purpose and knowledge.

24           Now Mr. Weichsel in his opening statement said that

25  this defendant went back to Georgia because she finally

Summation - Ms. Baglivi                              36

1    realized that she didn't like the company that she was keeping.
2    And, ladies and gentlemen, that is simply not true.  This
3    defendant liked the good life.  She liked the expensive hotels,
4    she liked going out to dinner and movies in New York City.  And
5    when the money ran out Jamie Farthing went home; that's as
6    clear as it can be.  That even comes from the defendant's own
7    statement.  "We had run out of all the money that we had stolen
8    because we stayed at expensive hotels and for food and
9    everything, I went back to Georgia."  No other reason why.  It
10   is not because she was under the spell and finally able to get
11   out from Ivy Demolena; because the money ran out she went home.
12   And the only thing we can glean from that, ladies and
13   gentlemen, is the old saying that crime doesn't pay.

14          Mr. Polites had that American Dream, Mr. Hippman had
15   that dream.  And what happened because of the actions of this
16   girl?  Mr. Hippman had to get up here and testify and he had to
17   sit here and tell you how he called a prostitution service.  Do
18   you think that was easy for him?  He had to live through that
19   nightmare again on the stand and he'll probably have to live
20   with it for the rest of his life.  That's not -- that was never
21   supposed to be part of his American Dream.

22          And how about Mr. Polites?  Mr. Polites was murdered
23   in his own home, murdered with his own neckties, murdered with
24   the own -- with his own electrical cord from his house.  His
25   life was ended.  He didn't even get to reach to be 40 years old

Summation - Ms. Baglivi                    37

1   today, left a shattered family.  His American Dream ended that

2   night because of this defendant and her cohorts.  Think of the

3   indignity this man suffered.  Look at the way he died.  He

4   wasn't shot, he wasn't stabbed, he was strangled with his own

5   neckties and hung with his own electrical cord.  His American

6   Dream is no more.

7          You have heard overwhelming evidence.  You've heard

8   from three confessions that this defendant gave to the police -

9   - three.  You heard from witnesses' testimony and I'm not going

10  to go through all of those witnesses, but you heard from the

11  witnesses at the Hippman house that night, the doorman, Mr.

12  Hippman himself.  You heard from the crime scene at the Polites

13  home, you heard it from Thomas Delgado, the man where they went

14  to pawn the jewelry, King Jewelers.  You heard from Magda

15  Rahey.  You heard all of that evidence.  You will also see

16  boxes of physical evidence.  You will see photographs of how

17  Mr. Polites died.  You will see exhibits.  You will see hotel

18  bills.  You will see all of that; overwhelming evidence

19  pointing to the guilt of this defendant.

20          And what do we hear from the defendant?  The abuse

21  excuse.  That's what it's called, ladies and gentlemen, make no

22  bones about it.  We have heard nothing but excuses,

23  justifications for this crime.  The abuse, the excuse that

24  doesn't appear until after this woman is charged with murder.

25  All of this all of a sudden starts surfacing.  Ladies and

1   gentlemen, I ask you, someone charged with murder, don't you

2   think they have a very good reason to lie?  This evidence of

3   rapes, this evidence of trauma, none of this comes out until

4   after she's charged with murder.  The diagnosis of post-

5   traumatic stress disorder -- not until she's charged with

6   murder.  All of this evidence -- the State have produced

7   overwhelming evidence and we come up with the abuse excuse.

8   She's not saying she wasn't there, she's not saying she didn't

9   do it, but she says because she was abused as a child you

10  should set her free and not find her guilty of any of these

11  charges.

12          Well, ladies and gentlemen, the judge will tell you,

13  and I'm not going to get into law with you, that's not my

14  place, but just keep in mind he's going to tell you that the

15  doctor's opinion is only as good as the evidence upon which

16  they base those opinions. And, ladies and gentlemen, you recall

17  how I crossed the doctors, on the facts.  And you heard me say

18  in my opening pay attention to the doctors, pay attention to

19  all of the witnesses of course.  But pay attention to the

20  facts.  The facts speak clearer than Dr. Apolito or Dr.

21  Kleinman could ever speak when they told you about this psycho

22  babble, and that's all it is, is psycho babble.  Their opinion

23  is based practically 99% on what this defendant told the

24  doctors and told the cops.  If you find what she told the

25  doctors or the police was incorrect then you have to reassess

Summation - Ms. Baglivi                    39

1   the opinions of the doctors' testimony.  And you heard Dr.

2   Apolito.  I said well assume this were true instead of that,

3   would that change your opinion?  Possibly.   I asked it again

4   on another fact; maybe.  Dr. Kleinman however, wouldn't give

5   you an inch.  He said nothing would change his opinion.  Well,

6   ladies and gentlemen, that's what you have to look at.  That

7   makes no sense.  He bases it on what he believes the facts to

8   be and if the facts are shown wrong he's not changing his

9   opinion?  At least Dr. Apolito said to you yes, that may change

10  my opinion.

11       Now I just went through the statements and the

12  doctors' reports and I just tagged a few areas.  And again,

13  it's your recollection that counts but remember all the

14  inconsistencies you heard.  And remember the most important

15  fact of all; Jamie Farthing is a liar.  How do I know that?

16  Not just through the statements, but what she told Lieutenant

17  Roger Kane when she got back to New Jersey.  Hey, Lieutenant,

18  can I speak to you?  No, no, no, we spoke to you in Georgia,

19  can't speak to you anymore.  But, Lieutenant, I lied to the

20  police, I know want to tell the truth.  She is an admitted liar.

21  She minimized her participation, she minimized her role in

22  these statements.  Why?  Because she's facing murder charges.

23  And what do you think she did when they doctors went to see

24  her?  She knew what they were there for.  She knew that Simring

25  was the State doctor and Apolito and Kleinman were the defense

1   doctors.  So do you think she told them the absolute truth?  Of

2   course not.  She shades things, she exaggerates things and she

3   out and out lied to them.

4           In her statement -- this is the oral statement, and

5   again, just a couple lies I'll point out.  She tells

6   Investigator Alver, "Farthing claimed that she agreed to go to

7   New York because she had never been to New York and thought --

8   thought it would be a nice vacation."  You know what?  Never

9   mentions once in here about the plan or robberies, not once.

10  It was going to be a vacation, lie number one.

11          Talking about what happened at Mr. Hippman's house --

12  and you heard from Mr. Hippman and do you really think he is

13  lying?  The man had to stand up here and tell you about this

14  escort service and to tell you that he called for this woman.

15  Do you think it was easy for him to do that number one?  And

16  number two, do you think it was easy for him to relive that

17  night again?  She says Demolena and Hippman went out onto the

18  balcony.  Well that's the first truth because that is what Mr.

19  Hippman said.   "Then James walked to the gold bag which was

20  left on the bar by Demolena and gave one of the guns to

21  Demolena."  Not true.  What is she doing here?  Trying to

22  minimize and distance herself.  "Demolena then gave the gun to

23  Farthing and told her to point it at -- told her to tell

24  Hippman that it was a stick-up.  Farthing took the gun, pointed

25  it at Hippman and told him to put his hands up and not move."

1   Again, that is not how it happened. Demolena is on the couch

2   with Hippman, James was wandering around, this defendant picks

3   up the first gun, points it, announces the holdup. Nobody

4   hands her a gun, nobody tells her to do it; she did it on her

5   own, another lie. She's asked, "Farthing was questioned about

6   the silk ties that I located in the bedroom and she stated that

7   she had purchased them at a flea market in Georgia." Again,

8   another lie.

9           Talking about Polites homicide. "Polites -- Demolena

10  threw down some neckties from the bedroom as well as a pillow

11  case from the bed." Untrue. In her statement she says it was

12  her. She says, "Demolena and James carried Polites upstairs."

13  Untrue. And you know what's really kind of unique -- unique

14  and different about the statement? She never mentions the

15  juvenile, Beninio Rosario. There is not one mention in either

16  of these recitations of these crimes that he was there. She

17  was trying to protect the juvenile so she doesn't mention him.

18          And then she goes on with the oral statement and

19  again, you know what else she doesn't tell them? She doesn't

20  tell them that she went home at one point in time to drop off

21  her loot and go back to New York; she fails to mention it.

22          Going through her transcribed statement the same

23  thing. Now of course she says yes, there was a plan. "During

24  July -- June and July did you have any conversations with them

25  before coming to New York?" "Yes. Whenever -- whenever I went

Summation - Ms. Baglivi                                    42

1  over to their house with some friends of mine and we went out

2  to the back shed and she told me like the whole plan." Totally

3  inconsistent with her oral statement where she says I just went

4  to New York for -- to see New York as a vacation.

5          Now however, in this statement she does mention that

6  Ben and Tato were there. She mentions Tato in the oral

7  statement, but now for the first time with this stenographic

8  statement she mentions the presence of Ben at the Hippman home

9  and at the Polites home. And she says, referring to Hippman,

10  "Who else was there?"  "Ben and Tato were waiting outside in

11  the car."

12          Then she goes in -- into the Hippman facts. Now she

13  says forget about going onto the balcony and then Demolena

14  putting the gun in her hand, she says, "He," meaning Mr.

15  Hippman, "started to get mad that Chris is there, he just

16  wanted him to leave. So she asked if me and her could go into

17  his room and talk for a minute, and he's like sure, go ahead."

18  Number one, that never happened. Mr. Hippman never says they

19  went in his bedroom, and number two, this is totally

20  inconsistent with her statement to Investigator Alver. What

21  does that tell you, ladies and gentlemen? It tells you that

22  when you're lying it is too easy to get tripped up because you

23  cant remember what you told somebody two days before. That old

24  saying, oh what a tangled web we weave and if at first we try

25  to deceive? That's what is happening to this defendant. She

Summation - Ms. Baglivi                    43

1  is lying so consistently and constantly she cant' remember what

2  she said.

3          Then she talks about, "Well did anything happen to

4  him," meaning Hippman, "at this point?" "I think Ivy kicked

5  him.  He made a noise and she was talking to him like, you

6  know, real harshly."  Was there any testimony to that?

7  Absolutely none.  Was there any test -- was there any mention

8  of that in the oral statement?  Obviously none.  Again, she is

9  trying to minimize her participation and heap all of the blame

10 on the other people.

11         And again, she talks about in the oral statement

12 going to the hotels after the crimes.  She says they went back

13 to Maria Rios', it goes on and on and on.  I've read both pages

14 and I'm not going to bore you because I'm sure you remember her

15 statement.  But there is just so much inconsistencies here.

16         That was just in the two oral statements.  Now don't

17 forget, I cross examined the doctors with the statements of the

18 co-defendants.  Now the judge is going to tell you, that's not

19 evidence.  You can't use it and say well then that was her

20 role.  But my point is that the doctors ignored -- they had

21 these other statements and they ignored it.  This defendant

22 tells the police that I was downstairs when Mr. Polites was

23 being killed upstairs.  Well I asked them did you consider the

24 statement of Thomas Christopher James that places this

25 defendant upstairs?  Would that have any bearing on your

44

1   opinion?  No, no, no, no, no.  They took everything that this

2   defendant said as the truth.  They didn't want to believe

3   anything else because it wouldn't fit with their diagnosis.

4   They ignored all of the evidence.  She lies to the doctors.

5   She says, referring to Mr. Hippman, "When they ran into some

6   difficulty with the victim she took Jamie into another room and

7   put a gun in her hand which the frightened youngster agreed to

8   handle. And only then she was told that it was not loaded.  Mr.

9   Hippman apparently read Jamie's frightened facial expression."

10  That didn't happen.  Mr. Hippman told you there was nothing

11  wrong with Jamie Farthing.  She pulled the gun, she announced

12  the stick-up and things proceeded from there.  There was no

13  forcing a gun in her hand.

14       Then she says, "Jamie was next told to tape the

15  victim's limbs, but she could not perform that simple task

16  either."  Where is there any evidence of that whatsoever?  The

17  testimony from Mr. Hippman and the statement that she gave to

18  the police says Thomas Christopher James began to tape her --

19  tape him up.  Nobody ever asked Jamie Farthing to do that, but

20  she's just trying to throw out these facts to make the doctors

21  believe that she couldn't act, she was so scared, she was so

22  frightened she couldn't do a simple task of tying somebody up

23  or wrapping somebody up with duct tape.

24       Another lie to this doctor -- this is talking about

25  the Polites homicide.  "Once they were in the victim's house

1   and the latter had been immobilized," meaning Mr. Polites,

2   "Jamie was directed to place a pillow case over his head which

3   she did.  She was then led on a robbery spree by Ms. Demolena."

4   Again, absolutely not true.  She says to the police I threw

5   down the pillow case.  And again, well you want to say well

6   this really gets her more involved.  Well my point to you is,

7   ladies and gentlemen, there are so many lies she can't remember

8   what she told them because all of this is one big lie.

9          She says, "Ms. Demolena only contacted Jamie,"

10  meaning Jamie Farthing, "after she was arrested to warn her

11  against any confession."  Again, a lie.  It was to warn her to

12  lay low; we got arrested, you better get out of the area, lay

13  low so you don't get caught.  And, ladies and gentlemen, she's

14  not going to say that because what does that tell you, that

15  statement right there?  This is a woman, Ivy Demolena, who

16  tried to exploit Jamie Farthing, who tried to use her and abuse

17  her?  Ivy Demolena is looking out for the welfare of this woman

18  and telling her we got caught, they're on their way, get out of

19  the area.  She's trying to protect her.

20         The other doctor again, full of lies.  I'll just

21  point out one or two.  Talking about Mr. Hippman, "He said she

22  was nice to Hippman, told him he wasn't going to get hurt, even

23  showing him that the gun didn't work."  Where is there any

24  evidence of that?  Not in the oral statements and not from Mr.

25  Hippman.  Again, an out and out lie trying to show you what a

Summation - Ms. Baglivi                              46

1  nice person she was when she committed these horrible crimes.

2          She says, "She did not learn," -- this is talking

3  about Mr. Polites -- "She did not learn that Mr. Polites had

4  been killed until they were leaving." Again, ladies and

5  gentlemen, an out and out lie because her own statement to the

6  police says I overheard them talking about killing him. I

7  overheard it when I was in the apartment before it happened.

8  But now she tells the doctors oh no, I didn't learn it until we

9  were ready to leave that house. Again, ladies and gentlemen,

10 an out and out lie.

11         You know what's very interesting in all of these

12 statements? There is no mention of excessive alcohol use and

13 there is no mention of drugs. Ladies and gentlemen, right at

14 the time she was interviewed by the police, right after these

15 things happened, a day after she gets arrested, two days after

16 she gets arrested -- she hasn't had time to think about the

17 defense. She hasn't had time to think about alcohol and drug

18 use as a defense, and they're not in the statement because they

19 didn't happen and because she hadn't thought of that good

20 excuse yet. Yes, there was some alcohol consumed at Mr.

21 Hippman's. There was a half a bottle of wine between two

22 people, that is it.

23         Mr. Mooney told you he was in a closed little area

24 down by the front door in that little lobby and he was on top

25 of all three of them. And he says I've seen people drunk

1  before.  The man's a doorman, there's probably people in and

2  out of that building all the time on the weekends, whatever,

3  slightly inebriated.  But Mr. Mooney tells you nothing was

4  wrong with the three of them, no unusual demeanor, no

5  characteristics of anyone being under the influence.  And he

6  also tells you on the way back down again, they even said good

7  night to him.  Nobody's stumbling, nobody's tripping, nobody's

8  acting wild or weird; there is no evidence.  Mr. Hippman says

9  the same thing; a half a bottle of wine was consumed.  The

10 police looked in the garbage, there were no empties.  They

11 looked in the refrigerator, there were no open bottles.  All

12 the other bottles were sealed.  The only bottle of alcohol was

13 a half a bottle.

14        Mr. Polites' house; there were two empty Budweiser

15 bottles in the garbage.  And you heard the medical examiner.

16 The medical examiner told you that there was some alcohol, a

17 very small amount in Mr. Polites' stomach, it hadn't even

18 reached his brain yet.  And he says that is consistent with one

19 or two beers.  What do we have left?  We have a bottle of Gold

20 Schlagher liqueur sitting on a counter and one glass somewhere

21 in the house, I don't really recall where the glass was found,

22 with some residue of this Gold Schlagher.  Ladies and

23 gentlemen, I -- I don't have any problem with that.  I would

24 assume that after three or four hours of ransacking somebody's

25 house you get a little thirsty.  But again, there is no

1    excessive use of alcohol.

2                The issue of drugs.  She does not say in these two

3    statements that she was high, that she was into acid and this

4    and that and LSD or whatever.  It's again an excuse that comes

5    much later in time.  You would expect that someone who is such

6    a heavy, heavy drug user as she claims to be, you'd find some

7    drugs, you'd find some paraphernalia.  They did a search on her

8    apart -- on her room in Georgia.  Did they find any drugs, even

9    a minute amount?  Did they find any paraphernalia --

10   paraphernalia, things to smoke drugs with or things -- a bong,

11   a pipe, a -- rolling papers?  There is not one iota of evidence

12   to suggest that she was on -- was high on drugs.  You heard

13   about the search of the luggage at Crossbay; nothing.  You

14   heard about the search of Maria Rios' apartment where she

15   stayed.  There is no evidence of drugs in this case.  It is

16   manufactured by this defendant to get out from underneath the

17   charges here.

18                Now, you have the testimony of the doctors, what do

19   they tell you?  Well Dr. Kleinman would have you believe that

20   anybody who's been abused as a child should escape

21   responsibility for crimes no matter how horrible they are.

22   Well thank God Dr. Apolito doesn't respond to that too, because

23   then we might as well just go down to the street and open the

24   jail of the Bergen County Jail and let people out, go down to

25   the state prisons and let people out.  That's not -- it's not a

Summation - Ms. Baglivi                           49

1    valid psychiatric theory.  I asked him, where do you get this

2    theory from?  What book, what can you show me that says this?

3    And he couldn't do that.

4              They say she had post-traumatic stress disorder and

5    because of that she couldn't act with purpose and knowledge.

6    Ladies and gentlemen, use the examples that those two doctors

7    gave you, you know, the Vietnam War veteran who's you know,

8    walking down the street and all of a sudden he hears the car

9    backfire and he gets startled and he turns around and starts

10   shooting or hitting people; post-traumatic stress disorder.  Or

11   the young lady who raped and then when men come near her she

12   shies away, she backs up.  It is a reaction that is not

13   planned, it is a startled reaction.  But do you really think

14   that that Vietnam Vet or that woman that had been raped cannot

15   go through life forming purpose and knowledge?  Absolutely not.

16   One has nothing to do with the other.

17             She tells the -- excuse me -- they tell you she has a

18   personality disorder and Dr. Simring agrees with that, she's

19   maladjusted.  Dr. Simring says what inmate in the Bergen County

20   Jail and the state prison system isn't maladjusted, because

21   yes, normal people don't go around committing crimes. And no

22   one -- no one is saying that she's not -- that she's perfectly

23   normal, she's maladjusted.  She had some tough times in her

24   life, well so have all of us.

25             Dr. Apolito, I asked him, and Dr. Kleinman too, well

1  let me ask you, you say couldn't form purpose and knowledge,

2  well when she went into Mr. Hippman's home did she know she was

3  pointing a gun at him?  Yes.   It wasn't a banana, I mean it

4  wasn't a pencil; she knew it was a gun.   Did she know that she

5  was going to steal things, commit a robbery?  Yes.   Did she

6  know the purpose to go there was to commit a crime and not to

7  go and see a movie or withdraw money from a bank?  She didn't

8  think it was a bank, she knew it was an apartment.   And think

9  of those words -- knew, knowledge.   Purpose or knowledge, the

10 purpose in going to the house.   She had a purpose, she had a

11 purpose in coming to New York, to commit crimes.   She was able

12 to form purpose and knowledge, there is no doubt about it.   At

13 Mr. Polites' house did she know that they were going there to

14 rob?   Yes.   Did she know that they were going there on the

15 ruse of getting together with Mr. Polites?  Yes.   Did she know

16 she was to steal things?   Yes.   She found money; she didn't

17 say oh, this money has no relevance and just toss it back onto

18 the bed.   She took it because she knew that that's what they

19 were there for.

20           These doctors make absolutely no sense.   It is a

21 desperate attempt to -- to grasp any psychiatric theory that

22 might fit.   They threw so much garbage out on this stand it's

23 like if you throw enough stuff up on the wall maybe something

24 will stick.   And that's what happened here.   They tell you that

25 this defendant was abused.   Where is the evidence of that

1   except out of the mouth of this defendant?  And I have just

2   shown you that she can't be trusted to tell the truth because

3   she has a real problem with telling the truth.  The only

4   evidence you heard of some kind of a difficult childhood was

5   from her family.  And you heard the stepmother and the father

6   and the brother testify.

7           Let's deal with the brother first, what did he tell

8   you?  Well he tells you about these two incidents when they got

9   kidnapped out to California, when Jamie Farthing saw her dog

10  get shot and when this Cousin Arthur took them out to the woods

11  and dropped them off.  And you sit here and you say to yourself

12  well that's pretty bad, it's pretty bad.  But then what a shock

13  when you find out from the father that Jamie Farthing was just

14  bearing three and a half years old when this happened.  Think

15  to yourselves, do you really remember back to when you were

16  three and a half years old?  Not many people do.  Maybe it was

17  upsetting at the time to her but she didn't understand what she

18  was feeling, she didn't understand what was going on, she was

19  three and a half.

20          The father tells you that yes, Loopey and I, the

21  defendant's natural mother, had a stormy relationship.   But

22  what does he tell you?  How old was Jamie Farthing?  He says

23  well I left California and I took the three children with me

24  and I went back to Georgia.  How old were they?  They were two

25  and a half -- well Jamie was two and a half years old.  So

Summation - Ms. Baglivi

52

1  anything she may have witnessed between Loopey and Paul, she

2  was less than two and a half years old.  The father said well I

3  don't know if they were there, they could have been in bed.

4  Well where is a two and a half year old or a two year old

5  normally when these fights are going on at night?   In bed

6  sleeping.

7          So you negate all of that and do you really think

8  that they had such a horrible childhood?   Jessie sat here and

9  told you about 18 different places that he lived in.   And I'm

10  not saying that he's out and out lying, you could understand a

11  brother trying to help his sister because she's facing a murder

12  charge.  So what does he do?  He exaggerates, he adds things.

13  Because when I finally add up all the years, by the time they

14  met Kathy my God, he was like 12 and that's not when it

15  happened.  They met Kathy when they were -- when the -- Jessie

16  was eight which would have made Jamie at six.  So finally at

17  age six she does have a stable influence.

18          Now do you really think that those parents were so

19  abusive?  Do you really believe any of that sexual abuse and

20  everything else you heard?  The only person you heard it from

21  is through a doctor who got it second hand through the

22  defendant who has a reason to lie, to make things up.  Maybe

23  they weren't the best parents in world but my God, which of us

24  really are perfect parents?  There's no such thing.  They tried

25  their best.  He loved his daughter.  He gave her a car, he

Summation - Ms. Baglivi                    53

1  built a beach out in the back when he built his new house, he

2  even put a little beach back there for his kids.  This man

3  tried his best and now she wants to blame those parents because

4  she turned out the way she turned out?  She's an adult.

5           Kathy said well I didn't -- it wasn't normal.  Well,

6  ladies and gentlemen, everybody has got their different

7  versions of normal.  Anyone that walked into my house when I

8  was growing up would have said oh my God.  We all talk a mile a

9  minute, you can see I still do that.  I mean normal is normal

10  for what is for you.  I mean it just -- there's no such thing

11  as a normal household.  Kathy Farthing says well she didn't

12  want to dress the way I wanted her to, she wanted to wear

13  makeup.  Jessie says we had a curfew, midnight.  My God, I wish

14  I had that curfew.  These are normal adolescent things.

15           The whole incident with the gun with Paul Farthing

16  and Loopey.  Number one, what bearing does it have on this

17  defendant?  She was not even present, she wasn't even there.

18  And second of all it just shows that the love that this man had

19  for his daughter that he went after his ex-wife to protect the

20  daughter.  So this is not such a horrible household.  It had

21  problems, yes it did, most houses do. She comes from a divorced

22  background, so what?    And Dr. Simring doesn't say that all of

23  this abuse is a lie, he doesn't say that, but he doesn't say

24  that it's true either.  He says for purposes of my evaluation

25  I'm going to assume it's true, but it has no bearing.  He is

1  not rendering a credibility on this abuse issue, that is for

2  you to decide.  He's just saying I don't need it to come to my

3  diagnosis.

4          What else did the doctors tell you?  The real cracker

5  here is minimal participation and only a few trinkets.  Again,

6  where did they get the minimal participation from?  Well they

7  get that from Jamie Farthing again because they refuse to

8  consider the statements of the co-defendants or any other

9  evidence presented; minimal participation.  Well I don't think

10 pulling out a gun on Robert Hippman and pointing it at him and

11 announcing a stick-up is minimal participation.

12          As I told you in the beginning of my opening, there

13 was a leader here and there were four followers.  She is a

14 follower just like the other three were, and Ivy Demolena

15 planned it.  Does that mean she is not responsible?  Of course

16 not.  The judge will talk to you about accomplice liability.

17 Well she didn't participate in the actual killing.  Well,

18 ladies and gentlemen, it only takes one person to wrap those

19 neckties around Mr. Polites' neck and pull with extreme force

20 for 30 seconds to three minutes.  It doesn't take five people

21 to do that, just like if they decided to shoot him it would

22 take five people to pull the trigger, just like if they were

23 going to stab him it wouldn't take five people to do that.

24 That's why the law recognizes accomplice liability.  It doesn't

25 say just because you are the shooter or the stabber or the

1  strangler you're the only one responsible.  No, it is the

2  people who aided and abetted you in different ways; you're also

3  guilty of the crime.

4          The doctors say well she got really nothing out of it

5  of value.  Well again, ladies and gentlemen, let me use the

6  example of a bank robber and let's get away from this for a

7  moment.  Assume you went into the bank, your purpose was to go

8  in there and rob it, you shot the guard dead, you grab the bank

9  bag and you run out.  You get home and you open up the bag and

10  its empty.  Does that mean you are not responsible for killing

11  that guard because you got no proceeds?  That's not the way the

12  law works here.  What did she get?  Okay, she got some ties,

13  she got the glass balls.  Ivy Demolena and Thomas Christopher

14  James got everything; they got the cash, they got everything.

15  Remember what was taken at the Crossbay in their luggage.  What

16  items of value did they get?  Anything of value taken from the

17  Polites or the Hippman crimes were hocked, were hocked to pay

18  the expensive hotel bills.  Now it doesn't matter who checked

19  in, the point is all five of them benefitted from those hotels.

20          Looking first at the first hotel, you can just put

21  them in chronological order yourself.  They were spending money

22  -- a room, $349, room tax $28, city tax, $20, New York

23  occupancy tax, $2; $349 without tax.  That's where the money

24  went.  Ivy Demolena and Thomas Christopher James, what did they

25  get?  They got a Jets jacket, they got a Mets jacket, they got

Summation - Ms. Baglivi                              56

1   a clock, they got nothing of real value because anything worth

2   any money, the jewelry, the Super Bowl ring was pawned at King

3   Jewelers or Modell's and they got cash.   And this defendant got

4   the benefit of that cash.   Her hotel rooms, her meals, shopping

5   sprees all paid for.   That's just the Marriott Financial Center

6   bill.

7            Then you've got the Ritz Carlton which is the next

8   night.   How much is that room, ladies and gentlemen?   That room

9   is $850 a night, not including $70 for tax, $42 for state tax,

10  $51 for city tax, $2 for room tax.   You've got pizza delivery,

11  $36, you've got pizza, $15, you got gift shops.   That is where

12  the money went. That is where all the good trinkets, the

13  expensive trinkets, the good jewelry went.   It was pawned to

14  pay for her high style of living which she enjoyed immensely.

15  And why do I say she enjoyed it immensely?   Ladies and

16  gentlemen, I'm just going to show you some pictures.   You're

17  going to have all of the pictures with you in the jury room,

18  but just take a look at these pictures.   You heard the

19  testimony that these hotels were identified, it was the various

20  hotels they stayed in.   Jamie Farthing on the left next to -- I

21  believe Investigator Kelaher told you that was Beninio Rosario

22  dressed in drag.   All dressed up on a night out on the town,

23  wouldn't you say?   Does it look like she's being held there

24  against her will, that she's being subject to psychological --

25  psychological prison?   She's decked out in makeup, dressed, and

1  she's smiling, ladies and gentlemen. And, ladies and

2  gentlemen, these pictures, these hotel stays are all after the

3  murder was committed. Here's another one, ladies and

4  gentlemen; she's posing in the room in one of those wigs with

5  that impish little grin on her face. Again, is she a

6  psychological prisoner? Is she there against her will? She's

7  having a grand old time. Again, there she is out on the street

8  corner smiling, happy. There she is posing in that wig with

9  Ivy Demolena again smiling, happy. They're posing with -- it

10 looks like some kind of a statue of a bird in the hotel room.

11 They're having a grand old time. Does she look like she's

12 under the spell of Ivy Demolena? Does she look like anybody's

13 holding her there against her will? Another picture of Jamie

14 Farthing enjoying the benefits of the motorcycle. And yes,

15 there was some testimony a motorcycle was put in Thomas

16 Christopher James' name. Well, ladies and gentlemen, how are

17 they going to register a motorcycle under five people's names?

18 But they all got the benefit of it. You heard from Thomas

19 Delgado when Jamie Farthing showed up at the jewelry store the

20 third time she came riding in on that motorcycle. Pictures

21 speak a thousand words, so much more than Dr. Apolito or Dr.

22 Kleinman could ever tell you.

23       More hotel bills. The Marriott Marquis, a different

24 Marriott. Again, we're talking about $194 hotel room with the

25 tax, with everything else, with movie rentals, with gift shops;

1   everything else.  And unfortunately these are not blown up but

2   again, you'll see the Marriott hotel bills again.  This room is

3   a little cheaper, it's only $149 a night and they stayed there

4   for quite some time.  And again, this defendant enjoyed the

5   benefits of this hotel.  And there was some testimony about the

6   Iroquois but there are no records.  You heard them, they were

7   there.  And then the Crossbay Motel.  And you know what's

8   really funny, ladies and gentlemen?  If you sit here and look

9   at all these bills you can see the progression as the money

10  runs out, as they start out with expensive hotels, $850, $350,

11  then they're down to $195, then they're down to $150; the

12  motels get cheaper because the money runs out.  And when the

13  money runs out she goes home.

14          Dr. Simring testifies.  His credentials I would

15  submit to you are pretty impressive.  The man runs the

16  curriculum at the University of Medicine -- Medicine and

17  Dentistry for the State of New Jersey, where Apolito once in a

18  while talks, lectures, teaches.  He has written books, Dr.

19  Simring.  He's written articles, a medical textbook for third

20  year medical students he told you.  He also told you, which is

21  something very interesting, he writes his reports as he sees

22  them, not based on who is paying him. When Mr. Weichsel asked

23  him some questions about who do you testify for more or less or

24  whatever, prosecution, state defense, he told you that he

25  writes the report for the prosecutions hire him, he examines

Summation - Ms. Baglivi                    59

1    the defendant, he writes the report.  And he told you, there
2    may be points in time when we may not like his opinion but
3    unfortunately that's the law and we're stuck with it.  He
4    doesn't write his reports based on who's paying him.  And the
5    same thing with the defense, and he told you this, that when
6    the defense hires him if they don't like his report and if it
7    doesn't jive with their theory of the case they can just push
8    it aside and go on and hire another doctor and another one and
9    another one.  So again, he doesn't write what the person hiring
10   him wants him to say.  He does what he thinks is right. And he
11   told you, she has a personality disorder.  He finds no evidence
12   of post-traumatic stress disorder.  And he says even if I
13   believe all of this abuse happened it does not affect my
14   opinion. This woman was not suffering from mental disease or a
15   defect and I'll quote right from his report which he read to
16   you.

17          "It is my opinion to a reasonable degree of medical
18   probability that Jamie Farthing does not suffer from a
19   psychotic mental illness.  She was in touch with reality at all
20   times during the commission of the alleged crimes.  Moreover,
21   she understood the nature and the quality of her actions, she
22   knew her acts were wrong.  She was capable at all times of
23   acting with purpose and knowledge."

24          It can't be any clearer than that.  And then he goes
25   on to point out in all the different ways he finds that the

1   letter -- that this defendant acted with purpose and knowledge.

2   And he says yes, she presents as an immature person, but I

3   believe it was Dr. Kleinman that I finally got him to admit

4   because one point he conceded, that immature people, people at

5   age 14 can and do commit crimes all the time.  That's why we

6   have a juvenile justice system.  Immaturity has nothing to do

7   with purpose or knowledge.  People that are 14 can purpose,

8   they can form knowledge.  Immaturity has nothing to do with it.

9   Simring says yes, she was immature.  And Kleinman even agrees

10  immature people can commit crimes.  So whether she was immature

11  or not, ladies and gentlemen, put that out of your minds.  But

12  all the doctors agree, immaturity has nothing to do with

13  purpose and knowledge.

14          Simring tells you she can act with purpose and

15  knowledge.  And where do we get that?  What is the evidence

16  here that backs it all up?  Well I'm not going to go through it

17  all again, but it is the facts, it is the testimony of Edward

18  Kummer, the testimony of Magda Rahey.  Just go through your

19  minds.  What -- what did Eddie Kummer say?  Now again, yes, the

20  State called him.  Do you think he was an easy witness?  You

21  saw the trouble that I had getting him to answer my questions;

22  he didn't want to be here.  This was his girlfriend, he didn't

23  want to be testifying against her, but he had no choice.  He had

24  given a statement a long time ago, he was stuck.  Now the same

25  thing with Magda Rahey.  Do you think she was an easy witness

1  to deal with?  You heard me -- 16 times I had to show her her

2  statement.  She wasn't going to tell me anything, but again,

3  she gave a statement and she stuck with it.

4           Eddie Kummer tells us, and he's the only one that

5  told us, that Jamie Farthing went back home to Georgia sometime

6  in early September to drop off her loot and went back.  We

7  would never have known that.  And why is that important, ladies

8  and gentlemen?  It is the crux of the whole case here.  If she

9  were under the spell of Ivy Demolena and was being held there

10  and she wanted to get out she had the perfect opportunity, she

11  went back down to Georgia.  Eddie Kummer tried to talk her out

12  of coming back, her mother Loopey tried to talk her out of

13  coming back.  All of these people tried, and what was her

14  response?  Nope, I've got to go back because I've got to get

15  more stuff.  That's what this case boils down to.  She makes

16  the -- a -- Ivy Demolena makes the first call to Kummer and

17  Kummer says I spoke to her and then I spoke to Jamie Farthing.

18  What does Jamie Farthing tell you during that first

19  conversation?  She's having a good time, she's staying in

20  expensive motels.  Well, ladies and gentlemen, remember when

21  they stayed in expensive motels -- after the crimes.  She has

22  already participated in a murder and she doesn't say Eddie, get

23  me out of here, I can't believe what these people did.  She

24  says I'm having a good time.  There was nothing wrong with her

25  thinking abilities.  So she participated in a murder, so she

1    participated in a robbery; she was staying at nice hotels and

2    enjoying the fruits of her labor and she didn't want to leave.

3              Kummer tells you that they do in fact -- he comes up

4    at one point in time.  They go on picnics, they go to movies,

5    they do all kinds of things and Thomas Christopher James is

6    picking up the tab.  And finally he realizes something is

7    bothering her.  I mean she is not a killer for hire with no

8    conscious.  She probably had a little inkling that you know,

9    maybe this wasn't the best thing to do and he notices that as

10   boyfriends, husbands or wives often do notice that in us

11   because they're the closest to us.  And he pushes her on it and

12   says what's -- what's going on here.  He saw all these things

13   in the room; the camcorders, the money, the guns.  He knew

14   there was something not right here.  And she tells him we were

15   acting as call girls and we went into rob people.  She says but

16   that's not the worst thing, the worst thing is Thomas

17   Christopher James killed someone.  Well Eddie is shocked, he

18   goes back to the hotel, he confronts them and they readily

19   admit it.  He asks this defendant why, as any one of us would

20   ask, why would you commit this crime of murder?  Why would you

21   commit these armed robberies, why?  What sense did it make?

22   And you know what her response was?  It was an easy way to get

23   things; greed.  Greed is behind all of her actions.  She says

24   it was an easy way to get things and I needed the money.  And

25   then, most importantly, she tries to justify and she says I

Summation - Ms. Baglivi                          63

1    didn't think it would go that far.  Ladies and gentlemen, the

2    key word here is think; purpose and knowledge -- I didn't think

3    it would go that far, which indicates to you, ladies and

4    gentlemen, that she knew what was going on when they committed

5    the robbery but she's trying to justify the murder -- I didn't

6    think they would kill them, which means her thinking, her

7    cognitive abilities were perfectly fine the night of the crime.

8    She was able to form purpose and knowledge.  He goes home, he

9    gets out of there.  He gets a phone call some time later from

10   Ivy Demolena who says we got caught, tell Jamie to lay low.

11   Kummer relates that message to Farthing and what is her first

12   reaction?  Maybe I'll go to Florida.  Ladies and gentlemen,

13   flight.  The judge will instruct you as to flight.  Why would

14   she run off to Florida?  Because she knew what she had done was

15   wrong.  She knew it was against the law to commit these crimes,

16   she knew she committed a robbery, she knew she committed a

17   kidnapping, she knew she committed a murder.  So she leaves.

18   If you believe the doctors, that she didn't know what was going

19   on, that she couldn't act with purpose and knowledge, why all

20   of a sudden when she finds out that Ivy Demolena and Thomas

21   Christopher James are arrested is her first thought of flight,

22   of leaving the area, getting out of there.  And in fact what

23   does she do?  Thank God the police are fast and thank God Alver

24   went right down to Georgia that day.  They set up the

25   surveillance -- I'm sorry, I'm getting a sore throat -- they

1    set up the surveillance and what do they see?  Her packing her

2    bags, throwing them into the pick-up and her mother and father

3    driving away with her to get her out of the area because they

4    knew the cops were coming and in fact they were there.  That

5    testimony I think, ladies and gentlemen, is most damning

6    against Jamie Farthing, the fact that she came back down to

7    Georgia.  She could have stayed.  Ivy Demolena was thousands of

8    miles away.  Thomas Christopher James, she was home, she could

9    have stayed.  But she chose to go back.  She made a conscious

10   decision in her mind to go back to New York to continue what

11   they were doing, to continue to live high off the hog, to enjoy

12   the fruits of her labor, to partake in the expensive hotels and

13   the shopping sprees.  And you heard Kummer -- when -- when she

14   gets back down to Georgia he says where did you get all those

15   things from?   Well we went on shopping sprees and Thomas

16   Christopher James gave me money so that I could shop. She liked

17   this life.

18          Again, all of the statements, even the statements

19   that she gave to the doctor point out that she could act with

20   purpose and knowledge.  And I -- again, I marked off -- this

21   doesn't say pork, this is my thing, purpose of knowledge, P or

22   K.  And I pointed out all the places where she talked about

23   purpose or knowledge, that she knew what was going on and that

24   she had a purpose to rob.  They had a list of people, she had a

25   list of people referring to Ivy Demolena that they were

1    definitely going to do. And then she had like people that we

2    were possibly doing.   Do you know how many there were in total?

3    I'm not really sure, but half of them we couldn't find the

4    number to or they never called her back or something.   She

5    knows full -- full well what was going on up in New York.

6            "When you came up here", meaning up to New York, "did

7    you bring any weapons with you?"  "Yes, Chris has brought his

8    grandmother's gun up here."  Again, she knew they were armed

9    with guns hitchhiking their way to New York to commit these

10   robberies.

11                          (PAUSE)

12           I'm talking about at Hippman's house again going

13   through who had the guns. They were in the gold bag, discussing

14   the fact that they went to this house armed with guns, showing

15   purpose and knowledge.

16           "He poured us both a glass of Pino Grigio, I think

17   that's what you call it, and then we started talking for a

18   while."

19           "Did he ask your name?"

20           "Yes."

21           "What name did you give him?"

22           "I told him my name was Alexis."

23           "And did you tell him where you were from?"

24           "I told him I was from Florida."

25           She went along with the plan to a tee; up from

1   Florida with my girlfriend.  And you know, the doctors say oh,

2   well she was given a new identify.  Ladies and gentlemen,

3   aliases, did you ever hear of that?  Give somebody an alias,

4   you don't want to use your real names?  Because no, they had no

5   intentions of killing Mr. Hippman, so they don't -- Mr. Hippman

6   only knew Ivy as Erica so they felt safe they wouldn't get

7   caught.  They don't use their real names.  That is not a new

8   identity, it is an alias used for that night.  But she went

9   along with it.  She had no problem following the instructions.

10   She says not to call each other by our real names.

11  She says that in her statement and again, she knew exactly why

12  not to, so that they wouldn't get caught.

13   "I assured him nothing was going to happen to him."

14   "Was he afraid?"

15   "Must have been, I mean I would have been."

16   Ladies and gentlemen, she knows full well she's

17  committing a robbery and she's telling you well if I were

18  Robert I'd be afraid.  So again, purpose and knowledge.  These

19  doctors told you that they couldn't -- she couldn't form

20  purpose and knowledge?  It's in here, it's in these statements.

21   "I put socks on my hands."  Why?  If she didn't know

22  what she was doing wrong would she put socks on her hands?  The

23  only reason she put socks on her hands is so she doesn't leave

24  finger prints.  And she does that at Mr. Hippman's house also.

25   "Did you take a lot of stuff from his house?"  Mr.

1  Hippman's.

2          "We had just one bag full, I'm not sure exactly what

3  was in it."

4          "Did anyone discuss what went wrong, what you could

5  have done better?"

6          "They said we need to cut down on the time."

7          Again, ladies and gentlemen, very important; we've

8  got to get in and out quick.  They spent three to four hours in

9  Mr. Hippman's house, too much time for things to go wrong.  So

10  she knew the significance of this, get in and out quick.

11          Talking about Mr. Polites -- "We called him at a bar

12  I think."

13          "You called him at a bar?"

14          "Yes."

15          "And you spoke to him?"

16          "Yes."

17          She went along with this plan, she spoke to him on

18  the phone.  Nobody was holding a gun to your head and she

19  obviously didn't blow it.  She didn't say Mr. Polites, don't go

20  to your apartment, you're going to be killed, you're going to

21  be robbed, you're going to be kidnapped.  She went along with

22  this plan.

23          "Did anyone have a gun with them that evening?"

24  referring to Mr. Polites.

25          "Yes, Ben had his gun with him and Chris had his gun

Summation - Ms. Baglivi

68

1   with him." And she knew they were guns, she didn't think their

2   bags were packed with bananas -- purpose and knowledge.

3           "We all started looking and he yelled to bring down

4   some ties. We all started looking." What was she looking for?

5   Things to steal, things to commit a robbery.

6           "We all went upstairs and we put socks on our hands."

7   Leave no finger prints.

8           "She," meaning Ivy, "said he would have a lot of

9   money in his house so we were pretty much looking for money and

10  jewelry."

11          She wasn't looking for vegetables in his refrigerator

12  or newspaper; she was looking for money and jewelry, purpose

13  and knowledge to commit a robbery.

14          Then she talks about when she went upstairs and saw

15  Mr. Polites hanging. "I just walked in, I saw blood on the

16  pillow case."

17          "And what did you think?" I'm sorry, "What did you

18  think?"

19          "I just thought they killed him."

20          "Did you ask what happened?"

21          "No, I went back downstairs," and then she continues

22  on in her statement that she packed up the things.

23          Ladies and gentlemen, don't you think if you had no

24  idea what was going on in that apartment that you might stand

25  there and say my God, what did you do to this man? I didn't

1  know we were going to -- we were being involved in murder.

2  Don't you think if you came across your friends and your

3  accomplices involved in this you wold have questioned them?

4  But that's not what she does at all.  Nope; no, I want back

5  downstairs and I continued packing up.

6            "Was there ever any talk about never speaking about

7  what had happened?"

8            "No, it was pretty much unspoken, we knew not to say

9  anything."  We knew not to say anything.  This is a woman who

10  couldn't act with purpose and knowledge, did not know what was

11  going on, yet she knew not to speak about it.  Why?  Because

12  she knew what she and the others had done was wrong and it was

13  unspoken.  Nobody had to say don't talk about it, we could get

14  in trouble, because she knew.

15            And, ladies and gentlemen, there's so many more of

16  those.  Just remember, recollect what the testimony was

17  regarding her statement, regarding both her oral and her

18  stenographic statement because it's all there.

19            Ladies and gentlemen, I think when you put all of

20  this evidence together there is only one conclusion that you

21  can come to; that this defendant acted with purpose and

22  knowledge.  She tell the doctors -- dealing with the Hippman

23  crimes first.  Armed robbery.  Well, ladies and gentlemen, she

24  had a gun.  Even if she didn't have the gun in her hands the

25  judge will talk to you about constructive possession.  The

1  other person had the gun in her hand, if she participated, if

2  she had the same mental state as the others she's guilty

3  whether or not she had the gun in her hand.  But we have heard

4  that she had the gun in her hand.  She is guilty; armed

5  robbery; in the course of committing a theft did use force upon

6  and was armed with a deadly weapon.

7          Theft?  No doubt about it.  Things that were taken?

8  Well maybe nothing of value but things were taken.

9          Used force?  Most definitely; he was tied up.

10          Armed with a deadly weapon?  Most definitely; Jamie

11  Farthing had one of the guns.

12          Kidnapping; we all think of kidnapping as taking

13  someone and removing them from another location.  Well the

14  judge will tell you that's one kind of kidnapping but there's

15  also another kind of kidnapping.  And that talks about unlawful

16  confinement.  Was he unlawfully confined?  Yes.  He wasn't just

17  left there sitting on his couch when they left.  They duct

18  taped him up to a chair and luckily for him, even though the

19  phone lines were cut and it was late at night, within 20

20  minutes he was able to get loose.  But she's guilty of

21  kidnapping by unlawful confinement of Mr. Hippman.

22          Possession of the weapons.  Again, ladies and

23  gentlemen, constructive possession.  She doesn't have to have

24  them in her hands, but they were present there at the scene and

25  she knew about them.

Summation - Ms. Baglivi                    71

1      There was no testimony of a permit, she had no permit
2  to carry.  They possessed those guns for unlawful purpose to
3  terrorize, to rob Mr. Hippman.
4      The Polites crimes.  Same crimes only there's an
5  added crime here of murder.  And again, the kidnapping with the
6  unlawful confinement, the weapons, the robbery.  Again, she
7  didn't have the gun.  There's no evidence here that she
8  actually possessed the gun at Mr. Polites' home that night
9  however, she knew that the guns were present.  She knew that
10 Junior and Thomas Christopher James had them; constructive
11 possession. She was in possession of those guns constructively.
12      Murder.  What makes the defendant guilty of murder?
13 The judge will tell you about accomplice liability.  And as I
14 said to you in my opening statement, I'm not alleging that she
15 was the one that pulled those ties.  I don't -- around Mr.
16 Polites's neck and used that extreme pressure for 30 seconds to
17 three minutes.  I don't think we'll ever know what really
18 happened up in that room.  But Mr. Polites was alive when they
19 got there and when the five of them left Mr. Polites was dead.
20 It was not a suicide the medical examiner told you, it was
21 murder. So only one of those five people, or two of those five
22 people, had actually committed the murder.  If she didn't
23 commit the murder is she responsible?  Most definitely yes.  If
24 she had the same mental state as the others, if she knew about
25 the plan ahead of time.  If the murder happened and she only

1  finds about it later then no, she's not guilty of murder.  But

2  why do I say she knew about the crime ahead of time?  There's

3  numerous factors for you to consider.  Number one, the phone

4  call from Magda Rahey -- from Ivy Demolena to Magda Rahey,

5  calling from a pay phone collect to Magda.  Magda is talking to

6  her sister on the phone.  She says -- Ivy Demolena says we've

7  got to stop off in Jersey to take care of someone.  And she

8  kept pushing and pushing and pushing, what do you mean take

9  care of someone?  And finally Ivy Demolena says we have to kill

10  someone, a guy by the name of Jamie.  So heading up from

11  Georgia while they're hitchhiking Ivy Demolena already knows

12  that the crime of murder is going to take place.  Well how does

13  that affect Jamie Farthing? Well remember also what Magda Rahey

14  told you, that Ivy Demolena told her that Jamie Farthing and

15  Thomas Christopher James were with her, they were all

16  travelling together, just the three of them alone, no other

17  people involved.  Magda Rahey also tells you that while she --

18  Ivy Demolena is telling her about the plan to kill this man

19  named Jamie in New Jersey she hears a male and a female in the

20  background and the female has a heavy southern accent.  Jamie

21  Farthing and Thomas Christopher James were present at Ivy

22  Demolena's elbow while she's making the call and talking about

23  the murder.

24        Another factor for you to consider; the defendant

25  tells you in her statements that she overheard in the house, in

Summation - Ms. Baglivi

73

1  Mr. Polites's house, the discussion about murder, that we have

2  to kill him.  This is before the murder ever takes place.  She

3  says it at least two or three times in her statement.  And,

4  ladies and gentlemen, what does she do to become an accomplice

5  to that?  Does she have a duty to stop them?  No, she does

6  not, but she continues on with her packing up.  She continues on

7  grabbing her things.  She says she's downstairs and everybody

8  else is upstairs. Well, ladies and gentlemen, there's a little

9  -- a little problem with that, and you -- you don't even have

10  to believe that statement that she was downstairs when she

11  overheard.  She'd like you to believe -- if you remember her

12  statement, when she says everyone is downstairs she's upstairs

13  and then coincidentally when everybody comes upstairs with Mr.

14  Polites she goes downstairs.  I suggest to you that that's

15  just minimization on her part.  She says she overheard them

16  talking about the murder.  Ladies and gentlemen, she wants you

17  to believe she's downstairs searching the kitchen or the living

18  room and she hears them up stairs in another bedroom talking

19  about murder?  She overheard them all right, but not because

20  she was downstairs, she was upstairs.

21        But what does she do to become an accomplice?  She

22  doesn't walk out the door.  She doesn't walk out of the

23  apartment, go up onto River Road, a major street, and try to

24  flag somebody down.  What does she do?  She doesn't stand there

25  and say I'm not doing anything anymore, I refuse to participate

Summation - Ms. Baglivi                     74

1  in this scheme.  No, she continues now, quickly I believe she
2  said, packing up the belongings in the bag because she knows
3  they're going to have to make a quick getaway.  She is aiding
4  and abetting the murders so they don't get caught.  She's
5  packing up all of the goodies that they stole.
6          And, ladies and gentlemen, there's one third factor,
7  the most important factor for you to consider when you
8  determine whether or not this defendant was an accomplice to
9  murder.  You remember in Mr. Hippman's case she told the police
10 that she took duct -- they took duct tape with them.  They
11 bought the duct tape in Georgia, they brought it to Mr.
12 Hippman's house.  And Mr. Hippman is tied up with duct tape.
13 Not neckties because, ladies and gentlemen, neckties are not
14 going to hold very long.  They used duct tape.  The purpose of
15 using duct tape is to hold Mr. Hippman, to keep him confined
16 for as long as possible so that they can make their getaway;
17 duct tape, not neckties.  Where was the duct tape at Mr.
18 Polites's house?  Ladies and gentlemen, it was there because
19 there was no reason to tie up Mr. Polites so they could make
20 their getaway.  Why?  Because going into the Polites home they
21 knew, all of them, that Mr. Polites was going to be killed.
22 There was no reason to bring duct tape.  They would use the
23 ties, they would hold for little while.  But Jamie Farthing
24 says there was duct tape at Hippman's.  There was no duct tape
25 at Polites', and you saw from the diagrams and the pictures

1    that there was no duct tape found, they don't bring it.  Jamie

2    Farthing knows it and she knows there's no reason for duct tape

3    because he doesn't have to be immobilized for any period of

4    time because when they leave that apartment Jamie Farthing

5    knows that James Polites will be dead.

6            These are all factors for you to consider.  Now,

7    ladies and gentlemen, Mr. Weichsel mentioned something about

8    felony murder also.  He read to you while it's an affirmative

9    defense if A, B, C and D -- ladies and gentlemen, he left out

10   the most important thing.  The judge is again going to tell you

11   what felony murder is and I'm not going to get into it with

12   you.  Basically -- and again, I'm paraphrasing -- you listen to

13   what the judge says about the law -- that if the person in the

14   course of committing a felony such as robbery, such as

15   kidnapping, if that person is committing a crime which, ladies

16   and gentlemen, I think there will be no doubt in your mind that

17   she was committing those crimes of robbery and kidnapping.  If

18   Mr. Polites died as a result of her committing these crimes she

19   is guilty of felony murder.  Now, Mr. Weichsel read to you

20   those affirmative defenses.  Well, ladies and gentlemen, what

21   he forgot to tell you, and the judge will tell you, is if the

22   State shows any one of those things she's not entitled to the

23   defense.  And he said well she was not armed with a deadly

24   weapon.  Well again, I would disagree with that, it was

25   constructive possession.  But let's give her that one for a

1   moment; did not commit the homicidal act.  Again, we don't know

2   who really committed it, but let's give her that one to.  Had

3   on reasonable ground to believe that any participant intended

4   to engage in conduct likely to result in death.  I totally

5   disagree with that but hey, let's give her that one too.  He

6   forgot to read you one of the most important ones.  Had no

7   reasonable ground to believe that any other participant was

8   armed with a weapon.  Ladies and gentlemen, from her own mouth

9   we know that she knew that there were two guns in the house.

10  This one -- and you only need one, as long as the State shows

11  you beyond a reasonable doubt that she knew there were guns in

12  the house she is not entitled to the affirmative defense.  And

13  he left that one out because, ladies and gentlemen, even he

14  knows that one's going to be a tough one to overcome.  I don't

15  have to disprove all four of their affirmative defenses, only

16  one.  I think the evidence shows at least three out of four are

17  going to be disproved, but forget it, it only takes one.  Did

18  she know that there were guns or deadly weapons?  Yes, yes,

19  yes.  She is then guilty of felony murder.

20          I am going to ask you to listen carefully to the

21  judges instructions.  I know you've been listening very

22  carefully all along to all the testimony.  Listen to what he

23  says but please, I am imploring you, begging you, don't look --

24  don't look past the facts.  No matter how much these doctors

25  want you to ignore the facts, the facts speak volumes. Think of

1  a reason why Jamie Farthing would exaggerate her history, lie

2  about her history and lie about the facts of this case.  It is

3  to escape responsibility for the crimes of murder, armed

4  robbery and kidnapping. And I am going to ask you, do not let

5  her escape responsibility.  Find her guilty of the charges

6  contained in the indictment.  Thank you.

7          THE COURT:  Thank you, Ms. Baglivi.  All right,

8  ladies and gentlemen, it's a quarter after twelve.  As I

9  indicated to you and I believe I've -- I've received word that

10 your lunch is downstairs.  You have a half hour lunch, you'll

11 come back, I'll charge you.  My charge will take about two

12 hours, so you prepare yourself for that, okay?  Do not discuss

13 the case now, you can go downstairs.  Don't leave the building.

14 You have your lunch here, you're coming back up.

15          (PAUSE - THE JURY LEAVES THE COURTROOM)

16          MR. WEICHSEL:  Judge, I -- I have a number of

17 objections to the prosecutor's summation.

18          THE COURT:  Yes?

19          MR. WEICHSEL:  One, the prosecutor -- and I'll go

20 through all of them.  The prosecutor stated when you hear from

21 the defendant the abuse excuse, well defendant didn't testify

22 and the defendant has no obligation to testify.  And I believe

23 --

24          THE COURT:  I'm sorry, say that -- she said what?

25          MR. WEICHSEL:  She said we hear from the defendant

1   the abuse excuse.  And the defendant -- you know, we didn't

2   hear from the defendant.  The defendant has no obligation to

3   testify.  In the same vein she said out of the mouth of this

4   defendant at another point.  Also she -- she indicated in

5   summation that items were pawned at Modell's.  I think the

6   testimony was that they -- they couldn't determine whether

7   anything was pawned at Modell's. And then another point the

8   prosecutor in talking about when she came back to New York

9   said, you know, to continue what they were doing.  I think

10  that's a clear inference that they were going to come to New

11  York and commit other crimes and there's been no evidence of

12  other crimes here. And lastly, the prosecutor said you know, in

13  terms of her duty at River Road -- duty in Edgewater is -- you

14  know, why didn't she go down and flag anyone down.  Well she

15  has no duty to do that, judge.

16              THE COURT:  Okay.  You want to respond?

17          MS. BAGLIVI:  Yes, judge.  Judge, the comments were -

18  - we hear from the defendant the abuse excuse, out of the mouth

19  of the defendant -- judge, that is what is testified to by the

20  doctors and I think I cleared that up later on when I said the

21  defendant told the doctors and the doctors are telling us.

22  That's what that was referring to, we hear the abuse excuse.

23  Where do we hear that from?  We hear it --

24              THE COURT:  All right.

25          MS. BAGLIVI:  Okay.

Colloquy

79

1    THE COURT:  As far as --

2    MS. BAGLIVI:  Judge --

3    THE COURT:  All right, let me respond to that.

4    MS. BAGLIVI:  Sure.

5    THE COURT:  As far as the hear -- the abuse excuse,

6    the jury knows that the defendant did not testify, I mean they

7    were here.  It -- that particular remark is said in the context

8    of part of the defendant's defense as the abuse excuse as

9    referred to by the -- by the prosecutor.  And from the mouth of

10   the defendant; certainly the defendant did not testify and I'm

11   sure the jury can interpret that remark as being the position

12   of the defense in its defense.  So I find that to be fair

13   comment in view of all the circumstances in this case.

14   THE COURT:  Go ahead.

15   MS. BAGLIVI:  The issue of the Modell's, judge, the

16   defendant's own third confession talks about pawning stuff --

17   she called it Models.

18   THE COURT:  I have no problem with that.

19   MS. BAGLIVI:  Okay, and the last one --

20   THE COURT:  Modell's, the remark on Modell's, let the

21   jury rely upon their own recollection as to what the testimony

22   was.  You're saying there was no testimony as to the -- any

23   pawning or -- they'll rely upon theirs'.  And there is mention

24   of Modell's and how it fits into the whole case is one which

25   the jury has to depend upon their own recollection.

Colloquy

80

1    MS. BAGLIVI:  And the last comment that she returned

2    to New York to continue what they're doing.  He takes that out

3    of context because the next words out of my mouth were living

4    the high life and living high on the hog, going back to the

5    hotels.

6    THE COURT:  I find that to be a fair comment given

7    the testimony.  And that's it?  Is that the --

8    MR. WEICHSEL:  And not flag anyone down, judge.

9    MS. BAGLIVI:  Oh.

10   THE COURT:  Oh, flag, yeah, I see that one.

11   MS. BAGLIVI:  The --

12   THE COURT:  That's again fair comment.  It's -- it's

13   -- the comment is taken in the context that when something was

14   happening at Jamie Polites' apartment, and the River Road would

15   be the main street that's in that area, as a comment that can

16   counteract the position taken by the defendant that when she

17   became aware that a death had taken place, that was an option

18   she could have taken, she chose not to.  All right?  It's a

19   fair comment again by the prosecutor.  I don't think the

20   prosecutor was saying that she had an obligation to go up

21   there.  She was saying the fact that she didn't do anything.

22   She may have -- so again, given the totality of the

23   circumstances I believe that all of the remarks that the

24   prosecutor at this time in her summation were all part of fair

25   comment given the evidence as it's been presented.

1    It is now 20 minutes after twelve, I will expect us

2    to be assembled her for -- at ten minutes to one for my charge,

3    all right?

4         MS. BAGLIVI:  Thank you.

5         MR. WEICHSEL:  Thank you, sir.

6              (RECESS)

7         THE COURT:  Ready to go, Mr. Weichsel?

8         MR. WEICHSEL:  Yes, I am, judge.

9         THE COURT:  Ms. Baglivi?

10        MS. BAGLIVI:  Yes, Your Honor.

11        THE COURT:  Bring up the jury please.  The spectators

12   know I'm going to lock the courtroom and you won't be able to

13   leave?  They told you that?  Okay.

14        MR. WEICHSEL:  They -- they know that, judge.

15           (PAUSE - THE JURY ENTERS THE COURTROOM)

16        THE COURT:  Good afternoon, ladies and gentlemen.

17        THE JURORS: Good afternoon.

18        THE COURT:  As I had mentioned to you, or I'll tell

19   you now, we're going to lock the courtroom doors.  This is one

20   of the few times that a courtroom is locked and it's during the

21   charge.  A sign is hung out there that -- not to disturb us

22   because the court is charging.  My officer hangs a sign out

23   there -- I don't know if he has it -- yeah, there it is.  And

24   the purpose for that is so that you're not distracted with

25   people coming and out of the courtroom during the court's

1    charge.

2                Now anybody who comes in the courtroom has to stay,

3    they can't get out, okay?  And anybody outside can't get in

4    once we start, all right?

5                Now, ladies and gentlemen of the jury, as you know

6    the evidence in this case has been presented, the attorneys

7    have completed their summations.  We now arrive at the time

8    when you, as jurors, are to perform your final function in this

9    case.

10                At the outset let me express my thanks and my

11    appreciation to you for your attention in this case. And I

12    understand, and believe me, we do appreciate the fact that it

13    entails some sacrifice on your part coming down here for the

14    last couple weeks.

15                I would like to commend counsels also for the

16    professional manner in which each have presented their

17    respective cases and for their courtesies to the court and to

18    the jury during the course of this trial.  I thank you,

19    counsels.

20                Now before we -- you retire to deliberate and reach

21    your verdict it is my obligation to instruct you as to the

22    principles of law applicable to this case.  Now you shall

23    consider my instructions in their entirety and not pick out any

24    particular instruction or overemphasize it.  You must accept

25    and apply this law for this case as I give it to you in this

1   charge.  Any ideas that you have of what the law if or what the

2   law should be or any statements by the attorneys as what the

3   law may be must be disregarded by you if they are in conflict

4   with my charge.

5            Now during the course of the trial I was required to

6   make certain rulings on admissibility of the evidence, either

7   in or outside of your presence.  These rulings involved

8   questions of law.  The comments of the attorneys on these

9   matters were not evidence and in ruling I have decided

10  questions of law. And whatever the rulings may have been in any

11  particular instance you should understand that it has -- it was

12  not an expression or an opinion by me on the merits of the

13  case.  Neither should any -- neither should my other rulings on

14  any other aspect of the trial be taken as favoring one side or

15  the other.  Each matter was decided on its own merits.

16           Now when I use the term evidence I mean the testimony

17  you have heard and seen from the witness box and the exhibits

18  that have been admitted into evidence.  Any testimony that I

19  may have had occasion to strike is not evidence and shall not

20  enter into your final deliberations, they must be disregarded

21  by you. This means that even though you may remember the

22  testimony you are not to use it in your deliberations or

23  discussions.  And further, if I gave a limiting instruction as

24  to how to use certain evidence that evidence must be considered

25  by you for that purpose only, you cannot use it for any other

1   purpose.  And I mention to you there has been references when

2   the experts were here, asking the experts, the doctors whether

3   they considered certain other co-defendants especially in their

4   -- in their consideration of these opinions, these questions

5   were asked.  That in no way this court was allowing you to hear

6   the testimony of say the co-defendants, they made statements,

7   for any other purpose but for the -- not for the truth of that

8   statement but that these -- these statements were given and

9   whether the expert considered those statements, not the truth

10  of the statement, okay?  And that's the limiting instruction in

11  that regard that I gave and I may have given you some others

12  too. So you're only to consider the testimony for those

13  purposes in which I intended for it to be presented to you.

14          Now as jurors it's your duty to weigh the evidence

15  calmly and without passion, without prejudice or without

16  sympathy.  Any inference or any influence caused by these

17  emotions has the potential to deprive both the State and the

18  defendant of what you promised them, that is a fair and

19  impartial trial by fair and impartial jurors.  Also,

20  speculation, conjecture and other forms of guessing play no

21  role in the  performance of your duty.

22          Again I remind you that the indictment, that the

23  defendant stands before you on an indictment returned by the

24  grand jury charging her with various crimes; robbery, -- I

25  guess it's' two counts of robbery, Mr. Hippman and Mr. Polites,

1   kidnapping of both Mr. Hippman and Mr. Polites, the murder of

2   Mr. Polites, the -- and also felony murder of Mr. Polites, the

3   felony is two counts and I'll get through that with you.   One,

4   his death was caused while there was a -- while a robbery was

5   being committed and his death was caused while a kidnapping was

6   committed.   Those are the two felonies, are kidnapping and

7   murder -- I'm sorry, kidnapping and robbery and the felony --

8   the death is caused while those felonies are being committed

9   and I'll get into that with you.   And of course the possessor

10  crimes are the charge with regard to the -- to the weapons, one

11  that the defendant is charged with possession, two counts or

12  two charges that she possessed a weapon with -- for unlawful

13  purposes and possessed a firearm, that's the firearm, without a

14  permit on two counts -- two counts of that.

15          All right, now that indictment again is not evidence

16  of the defendant's guilt on the charges.   An indictment is a

17  step in a procedure to bring the matter before the court and

18  the jury for the jury's ultimate determination as to whether

19  the defendant is guilty or not guilty of these charges.   Stated

20  in it, the defendant has pleaded not guilty to these charges.

21          Now again, I'll remind you now and I'll remind you

22  again as we go along; you are to consider each charge

23  separately, not just all in one.   You take each one of them

24  separately and you consider them.   And you apply the law to

25  them as I explain it to you.

1    Now the defendant on trial is presumed to be

2    innocent. And unless each and every essential element of an

3    offense charged is proved beyond a reasonable doubt the

4    defendant must be found not guilty of that charge.  The burden

5    of proving each element of a charge beyond a reasonable doubt

6    rests upon the State, and that burden never shifts to the

7    defendant.

8         The defendant in a criminal case has no obligation or

9    duty to prove her innocence or offer any proof relating to her

10   innocence.  Reasonable doubt is not a mere possible or

11   imaginary doubt because everything relating to human affairs is

12   open to some possible imaginary doubt.  Reasonable doubt is an

13   honest and reasonable uncertainty as to the guilt of the

14   defendant existing in your minds after you have given full and

15   impartial consideration to all of the evidence.  It may arise

16   from the evidence itself or it may arise from the lack of

17   evidence.

18        Now in my preliminary charges when we started the

19   case I explained to you that you are the judges of the facts.

20   And as judges of the facts you are to determine the credibility

21   of the various witnesses as well as the weight to be attached

22   to their -- to their testimony.  You and you alone are the sole

23   exclusive judges of the evidence, of the credibility of the

24   witnesses and the weight to be attached to the testimony of

25   each witness.  Regardless of what counsel said or I may have

1  said recalling the evidence in this case, it is your

2  recollection of the evidence that should guide you as judges of

3  the facts.  Arguments, statements, remarks, openings and

4  summations of counsel are not evidence and must not be treated

5  as evidence.  Although the attorneys may point out what they

6  think important in this case you must rely solely upon your

7  understanding and recollection of the evidence that was

8  admitted during the trial.  Whether or not the defendant has

9  been proven beyond a reasonable doubt is for you to determine

10  based on all the evidence presented during the trial.  Any

11  comments by counsel are not controlling.  Remember, it is your

12  sworn duty to arrive at a just conclusion after considering all

13  of the evidence which was presented during the course of the

14  trial.

15          Now the function of the court, that's me, is separate

16  and distinct from the function of the jury.  It's my

17  responsibility to determine all questions of law arising during

18  trial and to instruct the jury as to the law which applies in

19  this case.  Now you must accept the law as I give it to you and

20  apply it to the facts as you find them to be.  I have sustained

21  objections to some questions asked by counsel which may have

22  contained statements of certain facts.  Now the mere fact that

23  a -- an attorney asks a question and inserts facts or comments

24  or opinions in that question in no way proves the existence of

25  those facts.  Now you will only consider such facts which in

1   your judgment have been proven by the testimony of witnesses or

2   from exhibits admitted into evidence by the court.

3           Now the fact that I may have asked questions of a

4   witness in the case must not influence you in any way in your

5   deliberations. The fact that I asked such questions does not

6   indicate that I hold any opinion one way or the other as to the

7   testimony given by the witness.  Any remarks made by me to

8   counsel or by counsel to me or between counsels are not

9   evidence and should not affect or play any part in your

10  deliberations.

11          Now we'll talk about the evidence.  First of all I

12  remind you, evidence may be either direct or circumstantial.

13  We talked about this in my preliminary instructions and we'll

14  go over it again.

15          Direct evidence means evidence that directly proves a

16  fact without an inference and which in itself if true

17  conclusively establishes that fact.  On the other hand,

18  circumstantial evidence means evidence that proves a fact from

19  which an inference of the existence of another fact may be

20  drawn.  An inference is a deduction from fact that may

21  logically and reasonably be drawn from another fact or group of

22  facts established by the evidence.  Whether or not inferences

23  should be drawn is for you to decide using your own common

24  sense, your knowledge and every day experience.  Ask yourselves

25  is it probable, is it logical, reasonable.  It's not necessary

1   that all the facts be proven by direct evidence, they may be

2   proven by direct evidence, circumstantial evidence or a

3   combination of direct and circumstantial evidence.  All are

4   acceptable as means of proof.  In many cases circumstantial

5   evidence may be more certain, satisfying and persuasive than

6   direct evidence.   Remember the example I used about the snow?

7   That's the -- the classic example of circumstantial evidence

8   where you draw inferences from certain facts.  And direct

9   evidence is he sees the snow coming down.  So direct and

10  circumstantial evidence should be scrutinized however, and

11  evaluated carefully.  A verdict of guilty may be based on

12  direct evidence alone, circumstantial evidence alone or a

13  combination of direct evidence and circumstantial evidence

14  provided of course that it convinces you of the defendant's

15  guilt beyond a reasonable doubt.

16          Now the reverse is also true.  A defendant may be

17  found not guilty by reason of direct evidence or circumstantial

18  evidence or a combination of the two, or a lack of evidence if

19  it raises in your mind a reasonable doubt as to the defendant's

20  guilt.

21          Now the credibility of the witnesses, and there were

22  a list of witnesses; the investigating officers from the

23  Prosecutor's Office; there were people who testified from the -

24  - from the different banks that came in.  I can go through the

25  whole list.

1    John Acunto was the partner who discover the body;
2    Edith Makowski was one of the officer's from the Chase Bank
3    that testified; Karen Marie Hedley was the barmaid at the
4    saloon/bar in -- in Fort Lee; and of course the victim, one of
5    the alleged victims, Robert Hippman, Hackensack; Thomas Delgado
6    from the Bronx, I think he testified with regard to the King
7    Jewelry Store; Vincent Lupino -- I'm just going down the list,
8    this is -- doesn't necessarily mean the order they testified.
9    Vincent Lupino was the fellow who was on the opposite softball
10   team that came in and testified he was there when an alleged
11   phone call was made at the saloon/bar after the softball game
12   the night Mr. Polites was alleged to have died; a Leonard
13   Marshall, of course a friend of the deceased, former Giant
14   football player, you recall his testimony; William Mooney, he
15   was the doorman at the Hackensack apartment of Mr. Hippman;
16   Magda Molena Rahey, which is the half sister of Ivy Demolena --
17   Demolena; Donald Sposa, he's a -- I guess the partner of the
18   deceased in the saloon/hotel -- saloon/bar; Mr. Polites' mother
19   testified, Stella; numerous investigators from the Prosecutor's
20   Office, Trahey, Lieutenant Michael Trahey, a Senior
21   Investigator Carlos Rodriguez, Lieutenant Roger Kane, Senior
22   Investigator Frank Kelaher, Senior Investigator Terrance Alver,
23   a Lieutenant John Hines of the Hackensack Police Department,
24   Detective Sergeant Hugh Farley, he's retired from the
25   Hackensack Police Department, he came and testified, a Police

The Court's Charge to the Jury                    91

1  Officer Scott Spagnel who was the responding officer to the
2  initial call by Mr. Hippman's; the Bergen County Sheriff's
3  Department was a Corrections Officer Brian Shaw who came in and
4  testified with regard to -- I believe he testified as to Ms.
5  Farthing's request to talk or to see somebody in the
6  Prosecutor's Office, he was on guard duty when she was
7  incarcerated at Bergen County Jail; the Edgewater Police
8  Department, Sergeant Dominick Ray who arrived at the scene of
9  the -- the murder, of the murder scene; Suffolk County Police
10  Department, William Donahue; Detective Michael Duggan of the
11  New York City Police Department, the Robbery Squad, he came
12  over and testified; and there was Mr. Jason Farthing -- I'm
13  sorry, Jason Farthing didn't testify, Jessie Farthing
14  testified; Mr. Farthing -- I don't -- I guess it's Jason, is
15  that the father?

16          MR. WEICHSEL:  Paul, Your Honor.

17          THE COURT:  That's Paul.  I didn't have it marked
18  here.  It was Paul Farthing, the father of the defendant, her
19  brother Jessie and her stepmother Kathy testified on her
20  behalf. And then of course I'll go into the experts who
21  testified; Jonathan Kleinman, the psychologist; Dr. Apolito and
22  Dr. Simring.  There may have been a name or two I missed, I
23  left out here, but only because I neglected when he testified.
24  Dr. -- the medical examiner of course, Dr. Singh, and anybody
25  else whose name I may have left out here you will consider

The Court's Charge to the Jury                    92

1    also.  Oh see, there's Paul's name.

2             Now as judges of the facts you have to determine the

3    credibility of these witnesses.  And in determining whether a

4    witness is worthy of belief and therefore credible you may take

5    into consideration the following; the appearance and the

6    demeanor of the witness, the manner in which he or she may have

7    testified, the witness' interest in the outcome of the trial,

8    if any, his or her means of obtaining knowledge of the facts,

9    the witness' power of discernment, meaning their judgment,

10   understanding, his or her ability to reason, observe, recollect

11   or relate, the possible bias, if any, in favor of the side for

12   whom the witness testified.  You can consider the extent to

13   which, if at all, each witness is either corroborated or

14   contradicted, supported or discredited by other evidence,

15   whether the witness testified at -- with an intent to deceive

16   you, the reasonableness or unreasonableness of the testimony

17   that the witness has given, and any other matters in the

18   evidence which serve to support or discredit his or her

19   testimony.  And through this analysis as the judges of the

20   facts you weigh the testimony of each witness and then

21   determine the weight to -- to give it.  And through that

22   process you may accept all of it, a portion of it, or none of

23   it.

24             Now there is for your consideration in this case an

25   alleged oral statement made by the defendant.  It is your

The Court's Charge to the Jury                    93

1  function to determine whether or not such statement was

2  actually made by the defendant and if made whether such

3  statement or any portion of it is credible.  You are also to

4  determine whether it was voluntarily given, whether she freely

5  gave the statement and wasn't coerced, you determine that.  Now

6  in considering whether or not the statement was -- the

7  statement was actually made by the defendant and freely given

8  or whether it is credible you should receive high -- strike

9  that.

10         In considering whether or not the statement was

11  actually made by the defendant, and if made, whether it is

12  credible, you should receive, weigh and consider such evidence

13  with caution in view of the generally recognized risk of

14  misunderstanding, inaccuracies and error in communication and

15  recollection of verbal communication by the hearant.  Now this

16  statement we have is done by a -- I believe was referred to as

17  a -- a stenographic statement.  The specific words used and the

18  ability to remember them are important to the correct

19  understanding of any verbal communication because presence or

20  absence or change of a single word may substantially alter the

21  true meaning of even the shortest statement -- shortest

22  sentence.  So there's oral -- she gave an oral statement and

23  then she also gave a written statement.  So you are to consider

24  those factors in determining that in your evidence.  So receive

25  this -- you should receive therefore, weigh it and consider

1    such evidence with caution, especially an oral statement.

2              Now let's go into the elements of the charges

3    themselves.  You're also to consider the -- certain evidence,

4    and there's a list of items that run up into the 200's.  It

5    will all be available to you.  You can see anything you want.

6    I'm going to permit to go into the jury room any photographs --

7    well I'm permitting anything you want, I'm just talking about

8    the bulk, all those items.  My officers will be available to

9    bring it -- we can pile it all in there with you.  The charts,

10   photographs and all will be readily available to you.  All the

11   boxes of other items I'm going to leave outside the jury room

12   in the hallway.  If you want to see anything just ask for it,

13   all right?  You've seen what has gone in.  The photographs I

14   said you will be able to -- it's not as cumbersome as some of

15   the testimony you have.

16             Now let's go back now to the charges themselves.  I'm

17   going to explain to you each charge and each count.  And we're

18   going to go through it as it's set forth in the verdict sheet.

19   And I'm going to ask my officer to hand out the verdict sheets.

20   Now this verdict sheet that I have here is one that you will

21   have in the jury room with you; you will only have one.  The

22   purpose of my handing these -- don't open them up now and go

23   through them, just leave them on your lap for the moment.  But

24   the reason I'm handing out the verdict sheets at this time is

25   so that you can follow my instructions.  And you can -- and

1  we'll go through them as they are set forth in the verdict

2  sheet.  When I finish this I'm going to collect all those

3  verdict sheets back again, I don't want them floating around.

4  And then when you go into your jury room to deliberate one

5  verdict sheet will go in because that will be the official one

6  that you use.  All right?  All right, does everybody have it?

7  All right, now don't read it.  Put it down.  Put it down and

8  don't read the paper, in fact turn them over so you're not

9  tempted to read them, we'll get to them in a moment.

10          Now if you recall the first charge in the indictment

11  -- let me get the indictment out -- charges that Jamie Farthing

12  on August 4, 1994 -- Ivy Demolena and Thomas Christopher James

13  and -- they're also charged in this count too, but they're not

14  for your consideration here.  You are only to consider Jamie

15  Farthing.  On August 4 in Hackensack and within the

16  jurisdiction of this court did unlawfully confine Robert

17  Hippman for the substan -- for a substantial period with the

18  purpose to facilitate the commission of a crime or flight

19  thereafter and did fail to release the said Robert Hippman

20  unharmed and/or in a safe place prior to apprehension.  That's

21  contrary to the statute.  That's count number -- that's the

22  first charge.  Now if you turn over your verdict sheet you'll

23  see the first charge.  And that's the question, "How do you

24  find as to the charge that Jamie Farthing on August 4 did

25  kidnap Robert Hippman?" and that's the charge, all right?

1          Now if you would turn to charge number eight, which

2     will be the second -- the third -- three pages from the end.

3     Now that's the kidnapping charge of James Polites.  Now let me

4     just get that here in the indictment.  All right, the charge is

5     that on August 5 in the Borough of Edgewater, Jamie Farthing is

6     charged with she did engage in the commission of the crime of

7     kidnapping during which she or another caused the death --

8     sorry, it's -- it's the wrong one.  August 5, 1994 in the

9     Borough of Edgewater she's charged with did unlawfully confine

10    James Polites or Polites for the -- a substantial period of --

11    with the purpose to facilitate the commission of a crime or

12    flight thereafter -- thereafter, and inflict bodily injury on

13    James Polites and did fail to release the said James Polites

14    unharmed and in a safe place prior to her apprehension.  Okay?

15    So those are two counts of kidnapping.

16         Now I'm going to charge you as to the law with

17    kidnapping.  It's applicable to charge one and charge eight.

18    All right?  Now you can stay with page one.  All right, and

19    this -- the law I'm going to give you now is applicable to

20    charge one and also charge number eight which is at the pages

21    back there.  Now the -- the defendant as I said is charged with

22    the crime of kidnapping.  And I just read you the indictment

23    pertinent to count -- charge one in count -- and charge eight.

24    Here's the law.

25         "A person is guilty of kidnapping if he unlawfully

1 removes another from the place where he is found, or if he

2 unlawfully removes another from his place of residence or

3 business, or a substantial distance for the vicinity where he

4 is found, or if he is unlaw -- if he is unlawfully confined,

5 confines another -- if he unlawfully confines another for a

6 substantial period with any of the following purposes."

7        So for our purposes in this case is, "A person is

8 guilty of kidnapping if he unlawfully confines another for a

9 substantial period with -- with the following purpose." Any --

10 any of the following purposes.  "1) To facilitate the

11 commission of a crime or flight thereafter, or inflict bodily

12 injury on or to terrorize the victim or another." All right?

13 That's the definition of kidnapping.   "A person is guilty of

14 kidnapping if he unlawfully confines another for a substantial

15 period of time to facilitate the commission of any crime or

16 flight thereafter or to facili -- or to inflict bodily injury

17 on or to terrorize the victim or another." All right?

18        In order for you to find the defendant guilty of

19 kidnapping the State is required to prove each of the following

20 elements beyond a reasonable doubt.  1) That the defendant,

21 Jamie Farthing, unlawfully confined, in this case Jamie Polites

22 and/or Robert Hippman, depending on which count -- which charge

23 you're dealing it -- dealing with -- for a substantial period;

24 2) that the confinement was for the purpose to facilitate the

25 commission of any crime or flight thereafter.  All right,

1    that's what the State must prove beyond a reasonable doubt.

2            Now in relation to the first element you will note

3    that I have used the term "unlawful confinement".   A

4    confinement is unlawful if it is accomplished by force, threat

5    or deception.   Unlawful confinement must be for a substantial

6    period however, for this purpose a substantial period is not

7    measured in seconds, in minutes or hours, nor by any other

8    standard based strictly on the passage of time, rather a

9    substantial period is one that is significant in that it is

10   more than incidental to the underlying crime and substantially

11   increases the risk of harm to the victim.   That increases

12   victim -- that increased risk of harm must not be trivial.   If

13   the victim is confined for only a slight period of time and

14   such confinement does not create the isolation and increased

15   risk of harm that are at the heart of the kidnapping statute

16   then you should not convict the defendant of the kidnapping

17   charge.

18           All right, therefore in determining whether the

19   confinement is substantial you may consider 1) the duration of

20   the confinement, 2) whether the confinement occurred during the

21   commission of a separate offense, 3) whether the confinement

22   which occurred is inherent in the separate offense, and 4)

23   whether the confinement created a substantial danger to the

24   victim independent of that posed by the separate offense.

25           Now the second element that the State is required to

1    prove is that the confinement was with the purpose to

2    facilitate the commission of any crime or flight thereafter.   I

3    have told you that to constitute kidnapping an unlawful removal

4    or confinement must have been with a specific purpose.

5    Therefore I must define purpose for you.   Now you're going to

6    hear this word purpose in -- in most of the charge, we'll go

7    back and forth over it.

8              Now, a person acts purposely with respect to the

9    nature of his conduct or the result thereof or the result of

10   his conduct if it is his conscious object to engage in conduct

11   of that nature and to cause such a result.   That is, if a

12   person means to do what he does or she does, or to cause such a

13   result.

14             A person acts purposely with respect to the attendant

15   circumstances if the person is aware of the existence of such

16   circumstances or believes or hopes that they exist.   Now with

17   purpose or with design, or with design are -- are equivocal

18   terms, they have the same meaning.

19             The nature of the purpose with which the defendant

20   acted toward the victim is a question of fact for the jury to

21   decide.   Purpose is a condition of the mind which cannot be

22   seen and can only be determined by inference drawn from the

23   defendant's conduct; from defendant's conduct, from defendant's

24   words or acts as they have been presented in the evidence that

25   you have heard and seen in this case.   It is not necessary that

1    the State produce a witness or witnesses to testify or the

2    defendant -- that the defendant stated for example that her

3    purpose or his purpose in confining Jamie Polites or -- and/or

4    Robert Hippman was to facilitate the commission of any crime or

5    flight thereof. That is, an aid -- aid in committing the crime

6    or fleeing after -- or -- or fleeing afterward.  It is within

7    the power of the jury to find that the proof of purpose has

8    been furnished beyond a reasonable doubt by inferences which

9    you may draw from the nature of the acts and the circumstances

10   surrounding the conduct under investigation as they have been

11   presented in evidence to you -- in the evidence you have heard

12   and seen in this case.

13           Now a section of our statute -- and this is where we

14   get back to the verdict sheet.  The verdict sheet now says if

15   find him guilty of kidnapping -- you see that next question

16   there?  If you find the defendant guilty -- if you find the

17   defendant Jamie Farthing guilty of kidnapping you must then

18   answer question 1-A and question 1-B, both.  The question is,

19   "Did Jamie Farthing release the victim," that's Robert Hippman,

20   "unharmed prior to her apprehension?"  You just answer yes or

21   no.  And "Did Jamie Farthing release," then 1-B is, "Did Jamie

22   Farthing release the victim Robert Hippman in a safe place

23   prior to her apprehension?"  All right?  You'll answer that yes

24   or no.  And that's the same question is also asked with regard

25   to count eight or charge number eight which -- which applies to

1  Jamie Polites.

2          So let me go -- now let me explain to you what that

3  means.  A section of our statute provides that kidnapping is a

4  crime of the first degree except that it is a crime of the

5  second degree if the -- if the kidnapper releases the victim

6  unharmed and in a safe place prior to apprehension.  Now in

7  this case the State alleges the defendant did not release the

8  victim unharmed and in a safe place prior to her apprehension.

9  Now the burden of proof is on the State to prove beyond a

10 reasonable doubt that the victim was either harmed or not

11 released in a safe place prior to the defendant's apprehension.

12 Unless you find that the State has carried this burden you must

13 find the defendant not guilty of kidnapping in the first

14 degree.  Now that will take care of itself by answering those

15 questions.  You understand?  Therefore if you find the State

16 has not proven to you beyond a reasonable doubt each and every

17 element of the crime of kidnapping as I have defined that crime

18 to you then you must find the defendant not guilty.  If you

19 find her not guilty of kidnapping, question number one, don't

20 even consider question number 1-A and 1-B, you don't have to.

21 But you have to do 1-C and I'll get to that in a minute.  If

22 you find that the State has proved to you beyond a reasonable

23 doubt that the defendant committed the crime of kidnapping,

24 that is question one, as I have defined that crime to you, but

25 the State has not convinced you beyond a reasonable doubt that

1   the victim was either harmed or not released in a safe place

2   prior to the defendant's apprehension then you must find the

3   defendant not guilty of kidnapping in the second degree.  And

4   if you answer the question no there that will take care of

5   that.  Now if you find beyond a reasonable doubt that the

6   defendant committed the crime of kidnapping and that he harmed

7   the victim -- or he or she harmed the victim or did not release

8   the victim in a safe place prior to the defendant's

9   apprehension then you must find the defendant guilty of

10   kidnapping in the first degree.

11         Now if you find the defendant is not guilty of

12   kidnapping, that is not guilty of question number one or

13   question number -- I guess it's eight, is it?  I don't think I

14   have that here, let me see.  Or question number eight.  If you

15   find her not guilty of question number eight or question number

16   one then you can -- you are to consider what we refer to as a

17   lesser included offense, and in this case it's called criminal

18   restraint.  The lesser included charge in the kidnapping is

19   criminal restraint.  The statute reads that, "A person is

20   guilty of criminal restraint if he knowingly restrains another

21   person unlawfully in circumstances exposing the other person to

22   risk of serious bodily injury."  In order for you to find the

23   defendant Jamie Farthing guilty of this offense the State has

24   to prove the essential elements of this offense to you beyond a

25   reasonable doubt.  And these elements are first of all that the

1  defendant Jamie Farthing knowingly restrained Jamie Polites

2  and/or Robert Hippman, and 2) that the restraining was known by

3  the defendant to be unlawful, and 3) that the restraint was

4  under such circumstances which exposed Jamie Polites and/or

5  Robert Hippman to serious bodily injury.

6      Now I've used the term restraint -- the terms

7  restraint, knowingly, lawfully and serious bodily injury.  Let

8  me explain those words.  The words restraint means confinement

9  or limitation or abridgement.  Restraint involved hinderance,

10  confinement or restriction of liberty.  If a person acts

11  knowingly with respect to the nature of his conduct or the

12  intendant circumstances, if he is aware that his or her conduct

13  is of that nature and that such circumstances exist or is aware

14  of high probability of their existence.  A person acts

15  knowingly with respect to the result of the con -- his or her

16  conduct if he or she is aware that it is practically certain

17  that his or her conduct would cause such a result.  Knowing,

18  with knowledge are equivalent terms, they have the same

19  meaning.

20      Now I have used the term unlawful.  Unlawful means to

21  accomplish the restraint by -- by force, threat or deception.

22      The term serious bodily injury means bodily injury,

23  injury which creates a substantial risk of death or which

24  causes serious permanent disfigurement or protracted loss or

25  impairment of the functions of any body member or organ.

The Court's Charge to the Jury                    104

1    Now if after consideration of all of the evidence you
2    are convinced beyond a reasonable doubt that the defendant did
3    knowingly, unlawfully restrain Jamie Polites and/or Robert
4    Hippman and that such restraint exposed Mr. Polites and Mr.
5    Hippman to risk of serious bodily injury then your verdict
6    should be guilty. If however, after considering all of the
7    evidence you find that the State has failed to prove each of --
8    each and every element of the offense charged beyond a
9    reasonable doubt then your verdict must be not guilty. All
10   right?

11       Now that's the law with regard to kidnapping.
12   Remember, you have to consider kidnapping itself.  If you find
13   the defendant is not guilty of kidnapping then you go and
14   consider criminal restraint.  If you find him guilty of
15   kidnapping you don't have to consider criminal restraint
16   because that's a lesser included offense.  If you find him
17   guilty of kidnapping then consider the two questions which are
18   did he release the victim unharmed prior to her apprehension --
19   or did she or -- or he release the victim unharmed prior to
20   apprehension. And the other question is was he released in a
21   safe place prior to the apprehension, all right?

22       All right, turn to page two now.  Charge number two
23   is robbery.  And it's also, you'll find it -- charge number
24   nine, go back to the back.  That's the -- charge number two is
25   the robbery of Robert Hippman and charge number nine is the

1    robbery of James Polites, both charges.  All right?  That's the

2    next to last page of the verdict sheet.  I should have had the

3    verdict pages numbered, it would have been easier to work with,

4    but.  Charge number nine is the next to last. Do you see those

5    two?

6         All right, now let's talk about robbery, what the law

7    is there.  First of all we'll look at the indictment.  He is

8    charged with the crime of robbery and the indictment reads as

9    follows.  This is charge number two.

10        "Jamie Farthing," again, Ivy Demolena and Thomas

11   James are mentioned in these -- in this count, but that's not

12   your concern.  "Jamie Farthing on or about August 4, 1994 in

13   Hackensack in the course of committing a theft did use force

14   upon Robert Hippman while armed with a deadly weapon."  That's

15   contrary to the law.  That's the robbery charge.

16        Also, number -- number nine, charge number nine is

17   that, "Jamie Farthing on or about August 5 in Edgewater in the

18   course of committing a theft did use force upon James Polites

19   and/or commit the crime of murder upon James Polites while

20   armed with a deadly weapon."

21        All right, let me give you the law with regard to

22   robbery.  I'll give you the statute of what the law is.

23        "A person is guilty of robbery if in the course of

24   committing a theft he or she knowingly inflicts bodily injury

25   or uses force upon another, or in the course of committing a

1   theft he or she threatens another with or purposely puts him or

2   her in fear of immediate bodily injury." That's robbery.

3          Now in order for you find the defendant guilty of

4   robbery the State is required to prove each of the following

5   elements beyond a reasonable doubt. First, that the defendant

6   was in the course of committing a theft. I'll explain theft to

7   you in a moment. Secondly the State must prove beyond a

8   reasonable doubt is that while in the course of committing that

9   theft the defendant knowingly inflicted bodily injury or used

10  force upon another, or while in the course of committing the

11  theft the defendant threatened another with or purposely put

12  him in fear of immediate bodily injury; either one of those,

13  that's the second element.

14         Now as -- as I have said, the State must prove beyond

15  a reasonable doubt that the defendant was in the course of

16  committing a theft. Now in this connection you are advised

17  that an act is considered to be, quote, "In the course of

18  committing a theft if it occurs in an attempt to commit the

19  theft during the commission of the theft itself or in the

20  immediate flight after the attempt or commission." And theft

21  is defined as the unlawful taking or exercise of unlawful

22  control over property of another with the purpose to deprive

23  him thereof. I've used the word again, with purpose, and you

24  may hear me use that phrase or the word purposely again. I

25  shall now explain what it means.

1    A person acts purposely with respect to the nature of
2  his conduct or the result thereof if it is his or her conscious
3  object to engage in conduct of that nature or to cause such a
4  result.  So in addition to proving beyond a reasonable doubt
5  that the defendant was in the course of committing a theft the
6  State must also prove beyond a reasonable doubt that while in
7  the course of committing a theft that the defendant acted
8  knowingly.  The defendant knowingly inflicted bodily injury or
9  used force upon another.  Now a person acts knowingly with
10  respect to the result of his or her conduct if he or she is
11  aware that it is practically certain that his or her conduct
12  will cause such a result. A person acts knowingly with respect
13  to the nature of his or her conduct if it is -- if she's aware
14  that her conduct is of that nature.  And then the phrase bodily
15  injury means physical pain, illness or any impairment of
16  physical condition.  Force means an amount of physical power or
17  strength used against a victim and not simply against the
18  victim's property.  The force may not entail pain or bodily
19  harm and need not leave any mark, nevertheless force must be
20  greater than that necessary merely to snatch the object from
21  the victim's grasp or the victim's person. And the force must
22  be directed against the victim, not merely the victim's
23  property, or the victim threatened another with or purposely
24  put him in fear of immediate bodily injury.  The phrase bodily
25  injury means physical pain, illness or any other impairment of

1   physical condition.  As I mentioned, although no bodily injury

2   may have resulted the prosecution must prove that the defendant

3   either threatened the victim with or purposely put him in fear

4   of such bodily injury.

5           All right, now a section of our statute provides that

6   robbery is a crime of the second degree except that it is a

7   crime of the first degree if the robber is armed with or uses

8   or threatens the immediate use of a deadly weapon.  Now go back

9   to page two on the verdict sheet.

10          Charge two says, "How do you find as to the charge

11  that Jamie Farthing on August 4, 1994 while in the course of

12  committing a theft did use force upon Robert Hippman?"  If you

13  find her guilty of that then you have found her guilty of

14  robbery.  The next question will determine the degree of the

15  robbery.

16          "During the course of the robbery was she armed with

17  a deadly weapon, yes or no?"  And that will take of that --

18  that grade.  If you find that she is not guilty of robbery then

19  you do not answer that second question, all right?  And that's

20  the same -- same question as posed in charge number nine

21  relating to James Polites, was she armed with a deadly weapon

22  if she is found guilty of robbery there.  All right?

23          So it's a crime of the first degree if the robber --

24  see we're assuming now, we call the person a robber because a

25  person found guilty of robbery becomes a robber, and now we

1  determine was she armed with or uses or threatens the immediate

2  use of a deadly weapon. Now in this case it's alleged that the

3  defendant was armed with a handgun, a deadly weapon while in

4  the course of committing the robbery; the State claims it's a

5  deadly weapon.  In order for you to determine the answer to

6  this question you must understand the meaning of the word or

7  the term deadly weapon.

8          A deadly weapon is any firearm or -- or other weapon

9  -- and then it gives you a whole list -- a device, instrument,

10  material or substance, whether animate or inanimate which in

11  the manner it is used or intended to be used is known to be

12  capable of producing death or serious bodily injury or which in

13  the manner it is fashioned would lead a victim reasonably to

14  believe it to be capable of producing death or serious bodily

15  injury.  Again, I've given you the definition of serious bodily

16  injury, that is bodily injury which creates a substantial risk

17  of death and which means serious permanent disfigurement or

18  protracted loss or impairment of the function of any body --

19  bodily member or organ.

20          So to summarize that, if you find the State has not

21  proven beyond a reasonable doubt any element of the crime of

22  robbery as I have defined that crime to you then you must find

23  the defendant not guilty.  If you find that the State has

24  proved beyond a reasonable doubt that the defendant committed

25  the crime of robbery as I have defined the crime to you but you

1   have reasonable doubt a to whether the defendant was armed with

2   or used or threatened the immediate use of a deadly weapon at

3   the time of the commission of the robbery then you find the

4   defendant guilty of robbery in the second degree.  If you find

5   beyond a reasonable doubt that the defendant committed the

6   crime of robbery and was armed with a deadly weapon or used or

7   threatened the immediate use of a deadly weapon at the time of

8   the commission of the robbery then you find the defendant

9   guilty of robbery in the first degree.  And as I said, that

10  will take care of itself by answering that question.

11          Now throughout this entire case, and I'm getting to

12  the next area which if you turn to page number four, I'm

13  talking about the possession of the weapons and -- well let me

14  give you the -- I'll give you the charges on those two and then

15  we'll get into the murder charge in a moment.

16          Number three and number four.  Number three is that

17  Jamie Farthing is charged that on the 4th of August 1994, that

18  she possessed a H&R 32 caliber revolver and a Rossi 38 caliber

19  revolver with the purpose to use it unlawfully against the

20  person or property of another.  And in count four, she's

21  charged with possession of those weapons without having

22  obtained a permit to carry the same.  Now you see the question

23  is how do you find as to those charges.

24          Now keeping in mind that the theory of the State has

25  been accomplice liability, and I'm going to explain that to you

1    right after I finish these two, the concept of accomplice

2    liability before we get into the murder.  And you apply the

3    accomplice liability theory to every count separately; you just

4    don't take a blanket over everything, but separately on each

5    one of them as you go through them.

6         So let me -- let's just do these two.  Also on counts

7    number three, four -- three and four and also on ten and 11 are

8    the same similar charges except on the different days.  One is

9    on August 4 and that centers around the Hippman robbery in

10   Hackensack, and the ten and 11 is the Polites event which is

11   August 5, all right?

12        So let's do possession of a firearm with the purpose

13   of us it unlawfully against the person or property of another.

14   Counts three and -- I'm sorry, charges three and 12 of the

15   indictment charge the defendant Jamie Farthing with the crime

16   of possession of a firearm with the purpose to use it

17   unlawfully against the person or property of another. The

18   statute on which this count is in the indictment reads as

19   follows.

20        "Any person who has in his possession" --

21        MR. WEICHSEL:  Judge, I think it's charges three and

22   ten, judge.

23        THE COURT:  I'm sorry, three and ten, you're right.

24   I have it written on the top here.  Three and ten.  Count ten

25   is referring to the incident on the 5th of April in Edgewater,

1   all right?

2          MS. BAGLIVI:  August.

3          THE COURT:  And that's now both purpose -- possession

4   of a firearm with the purpose to use it unlawfully against the

5   person or property of another.  Jamie Farthing is charged in

6   count three and ten that she possessed a firearm with the  --

7   with the purpose to use it unlawfully against the person or

8   property of another.  That statute reads as following --

9   follows.

10          "Any person who has in his or her possession any

11   firearm with the purpose to use it unlawfully against the

12   person or property of another is guilty of a crime."

13          Now I don't want you to read the verdict sheets, just

14   leave them alone.  I'll -- when I make reference to the verdict

15   sheet then you know where I'm going, otherwise I'm reading

16   something and you may be -- you may be caught up in something

17   else.  We'll get -- I'll cover every one of them.  And then if

18   you have any questions you can write them out and you come back

19   and I'll explain it to you again.  But I want you to pay

20   attention to the charge, all right?

21          "A person who has in his possession any firearm with

22   the purpose to use it unlawfully against the person or property

23   of another is guilty of a crime."

24          In order for the defendant to be found guilty of this

25   charge the State has the burden of proving beyond a reasonable

1   doubt each of the following four elements now.  It must prove

2   that the -- that the -- I -- do we have the -- what exhibit

3   numbers were those, counsels?

4          MS. BAGLIVI:  S-35A through -- I believe it's A and B

5   are the two weapons.

6          THE COURT:  The two weapons; what is it?

7          MS. BAGLIVI:  S-35-A and B.

8          THE COURT:  All right. S-35-A and B, the State has to

9   prove beyond a reasonable doubt that they are fire -- firearms,

10  that it's a firearm.  Secondly, the defendant possessed the

11  firearm and third that the defendant possessed the firearm with

12  the purpose to use it against -- against another person, and

13  four, the defendant's purpose was to use the firearm

14  unlawfully.  Those are the four elements that the State has to

15  prove beyond a reasonable doubt.  And a firearm means any

16  handgun, rifle, shotgun, machine gun, automatic or semi-

17  automatic rifle or any gun.  All right?

18          The second element that the State has to prove is the

19  -- is the concept of possession.  I'll get you that in a

20  minute.  This is going to be applicable to the -- also to the

21  charge that number four, that she's charged with possession of

22  the firearms without a permit.  So this concept of possession

23  goes to both of those areas.  The words possessed as used in

24  criminal statutes signifies a knowing intentional control of a

25  designated thing accompanied by a knowledge of its character,

1   thus a person must know or be aware that she possesses the

2   item, in this case the guns, the firearms, and the person must

3   know what it is that she possesses or controls, that is that it

4   is a firearm.  Now this possession cannot merely be a passing

5   control that is fleeting and uncertain in its nature.  In other

6   words, to possess within the meaning of the law the defendant

7   must knowingly procure or receive the item possessed or be

8   aware of her control thereof for a sufficient period of time to

9   have been able to relinquish control if she chose to do so.  A

10  person may possess a firearm even though it was not physically

11  on her person at the time of the arrest if the person had in

12  fact at some time prior to her arrest had control and dominion

13  over it.  Now when we speak of possession we mean conscious,

14  knowing possession.  The law recognizes two kinds of

15  possession, they are actual possession and constructive

16  possession.

17          A person is in actual possession of a certain -- of a

18  particular article or thing when she knows what it is, that is

19  the person has knowledge of its character and knowingly has --

20  has it on her person at a given time.

21          Constructive possession.  The law recognizes that

22  possession may be constructive instead of actual, a person who

23  with knowledge of its character knowingly has direct physical

24  control over a thing at a given time is in actual possession of

25  it.  Constructive possession means possession in which the

1   person does not physically have the property but though not

2   physically on one's person she is aware of the presence of the

3   property and is able to exercise intentional control or

4   dominion over it.   A person who although not in actual

5   possession has knowledge of its character knowingly has both

6   the power and the intention at a given time to exercise control

7   over a thing either directly or through another person or

8   persons is then in constructive possession of it.

9           Now the law recognizes that possession may be sole or

10  joint.   If one person alone has actual or constructive

11  possession of a thing the possession is sole, S-O-L-E.   If two

12  or more persons share actual or constructive possession of a

13  thing possession is joint, that is if they knowingly share

14  control over the article.   That's the definition of the word

15  possession in the legal possession.

16          So the second element the State must prove, first of

17  all it must prove that S-35A and B is a firearm, secondly that

18  the defendant possessed it, possessed the firearm.

19          The third element the State must prove beyond a

20  reasonable doubt is that the defendant's purpose in possessing

21  the firearm was to use it against another person or property,

22  but it's another person.   Purpose again is a condition of the

23  mind which cannot be seen and can only be determined by

24  inferences from conduct, words and acts.

25          Now in determining the defendant's purpose in

The Court's Charge to the Jury                    116

1  possessing the firearm you may consider that a person acts

2  purposely with respect to the nature of her conduct or the

3  result thereof -- or the result of her conduct if it is the

4  person's conscious to engage in conduct of that nature or to

5  cause such a result.  That is, a person acts purposely if she

6  means to act in a certain way and/or to cause a certain result.

7  A person acts purposely with respect to the attendant

8  circumstances if the person is aware of the existence of such

9  circumstances or believes or hopes that they exist.  The

10 defendant's purpose or conscious object to use the firearm

11 against another person may be found to exist at any time she is

12 in possession of the object and need not have been the

13 defendant's -- and it need not have been the defendant's

14 original intention in possessing the object.

15        The fourth element the State must prove beyond a

16 reasonable doubt is that the defendant had a purpose -- had a

17 purpose to use the firearm in a manner that was -- that was

18 prohibited by law.  I've already defined purpose to you.  A

19 mental element of purpose to use a firearm unlawfully requires

20 that you find the defendant possessed the firearm with the

21 conscious objective, design or specific intent to use it

22 against the person or property of another in an unlawful manner

23 as charged in the indictment and not for some other purpose.

24 In this case the State contends that the defendant's unlawful

25 purpose in possessing the firearm was to threaten the victim

1   with force in order to commit theft, or robbery.  You must not

2   consider for your -- for your notions of unlawfulness of some

3   other undescribed purpose of the defendant, but rather you must

4   consider whether the State has proven the specific unlawful

5   purpose charged.  The State need not prove such specific

6   completed crime the defendant intended to commit using the

7   firearm.  The unlawful purpose alleged by the State may be

8   inferred by all that was said or done or from all of the

9   surrounding circumstances of the case.

10          If you are satisfied beyond a reasonable doubt that

11  the State has proven each of the elements of this offense as I

12  have defined them then you must find the defendant guilty.

13  However, if you find that the State has failed to prove beyond

14  a reasonable doubt any one of the elements of this offense as I

15  have defined them to you then you must find the defendant not

16  guilty.

17          Charge number four and number 11, and that's that

18  defendant Jamie Farthing is charged with in counts -- in

19  charges four and 11 with unlawful possession of a handgun. The

20  pertinent language of the statute is -- say as follows.

21          "Any person who knowingly has in his possession any

22  handgun without first obtaining -- without first having

23  obtained a permit to carry the same is guilty of a crime."

24          So the State has to prove beyond a reasonable doubt

25  the following elements, there are three here for these charges.

1    First, that S-35-A and B is a handgun, two, that the defendant

2    knowingly possessed the handgun, and that three, that the

3    defendant did not have a permit to possess such a weapon.

4            Now I mentioned to you that a handgun is any -- any

5    pistol, revolver, or other firearm originally designed or

6    manufactured to be fired by the use of a single hand.  The --

7    that's what a handgun is as opposed to a weapon for unlawful

8    purposes; this is a handgun now.  A handgun is any pistol,

9    revolver, or other firearm originally designed or manufactured

10   to be fired by the use of a single hand.

11           The second element that the State must prove beyond a

12   reasonable doubt is that the defendant knowingly possessed a

13   handgun.  I explained to you about the legal concept of

14   possess.

15           The third element in this -- in these charges is that

16   the State must prove that the defendant did not have a permit

17   to possess such a weapon.  Now if you find that the defendant

18   knowingly possessed a weapon and that there is no evidence that

19   the defendant had a valid permit to carry such a weapon then

20   you may infer if you think it appropriate to do so based upon

21   the facts presented that the defendant had no such permit.

22   Note however, that as with all other elements the State bears

23   the burden of showing beyond a reasonable doubt the lack of a

24   valid permit and that you may apply the inference only if you

25   feel it appropriate to do so under all of the facts and the

The Court's Charge to the Jury                  119

1  circumstances.

2       If any of the elements of the crime have not been

3  proven to your satisfaction beyond a reasonable doubt your

4  verdict must be not guilty.  If on the other hand you are so

5  satisfied beyond a reasonable doubt that the defendant

6  knowingly possessed a handgun without a valid permit your

7  verdict must be guilty.

8       Why don't we just stand up for a minute now, just for

9  a stretch?  I still have to give you the law on murder,

10  aggravated manslaughter and reckless manslaughter and also

11  felony murder, all right?  So we have that to go through and I

12  have to give you also the law regarding the liability or the

13  accomplice liability concept.  All right?  You want to keep

14  going or do you want to take a five minute break?  It's going

15  to be another hour.  A break?  Don't discuss the case now.

16  Leave -- leave all these papers there.  You can go into the

17  hallway if you want to use the rest rooms, but don't leave the

18  building.

19       (PAUSE - THE JURY LEAVES THE COURTROOM)

20       MR. WEICHSEL:  Judge?  Judge, you had indicated that

21  you were going to give the law on accomplice liability and

22  murder and manslaughter and felony murder.  You also are going

23  to give the law on diminished capacity I assume?

24       THE COURT:  Oh, yeah.

25       MS. BAGLIVI:  Yes, he is; he's got a lot more to go.

1       THE COURT:  I didn't want to load them on that.

2       MR. WEICHSEL:  I didn't think so.

3       THE COURT:  I'm going to give them -- yes, sure, I

4  have a whole other --

5       MR. WEICHSEL:  That's what I thought.

6       THE COURT:  -- other things, sure.  But I didn't want

7  to load it all on them.  I think it's meaningless to, all

8  right?

9                      (RECESS)

10      THE COURT:  Might I continue?

11      MS. BAGLIVI:  Yes, judge.

12      THE COURT:  Bring up the jury please.

13         (PAUSE - THE JURY ENTERS THE COURTROOM)

14      THE COURT:  All right, in the verdict sheet on charge

15  number five, do you all have that?   That purposeful and

16  knowing murder, the first question there, number five, "How do

17  you find as to the charge that Jamie Farthing did commit

18  murder, that is that she purposely or knowingly caused the

19  death or serious bodily resulting in the death of James Polites

20  on August 5, 1994, not guilty or guilty?"  Now if you follow

21  that, and I'm going to instruct you on each one of these items.

22  As you see, the next one says, "If you find the defendant

23  guilty of murder then you proceed to count -- to charge number

24  six."  You just turn the page and go right into number six

25  which is the kidnapping charge, all right?  However, if you

1  find the defendant not guilty of murder then you consider the

2  following questions, five -- question 5-A as to aggravated

3  manslaughter; that's a lesser included offense.  So if you find

4  that she is not guilty of murder purposely and knowingly then

5  consider manslaughter -- aggravated manslaughter.  That

6  question 5-A is, "How do you find as to the charge the Jamie

7  Farthing did recklessly cause the death of James Polites on

8  August 5, 1994 under circumstances manifesting extreme

9  indifference to human life, not guilty or guilty?"  If you find

10 that she's guilty of that then you continue right onto number

11 six.  But if you find not guilty of 5-A then consider 5-B, that

12 is the instruction is there, "If you find the defendant not

13 guilty of aggravated manslaughter then consider the following

14 question, 5-B, as to reckless manslaughter."  That's even

15 lesser.  "How do you find as to the charge that Jamie Farthing

16 did recklessly cause the death of James Polites on August 5,

17 1994?"  Now I'll give you the law on each one of these, all

18 right?  So you'll get that.  But before I do that I want -- I

19 want to now address the legal concept of the accomplice

20 liability.  Now keeping in mind that accomplice liability --

21 put the sheets away.  Close them up, put them away; I don't

22 want you distracted by them, or at least turn them over.

23        Each count or each charge in the indictment this

24 legal concept is applicable to, every one of them individually.

25 Not -- I'm going to give it to you now before we get into the

1  murder one only because it's in the middle of the charge and I

2  thought I would give it to you at this time, but I'm not

3  singling it out, this charge of accomplice liability to apply

4  only to the murder or only to the felony murder charge.  It

5  applies to the kidnapping charge, it applies to the robbery

6  charge, it applies to the possession of the -- of the weapons

7  charge too.  All right?  And when I read it to you it will

8  probably make a little -- it will probably be clearer to you as

9  an accomplice.

10         Now the jury will -- the State alleges that the

11  defendant is legally responsible for the criminal conduct of

12  Ivy Demolena and Thomas Christopher James in violation of the

13  law which reads in part as follows.  See an accomplice, the

14  theory of the State is that Ms. Farthing was an accomplice of

15  these other individuals and therefore is guilty of them.

16         Now, "A person is guilty of an offense if it is

17  committed by his own conduct or the conduct of another person

18  for whom he is legally accountable or both. A person is legally

19  accountable for the conduct of another person when," and I'm

20  going to use she here because the defendant is a female, "when

21  she is an accomplice of such other person in the commission of

22  an offense.  A person is an accomplice of another person in the

23  commission of an offense if with the purpose of promoting or

24  facilitating the commission of the offense she aids or agrees

25  or attempts to aid such other person in planning or committing

1  it."

2       Now this provision of the law means that not only is

3  the person who actually commits the criminal act responsible

4  for it, but one who is legally accountable as an accomplice is

5  also responsible.  Now this responsibility as an accomplice may

6  be equal and the same as he or she who actually committed the

7  crime, or they -- or there may be responsibility in a different

8  degree depending on the circumstances as you may find them to

9  be.  I'll further explain this distinction to you in a moment.

10      Now in this case the State alleges that the defendant

11  is equally guilty of the crimes committed by Ivy Demolena and

12  Thomas Christopher James because she acted as his or her

13  accomplice with the purpose that the specific crimes charged be

14  committed.

15      So in order to find the defendant guilty of the

16  specific crimes charged the State must prove beyond a

17  reasonable doubt the following elements.  First, that Ivy

18  Demolena and/or Thomas Christopher James committed the crimes

19  of kidnapping, armed robbery, with regard to James Hippman, and

20  of the course the kidnapping, armed robbery and murder of James

21  Polites, possession of firearms for unlawful purposes without a

22  permit, that they committed those crimes, Demolena and Thomas

23  James or Christopher James.  I'll shortly explain to you -- I

24  have explained to you those elements already.

25      Secondly the State must prove to you beyond a

1   reasonable doubt that this defendant Ms. Farthing did aid or

2   agree to aid him or her in planning or committing those crimes,

3   it or them meaning each crime separately when you consider them

4   separately.

5        Third, the State must prove beyond a reasonable doubt

6   that Ms. Farthing's purpose was to promote and facilitate the

7   commission of the offense or offenses.

8        Fourth, that Ms. Farthing possessed a criminal state

9   of mind that is required to be proved against the person who

10  actually committed the criminal act.  She had the same state of

11  mind that is required of the person who committed the actual

12  crime.  Remember that one acts purposely with respect to his or

13  her conductor the result thereof if it is his or her conscious

14  object to engage in conduct of that nature or to cause such a

15  result.

16       The word aid means to assist, support or supplement

17  the efforts of another.  Agree to aid means to encourage by

18  promise of assistance or support.

19       Now if you find that the defendant, Ms. Farthing,

20  with the purpose of promoting or facilitating the commission of

21  the offense or offenses aided or agreed to attempted to aid him

22  or her, meaning Ivy Demolena or Christopher James in planning

23  or committing them or each crime or all the crimes, any one of

24  the crimes, then you should consider her as if she committed

25  the crimes herself or the crime herself.  And again, I -- I

1    stress that the accomplice status should be considered

2    separately as to each charge.

3              To prove the defendant's criminal liability the State

4    does not have to prove her accomplice status by direct evidence

5    of a formal plan to commit a crime.  There does not have to be

6    a verbal agreement by all who are charged.  The proof may be

7    circumstantial; participation and agreement can be established

8    from conduct as well as spoken words.

9              Now mere presence at or near the scene does not make

10   one a participant in the crime nor does the failure of a

11   spectator to interfere make her a participant in the crime.  It

12   is however, a circumstance to be considered with the other

13   evidence in -- in determining whether she was present as an

14   accomplice.  Presence is not in itself conclusive evidence of

15   that fact.  To constitute guilt there must exist a community of

16   purpose and actual participation in the crime committed.

17             Now mere -- while mere presence at the scene of the

18   perpetration of a crime does not render a person a participant

19   in it, proof that one is present at the scene of the commission

20   of the crime without disapproving or approving or opposing it

21   is evidence from which in connection with other circumstances

22   it is possible for a jury to infer that she assented thereto,

23   lent to it her continuance and approval and was thereby aiding

24   the same.  It depends upon the totality of the circumstances as

25   those circumstances appear from the evidence.

1    Now an accomplice may be convicted on proof of the

2  commission of a crime or of her complicity therein even though

3  the person who is -- who it is claimed committed the crime has

4  not been prosecuted or has been convicted of a different

5  offense or degree of offense or has an immunity from

6  prosecution or conviction or has been acquitted.

7    Remember that this defendant can be held to be an

8  accomplice with equal responsibility only if you find as a fact

9  that she possessed the criminal state of mind that is required

10  to be proved against a person or persons who actually committed

11  the criminal act.

12    So in order to convict the defendant as an accomplice

13  to a specific crime, whether it's kidnapping, robbery, murder,

14  aggravated manslaughter or reckless manslaughter or possession

15  of the guns or felony murder, you must find that the defendant

16  had the purpose to participate in that particular crime.  You

17  must find that the defendant had the purpose to participate in

18  that particular crime.  She must act with the purpose of

19  promoting or facilitating the commission of the substantive

20  crime that -- with which she is charged.  It's not -- it is not

21  sufficient to prove only that the defendant had knowledge that

22  another person was going to commit the crime charged.  The

23  State must prove that it was the defendant's conscious object

24  that the specific conduct charged be committed.

25    In sum, in order to find the defendant guilty of

1  committing the crimes of murder, armed robbery, kidnapping,

2  possession of a handgun with an unlawful purpose, the State

3  must prove each of the following elements beyond a reasonable

4  doubt.   One, that Ivy Demolena and/or Thomas Christopher James

5  committed the crimes of murder, kidnapping, armed robbery,

6  possession of a firearm with unlawful purpose or felony murder.

7           Now you could -- the State could prove that Ivy

8  Demolena and/or Thomas James committed the crime of murder

9  purposely and knowingly.   For this defendant under an

10  accomplice liability theory to be found guilty of purposely --

11  of purpose and knowing murder she must have the same state of

12  mind that Ivy Demolena and Thomas Christopher James had, those

13  who were alleged to have been the perpetrators of the crime.

14           Secondly, that the defendant did -- secondly the

15  State must prove that the defendant did aid or agree or attempt

16  to aid them in planning or committing it or them; that's

17  robbery, kidnapping, et cetera, and murder.

18           Third, that the defendant's purpose was to promote or

19  facilitate the commission of the offenses, and fourth, that the

20  defendant possessed a criminal state of mind that is required

21  to be proved against the person who actually committed the

22  criminal act.   And you -- you consider each crime separately.

23           If you find that the State has proved each one of the

24  elements as described above beyond a reasonable doubt then you

25  must find the defendant guilty of these charges, depending it's

1  -- find him guilty of -- of the charge, whatever it is.  You're

2  going to go each one separately.

3          If on the other hand you find that the State has

4  failed to prove one or more of these elements beyond a

5  reasonable doubt then you must find the defendant not guilty of

6  that particular charge.

7          Now as I have previously instructed, any verdicts

8  rendered must be unanimous; all 12 jurors must agree as to the

9  guilty or the not -- to guilty or not guilty.

10         Now as I have previously indicated you will initially

11 consider whether the defendant should be found guilty or not

12 guilty of acting as an accomplice of Ivy Demolena and/or Thomas

13 Christopher James with full and equal responsibility for the

14 specific crime charged.  If you find the defendant guilty of

15 the specific crime or the specific charge then you need not

16 consider any lesser charge.  If however, you find the defendant

17 not guilty of acting as an accomplice of Ivy Demolena and/or

18 Thomas Christopher James on a specific crime charged then you

19 should consider whether the defendant did act as an accomplice

20 of Ivy Demolena and Thomas -- and/or Thomas James -- Thomas

21 Christopher James but with the purpose of promoting or

22 facilitating the commission of a -- of some lesser offense then

23 the actual crime charged in the indictment.  That's when we're

24 talking about murder. We're talking about aggravated

25 manslaughter and reckless manslaughter.

1    Now the law recognizes that two or more persons may

2    participate in the commission of an offense but each may

3    participate therein with a different state of mind.  That's the

4    issue and that's one of the main issues in this case.  They're

5    all main issues, but that's an issue that you have to decide.

6    Our law recognizes that two or more persons that participate in

7    the commission of an offense but each may participate therein

8    with a different state of mind.  The liability or

9    responsibility of each participant for any ensuing offense is

10   dependent on her own state of mind and not anyone else's.

11   Guided by these legal principles, and if you have found the

12   defendant not guilty of a specific crime charged you should

13   then consider whether the defendant is guilty or not guilty of

14   an -- as an accomplice on a -- on a lesser included offense or

15   a lesser charge.   That is aggravated manslaughter, reckless

16   manslaughter, there's criminal --  and criminal restraint which

17   is the lesser included of the offense of kidnapping and second

18   degree robbery as lesser included in the charge of first degree

19   robbery.

20   Now I've explained the elements of -- of these

21   offenses to you already.  In considering whether a defendant is

22   guilty or not guilty as an accomplice on this -- on these

23   lesser included offenses or on lesser included offenses

24   remember that each person who participates in the commission of

25   an offense may do so with a different state of mind and the

1   liability or responsibility of each person is dependent on his

2   or her own state of mind and no one else's.  So therefore, in

3   order to find the defendant guilty of the lesser included

4   offense of aggravated manslaughter, reckless manslaughter,

5   criminal restraint or second degree robbery the State must

6   prove beyond a reasonable doubt one, that Ivy Demolena and/or

7   Thomas Christopher James did commit the crimes of say murder,

8   armed robbery and kidnapping as alleged in the indictment, or

9   the lesser included offenses of aggravated manslaughter,

10  reckless manslaughter, criminal restraint or -- or robbery, and

11  secondly that this defendant did aid or agree or attempted to

12  aid them in planning or committing the lesser included offense

13  of aggravated manslaughter or reckless manslaughter, criminal

14  restraint or robbery. And that third, that this defendant's

15  purpose was to promote or facilitate the commission of these

16  less -- of the lesser included offense.  And fourth, that the -

17  - this defendant Jamie Farthing possessed the criminal state of

18  mind that is required for the commission of the lesser included

19  offense.

20          Now if you find that the State has proven each of the

21  -- of these elements beyond a reasonable doubt then you must

22  find the defendant guilty.  If on the other hand that the State

23  has failed to prove one or more of these elements beyond a

24  reasonable doubt then you must find the defendant not guilty.

25  As I have previously indicated, our verdict must be unanimous;

The Court's Charge to the Jury                131

1  all 12 jurors must agree as to the -- as to guilty or not

2  guilty.  That's accomplice liability.

3          Now I'm going to go into the two remaining charges

4  which is the murder charge, also it's lesser included offenses,

5  and the felony murder.  This is charge number five on your

6  sheets.

7          The defendant in the indictment is charged that on

8  August 5, 1994 in Edgewater did purposely or knowingly cause

9  the death or serious bodily injury resulting in the death of

10 James Polites or Polites contrary to the provisions of the law.

11         Now here's the law.  "A person is guilty of murder if

12 he or she purposely causes death or serious bodily injury

13 resulting in death, or," -- it's not and, it's or, "or

14 knowingly causes death or serious bodily injury resulting in

15 death."

16         Now in order for you to find the defendant guilty of

17 murder the State is required to prove each of the following

18 elements beyond a reasonable doubt.  Now remember that the

19 State's theory here is accomplice liability, okay, in this --

20 in each one of these charges.

21         The State must prove one, that the defendant caused

22 James Polites's death or serious bodily injury resulting in his

23 death, and two, that the defendant did so purposely or

24 knowingly.  Those are the two elements; caused his death or

25 caused bodily injury resulting in his death and did so

The Court's Charge to the Jury                    132

1    purposely or knowingly, those are the elements.

2            Now one of the elements the State must prove beyond a

3    reasonable doubt is that the defendant acted purposely or

4    knowingly.  Now a person who causes another -- another's death

5    does so purposely -- again we get into that word purposely --

6    when it is the defen -- the person's conscious object to cause

7    death or serious bodily injury resulting in death.

8            A person who causes another person's -- or another's

9    death does so knowingly when the person is aware that it is

10   practically certain that his or her conduct will cause death or

11   serious bodily injury resulting in death.

12           The nature of the purpose or knowledge with which the

13   defendant acted towards James Polites is a question of fact for

14   you, the jury, to decide.  Purpose and knowledge are conditions

15   of the mind which cannot be seen and can only be determined by

16   inferences from conduct, words or acts.  It is not necessary

17   for the State to produce a witness or witnesses who could

18   testify that the defendant stated, for example, that her

19   purpose was to cause death or serious bodily injury resulting

20   in death, or that she knew that her conduct would cause death

21   or serious bodily injury resulting in death.  It is within your

22   power to find that proof of purpose or knowledge has been

23   furnished beyond a reasonable doubt by inferences which may

24   arise from the nature of the acts and the surrounding

25   circumstances.  Such things as the place where the acts

1   occurred, the weapon used, the location, the number and nature

2   of wounds inflicted and all that was done or said by the

3   defendant preceding, connected with and immediately succeeding

4   the events leading to the death of James Polites are among the

5   circumstances to be considered.

6           Now although the State must prove that the defendant

7   acted either purposely or knowingly the State is not required

8   to prove a motive.  If the State has proved the essential

9   elements of the offense beyond a reasonable doubt the defendant

10  must be found guilty of that offense regardless of the

11  defendant's motive or lack of motive.   If the State however,

12  has proved a motive you may consider it insofar as it gives

13  meaning to other circumstances and on the other hand you may

14  consider the absence of motive in weighing whether or not the

15  defendant is guilty of the crime charged.

16          Now the other element that the State must prove

17  beyond a reasonable doubt is that the defendant caused James

18  Polites -- Polites' death or serious bodily injury resulting in

19  death. Remember I mentioned to you serious bodily injury means

20  bodily injury which creates a substantial risk of death or

21  which causes serious permanent disfigurement or protracted loss

22  or impairment of a function of any bodily member or organ.

23  Whether the killing is committed purposely or knowingly causing

24  death or serious bodily injury in death must be within the

25  design or contemplation of the defendant.

1    Now if you determine that the State has proven beyond

2  a reasonable doubt that the defendant purposely or knowingly

3  caused the death, serious -- or serious bodily injury resulting

4  in death you must find the defendant guilty of murder.

5    If on the other hand you determine that the State has

6  not proven beyond a reasonable doubt that the defendant

7  purposely or knowingly caused death or serious bodily injury

8  resulting in death then you must find her not guilty of murder

9  and go on to consider whether the defendant should be convicted

10  of crimes of  aggravated or reckless manslaughter.  And that's

11  the next question on the verdict sheet.  In other words, if you

12  find her not guilty of murder, purposely and knowingly, then

13  you can consider 5-A and that's aggravated manslaughter.

14    A person is guilty of aggravated manslaughter if she

15  recklessly causes the death of another person under

16  circumstances manifesting extreme indifference to human life.

17    In order for you to find the defendant guilty of

18  aggravated manslaughter the State is required to prove each of

19  the following elements beyond a reasonable doubt.  One, that

20  the defendant caused James Polites' death and that two, that

21  the defendant did so recklessly, and three that the defendant

22  did so without cir -- under circumstances manifesting extreme

23  indifference to human life.

24    One element the State must prove beyond a reasonable

25  doubt is that the defendant acted recklessly.  Now a person who

1  causes another's death does so recklessly when he or she is

2  aware of and consciously disregards a substantial and

3  unjustifiable risk that death will result from his or her

4  conduct.  The risk must be of such a nature and degree that

5  considering the nature and the purpose of defendant's conduct

6  and the circumstances known to the defendant, his or her

7  disregard of that risk is a gross deviation from the standard

8  of conduct that a reasonable person would follow in the same

9  situation.  In other words, you must find that the defendant

10  was aware of and consciously disregarded the risk of causing

11  death.

12      If you find that the defendant was aware of and

13  disregarded the -- the risk of causing death you must determine

14  whether the risk that she or he disregarded was substantial and

15  unjustifiable.  In doing so you must consider the nature and

16  the purpose of the defendant's conduct and the circumstances

17  known to the defendant, and you must determine whether in light

18  of those factors defendant's disregard of that risk was a gross

19  deviation from the conduct a reasonable person would have

20  observed in the defendant's situation.

21      Another element the State must prove beyond a

22  reasonable doubt is that the defendant acted under

23  circumstances manifesting extreme indifference to human life.

24  The phrase "under circumstances manifesting extreme

25  indifference to human life" does not focus on the defendant's

The Court's Charge to the Jury                    136

1    state of mind but on the circumstances under which you find he

2    or she acted.

3              If in light of all the evidence you find that the

4    defendant's conduct resulted in a probability as opposed to a

5    mere possibility of death then  you may find that he or she

6    acted under circumstances manifesting extreme indifference to

7    human life.

8              On the other hand if you find that his or her conduct

9    resulted in only a possibility of death then you may acquit him

10   or her of aggravated manslaughter and consider the offense of

11   reckless manslaughter which I will explain to you shortly.  And

12   that's 5-B.

13             The final element that the State must prove beyond a

14   reasonable doubt is that the defendant caused James Polites'

15   death.  Now you must find that James Polites would not have

16   died but for the defendant's action.

17             If after consideration of all the evidence you are

18   convinced beyond a reasonable doubt that the defendant

19   recklessly caused James Polites' under circumstances

20   manifesting extreme indifference to human life then your

21   verdict should be guilty of aggravated manslaughter.

22             If however, after considering -- consideration of all

23   of the evidence you are not convinced beyond a reasonable doubt

24   that the defendant recklessly caused James Polites' death under

25   circumstances manifesting extreme indifference to human life

1 you must find the defendant not guilty of aggravated

2 manslaughter and go on to consider whether the defendant should

3 be convicted of reckless manslaughter.

4         A person is guilty of reckless manslaughter if she

5 recklessly causes the death of another person, he or she.  In

6 order for you to find the defendant guilty of reckless

7 manslaughter the State is required to prove each of the

8 following elements beyond a reasonable doubt.  One, that the

9 defendant caused James Polites' death, two, that the

10 defendant did so recklessly.

11         The State must prove, one element the State must

12 prove beyond a reasonable doubt is that the defendant acted

13 recklessly.  Now let's talk about reckless.  A person who

14 causes another person -- another's death does so recklessly

15 when he or she is aware of and consciously disregards a

16 substantial and unjustifiable risk that death will result from

17 his or her conduct.  The risk must be of such a nature and

18 degree that considering the nature and purpose of the

19 defendant's conduct and the circumstances known to the

20 defendant, his or her disregard of that risk is a gross

21 deviation from the standard of conduct that a reasonable person

22 would have in the same situation.  In other words, you must

23 find the defendant was aware of and consciously disregarded the

24 risk of causing death.  If you find that the defendant was

25 aware of and disregarded the risk of causing death you must

1   determine whether the risk that he or she disregarded was
2   substantial and unjustifiable.  In doing so you must consider
3   the nature and purpose of the defendant's conduct and the
4   circumstances known to the defendant and you must determine
5   whether in light of those factors the defendant's disregard of
6   that risk was a gross deviation from the conduct of a
7   reasonable person would have observed in the defendant's
8   situation.  You must find that the defendant -- that the --
9   that James Polites would not have died but for the defendant's
10  conduct.

11          If after consideration -- if after consideration of
12  all the evidence you are convinced beyond a reasonable doubt
13  that the defendant recklessly caused James Polites' death then
14  your verdict should be guilty of reckless manslaughter.  If
15  however, after considering -- consideration of all the evidence
16  you are not convinced beyond a reasonable doubt the defendant's
17  -- the defendant recklessly caused James Polites' death you
18  must find the defendant not guilty of reckless manslaughter.

19          That's the charge on murder with the lesser included
20  offense, all right?

21          Counts six and seven, the next page.  The question
22  is, how do you find as to the charge that Jamie Farthing while
23  in the course of committing the crime of kidnapping she or
24  another person did cause the death of James Polites on August 5
25  and while in the course of committing -- and number seven -- in

1   the course of committing robbery she or another person did

2   cause the death of James Polites on August 5.  All right,

3   that's felony murder now.

4          The defendant is charged in counts six and seven with

5   felony murder in violation of the law.  And I just -- well I

6   read to you the indictment.  The State does not contend that

7   the defendant herself killed James Polites -- James Polites.

8   The State charges that James Polites was killed while the

9   defendant, with one or more other persons, was engaged in the

10  commission of robbery, that's as to count six.  The State

11  contends that with regard -- that the State contends with

12  regard to count seven that James Polites was not killed while

13  the defendant was -- charges that James Polites was killed when

14  the  defendant was, with one or more other persons, was engaged

15  in the commission of the crime of kidnapping.  So we have two

16  felony charges.  And that's why I'm going to give you this, you

17  apply it to both of those counts.

18         The law reads as follows.  "Criminal homicide

19  constitutes murder when it is committed when the actor either

20  acting alone or with one or more other persons is engaged in

21  the commission of robbery or kidnapping," either one, "and in

22  the course of such crime or the immediate flight thereafter any

23  person causes the death of a person other than one of the

24  participants."

25         Now under the law it does not matter that the act

1    which caused death was committed by a participant in the crime

2    of robbery or kidnapping in this case, it does not matter the

3    act which caused the death was committed by a participant in

4    the crimes other than the defendant, or even by someone other

5    than the participant nor does it generally matter that the act

6    which caused death was committed recklessly or unintentionally

7    or accidentally.   Each participant in the crime of, either --

8    in this case it's robbery and kidnapping -- each participant in

9    the crime, whether -- whether the participant himself or

10   herself caused the death or not, would be guilty of the felony

11   murder.   Each participant in the crime of robbery, whether the

12   participant herself caused the death or not would be guilty of

13   felony murder -- murder.   Read again, each participant in the

14   crime of kidnapping, whether the participant herself caused the

15   death or not, would be guilty of felony murder.

16        In order for you to find the defendant guilty of

17   felony murder in this case the State is required to prove

18   beyond a reasonable doubt that all of the evidence in the case

19   which is each of the following elements of the offense charged.

20   One, that on or about August 5, 1994 the defendant was engaged

21   in the commission of robbery, and that's as to charge seven.

22   Charge six, the State must prove that on or about August 5,

23   1994 the defendant was engaged in the commission of kidnapping.

24        The second element the State must prove as to each of

25   those charges, that the death of James Polites was caused at

1  some time within the course of the commission of that crime

2  including its aftermaths of flight and concealment efforts.

3  The first element requires the State to prove beyond a

4  reasonable doubt that the defendant was engaged in the

5  commission of the crime of robbery and/or -- or kidnapping. And

6  I've already explained to you the elements that are required

7  for robbery and/or kidnapping.

8           The second element requires that the State, to

9  establish that the -- that the victim's death was caused during

10 the commission of the robbery or the commission of kidnapping,

11 in order to meet it's burden of proof in this regard, the State

12 must prove beyond a reasonable doubt one, that -- that but for

13 the defendant's conduct or the conduct of one or more others --

14 or the conduct of one or more others with whom the defendant

15 participated in the commission of the robbery or the commission

16 of the kidnapping the victim would not have died.  In other

17 words, that the victim's death would not have occurred without

18 the commission of the robbery or that the victim's death would

19 not have occurred without the commission of the kidnapping.

20 Two, the State must prove beyond a reasonable doubt that the

21 victim's death was a probable consequence of the commission of

22 robbery or flight after committing the robbery, or that the --

23 the victim's death was a probably consequence of the commission

24 or the flight thereafter committing the crime of kidnapping.

25           In order for the death to be a probable consequence

1  of robbery or -- and/or kidnapping, the death must not have

2  been too remote or too accidental in its occurrence, or too

3  dependent on another's volitional acts to have a just bearing

4  on the defendant's liability for the gravity of her offense.

5  In other words, you must decide that the State has proven

6  beyond a reasonable doubt that under all the circumstances the

7  death did not occur at such an unexpected and unusual manner

8  that it would be unjust to find the defendant responsible for

9  the death.

10         Now there was some reference made by both counsels

11  with regard to what refer to affirmative defenses when it comes

12  to felony murder.  Under the statute which applies here it is

13  an affirmative defense to the charge of felony murder if there

14  is proof in the case that the defendant a) did not commit the

15  homicidal act or in any way solicit, request, command, cause or

16  aid the commission thereof, 2) the defendant was not armed with

17  a deadly weapon or an instrument, article or substance readily

18  capable of causing death or serious physical injury, and of a

19  sort not ordinarily carried in public places by law abiding

20  persons.  Actually what we have in this case is that the -- the

21  proof, affirmative offense is applicable if the -- if there is

22  proof that the defendant did not commit the homicidal act, was

23  not armed with a deadly weapon, 3) had no responsible -- I'm

24  sorry, strike that.  Had no reasonable ground to believe that

25  any other participant was armed with such a weapon, instrument,

The Court's Charge to the Jury                143

1  article or substance, so was not reasonably -- had no

2  reasonable ground to believe that any other participant was

3  armed with such a weapon, fourth, had no reasonable ground to

4  believe that any other participant intended to engage in

5  conduct likely to result in death or serious bodily injury.

6  Now those are the four.  This means that the affirmative

7  defense is not available to a defendant unless there is

8  evidence in the case supporting all of the four requirements,

9  not merely one or two or three of them.  If there is such

10 supporting evidence either in the State's proofs or as

11 presented in behalf of the defendant then it is incumbent upon

12 the State to negate these -- this evidence by proof beyond a

13 reasonable doubt however, it is not necessary that all four

14 requirements be negated since the defense is not available to a

15 defendant unless the evidence supports all four of the

16 requirements.  It is sufficient for the State in such case to

17 present proof beyond a reasonable doubt negating any one of

18 them.

19        Now if you find after a consideration of all of the

20 evidence that the State has proved to your satisfaction beyond

21 a reasonable doubt each of these elements of the offense

22 charged as I have just explained them to you, that is 1) that

23 the defendant was engaged in the commission of a robbery or --

24 or kidnapping, 2) that the death of James Polites was caused at

25 some time within the course of the commission of that crime,

1   including its aftermaths of flight and concealment efforts,
2   then you will find the defendant guilty of felony murder.  Now
3   on the other hand if you find that the State has failed to
4   prove to your satisfaction beyond a reasonable doubt any one or
5   more of these elements of the crime charged as I have explained
6   them -- explained them, then you must find the defendant not
7   guilty of felony murder.

8        Now keep in mind, and I -- and I instruct you and
9   advise you that if the State has failed to prove beyond a
10  reasonable doubt that any participant caused the death of the
11  victim then the defendant should be found not guilty of all
12  charges -- of all charged homicide offenses.

13       And if you find beyond a reasonable doubt that any
14  participant did cause the death of the victim but that the
15  State has failed to prove that the defendant was then engaged
16  as an accomplice in the course of the commission of the robbery
17  or kidnapping then you should proceed to consider whether the
18  defendant as an accomp -- as an accomplice -- as an accomplice
19  purposely, knowingly or recklessly caused the death of the
20  victim, James Polites.

21       All right, that's the law and I've covered each one
22  of the questions.  I'm losing my voice.

23       THE COURT OFFICER:  Ladies and gentlemen, if you'd
24  just (inaudible) please?

25       THE COURT:  Now if you believe any witness or party

1  wilfully or knowingly testified falsely to any material fact in

2  the case with the intent to deceive you, you may give such

3  weight to his or her testimony as you may deem it is entitled.

4  You may believe some of it or you may in your discretion

5  disregard all of it.

6        Now there are a number of offenses charged in the

7  indictment.  They are separate offenses, by separate counts in

8  the indictment.  The defendant is entitled to have her guilty

9  or innocence separately considered on each count by the

10  evidence which is relevant and material to that particular

11  count or charge based on the law as I give it to you.

12        All right, there's a few other things I just want to

13  mention now and before you go in to deliberate.  First of all,

14  there was -- you've already heard evidence that a witness in

15  particular, the defendant's father Paul Farthing, was a witness

16  who had previously been convicted of a crime.  And this

17  testimony may only be used in determining the credibility or

18  believability of this witness' testimony.  The jury has a right

19  to consider whether a person who was previously -- who has

20  previously failed to comply with society's rules as

21  demonstrated through a criminal conviction would be more likely

22  to ignore the oath requiring truthfulness on -- on the witness'

23  -- on the witness stand then a law abiding citizen.  Now you

24  may consider in determining this issue, the nature and degree

25  of the prior conviction and when it occurred.  I think he said

1   he had pointed a -- a gun at his former wife or something or

2   other and he explained that he did that to get the police

3   attention.  So you can consider that, but you -- for the

4   credibility purpose only; no propensity, you're not draw any --

5   any inferences that there's a propensity within the family to

6   crime because it was her father, only for the credibility

7   issue.  You are not however, obliged to change your opinion as

8   to the credibility of this witness simply because of a prior

9   conviction.  It is evidence that you may consider along with

10  all the other factors  we previously discussed to determine

11  credibility of a witness.

12        We had some testimony of doctors; Dr. Apolito, Dr.

13  Simring and Dr. Kleinman, the psychologist.  And remember, they

14  were considered to be experts and they gave opinions as to the

15  mental condition with regard to the defendant.  Now as a

16  general rule as I explained to you, of evidence, a general rule

17  of evidence is that witnesses can -- can testify only as -- as

18  to facts known by them.  This rule ordinarily does not permit

19  the opinion of a witness to be received as evidence however, an

20  exception to this rule exists in the case of an expert witness

21  who may give his opinion as to any manner in which he is versed

22  which is material to the case.  In legal terminology, an expert

23  witness.

24        An expert witness is a witness who has some special

25  knowledge, skill, experience or training that is not possessed

1  by the ordinary juror and who thus -- thus may able to provide

2  assistance to the jury in its fact finding duties.  Now in this

3  case I mentioned we had Dr. Apolito, Dr. Simring and Dr.

4  Kleinman who were called as experts and they testified.  Now

5  you're not bound by such experts' opinions, but you should

6  consider each opinion and give it the weight to which you deem

7  it is entitled whether that be great or slight.  And you may

8  reject it.

9          Now in examining each opinion you may consider the

10 reasons give for it, if any, and you may also consider the

11 qualifications and the credibility of the expert.  It is always

12 within the special function of the jury to decide whether the

13 facts in which he answered as an expert is based -- is based

14 actually exists or is answered -- I'm sorry, on which his

15 answer of the expert is based actually exists, whether those

16 facts exist.  And the value or weight of the opinion of the

17 expert is dependent upon and no stronger than the facts on

18 which it is predicated.

19         Now in examining an expert witness, counsel may

20 propound to him a type of question known in the law as a

21 hypothetical question and there was some of that used here.

22 Take for example this and suppose this, this and this, what

23 would be your opinion.  That's what a hypothetical question is,

24 you've heard it referred to during the -- the trial.  By such a

25 question the witness is asked to assume to be true a

1   hypothetical state of facts and to give an opinion based on

2   that assumption.   In permitting such a question the court does

3   not rule and does not necessarily find that all of the assumed

4   facts are within the possible range of the evidence.   It is for

5   you, the jury, to find from all the evidence whether or not the

6   facts assumed in the hypothetical question or questions have

7   been proved.   And if you should find that any assumption in

8   such a question has not been proved you are to determine the

9   affect of the -- of the failure of proof on the value and the

10  weight of the opinion, of the expert opinion based on that

11  assumption.

12          Now in resolving any conflict that may exist in the

13  testimony of the expert witnesses in this case you must weigh

14  one expert's opinion against that of the other and you must

15  consider the reasons given by one as compared by those of the

16  other and you should consider the relative credibility and

17  knowledge of the experts who have testified.   Thereupon, you

18  should find in -- thereupon, you should find in favor of that

19  expert testimony which in your opinions is entitled to the

20  greater weight.   Nevertheless, you must always keep in mind

21  that the State has the burden of proving the crime and each of

22  its elements beyond a reasonable doubt.   If you should find

23  that the State's expert is more credible than the defense

24  expert you must still consider whether the conflict of expert

25  testimony may have created reasonable doubt concerning the

1   crime or one of its elements.

2           Which leads me to the next area which is referred to

3   as diminished capacity.  And the defense has presented a --

4   what we refer to as a diminished capacity defense.  Evidence as

5   -- evidence that the defendant suffered from a mental disease

6   or defect has been -- has been produced.  You must consider

7   such evidence in determining whether or not the State has

8   proved beyond a reasonable doubt that the defendant acted

9   purposely or knowingly or recklessly as I instructed you

10  earlier.  The requirement that the defendant acted purposely or

11  knowingly or recklessly is an essential element of the offenses

12  charged.  If you find the existence of a mental disease or

13  defect then you must decide whether the prosecution has

14  sustained its burden of proving that the defendant acted

15  purposely or knowingly or recklessly.  The prosecution bears the

16  burden of proving beyond a reasonable doubt that the

17  defendant's mental disease or defect did not negate her

18  capacity to form a purposeful or knowing or reckless state of

19  mind.  In other words, assuming that you find that there was a

20  mental disease or defect that was capable of preventing the

21  defendant from acting with the mental state required, the

22  prosecution must prove that the defendant acted purposely or

23  knowingly or purpose -- or recklessly.

24          If the evidence of mental disease or defect or any

25  other evidence or lack of evidence prevents the State from

1  carrying its burden of proving beyond a reasonable doubt that

2  this defendant acted purposely or knowingly or recklessly then

3  you must find the defendant not guilty of the appropriate

4  offense, again considering diminished capacity separately with

5  each charge.

6        If however, you find that the State has proved beyond

7  a reasonable doubt that the defendant acted purposely or

8  knowingly or recklessly, depending on the charge, there --

9  together with all other elements of the offense, then you must

10  find -- you must convict the defendant of the applicable

11  defense.

12        There's one other thing, it's flight.  There has been

13  some testimony in the case from which you may infer that the

14  defendant fled shortly after the alleged commission of the

15  crime; the defendant denies any flight.  The question of

16  whether the defendant fled after the commission of the crime is

17  another question of fact for your consideration.  Mere

18  departure from the place where the crime has been committed

19  does not constitute flight.  If you find the defendant fearing

20  that an accusation or an arrest would be made against her on

21  the charge involved in the indictment, took refuge in flight

22  for the purpose of evading the accusation or arrest on that

23  charge then you may consider such flight in connection with all

24  the other evidence in the case as an indication or proof of

25  guilt.  Flight may only be considered as evidence of

1    consciousness of guilt if you should determine that the

2    defendant's purpose in leaving was to evade accusation or

3    arrest for the offense charged in the indictment.

4            And finally, now this defendant, Ms. Farthing, in

5    this case chose not to be a witness.  It is the constitutional

6    right of a defendant to remain silent.  I charge you that you

7    are not to consider for any purpose or in any manner in

8    arriving at your verdict the fact that the defendant did not

9    testify, nor should that fact enter into your deliberations or

10   discussions in any manner at any time. The defendant is

11   entitled to have the jury consider all of the evidence and she

12   is entitled to the presumption of innocence even if she does

13   not testify as a witness.

14           That concludes my instructions as to the principles

15   of law regarding the offenses charged in the indictment.  There

16   is nothing different in the way a jury is to consider the proof

17   in a criminal case from that in which all reasonable persons

18   treat any questions depending upon evidence presented to them.

19   You are expected to use your good common sense, consider the

20   evidence for only those purposes for which it has been admitted

21   and give it a reasonable and fair construction in light of your

22   knowledge of how people behave.  It is the quality of the

23   evidence, not simply the number of witnesses that control.

24   Anything that has been marked into evidence cannot -- that has

25   not been marked into evidence cannot be given to you in the

1   jury room even though it may have been marked for

2   identification.  Those items marked in evidence can be given to

3   you.  Now there have been references to reports, to written

4   statements; they are not in evidence, so they will not be

5   available to you.  You rely upon your own recollection, all

6   right?  Police reports too.

7              Very shortly you will go into the jury room to start

8   your deliberations.  You are to apply the law as I have

9   instructed you to the facts as you find them for the purpose of

10  arriving at a fair and correct verdict.  The verdict must be --

11  must represent the considered judgment of each juror and must

12  be unanimous as to each charge.  This means all of you must

13  agree if the defendant is guilty or not guilty on each charge.

14             It is your duty as jurors to consult with one another

15  and to deliberate with a view of reaching a -- an agreement if

16  you can do so without violence to individual judgment.  Each of

17  you must decide the case for yourself but do so only after in

18  impartial consideration of the evidence with your fellow

19  jurors.  Now remember what I said; you are to deliberate and

20  you come to a conclusion after impartial consideration of the

21  evidence with your fellow jurors.  In the course of your

22  deliberations do not hesitate to re-examine your own views and

23  change your opinion if convinced it is erroneous.  Do not -- but

24  do not surrender your honest conviction as to the weight or the

25  effect of the evidence solely because of the opinion of your

1  fellow jurors or for the mere purpose of returning a verdict.

2  You are not partisans now, you are judges, judges of the fact.

3         And as I said, in this case you may return a -- you

4  must return a verdict on each charge of either guilty or not

5  guilty.  This is a criminal case and therefore your verdict --

6  verdicts, whatever it -- whatever they be as to the offenses

7  charged must be unanimous.  All 12 who are ultimately chosen as

8  a deliberating jury must agree on its verdict.  You will have a

9  copy of that verdict that I mentioned to you or you viewed to

10 assist you.  This verdict sheet is not evidence.

11        If during your deliberations you have a question or

12 feel that you need further assistance or instructions from me,

13 write your question on a sheet of paper, give it to the Sheriff

14 -- my Sheriff's office.  The foreperson of the jury will do

15 that and then he will -- he'll be available and he'll turn that

16 question over to me.  I will then go over the question with the

17 attorneys and I will try to answer you as quickly as possible.

18 Please be patient.  If you do send a question or a note out for

19 any reason do not disclose where you stand on your

20 deliberations.  Do not tell us, as an example, that you are ten

21 to two or eight to four on a given charge.

22        If you have reached a unanimous verdict on each

23 charge, buzz for my officers and the Sheriff's officer will

24 then bring that information to me and we will bring you back

25 into the courtroom and receive your verdict here.

Colloquy

154

1      Sidebars, counsel?

2                    (SIDEBAR)

3      THE COURT:  Any exceptions?

4      MS. BAGLIVI:  Judge, I might -- obviously I missed

5  it, did you charge reasonable doubt?

6      MR. WEICHSEL:  I know you charged presumption of

7  innocence in the beginning.

8      MS. BAGLIVI:  Yes, I know, I understand --

9      MR. WEICHSEL:  Yeah, he charged it.

10     MS. BAGLIVI:  Okay, just -- I am sure you did, it was

11  all in with everything else, but --

12     THE COURT:  Yeah, I did.

13     MS. BAGLIVI:  -- I must have just missed it.

14     MR. WEICHSEL:  It's one of the first things he

15  charged.

16     MS. BAGLIVI:  Okay.

17     THE COURT:  Yeah, I did charge it.

18     MS. BAGLIVI:  No other exceptions.

19     THE COURT:  Any exceptions?

20     MR. WEICHSEL:  No.

21     THE COURT:  Okay, let's go to work.

22                    (END OF SIDEBAR)

23     THE COURT:  I called the attorneys over to ask did I

24  forget anything.  So okay, we're ready to go.  Put the 14 names

25  in the -- in the box and pick two out.  Let me get my jury list

Colloquy                                    155

1   out.

2            THE COURT OFFICER:  Alternate number one is juror

3   number four, Lisa Geovala (phonetic).

4            THE COURT:  You're alternate number one.  Why don't

5   you step down?  I guess we don't have any chairs.  Why don't

6   you sit in the front row over there?

7            THE COURT OFFICER:  Alternate number two is juror

8   number 12, Joseph Pelateri (phonetic).

9            THE COURT:  You're alternate number two.  Ms. Monteck

10  (phonetic), you are the foreperson of the jury, that's because

11  you're number one, that's all.  It's nothing -- nothing more

12  than that.  It will be your responsibility to lead the

13  deliberations.  It is also your responsibility to tell us what

14  the verdict is when you -- when the jury has decided it.  And

15  when we ask you to come out with the verdict please resume the

16  seats that you're in now, ladies and gentlemen, and then we'll

17  take the verdict from the foreperson.  The foreperson then will

18  -- well I'll ask the questions.  What I'll do is, the verdict

19  sheet that you have, I will go over the questions and you will

20  answer them as you have them.

21            Now as a foreperson your vote does not carry any

22  greater weight than any other juror in this -- in the jury

23  room.  It -- we simply designate you as foreperson for

24  administrative reasons to preside over the deliberations and to

25  tell us the results.  All right?

Colloquy

1    As soon as my officers now are sworn you will be --
2    you will return to the jury room.  Do not begin your
3    deliberations until the jury verdict sheet has been sent in and
4    we organize some of the exhibits and get them into you and
5    again, I keep -- I remind you that all those boxes there, and
6    there are one, two, three, four, five, six, seven, eight --
7    eight boxes full of -- filled with evidence and then there's a
8    lot of charts.  I'm going to send in the charts and papers,
9    those boxes I'll leave them available to you.  I think you have
10   an idea of what's in them.  If you want them in there you can
11   just ask for them.  It's up to you; if you want them all in
12   there I can send them all in, pile them all up if you want to
13   go through them, or if you have any ideas that you want to see
14   anything I'll have it right outside the room.

15   Now the alternates, this is for you.  You are not
16   excused, okay?  You will be kept in a separate location in case
17   it becomes necessary to substitute one or both of you for any
18   one of the jurors that have now been selected.  You should not
19   therefore discuss this case with anyone or between yourselves;
20   you still can't talk about the case because if one of you go in
21   then you've discussed it outside of the jury.  You can talk
22   about anything else you want but don't talk about the case.  If
23   it becomes necessary to substitute an alternate I will give you
24   and the remaining deliberating jurors further instructions of
25   law at that time, it's not necessary now.  If there is a

1  question or a verdict we will bring you back into the courtroom

2  so that you may depart then, okay?

3           Swear in the officers please?

4             (THE COURT OFFICERS ARE SWORN)

5           All right now, ladies and gentlemen, it's now about

6  25 minutes to four, it's late. You've had a long day. You can

7  begin your deliberations and any time you want to break and go

8  home and come back and deliberate tomorrow again first thing,

9  that's up to you. I don't intent -- I don't -- I really don't

10 think you should stay more -- you know, late into the evening

11 unless you want to. But if you feel that you want to come back

12 tomorrow at any given time you go in there and get organized

13 and you get -- you get an idea of how you will progress. And

14 if -- you might have a verdict, if you have a verdict today

15 that's fine. If you want to come back tomorrow we'll available

16 for you. Okay?

17          Now you may take the case now members of the jury and

18 render your verdict based on the instructions given to you and

19 -- in this charge as your conscious, your reason and candid

20 judgment deems proper. All right, you go down to the jury room

21 now. If you have anything -- the two alternates, if you have

22 anything you want to take out go down there now. Do not start

23 discussions until I sent word into you, all right?

24            (THE JURY IS EXCUSED TO DELIBERATE)

25          THE COURT: Anything else, counsels?

Colloquy                                    158

1          MS. BAGLIVI:  Judge, the only thing is I -- maybe we

2     should remind the jury that I broke the glass, the champagne

3     glass that's in the box so nobody sticks their hand in there?

4     There is broken glass and --

5          THE COURT:  Well if they -- if a box is going in

6     we'll remind them.

7          MS. BAGLIVI:  Okay.  Mr. Weichsel and I during the

8     break went through the loose items that I have that were not in

9     the boxes, they were in my book.  Your Sheriff's officer put

10    them in a folder.  All the charts and pictures are right there,

11    only the ones that were marked into evidence are there and all

12    of the boxes we took out anything that was not -- like the

13    tapes, the videotapes and things of that nature, they're all

14    out of the boxes and downstairs.

15         THE COURT:  Is there any -- any objection on your

16    part as to the way I've elected to proceed about the boxes?  Do

17    you want them to all go into the jury room or do you have any

18    problem with that?

19         MS. BAGLIVI:  Judge, I don't -- it doesn't really

20    concern me, the only concern I have is if at the end of the day

21    they don't reach a verdict if you could store them, maybe lock

22    them in the holding cell; I would have no objection to that.

23    You know, if you want to leave them in the hallway and they

24    want to just ask for boxes I don't have a problem with that.  I

25    --

1           THE COURT:  All right.

2           MR. WEICHSEL:  I don't have any problem with that,

3   judge.  Judge, I'm supposed to be --

4           THE COURT OFFICER:  Quiet in the courtroom please.

5           MR. WEICHSEL:  I'm supposed to be in Paramus

6   Municipal Court at 4:30.  Do you think you can have somebody

7   from the court call to tell I'll be late?

8           THE COURT:  Who is the judge there?

9           MR. WEICHSEL:  Bushman.

10          THE COURT:  Well they go all night, don't they?

11          MR. WEICHSEL:  What?

12          THE COURT:  They go all night?

13          MR. WEICHSEL:  Well I don't know that they go all

14  night on Mondays, judge, I think he just has attorney

15  conferences on Mondays.  He probably goes till about --

16          THE COURT:  Well I'm not going to call, you call

17  them.

18          MR. WEICHSEL:  Okay.

19          THE COURT:  You call and tell them you have a jury

20  out and if there's any problem then I'll -- I'll deal with it.

21          MR. WEICHSEL:  Okay, fine.

22          THE COURT:  All right?  We'll take a five minute

23  break.

24                          (RECESS)

25                  (THE COURT HEARS OTHER MATTERS)

1    THE COURT:  Bring the jury up please?  Bring the jury
2  up.  They're coming back tomorrow.

3    MS. BAGLIVI:  What time?

4    THE COURT:  We'll find out.

5    THE COURT OFFICER:  Your Honor, they've indicated to
6  me they already have some markings on the verdict sheet and I
7  had them seal it and I had juror number one sign across the
8  fold.

9          (PAUSE - THE JURY ENTERS THE COURTROOM)

10    THE COURT:  I have a note that you want to start
11  tomorrow at 9:15, ready to go at 9:30.  Is that right?

12    THE JURORS:  Yes, sir.

13    THE COURT:  All right, that's fine, there's no
14  problem with that, it's been a long day for all of us.  So I'll
15  ask -- and I have your verdict sheet that's sealed in here and
16  I'll keep that.  Don't discuss the case now with anybody at
17  home, all right?  And that also goes for the alternates.  I
18  expect you two to be back here tomorrow too.  You are not to
19  report to the jury room, but to -- where -- where are they, are
20  you down at central jury room?

21    THE ALTERNATES:  Yes.

22    THE COURT:  All right, so you -- that's where you
23  will report, down there.

24    There may be something in the newspaper on this case
25  and so be careful, don't be reading anything.  Safe home, we'll

Colloquy                                           161

1  see you here tomorrow, thank you.  You can go out this way, go

2  around the back.

3            (PAUSE - THE JURY LEAVES THE COURTROOM)

4            THE COURT:  Okay, we'll see you tomorrow then?

5            MS. BAGLIVI:  Judge, do you want us here to send them

6  out or how are you going to -- you're going to just send --

7  tell them to start deliberating once they're all here or do you

8  want us present to do a roll call in the courtroom?

9            THE COURT:  Yeah, we're going to do a roll call on

10  this one.

11            MS. BAGLIVI:  Okay.

12            THE COURT:  What do you think?

13            MR. WEICHSEL:  I -- I don't think -- I -- for my

14  purposes I don't think -- if they're all here, judge, they can

15  start deliberating.

16            THE COURT:  All right, when we get all 12 here and I

17  can do a roll call without you, that's the --

18            MS. BAGLIVI:  Yeah, I would just like to do the same

19  thing that Mr. -- I don't want one of us here and one of us not

20  here.

21            MR. WEICHSEL:  Yeah, I understand that.

22            MS. BAGLIVI:  So whichever the court --

23            MR. WEICHSEL:  Judge, I don't think we have to be

24  here unless you really --

25            MS. BAGLIVI:  No, I don't, I just.

1           MR. WEICHSEL:  No, I don't either, judge.

2           THE COURT:  Well you've got to be here for your

3    evidence.

4           MS. BAGLIVI:  Well no, the evidence is staying here,

5    it's being locked up.

6           THE COURT OFFICER:  We're going to lock everything in

7    the holding cell, Your Honor.

8           MS. BAGLIVI:  So --

9           THE COURT:  All right, then I'll -- when the 12 of

10   them are here in the morning I'll start them deliberating.

11   Okay?

12          MS. BAGLIVI:  Okay; without us?

13          THE COURT:  Yeah, and you're going to go to your

14   office, Mr. Weichsel?

15          MS. BAGLIVI:  I'll be in --

16          MR. WEICHSEL:  I'll be at my office, judge.

17          THE COURT:  All right, and you'll be in your office?

18          MS. BAGLIVI:  And I'll be in my office.

19          THE COURT:  All right, and you'll be in the circle?

20   All right?  She has to come over and be in the circle.

21          MR. WEICHSEL:  Judge, I -- just a question of

22   logistics.  I have some change of clean clothes that she wants

23   to wear in the morning. What -- should I bring them to the jail

24   or the circle or?

25          THE COURT:  They may be covering that course now in

1    the judicial college and I'm not there.

2              MR. WEICHSEL:  I don't know, judge, I'm just a

3    lawyer.

4              THE COURT:  I don't know either.

5              MS. BAGLIVI:  I think you bring them to the jail

6    because we had a problem last time; you had them here and they

7    would not let her change here.

8              MR. WEICHSEL:  Okay.  I'll get them over to the jail.

9              MS. BAGLIVI:  Probably at the jail.

10             THE COURT:  Get them over to the jail this evening.

11             MR. WEICHSEL:  I will.  Okay, thank you, Your Honor.

12             MS. BAGLIVI:  Good night.

13                        *           *           *

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>CERTIFICATION</u>

2       I, Dolores Hastings, the assigned transcriber, do

3  hereby certify the foregoing transcript of proceedings in the

4  Bergen County Superior Court, Law Division, Criminal Part, on

5  November 25, 1996, on tape number 191-96, index number from

6  00:00:00 to 04:44:20 and index number from 05:08:05 to

7  05:11:43, is prepared in full compliance with the current

8  Transcript Format for Judicial Proceedings and is a true and

9  accurate non-compressed transcript of the proceedings as

10  recorded.

11

12  _____          _____417_____

13  Dolores Hastings                     AOC Number

14

15  KEMCO TRANS, INC.                    7/11/97

16  Agency Name                          Date

17

18

19

20

21

22

23

24

25