EXHIBIT 33

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
BERGEN COUNTY
DOCKET NO. 95-07-00889
A.D. #_____

STATE OF NEW JERSEY,      )
                    )
        Plaintiff,    )
   vs.               )      TRANSCRIPT OF
                    )        SENTENCING
JAMIE FARTHING,        )
                    )
        Defendant.    )

Place: Bergen County Courthouse
       Hackensack, NJ 07601

Date:  February 14, 1997

BEFORE:

    HONORABLE TIMOTHY J. SULLIVAN, J.S.C. AND JURY

TRANSCRIPT ORDERED BY:

    DEBORAH COLLINS, ESQ. (Office of the Public Defender)

APPEARANCES:

    PATRICIA BAGLIVI, ESQ. (Assistant Prosecutor)
    Attorney for the State of New Jersey

    JOHN WEICHSEL, ESQ.
    Attorney for the Defendant

Transcriber Dolores Hastings
KEMCO TRANS, INC.
P.O. Box 900
Clark, New Jersey 07066
(908) 382-8500

Video Recorded
Recording Operator, Irene Nigro

1                           I N D E X

2   Colloquy                                          3

3

4   Graves Act Hearing (2C:43-6)                      18

5   THE COURT:   Decision on the Graves Act Hearing   19

6

7   Colloquy                                          19

8

9   The Sentence                                      26

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

colloquy                                                3

1          THE COURT:  All right, let's begin this morning with

2    State versus Farthing.

3                              (PAUSE)

4          THE COURT:  Ms. Baglivi?

5          MS. BAGLIVI:  Your Honor, the State moves to sentence

6    of Jamie Farthing on Indictment 889-95.

7          THE COURT:  Mr. Weichsel?

8          MR. WEICHSEL:  Yes, Your Honor.

9          THE COURT:  Have you had an opportunity to review the

10   pre-sentencing report with your client?

11         MR. WEICHSEL:  I have, judge.

12         THE COURT:  Are there any deletions, corrections,

13   amendments?

14         MR. WEICHSEL:  No, judge.

15         THE COURT:  All right, I'll hear you on sentencing.

16   And, Ms. Farthing, you'll have an opportunity to address the

17   court when Mr. Weichsel finishes addressing the court

18   pertaining to your -- your sentencing, all right?

19         MR. WEICHSEL:  Judge, I would also ask the leave of

20   the court, I -- Jamie's father, Paul Farthing and stepmother,

21   Kathy Farthing, also want to address the court.

22         THE COURT:  Yes.

23         MR. WEICHSEL:  Thank you.

24         Judge, it is always difficult to go before the court

25   when someone as young as Jamie Farthing comes before this

1   court.   And I know the court under mandatory sentencing laws

2   must impose a very severe sentence.   I'm also aware that Your

3   Honor sat through the trial of this case, heard the evidence in

4   this case.   And I know Your Honor also heard the evidence of

5   the psychological and psychiatric witnesses regarding Jamie

6   growing up.

7           And the one thing that -- that really, really struck

8   me about the testimony in this case regarding Jamie Farthing is

9   that while she chronologically was 18 years old on August 5th,

10  1994, mentally she was more like a 12 or 13 year old or 14 year

11  old.   And while her mental state was not such that the jury

12  found a lesser offense for diminished capacity I submit, judge,

13  that the court can take into account her upbringing, the total

14  turmoil in her life, the abuse that she was subjected to in

15  fashioning a sentence for Jamie Farthing.

16          Judge, I don't think for one minute had Jamie

17  Farthing not met this monster, this incarnation of evil in Ivy

18  Demolena that she would have participated in the events that

19  led to the killing of James Polites.   And I know, judge, from

20  talking to Jamie, that she with true sincerity and remorse

21  regrets the death of James Polites.   And she regrets her course

22  of events in the summer of 1994.   She is truly sorrowful and

23  remorseful for what happened.   And she knows that she has to

24  pay for what she did. And she knows that she's going to be

25  paying for a long time.

1          Should the court impose the minimum sentence of 30

2    years without parole the earliest Jamie could be paroled would

3    be age 48.  And that -- that literally, judge, is -- is -- is

4    the better part of one's lifetime.  She is going to spend the

5    years when most of us grow and mature and most of us find

6    spouses and have children and raise a family behind bars.

7    She's going to spend a barren, spinsteress life behind bars at

8    Clinton Reformatory.  To make it worse, judge, she's going to

9    be far from her family.  Her father and stepmother live in

10   Georgia.  Her natural mother, Loopey Anderson, lives in

11   Florida.  And I'm not trying to minimize the horror and the

12   loss and the tears the Polites family have shared.  I've seen

13   the Polites family here in court for the entire trial and for

14   the pretrial proceedings and here today.  I've read the letters

15   from the family members and I feel for them.  But, judge, in a

16   sense Jamie Farthing too was a victim of Ivy Demolena's

17   nefariousness.  I mean this -- I know Ivy Demolena hasn't gone

18   to trial yet, but I submit from what we've seen in this case

19   she is -- she is the incarnation of evil.  She is as wicked

20   and soulless and heartless as anyone could be.  A woman who

21   could arrange the murder of someone that she had dated, a woman

22   who could manipulate Jamie Farthing and Thomas Christopher

23   James and others to do acts that they otherwise wouldn't have

24   thought of.

25          Judge, I submit that Jamie Farthing was not the

1   leader here, and I believe the prosecutor agrees.  I submit

2   that Jamie Farthing was someone who during that time because of

3   events in her life, because her father asked her to leave the

4   house, because she had no constant, because she had no roots,

5   because she was adrift, with a natural mother who hasn't even

6   sent a letter to this court, who hadn't appeared at trial, who

7   isn't here at sentencing.  For the first time in maybe ten or

8   more years in the summer of 1994 she had contact with her

9   natural mother.

10          Unfortunately because she was adrift and she didn't

11  have an anchor and a constant she listened to the blandishments

12  of Ivy Demolena and let her head be filled with the nonsense

13  that Ivy Demolena filled it with.  And she was gullible and she

14  was naive and she listened to her.  What -- what did Jamie

15  Farthing get out of this?  Some nights in a hotel, a stupid

16  little ring, some other trinkets that were down in Georgia,

17  some -- some neckties and other things.  It is a tragedy,

18  judge.  It is truly, truly a tragedy for everybody concerned.

19          And Jamie Farthing for the next at least 30 years is

20  going to be sitting in a jail cell thinking about her

21  stupidity, her naivety, her gullibility and how at the age of

22  18 you can take a life and really mess it up for the rest of

23  your life.

24          She still has to face charges in New York, in Suffolk

25  County and in Manhattan.  I don't know what's going to happen

1   with those charges, whether they're going to be pleas or

2   trials, whether they're going to offer a plea agreement or not.

3   But I ask the court to look at the total picture here and

4   realize that 30 years without parole is a tremendous amount of

5   time.   And under the Code of Criminal Justice, that that is a

6   sufficient amount of time for both retribution and punishment

7   an deterrents.   Thirty years without parole is a tremendous

8   amount of time.   Thank you, Your Honor.

9          THE COURT:   Okay, Mr. Weichsel, would you client want

10  to speak first or her parents?

11         MR. WEICHSEL:   I think your parents?   Her parents,

12  judge.

13         THE COURT:   All right.   Come right up and stand next

14  to Mr. Weichsel please?   All right, state your name on the

15  record?

16         MS. KATHY FARTHING:   My name is Kathy Farthing, the

17  adopted mother of Jamie Farthing.

18         I would just like to ask this court to be as lenient

19  as possible in sentencing my daughter.   My personal feelings is

20  that my daughter is as much a victim as James Polites.   She was

21  led into something by Evia that she had no idea what it was

22  going to be.   I know that during the summer of 1994 she was on

23  drugs and maybe Patty says well why didn't I get her help

24  because I'm a social worker; I had tried that with her brother

25  and it didn't work so I figured tough love would be better.   To

1   follow my husband's advice I let her leave and maybe she'd

2   learn.   But unfortunately she met Evia who had already set up a

3   relationship with James Polites and she got led into something

4   that was beyond her control.

5            Jamie is not a bad person, she's a very good girl.

6   You may say well why did she do that, but she's got a good

7   heart.   Children love her, old people love her, and she's very

8   good with those kinds of people.   She's loving and caring and

9   gentle when it comes to that.   She was desperate that summer I

10  guess to -- to -- to keep her habit up of whatever drugs she

11  was doing.   I really don't know what all drugs that she was

12  doing, but I do know she wasn't a bad person.   And I love her

13  very much and I don't think she deserves to be there forever.

14            THE COURT:   Thank you.

15            MR. WEICHSEL:   Paul?

16            MR. PAUL FARTHING:   My name is Paul Farthing, I am

17  Jamie Farthing's father.

18            THE COURT:   Mr. Farthing?

19            MR. PAUL FARTHING:   Your Honor, I just -- I'd just

20  like to address the court that -- that I feel the same as my

21  wife, that Jamie was more or less a victim in this, these

22  people associated with this Evia person that came. And then I

23  want to express that Jamie, even though previously I -- I

24  didn't understand and didn't do right by her that through help

25  from others and all that she will have moral support from the

1   entire family that she comes from.  And I just -- I would like

2   to ask for leniency for her.

3          THE COURT:  Thank you.  Ms. Farthing, do you want to

4   say something?

5          MS. JAMIE FARTHING, THE DEFENDANT:  I really don't

6   know what to say.  I just wish I never would have got involved

7   with Evia and that whole crowd and everything like that.  And

8   I'm really not a bad person.  And I know you all think I'm like

9   this horrible monster or something like that, but I'm really

10  not.  And I just wanted to say to you all that I'm really sorry

11  and that I'll try to keep you all in my prayers because I know

12  how hard it was for you all togo through this trial and it's

13  going to be a lot harder when you Evia and Chris get here.

14  That's all I want to say.

15         THE COURT:  Thank you.  Ms. Baglivi?

16         MS. BAGLIVI:  Your Honor, we're here today to

17  sentence Jamie Farthing and let's not make no bones about it,

18  she is not the victim here.  Robert Hippman and James Polites

19  are the victims in this case.

20         Judge, Mr. Weichsel says she'll be 48 years old if

21  you give her the minimum sentence, that's the better part of

22  her life.  Well, judge, the better part of James Polites' life

23  is gone.  He was my age when he was killed and he had his whole

24  life in front of him. This is the time when life is good; we're

25  established, we have our jobs, our friends and our family. We

1  can now start enjoying out lives.  He does not have that

2  opportunity anymore.  He has been taken from his family.  You

3  see what devastation that the acts of this defendant the others

4  -- because I don't say she acted alone, we never said that --

5  but you can see what kind of devastation on this family because

6  of the actions of this defendant and others.

7          Judge, Jamie Farthing says she's the victim of Ivy

8  Demolena.  Well, judge, I think the trial bore that out.  Ivy

9  Demolena may have been the leader and whose idea it was and set

10 everything in motion.  But Jamie Farthing was not a victim, she

11 was a willing participant, a willing accomplice.

12         Your Honor, most telling in this case was the

13 testimony of Edward Kummer, her ex-boyfriend.  Judge, when I

14 went down to interview him in October right before the trial

15 that was when I found out for the first time that Jamie

16 Farthing had come back down to Georgia.  During the course of

17 this six week incidents in New York and New Jersey she had gone

18 back down to Georgia away from Ivy Demolena to bring back some

19 of her loot.  And Kummer at that point said please stay, don't

20 go back.  And her response to him was, but I'm having so much

21 fun.  Judge, she made those statements when she went back to

22 Georgia which was after the Hippman robbery, the Polites

23 homicide and the Fiametta homicide.  She went back down there

24 out of the spell of Ivy and she turned around of her own free

25 will and went back to New York because she enjoyed the good

1   life.

2          Mr. Weichsel says what did she get out of this?

3   Judge, none of them -- as I explained to the jury and I showed

4   through the evidence -- there wasn't a lot of money to be

5   gained here.  What money they got they spent on hotel and

6   clothing.  Kummer said she had all new clothes, she had some

7   jewelry. This woman was not a victim of Ivy Demolena, she was

8   an accomplice of Ivy Demolena.

9          And, judge, yes, the roles are different.  Her role

10  is different than Ivy Demolena's and Thomas Christopher James.

11  And that's why this is not a death penalty case, yet the State

12  will be asking a jury to impose a death penalty on the other

13  two.  The State recognizes the difference in the roles, but

14  that doesn't mean for one minute that she should not have been

15  found guilty of murder, of felony murder, of kidnapping, armed

16  robbery, and the crimes on Mr. Hippman the night before.

17          Everyone says she was high on drugs, high on alcohol;

18  she says and her parents say it.  Judge, there was not one

19  shred of evidence other than the doctors telling us that that's

20  what she told them, that there were drugs or alcohol involved.

21  There was a glass of wine at Hippman's resident, there was a

22  bottle of Gold Schlager opened at Mr. Polites' house. There

23  were no drugs.  There were no drugs found anywhere or any

24  paraphernalia found on any single defendant in this case;

25  nothing found in Georgia, nothing found in New York and nothing

1   found at any of the scenes that would suggest that this

2   defendant was heavily into drugs.  She had no money to buy

3   drugs.  Drugs and alcohol were not an issue here.

4           Judge, I feel sorry for her parents.  But it's about

5   time that this defendant takes responsibility for her own life.

6   I have heard them take responsibility for these crimes.  But

7   until this moment when Ms. Farthing said I'm sorry, that's the

8   first time she's taken any responsibility in these crimes.

9   These parents -- when I first read the -- the file in this case

10  and I read the psychiatric report I thought when Mr. and Mrs.

11  Farthing came in I was going to see two monsters.  But you

12  heard them testify.  They gave her a good life.  Maybe it

13  wasn't perfect, but none of us have had perfect upbringings.

14  They tried very hard and it is not their fault that their

15  daughter turned out the way she turned out. And it is not Ivy

16  Demolena's fault that she turned out the way she turned out.

17  She made a conscious decision to act as she did.  And she went

18  to Georgia and she came back to New York because she was having

19  so much fun.

20          In all the years that I've been doing, Your Honor, I

21  have never seen a family so devastated by the loss of a child,

22  never.  They are -- the Polites' are consumed by this. They

23  can't -- they call us, we speak to them constantly; they can't

24  get over the loss of their son.  And I never had the pleasure

25  to meet him however, by reading these letters from all the

1    friends and family members it is a tragedy.  It's a tragedy

2    when any life is taken, but especially when a man who did so

3    much for the world.  You heard the testimony from his business

4    partners, that he was involved in the bar on the publicity end

5    and he always ran charity events to raise money for charity.

6    He worked hard, he owned a shoe store, he worked there during

7    the day, at night he went to the bar and worked there.  This

8    man had a whole life in front of him.  He had a little three

9    year old niece that he could have enjoyed.  He doesn't have

10   that opportunity and she is missing that opportunity to know

11   her uncle.   This family is devastated and no matter what

12   sentence you give this defendant it can't bring their son back,

13   but it may be able to give them a sense of peace.

14              Judge, considering the aggravating and mitigating

15   factors here which is what the court should consider in

16   sentencing, I would suggest that there are many, many

17   aggravating factors in this case.

18              Aggravating factors number one and two, the heinous,

19   cruel or depraved nature of the crime or the second factor

20   which is the gravity and seriousness of the harm.  I know, Your

21   Honor, when looking at the Polites homicide cannot consider the

22   homicide as the aggravating factor because it is the charge

23   you're sentencing on.  However, in State versus Mara (phonetic)

24   1982 Appellate Division Court Decision, they said, "The court

25   can consider additional injuries as an aggravating factor."

1   What is needed for more than what caused the death of James

2   Polites.   Well we know James Polites was strangled and hung

3   from the door knob. And that is the -- what caused his death.

4   However, I think the court can consider the additional injuries

5   that he had to suffer before he was killed as aggravating

6   factors.   And that will be, judge, the gun butt to the head or

7   the -- the 25 pound weight that was used on this defendant.

8   Those were additional injuries; they were not needed to kill

9   Mr. Polites, and as Dr. Singh said, they didn't cause his

10  death.   Those were just additional things that this defendant

11  was an accomplice to.   It wasn't a quick and painful death;

12  they hit him a few times before they finally killed him.   Those

13  are aggravating factors.

14          Number three, the risk of this defendant committing

15  another offense.   Judge, I would suggest it's not -- it may not

16  be high, but it's definitely not low.   I think it's somewhere

17  in the middle towards the high end.   And the court again, an

18  Appellate Division in 1991 under State versus Tanksley

19  (phonetic) says, "The court can predict future risk based on

20  charges of arrest which have not resulted in a conviction."

21  Well I submit to you, you know from this case and you know from

22  reading some of the reports here that after she committed the

23  Hippman crime they went the next night, they committed the

24  Polites homicide. And then two nights later this defendant has

25  confessed to another murder in New York on Long Island.

1  Additionally, Your Honor, she was involved in the crimes, as

2  Mr. Weichsel pointed out she's facing charges in Manhattan for

3  the Iroquois Motel robbery.  As they checked out of the hotel

4  that night they needed more money, they robbed the Iroquois

5  Motel.  So when looking at all of these factors and considering

6  the prior incidents she had with the teacher while she was in

7  school where she threatened to burn down his house, I think you

8  can predict the future of this defendant in terms of the

9  likelihood of committing another offense.  It is there, it is

10  present, and that is an aggravating factor.

11          Need to deter this defendant?  Judge, obviously most

12  paramount in this case because this is a homicide case.  And in

13  State versus Rivers (phonetic), Appellate Division again, 1991,

14  they said that, "This factor can be shown through the

15  defendant's persistent in-court denial of involvement coupled

16  with her out of court confession and her lack of remorse.

17  Judge, not once during this whole investigation, through the

18  whole putting together of this crime did this defendant every

19  take responsibility or ever show any kind of remorse.  Yes, she

20  says she was there but she knew nothing about the murder.  Yes,

21  she was there but she didn't know about the plan.

22          Judge, in this 90 some odd page statement, the

23  stenographic statement, not once are the words I'm sorry this

24  ever happened in here.  In fact it's very cold and calculating

25  if you recall Lieutenant Kane's testimony when he read the

1    statement. And most telling is page 48 of that statement where

2    she's talking about -- where she goes back upstairs into the

3    Polites apartment and she sees Mr. Polites with a tie or a cord

4    or something around his neck, hanging from a door knob.  "His

5    face wasn't touching the ground, it was just handing there and

6    there was blood all over the pillow case and it was all over

7    the carpet", this is on page 48.  And the investigator says,

8    "Well what did you think?"; and her response is, "I just

9    thought they killed him."

10             "Did you ask him what happened?"

11             "No, I went back downstairs."

12             Judge, I -- this belies -- it's uncomp --

13   incomprehensible that she claims she walked in on a man having

14   just been murdered and she doesn't say a word.  She though, oh,

15   they just killed him.  What do you do?  I go back downstairs

16   and continue packing up all of our loot.  She doesn't say oh my

17   God, what have you done, I can't believe it -- nothing.  Nope,

18   I just thought they killed him.  To me, judge, that is so cold,

19   so calculating, so lacking in remorse it's amazing.  So I would

20   submit that that is a factor the court could consider.

21             Looking at the mitigating factors; strong

22   provocation?  I think I've already addressed that.  No, not

23   strong provocation, maybe being led by Ivy Demolena?  Of

24   course.  Maybe if she hadn't met Ivy Demolena this wouldn't

25   have happened, but how do we know if she hadn't met Jane Smith

1    and Jane Smith came up with this idea that she wouldn't have

2    gone along with it.  I don't think the strong provocation here,

3    judge, when we know for a fact that she went back down to

4    Georgia, back to her family, back to her friends, and she still

5    decided of her own free will to return to New York and New

6    Jersey because that is where she wanted to be.  Strong grounds

7    to excuse?  Judge, this psychiatric testimony didn't even rise

8    to that level. The jury did not buy it, there was no proof.  I

9    think Dr. Simring was clear; yes, she may have had a hard life,

10   he accepted that as a fact.  But that doesn't excuse or justify

11   her behavior by any means.

12           So, judge, the only thing that the court -- that the

13   State could say regarding mitigating factors is her age and the

14   fact that the only prior she had was that incident with the

15   teacher.  But then again, she was only 18 so she doesn't really

16   have any adult history because she wasn't an adult for that

17   long.

18           Looking at all of those aggravating and mitigating

19   factors I would submit that the aggravating substantially

20   outweigh the mitigating factors.  And I would ask regarding the

21   Hippman crimes, which would be counts one through four, that on

22   the kidnapping count, Your Honor -- she was convicted of first

23   degree kidnapping.  I would ask that you give her a 30 year

24   state prison sentence, 15 years without parole.

25           Count two, which is the armed robbery.  I would ask

1   that you run that concurrent to count one and I would ask that

2   the court give her a 20 year sentence, 10 years without parole.

3            THE COURT:  Counsellor, just --

4            MS. BAGLIVI:  Sure.

5            THE COURT:  Just stop before we -- I just want to

6   follow the statute which 2C:43-6 requires that the court have a

7   hearing at the time of sentencing if it's a Graves Act offense.

8   And I don't think we've done that yet and I'd like to do that

9   at this time.

10           So pursuant to 2C:43-6, it's incumbent upon the

11  prosecutor to establish by a preponderance of evidence that a

12  weapon was used or possessed -- weapon used or possessed was a

13  firearm.  And in making that finding I have -- I can take

14  judicial notice of any evidence that has been produced at trial

15  during the testimony in a pre-trial -- in the pre-sentencing

16  report, et cetera.  Is there anything else the State wants to

17  add?

18           MS. BAGLIVI:  No, judge, it would just be the

19  testimony of the police officer who found the guns and the

20  weapons that they were operable handguns.

21           THE COURT:  Mr. Weichsel, do you have anything that

22  you want to add here?

23           MR. WEICHSEL:  No.

24           THE COURT:  My -- I am going to take judicial notice

25  that this -- these crimes fall within the Graves Act Statute

1   which is 2C:43-6 thereby mandating that this court in

2   sentencing set -- set a period of parole and eligibility for

3   the armed robbery, that's count two, and the armed robbery in

4   the -- which is count 11 I believe.

5          My -- my read of the statute is that those are the

6   two Graves Act offenses.  Is that -- do we agree with that?

7          MS. BAGLIVI:  Well we would also -- possession of a

8   weapon without a -- a -- possession for a weapon for unlawful

9   purpose would also be Graves, but I believe that merges --

10         THE COURT:  It merges?

11         MS. BAGLIVI:  Right, into the armed robbery.

12         THE COURT:  Yeah, all right.  So we're in agreement.

13  Mr. Weichsel, is there is no exception on your part this court

14  will sentence the defendant under the Graves Act for those

15  charges, all right?

16         MR. WEICHSEL:  No objection.

17         THE COURT:  All right, now I'm sorry; you may

18  continue.

19         MS. BAGLIVI:  Okay.  As I said, judge, then count

20  three, possession of a weapon for unlawful purposes should

21  merge into count two.  And count four, possession of a weapon

22  without a permit does not merge however, I would ask that you

23  run that sentence concurrent to count one.  That would deal

24  with the Robert Hippman armed robbery and kidnapping from the

25  night before the Polites homicide.

1          Judge, regarding the Polites homicide which would be
2    count seven in this case, that's murder.  Judge, the minimum
3    would be 30 years without parole. Because the aggravating
4    substantially outweigh the mitigating factors in this case I
5    would ask that you impose a sentence of life, 30 years without
6    parole consecutive to count one. And, judge, the sentences in
7    this case for the Polites crime and the Hippman crime should be
8    consecutive.  You have two separate incidents here taking place
9    on two separate nights with two completely separate victims.
10   There should be no free crimes in this jurisdiction.  You
11   should not send a message that as long as you commit a series
12   of crimes in a row on different victims you'll have all of them
13   run together.  They should be consecutive.  There are two
14   victims to answer to in this case and I would ask that you run
15   those sentences consecutive.

16          The -- count eight and nine, the two counts of felony
17   murder -- murder, merge into count seven, the murder.

18          Count ten, the kidnapping, does not merge into
19   anything and I would ask that you sentence her to 30 years, 15
20   years without parole however, concurrent to count seven, the
21   murder.

22          THE COURT:  I'm sorry, say that one again?

23          MS. BAGLIVI:  The kidnapping, 30 with a 15 however
24   concurrent to the murder of Mr. Polites.

25          The armed robbery, counts 11, again I would ask --

```
 1              THE COURT:  I'm sorry, counsel, I think the statute

 2    was clear that a kidnapping charge where there is a murder

 3    involved has to run consecutively.

 4              MS. BAGLIVI:  I'm sorry, judge, I wasn't aware of

 5    that.

 6              THE COURT:  At least that's the way I read it.

 7    Kidnapping, 2C:13-1B.

 8                             (PAUSE)

 9              MS. BAGLIVI:  Judge, I'm sorry, you are are right.  I

10    did miss that.

11              THE COURT:  Yeah, and they must run consecutively if

12    there's a murder in the course of a kidnapping.  I think

13    there's -- they grade in kidnapping differently with sexual

14    offenses, children and then there's -- there's one where

15    there's a sentence imposed by the court where a kidnapping is a

16    result -- there's a murder in there that runs consecutive.

17              MS. BAGLIVI:  Yes, I'm sorry, judge, I missed that.

18    And I would ask that you then follow the law in that respect

19    and run that consecutive.  The armed robbery --

20              THE COURT:  There's no -- there's no stip mandated

21    though?

22              MS. BAGLIVI:  No, because that would be up to the

23    court.

24              THE COURT:  All right.

25              MS. BAGLIVI:  Armed robbery, count 11, it's a Graves
```

1   offense.  I would again that you impose the maximum under that

2   and run that also concurrent with count seven, possession --

3   count 12, the possession of a weapon for unlawful purposes

4   mergers into count 11, the unlawful purpose being the armed

5   robbery.  And count 13, possession of a weapon without a permit

6   does not merge however, I would ask that you impose that

7   sentence concurrently.

8          Your Honor, just to close and also I believe one of

9   the family members does want to address the court.  I just -- I

10  had a chance to read through the letters that were submitted on

11  behalf of the victim in this case, James Polites.  Many of them

12  were so well written, and I can't even -- I don't want to go

13  through all of them or point out anything in particular.  But

14  there was one thing and I really thing that this says it all.

15  This is a letter from Mrs. Polites' brother, and he says -- and

16  this was George Goyness (phonetic):

17          "The severity of the sentence imposed upon this

18  individual will in no way lessen the unbearable burden that the

19  family has endured and continues to bear.  Only the passing of

20  time and an abiding faith in God's will can assuage these

21  feelings of profound loss, suffering and sorry that the Polites

22  family endured and continues to bear -- continues to bear.

23  Neither will the sentence effect the reality of the situation.

24  By this depraved act of violence by this defendant a young life

25  filled with promise and hope for the future, loved by family

1    and friends, was savagely ended."

2              Judge, I asked the family if they wished to speak on

3    behalf of their son.  Mr. and Mrs. Polites said they thought

4    they would be much too upset to do so however, I do believe

5    Peter Polites would like to speak.  He is the brother of Jamie

6    Polites.

7              THE COURT:  Good morning, just state your name on the

8    record.

9              MR. PETER POLITES:  I'm Peter Polites, I'm the

10   brother of James Polites.

11             THE COURT:  Mr. Polites?

12             MR. PETER POLITES:  Yeah.  The first thing I wanted

13   to say is that my family really resents the comments made by

14   the family of this victim, of my brother who's the victim,

15   saying that she -- she is as much a victim as my brother.  We

16   resent that, that insults our intelligence.

17             The other thing I'd like to say is that I know you've

18   received a lot of letters.  I'm not privy to the content of the

19   letters but I know what they probably say, is they talk about

20   my brother and his attributes. And they try to define the

21   meaning or the impact that this crime has had on our family.

22   And believe when I tell you, no words can express what that has

23   done to our family, okay?

24             Probably also in those letters they -- they try to

25   appeal to you to -- to sentence this defendant to a just

1    sentence, to get justice.  Well we feel, as I think most law

2    abiding people, that for citizens to feel justice in this case

3    would be for this defendant and her co-defendants to meet a

4    horrific death like my brother did and to bring my brother

5    back; but that can't happen.  So secondary to that, in lieu of

6    that, I know this defendant will be sentenced to a -- to a long

7    term incarceration, probably the rest of her life in jail.  And

8    -- and she deserves it.

9            And I -- and I know from being at this trial every

10   day that the jury saw through this abuse excuse; they saw right

11   through it.  And society is -- is fed up with this abuse

12   excuse.  It's an insult to everyone's intelligence, okay?  So

13   now she's going to spend the rest of her life in jail and New

14   York is waiting for her.  When we finish with her here and get

15   her out of this system New York is waiting for her and you

16   know, -- and also, by the time she finds her real home in

17   prison this Bergen County Jail is going to seem like a country

18   club, it really is.

19           So -- but what I'd like to say to her is that if I

20   were here I'd get on my hands and knees every day and thank God

21   that there's a judicial system, okay, because just think if

22   this was a few hundred years ago or if this was a different

23   society or a different culture, or even modern times, if this

24   was in Singapore or in the Middle East.  Who knows where she'd

25   be?  But the State is going to take care of her; they're going

1    to feed her, they're going to give her a place to sleep,

2    they've coddled her.  I mean I saw her first arraignment

3    September 19th of '94.  Here is is February 14th of '97, okay?

4    It goes on and on.

5              So as far as we're concerned, I mean we're glad to

6    see her out of the system and we're going to wait for the other

7    defendants to come over.  But many times I've -- I've said and

8    I've told the prosecutor and friends and family that I can't

9    think of a more demeaning, despicable way to leave this life

10   then in the fashion my brother left his life.  Can you imagine

11   being set up in your own home and being killed with your own

12   possessions?  The weights that they hit my brother in the head

13   with were weights I got him for Christmas.  The neckties my

14   sister got him, possibly one of them is what they strangled him

15   with -- him with and left him hanging.  This is just a total

16   violation of -- of a human being's civil rights, a total

17   disregard for the rules of life, okay?  And there can be no

18   mercy in our society for -- for people like this, because if

19   there is mercy for people like this we're in trouble in this

20   society.

21             The last thing I'd like to say is that we have the

22   utmost faith and trust, that you, working within the confines

23   and within the parameters and the limits of the law, that you

24   will sentence this defendant to a just sentence.  And let me

25   just say on behalf of my family and the friends of my brother

 1   and every who knew him and loved him, thank you. That's all I

 2   have to say.

 3            THE COURT:  Thank you, Peter.

 4            Ms. Baglivi, one of the letters I received, there was

 5   a photograph attached to it, by Peter Karis (phonetic); is he

 6   here?  Would you see to it that he gets this photo back?

 7   There's no sense leaving it in this, it belongs to the family.

 8            MS. BAGLIVI:  Okay, yes.

 9            THE COURT:  I just want to check my calculations here

10   for a second, just bear with me.

11                          (PAUSE)

12            THE COURT:  Possession for the weapon for unlawful

13   purposes would be pertaining to Mr. Polites' death, is that

14   count 12 or 13?

15            MS. BAGLIVI:  Twelve.

16            THE COURT:  That's going to merge with the 11, right?

17            MS. BAGLIVI:  Correct.

18                          (PAUSE)

19            THE COURT:  All right, Ms. Farthing, would you please

20   stand?

21            Pursuant to Indictment Number 95-0700889 I have

22   reviewed your pre-sentencing report.  I have had the

23   opportunity to preside over the trial of this matter of these

24   two separate events, one involving Mr. Hippman in Hackensack

25   here, and one involving Mr. Polites in Edgewater.

1          Now I have letters received from the family of the

2    victim, numerous letters.  His -- a member of his family, his

3    brother, actually spoke here this morning.  I also heard you --

4    both your father and your stepmother testify during the trial

5    and also here this morning.  You're a young woman, you're 20

6    years old.  This event happened when you were 18.

7          This courtroom at the moment is filled -- filled with

8    tragedy, a dimension of which is very difficult for most of us

9    to understand except the parents of the victim.  All I could

10   think of when -- when I read these letters and when I -- I have

11   witnessed Mr. and Mrs. Polites sitting here day after day

12   listening to the -- to the horror of how their son died, I

13   could only think that they -- and his family, his brother was

14   here too most of the time and his sisters -- that they -- they

15   had a certain loyalty to him to be here.  But it had to be

16   painful for to -- to listen to the details.

17          There is a recent television personality which we all

18   are familiar with, Mr. Bill Cosby, whose son was killed sort of

19   aimlessly just killed.  And the press asked him since he was

20   you know, such a high profile person, you know, they were

21   trying to ask him how you feel.  And I remember his answer and

22   I -- and I can only feel the same way now.  He said only --

23   only a parent who has lost a child in this manner could

24   understand how I feel.  And that -- that's the way I feel.  I

25   think that we cannot -- we cannot begin to understand the --

1   the loss that the parents of the victim in this case feels. And

2   that was his answer and I believe that's probably the answer

3   that has to stand.  If you haven't lost a child in this manner

4   you cannot begin to understand what it feels like, and I accept

5   that.  I cannot; I can only imagine.

6            Now with that said we go back to what your father and

7   mother have to endure.  The next step is that their child is

8   going to be sentenced, for the rest of her life probably -- the

9   rest of her adult life in prison.  She will never get out.

10  It's a burden they have to carry too.  So it's a tragedy that's

11  filling the courtroom with everybody.  Families are destroyed

12  because of you; your own family as well as the Polites family,

13  not to mention what happened in Long Island.  And that's what

14  you did.

15           And there's -- as Ms. Baglivi said, there was a

16  defense raised that well you had a tough life.  But I remember

17  the summation of Ms. Baglivi.  She said hey listen, everybody

18  has a tough life, but they don't go out and start murdering

19  people like -- that's what you did.

20           So I find that there's very -- there's no remorse.

21  You've never expressed remorse. And there may be many reasons

22  for that.  I think that the feelings you have this morning and

23  the sorrow and the remorse you have is because you're faced now

24  with the -- with the ultimate decision of the court and of

25  society really.  It's not just me, it's the society that's

1    saying it, society is screaming out saying there must be a

2    response to this kind of activity, we cannot sit and tolerate

3    it.  We cannot allow people to come up from different states,

4    planned -- this is not just something that just happened, this

5    was planned weeks in advance to come up and rob people in

6    Bergen County or even in the New York area, kill them, and take

7    their belongings because you wanted some stuff, that's what you

8    said.

9            Your boyfriend, when he became aware of it, what

10   happened, even he said let's get out of here.  When he was told

11   -- and he testified right here -- he said when he was told what

12   had happened he said he  -- he didn't believe it, it was

13   unbelievable what happened.  He went back and confronted the

14   other two and confirmed it.  And he said to you let's get out

15   of here and you said no, I have to get more stuff.  He left, he

16   got out of the New York are and went back to Georgia.  And as

17   Ms. Baglivi said, no one knew that you returned to Georgia

18   until he told us.  And he only told them about a week before

19   the trial that you had come back and that you had went back up

20   to New York again.  So you had all of these opportunities to

21   get away from the situation which I find very difficult in

22   overcoming the fact that you had an opportunity to break it off

23   but you came back, you consistently came back to it.  So you

24   returned, your boyfriend indicated that you should withdraw.

25   He didn't even want to see you when you came back the second

1    time.

2              And then of course I must -- I must, and I cannot let

3    it go by, the tremendous and admirable police work that was

4    done in this case.  I cannot let that go by.  I listened to

5    this case and I knew very little about it when it was sent to

6    me.  I knew -- I didn't do any of the motions, I hadn't done

7    any of that.  I was given the case raw.  And to see and to

8    listen to how the Prosecutor's Office here and how the

9    Hackensack Police put together this crime and tracked you down

10   to the -- to the very threshold of your home in Georgia,

11   Conyers Georgia -- they probably didn't even -- had never heard

12   of Conyers, Georgia. But they stopped and they were standing

13   there when you were trying to get out and your parents were

14   trying to help you leave.  I'm sure your parents didn't even

15   understand the -- the -- the -- the -- the matter that you were

16   involved in.  All they knew was that you were in trouble and

17   they were going to help you, like any parent would do.  I'm

18   sure they didn't understand exactly what you were involved in.

19   But the police work from the New York City Police Department,

20   the Long Island Police, the Prosecutor's Office, the Georgia

21   Marshals, all of this, it was -- it's admirable and it's --

22   it's something that should -- we should all take to -- to heart

23   that there is -- there is -- there are ways in which the law

24   enforcement tracks down this kind of terrible, terrible event,

25   this diabolical episode, and that's what it is.

1            You had an opportunity to withdraw as I said.  It was

2    cold blooded, it was heinous.  You didn't even know the victim.

3    You didn't know who she was -- who he was, you could care less.

4            And then of course the other crimes that have been

5    alluded to which the court is considering; the murder out in

6    Long Island, I'm considering also the -- the charges of the

7    robbery at the motel in New York and the high living that you -

8    - that you had got yourself involved in supposedly in New York.

9            I agree with the prosecution.  In this case as I

10   heard it there's not one iota of evidence of any CDS, or

11   controlled dangerous substance, only except you telling your

12   doctors that you had gotten yourself involved in drugs; but

13   nothing came, came out of this.

14           So therefore in -- the aggravating factors the court

15   will consider is that -- well you have one prior arrest and

16   that involved a teacher.  I am not -- that's, you know, the

17   extent of your prior record.

18           I also find number one, the nature and circumstances

19   of the offense, the role that you played in the cold hearted

20   and cold blooded manner in which you functioned during these --

21   during the events, especially the Polites murder.  It was an

22   especially cruel and deprived manner, you hog tied him.

23           Number two, I also find that the harm inflicted on

24   Mr. Hippman, you tied him, you put a gun to his head.  You did

25   it, nobody else.  You put the gun to his head; he said that.

1  He sat here and said she did it; she put a gun to my head.

2          I think that you are a risk to repeat your criminal

3  behavior.  I've taken into account that there's charges in New

4  York for murder.  And certainly there's a need to deter you and

5  others from this -- from violating the law.

6          The mitigating factors I find are two; one, I --

7  which has to be applicable, the imprisonment of the defendant

8  would entail excessive hardship to herself and to her

9  dependents.  And number 13 I have to find as a mitigating

10  factor, the conduct of a youthful defender, and that's who you

11  are, was substantially influenced by another person more mature

12  than the defendant, and that's Ivy Demolena.  But that's it.

13          I conclude also -- I thereby conclude, given the

14  totality of the circumstances of both of these events that the

15  aggravating factors substantially outweigh the mitigating

16  factors.  I hereby sentence you as follows.

17          With regard to count one, which is the kidnapping of

18  Robert Hippman, you are hereby sentenced to be placed in the

19  custody of the Commission of Corrections for a period of 30

20  years.

21          Four count two, which is armed robbery of Robert

22  Hippman, and count three, which is possession of a weapon for

23  unlawful purposes, it's a Graves Act offense, they will merge.

24  You will be giving a sentence imposed a maximum of 20 years

25  with a ten year period of parole and eligibility.

1          Count four, which is the possession of a weapon

2    without a permit, you get the maximum sentence there of five

3    years.

4          Those -- count one and two and three merge, and count

5    four run consecutively -- concurrently.  Concurrently, that's

6    30 years with a ten year stip.

7          MS. BAGLIVI:  Judge, you said counts one, two and

8    three merged, just --

9          THE COURT:  No, count one --

10         MS. BAGLIVI:  Separate.

11         MS. BAGLIVI:  Okay.

12         THE COURT:  Two and three are merged.

13         MS. BAGLIVI:  Right.

14         THE COURT:  And count four.  That's 30 years with ten

15   stip.

16         With regard to count seven, knowingly and purposely

17   murdering Mr. James Polites, you are hereby sentenced to be

18   placed in the custody of the Commission of Corrections for the

19   rest of your life; life imprisonment, 30 years period of parole

20   and eligibility.

21         Now count and count nine which are felony murders of

22   kidnapping and armed robbery shall merge with count seven.

23         Count 11, armed robbery, will merge with count 12; 12

24   being the possession of a weapon, which is the gun, for an

25   unlawful purpose.  They will merge and you will receive a

1    sentence of the maximum of 20 years with a ten year period of

2    parole and eligibility.

3          Count 13, possession of a weapon without a permit,

4    five years, maximum.  They will run concurrent to each other.

5    So counts seven, eight, nine merge and will run concurrent to

6    the merge of 11 and 12 and 13.  So the total on that would be

7    life imprisonment with 40 years period of parole and

8    eligibility.

9          MR. WEICHSEL:  Forty, judge?

10         THE COURT:  Yeah; 30 for the life -- I'm sorry, no

11   it's -- that would be 30 years.  Life with 30 stip --

12   stipulation.

13         And then count ten.  Count ten has a statute

14   specifically and the Legislature has addressed that if someone

15   is kidnapped and they are murdered there's a separate and

16   distinct consecutive sentence.  And for that count -- count

17   ten, the kidnapping with the murder of Mr. Polites, you are

18   hereby sentenced to the 30 year sentence with ten year period

19   of parole and eligibility as aggravating factors substantially

20   outweigh the mitigating factors.

21         The totality of this sentence then is -- well let me

22   just get this right.  We have 30 with ten, we have life plus 30

23   -- I'm sorry, there's a -- the 30 year sentence with no stip on

24   count -- count ten which is running consec -- consecutive.

25         The totality of the sentence then is life plus 60

1   years with 40 years period of parole and eligibility.  Thirty

2   years with ten years period of parole and eligibility for the

3   crimes involving Mr. Hippman.  They are to run consecutive to

4   the crimes involving the -- Mr. Polites. They are two separate

5   days, distinct and separate acts and the court finds that a

6   consecutive sentence is appropriate.  And for the Polites

7   murder and crimes the court is imposing a life sentence plus 30

8   years for the kidnapping and a 30 year period of parole and

9   eligibility. They are running con -- consecutive to the

10  Hippman, so therefore the totality of the sentence accrued is

11  life imprisonment plus 60 years with 40 years stip.

12          And there's a victims of violent crimes compensation

13  penalty, $75 for each of the offenses, I'll work that figure

14  out with the merges involved, and $2,500 total of victims of

15  violent crimes compensation, and I'll proportion those out.

16          Now, Ms. Farthing, you're going to have 45 days to

17  appeal not only the sentence but also the trial and -- in this

18  matter, but you have 45 days to do that from today, when I

19  impose the sentence.  So from the day I sign it, the judgment

20  of conviction, which should be a few days.

21          I'm going to give you credit now because you've been

22  in jail for 874 days; you'll get credit for that time.

23          Anything else?

24          MS. BAGLIVI:  Judge, I think there's actually one

25  more week, because this is to -- from the 7th, I had to --

1           THE COURT:  Oh yeah, all right, that's correct; add

2     seven days to that; seven --

3           MR. WEICHSEL:  Eight eighty nine.

4           MS. BAGLIVI:  Eight eighty nine.

5           THE COURT:  Eight eight one; it's 881; 881 days

6     credit.

7           MS. BAGLIVI:  And, judge, there's also a safe

8     neighborhoods things.  You gave the --

9           THE COURT:  Seventy five dollars --

10          MS. BAGLIVI:  Oh, you said that?

11          THE COURT:  I said that.

12          MS. BAGLIVI:  Okay.

13          THE COURT:  And I'll proportion it out to the

14    sentences.

15          MS. BAGLIVI:  Yes.

16          THE COURT:  There's been a change on the merge,

17    that's why I just -- I'll work that out.

18          MS. BAGLIVI:  Okay.

19          THE COURT:  Anything else?

20          MS. BAGLIVI:  No, there's no dismissals.

21          THE COURT:  Mr. Weichsel?

22          MR. WEICHSEL:  No, judge.

23          THE COURT:  All right, good luck.

24          MS. BAGLIVI:  Thank you, Your Honor.

25                    *          *          *

## CERTIFICATION

I, Dolores Hastings, the assigned transcriber, do hereby certify the foregoing transcript of proceedings in the Bergen County Superior Court, Law Division, Criminal Part, on February 14, 1997, on tape number 28-97, index number from 05:02:00 to 1:05:03, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

_____          _____417_____

Dolores Hastings                                          AOC Number

KEMCO TRANS, INC.                                7/4/97

Agency Name                                              Date